# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**CHEVRON MINING, INC.,**

Plaintiff,

v.                                          No. 13-CV-00328 MCA-KK

**UNITED STATES OF AMERICA,
UNITED STATES DEPARTMENT OF
THE INTERIOR, UNITED STATES
DEPARTMENT OF AGRICULTURE,**

Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Defendants' Motion to Dismiss and Memorandum in Support* [Doc. 30] and *Defendants' Partial Motion to Dismiss and Memorandum in Support* [Doc. 40].  Having considered the parties' submissions, the relevant case law, and otherwise being fully advised in the premises, the Court will deny as moot *Defendants' Motion to Dismiss and Memorandum in Support* [Doc. 30] and grant in part and deny in part *Defendants' Partial Motion to Dismiss and Memorandum in Support* [Doc. 40].

## I.      BACKGROUND

The *First Amended Complaint* alleges the following relevant facts.  [Doc. 32] Molybdenum Corporation of America, later named Molycorp., Inc., (collectively referred

1

to as "Molycorp") was an independent mining company that operated a molybdenum mine near the village of Questa, in Taos County, New Mexico (hereinafter referred to as "the Questa Site" or "the Questa mine") from 1919 to 1977.  [Doc. 32 at 1]   During the early part of the century, the Questa Mine, which was made up of patented and unpatented mining claims and mill sites on federal lands, was one of only two primary molybdenum mines in the nation.  [Id. at 4]  In 1958, after a period of declining production, underground mining at the Questa Mine ceased due to the complete exhaustion of accessible ore.  [Id.]

In an attempt to revitalize the Questa Mine and ensure a ready domestic supply of molybdenum, a strategic mineral deemed critical to national security, the federal government helped finance further mineral exploration.  Throughout the 1960s, the United States continued to provide vital assistance to ensure the Mine's continued operation, including the discretionary conveyance of lands necessary for the disposal of hundreds of millions of tons of mine waste.  [Id.]

In 1977, the Union Oil Company of California (UNOCAL) acquired Molycorp, which continued operating the Questa Mine until 2005, when UNOCAL merged with Chevron Corporation.  [Id. at 5]  Plaintiff Chevron Mining, Inc. is an indirect subsidiary of Chevron Corporation.  [Id.]

In 2000, the State of New Mexico requested that the United States Environmental Protection Agency (EPA) place the Questa Site on the National Priorities List (NPL). [Id. at 27]  On November 6, 2000, the EPA issued a Special Notice Letter to Molycorp requesting that Molycorp perform and finance a Remedial Investigation/Feasibility Study

(RI/FS) at the Questa Site.  Molycorp agreed and in September 2001 the EPA and Molycorp entered into an "Administrative Order on Consent for Remedial Investigation/Feasibility Study" ("2001 Administrative Order").  [Id.; Doc. 52-1] Molycorp conducted the RI/FS from 2001 to 2009 and also undertook certain removal and reclamation activities at the Questa Site.  [Doc. 32 at 28]

On December 20, 2010, the EPA issued a Record of Decision ("ROD") identifying the selected remedy for the Questa Site, based in part on the information developed in the RI/FS.  The EPA estimated that the total cost of its selected remedy was between $516,602,000 to $882,557,000, not including the removal and RI/FS costs incurred by Plaintiff.  [Id.]

In September 2011, the EPA listed the Questa Site on the NPL.  76 Fed. Reg. 57,662 (September 16, 2011).  [Id.]

In March 2012, Plaintiff and the EPA entered into an "Administrative Settlement Agreement and Order on Consent for Removal Actions" ("March 2012 Administrative Settlement").  [Id.; Doc. 52-3]  Under the March 2012 Administrative Settlement, Plaintiff agreed to undertake certain non-time-critical removal actions to implement the selected remedy established in the ROD.  [Doc. 32 at 28]

In September 2012, Plaintiff and the EPA entered into an "Administrative Settlement Agreement and Order on Consent for Early Design Actions" ("September 2012 Administrative Settlement").  [Id.; Doc. 52-5]  Under the September 2012 Administrative Settlement, Plaintiff agreed to undertake certain "Early Design Actions" further implementing the selected remedy in the ROD.  [Doc. 32 at 29]

3

On April 5, 2013, Plaintiff filed a *Complaint* against the United States of America, the United States Department of the Interior, and the United States Department of Agriculture (collectively referred to as "Defendants"), which raised the following claims: (1) cost recovery under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§9607(a)(1), (2), (4)(B), based on Defendants' alleged ownership of lands that are now part of the Questa Site; (2) cost recovery under CERCLA §§ 9607(a)(3), (4)(B), based on Defendants' alleged liability as an arranger for the disposal of hazardous substances at the Questa Site; (3) in the alternative, cost contribution under CERCLA § 9613(f)(1), based on Defendants' alleged liability as an owner of the Questa Site and arranger for the disposal of hazardous substances at the Questa Site; and (4) declaratory judgment under CERCLA § 9613(g)(2) and the Declaratory Judgment Act, § 28 U.S.C. § 2201, based on Defendants' alleged liability as both an owner of the Questa Site and arranger for the disposal of hazardous substances at the Questa Site.  [Doc. 1 at 30-33]

On July 10, 2013, Defendants filed *Defendants' Motion to Dismiss and Memorandum in Support* [Doc. 30], alleging that Plaintiff's Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1) because: (1) Plaintiff "cannot proceed under CERCLA section 107(a)(4)(B) because it entered into administrative settlements with the United States, and therefore, as a matter of law, [Plaintiff] is limited to pursuing only a claim for contribution under section 113(f)(3)(B)"; (2) Plaintiff is prohibited "from pursuing a contribution claim under section 113(f)(1) because [it] has not alleged that it was, or is, subject to a civil action under CERCLA section 106 or

section 107(a)"; and (2) Plaintiff "cannot seek declaratory relief from the Court under

CERCLA section 113(g)(2) or the Declaratory Judgment Act, 28 U.S.C. § 2201, because

[it] has not asserted a valid substantive CERCLA cause of action upon which the Court

may grant a declaratory judgment, and the Court lacks subject matter jurisdiction to grant

declaratory relief under the Declaratory Judgment Act."  [Doc. 30 at 2-3]

In response, Plaintiff filed the *First Amended Complaint* [Doc. 32], which raised

the same claims as were raised in the *Amended Complaint*, but added an additional claim

for cost contribution under 42 U.S.C. § 9613(f)(3)(B) in Count III.  [Doc. 32 at 31-32]

Defendants then filed *Defendants' Partial Motion to Dismiss and Memorandum in*

*Support* [Doc. 40], which moved to dismiss Plaintiff's claims under section 107(a) and

section 113(f)(1) for the same reasons raised in the prior motion to dismiss, but conceded

"solely for purposes of this Motion, [that Plaintiff] has, or at one time had, a claim

against the United States under CERCLA section 113(f)(3)(B) (Count III) because it

entered into administrative settlements with the United States concerning the Questa

Site."  [Doc. 40 at 2-3]

## II.   STANDARD

A court will dismiss a complaint for "failure to state a claim upon which relief can

be granted."  Fed. R. Civ. P. 12(b)(6).  For decades, Rule 12(b)(6) motions were

governed by a test taken from Conley v. Gibson, 355 U.S. 41, 45-46 (1957):  a complaint

was subject to dismissal pursuant to Rule 12(b)(6) only where "it appears beyond doubt

that the plaintiff can prove no set of facts in support of his claim which would entitle him

to relief."  Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1214 (10th Cir. 2011)

(quoting <u>Conley</u>, 355 U.S. at 45-46) (internal quotation marks omitted).  <u>In Bell Atlantic</u>

<u>Corporation v. Twombly</u>, 550 U.S. 544, 570 (2007), the Court retired <u>Conley</u>'s test,

replacing it with a new standard:  "to withstand a motion to dismiss, a complaint must

have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible

on its face.'"  <u>Collins</u>, 656 F.3d at 1214 (quoting <u>Twombly</u>, 550 U.S. at 570)).  In

applying this standard, a court accepts as true all "plausible, non-conclusory, and non-

speculative" facts alleged in the plaintiff's complaint.  <u>Shrader v. Biddinger</u>, 633 F.3d

1235, 1239 (10th Cir. 2011) (internal quotation marks and citation omitted).  However,

"the tenet that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

Moreover, "'a formulaic recitation of the elements of a cause of action' will not suffice; a

plaintiff must offer specific factual allegations to support each claim" that "raise a right to

relief above the speculative level.'"  <u>Collins</u>, 656 F.3d at 1214 (quoting <u>Twombly</u>, 550

U.S. at 555).  In short, in ruling on a 12(b)(6) motion, "a court should disregard all

conclusory statements of law and consider whether the remaining specific factual

allegations, if assumed to be true, plausibly suggest the defendant is liable."  <u>Collins</u>, 656

F.3d at 1214.

　　　　"Generally, the sufficiency of a complaint must rest on its contents alone."  <u>Gee v.</u>

<u>Pacheco</u>, 627 F.3d 1178, 1186 (10th Cir. 2010).

> There are exceptions to this restriction on what the court can
> consider, but they are quite limited: (1) documents that the
> complaint incorporates by reference, (2) documents referred
> to in the complaint if the documents are central to the
> plaintiff's claim and the parties do not dispute the documents'

> authenticity, and (3) matters of which a court may take
> judicial notice . . .

Id. (internal quotation marks and citations omitted).  "If a district court intends to rely on other evidence, it must convert the Rule 12(b)(6) motion to a motion for summary judgment, giving proper notice to the parties. See Fed. R. Civ .P. 12(d)."  Id.

The 2001 Administrative Order, March 2012 Administrative Settlement, and September 2012 Administrative Settlement are referred to in the *First Amended Complaint*, are central to Plaintiff's cost contribution claims under sections 113(f)(1) and 113(f)(3)(B), and their authenticity is not in dispute.  Therefore, the Court will consider these documents in ruling on Defendants' Partial Motion to Dismiss.  See County of Santa Fe, N.M. v. Pub. Serv. Co. of New Mexico, 311 F.3d 1031, 1045 (10th Cir. 2002) (considering a document that was not attached to the complaint in ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) because "it is a document referred to in the complaint and it is a document that is central to the plaintiff's claim whose authenticity is not in dispute").

## III.   DISCUSSION

### A.   *Defendants' Motion to Dismiss and Memorandum in Support* [Doc. 30]

*Defendants' Motion to Dismiss and Memorandum in Support* [Doc. 30] was filed on July 10, 2013.  [Doc. 30]  Rather than responding to the motion to dismiss, Plaintiff filed its *First Amended Complaint* [Doc. 32] on July 18, 2013.  Rule 15 of the Federal Rules of Civil Procedure provides, in relevant part, as follows:

> A party may amend its pleading once as a matter of course
> within:

(A) 21 days after serving it, or

(B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

Fed. R. Civ. P. 15(a)(1).  Because Plaintiff timely amended its complaint eight days after the service of Defendant's Motion to Dismiss, Defendants' Motion to Dismiss the original complaint will be denied as moot.

B.      *Defendants' Partial Motion to Dismiss and Memorandum in Support* [Doc. 40]

"Congress enacted CERCLA to facilitate the expeditious cleanup of environmental contamination caused by hazardous waste releases . . . and to establish a financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." Young v. United States, 394 F.3d 858, 862 (10th Cir. 2005) (internal quotation marks and citations omitted).  "Thus, the twin aims of CERCLA are to cleanup hazardous waste sites and impose the costs of such cleanup on parties responsible for the contamination."  Id.

"CERCLA encourage[s] private parties to assume the financial responsibility of cleanup by allowing them to seek recovery from others." Id. (internal quotation marks and citations omitted).  "Specifically, CERCLA provides two types of legal actions by which parties can recoup some or all of their costs associated with hazardous waste cleanup: cost recovery actions under § 107(a), 42 U.S.C. § 9607(a), and contribution actions under § 113(f), 42 U.S.C. § 9613(f)."  Id. (internal quotation marks and citations omitted).

In United States v. Atlantic Research Corp., 551 U.S. 128 (2007), the United States Supreme Court discussed the relationship between these "two 'clearly distinct' remedies." Id. at 138.   A contribution action under § 113(f) "is contingent upon an inequitable distribution of common liability among liable parties," whereas a cost recovery action under § 107 "permits a [potentially responsible party] PRP to recover only the costs it has 'incurred' in cleaning up a site" "without any establishment of liability to a third party." Id. at 139.   Therefore, "the remedies available in §§ 107(a) and 113(f) complement each other by providing causes of action to persons in different procedural circumstances." Id. (internal quotation marks and citations omitted). However, this does not mean that § 107(a) and § 113(f) "have no overlap at all." Id. at 139 n.6.

> For instance, we recognize that a PRP may sustain expenses pursuant to a consent decree following a suit under § 106 or § 107(a). See, e.g., United Technologies Corp. v. Browning–Ferris Industries, Inc., 33 F.3d 96, 97 (C.A.1 1994). In such a case, the PRP does not incur costs voluntarily but does not reimburse the costs of another party. We do not decide whether these compelled costs of response are recoverable under § 113(f), § 107(a), or both. For our purposes, it suffices to demonstrate that costs incurred voluntarily are recoverable only by way of § 107(a)(4)(B), and costs of reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under § 113(f). Thus, at a minimum, neither remedy swallows the other . . . .

Id.

   Despite the Supreme Court's acknowledgment of a possible overlap between the remedies provided in § 107(a) and § 113(f), "[m]ost circuits, after Atlantic Research, have not allowed a plaintiff to pursue a cost recovery claim when a contribution claim is

available." Bernstein v. Bankert, 733 F.3d 190, 204 (2013); see Hobart Corp. v. Waste

Mgmt. of Ohio, Inc., 758 F.3d 757, 767 (6th Cir. 2014) (holding that "it is sensible and

consistent with the text to read § 113(f)'s enabling language to mean that if a party is able

to bring a contribution action, it must do so under § 113(f), rather than § 107(a)");

Solutia, Inc. v. McWane, Inc., 672 F.3d 1230, 1237 (11th Cir. 2012) (agreeing "with our

sister circuits that we must deny the availability of a § 107(a) remedy" when a § 113(f)

remedy is available); Morrison Enter., LLC v. Dravo Corp., 638 F.3d 594, 603 (8th Cir.

2011) (holding that "§ 113(f) provides the exclusive remedy for a liable party compelled

to incur response costs pursuant to an administrative or judicially approved settlement

under §§ 106 or 107"); Agere Sys. v. Advanced Envtl. Tech. Corp., 602 F.3d 204, 229

(3rd Cir. 2010) (holding that plaintiffs "who if permitted to bring a § 107(a) claim would

be shielded from contribution counterclaims under § 113(f)(2), do not have any § 107(a)

claims for costs incurred pursuant to consent decrees in a CERCLA suit"); Niagara

Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 128 (2d Cir. 2010) ("To

allow NiMo to proceed under § 107(a) would in effect nullify the SARA amendment and

abrogate the requirements Congress placed on contribution claims under § 113.").

> First, courts have noted that, despite its passing
> acknowledgment of a possible overlap in Atlantic Research,
> the Supreme Court has repeatedly emphasized the procedural
> "distinctness" of the CERCLA rights of action. See, e.g., 551
> U.S. at 138, 127 S.Ct. 2331; Niagara Mohawk, 596 F.3d at
> 128; ITT Indus., 506 F.3d at 458. Second, some courts have
> concluded that permitting a party who has already resolved
> his own liability through a settlement to pursue a §
> 9607(a)(4)(B) action would allow him to exploit CERCLA's
> "contribution bar" provision to shift full liability onto the

> target of his suit, a result antithetical to the purpose of the statute. See, e.g., Solutia, 672 F.3d at 1237; Agere Sys., Inc., 602 F.3d at 228-229.

Bernstein, 733 F.3d at 205.

Our Tenth Circuit Court of Appeals has not yet considered, subsequent to Atlantic Research, whether a plaintiff with a § 113(f) cost contribution claim may also pursue a § 107(a) cost recovery claim. However, prior to Atlantic Research, in United States v. Colorado & E. R.R. Co., 50 F.3d 1530 (10th Cir. 1995), the Court "clarif[ied] the relationship between cost recovery and contribution actions; specifically, who can recover under each provision." Id. at 1535. The Court held that "any claim that would reapportion costs between [PRPs] is the quintessential claim for contribution," and that if a PRP was allowed "to recover expenditures incurred in cleanup and remediation from other PRPs under § 107's strict liability scheme, § 113(f) would be rendered meaningless."[1] Id. at 1536. Therefore, because the plaintiff had a cost contribution claim under § 113(f), the "the district court erred in proceeding under § 107." Id. Since Colorado & E. R.R. Co., the Tenth Circuit has repeatedly reaffirmed the principle that a PRP with a cost contribution claim under § 113(f) is barred from also pursuing a cost recovery claim under § 107(a). See Sun Co., Inc. v. Browning-Ferris, Inc., 124 F.3d 1187, 1190 (10th Cir. 1997) (exploring the relationship between § 107(a) and § 113(f) and holding that a PRP with a cost contribution claim under § 113(f) cannot pursue a cost recovery action under § 107(a)); Young, 394 F.3d at 862 (noting "the rule in this Circuit

---

[1] The Court recognizes that, to the extent that Colorado & E. R.R. Co. and its progeny hold that a PRP can never pursue a cost recovery action against another PRP under § 107(a), these cases have been overruled by Atlantic Research Corp. See Atlantic Research, 551 U.S. at 141 (holding that "the plain terms of § 107(a)(4)(B) allow a PRP to recover costs from other PRPs").

that a Plaintiff–PRP must proceed under the contribution provisions of CERCLA § 113(f) when the Plaintiff–PRP sues another PRP for response costs").  "The court sees no reason to believe that the Tenth Circuit would hold otherwise post-Atlantic Research."  Cyprus Amax Minerals Co. v. TCI Pacific Commc'n, Inc., No. 11-CV-0252-JED-PJC, 2013 WL 6238485, at *5 (N.D. Okla. Dec. 3, 2013).  Accordingly, Plaintiff is prohibited from pursuing a cost recovery claim under § 107(a) if it has a valid cost contribution claim under § 113(f).

Despite the guidance provided by Atlantic Research, "navigating the interplay between § 107(a) and § 113(f) remains a deeply difficult task."  Agere Sys., 602 F.3d at 218.

> The best help that the Court has given us is to say that "costs incurred voluntarily are recoverable only by way of § 107(a)(4)(B), and costs of reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under § 113(f)." Id. at 139–40 n. 6, 127 S.Ct. 2331. Problems arise, as the Court foresaw, when PRPs do not voluntarily incur expenses or involuntarily reimburse another entity—the dichotomy upon which the Court's divide seems to operate. See id.; see also Bernstein, 733 F.3d at 208–09 (taking issue with the voluntary/involuntary dividing line).

Hobart Corp., 758 F.3d at 766-67 (footnote omitted).  For example, in the present case, Plaintiff voluntarily paid for the RI/FS, certain non-time-critical removal actions, and early design actions, but only because it was obligated to do so under the 2001 Administrative Order, March 2012 Administrative Settlement, and September 2012 Administrative Settlement, respectively.  "PRPs in such situations find themselves in the twilight between a core § 107 cost-recovery action and a core § 113 contribution action."

Id. at 767.  "The fact that [Plaintiff] directly incurred expenses suggests that [it] could seek cost recovery under § 107(a)(4)(B), while the existence of the administrative settlement seems to indicate that [it is] eligible only to bring a contribution action under § 113(f) . . . ."  Id.

To resolve the Partial Motion to Dismiss, the Court must determine whether Plaintiff has a cost contribution action under Section 113(f), which provides for relief: (1) "during or following any civil action under" § 106 or § 107(a), § 113(f)(1) and (2) after "an administrative or judicially approved settlement" that resolves "liability to the United States or a State for some or all of a response action or for some or all of the costs of such an action," § 113(f)(3)(B).   The Court will address each of these statutory subsections, in turn.

*1.*       *§ 113(f)(1)—Civil Action*

Defendants' move to dismiss Plaintiff's claim for cost contribution under § 113(f)(1), because the *First Amended Complaint* fails to allege that Plaintiff was subject to a civil action under § 106 or § 107(a).  [Doc. 40 at 25]  The *First Amended Complaint* alleges that the 2001 Administrative Order, March 2012 Administrative Settlement, and September 2012 Administrative Settlement "provides [Plaintiff] with a contribution claim against the United States."  [Doc. 32 at 32]

Section 113(f)(1) provides, in relevant part, that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title."  42 U.S.C. § 9613(f)(1).  In Cooper Industries, Inc. v.

Aviall Services, Inc., 543 U.S. 157 (2004), the United States Supreme Court considered "whether a private party who has not been sued under § 106 or § 107(a) may nevertheless obtain contribution under § 113(f)(1) from other liable parties."  Id. at 161.  In that case, the plaintiff sought contribution from a joint PRP for environmental cleanup costs that it voluntarily had incurred.  Although the Texas Natural Resource Conservation Commission (Commission) had informed the plaintiff that it was violating state law, directed plaintiff to clean up the site, and threatened to pursue an enforcement action if the plaintiff failed to undertake remediation, neither the Commission nor the EPA ever "took judicial or administrative measures to compel cleanup."  Id. at 164.  The United States Supreme Court held that the plaintiff could not pursue a cost contribution action under § 113(f)(1) because the plain language of the statute "authorizes contribution claims only 'during or following' a civil action under § 106 or § 107(a)" and it was undisputed that the plaintiff had "never been subject to such an action."  Id. at 168.  In arriving at this conclusion, the Court noted that the plaintiff  had never "been subject to an administrative order under § 106" and, therefore, the Court "need not decide whether such an order would qualify as a 'civil action under section 9606 . . . or under section 9607(a)' of CERCLA." Id. at 168 n.5 (quoting § 9613(f)(1)).

Our Tenth Circuit Court of Appeals has not yet considered whether an administrative order qualifies as a "civil action" under § 106 or § 107(a) for the purpose of § 113(f)(1) and the parties have not briefed this issue.  In the absence of guidance from the parties, the Court will not resolve the difficult question, left open in Cooper Industries, Inc., of whether an administrative settlement constitutes a civil action.

14

Compare Carrier Corp. v. Piper, 460 F. Supp. 2d 827, 840-41 (W.D. Tenn. 2006) (holding that a unilateral administrative order constitutes a civil action under § 113(f)(1)), with Raytheon Aircraft Co. v. United States, 435 F. Supp. 2d 1136, 1142 (D. Kan. 2006) (holding that a unilateral administrative order does not constitute a civil action under § 113(f)(1)).  Therefore, Defendants' Partial Motion to Dismiss Plaintiff's § 113(f)(1) claim will be denied.

2.   *§ 113(f)(3)(B)—Administrative Settlement; Contract Interpretation*

Defendants next move to dismiss Plaintiff's § 107(a) cost recovery claims, alleging that Plaintiff "falls squarely within the procedural circumstances of section 113(f)(3)(B) because it entered into administrative settlements with EPA concerning the Questa site."  [Doc. 40 at 11]  Plaintiff responds that the 2001 Administrative Order, March 2012 Administrative Settlement, and September 2012 Administrative Settlement do not constitute "administrative settlements" that resolved its "liability to the United States" within the meaning of § 113(f)(3)(B).   [Doc. 46]

Section 113(f)(3)(B) provides as follows:

> A person who has resolved its liability to the United States or
> a State for some or all of a response action or for some or all
> of the costs of such action in an administrative or judicially
> approved settlement may seek contribution from any person
> who is not party to a settlement referred to in paragraph (2).

42 U.S.C. § 9613(f)(3)(B).  The question of whether the 2001 Administrative Order, March 2012 Administrative Settlement, or September 2012 Administrative Settlement constitute an administrative settlement that resolved Plaintiff's liability to the United States under § 113(f)(3)(B) is "a matter of contract interpretation."  NCR Corp., 768 F.3d

at 692; see also Hobart Corp., 758 F.3d at 768 ("In determining whether the ASAOC

resolves some of Appellants' liability, we interpret the settlement agreement as a contract

according to state-law principles."); Bernstein, 733 F.3d at 213-14 ("Whether or not

liability is resolved through a settlement simply is not the sort of question which can or

should be decided by universal rule.  Instead, it requires a look at the terms of the

settlement on a case-by-case basis.").  "The parties to a settlement may choose to

structure their contract so that liability is resolved immediately upon execution of the

contract. . . . Or, the parties may choose to leave the question of liability open . . . ."

Bernstein, 733 F.3d at 213-14 (citations omitted).

New Mexico has adopted "the contextual approach to contract interpretation, in

recognition of 'the difficulty of ascribing meaning and content to terms and expressions

in the absence of contextual understanding.'"  Mark V, Inc. v. Mellekas, 845 P.2d 1232,

1235 (N.M. 1993) (quoting C.R. Anthony Co. v. Loretto Mall Partners, 817 P.2d 238,

242 (N.M. 1991)).

> The question whether an agreement contains an ambiguity is
> a matter of law to be decided by the trial court. . . . The court
> may consider collateral evidence of the circumstances
> surrounding the execution of the agreement in determining
> whether the language of the agreement is unclear . . . . If the
> evidence presented is so plain that no reasonable person could
> hold any way but one, then the court may interpret the
> meaning as a matter of law. . . . If the court determines that
> the contract is reasonably and fairly susceptible of different
> constructions, an ambiguity exists. . .

Id. (internal quotation marks and citations omitted).  "Once the agreement is found to be

ambiguous, the meaning to be assigned the unclear terms is a question of fact."  Id. at

1235. "However, in the event the parties do not offer evidence of the facts and circumstances surrounding execution of the agreement and leading to conflicting interpretations as to its meaning, the court may resolve any ambiguity as a matter of law by interpreting the contract using accepted canons of contract construction and traditional rules of grammar and punctuation." Id. at 1236.

*i.*       *2001 Administrative Order*

The 2001 Administrative Order "requires that Molycorp  prepare and perform a remedial investigation and feasibility study (RI/FS) for the Molycorp, Inc., Site in Taos County, New Mexico (the "Site").  Molycorp must also reimburse EPA for all past response costs and all response costs incurred in connection with the RI/FS, subject to the reservations of rights in Sections XXV and XXVI."  [Doc. 52-1 at 2]   Section XXV, entitled "RESERVATIONS OF RIGHTS AND REIMBURSEMENT OF OTHER COSTS," provides as follows:

> 100.    EPA reserves the right to perform its own studies; to terminate, take over, or undertake activities required under this Consent Order in the event of deficient submissions or other nonperformance; to seek reimbursement for the costs of those actions; and to seek any other appropriate relief.  If EPA performs its own studies or terminates, takes over, or undertakes activities required under this Consent Order, those studies and activities will be conducted under CERCLA and will not be inconsistent with the NCP.  EPA will consult with Molycorp's Project Coordinator in advance regarding such studies and activities.

> 101.    EPA reserves the right to bring an action against Molycorp under Section 107 of CERCLA for recovery of all response costs, including oversight costs, incurred by the United States at the site that are not reimbursed by Molycorp, any costs incurred in the event EPA performs the RI/FS or

any part of it, and any future costs incurred by the United States in connection with response activities conducted under CERCLA at this Site.

102.    EPA reserves the right to bring an action against Molycorp to enforce the past costs and response and oversight cost reimbursement requirements of this Order, to collect stipulated penalties assessed pursuant to section XXI of this Order, and to seek penalties pursuant to Section 109 of CERCLA, 42 U.S.C. § 9609.

103.    Except as expressly provided in this Order, each party to this Order reserves all rights and defenses it may have. Nothing in this Order affects EPA's removal authority or EPA's response or enforcement authorities, including the right to seek injunctive relief, stipulated penalties, statutory penalties, and/or punitive damages.

104.    After satisfying the requirements of this Order, Molycorp will have resolved its liability to EPA for the work performed by Molycorp pursuant to this Order.  The activities conducted pursuant to this Order, if approved by EPA, will be considered consistent with the NCP.  Furthermore, Molycorp is entitled to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA for matters addressed in this Order.  The "matters addressed in this Order" are the work performed by Molycorp under the requirements of the Order and the costs paid by Molycorp pursuant to this Order.  Molycorp is not released from liability, if any, for any costs not paid by Molycorp pursuant to this order, or for response actions beyond the scope of this Order regarding removals, other operable units, remedial design/remedial action of this operable unit, or activities arising pursuant to Section 121(c) of CERCLA, 42 U.S.C. § 9621(c).

[Doc. 52-2 at 1]

Under the plain language of the Administrative Order, Plaintiff's liability to the

EPA is not resolved until "*after satisfying the requirements of this Order*."  [Id.

(emphasis added)]  Indeed, the EPA reserved the right "to perform its own studies; to

terminate, take over, or undertake activities required under this Consent Order in the event of deficient submissions or other nonperformance; to seek reimbursement for the costs of those actions; and to seek any other appropriate relief." [Id.] Furthermore, the EPA reserved the right to bring a cost recovery action against Plaintiff under § 107 "in the event EPA performs the RI/FS or any part of it . . . ." [Id.] )

It remains unclear, at this preliminary stage of the proceedings, whether Plaintiff has satisfied the requirements of the 2001 Administrative Order and thereby resolved its liability to the United States. See Bernstein, 733 F.3d at 204, 210-14 (holding that, under the plain terms of the Administrative Order on Consent (AOC), the respondents had not resolved their liability to the United States as required by § 113(f)(3)(B) until they had completed performance of their obligations under the AOC and obtained a notice of approval from the EPA). Because the Court cannot conclude on the state of the record before it that Plaintiff "has resolved its liability to the United States" as required by § 113(f)(3)(B), Defendants' Partial Motion to Dismiss will be denied with respect to the matters addressed in the 2001 Administrative Order.

ii.     *March 2012 and September 2012 Settlement Agreements*

The March 2012 and September 2012 Settlement Agreements, in contrast to the 2001 Administrative Order, are both specifically entitled "Settlement Agreement[s]". Furthermore, both agreements contain the following explanation regarding the effect of settlement and contribution:

> This Agreement constitutes an administrative settlement for purposes of CERCLA §§ 113(f)(2), 122(h)(4), 42 U.S.C. §§ 9613(f)(2), 9622(h)(4), and as of the Effective Date

> Respondent is entitled to protection from contribution actions
> or claims as provided by CERCLA § 113(f)(2), 122(h)(4), 42
> U.S.C. §§ 9613(f)(2), 9622(h)(4), or as may be otherwise
> provided by law for "matters addressed" in this Agreement.
> "Matters addressed" in this Agreement are the Work and
> Future Response Costs.  This Agreement constitutes an
> administrative settlement for purposes of CERCLA §
> 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B), pursuant to which
> Respondent has, as of the Effective Date, resolved its liability
> to EPA for the Work and Future Response Costs.

[Doc. 52-3 at 42; 52-5 at 46]  Additionally, the Agreements contain the following

covenant not to sue by the EPA:

> In consideration of the actions that will be performed and the
> payments that will be made by Respondent under the terms of
> this Agreement and except as otherwise specifically provided
> in this Agreement, EPA covenants not to sue or to take
> administrative action against Respondent pursuant to
> CERCLA § 106 or § 107(a), 42 U.S.C. § 9606 or § 9607(a),
> or SWDA § 7003, 42 U.S.C. § 6973, for the Work and Future
> Response Costs.  This covenant shall take effect on the
> Effective Date and is conditioned on Respondent's complete
> and satisfactory performance of all its obligations and
> responsibilities under this Agreement, including payment of
> Future response Costs pursuant to Section XV (Payment of
> Response Costs).  This covenant applies only to Respondent
> and not any other person.

[Doc. 52-3 at 38; Doc. 52-5 at 41]

Consistent with the plain language of the March 2012 and September 2012

Settlement Agreements, the Court concludes that these agreements constitute

administrative settlements under § 113(f)(3)(B), which resolved Plaintiff's liability to the

United States as of the Effective Date specified in the Agreements.  See Hobart, 758 F.3d

at 768-69 (holding that an administrative settlement, which not only "explicitly state[d]

that Appellants have resolved their liability, but . . . also cites the specific section of

CERCLA at issue here," namely, § 113(f)(3)(B), was "an administrative agreement within the meaning of § 113(f)(3)(B)); see also NCR Corp., 768 F.3d at 692 (holding that an administrative settlement that included covenants not to sue that took effect on the effective date of the agreement constituted an administrative agreement within the meaning of § 113(f)(3)(B)).  To resolve the question of whether Plaintiff's liability to the United States has been resolved in accordance with § 113(f)(3)(B), the Court turns to the Effective Date of the two respective Agreements.

The March 2012 Settlement Agreement provides that the "'Effective Date' shall be the date on which this Agreement is filed with the EPA Region 6 Hearing Clerk." [Doc. 52-3 at 6]  The Agreement further provides that "[t]his Agreement is effective upon filing with the EPA Region 6 hearing clerk.  EPA shall provide Respondent with a file-stamped copy of the Agreement by 5:00 p.m. (Central Time) on the date of filing."  [Doc. 52-3 at 50]  According to the file stamp on the March 2012 Settlement Agreement, the Agreement was filed with the "Regional Hearing Clerk EPA Region VI" on March 8, 2012 at 10:32 a.m.  [Doc. 52-3 at 2]  Because Plaintiff resolved its liability to the United States as of March 8, 2012,  as required by § 113(f)(3)(B), Defendants' Partial Motion to Dismiss will be granted with respect to the matters addressed in the March 2012 Settlement Agreement.

The Effective Date of the September 2012 Settlement Agreement "shall mean October 19th, 2012."  [Doc. 52-5 at 6]  Because Plaintiff resolved its liability to the United States as of October 19, 2012, as required by § 113(f)(3)(B), Defendants' Partial

Motion to Dismiss will be granted with respect to the matters addressed in the September 2012 Settlement Agreement.

### iii.   *"Matters Addressed"*

"[A] proper reading of section 113(f)(3)(B) is one that limits a plaintiff's right to contribution to those response costs for which it has resolved its liability in settlements with the United States or a State." Raytheon Aircraft Co. , 435 F. Supp. 2d at 1144. "Stated another way, the right to contribution under section 113(f)(3)(B) is defined by the scope of the liability resolved." Id. (citing Restatement (Third) of Torts, § 23 cmt. b)); see Colorado & E. R.R. Co., 50 F.3d at 1537-38 (taking a fact-specific approach to determine the "matters addressed" in a consent decree under § 113(f)); see also 42 U.S.C. § 9613(f)(2) ("A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution *regarding matters addressed in the settlement*.") (emphasis added). The Court emphasizes that Plaintiff's § 107(a) claim is dismissed only insofar as it seeks to recover costs for "matters addressed" in the March 2012 and September 2012 Settlement Agreements.[2]

## IV.   CONCLUSION

For the foregoing reasons, *Defendants' Motion to Dismiss and Memorandum in Support* [Doc. 30] will be denied as moot and *Defendants' Partial Motion to Dismiss and Memorandum in Support* [Doc. 40] will be granted in part and denied in part.

---

[2] The parties have not addressed in their briefs the scope of  "matters addressed", as that term is used  in the March 2012 and September 2012 Settlement Agreements and, therefore, the Court expresses no opinion on this issue.

Specifically, Defendants' Partial Motion to Dismiss will be denied to the extent that it seeks to dismiss Plaintiff's § 113(f)(1) claim and to the extent that it seeks to dismiss Plaintiff's § 107(a) claim for matters addressed in the 2001 Administrative Order. However, Defendants' Partial Motion to Dismiss will be granted to the extent that it seeks to dismiss Plaintiff's § 107(a) claim for matters addressed in the March 2012 and September 2012 Settlement Agreements.

**IT IS THEREFORE ORDERED** that *Defendants' Motion to Dismiss and Memorandum in Support* [Doc. 30] is **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that *Defendants' Partial Motion to Dismiss and Memorandum in Support* [Doc. 40] is **GRANTED IN PART AND DENIED IN PART**.

**SO ORDERED** this 31st day of March, 2015, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
Chief United States District Judge

23