# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**CHEVRON MINING, INC.,**

Plaintiff,

     v.                                       No. 13-CV-00328 MCA-KK

**UNITED STATES OF AMERICA,**
**UNITED STATES DEPARTMENT OF**
**THE INTERIOR, UNITED STATES**
**DEPARTMENT OF AGRICULTURE,**

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff Chevron Mining, Inc.'s *Motion for Partial Summary Judgment Regarding the United States' Ownership Liability* [Doc. 28]; Plaintiff's *Motion for Partial Summary Judgment Regarding the United States' Arranger Liability* [Doc. 29]; and *The United States' Cross Motion for Summary Judgment* [Doc. 87]. Oral argument on the motions was held on May 6, 2015. Having considered the parties' arguments and submissions, the relevant case law, and otherwise being fully advised in the premises, the Court grants the United States' Motion for Summary Judgment and denies Plaintiff's Motions for Summary Judgment.

1

## BACKGROUND

### *History of Mining at the Questa Site*

The Court considers the United States' Motion for Summary Judgment first (and ultimately grants the motion), and thus considers the facts in the light most favorable to CMI. *Dreiling v. Peugot Motors of Am.*, *Inc.*, 850 F.2d 1373, 1377 (10th Cir. 1988). To the extent that either party contests a supported material fact solely because it is immaterial or incomplete, without submitting any record support, the Court concludes that the party has failed to dispute the facts pursuant to Federal Rule of Civil Procedure 56(c)(1), and thus, such facts are not contested for the purposes of the pending Motions.

At the time this Complaint was filed, CMI operated a molybdenum mine near the village of Questa, in Taos County, New Mexico (hereinafter referred to as "the Questa Site" or "the Questa mine"). The Questa Site is composed of two distinct areas: 1) the mine and waste rock disposal area, approximately four miles east of the town of Questa, New Mexico, and 2) the tailings disposal area, approximately one mile west of the town of Questa. [Doc. 87, ¶ 1; Doc. 91, ¶ 1] From 1919 through the date the Complaint was filed, CMI or its predecessors, including Molycorp (collectively referred to as CMI), engaged in mining at the Questa Site. [Doc. 87, ¶¶ 5, 47; Doc. 91, ¶¶ 5, 47] Mining occurred in three distinct phases: 1) conventional underground mining from 1919 to 1958; 2) open-pit mining from 1964 to 1983; 3) and underground mining from 1983 through the time of briefing in this case. [Doc. 87, ¶ 4; Doc. 91, ¶ 4] During the first period of underground mining, approximately 150,000 tons of waste rock were produced. [Doc. 87, ¶ 6; Doc. 91, ¶ 6] During the period of open-pit mining, nearly 328 million tons

2

of waste rock and stockpiled rock were produced.  [Doc. 87, ¶ 30; Doc. 87-4 (U.S. Ex. 4); Doc. 91, ¶ 30]

In 1957, at around the time that the molybdenum supply accessible through the first stage of underground mining was dwindling, the Defense Minerals Exploration Administration (DMEA) of the United States and CMI entered into an Exploration Project Contract.  [Doc. 87, ¶ 8; Doc. 91, ¶ 8; Doc 28, ¶ 3]  The DMEA contract was in part driven by the United States' domestic molybdenum production goal.  [Doc. 28, ¶ 2; Doc. 88, ¶ 2]  Under this Contract, CMI was responsible for performing exploration, drilling, and sampling, and creating geologic maps, while the United States agreed to loan CMI funds for half of the expenditures of the work up to $255,250.  [Doc. 87, ¶ 8; Doc. 91, ¶ 8; Doc. 28, ¶ 4; Doc. 88, ¶ 4]  The Contract contained a "Description of Work;" all exploration work under the contract was subject to Government approval; and CMI was required to submit monthly progress reports.  [Doc. 28, ¶ 5; Doc. 88, ¶ 5]  CMI conducted additional exploration outside of the DMEA contract and was not precluded by the Government from doing so.  [Doc. 88, ¶ 5; Doc. 87, ¶ 7; Doc. 87-5, pp. 3-4 (U.S. Ex. 5); Doc. 91, ¶ 7]  Under the DMEA contract, the Government ultimately provided $200,340 to CMI, but CMI independently spent over $4,000,000 in exploration by 1964.  [Doc. 87, ¶¶ 12, 15; Doc. 87-4, pp. 3-4 (U.S. Ex. 4); Doc. 91, ¶¶ 12, 15; Doc. 87-3, p. 10 (U.S. Ex. 3)]  Pursuant to the contract, some of the land on which the exploration took place was held by CMI in fee, but much of it was held by CMI via unpatented claims, with the United States retaining title to the land.  [Doc. 28, ¶ 6; Doc. 88, ¶ 6]

The parties dispute whether the minerals ultimately found were found as a result of the exploration project or were "interconnected" with the exploration areas covered by the DMEA contract.  [Doc. 28, ¶ 8; Doc. 88, ¶ 8; Doc. 87, ¶¶ 10-16; Doc. 91, ¶¶ 10-16] Nonetheless, the United States stated in a "Certification by the United States of America of a Discovery or Development Under an Exploration Project Contract" that "discovery or development" of "molybdenite-bearing areas" "resulted from the exploration work" of the contract.  [Doc. 28-10 (CMI Ex. 10)]  The DMEA Exploration Contract ended on June 30, 1960.  [Doc. 87, ¶ 11; Doc. 91, ¶ 11]  In 1966, CMI made its final royalty payment to the United States under the DMEA contract, which required repayment via royalties if minerals were discovered.  [Doc. 28, ¶ 8; Doc. 88, ¶ 8; Doc. 87, ¶ 8; Doc. 91, ¶ 8]  Also by 1966, CMI had removed over 71,000,000 tons of overburden and had begun full-scale operation of the open-pit mine.  [Doc. 28, ¶ 8; Doc. 88, ¶ 8]

### History of Ownership of Relevant Land now part of the Questa Site

In 1961 CMI began efforts to obtain title to many parcels of land which it held via unpatented mining and mill site claims.  [Doc. 28, ¶ 9; Doc. 88, ¶ 9]  The United States agreed that bringing one of these parcels of land consisting of 454 acres to patent would "protect the Government's royalty interest in the property."  [Doc. 28, ¶¶ 9, 10; Doc. 88, ¶¶ 9, 10; Doc. 28-12 (CMI Ex. 12); Doc. 28-13 (CMI Ex. 13)] These 454 acres of land were patented to CMI in 1970.  [Doc. 28, ¶ 10; Doc. 88, ¶ 10]  Prior to that time, CMI had deposited waste rock on this land which it held pursuant to unpatented mining claims.  [Id.]  The United States was aware that waste rock had been deposited, as shown by a Survey conducted by the Bureau of Land Management, which identified certain

4

tracts of land by parts of the waste dumps.  [Doc. 28, ¶ 10(a); Doc. 28-16, pp. 4-6 (CMI

Ex. 16); Doc. 88, ¶ 10(a)]

In early 1969, CMI officials and personnel from the "Regional Office Lands"

discussed the matter of either patenting additional tracts of land or engaging in a land

exchange by which CMI would acquire 2,226.39 acres of National Forest lands adjacent

to the open-pit which had, in part, already been used for waste rock disposal.  [Doc. 28,

¶ 11; Doc. 88, ¶ 11; Doc. 28-17 (CMI Ex. 17); Doc. 28-18 (CMI Ex. 18)]   CMI and

various Government officials met, corresponded, and negotiated regarding the matter,

which ended in the land exchange.  [Doc. 28-18 (CMI Ex. 18); Doc. 29-1 (CMI Ex. 19)]

During the process leading up to the land exchange, an Assistant Regional Forester

indicated by letter that the property CMI wished to acquire was held by unpatented

mining and mill site claims.  With regard to the mining claims, he suggested that CMI

had two options:  either CMI relinquish the mining claims to the United States or the

United States would have "to contest the claims through the usual Bureau of Land

Management procedures."  [Doc. 28-17, p. 1 (CMI Ex. 17)]   The Forester stated:

"Because of the time involved in these procedures, most exchange proponents prefer the

first suggested means of clearing the claims."  [Doc. 28-17, p. 1 (CMI Ex. 17)]   With

regard to the mill site claims, the Forester stated:

> [O]ur attorney has not been able to determine whether mill site claims can
> properly be used for mine waste dumps. . . .
>
> We recognize that sufficient land adjacent to the mine for waste dumps
> must be made available to [CMI] by some means.  However, since there is
> an area of about 2,400 acres of National Forest land involved, we believe it
> necessary to initiate a friendly validity contest to determine if mill site

claims or mining claims can be located solely for the purpose of mine waste disposal, if Molycorp intends to hold the land under the mining laws.

We will be glad to proceed with an exchange if this is the Company's decision.

[Doc. 28-17, pp. 1-2 (CMI Ex. 17)]  CMI relinquished the unpatented mining and mill site claims, and the United States held them in "informal escrow" so that the land exchange could proceed.  [Doc. 28-18, p. 2 (CMI Ex. 18)]  The Regional Forest Service also indicated by letter that various governmental agencies disagreed whether "a large series of millsites can be patented for dumping purposes."  [Doc. 28-18, p. 1 (CMI Ex. 18)]  However, this letter indicates that, though "the court decisions and Land Department rulings applicable to this use are conflicting and inconclusive," the question was never answered because CMI elected to move forward with the land exchange. [Doc. 28-18, p. 2 (CMI Ex. 18)]

In 1972, the Forest Service conducted an environmental analysis of the land which was ultimately exchanged.  [Doc. 29-2 (CMI Ex. 20)]  This report stated that:

The open pit operation moves 60 to 70 thousand tons of ore and waste per 8-hour shift.  Eight parts of this volume are waste which must be dumped outside the periphery of the pit operation. . . . The selected lands will be the final area of disposal for a part of the nonmineral overburden.

[Doc. 29-2, p. 3 (CMI Ex. 20)]  This report also observed that there were naturally existing hydrothermal formations on some of the land CMI sought to acquire, which were causing mudflows, which in turn dumped sediment into the Red River and also crossed State Highway 38, requiring costly cleanup.  [Doc. 29-2, pp. 4, 5 (CMI Ex. 20)]  The report stated that CMI was dumping overburden onto these hydrothermal formations, and

that a positive environmental effect would be that the sediment load into the Red River would likely be reduced by 30 to 40% and the overburden would prevent the mud flows onto the Highway, thereby saving taxpayers money.  [Doc. 29-2, p. 5 (CMI Ex. 20)]  This same report noted that the adverse environmental effects already occurring were "not the result of the exchange proposal, but from the mining activity, itself.   The mining activities will still continue on the patented mining claims or on mill sites and are not dependent upon approval or disapproval of this land exchange proposal."  [Doc. 29-2, p. 5 CMI Ex. 20)]  This report reviewed alternatives to the proposed action.  One proposal, which was "vigorously opposed by the Forest Service and ecologist groups," would have involved CMI dumping the waste rock at a different location, which would have required rerouting Highway 38, diverting Red River, and would have caused tremendous "impact on the environment and ecology of Red River Canyon."  [Doc. 29-2, p. 6 (CMI Ex. 20)] Another option discussed was to "prohibit the dump on National Forest land," but the report recognized that CMI had "every right to use mill sites for waste disposal areas, and economics would force them to follow this route rather than transport the large volume of overburden 8-10 miles to a site outside the National Forest."  [Doc. 29-2, p. 6 (CMI Ex. 20)]  Ultimately, the report recommended approval of the land exchange.  [Doc. 29-2, p. 7 (CMI Ex. 20)]   The land was exchanged in 1974 pursuant to the United States discretionary authority under the General Exchange Act of March 20, 1922.  [Doc. 29, ¶ 10]

CMI's former mine manager estimated that prior to the finalization of the 1974 Land Exchange, CMI had disposed of approximately 80% of the waste rock ultimately

dumped into the piles on the exchanged land.  [Doc. 87, ¶ 59]  The Government concedes that it was aware that CMI had already disposed of waste rock on the exchanged land prior to the finalization of the Land Exchange in 1974.  [Doc. 87, ¶ 60]

In 1965, CMI sought to purchase a 627 acre tract from the United States "for the purpose of constructing a dam across the arroyo it embraces to provide a tailings pond for their molybdenum mining operation."  [Doc. 29-7, p. 2 (CMI Ex. 25); Doc. 29, ¶ 12]  Milling, the process by which molybdenum is extracted from rock, produces "tailings," which included finely ground rock and water.  [Doc. 87, ¶ 31; Doc. 91, ¶ 31]  The United States conducted an appraisal, in which it stated that the lands were "greatly needed as a tailings pond.  The existing mill site claims held by the applicant should be relinquished before notice of publication goes out from the Land Office."  [Doc. 29-7, p. 4 (CMI Ex. 25)]  In this appraisal report, the appraiser reported that CMI was already constructing a dam on an adjoining parcel of land, previously purchased from the United States, and when that tailings pond became full the intent was to use this 627 acre tract of land for a second tailings pond.  [Doc. 29-7, p. 2 (CMI Ex. 25)]  The report concluded that, given the "urgent need of the applicant for the subject tract" and the "resulting economic benefit to the general area," the highest and best use for the land was for a tailings pond, while the alternative use was grazing.  [Doc. 29-7, p. 7 (CMI Ex. 25)]  Thus, the report recommended that the land be classified for sale at public auction.  [Doc. 29-7, p. 4 (CMI Ex. 25)]  It was, and CMI purchased the 627 acre tract of land from the United States in 1966.  [Doc. 29-8 (CMI Ex. 26)]

In 1977, CMI applied for patents for more than 100 additional acres of land in the tailings area, which CMI stated was "presently being occupied and used to receive tailings from the mill which processes ore from patented and unpatented lode mining claims." [Doc. 28, ¶ 12; Doc. 29-10 (CMI Ex. 28); Doc. 29-9, p. 2 (CMI Ex. 27)]  The United States disputes that CMI dumped tailings onto this 100 acres of land prior to the United States patenting such land to CMI.  [Doc. 88, ¶ 12]  The United States asserts that CMI only produced evidence that it dumped tailings onto land in the tailings area which it already held in fee simple.  [Doc. 88, ¶ 12]  However, viewing the evidence in the light most favorable to CMI for purposes of summary judgment, there is evidence that CMI was dumping tailings onto land to which the United States held legal title prior to the United States issuing patents to CMI for such land.  [Doc. 29-9, p. 2 (CMI Ex. 27); Doc. 29-10, p. 2 (CMI Ex. 28); Doc. 29-11, p. 2 (CMI Ex. 29); Doc. 91-14, p. 2 (CMI Ex. 52)]  For example, in its patent application for the mill sites, CMI stated:  "The mill site claims are being used for waste disposal from these [open-pit mining] operations."  [Doc. 28, ¶ 12; Doc. 28-9, p. 2 (CMI Ex. 9); Doc. 29-11, p. 2 (CMI Ex. 29)]  By 2014, over 100 million tons of tailings were deposited at the tailings area.  [Doc. 87, ¶ 37; Doc. 87-2 (U.S. Ex. 2); Doc. 91, ¶ 37]

In the 1920's, some land near the Questa Mine had been withdrawn from mineral exploration and development so that it could be used for the development of a water power project.  [Doc. 29, ¶ 4]  In 1968, CMI applied to the Federal Power Commission to vacate that withdrawal so that CMI could obtain title to that land and use it for mining purposes.  [Doc. 29, ¶ 4]  The Federal Power Commission vacated the withdrawal, and

indicated in a Geologic Survey that the "greater public benefit" would come from using the land for the mining operation than for the water power development. [Doc. 29, ¶ 4]

Finally, in 1965 the United States issued "Special Use Permits" allowing CMI to build pipelines to transport the tailings from the Questa Mine to the tailings disposal area. [Doc. 29, ¶ 15; Doc. 89, ¶15] These pipelines crossed 4.271 miles of National Forest land. [Doc. 29, ¶ 15; Doc. 89, ¶15]

### *Procedural History of this Case*

The United States put the Questa Site on the National Priorities List. [Doc. 87-2, p. 1 (U.S. Ex. 2)] In September 2001 the EPA and CMI entered into an "Administrative Order on Consent for Remedial Investigation/Feasibility Study" ("2001 Administrative Order"). [Doc. 52-1] Therein, the parties agreed that the Site is a facility under CERCLA; CMI is a person and the current owner and operator under CERCLA; and that CMI "caused the release of hazardous substances into the air, soil, surface water, and ground water at the Site." [Doc. 28, ¶ 14; Doc. 52-1, p. 11, ¶¶ 27-32] CMI conducted the Remedial Investigation/Feasibility Study ("RI/FS") from 2001 to 2009 and also undertook certain removal and reclamation activities at the Questa Site. [*See* Doc. 32, ¶¶ 119-122] On December 20, 2010, the EPA issued a Record of Decision ("ROD") identifying the selected remedy for the Questa Site, based in part on the information developed in the RI/FS. [Doc. 52-3, p. 52] The EPA estimated that the total cost of its selected remedy was between $516,602,000 to $882,557,000, not including the removal and RI/FS costs incurred by Plaintiff. [Doc. 28, ¶ 15; Doc. 88, ¶ 15] In September 2011,

10

the EPA re-listed the Questa Site on the NPL.  National Priorities List, Final Rule N. 52, 76 Fed. Reg. 57,662 (September 16, 2011).  [Doc. 87-2, p. 1 (U.S. Ex. 2)]

Previously, the United States filed a Partial Motion to Dismiss, submitting that to the extent CMI brought its claims under Sections 107(a) and 113(f)(1) of CERCLA, the claims were precluded based on a September 2001 "Administrative Order on Consent for Remedial Investigation/Feasibility Study," and two 2012 Administrative Settlement Agreements and Orders on Consent for Removal Actions.  [Doc. 40; Doc. 103, pp. 3-5] The Court denied the Motion with respect to the September 2001 Administrative Order but granted the Motion with respect to the two 2012 Administrative Settlement Agreements and Orders.  [Doc. 103, pp. 22-23]  The United States did not move to dismiss CMI's alternative action under CERCLA Section 113(f)(3)(B).

The case is now before the Court on cross motions for summary Judgment by CMI and the United States, which turn on whether the United States is liable for clean-up and remediation under CERCLA as an "owner" or "arranger" pursuant 42 U.S.C. § 9607(a).

**STANDARD FOR SUMMARY JUDGMENT**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  Once the movant meets this burden, the non-moving

11

party is required to put in the record facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(c).

"A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008) (internal citations omitted).

> The trial judge is not to weigh the evidence to determine the truth of the matter, but instead must ask "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." [*Liberty Lobby*, 477 U.S.] at 252, 106 S.Ct. at 2512. In making the decision, the trial judge must consider all the evidence in the light most favorable to the nonmoving party. *Redhouse v. Quality Ford Sales, Inc.*, 511 F.2d 230, 234 (10th Cir.1975). Thus, the trial judge must deny motions for summary judgment when reasonable jurors might disagree, even though the judge as trier of fact would find for the moving party.

*Dreiling*, 850 F.2d at 1377.

**CERCLA**

"Congress enacted CERCLA to facilitate the expeditious cleanup of environmental contamination caused by hazardous waste releases . . . and to establish a financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." *Young v. United States*, 394 F.3d 858, 862 (10th Cir. 2005) (internal quotation marks and citations omitted). "Thus, the twin aims of CERCLA are to [clean up] hazardous waste sites and impose the costs of such cleanup on parties responsible for the contamination." *Id.*

> The elements of a prima facie case of liability under § 9607(a) require a showing (1) that the defendant is a "covered person" under CERCLA; (2) that a "release" or "threatened release" of any "hazardous substance" at the site in question has occurred; (3) that the release or threatened release caused plaintiff to incur costs; (4) that plaintiff's costs are "necessary" costs of response; and (5) that plaintiff's response action or cleanup was consistent with the [National Contingency Plan].

*Morrison Enters. v. McShares, Inc.*, 302 F.3d 1127, 1135-36 (10th Cir. 2002) (italics omitted).   The only element in dispute in this case is whether the United States is a covered person under Section 9607(a), which imposes liability for the cleanup of facilities on four categories of persons:

> (1) the owner and operator of a vessel or a facility,
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

42 U.S.C. § 9607(a).

CMI alleged and argues that the United States is liable as a party who owned the facility when the hazardous substances were disposed under Section 9607(a)(2) and as an arranger under Section 9607(a)(3).   The United States disputes that it fits into either category of covered persons.

### *Owner Liability under CERCLA*

13

The seminal case considering whether the United States is an owner under CERCLA of land on which another party holds unpatented mining claims is *United States v. Friedland*, 152 F. Supp. 2d 1234, 1239 (D. Colo. 2001).  In the present case, the parties' arguments focus largely on whether the analysis in *Friedland* was sound, and, if so, whether this case is distinguishable.  *Friedland's* analysis merits review here.

> *Friedland*

The *Friedland* Court attempted to determine whether Congress intended the United States to be an owner under CERCLA when the United States holds title to land and another party holds an unpatented mining claim.  *Id.*  Because CERCLA unhelpfully defines an owner as "any person . . . owning" a facility, the *Friedland* Court began by "'giv[ing] the term its ordinary or natural meaning.'"  *Id.* at 1242 (quoting *United States v. Bestfoods*, 524 U.S. 51, 66 (1998)).  However, this canon of construction failed to be of much use given broad, equivocal, and at times inconsistent definitions of ownership.  *Id.* (pointing out that while Webster's dictionary defines owner as "'one that has the legal or rightful title whether the possessor or not,'" Black's Law Dictionary defines an owner as "'[o]ne who has the right to possess, use, and convey something,' and as '[o]ne who has the primary or residuary title to property.'" (quoting Webster's Third New International Dictionary of the English Language Unabridged 1612 (1981) and Black's Law Dictionary 1130 (7th ed. 1999)).  And, to further complicate matters, "courts have supplied virtually no consistent guidance as to which property rights define ownership."  *Id.*

The Court thus turned to the nature of the United States' ownership of land on which a third party holds an unpatented mining claim. The *Friedland* Court described this interest as "bare legal title." *Id.* The Court recognized that, in other contexts, courts have held that the holder of bare legal title could be held liable if there were "adequate indicia of ownership over and above bare legal title." *Id.* at 1242-43 (collecting cases). Thus, the Court examined the relationship between the United States and "those entities utilizing the property subject to the unpatented mining claim" in order to "determine whether the United States possessed indicia of ownership sufficient" to be considered an owner under CERCLA. *Id.* at 1244. To make this determination, the Court reviewed various United States Supreme Court cases describing the nature of the United States' interest in an unpatented mining claim.

As *Friedland* discusses, mining claims find their legal basis in the Mining Act of 1872. *Id.* at 1244-45. One seeking a mining claim could "go onto unappropriated, unreserved public land," discover a mineral deposit, follow "the minimal procedures required to formally 'locate' the deposit," and thereby gain "the right of exclusive possession of the land for mining purposes." *United States v. Locke*, 471 U.S. 84, 86 (1985) (quoting 30 U.S.C. § 26); *see Friedland*, 152 F. Supp. 2d at 1245. Under the Mining Act:

> [t]he locators of all mining locations made on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, ... so long as they comply with the laws of the United States ... shall have the exclusive right of possession and enjoyment of all surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth.

*Friedland*, 152 F. Supp. 2d at 1245 (quoting 30 U.S.C. § 26).

> When the location of a mining claim is perfected under the law, it has the
> effect of a grant by the United States of the rights of present and exclusive
> possession. The claim is property in the fullest sense of that term; and may
> be sold, transferred, mortgaged, and inherited without infringing any right
> or title of the United States. The right of the owner is taxable by the state;
> and is "real property" subject to the lien of a judgment recovered against
> the owner in a state or a territorial court .... The owner is not required to
> purchase the claim or secure patent from the United States but so long as he
> complies with the provisions of the mining laws, his possessory right, for
> all practical purposes of ownership, is as good as though secured by patent.

*Id.* at 1245-46 (quoting *Wilbur v. United States ex rel. Krushnic*, 280 U.S. 306, 316-17

(1930)).   Thus, though "the United States maintains broad powers over the terms and

conditions upon which the public lands can be used, leased, and acquired, the claimant

nevertheless enjoys a valid, equitable, possessory title, subject to taxation, transferrable

by deed or devise and otherwise possessing the incidents of real property."[1] *Id.* at 1245.

Based on the limited nature of the ownership rights of the United States to land

held by the company via unpatented mining claims, the *Friedland* Court held that the

United States was not an owner for purposes of CERCLA.  *Id.* at 1246.  The Court relied

on the facts that "unpatented mining claimants possess vested property rights (including

the right to sell, mortgage, or inherit), are subject to taxation, and cannot be divested of

their rights if they demonstrate substantial compliance with maintenance requirements

specified in the mining law."  *Id.*  The Court also relied on the facts that the United

States: "is not allowed to exclude individuals from the land and may only regulate" the

mining activities; "receives no financial benefit" from the mining, such as royalties;

---

[1] The United States maintains broad regulatory powers over mining, whether the mining
occurs on patented or unpatented land.  *See Locke*, 471 U.S. at 104.

"lacks the power to retain title to its land if the claimant seeks title"; and has "no ability to set the boundaries of the conveyance or establish the terms of the sale based upon the land's value." *Id.* Considering this limited nature of the United States' ownership of unpatented mining claims, the *Friedland* Court concluded that Congress did not intend the term "owner" to encompass the United States with regard to land held by third parties via unpatented mining claims. *Id.*

This Court agrees with *Friedland's* focus on who owns which strands of the bundle of property rights in determining whether the United States is an owner. *See id.* 1244-46 (applying an indicia of ownership test); *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 331-32 (2nd Cir. 2000) (applying the bundle of ownership rights analysis to determine whether party met the definition of an owner); *see also* John F. Seymour, *Hardrock Mining and the Environment: Issues of Federal Enforcement and Liability*, 31 Ecology L.Q. 795, 898-900 (2004) (describing *Friedland's* analysis and noting that most courts have shown "marked and consistent reluctance to impose owner liability on the United States for environmental contamination arising from mining activities where the United States was required by law to make the land available for mining, derived no royalties or other revenue from the use of the land, and had limited regulatory authority over the mining claims themselves.") This Court is not persuaded by CMI's argument that "legal title conclusively establishes owner liability under CERCLA," [Doc. 28, p. 25] because the right to use the property as a facility is held only by CMI and not the United States.

17

Pursuant to Section 9607(a), the Court must focus on ownership of the *facility* rather than ownership of the *land*.  42 U.S.C. § 9607(a)(2) (stating that "any person who at the time of disposal of any hazardous substance *owned or operated any facility* at which such hazardous substances were disposed of" is liable under CERCLA (emphasis added)).  CERCLA defines a facility as

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).  Here, CMI's disposal of waste rock on the unpatented mining claims both created the "facilities" under CERCLA, and, with respect to the land that became a facility, divested the United States of the use of the property under the Multiple Use Act.  30 U.S.C. §§ 611-612.  Under the Multiple Use Act, "any use of the surface of any such mining claim by the United States, its permittees or licensees, shall be such as not to endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto."  Multiple Use Act, 30 U.S.C. § 612(b); *see also United States v. Curtis-Nevada Mines, Inc.*, 611 F.2d 1277, 1279 (9th Cir. 1980) (relied on by CMI and addressing, under the Multiple Use Act, "the right of the general public to use the surface of land upon which unpatented mining claims have been located, when that use does not interfere with mining activities").  Additionally, as correctly recognized by *Friedland* in its analysis, the United States could not prevent CMI from locating the

18

mining claims, or establish the boundaries of the unpatented claims, or prevent CMI from using those claims for mining purposes. *See Friedland*, 152 F. Supp. 2d at 1245-46.

Focusing the inquiry on whether the United States was an owner of the facility, rather than an owner of the land where the facility exists, correctly employs Congress's definition of a facility. This approach is consistent with the broader intent of CERCLA, which is to "ensure that the costs of [environmental] cleanup efforts [are] borne by those responsible for the contamination." *Burlington Northern & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009); *see also Commander Oil*, 215 F.3d at 330 (pointing out that, in the legislative history of CERCLA, Congress cited a case which stands for the proposition that "[w]hen one enters into a business or activity for his own benefit, and that benefit results in harm to others, the party should bear the responsibility for that harm" (internal quotation marks and citations omitted)). Thus, while the Court considers and discusses the parties' arguments relating to the application of *Friedland* to the United States' property interests here, the Court will do so through the lens of answering the question of who owned the facility, not who owned the land.

### The Parties' Contentions

CMI asks this Court to depart from *Friedland* and hold that "fee simple ownership, standing alone, establishes 'owner' liability." [Doc. 28, p. 22] CMI argues that *Friedland* was wrongly decided because it "ignored the long line of precedent recognizing that the United States holds title to and has significant property interests in and control over lands underlying unpatented mining claims." [Doc. 28, p. 26] It points to language in various cases, including *Commander Oil*, 215 F.3d 321. *Commander Oil*,

however, is not particularly helpful for CMI.  *Friedland* adopted large sections of its analysis, and reached the conclusion that the United States was not an owner under CERCLA.  *See Friedland*, 152 F. Supp. 2d at 1242-44 (referring to *Commander Oil* as *Barlo*).  Moreover, *Commander Oil* points out that "[o]wnership exists vis-à-vis someone else; it represents a priority of rights and claims and not a concrete status."  *Commander Oil*, 215 F.3d at 329.  *Commander Oil* considered the relational property rights as between an owner, lessee/sublessor, and sublessee, and held, based on the contract at issue and the facts of the case, that the lessee/sublessor did not have the indicia of ownership, including "deriv[ing] benefit from the activities conducted on their property," necessary to be considered an owner under CERCLA.  *Id.* at 330-32.  Contrary to CMI's argument, applying *Commander Oil* to the facts here requires the holding that the United States was not an owner of the facilities in question.  *See id.*

CMI also relies on *United States v. Weiss*, 642 F.2d 296 (9th Cir. 1981), *United States v. Etcheverry*, 230 F.2d 193 (10th Cir. 1956), and *Curtis-Nevada Mines, Inc.*, 611 F.2d 1277, in arguing that the *Friedland* court improperly discounted the strength of the United States' property interests in land on which a third party holds an unpatented mining claim.[2]  [Doc. 28, p. 29]  Each of these cases describes and considers the interest of the United States vis-à-vis unpatented claim holders in various contexts other than CERCLA.  For example, in *Weiss*, the Ninth Circuit reviewed and upheld regulations

---

[2] In addition, CMI points out that the United States also had a reversionary interest in the property on which it held unpatented mining claims.  [Doc. 28, p. 23]  CMI does not expressly point out that *Friedland* fails to acknowledge this interest.  *See Friedland*, 152 F. Supp. 2d 1234.  This Court recognizes and takes into account the United States' reversionary interest in reaching its decision.

governing mining activities issued by the Secretary of Agriculture in 1974. *Weiss*, 642

F.2d at 297, 299.   These regulations required miners owning unpatented placer mining

claims within the St. Joe National Forest in Idaho to submit operating plans to the Forest

Service for approval. *Id.* at 297.   After *Weiss* was decided, however, the United States

Supreme Court considered, and rejected, a challenge to a statute enacted in 1976

requiring annual registration of unpatented mining claims[3] in *Locke*. *Locke*, 471 U.S. at

86. *Locke* considered in depth the "unique form of property" interests held by unpatented

mining claimants and by the United States. *Id.* at 104.   Thus, given the United States

Supreme Court's intervening decision in *Locke*, which quite thoroughly describes the

United States' property interests in unpatented claims, there was no need for *Friedland* to

consider the description of the United States' property interest by the Ninth Circuit in

*Weiss.*[4]   Though various courts, including the courts in *Weiss, Curtis-Nevada Mines,*[5] and

---

[3] In 1976, Congress passed the Federal Land Policy Management Act, 43 U.S.C. §§ 1701-1787, esp. § 1744 (requiring yearly registration of unpatented claims with the Bureau of Land Management) and the Mining in the Parks Act, 54 U.S.C. §§ 100731-100737, esp. § 100732 (formerly codified at 16 U.S.C. §§1901-1912, esp.§ 1902) (authorizing the Secretary of the Department of Interior to regulate "all activities resulting from the exercise of mineral rights on patented or unpatented mining claims within any [National Park] System unit").  *Locke* considered the statutory provision of the FLPMA requiring yearly registration with the Secretary of the Interior.

[4] At oral argument, CMI argued that *Weiss* illustrates that mining regulations come from the United States authority as a property owner, i.e., the Property Clause, and not from its regulative or legislative authority under the Commerce Clause.  The Court has not found a definitive answer to this argument in the text of the pertinent statutes or regulations. Because CMI raised this for the first time at oral argument, there was no development of this argument in the briefs and no opportunity for the United States to respond.  Even considering the argument, the Court is not persuaded that this is a distinction with a difference. *See Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976) (stating that "Congress exercises the powers both of a proprietor and of a legislature over [land in] the public domain."); *Locke*, 471 U.S. at 104 (citing *Kleppe* for the proposition that the United

*Etcheverry*[6] describe the nature of the United States' property interests more or less forcefully, ultimately, this Court is persuaded that *Friedland's* description is accurate. In sum, the Court does not agree that *Friedland* improperly discounted the United States' interests in land on which third parties hold unpatented mining claims.

Availing itself to the provisions of the mining laws, CMI was able to freely enter onto federal lands, stake numerous claims, mine without interference from the United States or the public, and enjoy substantial economic benefits from its mining claims. *Friedland*, 152 F. Supp. 2d at 1246; *see also Locke*, 471 U.S. at 104-05. The United States could not exclude CMI from the land, prevent it from staking its claims, or

---

States "maintains broad powers over the terms and conditions upon which the public lands can be used, leased, and acquired."). Thus, however accurate CMI's argument is, the Court is not persuaded that it requires an analysis that departs from *Locke* or *Friedland*. There is no dispute that the United States has property interests in federal lands on which third parties also have unpatented mining claims. Considering the full strength of these property interests as discussed in *Locke*, *Kleppe*, *Weiss*, *Etcheverry*, and other cases cited by CMI, the Court concludes that Congress did not intend for the United States to be an owner of the facilities given that the United States did not have the ability to exclude miners from reasonable use of the land for mining and waste storage related to the mining (and thereby creating facilities).

[5] *Curtis-Nevada Mines, Inc.* discusses the respective rights to the surface between unpatented mining claimants and the United States before and after the enactment of the Multiple Use Act, stating that under the Act Congress "limit[ed] the exclusive possession of mining claimants so as to permit the multiple use of the surface resources of the claims prior to the patenting of the claims, so long as that use did not materially interfere with prospecting or mining operations." *Curtis-Nevada Mines, Inc.*, 611 F.2d at 1283.

[6] *Etcheverry* held that "general grazing rights of the public domain are not included in the possessory rights of a mining claim." *Etcheverry*, 230 F.2d at 196. In so doing, the Court uses strong language, to which CMI points: "We are satisfied that under the statute the mere location of a mining claim gives to the locator only the right to explore for and mine minerals, and to purchase the land if there has been a compliance with the provisions of the statute. As against third parties, the locator or his assigns have exclusive right to use the surface of this land, but as against the United States, his right is conditional and inchoate." *Etcheverry*, 230 F.2d at 195.

22

interfere with CMI's reasonable mining activities, including dumping the waste rock and tailings (though it could regulate those activities).  *See Friedland*, 152 F. Supp. 2d at 1246.  Given that the United States' ownership interests in land on which another holds unpatented mining claims are unique, there is no comparable ownership interests of private parties in other contexts.  *See Locke*, 471 U.S. at 104.  After careful consideration of the parties' arguments, the Court concludes that Congress did not intend for the United States to be an owner of a facility created by a miner on unpatented land under CERCLA under the circumstances of this case.  It would be at odds with the purpose of the statute and the weight of persuasive authority to conclude that the United States was an owner because of the nature of the property interests created by the Mining Act.  It would be further at odds with the purpose of CERCLA and the weight of the case law to determine that the United States subjected itself to liability by, in the 1970s, enacting regulations and statutes designed to give the United States knowledge about which mining claims were in existence and to begin to prevent or limit further environmental damage on the land it had made available to miners.  *C.f. United States v. New Castle Cnty.*, 727 F. Supp. 854, 869-70 (D.DE 1989) (concluding that the state of Delaware was not liable as an operator where it required landfill operator to submit plans for approval to receive a permit and conducted various inspections to ensure compliance with state Solid Waste Disposal Code).

CMI argues that *Friedland* is distinguishable from the facts at hand for several reasons.  First, it argues that with regard to many of the mining claims at issue for the land exchange, the United States stated in a mineral report that the land CMI exchanged

23

was non-mineral in character.  [Doc. 28, p. 28 & ¶ 11(d); Doc. 29-6, p. 3 (CMI Ex. 24)]
Thus, CMI argues that it could not have patented its mining claims to the land.  While
this distinction is noteworthy, the reality is that the United States never contested the
validity of the mining claims, of which CMI continued to maintain ownership (though the
United States held them in "informal escrow") until the date of the land exchange.  [Doc.
28-18, p. 2 (CMI Ex. 18)]  CMI held unpatented mining claims, which were potentially
voidable but never voided, and thus, the ownership interests in the land remained
consistent with the ownership interests described in *Friedland* and *Locke*.  The facts
indicate that CMI continued to utilize the land as though it continued to hold the land via
unpatented mining claims, and continued to create "facilities" by dumping waste rock
and creating rock stockpiles.  [*See* Doc. 87, ¶¶ 27-28; Doc. 91, ¶¶ 22-30]  Accordingly,
the Court is not persuaded that this factual distinction is material.

CMI also argues that, with regard to the land exchange, the United States set the
boundaries of the conveyance and established the terms of the sale, and thus, *Friedland's*
analysis is inapplicable.  [Doc. 28, p. 28]  The Court is not persuaded by this argument
for two reasons.  First, as previously stated, it is ownership of the facility at the time the
hazardous material is disposed there that is the controlling inquiry.  At the time that waste
rock was placed on the land, creating the facilities at issue, CMI held the land via
unpatented mining claims and the United States maintained legal title and a reversionary
interest in the land.  Without the additional property interests such as possession, control,
and the ability to exclude CMI from using the land for the disposal of the hazardous
materials, the boundaries of the exchange are immaterial to the ultimate question of

whether Congress intended the United States to be an owner.  Second, and alternatively, if consideration of setting the boundaries is appropriate, the proper focus is on the United States' inability to set the boundaries of the unpatented mining claim, rather than the final conveyance.  It is the claimant's unpatented mining claim that gives the claimant the right to use the land for mining purposes, including the disposal of waste rock.  30 U.S.C. § 612(b) ("[A]ny use of the surface of any such mining claim by the United States, its permittees or licensees, shall be such as not to endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto.").

Finally, to establish ownership, CMI argues that the United States "carried out multiple affirmative acts to facilitate mining with contemporaneous knowledge of [CMI's] waste disposal activities."  [Doc. 28, p. 25]  CMI points to the following acts by the United States:  the United States entered in to the Exploration Contract with CMI in 1957; the United States "[d]irect[ed] successful mineral exploration at the Mine from 1957 to 1960" under the DMEA Contract; the United States received "molybdenum production 'royalties' as repayment for the DMEA contract"; the United States made the discretionary conveyance of 2,226 acres to CMI; the United States conveyed federal lands to CMI for tailings disposal; and the United States "[p]rioritiz[ed], examin[ed], and approv[ed] land title applications . . . while mine waste rock was being generated and disposed of on federal lands."  [Doc. 28, pp. 25-26]  With regard to the loan and royalties, these facts have generally been considered (and, without more, determined to be insufficient) with regard to arguments that the United States should be liable as an operator or an arranger, not as an owner.  *See, e.g. United States v. Iron Mountain Mines,*

25

*Inc.*, 881 F. Supp. 1432, 1449-52 (E.D. Cal. 1995).  The Court concludes that these facts are not material to the question of ownership of the facility.  While the United States received royalties, here, the payment of royalties was for the express purpose of repaying the exploration loan.  [Doc. 28-6, p. 3 (CMI Ex. 6)]  This must be distinguished from cases in which the payment of royalties was pertinent to the ownership inquiry, such as production royalties.  *See, e.g.*, *United States v. Newmont USA Ltd*, 504 F. Supp. 2d 1050, 1073-74 (E.D. Wash. 2007) (holding that the United States was owner of facility where the United States held land as trustee for Indian Tribe, leased mining rights, and among other things collected rents and royalties; stating that "the United States exercised much more control and exhibited greater 'indicia of ownership' than the parties in either *Castlerock Estates* or *Friedland*," (citing *Castlerock Estates, Inc. v. Estate of Markham*, 871 F. Supp. 360 (N.D.Cal.1994) and *Friedland*, 152 F. Supp. 2d 1234)).  Here, CMI already had the right to mine the land, and the royalties were solely for the purpose of repaying the amount loaned by the United States to CMI for mineral exploration.  [Doc. 28-6, p. 3 (CMI Ex. 6)]  Once that finite amount was repaid, CMI had no further obligation to pay the United States royalties.  [Doc. 28-6, pp. 2-3 (CMI Ex. 6)]  The royalties here evidence a lender/lendee relationship, not an owner/lessee relationship.

Finally, the United States entered into land transactions with CMI knowing that CMI intended to use the land for waste rock disposal.  Not only is this fact not pertinent to the question of whether the United States should be liable as an owner, as discussed in detail below, it is insufficient to create arranger liability, which is generally the theory argued for liability on similar facts.  *C.f. Burlington Northern*, 556 U.S. at 612 (holding

26

that a company's knowledge that its hazardous product would be spilled, without more, was insufficient to create arranger liability); *Pakootas v. Teck Cominco Metals, Ltd.*, 832 F. Supp. 2d 1268, 1272 (E.D. Wash. 2011) ("While actions taken with intent to dispose of a hazardous substance are sufficient for arranger liability, actions taken with mere knowledge of such future disposal are not." (internal quotation marks and citation omitted)), *clarified on denial of rehearing by* 2012 WL 370105 (E.D. Wash., Feb. 3, 2012). The Court concludes that the United States was not an owner of the facilities for purposes of CERCLA in this case.

### Arranger liability under CERCLA

Arranger liability is "intended to deter and, if necessary, to sanction parties seeking to evade liability by 'contracting away' responsibility." *United States v. Gen. Elec. Co.*, 670 F.3d 377, 382 (1st Cir. 2012). CERCLA liability for removal and remediation attaches to:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3). Considering arranger liability, our Tenth Circuit stated:

> To be held liable under CERCLA as an arranger, a party must satisfy three requirements. First, the party must be a 'person' as defined in CERCLA. Second, the party must 'own' or 'possess' the hazardous substance at issue. Third, the party must, by contract, agreement or otherwise, arrange for the transport or disposal of such hazardous substances.

*Raytheon Constructors, Inc. v. Asarco, Inc.*, 368 F.3d 1214, 1219 (10th Cir. 2003).

27

The Supreme Court observed that arranger liability is clear when "an entity [enters] into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance." *Burlington Northern*, 556 U.S. at 609-10. It is likewise clear that arranger liability does not attach where an entity "merely [sells] a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination." *Id.* at 610. However, the Court recognized, arranger liability is unclear in "the many permutations of 'arrangements' that fall between these two extremes." *Id.* (internal quotation marks and citation omitted). The Court agreed with courts which have concluded that arranger liability is a "fact intensive and case specific" inquiry, and lower courts were instructed to rely on the "ordinary meaning" of arrange "[b]ecause CERCLA does not specifically define what it means to 'arrang[e] for' disposal of a hazardous substance." *Id.* at 610-11. "In common parlance, the word 'arrange' implies action directed to a specific purpose." *Id.* at 611. Thus, "an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Id.*

In *Nu-West Mining, Inc. v. United States*, 768 F. Supp. 2d 1082, 1089, 1091 (D. Idaho 2011), the Court granted summary judgment for the plaintiff mining company against the United States on the grounds that the United States acted both as an arranger and an operator for purposes of CERCLA. In *Nu-West*, the United States owned both the land and the waste, called middle waste shale. *Id.* at 1088. The United States awarded mining leases for phosphate ore. *Id.* at 1085.

28

> Before any mining could begin, the Government required the Lessees to obtain its approval of plans for mining, waste disposal, and reclamation. The United States conditioned its approval of mine plans on requiring the Lessees to perform specific reclamation activities at the Mine Sites, including locating, designing, and shaping waste rock dumps, covering waste dumps with a layer of middle waste shale as a growth medium, and planting specific seed mixtures on the waste dumps.

*Id.* at 1086.  The middle waste shale contained selenium, a hazardous substance, which leached into the environment and the water flowing through the valley where the United States had required the waste dumps to be located.  *Id.* at 1086, 1089-90.  Considering these facts, the District Court of Idaho applied *Burlington Northern's* requirement that the arranger have taken "'intentional steps to dispose of a hazardous substance.'"  *Id.* at 1088 (quoting *Burlington Northern*, 556 U.S. at 611).  The Court also applied the Ninth Circuit's test considering whether the purported arranger "(1) owns the hazardous substance; (2) had the authority to control the disposal of that substance; and (3) exercised some actual control over the disposal of that substance."  *Id.* (citing *U.S. v. Shell Oil Co.,* 294 F.3d 1045, 1055 (9th Cir. 2002)).  The District Court of Idaho concluded that there were no questions of fact and that all of these factors were met: the United States owned the middle waste shale; the United states had the authority to and did control the disposal of the shale through the leasing requirements; and the United States took intentional steps to dispose of the shale, "by requiring its lessees to cover the outer surface of the waste dumps with a layer of middle waste shale."  *Id.* at 1088.  The Court thus concluded that the United States was an arranger and subject to liability under CERCLA.  *Id.* at 1059.

In contrast, in *Coeur d'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 2d 1094, 1132 (D. Idaho 2003), the Court concluded that the federal government was not liable as an arranger for waste disposal based on the government's involvement in mining activities during World War II.  In *Coeur d'Alene Tribe*, the United States'

> involvement included the control of the price for the product via the premium price plan and quota system, the control of wages for mining and non-mining personnel, control of the length of the work week, the approval of capital improvements, equipment and necessary chemicals for processing via the priority system, military oversight of the security of the mill and required changes the mills had to make to their security, laborers were restricted from taking other employment, soldiers were offered deferments from military service to work in the mines and mills, the mines and mills were required to submit monthly operating reports to the government, government financing pursuant to the exploration premium plan to encourage development of new sources of metals, the government was aware of the tailings generated from the mining and milling and of the disposal method used for such tailings, and the government threatened seizure of the operations if certain conditions were not complied with by the mining companies.

*Id.* at 1127.  The Court determined that *Bestfoods*, 524 U.S. at 66-67, required "active involvement in the arrangements of disposal of hazardous substances," and that "control," while informative, was not a necessary factor in every case.  *Id.* at 1131.  The Court concluded that the facts above did not establish arranger liability because "the United States did not own or possess waste or arrange for its disposal during World War II and the United States did not exercise actual control over the disposal of mining tailings."[7]  *Id.* at 1132.  The Court also based its conclusion on additional factors set forth

---

[7] By contrast, the Court found the United States liable with regard to a construction of an interstate, using tailings to line the road bed, where the United States "paid 92% of the construction costs, exercised the ultimate approval of the [contractor's actions] right

by the Eleventh Circuit, including whether the alleged arranger "intended to dispose of a substance at the time of the transaction" and "made the 'crucial decision' to place hazardous substances in the hands of a particular facility." *Id.* (quoting *Concrete Sales and Servs. v. Blue Bird Body*, 211 F.3d 1333, 1336-37 (11th Cir. 2000).

In *Pakootas*, the Court concluded that the State of Washington was not liable as an arranger where the State leased land to the miners, received a royalty from the mining profits, and knew that

> waste in [the] form of tailings and waste rock is inherent to the mining and milling processes, the means of disposal historically has been to the environment and direct disposal of tailings to the Pend Orielle River was in fact occurring when the State entered the Contracts . . . and the State allowed the practice to continue without intervention for decades after entering the contracts.

*Pakootas*, 832 F. Supp. 2d at 1270.  The Court stated:  "'While actions taken with intent to dispose of a hazardous substance are sufficient for arranger liability, actions taken with mere knowledge of such future disposal are not.'" *Id.* at 1272 (quoting *Team Enters., LLC v. W. Inv. Real Estate Trust*, 647 F.3d 901, 908 (9th Cir. 2011)).  The *Pakootas* Court reiterated that *Team Enterprises* held that indifference to the foreseeable possibility of disposal is insufficient, and, rather, applied the standard that "the probable purpose for entering into such a transaction is to dispose of hazardous waste." *Id.* at 1273-74 (internal quotation marks and citation omitted).  The Court held that the State did not have the requisite intent to dispose of hazardous materials:  "[T]his court finds the physical nature of ore and the need to obtain access to the metals within does not indicate

---

down to the change orders of less [than] $1,000, [and] conducted audits and investigations on a regular basis." *Coeur D'Alene Tribe*, 280 F. Supp. 2d at 1133.

the State intended the disposal of mining waste, but at most was indifferent to whatever disposal method was chosen by the mining companies." *Id.* at 1274. The Court also considered other tests applied by various courts, and concluded that the State did not exercise control over the hazardous substances (applying *Shell Oil Co.* and *Nu-West*) or sufficient involvement (applying *Coeur d'Alene Tribe*) to conclude that the State was liable as an arranger. *Id.* at 1279, 1280. Finally, the *Pakootas* Court concluded that the State was not an owner of the hazardous waste because the "naturally occurring ore deposits on State lands did not have the characteristic of waste when they were delivered to the mining companies via the leases and mining contracts." *Id.* at 1275 (internal quotation marks omitted).

Here, CMI relies on certain facts to argue that the United States arranged for the disposal of the waste rock and tailings. It submits that the United States "facilitated mine development and arranged for the disposal of mine waste rock on lands then owned by the United States . . . by conveying those lands to Molycorp for use as a waste rock disposal site." [Doc. 29, pp. 5, 17, 19] CMI also argues that that the United States "facilitated mine development" and operations, "which necessarily included extensive waste rock generation and disposal." [Doc. 29, p. 5] CMI argues that the United States "determined that the disposal of waste rock on the Selected Lands was the best option for the Questa Mine." [Doc. 29, p. 19] It submits that the United States took the position that it would benefit from a land exchange, in that it "would obtain higher-value land as consideration for the conveyance." [Doc. 29, p. 19] CMI points out that the United States determined that utilizing the land exchange process rather than the patenting

process would "minimize the burden on the United States."  [Doc. 29, p. 19]  CMI submits that the United States also stated in documentation pertaining to the land exchange that it was in the "public interest" for the land exchange to occur, in part based on the use of the land for waste rock disposal.  [Doc. 29, p. 19; Doc. 29-5, p. 2 (CMI Ex. 23)]  Finally, the crux of CMI's argument is that the "United States' knowledge of this ongoing waste rock disposal while processing the land conveyance demonstrates that the United States approved of the waste rock disposal and intended disposal to occur there." [Doc. 29, p. 20]

    CMI's argument conflates knowledge of disposal of a hazardous substance with performance of affirmative "intentional steps" to dispose of a hazardous substance as required by *Burlington Northern*.  *Burlington Northern*, 556 U.S. at 611.  Applying *Burlington Northern*, none of the acts here establish that the United States took intentional steps to arrange for the disposal of the hazardous substances.  First, CMI had been disposing of the waste rock without input or directive from the United States, since well before the land transfer.  [*See, e.g.*, Doc. 29-2, p. 5 (CMI Ex. 20); Doc. 29-4, p. 2 (CMI Ex. 22)]  The actions to which CMI points, including the United States' agreement to the DMEA loan and the land exchange and conveyances, do not amount to intentional steps to dispose of the waste rock.  Rather, the United States took action which allowed CMI to continue to conduct its business as it had been, but it did not undertake "intentional steps to dispose of a hazardous substance."  *Id.*  Furthermore, CMI produced no evidence that the United States took any steps similar to those taken by the United States in *Nu-West* to direct, control, or arrange for the disposal of the waste rock or

tailings where CMI disposed of them.  *Compare Nu-West*, 768 F. Supp. 2d at 1088-89 (holding the United States liable as an arranger where it required the disposal of the hazardous material as a condition of mining approval).  Thus, though CMI argues that during the land conveyance the United States "affirmed the ongoing and future intended waste disposal purpose of the land exchange," the actions of the United States were closer to those of the United States in *Coeur d'Alene Tribe* or those of the State of Washington in *Pakootas* than those of the United States in *Nu-West*.  The Court concludes that these actions alone do not show that the United States took intentional steps to dispose of a hazardous substance.

CMI relies on documents the United States created in terms of the various patents, land exchanges and conveyances, to show that the United States intended for CMI to dispose of the waste rock as it did.  [*See* Doc. 29, ¶¶ 4-14]  For example CMI points to the United States' "Environmental Analysis" of the land exchange, in which the United States expressed a preference for the disposal of the waste rock on the Selected Lands, because it would reduce mud flows into the Red River and across State Highway 38, as against disposal in an area that would require diversion of the Red River and a tunnel for State Highway 38.  [Doc. 29-2, pp. 5-6 (CMI Ex. 20)]  Again, however, this document does not establish that the United States arranged for CMI to dispose of the waste rock where it did via the land exchange.  CMI made the decision to dump the waste rock in this particular location, and the United States merely acquiesced.  As the United States pointed out in the Environmental Report:  "Adverse environmental effects are not the result of the exchange proposal but, from the mining activity, itself.  The mining

activities will still continue on the patented mining claims or on millsites and are not dependent upon approval or disapproval of this land exchange proposal." [Doc. 29-2, p. 5 (CMI Ex. 20)] By contrast, in *Nu-West,* the United States told the mining company: "you'll do it our way or not at all." *Nu-West*, 768 F. Supp. 2d at 1089. The United States did not take an intentional step to dispose of the hazardous substances in this case.

CMI further argues that the United States arranged for the disposal of hazardous waste by entering into the DMEA loan with CMI. [Doc. 29, p. 22] A similar argument was rejected by *United States v. Federal Resources Corporation*, 30 F. Supp. 3d 979, 995 (D. Idaho 2014), *appeal docketed,* No. 15-35259 (9th Cir. April 7, 2015). In *Federal Resources Corporation*, as here, the United States entered into a DMEA contract to pay for 50% of the exploration costs for mining to find metals which were needed for strategic purposes. *Id.* at 985. The mining company "infer[red] that the United States intentionally disposed of hazardous tailings because it (1) controlled F & M's [the mining company's] mining activities, (2) encouraged F & M to construct a flotation mill, and (3) knew that F & M was dumping tailings on site." *Id.* at 995. Though the mining company introduced evidence that the United States instructed the mining foreman to change course with regard to drilling, the Court held that, from such evidence, "no reasonable juror could find that the United States intended F & M to dispose of hazardous waste on site." *Id.* at 996. As to the mill, the Court held that the mining company's "[s]howing that the Government liked the prospect of a mill at the Conjecture site does not raise a genuine issue of material fact on the question whether the Government intended that hazardous substances be dumped on site." *Id.* Finally, relying on the United States' lack

of control over the disposal of tailings, the Court held that "mere knowledge . . . that F & M was discarding mill tailings on site does not make the United States an arranger." *Id.*

Likewise, the Eastern District of Washington rejected an argument that the State was an arranger for the disposal of hazardous substances where the State leased lands to the mining company for exploration, mining, and milling of valuable minerals, and thus knew that tailings would inevitably be disposed to the environment. *Pakootas*, 832 F. Supp. 2d at 1270. The *Pakootas* Court looked to the United States Supreme Court's decision in *Burlington Northern*, concluding that therein the Court "reversed the Ninth Circuit's decision . . . that arranger liability may 'attach when disposal of hazardous wastes is a foreseeable byproduct of, but not the purpose of, the transaction.'" *Id.* at 1273 (quoting *United States v. Burlington Northern & Santa Fe Railway Co.*, 520 F.3d 918, 948 (9th Cir. 2008), *rev'd,* 556 U.S. 599 (2009)). Applying this reasoning, the *Pakootas* Court held that "[d]isposal of hazardous wastes must be a purpose of the transaction, not merely a foreseeably byproduct of the transaction." *Pakootas*, 832 F. Supp. 2d at 1274. CMI has not articulated a reason for this Court to depart from the analysis in *Federal Resources Corp.* or *Pakootas*, particularly given the analysis in *Burlington Northern*. *Burlington Northern*, 556 U.S. at 612 (rejecting the argument that CERCLA creates arranger liability for the seller of a useful product where the seller knows that it will eventually become hazardous waste and that hazardous waste will be disposed).

Finally, CMI argues that the United States is liable as an arranger for issuing permits for CMI's pipeline from the mine to the tailings area over BLM land. [Doc. 29, pp. 27-28] CMI cites no case law as authority that a government issuing a permit

allowing the transportation of a hazardous substance is liable as an arranger, and this Court has found none.   [Doc. 29, pp. 27-28; Doc. 93]   CMI's argument fails the *Burlington Northern* test.   *Burlington Northern*, 556 U.S. at 612 (knowledge that a discharge of a hazardous substance will occur is insufficient).   It fails to meet the requirements set forth in *Raytheon Constructors, Inc.  Raytheon Constructors, Inc.*, 368 F.3d at 1219 (stating that to be liable as an arranger one must be a person, must own or possess the hazardous substances, and must by contract or otherwise "arrange for the transport or disposal of such hazardous substances").   And it fails the *Coeur d'Alene Tribe* and *Nu-West* tests. *Coeur d'Alene Tribe,* 280 F. Supp. 2d at 1132 (requiring possession of the waste and the exercise of "actual control over the disposal of mining tailings"); *Nu-West Min.*, 768 F. Supp. 2d at 1088 (considering "whether the entity (1) owns the hazardous substance; (2) had the authority to control the disposal of that substance; and (3) exercised some actual control over the disposal of that substance"). The Court concludes that the pipeline permits do not establish a question of fact that the United States arranged for the disposal of hazardous substances in this case.

CMI has failed to establish that the United States "by contract, agreement or otherwise, arrange[d] for the transport or disposal of such hazardous substances." *Raytheon Constructors, Inc.*, 368 F.3d at 1219.   Because CMI failed to establish an element essential to show arranger liability, the United States is entitled to summary judgment.

**CONCLUSION**

There is no genuine dispute as to any material fact in this case.  Based on the undisputed facts, the United States is entitled to judgment as a matter of law that it was neither an owner nor arranger as alleged by CMI.

**IT IS THEREFORE HEREBY ORDERED THAT:**

1) The *United States' Cross Motion for Summary Judgment* [Doc. 87] is **GRANTED**;

2) Plaintiff Chevron Mining, Inc.'s *Motion for Partial Summary Judgment Regarding the United States' Ownership Liability* [Doc. 28] is **DENIED**; and

3) Plaintiff's *Motion for Partial Summary Judgment Regarding the United States' Arranger Liability* [Doc. 29] is **DENIED**.

**IT IS SO ORDERED** this 30th day of September, 2015 in Albuquerque, New Mexico.

_____
M. CHRISTINA ARMIJO
Chief United States District Judge