IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


CHEVRON MINING,

      Plaintiff

vs.                  No. 1:13-CV-00328 PJK/JFR

UNITED STATES OF AMERICA,
UNITED STATES DEPARTMENT OF THE INTERIOR,
UNITED STATES DEPARTMENT OF AGRICULTURE,

      Defendants.



TRANSCRIPT OF PROCEEDINGS

March 14, 2022

Volume 1
Pages 1 - 209


BEFORE:  HONORABLE JUDGE PAUL KELLY
         UNITED STATES 10TH CIRCUIT JUDGE




Proceedings reported by stenotype.

Transcript produced by computer-aided

transcription.

```
 1   A P P E A R A N C E S:

 2   FOR THE PLAINTIFF:

 3           MODRALL SPERLING
             500 Fourth Street NW, Suite 1000
 4           Albuquerque, New Mexico  87103
             505-848-1800
 5           BY:  MEGAN MUIRHEAD
             mmuirhead@modrall.com
 6
                         - and -
 7
             SIDLEY AUSTIN, LLP
 8           1501 K Street N.W.
             Washington, D.C.  20005
 9           202-736-8000
             BY:  GORDON TODD
10           gtodd@sidley.com
                 MARK HOPSON
11           mhopson@sidley.com
                 ELLEN CRISHAM PELLEGRINI
12           epellegrini@sidley.com

13   FOR THE DEFENDANT:

14           U.S. DEPARTMENT OF JUSTICE
             ENVIRONMENT and NATURAL RESOURCES DIVISION
15           ENVIRONMENTAL DEFENSE SECTION
             P.O. Box 7611
16           washington, D.C.  20044-7611
             202-616-6519
17           BY:  BRYAN JAMES HARRISON
             Bryan.Harrison@usdoj.gov
18               TSUKI HOSHIJIMA
             Tsuki.Hoshijima@usdoj.gov
19               MICHAEL AUGUSTINI
             Michael.Augustini@usdoj.gov
20               KIMERE KIMBALL
             Kimere.kimball@usdoj.gov
21

22

23

24

25
```

1                        I N D E X

2    WITNESS:                                      PAGE:

3    R. GENE DEWEY

4         Cross-Examination by Mr. Augustini        12
          Redirect Examination by Mr. Hopson       133
5
     DR. NEAL RIGBY
6
          Cross-Examination by Ms. Kimball         154
7

8    Certificate of Reporter                       209

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   EXHIBIT:             DESCRIPTION1

 2   Amended Notice of Deposition -            5

 3   James Brewster2          E-mail dated December 3,

 4   2014,    12          Catherine Earl to Frances

 5   Carpenter3          Letter dated November 26,

 6   2014,    15          Catherine Earl to Frances

 7   Carpenter4          E-mail Chain dated

 8   December 3, 2014,    16    Frances Carpenter and

 9   Jim Brewster5          E-mail dated December 8,

10   2014,    18          Jim Brewster to Frances

11   Carpenter6          E-mail dated December 9,

12   2014    28          Jim Brewster and Frances

13   Carpenter7          E-mail dated December 10,

14   2014,    31          Jim Brewster and Frances

15   Carpenter8          E-mail dated December 12,

16   2014,    36          Estevan Lujan and Frances

17   Carpenter          with Attached Letter9

18   New Mexico Corrections Department's    37

19   Answers and Responses to Plaintiff's

20   Interrogatories and Requests for

21   Production10          E-mail String dated

22   December 10, 2014

23          THE COURT:  Good morning.  You may be

24   seated.

25          Before we begin, are there any
```

1    preliminaries we need to handle?

2              MR. TODD:  Good morning, Your Honor.

3              Gordon Todd for Chevron.

4              Your Honor, we have a couple of things to

5    address.  First of all, one of Chevron's expert

6    witnesses is unavailable to testify this week,

7    Dr. Robert Haddad, who is a remediation expert.  He

8    lives in Los Angeles, and his elderly mother is

9    dying.  We talked about it.  She is not quite in

10   hospice care yet but had a stroke and congenitive

11   heart failure.

12             THE COURT:  Had a stroke?

13             MR. TODD:  She had a stroke.  And she was

14   already suffering from heart disease, so this week

15   he is meeting with doctors trying to attend to her

16   medical care and deciding what further care is

17   appropriate or not, so he doesn't want to leave the

18   Los Angeles area.

19             So we discussed with the Government, and

20   the Government's amenable to leaving the record open

21   to take care of Dr. Haddad's cross-examination at

22   some point after this week.

23             The Chevron team and Dr. Haddad are

24   willing to do it remotely if that would work for the

25   Court.  He is available at the end of next week or

1    the week after.

2              I know Your Honor has a Tenth Circuit

3    sitting.  I think the Government would prefer to do

4    it in person.  I will let them speak for themselves.

5    But we just need to work out a date if that is okay

6    with the Court.

7              THE COURT:  We will work on it.

8              MR. TODD:  Great, Your Honor.

9              The other thing is we have worked out an

10   agreement, the sides have discussed and if it is

11   okay with both sides, if it is okay with the Court,

12   that all witnesses remain in the courtroom during

13   the hearing.  The only fact witness is Mr. Gene

14   Dewey, who is testifying first.  Everyone else is an

15   expert.

16             Is that acceptable with the Court?

17             THE COURT:  There is no reason to invoke

18   the rule.

19             MR. TODD:  Exactly.  Thank you,

20   Your Honor.

21             THE COURT:  Now, what about exhibits that

22   were to be admitted, agreed upon exhibits prior to

23   the commencement of testimony?

24             MR. TODD:  Sorry, I think we need some

25   guidance from the Court on that.

1          All of the direct examinations have been

2    submitted.  I don't know if Your Honor needs

3    anything further on that, if we need to formally

4    tender them when a witness takes the stand.

5          And Your Honor previously ruled that all

6    of the exhibits discussed in direct testimony are

7    automatically admitted.

8          So we are all, we are assuming those are

9    in and nothing else is in yet.  I think the

10   Government has something else they want to say on

11   that front.

12          THE COURT:  The Government has some

13   cross-examination exhibits that they wish to admit?

14          MS. KIMBALL:  Yes, Your Honor.  We will

15   have additional exhibits on cross-examination.  We

16   are happy to admit them all at the start, if that is

17   easier.

18          THE COURT:  Okay, can you speak into the

19   microphone with the glass sealing here that --

20          MS. KIMBALL:  Sorry about that.  Is that

21   better?

22          THE COURT:  Yes.

23          MS. KIMBALL:  The Government does have

24   exhibits that they will be admitting on

25   cross-examination.  We are happy to tender all of

Page 8

1    those at the start or we can -- or would the Court

2    prefer that we list out where it has already been

3    admitted or the Government has a list of everything

4    in the directs.

5              THE COURT:  So it is probably better just

6    to do it as we go.

7              MS. KIMBALL:  Okay.  And for the direct

8    exhibits?

9              THE COURT:  Yeah.

10             MS. KIMBALL:  Okay.  And for the direct

11   exhibits, would the Court prefer that we identify at

12   this point what all is coming in?

13             THE COURT:  You might as well.  And I

14   think just a simple motion would do it.

15             MS. KIMBALL:  Okay.  I have a motion for

16   the Government's witnesses -- for the Government's

17   Exhibits.  I don't have Chevron's.

18             MR. TODD:  Your Honor, I suspect that both

19   sides have an identical list of everything that has

20   been admitted so far.  Perhaps we should -- well,

21   why don't we just move orally, Your Honor?  Could we

22   move the admission of all of the exhibits identified

23   in the prefiled direct testimony?

24             THE COURT:  All right.  And without

25   objections, they are admitted.

Page 9

```
 1              MR. TODD:  Thank you, Your Honor.
 2              Your Honor, would the Court staff like a
 3    list to work off at this point of what is admitted
 4    or your law clerks or --
 5              THE COURT:  That would be helpful, I
 6    think.
 7              Julie, do we have it?
 8              THE DEPUTY CLERK:  I have it Your Honor.
 9              THE COURT:  We already have it.
10              MR. TODD:  Thank you.
11              MS. KIMBALL:  One other issue, Your Honor,
12    because Dr. Haddad is testifying late and because
13    there is, I guess, some question as to whether or
14    not he ultimately will be able to testify, we would
15    like to reserve the right to move to strike the
16    exhibits that were admitted through his direct
17    testimony.
18              THE COURT:  Who is this now?  I'm sorry?
19              MS. KIMBALL:  Dr. Haddad.
20              THE COURT:  The fellow with the stroke,
21    yeah.
22              MS. KIMBALL:  So if he is ultimately not
23    able to testify, we would like to be able to strike
24    the exhibits that were admitted, sir.
25              THE COURT:  All right.
```

```
 1              MS. KIMBALL:  Thank you, Your Honor.

 2              THE COURT:  All right.  You may call your

 3    first witness.

 4              MR. HOPSON:  Chevron calls Mr. Gene Dewey.

 5              (Whereupon the witness was sworn.)

 6              THE DEPUTY CLERK:  Please be seated, and

 7    state and spell your name for the record.

 8              THE WITNESS:  My name is R. Gene Dewey.

 9    R.  G-E-N-E.  Dewey, D-E-W-E-Y.

10              THE COURT:  You may proceed.

11              MR. AUGUSTINI:  Good morning, Your Honor.

12              Michael Augustine for the United States.

13              THE COURT:  I think before we get to the

14    cross-examination, we need to get his testimony

15    introduced together with whether or not there is any

16    changes or additions or deletions.

17              MR. HOPSON:  I will be brief.

18              Mr. Dewey, did you work for us to prepare

19    written direct testimony in this case?

20              THE WITNESS:  Yes, I did.

21              MR. HOPSON:  Is that your testimony under

22    oath?

23              THE WITNESS:  Yes, it is.

24              MR. HOPSON:  Your Honor, there are no

25    additions or revisions.
```

1          THE COURT:  Very good.

2          Direct testimony will be admitted.

3          (Whereupon, the direct testimony of R.

4    Gene Dewey was prefiled and admitted.)

5          MR. AUGUSTINI:  Your Honor, one

6    administrative note.

7          We have handed up a notebook, it is before

8    you, that contains hard copies of the exhibits that

9    we may use during cross-examination, just as a

10   supplement.  It is an electronic trial but sometimes

11   people like to look at a hard copy, too.

12         So we provided the same notebook to

13   Mr. Dewey, and otherwise, we'll proceed.

14         THE COURT:  You may proceed.

15

16

17

18

19

20

21

22

23

24

25

1                          CROSS-EXAMINATION

2        BY MR. AUGUSTINI:

3        Q.    Mr. Dewey, your first job in the mining

4   industry was with Kennecott Copper Corporation; is

5   that correct?

6        A.    Yes, sir.

7        Q.    Did you work at a Kennecott Mine in

8   Arizona between 1962 and 1967?

9        A.    Yes, sir.

10        Q.    Kennecott operated a number of mines in

11   the Western United States, correct?

12        A.    Correct.

13        Q.    Kennecott's Bingham Canyon Utah Mine is

14   said to be the largest open pit mine in the world;

15   is that right, or one of the largest?

16        A.    I believe it still is, yes, sir.

17        Q.    And Kennecott produced molybdenum as a

18   byproduct of its copper mining, right?

19        A.    Yes.

20        Q.    Did you leave Kennecott and start working

21   for Molycorp at the Questa Mine in July, 1967?

22        A.    Yes.

23        Q.    When you arrived in 1967, Molycorp had

24   already been operating the open pit mine for about

25   two years, right?

1      A.     Yes.

2      Q.     And did you report to B.C. Lansing, the

3   general manager at that time?

4      A.     Yes.

5      Q.     Did your responsibilities include

6   analyzing the financial aspects of the Questa Mine?

7      A.     Yes.

8      Q.     During your tenure with the company, did

9   Molycorp pay all the operational costs associated

10   with the molybdenum mining?

11      A.     Yes.

12      Q.     Did Molycorp receive the many millions of

13   dollars generated from the sales of molybdenum

14   produced at the Questa Mine?

15      A.     Yes.

16      Q.     In September of '69, did you become

17   general superintendent of the Questa Mine?

18      A.     Yes, sir.

19      Q.     And in that position, were you responsible

20   for all mining activities in Questa?

21      A.     Yes.

22      Q.     Now, in your testimony, you noted that the

23   Molycorp management team determined when and where

24   to mine at Questa; is that correct?

25      A.     That is correct.

1       Q.      And controlling the land was critical to

2    Molycorp's mining operations; is that right?

3       A.      Would you repeat that?

4       Q.      Controlling the land was critical to

5    Molycorp's mining operations, right?

6       A.      Yes.

7       Q.      Molycorp made sure that the company owned

8    or controlled all the land at the Questa Mine,

9    correct?

10      A.      There was certainly land that wasn't under

11   Molycorp's control but --

12      Q.      Within the Questa Mine?

13      A.      Yes.

14      Q.      What land was that?

15      A.      All of the unpatented mining claims.

16      Q.      Well, with respect to the unpatented

17   mining claims, Mr. Dewey, didn't Molycorp have

18   exclusive possession and use of that land, too?

19      A.      Molycorp had unpatented mining claim

20   control such as was provided under the fall of 1872,

21   yes.

22      Q.      And so that included the right to conduct

23   mining on the unpatented land, the unpatented land

24   as well as the land that Molycorp owned in fee?

25      A.      I honestly don't know if any mining

1    occurred on unpatented mining claims.  I can't

2    answer that question at this point.

3            Okay.  That is fine.  Mr. Dewey, I will

4    move on.

5            Molycorp's managers ensured there was

6    sufficient mining and equipment to conduct the

7    mining that needed to be done at Questa, correct?

8        A.    Yes, sir.

9        Q.    **For example, Molycorp purchased excavators**

10   **and a fleet of hauling trucks to haul land waste**

11   **from the open pit, right?**

12       A.    Yes.

13       Q.    **No mining equipment was bought by the**

14   **United States, right?**

15       A.    Correct.

16       Q.    **And based on your experience with the**

17   **company, Molycorp determined how many employees to**

18   **hire and fire on a routine basis; is that right?**

19       A.    Yes.

20       Q.    **Molycorp employees conducted all the**

21   **day-to-day mining and disposal activities at the**

22   **Questa Mine, correct?**

23       A.    Repeat that, please.

24       Q.    **Did Molycorp employees conduct all of the**

25   **day-to-day mining and disposal activities at the**

1    Questa Mine?

2        A.    Yes, sir.

3        Q.    Thank you.

4              And Molycorp's mining plan determined how

5    many tons of ore would be supplied to the company

6    mill for processing; is that right?

7        A.    Yes.

8        Q.    So Molycorp's mining plan determined how

9    many tons of tailings the mill would generate,

10   correct?

11       A.    Yes.

12       Q.    And similarly, Molycorp's mining plan

13   determined how much waste rock from the open pit

14   would be dumped on the surrounding land at the mine,

15   correct?

16       A.    Correct.

17       Q.    Mr. Dewey, I would like to show passages

18   from your direct testimony at this point.  It is

19   Page 5.

20             MR. AUGUSTINI:  We are using the

21   electronic court page references instead of the

22   internal pages, just for clarity in the record.

23       Q.    (By Mr. Augustini)  Directing your

24   attention to the middle of the page, there is a

25   question and answer there, and you stated, "Also,

1  **waste disposal capacity and planning is a key**

2  **element of feasibility planning.  So it was**

3  **something I was very attuned to throughout my time**

4  **at Molycorp."**

5              THE COURT:  Excuse me.  Where are you

6  reading from?

7              MR. AUGUSTINI:  Your Honor, the middle of

8  page, ECF Page 5, Page 4 of Mr. Dewey's written

9  direct testimony.

10             THE COURT:  I am on Page 4 here.

11             MR. AUGUSTINI:  Yes.  Just in order to

12  pull it up --

13             THE COURT:  It is either Page 5 or 4?

14             MR. AUGUSTINI:  I'm sorry, Your Honor, I

15  tried to explain before to avoid the confusion, and

16  I apologize, but it is Page 4 of his written

17  testimony.  But just for reference purposes, we're

18  at the top of ECF filing line.  It's Page 5, so that

19  is why --

20             THE COURT:  All right, I can't tell

21  whether you are giving him the right quotes if I

22  can't see it.

23             MR. AUGUSTINI:  Okay.  Maybe we could

24  highlight the passages, if we can on the fly, but

25  otherwise, I will try to make sure that I'll cite

1    both page numbers.  I apologize, Your Honor.

2            THE COURT:  I still only have Page 4 here.

3            MR. AUGUSTINI:  That is the correct page.

4    We'll try to highlight it for Your Honor, please.

5            THE COURT:  Okay.

6            MR. AUGUSTINI:  That is what I just read,

7    Your Honor.  It is now blown up a little bigger.

8            THE COURT:  Okay.

9            MR. AUGUSTINI:  I apologize.

10       **Q.    (By Mr. Augustini)  So, Mr. Dewey, so**

11   **hopefully that is a little more visible for you,**

12   **too.  I realize it is hard to pick it out of a blank**

13   **page on the screen.**

14       A.    Thank you.

15       **Q.    But that is your testimony, sir?**

16            **Waste disposal planning was a key element**

17   **of the job of mine planning at Questa?**

18       A.    Very definitely.

19       **Q.    And was Molycorp's engineering department**

20   **primarily responsible for selecting the locations**

21   **and designing the configurations of the waste dumps?**

22       A.    Yes, sir.

23            MR. AUGUSTINI:  Mr. Hambrick, please show

24   Exhibit USX015.

25       **Q.    (By Mr. Augustini)  Mr. Dewey, do you**

1   recognize USX015 as a May 1971 memorandum from

2   Mr. McKereghan to Mr. Torgerson?

3        A.    Yes.

4             MR. AUGUSTINI:  I move to admit USX015,

5   Your Honor.

6             MR. HOPSON:  No objection.

7             THE COURT:  Without objection, it is

8   admitted.

9             (Exhibit admitted, USX015.)

10       Q    (By Mr. Augustini) And here, referencing

11   the sentence just below the first paragraph, "I

12   believe the following dump criteria should be used."

13            So do you agree this is an example of the

14   engineering department establishing the criteria in

15   which the waste-rock dumps at the Questa Mine would

16   be designed?

17       A.    Yes.

18       Q.    And the numbers there listed in USX015

19   would be 600, 9,000, 9,200, those correspond to

20   elevations at the mine, correct?

21       A.    Correct.

22       Q.    And so the dumps were located at different

23   elevations relative to the pit, generally, correct?

24       A.    Right.

25       Q.    The natural terrain at the Questa Mine is

1    very steep, isn't it?

2        A.    Yes.

3        Q.    And that made Molycorp's mining a little

4    bit more of a challenge, right?

5        A.    A little bit more what?

6        Q.    The topography impacted where Molycorp

7    chose to locate the mill facilities, the truck shop,

8    the mine roads, and other aspects of the mine; is

9    that right?

10       A.    Yes.

11       Q.    One consideration was Molycorp wanted to

12   maximize the use of available space for waste-rock

13   dumps near the open pit; is that right?

14       A.    Yes.

15             MR. AUGUSTINI:  Mr. Hambrick, please show

16   USX601.

17       Q.    (By Mr. Augustini)  Mr. Dewey, do you

18   recognize, again, Mr. Torgerson?

19       A.    Yes, I do.

20       Q.    And who is he?

21       A.    He was the chief engineer at the mine at

22   that time.

23             MR. AUGUSTINI:  Your Honor, I move to

24   admit USX601.

25             THE COURT:  Any objection?

```
 1              MR. HOPSON:  No objection, Your Honor.

 2              THE COURT:  It will be admitted.

 3              (Exhibit admitted, USX601.)

 4       Q    (By Mr. Augustini) And this memo,

 5   Mr. Dewey, refers to Riverside Dump Mechanics; is

 6   that right, the title?

 7       A.   Yes.

 8              MR. AUGUSTINI:  If we could turn to the

 9   next page, Mr. Hambrick.  Highlight the Section 2 at

10   the bottom, please.

11       Q.    (By Mr. Augustini) Do you see the

12   Section 2 titled, "Maximize Lower Dump Life,"

13   Mr. Dewey?

14       A.   Yes.

15              MR. HOPSON:  Your Honor, I don't have an

16   objection.  I would like to give a binder with the

17   complete document to Mr. Dewey so he can see the

18   document in whole rather than just excerpts that the

19   Government has provided.

20              THE COURT:  You have that document, don't

21   you?

22              MR. HOPSON:  Yes, thank you.

23              MR. AUGUSTINI:  It is USX601.

24              I have a few simple questions.

25              May I proceed, Your Honor, or --
```

1              THE COURT:  Let him find it.

2              Did you find 601, Mr. Dewey?

3              THE WITNESS:  Yes, I did.  I have reviewed

4    it, sir.

5              THE COURT:  You may proceed.

6    **Q    (By Mr. Augustini) Thank you.**

7         **I was just going to reference the first**

8    **sentence under the maximize dump utilization.**

9         **It states, "Recent studies into the**

10   **mechanics of waste disposal at the Riverside dumps**

11   **indicate that the upper terrace dumps must lead the**

12   **lower terrace dumps east to west in order to**

13   **maximize the utilization of available dump storage,"**

14   **and then the memo continues.**

15        **Is this just another example, Mr. Dewey,**

16   **of the engineering department doing dump planning**

17   **and design in order to maximize the available space**

18   **at the site?**

19   A.   Once this became the only option, the

20   Riverside dumps became the only option, a

21   significant amount of time was then spent trying to

22   figure out how to get all of this waste on that

23   hillside.  And this ongoing activity, yes, sir.

24   **Q.   Using the space that was available to it,**

25   **it was important for the operation, correct?**

Page 23

1        A.     That is correct.

2        Q.     Okay.  By 1974, you were in charge of all

3   operations at the Questa Mine; is that right?

4        A.     Yes, sir.

5        Q.     And those operations included managing the

6   waste dumps in the company's offsite tailings

7   disposal facility, correct?

8        A.     Yes.

9        Q.     By the mid-1970s, Molycorp planned to

10  transition from an open pit mine to a -- developed a

11  new underground mine; is that right?

12       A.     Yes.

13       Q.     And in 1976, I believe you received a

14  promotion to be vice president of the company and

15  moved to the New York headquarters; is that right?

16       A.     Yes.

17       Q.     And then UNOCAL, Union Oil of California,

18  acquired Molycorp in 1977, right?

19       A.     Yes.

20       Q.     A few months after the merger, did you and

21  your team present Molycorp's feasibility analysis to

22  UNOCAL seeking corporate approval to develop the new

23  underground mine at Questa?

24       A.     Approximately nine months after its

25  merger.

1        Q.    At the time UNOCAL was one of the largest

2   companies in America, correct?

3        A.    I don't believe that's correct, no, sir.

4   They were a significantly large company, but not one

5   of the largest.

6        Q.    Not part of the Fortune 500, that you

7   recall?

8        A.    I don't know.

9        Q.    Okay.  At your deposition, I believe you

10   mentioned that the Questa project was the largest

11   investment that UNOCAL had made up to that point in

12   time; is that correct?

13        A.    That is correct.

14        Q.    The United States provided no funding for

15   the development and operation of the underground

16   mine, right?

17        A.    No, that is not correct.

18        Q.    What funding did the U.S. provide?

19        A.    They provided half the funding for the

20   defense mineralization defense contract work.

21        Q.    Okay.  So other than that one loan, which

22   occurred in 1957, correct?

23        A.    Correct.

24        Q.    The United States provided no funding

25   whatsoever for the development of the underground

1    **mine, which happened 20 years later.**

2        A.    I still don't agree with that statement,

3    sir.

4        **Q.    What else besides the DMEA loan, sir?**

5        A.    The involvement of the USGS in the Defense

6    Minerals Exploration Act and their certification of

7    the resource that they said was identified as a

8    result of that project enabled Molycorp to get

9    funding from Wall Street to do this operation.

10       **Q.    So my question was direct funding, sir.**

11            **There was no financing by the**

12   **United States provided with respect to the**

13   **underground mine, correct?**

14       A.    Correct.

15       **Q.    Now, between 1985 and 2000, you served as**

16   **president of Molycorp, right?**

17       A.    Correct.

18       **Q.    And during that period Molycorp owned all**

19   **the land at the Questa Mine, including the open pit**

20   **and the underground mine, right?**

21       A.    Yes, sir.

22       **Q.    Molycorp generated and disposed of**

23   **100 percent of the waste rock in the piles at the**

24   **Questa Mine, correct?**

25       A.    Yes.

1       Q.      Molycorp also generated and disposed of
2    100 percent of the tailings at the company's offsite
3    tailings facility, correct?

4       A.      Yes.

5       Q.      And in addition to the initial dumping of
6    waste, Molycorp was responsible for managing and
7    maintaining all the waste piles at the Questa Mine,
8    correct?

9       A.      Correct.

10      Q.      Molycorp's activities included
11   consolidating the piles, grading, cutting benches,
12   into the piles to facilitate ongoing disposal of
13   waste rock, correct?

14      A.      Correct.

15      Q.      And if the market price warranted, could
16   Molycorp take what was previously marginal there and
17   process it to sell from the piles?

18      A.      There was one period in time in which we
19   attempted to do that unsuccessfully.

20      Q.      I think you testified at your deposition,
21   sir, that some material was taken from the Sugar
22   Shack and middle waste-rock piles in the latter
23   years of the open pit history; is that correct?

24      A.      One period, if I said latter years, that
25   is correct.  A small amount for a month or two to

1   see if that was a possibility.  The first time in a

2   long time the price of molybdenum had increased

3   dramatically and we were not in a position to

4   participate in that market.

5       Q.    In your 33-year career with Molycorp,

6   Mr. Dewey, the company directed, managed and

7   controlled all of the mining disposal operations at

8   the Questa Mine and the offsite tailings area,

9   correct?

10      A.    Correct.

11      Q.    Okay.  Mr. Dewey, I know you are very

12  familiar with the open pit's operational history.

13            MR. AUGUSTINI:  At this time,

14  Mr. Hambrick, I would just -- please show USX594.

15      Q.    (By Mr. Augustini) Mr. Dewey, are you

16  familiar with a promotional video Molycorp made in

17  the mid-1960s called, "A Story of Molycorp," as

18  reflected in this screenshot?

19      A.    In the mid-1960s?

20      Q.    Or at any time, sir.

21            Have you ever heard of this video before?

22      A.    I don't know about the mid-1960s.

23            I believe I'd have to see it, but I think

24  this was done in conjunction with the dedication of

25  the new underground mine, which would have been, you

1   know, in 1983 or so.

2        **Q.    Okay.**

3             MR. AUGUSTINI:  Well, Your Honor --

4        A.    I would have to see it.

5        **Q.    Sure.  I understand, sir.  One moment.**

6             MR. AUGUSTINI:  Your Honor, we have a

7   short video clip from this movie that we would like

8   to request permission to display.  It is about two

9   minutes long.  And then Mr. Dewey would have a

10  better basis to identify what's shown.

11            THE COURT:  What is the purpose of the

12  movie?

13            MR. AUGUSTINI:  The purpose is it depicts

14  the operations occurring in the open pit, including

15  the excavation of material, the loading of haul

16  trucks and the dumping of waste down on the waste

17  piles.

18            THE COURT:  Is there a dispute about any

19  of that?

20            MR. AUGUSTINI:  I don't think there is any

21  dispute that --

22            THE COURT:  If there is no dispute, let's

23  move right on by that.

24            MR. AUGUSTINI:  Okay, Your Honor.

25       **Q    (By Mr. Augustini) Mr. Dewey, you are**

1    **familiar with the haul trucks that Molycorp used?**

2        A.    Yes, sir.

3        **Q.    Some of those had up to a 100-ton payload**

4    **capacity; is that right?**

5        A.    The largest trucks we had were 120 tons.

6        **Q.    As part of the open pit mining, was the**

7    **company interested in acquiring the largest possible**

8    **haul trucks it could?**

9        A.    We were -- we would love to have it but we

10    didn't have the money to do that.

11        **Q.    Still a 100-ton payload is -- I mean,**

12    **these are gigantic machines, right?**

13        A.    Nothing compared to the 400-ton trucks

14    that exist today, and as it evolved in the period of

15    time from 120 tons to 200 to 300 to 400.  We would

16    have loved to have had that.

17        **Q.    Sure.**

18            **But just for the laymen, who is not used**

19    **to seeing these, they are not just pickup trucks,**

20    **they're hauling waste?**

21        A.    Right.

22        **Q.    And when you were working as an executive**

23    **at the Questa Mine, did you frequently observe haul**

24    **trucks going back and forth from the pit to the**

25    **waste piles dumping waste?**

1      A.    Yes, sir.

2      **Q.    Was that basically a continuing constant**

3   **process as relating while mining was occurring?**

4      A.    24/7.

5      **Q.    And waste hauling, you testified, was one**

6   **of the biggest cost drivers of the entire open pit**

7   **mining operation, right?**

8      A.    Excuse me?

9      **Q.    Was waste hauling one of the biggest cost**

10  **drivers of the open pit mining?**

11     A.    Yes, the biggest.

12     **Q.    The biggest.**

13        **That is why Molycorp wanted to dump waste**

14  **rock as close to the open pit as possible, right?**

15     A.    No, sir.

16     **Q.    Well, the longer the haul, the more**

17  **expensive, right?**

18     A.    It depends on the gradient of the haul,

19  the method of the haul.  I really -- truck versus

20  conveyors for example, so --

21     **Q.    Understood.**

22        **Molycorp conducted all of the blasting and**

23  **excavating, maintained all the mine roads at the**

24  **Questa open pit mine; is that right?**

25     A.    Yes, sir.

1     Q.     **Would you say it was a fairly -- because**
2     **of all of that activity, there was a fair amount of**
3     **dust that was generated?**
4     A.     No.   There was a little bit of dust after
5     a blast, but we always had water trucks on the road.
6     Several water trucks.   That was critical.   It was
7     impossible for those trucks to operate in a dusty
8     environment.
9     Q.     **The terrain is so steep and visibility is**
10    **important for the drivers, correct?**
11    A.     For the drivers and for the employees.
12    Q.     **Right.**
13           MR. AUGUSTINI:  Mr. Hambrick, please
14    display USX584.
15    Q.     **(By Mr. Augustini) Mr. Dewey, I will**
16    **represent to you that this is a top and bottom**
17    **before and after depiction of the Questa Mine.**
18           **If you notice, the date below the top**
19    **photograph, October 7, 1962, the date below the**
20    **bottom photograph, July 7, 2016.**
21           **Do you recognize that the Questa Mine is**
22    **depicted in those photos?**
23    A.     Yes, sir.
24    Q.     **And the top photo from 1962 was from**
25    **before Molycorp's open pit mining, correct?**

1     A.    Correct.

2     Q.    **To your knowledge, there were no visible**

3  **waste piles of any significance on the surface at**

4  **the Questa Mine in 1962?**

5     A.    That is correct.

6     Q.    **Nothing like what we see in 2016, correct?**

7     A.    Yes, that is correct.

8     Q.    **And in the 1962 photo, are you aware that**

9  **the site was generally forested with trees?**

10    A.    Far from it.

11          The site, it included several hydrothermal

12  scars that were a constant source of pollution to

13  the Red River after every rainstorm.

14          I would not call it pristine.  The whole

15  river would trench, all the way from just below Red

16  River to below the mine site.  Contains at least

17  half a dozen hydrothermal scars.

18          Pristine is not a word I would use, sir.

19    Q.    **I didn't say pristine.  I asked if there**

20  **were trees.**

21          **There were trees in 1962 at the site,**

22  **correct?**

23    A.    It was what?

24    Q.    **There were trees, that's all.**

25    A.    Oh, trees.  Not many at the mine site.

1            Again, if you look at a blowup of that

2    sulphur gulch, it was completely denoted from the

3    hydrothermal scars.

4            Obviously, there were trees where the dump

5    site is, yes, but where the open pit mine took place

6    on the east side, that was -- there were no trees of

7    any consequence.

8        Q.    **Mr. Dewey, I have circled the area in the**

9    **1962 photo.  I agree there are bare spots where the**

10   **hydrothermal scars are located.**

11           **Did I circle the one that you were**

12   **referring to?**

13       A.    Yes, sir.

14       Q.    **Okay.  But otherwise, there were trees at**

15   **the site but there weren't, as of 2016, the white**

16   **area that we see in the bottom photo, that is all**

17   **waste rock, correct?**

18       A.    That is correct.

19           MR. AUGUSTINI:  Mr. Hambrick, could you

20   please display US Demonstrative Exhibit 2.

21       Q.    **(By Mr. Augustini) Mr. Dewey, when you**

22   **have a chance, you agree that this photograph**

23   **depicts the general appearance of the Questa Mine**

24   **open pit mining, sir?**

25       A.    Yes, sir.

1     Q.    Okay.  Some of the lettering is a little

2  bit small to read, perhaps, on the screen, but you

3  are familiar with the layout.

4           Do you see in green down on the south

5  there is a label for the Red River and Highway 38?

6     A.    Yes.

7     Q.    That is where those were located, correct?

8     A.    Yes.

9     Q.    And in the foreground, there is a blue

10  label that sits on top of the mill area.

11           Is that the correct location?

12     A.    Yes, sir.

13     Q.    Thank you.

14           And the elevation, there in the mill area,

15  is a little bit lower than what you would get if you

16  head up to the top of the open pit rim, correct?

17     A.    The elevation at the mill area is 7900,

18  elevation to the very top of the pit is 10,000.

19     Q.    And if we look down the Red River trench,

20  the canyon, and we keep going all the way in the

21  distance, are those the Guadalupe Mountains that we

22  can see at the top of that photograph?

23           THE COURT:  If you would stay a little

24  closer to the microphone.  Thank you.

25     Q    (By Mr. Augustini) Mr. Dewey, do you

1    recognize the Guadalupe Mountains at the top of the

2    photograph?

3        A.    Yes, yes, I do.

4        Q.    And the company's offsite tailings

5    facility was located just at the base of those

6    mountains.  You may be able to make it out even, the

7    white areas.

8              Does that correspond to the company's

9    tailing facility?

10       A.    Yes, it does, sir.

11       Q.    And is the approximate pit rim identified

12   accurately with an orange circle on this

13   demonstrative?

14             Is the pit rim represented?

15       A.    Yes, yes, sir.

16       Q.    Okay.  Thank you.

17             And are the various waste piles that were

18   located during the open pit mining also correctly

19   labeled with the blue lettering surrounding the pit?

20       A.    Yes, sir.

21             Excuse me.  May I point out something to

22   go back to a question that you had a couple of times

23   ago?

24             You have a better view of what this pit

25   looked like before we started in the top part of

1    that hydrothermal scar.

2        Q.    **Okay.  Your counsel can follow up, if he'd**

3    **like.**

4        A.    Very good.

5        Q.    **Thank you.**

6              **And the so-called roadside piles, do you**

7    **see those depicted on the demonstrative?**

8              THE COURT:  What did you call them?

9    Roadside?

10             MR. AUGUSTINI:  Yes, sir, they are called

11   the roadside piles.

12       A.    I have never heard them called roadside

13   piles, but the piles that are adjacent to the

14   highway you are referring to.

15       Q.    **(By Mr. Augustini)  Sure.**

16             **We are talking about Sulphur Gulch,**

17   **Mid-Low and Sugar Shack?**

18       A.    Yes, yeah.

19       Q.    **Now, are you aware that those three piles**

20   **in particular above the state highway are roughly a**

21   **thousand feet tall?**

22       A.    Yes.

23       Q.    **And what is the green forested area on the**

24   **south side of the Red River?**

25       A.    What is it?

Page 37

1      Q.     Is that part of the Carson National

2  Forest?

3      A.     Yes.

4      Q.     When you came to Questa in the late 1960s,

5  the Red River already was a popular spot for trout

6  fishing, right?

7      A.     Yes.

8      Q.     The state's Fish Hatchery is only about a

9  mile downstream from the tailings impoundments,

10 right?

11     A.     Right, right.

12     Q.     And the area around Questa in the late

13 '60s, was there a prime destination for skiing and

14 various outdoor recreation, right?

15     A.     That is correct.

16     Q.     And when Molycorp decided to develop an

17 open pit mine, it was aware of its surroundings and

18 the environment, right?

19     A.     Yeah, that is correct.  Molycorp had been

20 there since 1920.

21     Q.     Right.

22            Now, Mr. Dewey, I would like to turn to

23 some questions about Kennecott.

24            When you left Kennecott in 1967, were you

25 aware that Kennecott and Molycorp had a longstanding

1    **business relationship?**

2        A.    No.

3        **Q.    Did you find that out after you joined**

4    **Molycorp?**

5        A.    Yes.

6            MR. AUGUSTINI:  Mr. Hambrick, please

7    display CX519.  Sorry, USX519.

8        **Q.    (By Mr. Augustini) Mr. Dewey, Molycorp is**

9    **a publicly-traded corporation, right?**

10       A.    Yes, sir.

11       **Q.    And Molycorp prepares reports, annual**

12   **reports to shareholders, right?**

13       A.    Yes, sir.

14       **Q.    What we have displayed in USX519 is the**

15   **1955 annual report.**

16           MR. AUGUSTINI:  If we could turn to

17   Page 3, Mr. Hambrick.

18           And the first full paragraph, please blow

19   up.

20       **Q.    (By Mr. Augustini) Do you see the**

21   **reference there to a stock purchase by Kennecott,**

22   **Mr. Dewey?**

23       A.    Yes, sir.

24       **Q.    So Molycorp sold Kennecott 50,000 shares**

25   **of stock in exchange for about 2.8 million in 1955,**

1    right?

2        A.    Yes.

3        Q.    **And that money received in 1955 could be**

4    **used to conduct exploration for newer bodies in**

5    **Questa, correct?**

6        A.    It was used for general corporate expense,

7    including some exploration, I'm sure.

8        Q.    **So it was up to the company how to use the**

9    **funds once the transaction was completed, correct?**

10       A.    Yes, sir.

11       Q.    **And that was two years before the small**

12   **DMEA loan that you mentioned earlier in your**

13   **testimony.**

14             **Two years prior to the DMEA loan in 1957?**

15       A.    Yes, yes, sir.

16       Q.    **And just briefly turning to the Page 4,**

17   **you probably are familiar with this, Molycorp and**

18   **Kennecott also had a common interest to explore and**

19   **develop a rare earth mine in Oka, Québec?**

20       A.    Not a rare earth mine, sir.  It was a

21   Columbian mine.

22       Q.    **Okay.  Nevertheless, there was a**

23   **partnership with Kennecott to develop and explore at**

24   **the mine in Canada, correct?**

25       A.    It was at the stage of exploration, yes,

1    sir.

2        **Q.    And joint venturers to develop mines are**

3    **fairly common in the mining industry; isn't that**

4    **right?**

5        A.    Yes, that occurs.

6        **Q.    And is there a reason because mines are so**

7    **capital intensive to develop a mine, it costs a lot**

8    **of money so partners -- partnerships are born?**

9        A.    Generally, the reason is one company or

10   the other has the right to explore that and they are

11   willing to bring another company in that might have

12   some expertise in that particular -- in this case,

13   you know, I learned a lot about that after I became

14   vice president, but in this case, the Boca, Molycorp

15   had been involved in Columbia, from Brazil, Molycorp

16   had been involved in producing Columbian products

17   and Kennecott had no experience with Columbian.

18            And so it was Kennecott's advantage to try

19   to entice Molycorp to get involved in this project

20   in order to determine whether it might be

21   competitive of what was going on in other parts of

22   the world.

23       **Q.    Sure.**

24           **And Kennecott provided capital to Molycorp**

25   **for that in connection with the partnership, right?**

1     A.    That's correct.

2           MR. AUGUSTINI:  Mr. Hambrick, please

3     display CX119.

4     **Q.    (By Mr. Augustini) Mr. Dewey, do you**

5     **recognize the Molycorp Molybdenum Corporation of**

6     **America header and see the date, September 26, 1961?**

7     A.    Yes, sir.

8     **Q.    And the location is New York.  That is the**

9     **Molycorp headquarters, correct?**

10    A.    Yes.

11          MR. AUGUSTINI:  Your Honor, I move to

12    admit CX119.

13          MR. HOPSON:  No objection.

14          THE COURT:  Admitted.

15          (Exhibit admitted, CX119.)

16    **Q    (By Mr. Augustini) If we could just scroll**

17    **briefly to the end to see the signature.**

18          **Do you see at the bottom, this memo is**

19    **signed by William Kuntz?**

20    A.    Yes, sir.

21    **Q.    What position did he hold at Molycorp at**

22    **the time?  Was he president?**

23    A.    He was certainly president by the time I

24    got there.  I am not sure when he, the exact date he

25    became president.  It could very well have been.

Page 42

1       Q.      So a senior executive, nonetheless, in the

2   '60s?

3       A.      Yes.  He was treasurer and assistant

4   secretary prior to being appointed president, so,

5   yes.

6       Q.      And the date, 1961, this is after the DMEA

7   exploration, correct?

8       A.      Yes.

9       Q.      And Molycorp, at this time, had not

10  decided on a method of mining yet, right?

11      A.      No, I don't agree with that.

12      Q.      Okay.  Well, let's look at the -- I'm

13  sorry.

14      A.      Because at this point in time, 1961, the

15  fact that they were no longer going to be able to

16  use this 50-ton-a-day run by mules and a few 50

17  employees, they had now encountered this significant

18  large low-grade deposit, that was going to be

19  something quite different.

20      Q.      Yes.

21              But low-grade deposits can be mined either

22  through underground mining methods or open pit

23  mining methods, correct?

24      A.      Absolutely not.  Low grade -- low grade --

25  the low grade that we mined at Questa, there is no

Page 43

1    mine in the world that could successfully pull that

2    off from underground and be economic.

3        Q.    **Yes.**

4              **But that has to do with how close they are**

5    **to the surface as opposed to the grade of the ore,**

6    **right?**

7        A.    Molycorp had been mining 5 percent rock, 3

8    to 5 percent.  We are talking rock here that was

9    three-tenths of 1 percent, so anyway, the decision

10   to do an open pit, in my mind, was made even as

11   early as 1960 when the definitive drilling was

12   initiated.

13       Q.    **Okay.  We will definitely get into this in**

14   **more detail, but since you brought it up, what was**

15   **the ore grade in the new underground mine?**

16       A.    Well, approximately -- I think the average

17   grade was pulled out with something around 0.297.

18       Q.    **That is low grade, isn't it?**

19       A.    Not as low as 0.18.  And it happened to be

20   3,000 feet below the surface versus the open pit is

21   on the surface.

22       Q.    **Okay.  So I just want to understand, the**

23   **underground mine was nowhere near 5 percent that**

24   **they had been doing in the 1920s and '30s, right?**

25              **It is significantly lower than -- did you**

1    not refer to it as low-grade ore when you were

2    mining?

3        A.    In the 1930s?

4        Q.    In the 1930s, you mentioned the grade of,

5    or that they were extracting from these veins was

6    5 percent?

7        A.    Right.

8        Q.    What was the grade of the ore that you

9    extracted from the underground mine?

10       A.    Roughly three-tenths of 1 percent.

11       Q.    Three-tenths of 1 percent.   .03.

12             Okay.   Turning back to CX119, the first

13   paragraph mentions Al Grazulin.

14             You know, him, correct?

15       A.    Yes.

16       Q.    What was his role at Molycorp?

17       A.    He had been assistant manager and then

18   there was a period of time when he served as

19   manager.

20             And when I arrived, he was in charge of

21   our Government relations.

22       Q.    Okay.

23       A.    He was a staff person working on --

24   basically he spent time in Santa Fe when the Santa

25   Fe legislature was in session.

Page 45

1      Q.     Okay.  That is a fair description.

2             Do you see that there is -- Mr. Kuntz's

3      memo mentions that Al Greslin was in the process of

4      locating 570 additional mining claims around Questa?

5      A.     Yes, sir.

6      Q.     And there is a reference there that

7      Mr. Kuntz is pleased that Molycorp has beaten Climax

8      to the best prospects for mineralization in Questa,

9      right?

10     A.     Yes.

11     Q.     And Climax was, at the time and throughout

12     the history of the mining in Questa, the largest

13     producer of molybdenum in the world by far, right?

14     A.     Yes.

15     Q.     So Molycorp knew that Climax, as a

16     dominant player in the molybdenum mining market was

17     looking for opportunities to exploit molybdenum

18     deposits in Questa as well, correct?

19     A.     Correct.

20     Q.     And if Molycorp did not maintain its

21     mining claims correctly, in accordance with the law,

22     Climax was active in the area and looking to take

23     advantage of opportunity, correct?

24     A.     Correct.

25     Q.     Now, with respect to Kennecott, Mr. Kuntz

1    **writes, in the middle --**

2              MR. AUGUSTINI:   If we could pull out,

3    Mr. Hambrick, the lower half of the memo.

4        **Q.    (By Mr. Augustini) -- refers to Kennecott**

5    **exploration.**

6              **Do you see that, Mr. Dewey?**

7        A.    Yes, sir.

8        **Q.    Were you aware that Kennecott conducted a**

9    **field examination of the Questa Mine --**

10       A.    I am.

11       **Q.    -- in summer of 1961?**

12       A.    Yes.

13       **Q.    And Kennecott assisted Molycorp in**

14   **evaluating the potential for the future mine that**

15   **was under consideration at that time, correct?**

16       A.    No.   They -- Kennecott was working on

17   their own behalf.   I don't believe they were

18   assisting Molycorp.   They were deciding whether it

19   was something they wanted to pursue or not.

20       **Q.    Well, in any event, Molycorp invited them**

21   **or allowed them to come onto the property and look**

22   **at all the data and evaluate what the situation was?**

23       A.    At this point, as you pointed out, they

24   were shareholders, significant shareholders of that.

25       **Q.    Okay.**

Page 47

1          MR. AUGUSTINI:  Mr. Hambrick, please

2     display CX118.

3          **Q.    (By Mr. Augustini) The title is a little**

4     **bit faded, Mr. Dewey, but do you see that is the,**

5     **"Final Report at Questa Mine Examination, Taos**

6     **County, New Mexico"?**

7          A.    Yes.

8          **Q.    Do you recognize this report?**

9          A.    Yes, sir.

10          **Q.    This was prepared by Bear Creek Mining,**

11     **correct?**

12          A.    Yes, sir.

13          **Q.    And that was a division of Kennecott,**

14     **right?**

15          A.    Yes.

16          MR. AUGUSTINI:  If we could turn to

17     Page 11, Mr. Hambrick, please.

18          I don't think that is the right page.

19          **Q.    (By Mr. Augustini) But do you recall that**

20     **Kennecott provided Molycorp with a proposed**

21     **financial analysis for a block caving mine in this**

22     **report?**

23          A.    I don't re- -- I think Kennecott, in this

24     report, looked at the possibility of block caving

25     and open pit.

Page 48

1        Q.    So that was something -- a block caving is

2   an underground mine, correct?

3        A.    That is correct.

4        Q.    So that was something still in play, at

5   least in terms of Kennecott's report, as of 1961,

6   correct?

7        A.    That is correct.

8              But, sir, this other resource, as you

9   pointed out, we went underground to mine

10  three-tenths ore, that was known at the time and it

11  was assumed that at some point in time the mine

12  would go underground because everybody was plunging

13  underground.

14             So they looked at -- they looked at the

15  possibility of doing that through block caving.  I

16  believe Kennecott was one of the first block caving

17  mines.  In fact, the mine I worked at in Arizona

18  prior to 19 -- I don't know when, the 1940s or

19  somewhere, was a block caving mine.

20             So this was a concept they clearly

21  understood, yes.

22        Q.    And just not to minimize the levels of

23  analysis but a mining company would want to crunch

24  the numbers for either possibility to understand

25  which is the best option to undertake first,

1    **correct?**

2         A.    Yeah, but not necessarily undertake first.

3              In this case, everybody was on -- sitting

4    on the surface.  This underground portion is several

5    thousand feet deeper and away from that surface

6    expression.

7         **Q.    Sure.**

8              **My question was just, you would want to**

9    **make sure you understand which ore body was going to**

10   **be most advantageous to exploit before deciding**

11   **which direction to go, correct?**

12             **You have to run the numbers to know that.**

13        A.    Not -- the plan that was developed was to

14   exploit first what was laying on the surface to try

15   to generate some of the revenue they might be able

16   to use to develop these material that was several

17   thousand feet under the mountain.

18             So the timing of when this large open pit

19   possibility exist -- was necessary to start first

20   because that was the easiest and quickest thing to

21   get into operation.

22             An underground operation, you are talking

23   five to seven, seven years at that point in time, so

24   they are talking 40 or 50 years.

25             But the -- so to answer your question,

1  yes, they looked at the underground portion of that

2  ore deposit and they looked at the open pit portion.

3      Q.    Okay.

4           MR. AUGUSTINI:   If we could turn back to

5  CX199, Mr. Hambrick.

6      Q.    (By Mr. Augustini) Down on the very last

7  line and onto the second page, Mr. Kuntz states, "I

8  got the impression that Carmen feels that a deal

9  with Kennecott or a comparable large money company

10  would accelerate our quest for exploration because

11  of the professional and specialized training of

12  their personnel."

13          Does that make sense to you, that the

14  company would be thinking about whether a

15  partnership or some involvement by Kennecott in the

16  mine might make sense in '61?

17     A.    This individual felt that way, yes, sir.

18     Q.    Turning down to the last sentence of the

19  memo.

20          "I advised Carmen and Greslin that any

21  expenditures necessary to the exploration program

22  should be made.  I tried to impress upon them that

23  we are intent on making a mine out of Questa and we

24  should do it as expeditiously as possible."

25          Is that your understanding of Molycorp's

Page 51

1  **view as of 1961 to get moving and develop a mine as**

2  **quickly as possible?**

3      A.    Yes.  Molycorp couldn't exist at that

4  point in time without this mine, and that is why I

5  said earlier, I believe that Mr. Kuntz and company

6  had made a decision in 1960s, shortly after the ore

7  deposit was discovered.

8      Q.    **The company made the decision to proceed**

9  **with the open pit, correct?**

10     A.    Correct.

11           MR. AUGUSTINI:  Mr. Hambrick, please

12 display USX191.

13     Q.    **(By Mr. Augustini) Mr. Dewey, do you see**

14 **the title of this article is, "Long-Haul Drilling"?**

15     A.    Yes, sir.

16     Q.    **And the name to the right, Jack F.B.**

17 **Dolman?**

18     A.    Yes.

19     Q.    **Molycorp, correct?**

20     A.    Yes.

21     Q.    **Was he the chief geologist at Questa?**

22     A.    At that time, right, yes, sir.

23     Q.    **And if we look down at the bottom -- this**

24 **is a poor copy, so maybe you won't be able to see**

25 **the date -- there is a Mining Engineering.**

1           Is that a publication you are familiar

2  with?

3      A.   May of '65?

4      Q.   Correct.

5           If we expand the lower right-hand corner,

6  at the time.

7           Mr. Dolman states that, "The company had

8  allotted about a year to investigate the ore

9  possibilities at the Questa Mine, which at the

10  outset was considered only as an underground

11  operation."

12           Do you see that sentence?

13      A.   I see that.

14      Q.   And then a little bit further down,

15  Mr. Dolman writes, "About halfway through the

16  project, the possibilities of an open pit ore

17  deposit became apparent."

18           Do you see that, Mr. Dewey?

19      A.   Yes.

20      Q.   And then Mr. Dolman states that, "A large

21  amount of drilling had to be done in a short period

22  to prove or disprove a feasible open pit deposit."

23           Right?

24      A.   Yes.

25           MR. AUGUSTINI:  Move to admit USX191,

Page 53

1    Your Honor.

2              THE COURT:  Any objections?

3              MR. HOPSON:  No objection.

4              THE COURT:  Without objection, 191 is

5    admitted.

6              (Exhibit admitted, USX191.)

7              MR. AUGUSTINI:  Mr. Hambrick, please

8    display CX130.

9         Q.   (By Mr. Augustini) Mr. Dewey, this is,

10   again, a Molycorp letterhead.  The date is April 20,

11   1964, correct?

12        A.   Correct.

13        Q.   If you look at the first line or the

14   subject is, "Questa Financing Chemical Bank New York

15   Trust Company," correct?

16        A.   Yes, sir.

17        Q.   Are you familiar with that bank?

18        A.   Yes.

19        Q.   That was one of the lenders of the

20   company?

21        A.   Yes, sir.

22        Q.   And the first sentence states, "Bob Kuntz,

23   Ken Walker, Bob Davis and William Kuntz met with the

24   people from Chemical Bank."

25              Correct?

1      A.    Yes.

2      Q.    And just briefly, there is discussion of

3    the terms of the loans that Molycorp was seeking

4    from the banks, correct?

5      A.    Right.

6      Q.    Now, ultimately, Molycorp did obtain

7    financing in the amount of 20 million from Bankers

8    Trust and Malin Bank; is that right?

9      A.    That is correct.

10      Q.    And Chemical Bank provided Molycorp with

11    additional financing in 1964 through a

12    12.4 million-dollar debenture agreement; is that

13    right?

14      A.    You are correct, yes.

15      Q.    Do you agree those bank loans were

16    critically important to the company to develop the

17    pit?

18      A.    Yes.

19      Q.    In fact, Molycorp obtained private

20    financing to fund the development and pit mining

21    operation, correct?

22      A.    Correct.

23      Q.    I believe you stated in your written

24    testimony the development costs alone were about

25    $50 million.

1              Is that approximate?

2        A.    That is correct.

3        Q.    And in 1965, that would qualify as a very

4   large investment for Molycorp, right?

5        A.    Yes.

6        Q.    And it is a big investment for the banks,

7   too.  They are loaning the money for the pit, too,

8   correct?

9        A.    Correct.

10        Q.    By contrast, the United States did not

11   provide Molycorp with any capital for the open pit

12   development or operation, correct?

13        A.    That is correct.

14        Q.    The United States didn't purchase company

15   stock like Kennecott did, right?

16        A.    That is correct.

17        Q.    Nor did Molycorp and the United States

18   enter into any partnership agreements or share

19   profits or losses with respect to the mine

20   operations at Questa, correct?

21        A.    I believe the DME contract required

22   Molycorp to repay the loan from any operation that

23   was a result of the exploration program, and which,

24   in fact, was paid off within a matter of a couple of

25   years on the open pit mining operation.

Page 56

1      Q.      Sure.

2              Other than paying back the money it

3      borrowed to DMEA, there is no sharing of profits or

4      losses involved, right, with the United States?

5      A.      That is not correct, sir.

6      Q.      Well, you paid back the bank loans,

7      correct?

8      A.      We paid back the bank loans but we paid

9      millions of dollars in taxes over the years, you

10     know.

11     Q.      Because you think taxes are --

12     A.      We had no profits, but they certainly

13     shared in the cost of -- associated with the

14     Government revenues; i.e., state taxes, federal

15     taxes, so on.

16     Q.      Okay.  Well, taxes are just -- everyone

17     pays taxes, right?

18     A.      Everyone pays taxes, but they were the

19     only beneficiaries of that operation, to the best of

20     my knowledge.

21     Q.      You view taxes as some form of a joint

22     venture or partnership, is that your testimony?

23              MR. HOPSON:  Objection, argumentative.

24              THE COURT:  Sustained.

25              MR. AUGUSTINI:  Mr. Hambrick, let's

Page 57

1  display USX3, please.

2      Q.    (By Mr. Augustini) Mr. Dewey, are you

3  familiar with an S1 Registration Statement Molycorp

4  filed in October, 1964?

5      A.    Yes, sir.

6      Q.    Turning to Page 12 or maybe you are

7  generally familiar, were you aware that Kennecott

8  supplied almost all the ore that Molycorp processed

9  in its roster?

10      A.    That was Molycorp's primary business, yes.

11      Q.    Right.  The road it wasn't mining that was

12  the primary business, it was the roasting of

13  molybdenum ore that other companies, such as

14  Kennecott, supplied, correct?

15      A.    That supplemented with the underground

16  mining, that is correct.

17      Q.    Okay.

18          MR. AUGUSTINI:  Mr. Hambrick, please turn

19  to USX559.

20      Q.    (By Mr. Augustini) Are you familiar,

21  Mr. Dewey, with the UNOCAL Form S8 Securities

22  Registration payment from 1977?

23      A.    Yes, I have seen this, yes, sir.

24      Q.    And you mentioned earlier UNOCAL acquired

25  Molycorp in the summer of 1977?

Page 58

1      A.    Yes.

2      Q.    **By that time Molycorp was well into**

3   **planning what to do after the open pit mine,**

4   **correct?**

5      A.    Correct.

6      Q.    **Molycorp wanted to invest between 200 to**

7   **300 million to develop a new underground mine at**

8   **Questa, right?**

9            **That was on the table?**

10     A.    I wouldn't say Molycorp wanted to invest

11   that.  There was a joint venture with Kennecott to

12   define the underground resource.  And if those

13   numbers -- if the mining operation were that large,

14   then that was the numbers.

15           See otherwise, Molycorp's plan, we had a

16   parallel plan to do something on our own without a

17   joint venture with Kennecott.  And so I never

18   envisioned the same plan that Kennecott had.

19     Q.    **Okay.  So just to unpack that a little**

20   **bit, in connection with the thinking about or**

21   **planning for the next phase of mining at Questa,**

22   **Kennecott came back into the picture again and**

23   **actually did enter a partnership agreement with**

24   **Molycorp, correct?**

25     A.    Correct.  Well, an agreement that could

Page 59

1    lead to a partnership, yes, sir.

2         Q.    Okay.   Did Kennecott contribute about

3    $6 million for drilling and exploration related to

4    the Questa Mine?

5         A.    Yes.

6         Q.    And in 1975, Molycorp owned virtually all

7    the land at the Questa Mine in fee simple, correct?

8         A.    Correct.

9         Q.    And do you recall that if Phase 2 of the

10   partnership with Kennecott was reached, that

11   Kennecott would essentially acquire the mine lands?

12        A.    They would acquire 60 percent, if I

13   remember the number.

14        Q.    Okay.

15             MR. AUGUSTINI:   Mr. Hambrick, please show

16   USX11.

17        Q.    (By Mr. Augustini) Mr. Dewey, do you

18   remember this geological report, Questa project 1975

19   to '77?

20        A.    Yes, I do.

21        Q.    Yes?

22        A.    Yes, sir.

23        Q.    And this was prepared by Kennecott,

24   correct?

25        A.    Correct.

Page 60

1    Q.    Did you receive it as a vice president of

2  Molycorp?

3              I'm sorry, sir, we are talking too

4  quickly.

5              Did you receive a copy of this report in

6  your capacity as vice president?

7    A.    Yes, I did.

8    Q.    As it turned out, UNOCAL acquired Molycorp

9  in July '77 and --

10   A.    August of '77.

11   Q.    August, excuse me.

12             And the underground mine became a UNOCAL

13  project at that point, correct?

14   A.    Not at that point, no, sir.

15   Q.    Rather than proceeding with Kennecott

16  under the partnership, as it turned out the

17  underground mine was developed under UNOCAL,

18  correct?

19   A.    Correct.

20   Q.    And UNOCAL bought out Kennecott's

21  partnership interest in the Questa Mine for

22  $13 million.

23             Do you recall that?

24   A.    Yes, I do.

25             MR. AUGUSTINI:  Mr. Hambrick, please

Page 61

1   display USX486.

2        Q.     (By Mr. Augustini) Mr. Dewey, I know you

3   might not recall this specific letter at the moment,

4   but do you see your name on the letterhead at the

5   top of this exhibit?

6        A.     Yes.

7        Q.     And the date is February 1979?

8        A.     Yes, sir.

9               MR. AUGUSTINI:  Your Honor, I move to

10  admit USX486.

11              THE COURT:  Without objections, 486 is

12  admitted.

13              (Exhibit admitted, USX486.)

14       Q     (By Mr. Augustini) Is this a letter, sir,

15  that you sent to your counterpart at Kennecott in

16  1979?

17       A.     He was not a counterpart, he was the

18  individual, the head of the exploration group at

19  Bear Creek Mining.

20       Q.     And that would be Mr. Van Voorhis?

21       A.     Van Voorhis.

22       Q.     And do you recall your letter generally

23  commends the Kennecott geologists who came and

24  assisted Molycorp with exploration and

25  predevelopment work for the underground mine?

1      A.      Would you repeat the question?

2      **Q.      We can look at the language, but do you**

3  **recall this letter was complimentary of the**

4  **professionalism and caliber of the Kennecott people**

5  **who came to the Questa Mine and worked with you-all?**

6      A.      The basic purpose of this letter was I was

7  objecting to their writing a report, taking all the

8  credit for what was involved, and there were some

9  definitely complimentary comments in the letter,

10 yes.

11     **Q.      Sure.**

12             **So, for example, you -- I guess the**

13 **positive is, "I recognized that they made a major**

14 **contribution during the two years they were on the**

15 **project."**

16             **That is referring to the Kennecott**

17 **geologists, correct?**

18     A.      Correct.

19     **Q.      So although the partnership didn't come to**

20 **full fruition, Molycorp's relationship with**

21 **Kennecott ended on good terms, correct?**

22     A.      Ended up what?

23     **Q.      On good terms?**

24     A.      Yes, I would say certainly on business

25 terms.

Page 63

1      Q.     **Exactly.**

2      A.     Yeah.

3      Q.     **Okay.  Mr. Dewey, changing subjects, as a**
4      **former executive, you're familiar with the ownership**
5      **history of the Questa Mine?**

6             THE COURT:  Counsel?

7             MR. HOPSON:  Yes, Your Honor, if we are

8      changing subjects, might this be a good time to take

9      a short break?

10            MR. AUGUSTINI:  Yes.

11            THE COURT:  Okay.  10-minute break.

12            (A recess was taken.)

13            THE COURT:  You may be seated.

14            Counsel, you may proceed.

15            MR. AUGUSTINI:  Thank you.

16            Your Honor, I neglected to move the entry

17     of CX130, it's the Chemical Bank memos that we

18     discussed and --

19            MR. HOPSON:  No objection, Your Honor.

20            THE COURT:  Without objection, 130 is

21     admitted.

22            (Exhibit admitted, CX130.)

23     Q    (By Mr. Augustini) **Mr. Dewey, Molycorp**
24     **acquired fee title to several hundred acres of land**
25     **at the Questa Mine in the 1920s and the 1930s; is**

Page 64

1   that right?

2       A.   Yes, sir.

3       Q.   **And that was the land on which Molycorp**

4   **developed the open pit, correct?**

5       A.   Correct.

6            MR. AUGUSTINI:  Mr. Hambrick, please

7   display CX453.

8       Q.   **(By Mr. Augustini) Mr. Dewey, this is an**

9   **Exhibit prepared by one of Chevron's witnesses, Dr.**

10  **Haddad.**

11           **And if you zoom in, you can see dates and**

12  **boundaries.**

13           **Do you have a general understanding of the**

14  **coverage of the patents that Molycorp obtained over**

15  **time?**

16      A.   Yes, sir.

17           MR. AUGUSTINI:  Mr. Hambrick, please

18  display the next version of this exhibit.

19           And on this, just for ease of reference,

20  we have shaded the area that is encompassed by

21  Molycorp's patents in the 1920s and '30s.

22      Q.   **(By Mr. Augustini) Do you see that,**

23  **Mr. Dewey?**

24      A.   That is the yellow area that says "Land

25  Patent"?

Page 65

1      Q.      Yes, sir.

2      A.      Yes, sir.

3      Q.      And within the yellow area, if you see the

4      photo behind it, is the open pit location, correct?

5      A.      Yes, sir.

6      Q.      And owning the land that encompassed the

7      open pit was important to Molycorp in terms of being

8      able to obtain financing from banks; is that right?

9      A.      Having control of the land, yes, sir.

10     Yes, sir.  Yes.

11     Q.      They wanted to know that you will be able

12     to conduct your mining operations before they loan

13     you tens of millions of dollars, generally, correct?

14             That is the concern?

15     A.      Yes.

16     Q.      And the open pit was the source of the

17     molybdenum of the mining company in the 1960s and

18     '70s, correct?

19     A.      Correct.

20     Q.      And the open pit was the waste rock that

21     was dumped on the ground surface at the Questa Mine,

22     correct?

23     A.      Right.

24     Q.      And once the mining was underway, the open

25     pit's geology became a source of some significant

Page 66

1    operational problems for Molycorp; is that right?

2        A.    Yes.

3              MR. AUGUSTINI:  Please display CX365.

4        Q.    (By Mr. Augustini) Mr. Dewey, this is an

5    e-mail, if you see the "From Tom Couzens, Colorado

6    Springs."

7              Is that how you say his name?

8        A.    Yes.

9        Q.    Are you familiar with Mr. Couzens?

10       A.    Yes, sir.

11       Q.    What was his role in Molycorp?

12       A.    Chief pit engineer.

13       Q.    So he would have extensive familiarity

14   with the open pit operation, correct?

15       A.    Correct.

16             MR. AUGUSTINI:  Turning to the third page

17   of Mr. Couzens' e-mail, in the top right corner, if

18   we can blow that up above the picture of Bob Larson.

19   Above the picture, please.  Okay.

20       Q.    (By Mr. Augustini) Do you see Mr. Couzens

21   states that he and a geologist, Gordon Gumble -- was

22   he also a Molycorp employee?

23       A.    Yes.

24       Q.    -- were exploring the back side of the

25   high west ridge in the summer of '67 and found some

Page 67

1    strange depressions?

2              Are you familiar with what he is referring

3    to, sir?

4         A.   Yes, sir.

5         Q.   And is the photo there, of Mr. Larson down

6    inside of the crack, the evidence of a fault that

7    was in the ridge that formed the back wall of the

8    open pit?

9         A.   It is not evidence of a fault, sir.  It is

10   evidence of a karst.

11        Q.   Is it the crust?

12        A.   Evidence of a crack of a karst --

13        Q.   Oh, okay.

14        A.   -- not evidence of a fault.

15        Q.   Very good.

16             MR. AUGUSTINI:  Go down a little bit,

17   please, Mr. Hambrick.

18        Q.   (By Mr. Augustini) Just below the picture

19   of the -- on the top left, Mr. Couzens states,

20   "There were some small one or two offsets that we

21   realized were scars from tension cracks that had

22   been there for years, covered by vegetation,

23   partially healed but still obviously moving a bit."

24             Is that a fair description of what

25   Molycorp discovered on the back side of the ridge in

1  the summer of '67?

2      A.    Yes.

3      Q.    And then he goes on to say, "Wow, we had

4  started mining in the middle of a huge failure rock

5  that was part of the erosion process of Sulphur

6  Gulch."

7           That was the situation you encountered in

8  the summer of '67?

9      A.    Would you repeat the question?

10     Q.    This refers to the failure rock being

11  discovered.

12           Was that the situation Molycorp

13  encountered in the summer of '67?

14     A.    Yes.

15     Q.    Did Molycorp not know there was a fault in

16  the back pit wall when it decided to do the open pit

17  mine?

18     A.    Again, in 1971, we employed then one of

19  the world's best geotechnical experts, and they

20  determined that this -- these tension cracks, this

21  filled ground, was a result of the geology in that

22  back wall.

23           No fault was ever identified as such.

24  This, in their opinion, was a result of weaker

25  ground about halfway down through the mountain,

Page 69

1    Golder Browne & Associates.

2           And that weaker ground allowed the upper

3    portion of the mountain to collapse, start to

4    collapse.

5       Q.    I apologize with my terminology.

6             He refers to it as a fault but it is not

7    important.

8             But the question was, was Molycorp aware

9    of this, these tension cracks or weaker ground, as

10   you described, before deciding to develop the open

11   pit?

12      A.    No, I don't believe they were.

13      Q.    And because of that, Molycorp's pit design

14   called for a relatively steep slope in the pit wall,

15   correct?

16      A.    The design was a conventional design that

17   all mines are initially trying to achieve.

18      Q.    And then the -- as it turned out, the

19   conventional design was to steep given the weakness

20   in the ground, correct?

21      A.    In that particular portion of the pit

22   wall, yes, sir.

23      Q.    In the development of the pit, the initial

24   activities of stripping and blasting, that

25   exacerbated the weakness in the portion of the pit

1    **wall, correct?**

2         A.    Correct.

3         Q.    **Mr. Couzens states that "This area came to**

4    **be known as Quivering Ridge."**

5               **Is that a name you ever heard at Molycorp?**

6         A.    It is probably something that was passed

7    around in the engineering department.  I don't

8    remember other than this report.

9         Q.    **Once the problem was detected, this was**

10   **something that Molycorp had to monitor very**

11   **carefully, correct?**

12        A.    The initial monitoring was very crude.  It

13   involved a couple of stakes in the ground and a

14   piece of wooden lath.

15             And the foremen were asked to go up and

16   make a pencil mark so they could try to determine if

17   there was any movement, and if so, how much.  And --

18   but that, I wouldn't call it extensive.

19        Q.    **It is certainly something that in the**

20   **interest of the safety of the mining personnel and**

21   **the equipment that would be tracked by Molycorp,**

22   **correct?**

23        A.    Correct.

24             MR. AUGUSTINI:  Mr. Hambrick, please

25   display CX240.

1      Q.     (By Mr. Augustini) Mr. Dewey, the title at

2  the top, the letterhead is -- references Anaconda

3  Company.

4             Is that a mining company?

5      A.    Yes, sir.

6      Q.    And the date is June 12, 1970?

7      A.    Yes.

8      Q.    And in the first full paragraph, there is

9  a reference to a meeting that included you and other

10 Molycorp personnel, as well as Anaconda, correct?

11     A.    Correct.

12            MR. AUGUSTINI:  Your Honor, I move to

13 admit CX240.

14            MR. HOPSON:  No objection, Your Honor.

15            THE COURT:  No objection, it is admitted.

16            (Exhibit admitted, CX240.)

17            THE COURT:  Are CX153 and 136 already

18 admitted?

19            MR. AUGUSTINI:  I believe so, Your Honor.

20            Thank you.

21     Q     (By Mr. Augustini) Mr. Couzens was also at

22 this meeting with Anaconda, according to the memo?

23     A.    Yes, sir.

24     Q.    So did Molycorp invite Anaconda in to

25 advise them of the pit instability issue?

Page 72

1      A.    Yes.  They had a similar issue going on at

2    the time, and they had some experience with --

3    pre-dated our experience.

4              MR. AUGUSTINI:  If we can blow up,

5    Mr. Hambrick, the very bottom.

6      **Q.    (By Mr. Augustini) Anaconda notes, at the**

7    **bottom here, that "The slide problem at the Questa**

8    **Mine is of special interest, in part, because the**

9    **magnitude, 50 million tons of the slide, is as large**

10   **or larger than any that have been known to exist in**

11   **an open pit mine."**

12             **Is that a correct assessment of the**

13   **problem that Molycorp encountered in the late '60s,**

14   **early '70s?**

15     A.    No.  In fact, when they ultimately had

16   their slide at Twin Boots, significantly larger than

17   that.

18             Just six or seven years ago, in the

19   largest open pit in the world that you mentioned,

20   they had a slide with the magnitude of well over

21   100 million tons.

22             So this -- yeah, this was one man's

23   opinion of what this potential might be.

24             It turns out, his estimate was, in fact,

25   accurate when we did finally have a catastrophic

1    failure in 1977.  The approximate estimate of debris

2    involved in that failure was 50 million tons.

3         Q.    I see.

4               So just in -- general speaking, there is

5    no question that the pit wall instability was a big

6    problem that Molycorp had to address to continue

7    open pit mining, right?

8         A.    Changed the whole paradigm, yes, sir.

9         Q.    Okay.

10              MR. AUGUSTINI:  Mr. Hambrick, please

11   display CX131.

12        Q.    (By Mr. Augustini) Mr. Dewey, there is a

13   handwritten note on the cover page, "Original

14   Feasibility Study."

15              Do you see that?

16        A.    Yes, I do.

17        Q.    And in your written testimony, you noted

18   that the original mining plan for the pit

19   involved -- planned for a two-to-one waste-to-ore

20   ratio; is that right?

21        A.    Correct.

22        Q.    In other words, Molycorp planned to

23   generate and dispose of 2 tons of waste rock from

24   the pit for every 1 ton of ore that was provided to

25   the mill, right?

Page 74

1      A.     Yes, sir.

2      Q.     **And Molycorp had to maintain an efficient**

3   **ore-to-waste ratio in order to continue to draw the**

4   **bank funds and pay back the money it had borrowed**

5   **from the banks to operate the pit, correct?**

6      A.     Very definitely.

7      Q.     **So the whole idea of the mining plan was**

8   **to produce sufficient or to generate the cash flow**

9   **needed to pay all expenses and repay the loans,**

10  **right?**

11     A.     Correct.

12            MR. AUGUSTINI:  Let's turn to page 96 of

13  CX131, please.

14     Q.     **(By Mr. Augustini) One of the issues that**

15  **the Molycorp feasibility study for the open pit mine**

16  **had to address was what to do with the waste rock,**

17  **correct?**

18     A.     Correct.

19     Q.     **And is this table indicating that the**

20  **original plan was to generate approximately**

21  **31 million tons of waste rock?**

22     A.     That is correct.

23     Q.     **I'm sorry, I think I misspoke, Mr. Dewey.**

24            **I believe the table references cubic**

25  **yards?**

1       A.      I stand corrected as well.  Thank you.

2       **Q.      Yes, that is my mistake.**

3               **Do you have an approximation for how that**

4       **converts to tons at all?**

5       A.      1.7 tons to a cubic yard.

6               And in our case, it varies depending upon

7       the propensity of the rock.

8       **Q.      Yeah, that's what I was figuring for that**

9       **roughly 55 million tons, total.**

10              **And according to the waste-dump areas**

11      **section that is just below there, there is a**

12      **reference to various waste dumps, correct?**

13      A.      Yes.

14      **Q.      And then the total capacity is listed in**

15      **that table, correct?**

16      A.      Correct.

17      **Q.      And it is 68 million tons -- cubic yards,**

18      **excuse me, approximately, correct?**

19      A.      Correct.

20      **Q.      So this feasibility study indicates that**

21      **the dump capacity at the time the open pit was to**

22      **begin was more than sufficient to accommodate the**

23      **31 million cubic yards of waste expected, correct?**

24      A.      Correct.

25      **Q.      But then with the pit wall, it became**

1    clear that the original mining plan was no longer

2    doable, right?

3        A.    Yes.

4        Q.    You testified at your deposition, in 1968

5    and '69, you were working night and day to find a

6    financially-viable way to continue with the open pit

7    mining, correct?

8        A.    Correct.

9        Q.    And I think the term you used at your

10   deposition was that the solution involved generating

11   tremendous amounts of waste rock compared to the

12   original plan?

13       A.    Right.

14       Q.    And to put some quantification on it, the

15   waste-to-ore ratio went from two-to-one in the

16   original plan to roughly ten-to-one; is that right?

17       A.    At times ten-to-one, the overall ratio was

18   a little less than ten-to-one.

19       Q.    So the revised mining plan would generate

20   somewhere between four, roughly four times more than

21   originally expected, correct?

22       A.    Yes.

23       Q.    And that is why the total waste generated

24   by the open pit mine eventually was so much higher,

25   correct?

Page 77

1     A.    Correct.

2     Q.    And the increased cost of handling the

3   waste rock that was necessary to flatten the pit

4   slope, that had to be offset by increased revenue,

5   correct?

6     A.    Correct.

7     Q.    Revenue had to cover the increased costs.

8           And so did that mean that Molycorp had to

9   expand its mill operation?

10    A.    Yes, sir.

11    Q.    And that meant that additional tailings

12  would be generated and disposed at the offsite

13  location, correct?

14    A.    Right.

15          MR. AUGUSTINI:  Mr. Hambrick, USX116,

16  please.

17    Q.    (By Mr. Augustini) Mr. Dewey, we displayed

18  USX116, the title page, "Molycorp Questa Expansion

19  Proposal, August 28, 1968."

20          Do you see that?

21    A.    Yes, sir.

22    Q.    Mr. Lansing is down at the bottom.

23          He was a senior executive at Molycorp?

24    A.    He was the general manager.

25    Q.    Did you work on the Questa expansion

1   proposal?

2        A.    Yes, sir.

3              MR. AUGUSTINI:  Your Honor, I move to

4   admit USX116.

5              MR. HOPSON:  No objection, Your Honor.

6              THE COURT:  Without objection, admitted.

7              (Exhibit admitted, USX116.)

8        Q    (By Mr. Augustini) Was this proposal

9   prepared in response to the problems found in the

10  back wall of the pit?

11       A.    Yes.

12             MR. AUGUSTINI:  If we turn to the fourth

13  page, Mr. Hambrick.

14       Q.    (By Mr. Augustini) There is a table there.

15             This proposal, Mr. Dewey, quantifies the

16  tonnage of additional waste that would be generated

17  under the revised plan for the open pit; is that

18  right?

19       A.    That is correct, sir.

20       Q.    219 million tons, roughly, according to

21  the total in the table -- oh, I'm sorry, 210.

22       A.    Ten, yes.

23       Q.    And the cost associated with that waste

24  handling would be a little bit more than

25  $25 million; is that right?

Page 79

1        A.    Yes, sir.

2        **Q.    And even in light of the additional cost**

3    **from the waste-rock handling and disposal, the**

4    **company still developed a plan that it projected**

5    **would be profitable in the long run, correct?**

6        A.    That is correct.

7              MR. AUGUSTINI:  Mr. Hambrick, please

8    display USX583.

9        **Q.    (By Mr. Augustini) Mr. Dewey, do you see**

10   **that the upper right-hand corner references Utah**

11   **Construction & Mining Co.?**

12       A.    Yes, sir.

13       **Q.    Are you familiar with that company?**

14       A.    Yes, sir.

15       **Q.    Were they a consultant for Molycorp?**

16       A.    Yes, sir.

17             MR. AUGUSTINI:  I move to admit USX583.

18             MR. HOPSON:  No objection, Your Honor.

19             THE COURT:  Without objection, 583 is

20   admitted.

21             (Exhibit admitted, USX583.)

22       Q    (By Mr. Augustini) Did you use Utah's --

23   you mentioned Fluor -- Fluor Utah Construction in

24   your direct testimony.

25             **Is that the same company we are talking**

1      **about?**

2          A.    Yes, it is.

3          Q.    **They are based in San Francisco?**

4          A.    Correct.

5          Q.    **Did you use Utah Construction's work to**

6      **develop the revised feasibility study?**

7          A.    Yes, we did, both from an engineering

8      standpoint and, ultimately, it was one of the first

9      companies we were able to get these feasibility

10     studies, that I was doing by hand, computerized.

11             MR. AUGUSTINI:   If we could pull out a

12     bit, Mr. Hambrick.

13         Q.    **(By Mr. Augustini) Mr. Dewey, there is a**

14     **column for "Bench," correct, on the left-hand side?**

15         A.    That is correct.

16         Q.    **And does that refer to the elevations**

17     **within the pit?**

18         A.    Yes.

19         Q.    **And then there is a column for "Waste**

20     **Tons," second from the right, correct?**

21         A.    Yes.

22         Q.    **Does that refer to the amount of waste at**

23     **that elevation that would be generated under the**

24     **revised mining plan?**

25         A.    Yes, sir.

1      Q.    And can you explain -- there is no ore in

2  the ore column from 10,160 feet down to 9,000 feet.

3            Can you explain what was going on there,

4  please?

5      A.    Yes.

6            If you envisioned this ore deposit as an

7  elongated watermelon, and it is dipping down under

8  this 10,000-foot high mountain at a 22-degree angle,

9  we started at the top of the mountain and sliced the

10 slice -- sliced down, took approximately five years

11 to remove enough waste to expose approximately a

12 year-and-a-half worth of ore.

13           So we had three contiguous slices coming

14 down the mountain, and these tons reflected the

15 total on that level.

16     Q.    So in other words, to take the weight off

17 of the weak ground that is below, I know it is

18 imprecise, but essentially, the plan was to remove

19 part of the ridge above the weak ground; is that

20 generally correct?

21     A.    That is the whole reason for going to the

22 top of the mountain, yes, sir.

23     Q.    And you testified at your deposition --

24 well, one further question on this.

25           The fact that so much waste had to be

Page 82

1    removed before you get to the ore, that put a lot of

2    financial strain on Molycorp, correct?

3         A.    Correct.

4         Q.    And you testified that -- at your

5    deposition, you remembered going to New York

6    headquarters in the summer of '69 to obtain approval

7    for the revised plan; is that right?

8         A.    Yes, sir.

9         Q.    And ultimately, Molycorp's executives and

10   board of directors made the call to proceed with the

11   Utah construction plan; is that right?

12        A.    Yes.

13        Q.    And to sum it up, Molycorp did what is

14   necessary to protect its sizable investment in the

15   pit up through that point, correct?

16        A.    It was either that or declare bankruptcy,

17   which was not an option.

18        Q.    Yes.

19        A.    We had -- the entire Northern New Mexico

20   was dependent upon that mine and to walk away from

21   it at that point in time, the lives of thousands of

22   people would have been impacted in a very negative

23   way.

24              And it was as much of a consideration of

25   taking this gamble as anything, we felt.

Page 83

1      Q.     Sure.

2             And that was Molycorp's decision to

3   proceed, correct?

4      A.     Yes, it was.

5      Q.     Now, you mentioned when all of this

6   additional waste is generated under the revised

7   mining plan, that creates a problem with respect to

8   dump space, right?

9      A.     Major problem.

10     Q.     Do you recall that one of the options

11  Molycorp considered was obtaining a special use

12  permit to locate the waste rock on patented claims?

13     A.     That was discussed, yes, sir.

14            MR. AUGUSTINI:  Mr. Hambrick, please

15  display CX179.

16     Q.     (By Mr. Augustini) Mr. Dewey, do you

17  recall an engineer by the name of W.K. Pincock?

18     A.     Yes.  He was the chief engineer at that

19  time.

20     Q.     And this time referenced in this exhibit

21  is June 6, 1967, correct?

22     A.     June 6, yes.

23            MR. AUGUSTINI:  And just down to the very

24  bottom of the document, please.

25     Q.     (By Mr. Augustini) Mr. Pincock advises of

1    Mr. Lansing in this memo that "Long-range plans are

2    in progress with respect to tailings area and dump

3    room.  We are currently working toward a long-range

4    special use permit from the Forest Service."

5           So is that consistent with your

6    recollection, that was one of the options in the

7    late '60s?

8       A.   Yes.

9       Q.   Okay.

10          MR. AUGUSTINI:  Mr. Hambrick, please

11   display CX204.

12      Q.   (By Mr. Augustini) Mr. Dewey, you

13   mentioned, in your direct testimony, John Watson,

14   Watson & Watson law firm.

15          Was that Molycorp's counsel?

16      A.   Yes, sir.

17      Q.   And the date of this letter is July 26,

18   1968.

19          Do you see that, sir?

20      A.   Yes, that is correct.

21      Q.   And then in the first sentence, Mr. Watson

22   references a conversation he had with Mr. Kentro

23   regarding acquisition of dump areas, right?

24      A.   Yes.

25      Q.   So this goes back to the need to find

1    **space for the waste rock under the revised plan,**

2    **right?**

3          A.    It is in the same time frame.

4                MR. AUGUSTINI:   Turning to the second --

5    top of the second page, please.   If you could blow

6    up the first paragraph.

7          **Q.    (By Mr. Augustini) Do you see the sentence**

8    **where Mr. Watson advises he is reluctant to**

9    **recommend the special use permit approach to**

10   **Molycorp?**

11         A.    I guess I see that sentence, sir.

12         **Q.    And one of the problems he mentions with a**

13   **special use permit is the company could be subject**

14   **to some kind of future regulation from the Forest**

15   **Service, right?**

16         A.    Not only future but current.   They could

17   withdraw it at any time.

18         **Q.    So that is why it is -- special use**

19   **permits might be viewed as less desirable than**

20   **owning the land outright, correct?**

21         A.    Correct.

22               MR. AUGUSTINI:   Scroll down, please,

23   Mr. Hambrick.

24         **Q.    (By Mr. Augustini) With respect to mill**

25   **sites, Mr. Dewey, were you aware -- were you aware**

1   that Molycorp would have to demonstrate some use of

2   the land --

3      A.    Yes.

4      Q.    Before obtaining ownership of a mill site

5   claim?

6      A.    Yes, sir.

7      Q.    Were you also aware that if Molycorp

8   wanted to obtain fee title to the land that was

9   covered by a mill site, that the statute, the mining

10   law, required those patents to be limited to just

11   5 acres; is that your recollection?

12      A.    Yes.

13      Q.    So if Molycorp wanted to obtain 50 acres

14   for waste-rock dump purposes or any other purposes

15   through a mill site patent, that can't be done,

16   correct, in one patent because you are limited to

17   5 acres?

18      A.    Each individual claim is limited to

19   5 acres, yes, sir.

20      Q.    So if you have your eyes on a 50-acre

21   section of land that you would like to use, you

22   can't take ownership of it all under one mill site

23   patent, right, because of the 5-acre limitation?

24      A.    The -- Ed Torgerson, the chief engineer,

25   devised a plan that worked around that issue by

1   stacking mill-site claims, one next to the other,

2   and having the extension of the claim long enough to

3   cover what was going to be used.

4          And we staked such claims in Capulin

5   Canyon.

6      **Q.    Well, yes, Mr. Dewey, but one thing is**

7   **clear, if you are planning to dispose of a large**

8   **quantity of waste rock, you don't want to be limited**

9   **to 5-acre increments, correct?**

10     A.    Right.

11         As I said, he had a -- he had a plan on

12   paper which -- on paper and the field that

13   accomplished that objective by narrow 2-foot wide by

14   2,000-foot long claims, one after the other, in a

15   fan shape or whatever was required, and encompassed

16   that entire canyon.

17     **Q.    Okay.  But you do understand that use**

18   **would have to be demonstrated.  You can't obtain**

19   **ownership for land that you may use in the future,**

20   **correct?**

21         **You have to demonstrate a current use.**

22         **Is that your understanding?**

23     A.    Yes, that is correct.

24     **Q.    Okay.  Molycorp was interested in**

25   **acquiring space for the future use for waste-dumping**

Page 88

1    purposes, correct?

2        A.    Correct.

3        Q.    And there was a meeting in January of 1969

4    with the Forest Service to discuss how that might be

5    possible, correct?

6        A.    Correct.

7        Q.    During that meeting, Molycorp raised the

8    idea of possibly using the Red River Valley itself

9    as a waste-dump location, correct?

10       A.    Using the Red River Valley for waste rock

11   to access the south side of the highway, yes, sir.

12       Q.    But there would be substantial quantities

13   of waste sitting within the Red River Valley

14   floodplain under this concept, correct?

15       A.    That is enough waste to create a

16   right-of-way over.

17       Q.    Right across the river and over to the

18   Carson National Forest on the other side.

19       A.    Exactly.

20       Q.    And you didn't attend the meeting in

21   January of 1969 but you certainly were aware of it

22   and heard about it, correct?

23       A.    Correct.

24       Q.    This concept would have required shutting

25   down and relocating the state highway that ran

1    around the mine?

2        A.    Shutting down the state highway?

3        Q.    **Yeah, relocating it, if there is going to**

4    **be a waste pile that stretches across the canyon?**

5        A.    Relocated?  I don't think necessarily it

6    would have entailed shutting it down for any period

7    of time.

8        Q.    **Did Molycorp present this idea to anyone**

9    **other than the Forest Service at that one meeting?**

10       A.    I think there is a reference earlier by

11   forester, head forester John Hart in some

12   memorandums I have seen from John Hart, seem to

13   indicate that John was aware of the plan.

14            We had a very close relationship with him,

15   and Al Greslin would stop by and have coffee at the

16   ranger station and so on.

17            So I don't know this personally but from

18   what I read, I believe there was some pre-knowledge

19   on at least the part of the head forester of Carson

20   National Forest, John Hart.

21       Q.    **Before the January '69 meeting?**

22       A.    Right.

23       Q.    **How about the State of New Mexico**

24   **agencies, any communications, discussions of the**

25   **idea with them?**

Page 90

1      A.    Not that I am aware of.

2      Q.    **The tailings pipelines that connected the**

3   **mill to the disposal area offsite, those would also**

4   **have to be addressed under this proposal, correct,**

5   **because they run along the road?**

6      A.    Yeah, that is probably a three-day job.

7      Q.    **Okay.  But up to -- before January '69,**

8   **the tailings pipelines had attracted negative**

9   **publicity?**

10          **Without getting into the specifics of it,**

11   **there were concerns about the pipelines before that,**

12   **correct?**

13      A.    That is correct.

14      Q.    **Environmental concerns?**

15      A.    Yes.

16      Q.    **Did Molycorp do any outreach to the**

17   **public, all the people that recreate in the area,**

18   **about this plan?**

19          MR. HOPSON:  Objection, Your Honor.

20   Assumes facts not in evidence regarding "all the

21   people who recreate."

22          THE COURT:  I'm sorry, I can't understand

23   what you just said.

24          MR. AUGUSTINI:  I will rephrase,

25   Your Honor.

Page 91

```
 1              THE COURT:  Pardon?

 2              MR. AUGUSTINI:  I will rephrase my

 3    question.

 4              THE COURT:  All right.  Thank you.

 5       Q    (By Mr. Augustini) Did Molycorp do any

 6    outreach to the public about this concept?

 7       A.   No, not that I am aware of.

 8       Q.   You mentioned Al Greslin was involved in

 9    this.

10              Did you hear from him, after the meeting,

11    that there was a way in which Molycorp could obtain

12    ownership of the land it needed to continue the

13    disposal mining and disposal of the waste rock?

14       A.   He, along with Lansing, the general

15    manager, who probably heard it first from Lansing,

16    because we rode to work and back every day together,

17    explained that the idea was rejected out of hand,

18    more or less, by the Albuquerque officials and

19    somebody threw out the idea of a land exchange.

20       Q.   So the land exchange will give the

21    Molycorp ownership of the land it needs for the

22    dumps, correct?

23       A.   No.

24              Land exchange -- land exchange would give

25    Molycorp a place to put that dump immediately, which
```

Page 92

1    is what was required.  We had to have a place right

2    now.

3              But it was not -- the land exchange is the

4    reason we are here today.

5              If we would have been able to go across

6    that highway and put this waste where they wanted to

7    put it, there would not be 350,000 -- million tons

8    there.

9              We talked about the dump planning.  All

10   the dump planning that was done was to try to figure

11   out how to get all of this waste in this limited

12   hillside.

13             If we'd had had a road going across, as we

14   envisioned, to those big canyons on the other side,

15   it would be an entirely different situation.

16        Q.   **But nevertheless, you said there was an**

17   **immediate need for space now.**

18             **Do you remember that?**

19        A.   Either that, or shut down.

20        Q.   **You weren't going to shut down, correct?**

21        A.   We had made a decision not to, if we could

22   help it.

23        Q.   **So when the Forest Service made this**

24   **suggestion, the company embraced it, correct?**

25        A.   That is correct.

1     **Q.    And you testified at your deposition,**

2   **within a few weeks of the meeting, Al Greslin had**

3   **found a suitable parcel of land adjacent to the**

4   **Carson National Forest that the company could offer**

5   **to the Forest Service to trade, right?**

6     A.    That was my testimony.  That was my

7   understanding, at the time.

8           I think I have since learned the

9   acquisition of those parcels predated that meeting.

10    **Q.    We will get to that in just a second.**

11          **So what you are saying now is the company**

12  **had already identified land that could be traded**

13  **with the Forest Service years before this meeting in**

14  **1969, correct?**

15    A.    I believe that Forest Service identified

16  those parcels and very specifically wanted that land

17  because the hippies were encroaching upon the

18  National Forest and that those parcels were

19  complicated land surveys and so on.

20          My view that during the feasibility

21  studies in the early '60s, when they were doing all

22  the planning, as you pointed out, to come up with

23  land, the possibility of land exchanges were

24  discussed, and foresters identified those two

25  parcels.

1          Al Greslin, that was his job to get leases

2    for tailings land, for right-of-ways, whatever, and

3    so he acquired that property at that time.

4          MR. AUGUSTINI:  So let's take a look at

5    USX587.  We will bring this into focus perhaps.

6     Q.    (By Mr. Augustini) Mr. Dewey, do you

7    recognize this option agreement between, would you

8    say Raels and Gaillours --

9     A.    Yes, sir.

10    Q.    -- and Molycorp?

11    A.    Yes, sir.

12    Q.    And the date is February 21, 1964?

13    A.    Yes, sir.

14    Q.    So this is five years, approximately,

15    before the January, 1969 meeting with the Forest

16    Service?

17    A.    Correct.

18    Q.    And is it your understanding then that

19    this is the option agreement for the La Lama Land?

20    A.    Correct.

21    Q.    And the Lama Land was the parcel that

22    Molycorp ended up offering to the Forest Service for

23    the land exchange, correct?

24    A.    Actually, two parcels.

25    Q.    Two parcels, correct?

1              And the option agreement itself states

2     that the purpose of it was to trade, trade the land

3     to the Forest Service for some potential use in the

4     future, right?

5          A.    That is correct.

6          Q.    It wasn't necessarily for the land

7     exchange in mind at the time but you knew that you

8     might have a need to do a land exchange with the

9     Forest Service at some point in connection with your

10    operation, correct?

11         A.    Yes, sir.

12         Q.    Okay.

13              MR. AUGUSTINI:  And let's turn to CX212.

14         Q.    (By Mr. Augustini) Mr. Dewey, again, you

15    see the letterhead from the Watson & Watson law

16    firm?

17         A.    Yes, sir.

18         Q.    And the date is February 20, 1969?

19         A.    Yes.

20         Q.    The letter is sent to Mr. Taylor at the

21    Forest Service, correct?

22         A.    Correct.

23         Q.    And in the first sentence, Mr. Watson

24    states, "I have been authorized by Mr. Lansing,

25    manager of the Molybdenum Corporation Mine in

1    Questa, New Mexico, to make application to you on

2    behalf of the corporation for the exchange of the

3    land designated as parcel one and parcel two on the

4    enclosed map."

5            Correct?

6       A.   Correct.

7       Q.   So within three weeks of the meeting, the

8    company's attorney is sending a letter to the Forest

9    Service saying we would like to apply for the land

10   exchange, correct?

11      A.   Right.

12      Q.   And from that point forward, you testified

13   at your deposition, under the revised mining plan,

14   Molycorp's cost calculations took into account the

15   fact that the land exchange would come to fruition;

16   is that right?

17      A.   That's correct.

18      Q.   So, based on the meeting, Molycorp assumed

19   that it would become the owner of all the land that

20   was subject to the exchange, correct?

21      A.   Correct.

22      Q.   And that took -- it took a while but

23   that's what came to pass, correct?

24      A.   Correct.

25            MR. AUGUSTINI:  Let's turn to CX248,

Page 97

1    please.

2        Q.    (By Mr. Augustini) Mr. Dewey, do you

3    recognize the name C.A. Campbell?

4        A.    Yes, I do.

5        Q.    And was he the president of Molycorp?

6        A.    No.  He was a -- he was hired sometime

7    around early 1970 from International Mining in

8    Canada, as general manager.

9             The general manager of the mine that hired

10   me resigned and for a period of about four or

11   five months, between September and December of 1969,

12   I was the acting manager.

13            And we were looking for somebody to

14   replace the position of general manager, and Colin

15   Campbell was hired for that position.

16       Q.    So at the time of this memo, he is likely

17   to be the general manager at Questa Mine?

18       A.    He definitely was.

19       Q.    And Mr. Torgerson, again, was part of the

20   engineering department?

21       A.    Yes, sir.

22       Q.    And do you understand this memo to be

23   providing an estimate for the costs if Molycorp were

24   to obtain mill sites for the land covered by the

25   exchange?

Page 98

1      A.     Yes, sir.

2      Q.     And again, he is referencing in this

3   5-acre mill site claim?

4      A.     Correct.

5      Q.     And to cover 2,000-plus acres, or I guess

6   not all but -- just to step back for a second, the

7   land exchange covered over 2,000 acres, correct?

8      A.     Yes.

9      Q.     That is what Molycorp acquired?

10     A.     Yes, sir.

11     Q.     And there was never any intention to use

12  all of the 2,000-plus acres for waste dumping,

13  correct?

14     A.     Just a portion.

15     Q.     Yeah.

16     A.     Just to get across the highway to the

17  other side.

18     Q.     Now, excuse me, Mr. Dewey, the 2,000 acres

19  acquired from the Forest Service or the

20  United States, for the -- for the land exchange,

21  some of that would be used for dumping waste rock

22  but most of it was other land, correct?

23     A.     No.  If you look at the photographs you

24  showed earlier, all of the dumps along the north

25  side of the highway start from Sugar Shack to the

1    extreme south and worked their way across that

2    entire area.

3              Now, I don't know that --

4        Q.    I don't mean to cut you off.  I am not

5    asking my questions very well.

6              There are not waste rock piles on all of

7    the 2,000 acres that were acquired, correct?

8        A.    I can't honestly answer that.  I don't

9    know.  I would have to look at a survey plat.  There

10   might be a few acres in there that are not covered

11   by rocks.

12       Q.    But part of the land that was acquired

13   through the exchange, for example, would cover the

14   surface above the underground mine to the -- to the

15   right, right?

16       A.    Right.  I believe that's correct, yes.

17       Q.    Okay.

18       A.    Yes, it definitely is.

19       Q.    All the way up to the western boundary of

20   the mine?

21       A.    Yes, sir.

22       Q.    Now, don't you agree, as an economic

23   proposition, the price that Molycorp paid for the

24   Lama Land was quite reasonable given Molycorp's

25   tremendous needs in 1969 to continue operating the

1    open pit and then the thousand of acres that it

2    received from the Forest Service in return?

3                 What was the price of the Lama Land that

4    was purchased under the option?

5        A.    Something close to $100,000.

6        Q.    And in return, Molycorp received

7    2,000-plus acres, correct?

8        A.    Yeah.  Yes, 2,000-plus acres of

9    hydrothermally scarred mountain side, yes, sir.

10       Q.    And you were able to continue mining for

11   another ten-plus years as a result, correct?

12       A.    Correct.

13       Q.    Forest Service didn't extract a profit on

14   the land exchange, correct?

15       A.    It is an even exchange, intended to be,

16   right?

17                 THE COURT:  Counsel, how does he know what

18   the Forest Service considered a profit?  He would

19   have no idea.

20                 Move on.

21                 MR. AUGUSTINI:  Will do.

22                 Mr. Hambrick, please display CX282.

23       Q.    (By Mr. Augustini)  Mr. Dewey, you

24   mentioned this document in your direct testimony,

25   the Molycorp Interim Feasibility Study in February,

1   **1972?**

2       A.    Yes, sir.

3       Q.    **And this was for future planning**

4   **post-1976, right?**

5       A.    Correct.

6             MR. AUGUSTINI:  If we turn to page 34,

7   please.

8       Q.    **(By Mr. Augustini) Maybe I will try asking**

9   **first.**

10            **This document involved future planning for**

11  **either another open pit or an underground mine,**

12  **correct?**

13      A.    It is not for another open pit.  This is

14  for an existing open pit, to the best of my

15  recollection.

16      Q.    **Well, there was another ore body or ore**

17  **that was available and the company was considering**

18  **what method of mining to use to extract that ore,**

19  **correct?**

20      A.    The portion of the over-deposit for the

21  mineral deposit, it was the underground portion.

22            You know, I was not involved in this

23  memorandum, I don't believe.

24            This has to do with what we were doing at

25  the time.

1      Q.     All right.

2             MR. AUGUSTINI:  Let's turn to page 20,

3      please.

4      Q.     (By Mr. Augustini) This document,

5      Mr. Dewey, references immediately available dumps;

6      is that correct?

7             Both immediately available and possible

8      future?

9      A.     Yes, A, B and C, correct.

10     Q.     And the immediately available dumps would

11     include the locations that are listed.

12            Those are within the Questa Mine boundary,

13     correct?

14     A.     Correct.

15     Q.     And the possible future dumps, those don't

16     exist yet as of this time, correct?

17     A.     Those are the dumps on the south side of

18     the river.

19     Q.     Right.

20            So they are theoretically available

21     possibly at some point in the future, right?

22     A.     That was our hope.

23     Q.     But as it turned out, the space across the

24     river wasn't needed because the second -- the next

25     phase of mining that Molycorp chose to pursue was an

1   **underground mine, right?**

2        A.    The underground mine did not require any

3   significant amount of waste, that's correct.

4        **Q.    So once that decision was made, the**

5   **company knows its existing capacity within the mine**

6   **isn't going to be a problem because, as I under --**

7   **could you just describe how the block caving process**

8   **works and how that relates to what gets to the mill,**

9   **please?**

10       A.    Well, you have asked two questions there.

11             Can I answer the first one?

12       **Q.    Let me try it again.   I apologize.**

13       A.    That is all right.

14       **Q.    Under the block caving process, as I**

15  **understand it, generally there are grizzlies that**

16  **the ore is on top of a grizzly system, it passes**

17  **through these grizzlies, it is carted to the mill,**

18  **correct, generally?**

19       A.    Correct.

20       **Q.    So everything that is extracted from the**

21  **underground mine gets processed and that results in**

22  **tailings, correct?**

23       A.    Correct.

24       **Q.    So the surface disposal is not a factor as**

25  **you have mentioned, right?**

Page 104

1    A.    Correct.

2    **Q.    If we can turn to --**

3    A.    Sir, may I back up to the first statement

4  you made before you get to the block caving?

5          When you said -- could you repeat that?

6  Do you remember what you said?

7    **Q.    About the grizzlies?**

8    A.    Before the grizzly, before you mentioned

9  block caving, you mentioned that we had enough land

10  for what we needed to do here or something.

11   **Q.    It is a simple point, we covered that when**

12  **it comes to the underground block cave mine, the**

13  **surface disposal waste is no issue, correct?**

14         **That is all I was getting at.**

15   A.    Correct.

16         MR. AUGUSTINI:  Let's turn to page 38 of

17  the interim feasibility study.

18         There is a lot here but this section is

19  entitled "Landownership, Claims, Leases and

20  Patents."

21         And then down in the fourth or fifth

22  paragraph, "recently, several proposals," can you

23  blow that up, please.

24   **Q.    (By Mr. Augustini) If you would take a**

25  **minute now -- just take to look at that now,**

1     **Mr. Dewey, please.**

2          A.    Yes, I see that.

3          Q.    **Was one of Molycorp's concerns that there**

4     **might be changes in the mining law that would impact**

5     **its business?**

6          A.    Every mining company in the world.

7          Q.    **And so part of the discussion here in this**

8     **interim feasibility plan for the future mining --**

9                MR. AUGUSTINI:  If we turn to the next

10    page.

11         Q.    **(By Mr. Augustini) -- there is a paragraph**

12    **that says, "The effects of these measures on**

13    **Molycorp's unpatented claims is readily apparent.**

14    **The company will not control all the mineral land it**

15    **is will need in the Questa Red River area."**

16                **And do you see that passage, Mr. Dewey?**

17         A.    Yes, I do.

18         Q.    **And then it goes on to say, "It is**

19    **necessary to proceed with a land exchange."**

20                **Correct?**

21         A.    It is necessary to complete that and the

22    mineral claims in the log cabin area.

23         Q.    **And it continues, "The land exchange in**

24    **progress with BLM, that would give fee simple title**

25    **to an additional 2250 acres on the west side."**

1      A.    Okay.  Yes, I'm sorry I see that, that

2  2250.

3      Q.    **So in light of this concern about maybe**

4  **the mining law would change this document, the**

5  **Interim Feasibility Study, states that It is very**

6  **important to get the land.  That is the subject of**

7  **the land exchange, correct?**

8      A.    Correct.

9            MR. AUGUSTINI:  Let's turn to CX245,

10  please.

11     Q.    **(By Mr. Augustini) Mr. Dewey, you may**

12  **recall, I believe you have mentioned this memorandum**

13  **in your direct testimony?**

14     A.    Yes.

15     Q.    **Written by John Miller, I believe?**

16     A.    Yes, sir.

17     Q.    **He was one of the engineers on Molycorp's**

18  **staff?**

19     A.    Yes, he was.

20     Q.    **And he mentions his concerns about dump**

21  **stability as of December, 1970, correct?**

22     A.    Correct.  He was very concerned.

23     Q.    **I mean -- and just to put some detail on**

24  **that, one of the concerns is certainly that the**

25  **waste piles are standing above the state highway,**

1    correct?

2        A.    Correct.

3        Q.    **And so this memo was prepared during the**

4    **time that the company was pursuing the land**

5    **exchange, correct?**

6        A.    This memo, I believe, postdated the

7    decision to make the land, yes.

8        Q.    **Okay.**

9              MR. AUGUSTINI:  Let's show USX482, please.

10       Q.    **(By Mr. Augustini)  Mr. Dewey, you may**

11   **recognize your signature on this first page of the**

12   **August 23 memo; is that right?**

13       A.    Yes.

14       Q.    **And this was to Mr. Kostuik?**

15       A.    Kostuik, yes, sir.

16       Q.    **Kostuik.**

17             **The subject is "Dump Plans Five Years."**

18       A.    Yes, sir.

19       Q.    **Molycorp was always looking out into the**

20   **future in terms of what it needs maybe for the**

21   **mining, correct?**

22       A.    Daily, weekly, monthly, five years, it was

23   a continual process.

24       Q.    **And here you ask for Mr. Kostuiks' input**

25   **regarding plans for the open pit mine continuing,**

1   **correct?**

2        A.    Correct.

3              At that time he was the -- had a position

4   of vice president and general manager of Molycorp,

5   so I reported directly to him.

6              And we would spend about a week or so a

7   month at the mine, and we would work together to try

8   to resolve these kind of issues.

9        **Q.    And so if I understand it, you need to**

10  **know what the mine plan is to know how to plan for**

11  **the future waste handling or dump storage, correct?**

12       A.    Correct.

13             THE COURT:  Counsel, is this a good time

14  to take our noon recess?

15             MR. AUGUSTINI:  Yes, it is, Your Honor.

16             THE COURT:  All right.  Let's be in recess

17  until 1:30.

18             (A recess was taken.)

19             THE COURT:  You may proceed.

20       **Q.    (By Mr. Augustini)  Good afternoon,**

21  **Mr. Dewey?**

22       A.    Good afternoon.

23             MR. AUGUSTINI:  Mr. Hambrick, please

24  display CX281.

25       **Q.    (By Mr. Augustini)  Mr. Dewey, on your**

Page 109

1    direct testimony I believe you also cited the Forest

2    Services 1972 environmental assessment related to

3    the land exchange.

4              Do you recall that?

5    A.    Yes, sir.

6    Q.    Did you receive a copy of this in 1972?

7    A.    Yes.

8    Q.    I would like to turn to the second page of

9    CX281.  Do you recall that one of the statements in

10   the environmental assessment had to do with the, one

11   of the rationales was that the exchange would

12   facilitate Molycorp's planning and development of

13   the mining dumps?

14   A.    Yes, I do.

15   Q.    And then on Page 6 the environmental

16   assessment notes that in the Forest Service view

17   Molycorp's mining would continue?

18   A.    Page 6?  I'm sorry, Page 5 is on the

19   screen.  Okay.

20   Q.    The question was about the second sentence

21   there, "The mining activities will still continue on

22   the patented mining claims or on mill sites and are

23   not dependent upon the approval or disapproval of

24   this land exchange proposal."

25              And that was Molycorp's intention, to

1   continue mining one way or the other, correct?

2       A.   That was our intention to try to keep the

3   mine going, yes, sir.

4       Q.   And Molycorp had been mining from the time

5   we saw the February '69 letter that Mr. Watson sent

6   applying for the exchange through this point, which

7   was 1972, correct?

8       A.   Correct.

9       Q.   And Molycorp also continued to mine

10  between 1972 and 1974 when the land exchange finally

11  was completed and Molycorp took title to the land,

12  correct?

13      A.   Yes, sir.

14      Q.   If we can move to the PDF Page 8, I

15  believe that would be 7 of the report.  There is a

16  sentence I will read for the record, Mr. Dewey.

17           "If the company is able to acquire the

18  entire dump site, it plans to develop it in an

19  orderly fashion with terraces and enough backfill of

20  fine material on the surface to permit establishment

21  of vegetation."

22           Do you see that passage, sir?

23      A.   Yes, I do.

24      Q.   Is that consistent with what Molycorp had

25  in mind as of 1972?

Page 111

1      A.    Yes, sir.

2      **Q.    In fact, I believe it is fair to say you**

3   **took somewhat of a personal interest in reclamation**

4   **in the early 1970s?**

5      A.    Yes.

6      **Q.    And one of the ideas that you explored was**

7   **reclaiming the tailings, a portion of the tailings**

8   **disposal area; is that right?**

9      A.    The old original underground tailings,

10  yes.

11     **Q.    How about with respect to the offsite**

12  **tailings area, did you do a test plot to see if you**

13  **could cover it and get vegetation to grow there,**

14  **too?**

15     A.    You know, I didn't personally supervise

16  that but yes, the company did, in fact, have

17  significant vegetation growing on the tailings

18  ponds.

19     **Q.    And once operations were complete in the**

20  **ponds, was that the company's plan to eventually**

21  **cover it with clean material and revegetate?**

22     A.    Yes.

23           MR. AUGUSTINI:  We looked at this exhibit

24  earlier it is CX453, Mr. Hambrick.

25     **Q.    (By Mr. Augustini)  Again for**

1    reorientation purposes this is the map of the Questa

2    Mine that indicates the patent boundaries that

3    correspond to the changes in the land ownership over

4    time, correct, Mr. Dewey?

5         A.    Yes, sir.

6              MR. AUGUSTINI:  If we could just show the

7    next slide, please.

8         Q.    (By Mr. Augustini)  As the previous one we

9    saw with respect to the open pit, here we have

10   shaded Molycorp's landownership as of January 1974

11   after the land exchange, does that look accurate to

12   you, sir, the shaded, orange shaded area, again, is

13   the Molycorp owned land?

14        A.    I think it's accurate, yes, sir.

15        Q.    We did ask a question about this earlier

16   in terms of whether the waste piles were going to be

17   disbursed across the entire area.  Does this photo

18   show, for example, down to the southern boundary and

19   out west that there is no indication of waste piles

20   in those areas, correct?

21              MR. HOPSON:  Objection, ambiguous.  I

22   don't know what areas we are referring to,

23   Your Honor.  I can't understand the question because

24   it is ambiguous.

25              THE COURT:  Please restate your question.

1      Q    (By Mr. Augustini) Over here,

2  approximately, do you see any indication of waste

3  piles in that area, sir?

4      A.   No, I do not.

5      Q.   And after acquiring title to the

6  2,000-plus acres in the exchange in January of 1974,

7  Molycorp kept mining and kept dumping waste rock on

8  its land, correct?

9      A.   Correct.

10     Q.   Generally the same manner it had before,

11 correct?

12     A.   Correct.

13     Q.   I would like to turn to the DMEA loan,

14 Mr. Dewey.  We touched on that earlier.  Molycorp

15 applied for the DMEA loan ten years after your

16 arrival in Questa, correct?

17     A.   No, ten years before my arrival.

18     Q.   Yes, you are correct.

19          The DMEA was in 1957 and you arrived at

20 Molycorp in 1967, correct?

21     A.   Correct.

22     Q.   And was it your understanding Molycorp

23 voluntarily filed the loan application and received

24 approximately $200,000 in loan funds over a

25 three-year period between 1957 and 1960?

Page 114

1      A.    Yes, sir.

2      **Q.    So the loan was roughly $66,000 a year for**

3    **three years?**

4      A.    That is correct.

5      **Q.    And Molycorp paid the full amount back to**

6    **the Government, correct?**

7      A.    Yes.

8      **Q.    So ultimately Molycorp incurred**

9    **100 percent of the exploration expense, correct?**

10     A.    That is not exactly correct, sir.  The

11   USGS geologists were intimately involved in the

12   program.  They brought a lot of expertise to the DME

13   program that was not charged, if you will, it was

14   just topnotch geologists advising the program.

15     **Q.    Sure.  That was free, right?**

16     A.    Yes, sir.

17     **Q.    So in terms of the money expended,**

18   **Molycorp paid 100 percent for the work, correct?**

19     A.    Yes.

20     **Q.    And all of the exploration work between**

21   **1957 and 1960, the DMEA period, was underground; is**

22   **that right?**

23     A.    Yes.

24     **Q.    And there was no waste rock generated from**

25   **the underground exploration, correct?  At least --**

1      A.    Well, there were some small amounts of

2  drifting and crosscutting, and that rock associated

3  with that, of course had to come out of the tunnel,

4  but it was copious amounts relative to what we are

5  talking about today.

6      Q.    Sure.

7            **Just so I understand the last part, the**

8  **waste generated by underground exploration was**

9  **insignificant compared to the actual mining,**

10 **correct?**

11     A.    Correct.

12     Q.    **Now, we discussed this morning that**

13 **Molycorp old timers initially were hoping to find**

14 **more of the super high grade or that they had been**

15 **finding in the little veins in the mine, correct?**

16     A.    That was the whole purpose of the

17 exploration program, sir.

18     Q.    **And at your deposition you testified that**

19 **perhaps the Molycorp team at the time before your**

20 **arrival should have been listening more to**

21 **state-of-the-art geologists like Stewart Wallace and**

22 **John Schilling.**

23            **Do you remember that?**

24     A.    Yes.

25     Q.    **Are you familiar with John Schilling?**

1     A.     I am familiar with his report.

2     Q.     **Did he work for the New Mexico Bureau of**

3  **Mines?**

4     A.     Yes, sir.

5     Q.     **And was Questa Mine one of his most**

6  **significant geological studies?**

7     A.     Yes.

8     Q.     **Are you familiar with his 1956 publication**

9  **regarding the Questa Mine?**

10    A.     That is correct.

11    Q.     **Do you understand Mr. Schilling spent**

12  **about 14 months living and working at the mine site**

13  **in the '50s?**

14    A.     Correct.

15    Q.     **And he was welcomed by the Molycorp team,**

16  **correct?**

17    A.     Yes, sir.

18    Q.     **So there is no doubt that Molycorp was**

19  **aware of Mr. Schilling's geological study about the**

20  **mine, correct?**

21    A.     Correct.

22    Q.     **And since it was published in 1956, that**

23  **study would have been available to Molycorp prior to**

24  **applying for the DMEA loan, correct?**

25    A.     Correct.

1      Q.    And is it your understanding that of

2  Mr. Schilling's work that he did not think that

3  pursuing high grade ore as had been done in the past

4  was a good idea?

5      A.    Yes, I believe that is the conclusion he

6  came to, yes.

7      Q.    And he did suggest that while nobody knows

8  what the results would be, that exploration for low

9  grade ore might be a good path for the Questa Mine?

10     A.    That is correct.

11     Q.    Now, Mr. Dewey, you also testified that

12  Molycorp raised funds based on the award of the loan

13  from DMEA; is that right?

14     A.    Yes, sir.

15           MR. AUGUSTINI:  Mr. Hambrick, please show

16  CX63.

17     Q.    (By Mr. Augustini)  Mr. Dewey, do you

18  recognize this as the Molycorp stock offering that

19  relates to the fundraising we just discussed?

20     A.    Yes, sir.

21     Q.    If we could turn to Page 10, please.

22           MR. AUGUSTINI:  If you could blow up the

23  bottom paragraph.

24     Q.    (By Mr. Augustini)  I will read it for the

25  record, Mr. Dewey.

1                    "In 1954 the company, following geological

2       work on the property, undertook an exploration

3       program aimed at locating extensions of the ore

4       deposit.  This work continued for two years and was

5       evaluated by the company and consulting geologists."

6                    THE COURT:  What is your question,

7       counsel?

8                    MR. AUGUSTINI:  Excuse me, Your Honor.

9          Q.    (By Mr. Augustini)  If you would take a

10      minute, Mr. Dewey does, that passage accurately

11      reflect your understanding of the exploration work

12      Molycorp was doing in the mid-'50s?

13         A.    Yes.

14         Q.    And the last sentence there, "One of the

15      possibilities that Molycorp was considering at that

16      time was a large deposit of molybdenum, which would

17      be of commercial grade if mined and milled in

18      sufficiently large quantities."

19                    Is that consistent with your

20      understanding?

21         A.    Yes, that is.

22         Q.    And as for DMEA certifying the presence of

23      an ore body, your testimony is that is what happened

24      after the loan concluded, correct?

25         A.    Correct.

Page 119

1      Q.      Regardless of what Molycorp found, under

2   the loan agreement with the Government, there was no

3   obligation to conduct any mining, correct?

4      A.      Correct.

5      Q.      So the mining was a business decision by

6   the company, correct?

7      A.      Correct.

8      Q.      And Molycorp made that choice only after

9   conducting much more exploration, ore body

10  delineation, development work, correct?

11     A.      Yes.

12     Q.      And as we have discussed briefly this

13  morning, Molycorp would not embark on a

14  50-million-dollar investment to begin large scale

15  mining without preparing a mine feasibility study,

16  correct?

17     A.      Correct.

18     Q.      You testified the feasibility study was

19  critical to justify investment and/or obtain

20  financing for mine operations, right?

21     A.      Yes.

22     Q.      That is why Molycorp did so much work to

23  explore and to develop the mine, to prove its

24  feasibility, correct?

25     A.      It was critical work to defining the

Page 120

1    limits of the ore research, yes.

2        Q.    I would like to just briefly show you your

3    written testimony.  It is Page 28 or PDF Page 29

4    from the Court filing.

5              At the top is your discussion of the

6    feasibility study.  If you take a moment to look at

7    that, sir.

8        A.    (Witness complied.)

9        Q.    So if you are ready, the feasibility study

10   reflected Molycorp's independent analysis of a

11   number of factors, correct?

12       A.    Correct.

13       Q.    You list them here, but just to quickly go

14   through them, those factors would include expected

15   market place of molybdenum?

16       A.    Yes.

17       Q.    Capital required to construct a processing

18   mill?

19       A.    Yes.

20       Q.    Infrastructure and equipment costs to do

21   the mining?

22       A.    Yes.

23       Q.    Labor and material costs for mining?

24       A.    Yes.

25       Q.    Daily production rates at the mine?

1      A.    Yes.

2      Q.    **Floor to waste stripping ratios?**

3      A.    Yes.

4      Q.    **Waste hauling routes?**

5      A.    Yes.

6      Q.    **Dump logistics and more, correct?**

7      A.    Say that again.

8      Q.    **I'm sorry, also the feasibility study, of**

9   **course, would address waste dump logistics, correct?**

10  **Where to place the waste rock that would be**

11  **generated from mining?**

12     A.    You know, at that particular time not in

13  intimate detail, but we subsequently, that was taken

14  into consideration, yes.

15     Q.    **So now that you have a feasible project**

16  **you have to have adequate space to accommodate your**

17  **waste rock, right?**

18     A.    You could sit there and look at that space

19  very easily, yes.

20     Q.    **Yes.**

21           **The United States did not participate in**

22  **any of those different analyses, correct?**

23     A.    Correct.

24     Q.    **Mr. Dewey, I would like to turn briefly to**

25  **the mill area again.**

Page 122

 1              MR. AUGUSTINI:  Mr. Hambrick, if you could

 2   put up Demonstrative 2.

 3        Q.    (By Mr. Augustini)  We looked at this

 4   earlier.  And you did identify the mill area down

 5   where I circled; is that correct, sir?

 6        A.    Yes, sir.

 7        Q.    Molycorp owned the land where the mill was

 8   situated, correct?

 9        A.    That is correct.

10              MR. AUGUSTINI:  Now, I would like to show

11   USX582.

12        Q.    (By Mr. Augustini)  Mr. Dewey, do you see

13   that this is a memorandum titled, "Mill Operation

14   Report June 1976" addressed to you?

15        A.    Yes.

16        Q.    And I think it is prepared, we can see it

17   in a bit, but was Mr. Filick (phonetic) the manager

18   of the mill?

19        A.    He was the mill superintendent.

20        Q.    Did you receive an operation report like

21   this for the mill every month in your job?

22        A.    Yes.

23              MR. AUGUSTINI:  Your Honor, move to admit

24   USX582.

25              MR. HOPSON:  No objection.

Page 123

1          THE COURT:  Without objection USX582 is

2    admitted.

3          (Exhibit admitted, USX582.)

4    **Q     (By Mr. Augustini) This is an example of**

5    **the detailed information that Molycorp management**

6    **received regarding all aspects of the mill**

7    **production, correct?**

8    A.     Correct.

9    **Q.     This is information that was routinely**

10   **transmitted to you as your role as manager of the**

11   **mine, correct?**

12   A.     Correct.

13   **Q.     In addition to the land, did Molycorp own**

14   **all of the buildings and machinery in the mill area?**

15   A.     No.  We were constantly struggling with

16   finances and we generated some funds by selling all

17   of our, not all of our equipment, but significant

18   number of trucks to CIT.  And so we leased the

19   equipment back from, I don't remember now what the

20   acronym stands for, but the lending company was

21   called CIT.  And other than that we owned

22   everything.

23   **Q.     Okay.  Just to break that down a bit,**

24   **Molycorp owned the buildings in the mill complex; is**

25   **that right?**

Page 124

1      A.    Yes.

2      Q.    **And with regard to specific machinery, the**

3   **ball grinders and whatnot, that is what was used to**

4   **process the ore, correct?**

5      A.    Yes, sir.

6      Q.    **Was that Molycorp owned or --**

7      A.    Molycorp owned it, yes.

8      Q.    **And what was the other equipment that you**

9   **mentioned that was leased from CIT then?**

10      A.    Well, basically just a portion of the

11   whole truck fleet, of the haulage fleet.

12      Q.    **Okay.  Then with respect to the mill, that**

13   **was all company machinery and equipment, correct?**

14      A.    Correct.

15      Q.    **Molycorp also owned and operated the**

16   **tailings pipeline that went from the mill down to**

17   **the tailings area?**

18      A.    Yes.

19      Q.    **And if there was damage that resulted from**

20   **the pipeline, one of the things Molycorp agreed was**

21   **to indemnify the United States, correct?**

22      A.    That terminology is in the lease

23   agreement, yes, sir.

24      Q.    **With respect to the tailings area, sir --**

25            MR. AUGUSTINI:  If we can turn to CX370.

1        Q.    (By Mr. Augustini)  Mr. Dewey, this is the

2    site map that I believe you included in your direct

3    testimony.  Would you just take a moment and explain

4    for the Court where the tailings area is in

5    relationship to the mine?

6        A.    Okay.  The mine obviously is labeled

7    Molycorp mine site, surrounded by a yellow

8    borderline.  And if you look to the west of the mine

9    cite, the next thing you see is the Questa, the town

10   of Questa itself, and just to the left of that are

11   the two tailings facilities.  They are shaded in

12   brown, outlined in brown.

13       Q.    Yes, thank you, sir.

14             The legend on the right side of the map

15   indicates that the yellow line is property boundary.

16             Do you see that?

17       A.    Yes, I do.

18       Q.    So at least the yellow, yellow line

19   surrounds the dark area that is shaded to reflect

20   the Questa Mine, correct, that is Molycorp property?

21       A.    Correct.

22       Q.    Over at the tailings area, if we trace the

23   yellow line sort of roughly like that, this map

24   indicates that that is the Molycorp property that

25   encompasses the tailings facility, correct?

Page 126

```
 1       A.    That's correct.
 2       Q.    And over its lifespan the mill generated
 3  100 percent of the tailings slurry that was
 4  transported to the tailings area, correct?
 5       A.    Correct.
 6       Q.    Molycorp directed, managed, monitored,
 7  controlled, all of the tailings disposal operations,
 8  correct?
 9       A.    Yes, sir.
10             THE COURT:  You know, Counsel, I don't
11  think there is any dispute about any of this.
12             MR. AUGUSTINI:  Yes, Your Honor, I just
13  want to make sure it is in the record.  I'll move
14  on.
15             THE COURT:  It is in the record over and
16  over and over again.
17             MR. AUGUSTINI:  I will move on,
18  Your Honor.  Thank you.
19             Let's turn to USX368, please.
20       Q.    (By Mr. Augustini)  Mr. Dewey, are you
21  familiar with the preventive maintenance and
22  surveillance plan that Molycorp developed?
23       A.    Yes.
24             MR. AUGUSTINI:  I move to admit USX368,
25  Your Honor?
```

1           MR. HOPSON:  Your Honor, I am concerned

2    about relevance on this one.  We have a stipulation

3    on the pipelines that we are not seeking any

4    contribution on the pipeline issue, so I don't know

5    what the relevance of this is.

6           THE COURT:  That is why I said I thought

7    it was established.  I thought it was also

8    established that the United States didn't fund

9    anything except the DMEA, they didn't pay for

10   anything, they just stored stuff on the unpatented

11   lands.

12          MR. AUGUSTINI:  Correct, Your Honor.

13          THE COURT:  Why do we have to go through

14   it over and over and over again?

15          MR. AUGUSTINI:  I don't plan to.  I don't

16   plan to ask questions about the pipeline either.

17   This document addresses the chronology of the

18   tailings area, which has not been established.

19          THE COURT:  It is irrelevant.

20          MR. AUGUSTINI:  The western tailings area,

21   Your Honor, is part of their claim against the

22   United States.

23          THE COURT:  All right.  Is that correct?

24          MR. HOPSON:  Yes, the tailings area is

25   part of the claim but this is a document about

1   taking care of spills from the pipeline, which we

2   are not seeking contribution on.

3          MR. AUGUSTINI:  The Court has already

4   ruled that it won't consider those and I don't have

5   any questions about it, so it is moot.

6          THE COURT:  Okay.  Let's move along.

7          MR. AUGUSTINI:  Let's turn to Page 19,

8   Mr. Hambrick.

9     Q.    **(By Mr. Augustini)  What I wanted to get**

10  **to, Mr. Dewey, was Section 35, the western tailings**

11  **area.  Is Section 35 where Molycorp chose to**

12  **construct the western tailings impoundment, sir?**

13    A.    I'm sorry, I was reading and I am not

14  reading your lips.  I'm sorry.

15    Q.    **Section 35, was that the area in which**

16  **Molycorp constructed the western tailings**

17  **impoundment?**

18    A.    Yes, sir.

19    Q.    **Do you see the date in the second**

20  **sentence, 1971, was that the date that Molycorp**

21  **began to build the first end in the western tailings**

22  **area?**

23    A.    Yes, sir.

24    Q.    **So Molycorp did not begin disposing**

25  **tailings in the western area until after that dam**

1    **was completed in 1971, correct?**

2        A.    That is correct.

3        **Q.    And according to USX368 the dam, Dam 4,**

4    **was that the one, main one in Section 35?**

5        A.    Repeat it, please.

6        **Q.    Sorry.**

7            **Was Dam 4 the main tailings dam in**

8    **Section 35, the western area?**

9        A.    Yes, sir.

10       **Q.    Was that about 118 feet tall,**

11   **approximately a thousand feet long and 1,300 feet**

12   **wide?**

13       A.    Yeah, to the best of my recollection, that

14   is correct.

15            THE COURT:  It is just what it says there.

16            MR. AUGUSTINI:  Yes, Your Honor.

17            THE COURT:  Counsel, you are going to have

18   to move this.  You have taken all morning and all

19   afternoon going over stuff that was either not

20   controverted or that we know is not disputed.

21            MR. AUGUSTINI:  Okay, I will move on,

22   Your Honor.

23       **Q    (By Mr. Augustini) Are you aware that**

24   **perimeter ditches surrounded the tailings area?**

25       A.    Yes, sir.

Page 130

1      Q.      What was the purpose of those, sir?

2      A.      To control meteoric waters, keep them from

3  encroaching the tailings areas.

4      Q.      And was that natural runoff that would

5  come down from the mountain?

6      A.      Yes.

7      Q.      Was the purpose of those to dispose of

8  tailings waste?

9      A.      No.

10     Q.      Molycorp never intended for contaminated

11  water to go from the tailings ponds to the Red

12  River, correct?

13     A.      All the water went, eventually all the

14  overflow eventually went to the Red River from the

15  very beginning.

16     Q.      It did flow to the Red River, sir, but it

17  was not Molycorp's intention that there would be any

18  contamination in the outflow from the impoundments

19  down to the river; is that correct?

20     A.      That's correct.

21     Q.      And can you just briefly describe for the

22  Court, please, the canting process within the

23  impoundments?

24     A.      Yes.  The tailings are thickened at the

25  mill to consistency of about 60 percent solids,

Page 131

1   40 percent water, pump, in this case, that Dam

2   Number 35, 10 miles to the pond.

3          A course fraction, the heavy, all of the

4   sediments in the solution settles out into the pond

5   and over time the clear water is on the surface and

6   that is decanted off in a series of spillways

7   directed to an iron exchange plant where the water

8   is treated to remove copious amounts of rubidium

9   that back in, I think, 1985 the EPA decided was too

10  much and then it is discharged into the Red River

11  immediately above the fish hatchery.

12     **Q.    Right.  And so the basic concept of the**

13  **decanting would be for the tailing solids to sit**

14  **right there and collect at the bottom of the**

15  **impoundment, correct?**

16     A.    Correct.

17     **Q.    And then the clear or the clean water**

18  **would move on down, after treatment would move on**

19  **down towards the Red River, right?**

20     A.    Correct.

21          MR. AUGUSTINI:  Mr. Hambrick, please

22  display USX478.

23     **Q.    (By Mr. Augustini)  Mr. Dewey, do you**

24  **recognize your initials there on this memorandum?**

25     A.    Well, yes, I do.

Page 132

1      Q.      **The date is May 10, 1991?**

2      A.      Correct.

3      Q.      **The title is, "Process Residues and**

4      **Waste," correct?**

5      A.      Correct.

6      Q.      **Could you please describe what the purpose**

7      **of this memo was?**

8      A.      At this point in time we had decided to

9      put Molycorp up for sale and we had created a data

10     room and we wanted to put everything in the data

11     room that pertained to Molycorp's operation.

12             And this memo was prepared to go to

13     Mr. Dikers who was in charge of the data room at the

14     time.

15     Q.      **So was this in the nature of due diligence**

16     **process for potential acquisition then?**

17     A.      Yeah, for something of who might want to

18     look at acquiring Molycorp could look at, yes.

19             MR. AUGUSTINI:  Let's turn to USX477,

20     please.

21     Q.      **(By Mr. Augustini)  Do you recognize this**

22     **memo, sir?**

23     A.      Yes, I do.

24     Q.      **And this is Mr. Shoemaker's response to**

25     **the exhibit that we previously reviewed, correct?**

Page 133

1      A.    Yes.

2      Q.    And he goes through and identifies sources

3   of waste that are located at the Questa Mine,

4   correct?

5      A.    Yes, sir.

6      Q.    Have you had a chance to review this

7   memorandum prior to testifying to today?

8      A.    I have.

9      Q.    Is there anything in the memo

10   Mr. Shoemaker wrote that is incorrect?

11      A.    No.

12           MR. AUGUSTINI:  No further questions,

13   Your Honor.

14           THE COURT:  Thank you.  You may redirect.

15           MR. HOPSON:  Your Honor, good afternoon.

16                REDIRECT-EXAMINATION

17   BY MR. HOPSON:

18      Q.    Good afternoon, Mr. Dewey.  Let's start by

19   looking again at Chevron Exhibit 245, parts of which

20   were reviewed during your cross-examination.  It is

21   on the screen in front of you, and this is the

22   Miller memo.  Now you knew Mr. Miller, right?

23      A.    I'm sorry?

24      Q.    Did you know Mr. Miller?

25      A.    Oh, very well, yes, sir.

1      Q.      Okay.  Did Mr. Miller prefer the land

2   exchange or did he prefer the valley fill plan?

3      A.      He preferred the valley fill plan.

4      Q.      Why did he prefer the valley fill plan?

5      A.      I believe this memo, can I look at the

6   whole memo for a minute?  I think this memo

7   described why.

8              The second paragraph he outlines his

9   concern.  "Future generations will no doubt be faced

10  with tremendous problem regarding the Red River

11  canyon dumps.  First the material is already

12  standing at the angle of repose because that was the

13  angle of the hillside.

14             "Second the material is easily altered by

15  weathering and it should not take many summers for

16  the channel to form under dump slopes and create

17  possibility of catastrophic mud slides.

18             "The idea of putting a highway in the

19  river through a tunnel has already been rejected.

20  Now is not the time.  Emotions are running high

21  against strip mines from the standpoint of ecology,

22  a tunnel would be a more practical solution.

23             "First of all, by dumping straight across

24  the canyon would have only the dump faces to contend

25  with.  Secondly, we could terrace or flatten the

1   dump faces and stand a much better chance of

2   controlling erosion.  A flatter slope would be more

3   amenable to trees and ground cover."

4          John and the rest of us never gave up on

5   the idea that this was where it needed to go.

6      **Q.    So if you went back to December 10, 1970**

7   **and you personally could choose between valley fill**

8   **plan and the land exchange, what would you choose?**

9      A.    Valley fill plan.

10     **Q.    Why did you accept the land exchange that**

11  **was proposed by the Forest Service?**

12     A.    During the meeting when they discussed the

13  use of mill site claims, one of the Government

14  officials stated that we are not sure that waste

15  disposal on mill site claims is an allowable use.

16  And if you choose to do that, we would probably --

17  we would force a friendly, I think they used the

18  word friendly, validity contest.

19          And, you know, Judge Watson, I'm sorry,

20  Jack Watson knew enough about where things are going

21  that a validity contest in all probability would be

22  several years and we needed to have a place to go

23  the next day.

24     **Q.    When you talk about the claims in the**

25  **valley, are those, those fan-shaped claims you were**

Page 136

1      talking about earlier today?

2          A.    Yes, sir.

3          Q.    Did you view the Forest Service discussion

4      of a validity contest as a threat?

5          A.    Very definitely.

6          Q.    And finally on this subject, this morning

7      when you were answering questions you said the land

8      exchange is why we are here.

9                What did you mean by that?

10         A.    Well, if we would have had the ability to

11     go across the highway, probably only -- I can't be

12     specific, but I would say 25 percent of the waste

13     that is on that hillside now would be what was

14     there, maybe not in the hole with -- but it would be

15     just enough, just enough to get across the tunnel

16     and a culvert put the highway on a culvert, the

17     tunnel, and get to the other side.

18               We had to spend our full time figuring out

19     how to stack close to 400 million tons on that piece

20     of land exchange and that is the reason for these

21     extensive dump plans going on continually.  And if

22     we were able to just go straight across,

23     particularly, you know, I get an opportunity

24     sometime around 1970s to go and visit this other

25     mine in Arizona, Twin Buttes, where they had a

1   similar rock failure.  And in the process, I was

2   shown a system they put in, in pit crusher with a

3   conveyer system limiting the truck haulage extremely

4   at a third the cost of truck haulage.

5           There is no question in my mind that if we

6   were hauling trucks across valley full, after what I

7   saw overnight we would have had a conveyer going

8   across that valley fill.

9       Q.    **That raises something.  Was the valley**

10  **fill a longer haul than the land exchange lands?**

11      A.    No.  Well, yes and no.  In some

12  configurations of those dumps they had to almost do

13  S-shaped turns in order to try to stage the volume

14  of material that was going in level by level in

15  order to try to make it all fit.

16      Q.    **Okay.**

17          MR. HOPSON:  Ms. Hutchman, can we see just

18  the front page of Chevron 281, which is the

19  Environmental Impact Statement.

20      Q.    **(By Mr. Hopson)  Mr. Dewey, when you were**

21  **testifying about the environmental impact statement**

22  **you said it was always Molycorp's intent to continue**

23  **mining; is that correct?**

24      A.    Correct.

25      Q.    **But if you didn't get land through the**

1    land exchange or through the valley fill, would you

2    have been able to continue mining?

3        A.    Definitely not.

4        Q.    You talked about in the environmental

5    impact statement terracing and restoring the

6    vegetation.  Is it possible to do that on those

7    front rock dumps that go along the highway and the

8    Red River?

9        A.    Yes, we had test plots.  I am sure Chevron

10   continues to have test plots long after I left but

11   we were able to grow vegetation, yes, sir.

12       Q.    Okay.  We looked earlier today, you were

13   asked questions about U.S. Exhibit 191, which was an

14   article about by Jack Dolman about long hold

15   drilling.

16             Do you remember that?

17       A.    Yes, I do.

18       Q.    Whose idea was it to do long hole or

19   diamond drilling during the DMEA exploration

20   program?

21       A.    The USGS or the Government geologists

22   literally insisted if we were going to get an

23   agreement, at least as I read all of the back and

24   forth, if we were going to get this application

25   approved, we had to, Molycorp, I said we, Molycorp

1    had to accept this proposal to do some diamond

2    drilling to look for what Schilling described as a

3    potential low grade resource.

4          There is no question that Carman Greslin

5    and all of those people who were involved in that

6    50-ton-a-day mule horse and buggy operation were

7    interested in that, but in order to get that

8    contract, they agreed to it.

9      **Q.    And just before the negotiations with the**

10   **DMEA in 1954 to 1956, was Molycorp looking for high**

11   **grade ore or low grade ore?**

12     A.    Only high grade.

13     **Q.    Was Molycorp reluctant to look for low**

14   **grade ore?**

15     A.    They had no use for it.

16     **Q.    Let me ask you this.  How important was**

17   **the expertise of the U.S. Bureau of Mines and the**

18   **geological survey in the course of the DMEA program?**

19     A.    You know, very important.  If you read

20   through Carman's reports, he consistently

21   compliments the expertise of the geologists that the

22   Government had.

23          And, you know, people prior to the DMEA

24   program, the only expertise they had were hiring

25   people like Schilling or when they would visit the

Page 140

1   property.  So they were there, you know, to direct

2   the program as it was underway, they reviewed what

3   was going on and made some suggestions and Carman

4   refers to that as being very helpful.

5      Q.     Okay.  You mentioned Mr. Schilling.

6             MR. HOPSON:  If we could, Ms. Hutchman,

7   can we call up Chevron 43 and turn to Page 92.

8      Q.     (By Mr. Hopson)  Now, do you remember

9   being asked about Schilling's comments and

10  observations about low grade ore?

11     A.     Yes, I do.

12     Q.     Let's look at what Mr. Schilling's

13  conclusions were about low grade ore.

14             "In summary," he says, "large tonnages of

15  low grade molybdenum ore occur but no deposits are

16  not large enough to be mined by block caving or open

17  pit methods which would be necessary for profitable

18  operation."

19             Was that the understanding of Molycorp and

20  everybody else prior to the DMEA program?

21     A.     Yes, sir.  Not everybody else because if

22  you look back at some of the correspondence that was

23  taking place between the Government individuals,

24  they felt that the exploration for high grade was

25  not a valid reason to justify a DMEA contract.  They

Page 141

1    needed to have a better target.

2              And this to them, based upon this

3    Schilling report, was the better target and why they

4    were insisting on the diamond drilling program to

5    look for this low grade ore resource.

6        **Q.    And when you say, Mr. Dewey, they were**

7    **insisting, are you referring to the DMEA and the**

8    **geological survey and the Bureau of Mines and the**

9    **other agencies of the United States?**

10       A.    Yes.  If you look back through the files

11   you will see comments that, you know, we don't

12   believe that Molycorp management was interested or

13   will agree to this.  Ultimately they had to do

14   something, and they agreed to it.

15       **Q.    I want to change gears here for a minute.**

16   **Mr. Augustini asked you about, a number of questions**

17   **about Kennecott.  And I believe you testified that**

18   **there was an agreement to enter a partnership with**

19   **Kennecott; is that correct?**

20       A.    Correct.

21       **Q.    Was that agreement finalized or**

22   **consummated?**

23       A.    No, it was not.

24       **Q.    Did you negotiate to buy Kennecott out of**

25   **that agreement?**

1      A.     Yes, I did.

2      **Q.     Why?**

3      A.     I was against the agreement from the very

4   beginning.  I felt that we had worked all of these

5   years on this property, we had finally discovered a

6   resource that looked like it had a chance to be

7   profitable, and for a lousy $5 million, it turned

8   out to be 6 million, we were going to give Kennecott

9   a chance to take 60 percent.

10         We had accumulated thousands of acres of

11  water rights which were precious, timely, patented

12  ground, 20,000 acres of patented ground by that

13  time, and to give it all away for what initially was

14  $5 million to me never made sense.

15     **Q.     Well, let me just stop you there,**

16  **Mr. Dewey.  While you were exploring that**

17  **partnership, I think it was pointed out that**

18  **Kennecott spent about 6 million?**

19     A.     Correct.

20     **Q.     What did they spend that on?**

21     A.     Definitive drilling of -- we had prior to

22  getting Kennecott involved, we had found enough

23  drilling to make an estimate of this resource, but

24  we had no money, and so we -- I was told to find a

25  joint venture.

Page 143

1     Q.     Did Kennecott spend that money to benefit

2  Molycorp or to protect its investment?

3     A.     Well, I don't believe Kennecott had any

4  investment in Molycorp at that time.  I think

5  sometime, sometime after that -- after their study

6  in 1961, I think they sold their investment.  I

7  don't remember seeing any discussion about Kennecott

8  continuing in the ownership in any kind of Molycorp.

9     Q.     Why did they spend the $6 million figuring

10  out what was there?

11     A.     Well, you know, we had the low cadmium,

12  60 million tons sitting behind the town of Questa.

13          Moly prices for the first time ever in my

14  career had gone from $3 a pound to $25 a pound and

15  ultimately ended up at $40 a pound.  And typical of

16  what happens in this commodity business, everybody

17  and their brother jumps on the opportunity to, you

18  know, 127 oil a day, I mean, we all can see what

19  happens to the profits to the oil company.

20          So Kennecott was very interested in

21  participating in this resource that they knew a lot

22  about because they had been in and out of it in 1961

23  and prior.  It was a very easy decision for them to

24  make.

25          It was easy for our management to make it

1    at the time because they had lost so much on the

2    open pit portion that they were insistent that if we

3    were going to do anything in the future we needed to

4    have a partner.

5         Q.    **Was Kennecott ever an owner of the Questa**

6    **site?**

7         A.    No, sir.

8         Q.    **We talked a little bit on your direct, you**

9    **were asked about the valley fill plan and**

10   **Mr. Torgerson's role in helping to develop that.**

11            **Do you recall that testimony?**

12        A.    Yes, I do.

13        Q.    **Who was Mr. Torgerson?**

14        A.    He was, at the time a senior engineer in

15   the engineering department and he eventually became

16   chief engineer.

17        Q.    **Did he develop written proposals and**

18   **drawings about valley fill plan?**

19        A.    Yes, yes, sir.

20        Q.    **Do you recall seeing them?**

21        A.    I recall seeing the drawings of the

22   culverts and the tunnel concept.  I didn't see

23   anything other than -- that I can remember today,

24   other than those.

25        Q.    **Okay.  And as we have already established,**

1    **Molycorp continued to be interested in the valley**

2    **fill program even as it was pursuing the land**

3    **exchange, right?**

4         A.    Yes.

5         Q.    **You were asked a number of things today**

6    **over and over again, things that Molycorp did like**

7    **buying equipment and hiring employees.  I just want**

8    **to ask you a couple of things the U.S. did.**

9              **Did the U.S. take discretionary actions to**

10   **provide special use permits at the Questa site?**

11        A.    You know, very definitely in the beginning

12   the tailings lines had to traverse 6 or 7 miles of

13   Forest Service land to make it to the tailings pond

14   area.

15             Section 35 land was owned by the BLM, at

16   the time, and practically overnight they facilitated

17   a public auction to enable us to acquire that

18   parcel.

19             There were special use permits for

20   decanting water from the tailings dam to the river.

21   Anything we did required some kind of a, you know,

22   approval or permit.

23             And they were anxious to provide us with

24   those.

25        Q.    **At the time did you ever refer to the**

Page 146

1      United States Government as your landlord?

2          A.    Yes, sir.

3          Q.    And why did you refer to them as your

4      landlord?

5          A.    Because is precisely what they were.  We

6      were operating on U.S. Forest Service land and, you

7      know, one of our -- one of our concerns mentioned

8      the time it took between the time the land exchange

9      was agreed to in 1969 and it finally approved in

10     '74.

11             At any point in time somebody could have

12     decided they didn't like what we were doing, and

13     that would be the end of it.  So we really wanted

14     that consummated and so that is why, we were, they

15     were in control of anything we did.

16         Q.    Did you work to maintain a good working

17     relationship with the Forest Service and other

18     agencies in the United States Government?

19         A.    Yes, I did.  I had a very close

20     relationship with John Hart, the Forester.  Whenever

21     one of our employee's wife died prematurely and she

22     happened to be a ski instructor in a little small

23     ski area across from an old Forest Service graveyard

24     that hadn't been used in 75 years or so and her

25     husband wanted her buried there.  And I went and

1   talked to John and told him what the situation was

2   and he gave me permission to take a grave and bury

3   her there.

4           About two years later her husband left us

5   and went off to Idaho and worked for SIMCO Company

6   and drowned in a cold lake and his family whose

7   brothers worked at the mine said we got to plant Al

8   next to Judy and I had to go back to John.

9           And as far as the fish hatchery was

10  concerned, I had a relationship with everybody from

11  Led Gordon who was the head of the whole department

12  of Fisheries to Roy Pope, Pope named a lake after

13  Roy when we first started Dam Number 35 and they

14  opened up the gates to let some recant water out, it

15  created some turbidity in the river because that

16  wash hadn't been used since a rainstorm several

17  months prior.  And Roy came up, gave me a lot of

18  static and within about two hours we had a dam

19  created, temporary dam to control it.  We had to

20  stop it immediately, and I guess tongue in cheek,

21  but I painted a sign that said Pope Lake and stuck

22  it in the ground and got Roy to come back up and

23  show him what we had done.

24      Q.    Let me focus you back on the Questa site

25  for a minute.  Did the United States take other

1    discretionary acts such as providing rights of way?

2        A.    Yes.

3        Q.    Did the United States provide lands,

4    including lands for disposal of waste rock through

5    land sales and land exchanges?

6        A.    Yes, sir.

7        Q.    Did the United States Government support

8    and promote the open pit mining at Questa?

9        A.    Very definitely.  You know, there are

10   letters in the files from Department of Interior

11   talking about how poor Northern New Mexico was and

12   the Forestry at that time back in those years were

13   mobile use agencies.

14            And the head Forester was advising the

15   local Forester that we needed to do everything that

16   we can to help Molycorp, help this mine to help the

17   people of Northern New Mexico.

18       Q.    Back to your personal relationship with

19   the Questa Mine site.  When you arrived at the site

20   in 1969 --

21       A.    '67.

22       Q.    -- sorry, 1967.  When you arrived at the

23   site in '67 did the United States own part of the

24   land at the Questa Mine site?

25       A.    Yes.

1      Q.    Did the United States own land on which

2   waste rock was deposited at the time you arrived at

3   the Questa Mine site?

4      A.    Yes.

5      Q.    Was the United States aware that its land

6   was being used for waste rock disposal?

7      A.    Yes, it was.

8      Q.    To your knowledge, all your decades with

9   the company, did the United States ever object to

10   the manner in which Molycorp disposed of waste rock?

11      A.    They expressed concerns about the

12   possibility of a dump encroaching the highway and in

13   several instances we had already established some

14   catchment basins, if you will, or berms that we

15   should continue that in a new area we were dumping

16   in.

17      Q.    That was the very same land that the

18   United States gave you in the land exchange, right?

19      A.    They were in the process of giving it to

20   us.  They still owned and controlled it then.

21      Q.    There were questions asked about stock

22   offerings that Molycorp did, including one in 1957.

23            Do you recall that?

24      A.    Yes, I do.

25      Q.    And in the wake of the DMEA program and

Page 150

1      the discovery of the low grade ore body, did

2      Molycorp go out and raise money?

3          A.     Yes, they did.

4          Q.     Did they do it through securities

5      offerings?

6          A.     Yes.

7          Q.     Did they do it through bank loans?

8          A.     I think there was a small bank loan then

9      was primarily the security offering or something

10     approaching $13 million or so.

11         Q.     In that securities offering, did they

12     attach any documents referencing the DMEA?

13         A.     Yes, they attached the contract itself and

14     I referred to the originals.

15         Q.     So the DMEA contract was attached to the

16     prospectus of raising money, right?

17         A.     Yes.

18         Q.     And did they use the DMEA certification of

19     the discovery in connection with obtaining bank

20     financing and other financing?

21         A.     Yes, very definitely.

22         Q.     I want to look at one last document,

23     Mr. Dewey.

24             MR. HOPSON:  Ms. Hutchman, can we call up

25     Chevron 46 at Page 6, please.

1          Q.     (By Mr. Hopson)   You know, Mr. Dewey, that

2     this is the application, the original application

3     that Molycorp made to obtain DMEA funding and

4     assistance, correct?

5          A.     Yes, sir.

6          Q.     Will you read for us what they said about

7     their current plans at the time they were asking the

8     DMEA for help?

9          A.     "As stated, no production is forthcoming

10    from any part of the mine and no ore reserve are

11    considered available.  Also, no other exploration

12    work is, for the present, planned other than that

13    covered by this application."

14         Q.     You have spent many years of your life in

15    the mining industry and became a senior executive at

16    Molycorp.  Do you believe a company that has no

17    production and no reserves would have obtained

18    financing but for the DMEA loan?

19         A.     No, I do not.

20               MR. HOPSON:  No further questions,

21    Your Honor.

22               THE COURT:  Thank you.  I have one

23    question.

24               Mr. Dewey, did your company store waste,

25    put waste products on unpatented mining claims?

 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  And how many were there, if

 3    you can approximate.

 4              THE WITNESS:  Well, during this whole

 5    period of the land exchange nearly all of that land

 6    was unpatented mining claims, which we withdrew the

 7    claims in order to facilitate the land exchange.

 8    That was a requirement.

 9              You know, prior to that there was

10    definitely places where waste disposal was going on

11    unpatented ground.

12              THE COURT:  And how about on unimproved

13    mill sites?

14              THE WITNESS:  Unimproved mill sites.  Yes,

15    some of the original unpatented mill sites, yes.  On

16    Kathleen Canyon we used mill sites.  Kathleen Canyon

17    is large canyon that faces Questa.  It goes directly

18    south, so the top of the mountain when we had to get

19    up, the top of the mountain was stripped off and put

20    into Kathleen Canyon.  And that is the first place

21    that we used this mill site claims that were not

22    patented.

23              THE COURT:  All right.  Thank you.  You

24    may step down.

25              (Whereupon the witness was excused.)

Page 153

```
 1              THE COURT:  Please call your next witness.

 2              MR. TODD:  Your Honor, Chevron calls

 3   Dr. Neal Rigby.

 4              THE COURT:  I'm sorry, say who?

 5              MR. HOPSON:  Neal Rigby, Dr. Rigby.

 6              (Whereupon the witness was sworn.)

 7              THE DEPUTY CLERK:  Please be seated and

 8   state and spell your name for the record.

 9              THE WITNESS:  My name is Neal Rigby,

10   N-E-A-L, R-I-G-B-Y.

11              MR. TODD:  Dr. Rigby, have you prepared

12   written testimony in this matter?

13              THE WITNESS:  Yes, I have.

14              MR. TODD:  Before it is offered, is there

15   any testimony that you would like to update?

16              THE WITNESS:  Two items on my direct

17   testimony.  One is on Page 7 where my original rate

18   was $560 an hour.  That was increased on January 1st

19   to $645 an hour.

20              And there is another change, which is on

21   Page 37, which is a typo, where I refer or what is

22   written is northwest zone and actually, in fact, it

23   should be northeast zone.

24              Other than that, nothing.

25              MR. TODD:  Your Honor, with those two
```

Page 154

1    changes, we submit Dr. Rigby's testimony.

2                THE COURT:  Very good.

3                (Dr. Neal Rigby's direct testimony was

4    prefiled and admitted.)

5                THE COURT:  You may cross-examine.

6                MS. KIMBALL:  Thank you, Your Honor.

7                     CROSS-EXAMINATION

8    BY MS. KIMBALL:

9        Q.    **Good afternoon, Dr. Rigby.**

10       A.    Good afternoon.

11       Q.    **You are employed by SRK Consulting,**

12   **correct?**

13       A.    Correct.

14       Q.    **SRK provides full service consulting to**

15   **companies operating mines, correct?**

16       A.    Correct.

17       Q.    **SRK helps companies develop and maintain**

18   **mines, is that right?**

19       A.    Among other things, yes.

20       Q.    **They help companies plan and conduct**

21   **exploration for mines?**

22       A.    Yes.

23       Q.    **They help mining companies develop mines?**

24       A.    Yes.

25       Q.    **And they help mining companies find**

Page 155

1   financing for their mines?

2       A.   Indeed, yes.

3       Q.   Is it fair to say that mining companies

4   make up a large share of the clientele of SRK

5   Consulting?

6       A.   A large share, yes.

7       Q.   Aside from a couple of years when you were

8   employed directly by a mine, you have worked for SRK

9   for virtually your entire career; is that correct?

10      A.   44 years.

11      Q.   And you were the group chairman of SRK

12  Global from 1995 through 2010; is that right?

13      A.   Yes.

14      Q.   And that position oversaw SRK's work in

15  North America; is that accurate?

16      A.   Globally.

17      Q.   Okay.  Did that include --

18      A.   It includes North America, yes.

19      Q.   Thank you.

20           And Chevron and its predecessor Molycorp

21  hired SRK Consulting to consult on the Questa Mine

22  while you were the chair over North America,

23  correct?

24      A.   Over a period of time, yes.

25      Q.   Okay.  And what period of time was that?

1     A.    I am not entirely certain, but I would say

2  probably SRK's involvement in the maybe '80s and

3  '90s, maybe beyond that.

4     **Q.    Up into the 2000s?**

5     A.    Yes.

6     **Q.    Okay.  And is SRK Consulting current doing**

7  **any work for Chevron Mining aside from your expert**

8  **services?**

9     A.    Not that I am aware of.

10     **Q.    Okay.  You mentioned in your testimony and**

11  **I am going to turn to your opinions, I apologize.**

12        **Now you mentioned in your testimony that**

13  **there are certain places where acid rock drainage**

14  **occurs naturally near the Questa Mine, correct?**

15     A.    Yes.

16     **Q.    This case is solely about responsibility**

17  **for the mine waste that Chevron created at its mine,**

18  **correct?**

19     A.    Correct, but the receiving environment in

20  totality is very important.

21     **Q.    But they are not being asked to clean up**

22  **natural formations, are they?  They are being asked**

23  **to clean up the waste rock that they created?**

24     A.    I believe so, yes.

25     **Q.    And Chevron extracted more than**

1   **300 million tons of waste rock from the open pit,**

2   **correct?**

3        A.    Yes.

4        Q.    **And that open pit mine was on land that**

5   **Chevron has owned since the 1920s, isn't that right?**

6        A.    The mine itself, yes.

7        Q.    **The open pit mine?**

8        A.    Yes.

9        Q.    **And Chevron owned that land for decades**

10  **before they even contemplated building the open pit,**

11  **right?**

12       A.    Yes.

13       Q.    **As of 1974 Chevron owned virtually the**

14  **entire area of the mine, isn't that right?**

15       A.    I believe so.

16       Q.    **And Chevron dumped over 300 million tons**

17  **of acid waste rock around the pit, around the open**

18  **pit on land that it has owned for decades, right?**

19       A.    No, I disagree with that.

20       Q.    **They have not owned that land for decades?**

21       A.    No, no, no, I disagree that it is

22  300 million tons of acid waste rock.  Some is acid

23  generating and some isn't.

24       Q.    **Okay.  Would it be fair to say they have**

25  **dumped 300 million tons of waste rock that contains**

Page 158

1    **acid waste rock around the open pit on land that**

2    **they have owned since the '70s?**

3         A.    That contains a degree of acid waste rock,

4    yes.

5         Q.    **And the 300 million tons of waste rock on**

6    **Chevron's land generates acid mine drainage that is**

7    **separate from and different drainage than the**

8    **natural acid rock drainage, right?**

9         A.    Can you differentiate, please, natural

10   versus?

11        Q.    **There is drainage that is occurring from**

12   **the waste rock that Chevron created?**

13        A.    Yes.

14        Q.    **That is different than that is -- it is**

15   **not the exact same waste rock that is coming from**

16   **the natural formation, right?  There is waste rock**

17   **coming off of Chevron's waste rock piles?**

18        A.    In addition to the drainage, the acid rock

19   drainage coming from the hydrothermal alteration

20   scars, yes.

21        Q.    **Thank you.**

22              **Chevron alone extracted the rock from the**

23   **open pit mine, correct?**

24        A.    Correct.

25        Q.    **The United States did not extract any rock**

1    from the open pit mine?

2        A.    No.

3        Q.    And Chevron alone arranged for the

4    transportation of the waste rock from the open pit

5    to the dump sites?

6        A.    Yes.

7        Q.    The United States did not make any

8    decisions regarding how the waste rock was

9    transported to the dump sites?

10       A.    No.

11       Q.    And Chevron alone actually transported

12   that waste rock, isn't that right?

13       A.    Yes.

14       Q.    And Chevron owned the vast majority of the

15   dump sites by 1974, isn't that right?

16       A.    Was that up to or including the date of

17   the land exchange, which was in 1974.

18       Q.    As of the land exchange they owned

19   virtually all of the land that the waste rock is on?

20       A.    Yes.

21       Q.    Okay.  And because Chevron owned and

22   operated the mine, the EPA has now required Chevron

23   to take certain steps to prevent its mine waste from

24   contaminating the Red River, isn't that right?

25       A.    I believe so.

Page 160

1       Q.      There is no question that Chevron's mining

2   contaminated this site and impacted the Red River,

3   right?

4       A.      To a degree, yes.

5       Q.      There is no question that the

6   United States did not conduct any mining whatsoever

7   on the mine site, correct?

8       A.      Correct.

9       Q.      You visited the site in 2018 and took

10  photos of the open pit, right?

11      A.      I visited the site, twice.

12      Q.      Okay.

13      A.      2018 and 2019.

14      Q.      Okay.  Did you take photographs while you

15  were there?

16      A.      Yes.

17              MS. KIMBALL:  Mr. Hambrick, could you pull

18  up USX596.

19      Q.      (By Ms. Kimball)  Dr. Rigby, is this a

20  photograph that you took of acid rock drainage in

21  the open pit of the Questa Mine?

22      A.      I believe so, yes.

23              MS. KIMBALL:  Your Honor, I would like to

24  move for admission of USX596 into evidence.

25              MR. TODD:  No objection.

1                    (Exhibit admitted, USX596.)

2         Q.    (By Ms. Kimball) Dr. Rigby, approximately

3    how big is this pool of acid mine drainage?

4         A.    What do you mean how big?

5         Q.    Do you have any concept of the --

6         A.    Gallons or, no, I have no idea.

7         Q.    How about the footage?

8         A.    No, not really.

9         Q.    Can you say like in a ballpark is it more

10   than 100 feet across, is it more than 5 feet across?

11        A.    No, I think you are probably looking at

12   maybe 100 feet by 200 feet or thereabouts.

13        Q.    Thank you.

14              THE COURT:  I'm sorry, what was your

15   answer to that question.

16              THE WITNESS:  100 feet by 200 feet.

17              THE COURT:  I'm sorry, say it again.

18              THE WITNESS:  100 feet by 200 feet.

19              THE COURT:  Okay.  Thank you.

20        Q     (By Ms. Kimball) And a similar pool sits in

21   the subsidence area of the mine, correct, right on

22   top of the second underground mine?

23        A.    Could you repeat that, I'm sorry, I missed

24   it.

25        Q.    A similar pool of acid rock drainage sits

1    **in the subsidence area of the mine right on top of**

2    **the second underground mine?**

3         A.    Yes.  But a lot of that would drain

4    through due to the subsidence.

5              MS. KIMBALL:  Mr. Hambrick, could you

6    please pull up -- did I move for admission of

7    USX596?

8              MR. TODD:  Yes.

9              MS. KIMBALL:  Thank you.  Mr. Hambrick,

10   could you please pull up USX104.  Could you zoom in

11   on the subsidence area.

12        **Q.    (By Ms. Kimball)  It is a little hard to**

13   **see because of the wording is right over it, but can**

14   **you see the little yellow shading behind the**

15   **subsidence?**

16        A.    Yes, I can.

17        **Q.    That is the acid rock drainage that is in**

18   **the subsidence area?**

19        A.    Just above the subsidence area, yes.

20        **Q.    And do you have any idea of the general**

21   **size of those pools?**

22        A.    Probably not dissimilar to the one in the

23   pit, maybe slightly smaller.

24        **Q.    Okay.  And that acid rock drainage is**

25   **filtering down through the underground mine works of**

1  **Chevron's second underground mine, correct?**

2      A.    Yes, where it is collected today, where it

3  is collected and pumped brought back for treatment

4  before discharge to the Red River.

5      Q.    **You said today.  Did there come a time**

6  **when that changed?**

7      A.    I believe so, but I don't know the date.

8      Q.    **Because of Chevron's mining impacts, the**

9  **EPA has required Chevron to manage and collect all**

10  **the mine runoff and conduct water treatment for a**

11  **new treatment plan at the Questa Mine, right?**

12     A.    Yes, and I visited that plant.

13     Q.    **Okay.  And Chevron is not required to**

14  **clean up acid rock anywhere in the Red River Valley**

15  **except in the mine site that it exclusively owned**

16  **and operated for the past 50 to 80 years, correct?**

17     A.    Can you repeat that, please.

18     Q.    **Chevron's only required to clean up acid**

19  **rock from its own mine?**

20     A.    Acid rock drainage or acid rock.

21     Q.    **Well, both, actually?**

22     A.    Within its own property, I believe so.

23     Q.    **It is not cleaning up any other parts of**

24  **the Red River Valley?**

25     A.    Upstream and downstream of the mine.

Page 164

1      Q.     **Well, that it didn't cause, I mean?**

2      A.     That it didn't cause.

3      Q.     **Correct.**

4      A.     I believe so.

5      Q.     **So you believe that they are cleaning up**

6   **waste?**

7      A.     No, no.

8      Q.     **Thank you.**

9             **And with respect to the rock pile, Chevron**

10  **is also expected to properly manage the piles that**

11  **it designed, created and left exposed to the**

12  **elements for the past 50 years; is that right?**

13     A.     I believe so.

14     Q.     **It is not expected to address any**

15  **nationally occurring rock formation?**

16     A.     Well, in actual fact, the active waste

17  rock disposal on the front piles, the ones close to

18  the R38, they actually covered and effectively

19  sealed, I think, two or three hydrothermal

20  alteration scars, so that was a positive effect of

21  the dumps.

22     Q.     **The EPA is not requiring Chevron to clean**

23  **up anything other than its own waste rock piles**

24  **though, correct?**

25     A.     I don't believe so.

Page 165

1       Q.      Thank you.

2               And as for the tailings area, Chevron

3   dumped more than 100 million tons of tailings waste

4   from its mill at the Questa site into that area?

5       A.      I prefer the term deposited.

6       Q.      Okay.  They deposited 100 million tons?

7       A.      Yes.

8       Q.      And Chevron disposed of billions of

9   gallons of wastewater in the tailings impoundments

10  that contaminated the aquifers beneath Chevron's

11  tailing facility, isn't that right?

12      A.      I am not sure about that.

13              MS. KIMBALL:  Mr. Hambrick, could you pull

14  up USX426, please.

15      Q.      (By Ms. Kimball)  This is the EPA record

16  of decision of Chevron's mining activities.

17              Are you familiar with this document?

18      A.      I am familiar with it but really that was

19  outside of the scope of work that I was asked to

20  address.

21      Q.      Okay.  Then I will move on.

22              In terms of reclamation, covering mine

23  tailings with clean soil and revegetating is a

24  standard practice that the owner and operator would

25  have been expected to perform even back in the

Page 166

1   1970s, isn't that right?

2       A.    In due course, yes.

3       Q.    And Chevron agreed to do that at the

4   Questa site when it got its permit to close out the

5   mine from the State of New Mexico, isn't that right?

6       A.    I am not, again, I haven't run into that,

7   no, that area.

8       Q.    Okay.  But to summarize, Chevron has no

9   responsibility for cleaning up any waste other than

10  what it actually generated or caused, isn't that

11  right?

12      A.    I believe so.

13      Q.    Let's turn now to your opinions on the

14  DMEA or Defense Mineral Exploration Administration.

15      A.    Yes.

16      Q.    If I refer to that as the DMEA or DMEA,

17  would you understand what that means?

18      A.    I prefer DMEA.

19      Q.    DMEA was a Federal agency that offered

20  loans to private companies to explore for certain

21  minerals if that exploration met DMEA's guidelines.

22            Is that generally accurate?

23      A.    Yes.

24      Q.    And did the DMEA later became the Office

25  of Mineral Exploration; is that right?

1     A.     That is right.

2     Q.     **If I use the term DMEA today, will you**

3  **understand that to mean either the DMEA or the**

4  **Office of Mineral Exploration?**

5     A.     Yes.

6     Q.     **Chevron had no interactions with the DMEA**

7  **prior to December 1956, isn't that right?**

8     A.     Not that I am aware of.

9     Q.     **Chevron submitted its initial application**

10  **for a loan from DMEA on December 10, 1956; is that**

11  **correct?**

12     A.     Yes.

13          MS. KIMBALL:  Mr. Hambrick, could you

14  please pull up CX046, which was previously admitted.

15     Q.     **(By Ms. Kimball)  Is this the -- I'm**

16  **sorry, is this Molycorp's original application for**

17  **the DMEA loan?**

18     A.     Yes, I am familiar with this document.

19          MS. KIMBALL:  Mr. Hambrick, could you

20  please go Page 2.

21     Q.     **(By Ms. Kimball)  Now, Chevron's**

22  **application for a DMEA loan was purely voluntary,**

23  **right?**

24     A.     Yes.

25     Q.     **They weren't required to apply for the**

1    **loan?**

2        A.    No.

3        **Q.    And if they did not apply for a loan from**

4    **DMEA, they would have had no interaction with DMEA**

5    **at all, isn't that right?**

6        A.    I presume so.

7        **Q.    DMEA denied Chevron's initial application**

8    **because the proposed exploration was too speculative**

9    **based on the known geological data at the time,**

10   **correct?**

11       A.    I have certainly read that, yes.

12             MS. KIMBALL:  And could you, Mr. Hambrick,

13   could you please pull up CX048?

14             THE COURT:  Could you slow down just a

15   little bit on your numbers.

16             MS. KIMBALL:  Sure, absolutely.

17             THE COURT:  All I got was 46.

18             MS. KIMBALL:  CX046.  And this next one is

19   CX048.

20       **Q.    (By Ms. Kimball)  This exhibit also was**

21   **previously admitted.  This is DMEA December 21, 1956**

22   **correspondence regarding the Chevron application,**

23   **isn't that right?**

24       A.    Yes.

25       **Q.    And DMEA told Chevron that it may be**

1    **willing to loan Chevron money to fund exploration of**

2    **the low grade molybdenum that the latest geological**

3    **work had suggested was present, isn't that correct?**

4        A.    Where do I see that?

5        **Q.    So in this correspondence they were**

6    **basically discussing the general -- their thoughts**

7    **on how they would loan?**

8        A.    I thought you were putting something on

9    the screen.

10       **Q.    No, I am just establishing what this**

11   **document is for the moment.**

12            MR. TODD:  Objection, Your Honor.  If

13   counsel is going to ask the witness what a document

14   says, could counsel show the witness the whole

15   document.

16            THE COURT:  I think that would only be

17   fair.

18            MR. TODD:  Thank you.

19       **Q.    (By Ms. Kimball) You are welcome to look at**

20   **the binder if you would like.  It is, again, CX048.**

21       A.    Okay.  Do you want to show me the page or

22   tell me the page?

23       **Q.    Well, so I think right now your counsel**

24   **had just asked that you be familiar with the**

25   **document.**

Page 170

1      A.    Okay.

2            THE COURT:  You will find --

3      A.    Lots of correspondence, yes.

4      Q.    (By Ms. Kimball)  All right.  So going

5    back to Page 6.

6      A.    Page 6, yes.

7      Q.    In the second paragraph.

8      A.    Yes.

9      Q.    Here it says that DMEA may be willing to

10   loan Chevron money to fund exploration for low grade

11   molybdenum, is that accurate?

12     A.    I don't see that in that paragraph.

13           THE COURT:  I don't find that, counsel.

14     Q.    (By Ms. Kimball)  Sorry.

15     A.    Which paragraph does it state that?

16     Q.    In this paragraph, the second full

17   paragraph, the first line it states that Chevron's

18   initial idea was too tentative or was not supported

19   by the geological data, isn't that accurate?

20     A.    That is right, yes.

21     Q.    DMEA ultimately told Chevron that it would

22   loan it money to exploration of low grade

23   molybdenum, isn't that accurate?

24     A.    Where do I see that?

25     Q.    Not in this document specifically, but in

1    general?

2         A.    It was the case, yes.

3         Q.    **Chevron could have simply foregone the**

4    **DMEA loan at that point and used alternate sources**

5    **of funding, correct?**

6         A.    On the assumption it could raise

7    alternative sources of funding.

8         Q.    **It could have entered into a joint venture**

9    **with another company?**

10        A.    Possibly, yes.

11        Q.    **It could have gotten a bank loan?**

12        A.    Possibly.

13        Q.    **It could have sold stock?**

14        A.    Yes.

15        Q.    **Chevron instead voluntarily submitted a**

16   **revised application in February 19557, isn't that**

17   **right?**

18        A.    I believe so.

19              MS. KIMBALL:  Mr. Hambrick, could you

20   please pull up USX140.

21        Q.    **(By Ms. Kimball)  Dr. Rigby, are you**

22   **familiar with this document?**

23        A.    Yes.

24        Q.    **Is this Chevron's second DMEA application?**

25        A.    I believe so.

Page 172

1          MS. KIMBALL:  Your Honor, I would like to

2   move to admit USX140 as an exhibit.

3          THE COURT:  Any objection?

4          MR. TODD:  No objection, Your Honor.

5          THE COURT:  Without objection, admitted.

6          (Exhibit admitted, USX140.)

7     Q.   (By The Court) And Chevron ultimately

8   accepted a loan to conduct diamond drilling for low

9   grade ore as well as some underground drifting and

10  crosscutting in May 1957, right?

11    A.   Yes.

12    Q.   And Chevron conducted --

13    A.   And sampling.

14    Q.   Okay.

15    A.   Important.

16    Q.   Okay.  And Chevron conducted exploration

17  using the DMEA loan through June 1960, right?

18    A.   Yes.

19    Q.   And from that Chevron discovered three low

20  grade, three blocks of low grade ore with their

21  exploration under the contract; is that accurate?

22    A.   One, two, and three, yes.

23          MS. KIMBALL:  Mr. Hambrick, could you

24  please pull up CX107, which was previously admitted.

25    Q.   (By Ms. Kimball)  Dr. Rigby, is this

1  Chevron's final report to DMEA?

2      A.    It appears to be, yes.

3      Q.    And at Page 9, are these the three blocks

4  that we were just discussing?

5      A.    They are indeed.

6      Q.    And DMEA certified the discovery of the

7  ore body in January of 1961, correct?

8      A.    Yes.

9      Q.    And even after Chevron completed

10  exploration under the DMEA contract, it was not

11  under any obligation to actually mine for ore that

12  was discovered, isn't that right?

13      A.    In accordance with contractual

14  obligations, no obligation whatsoever.

15      Q.    So if Chevron had decided at that point to

16  not -- to get out of the mining business, they would

17  not have owed anything back to DMEA, isn't that

18  correct?

19      A.    No, no.

20      Q.    You have testified that DMEA provided

21  Chevron with technical expertise, correct?

22      A.    Correct.

23      Q.    And Chevron had been mining for decades

24  across multiple mines in North America before it

25  ever applied for DMEA funding, isn't that right?

Page 174

1      A.    Yes.

2      **Q.    And you testified that Chevron did not**

3   **consider the possibility of mining low grade**

4   **molybdenum at the Questa site prior to its**

5   **interactions with DMEA, correct?**

6      A.    Well, I wasn't there, but there was no --

7   in the initial application to DMEA, there was no

8   reference to low grade.  They were basically

9   searching for more high grade, which sustained them

10  for the previous 30 or 40 years.

11          THE COURT:  Excuse me, counsel, would this

12  be a good time to take an afternoon recess.

13          MS. KIMBALL:  Sure.

14          THE COURT:  Okay.  We'll be in recess

15  until 3:15.

16          (A recess was taken.)

17          THE COURT:  You may be seated.

18          Before we begin, I forgot to ask for

19  entries of appearance with everybody's name, and so

20  I have got to do that or I will get in trouble.  So

21  could we have appearances, please, for the

22  plaintiff.

23          MR. TODD:  Gordon Todd for Chevron.

24          MR. HOPSON:  Mark Hopson for Chevron.

25          MR. MONDO:  Danny Mondo for Chevron.

Page 175

```
 1              MS. MUIRHEAD:  Megan Muirhead.

 2              MR. HUGHES:  Scott Hughes counsel for

 3    Chevron.

 4              MS. CRISHAM PELLEGRINI:  And Ellen Crisham

 5    Pellegrini.

 6              THE COURT:  For the defense?

 7              MR. HARRISON:  Brian Harrison.

 8              MR. HOSHIJIMA:  Tsuki Hoshijima.

 9              MR. AUGUSTINI:  Michael Augustini.

10              MS. KIMBALL:  Kimere Kimball.

11              THE COURT:  Thank you.

12              Now you may proceed.

13       Q.    (By Ms. Kimball)  Dr. Rigby, just before

14    we went on the break, you testified that you found a

15    reference to any low grade molybdenum exploration in

16    Chevron's original DMEA application, right?

17       A.    Yes.

18              MS. KIMBALL:  Mr. Hambrick, could you pull

19    up CX046.  And this is Chevron's original DMEA

20    application, correct, CX046.

21              Mr. Hambrick, if you could turn to Page 8,

22    please.

23       Q.    (By Ms. Kimball)  And in the last full

24    paragraph.  I will wait until Dr. Rigby is there.

25       A.    Page 8?
```

1     Q.     Yes.

2            Sorry, to be clear the Page 8, that is the

3     page number at the very bottom in small print.  It

4     is the PDF page number.  So it says Page 8 of 51 at

5     the very bottom.

6            Does that help?

7     A.     Yes.

8     Q.     All right.  So do you see the paragraph

9     that says, "By the time of the second Carpenter

10    report, work had progressed westward in the granite

11    on the main drift west and some exploration of the

12    contact to the south of the main drift had been

13    done."

14            And then skip down a couple of lines.  "At

15    this time the possibility of finding a large low

16    grade -- large low grade bodies of ore seemed

17    possible.  Then the sampling of all molybdenum from

18    these headings was started."

19            Is that an accurate reading of that

20    statement?

21    A.     It may be an accurate reading but I don't

22    believe it is an accurate interpretation because the

23    application from Molycorp, the initial application,

24    was solely drifting and crosscutting, no sampling,

25    no diamond drilling to address the third dimension.

1    So that is not what they were looking for, but, of

2    course, there is always the possibility that some

3    large amounts of low grade may be there but that

4    certainly wasn't the focus of what they were

5    proposing.

6         **Q.    So this is their original application,**

7    **correct?**

8         A.    Yes.

9         **Q.    It does reference the possibility of**

10   **finding low grade molybdenum?**

11        A.    It does, but it doesn't state that that

12   was the target.

13        **Q.    Sure.**

14             **And then if you turn back to Page 40 of**

15   **this document.   So Chevron had attached the**

16   **Carpenter report to their application?**

17        A.    Both Carpenter reports were attached.

18        **Q.    Correct.   So the second one begins at**

19   **approximately Page 36 of this document of CX048?**

20        A.    Are you going to put it up on the screen?

21        **Q.    Sure.**

22        A.    Or should I refer?

23             MS. KIMBALL:   Mr. Hambrick, could you pull

24   up Page 36?   Maybe try 35.

25        **Q.    (By Ms. Kimball)   Sir, can you see that**

Page 178

 1   this is the Carpenter report --

 2        A.    Yes.

 3        Q.    -- that was attached to the application

 4   for DMEA in their first application, correct?

 5        A.    I believe that sort of background

 6   geological research interpretation potential, yes,

 7   yeah.

 8        Q.    So Chevron had hired Mr. Carpenter to

 9   conduct a geological study, correct?

10        A.    Yes.

11        Q.    And Mr. Carpenter had recommended that

12   they search for low grade molybdenum?

13        A.    No, I don't believe so.  I think he was

14   still recommending the possibility of high grade

15   veins and he was certainly recommending developing,

16   potentially drilling to find the contact where they

17   thought the contact could well be a favorable host

18   for high grade veins.

19        Q.    So if you turn to Page 40, Mr. Carpenter

20   notes the possibility of finding low grade ore,

21   correct?

22        A.    Can you show me where that is stated.

23        Q.    Sure.

24              In the paragraph that begins, "The western

25   most penetration of the exploration."

1          **And about halfway through the paragraph it**

2    **says, "There is a possibility that the contact**

3    **fringe may represent a zone of shattering and**

4    **fracturing sufficiently extensive to allow for the**

5    **development of low grade molybdenum ore body."**

6          **Correct?**

7    A.    That is a possibility, yes, as he states.

8    **Q.    So Chevron was aware of the possibility of**

9    **finding low grade molybdenum before they applied for**

10   **the DMEA application, right?**

11   A.    I would have thought so, yes.

12   **Q.    You also testified that part of the**

13   **expertise that DMEA provided Chevron was with the**

14   **information on diamond drilling and drilling**

15   **procedures to look for low grade ore, correct?**

16   A.    I think it is a bit more than that because

17   my own personal opinion is that the technical

18   expertise which the DMEA provided free of charge,

19   probably more important than the money itself,

20   because they were very good, very good exploration

21   geologists and mining engineers from the USGS and

22   the Bureau of Mines.

23          And I think really what -- from the outset

24   they were believed strongly in the possibility of

25   large low grade deposits of molybdenum.  And what

Page 180

1    they were proposing was effectively to explore in

2    the third dimension.  That is why they brought in

3    the concept of diamond drilling and sampling and

4    assaying.

5             Because what Molycorp was proposing was

6    just simply two dimensional exploration, the X and

7    the Y, with horizontal drifts and horizontal

8    crosscuts.  What the DMEA was insistent on was look

9    into the third dimension by vertically up,

10   vertically down and incline drill holes to look at

11   the distribution of mineralization in a volumetric

12   sense.  That is the difference.

13       **Q.    So am I correct in understanding that they**

14   **would do that through diamond drilling and long hole**

15   **drilling, correct?**

16       A.    Diamond drilling, sampling and assaying.

17       **Q.    And you testified previously that Chevron**

18   **had done no exploratory drilling, correct?**

19       A.    Yes.

20       **Q.    But diamond drilling and long hole**

21   **drilling were by no means new or novel methods of**

22   **exploration in the mining industry in the 1950s,**

23   **were they?**

24       A.    No, not at all.

25       **Q.    And Chevron had conducted its own diamond**

1    **drilling specifically at the Questa site in 1954,**

2    **hadn't it?**

3         A.    Not that I am aware of.

4              MS. KIMBALL:  Mr. Hambrick, could you

5    please pull up USX0003, which was previously

6    admitted.

7         **Q.    (By Ms. Kimball)  Dr. Rigby, this is**

8    **Chevron's October 1964 SEC disclosure, correct?**

9         A.    Yes, yes.

10             MS. KIMBALL:  And, Mr. Hambrick, if you

11   could go to Page 17, the second paragraph under

12   Exploration and Development.

13        **Q.    (By Ms. Kimball)  Here Chevron disclosed**

14   **that, "In 1954 the company initiated a small scale**

15   **exploration program consisting of diamond drilling,**

16   **of drifting and crosscutting to determine the**

17   **possibility of developing large mineable tonnages of**

18   **low grade material."**

19             **Right?**

20        A.    I see that is what it says.  I have given

21   this some considerable thought.  I believe that is

22   wrong.  I believe that is a misstatement and it was

23   not offered by the appropriate technical person from

24   Molycorp.

25             The document is basically a legal document

Page 182

1    to satisfy the SEC requirements.  And I think what

2    basically is done there, they, this was in 1961, so

3    I think they -- he or she has inadvertently

4    compressed what actually happened and there is

5    absolutely no evidence in the record other than this

6    statement that any diamond drilling was undertaken

7    by Molycorp prior to that associated with the DMEA

8    contract.

9         Q.    And as an SEC filing, Chevron was required

10   to submit truthful information in that filing,

11   correct?

12        A.    Agreed, but I don't really see that as

13   being misrepresentative.  I think it was just a, you

14   know, lack of knowledge.

15        Q.    And you were present in the courtroom for

16   Mr. Dewey's testimony, correct?

17        A.    Yes.

18        Q.    And when Mr. Dewey was shown this same

19   paragraph did you hear him say that that did conform

20   to his understanding of the exploration in the '50s?

21             MR. TODD:  Objection, Your Honor,

22   misstates the testimony.  I think Mr. Dewey was

23   shown a document from 1957 not 1964, which did not

24   contain the same statement regarding diamond

25   drilling in 1954.

Page 183

1              THE COURT:  Well, the record will speak

2     for itself.

3              MR. TODD:  Thank you, Your Honor.

4         **Q    (By Ms. Kimball) Chevron had also conducted**

5     **diamond drilling at its other mines prior to the**

6     **DMEA application, correct?**

7         A.   I have no knowledge of that.

8              MS. KIMBALL:  Mr. Hambrick, if we could go

9     to Page 22 of USX003.  And go to the second

10    paragraph under the section on the Mountain Pass

11    mine.

12        **Q.   (By Ms. Kimball)  Do you see here where it**

13    **refers to drilling being done at the Mountain Pass**

14    **mine?**

15        A.   I do, and now I have that knowledge.

16        **Q.   And they also had conducted diamond**

17    **drilling at the Oka mine in Québec, correct?**

18        A.   Quite possibly.

19             MS. KIMBALL:  Mr. Hambrick, if you could

20    go to Page 23 of the same document, the second

21    paragraph under the Oka Mine heading.

22        **Q.   (By Ms. Kimball)  Do you see here where it**

23    **refers to exploratory drilling done at the Oka Mine?**

24        A.   Absolutely, yes.

25        **Q.   So Chevron was well aware of the diamond**

1    drilling methodology at the time it submitted the

2    DMEA application, isn't that right?

3        A.    I would have certainly thought so.

4        Q.    You also opine that without the loan

5    Chevron obtained from DMEA it could not have

6    discovered the low grade molybdenum at the Questa

7    Mine; is that right?

8        A.    I think without the loan, and let's just

9    call it the discipline that the DMEA brought to the

10   exploration program, I don't believe that they would

11   have discovered it.

12       Q.    And lots of mining company explored for

13   ore without seeking any funding from DMEA, correct?

14       A.    The majority of them do.

15       Q.    If a private mining company declines to

16   seek any loan from DMEA, then they don't have any

17   interaction with DMEA, correct?

18       A.    No.

19       Q.    Chevron raised funding for exploration

20   without DMEA before it ever submitted its

21   application, correct?

22       A.    I am not sure about that.  They certainly

23   raised funding.  Whether that was specifically for

24   exploration, I cannot say.

25       Q.    Well, they conducted exploration at the

1    **mine prior to submitting the DMEA application,**

2    **correct?**

3         A.    Do you want to be specific in terms of

4    timeline?

5         **Q.    At any time.**

6         A.    Well, fundamental of a mining project you

7    are constantly replacing depleted reserves, yes.

8         **Q.    They had done that without any DMEA loans,**

9    **correct?**

10        A.    Yes.

11        **Q.    Chevron had raised money for exploration**

12   **at its Oka site by entering into a venture with**

13   **Kennecott in 1955, correct?**

14        A.    Yes.

15        **Q.    And Chevron could have sought a similar**

16   **arrangement with another mining or even with**

17   **Kennecott at the Questa Mine, correct?**

18        A.    It could, yes.

19        **Q.    Chevron had also raised money for**

20   **exploration and mining through loans with private**

21   **banks, correct?**

22        A.    Mining through -- sorry.

23        **Q.    Chevron had also raised money for its**

24   **mining through loans from private banks, correct?**

25        A.    Yes, yes.

1      Q.      And they could have done that again in, in

2   the '50s as well, correct?

3      A.      In the '50s, well, again, provided they

4   are able to demonstrate to whoever is going to

5   provide the loans that there is a good likelihood of

6   successful exploration and being paid back the loan.

7      Q.      In June of 1954, just two years before

8   applying for the DMEA loan, Chevron borrowed

9   $750,000 from Chase bank, correct?

10     A.      I believe so.

11     Q.      And at the same time borrowed another

12   750,000 from Manufacturers Trust Company?

13     A.      Yes.

14     Q.      So they were able to raise $1.5 million

15   even before they ever -- even before they submitted

16   the DMEA application, correct?

17     A.      I believe there were actually additional

18   raisings as well.  But nowhere does it state that

19   that is solely for exploration at Questa.  Certainly

20   in the -- what is it, in 1957 raising where I

21   remember going back and looking at the balance

22   sheets for '52, '53, '54, '55, '56, and at the

23   bottom of each summary, if you like, was net revenue

24   including special factors.  And the maximum I saw

25   there was a million dollars and that is for the

1    whole of Molycorp, you know, with its multiple

2    mineral interests.  So I don't see there is any way

3    that we can really establish that with additional

4    fundraising just how much of that would have been

5    available for exploration of Questa.

6         **Q.    The amount of money that Chevron received**

7    **under DMEA was only $200,000, wasn't it?**

8         A.    Yes, yeah.

9         **Q.    And they were able to raise 1.5 million**

10   **from bank loans in 1954, correct?**

11        A.    Yes, I believe so.

12        **Q.    And they also were able to raise**

13   **2.8 million by selling stock to Kennecott in 1955,**

14   **correct?**

15        A.    Yes.

16        **Q.    So they were able to raise 4 million**

17   **before they had even filed their DMEA application,**

18   **whereas DMEA only gave them $200,000, correct?**

19        A.    Yes.  But I think 1955 the net revenue,

20   including special factors, is about $500,000 for the

21   corporation.  So, you know, I don't really see how I

22   can comment that the ability to raise would result

23   in substantial exploration funding at Questa.

24        **Q.    And Chevron raised another 4 million of**

25   **their own private capacity solely for exploration by**

Page 188

1    issuing stock in 1957, correct?

2        A.    1957 and the prospectus actually appended

3    a statement or even appended the signed DMEA

4    contract.

5        Q.    Sure.

6        A.    That was good timing.

7        Q.    They had raised the same amount of money

8    after submitting the application as before, correct?

9        A.    Yes.

10       Q.    And they had raised that money before DMEA

11   had ever certified any ore discovery, correct?

12       A.    Yes, on the basis of the existence of a

13   DMEA contract, which was a big positive.

14       Q.    On the basis of a contract for $200,000?

15       A.    Yes.

16             MS. KIMBALL:  And just for housekeeping,

17   Mr. Hambrick, could you please pull up CX166.

18       Q.    (By Ms. Kimball)  Dr. Rigby, this is

19   confirmation of DMEA's receipt of Chevron's

20   repayment of the DMEA loan, correct?

21       A.    Yes.

22             MS. KIMBALL:  Your Honor, I would like to

23   admit CX166 into evidence.

24             MR. TODD:  No objection.

25             THE COURT:  No objection, admitted.

1            (Exhibit admitted, CX166.)

2       Q    (By Ms. Kimball) And this document

3   demonstrates that DMEA loaned Chevron $200,000,

4   $200,339.57 cents, correct?

5       A.   In 1966, yes.

6       Q.   But they repaid it in 1966, correct?

7       A.   Yes.

8       Q.   They had loaned it in 1957?

9       A.   Correct.

10      Q.   So Chevron -- isn't it true that the DMEA

11  loan was for up to $255,000?

12      A.   That was the DMEA share, if you like,

13  50 percent of the projected cost or the actual cost.

14      Q.   But then Chevron only used $200,000 of the

15  reimbursable cost, correct?

16      A.   Yeah, that was half of the cost.

17      Q.   No, they used $200,000 of the 255 half?

18      A.   That is right, yeah.  It was based on the

19  amount of exploration actually undertaken.

20      Q.   So Chevron did not use 20 percent of the

21  available funding from DMEA, correct?

22      A.   It appears that way, yes.

23      Q.   And Chevron did conduct its own

24  exploration with non-DMEA funding at the same time

25  as the DMEA funding, correct?

1      A.    Correct.

2      Q.    **And you testified at your deposition that**

3   **Molycorp was doing a significant amount of**

4   **exploratory work on its own during the DMEA**

5   **contract, correct?**

6      A.    Correct.

7      Q.    **Chevron's final DMEA report spells out**

8   **some of the work that Chevron did with private funds**

9   **at the same time as the DMEA, isn't that right?**

10     A.    Yes.

11           MS. KIMBALL:  If we pull up CX107.

12   Mr. Hambrick, if you could go to Page 7, please.

13     Q.    **(By Ms. Kimball)  And in this section that**

14   **refers to unassisted work.**

15           **Do you see that?**

16     A.    I do.

17     Q.    **That is the work that Chevron did, at**

18   **least some of the work that Chevron did with its own**

19   **private capital during the time of the DMEA loan,**

20   **correct?**

21     A.    It is.

22     Q.    **And Chevron stated in its SEC disclosures**

23   **that it spent 1.19 million of its own private**

24   **capital for exploration at the same time as it was**

25   **using the $200,000 from DMEA, correct?**

Page 191

1    A.    I don't recall seeing that, but I didn't

2    dispute it.

3    **Q.    Okay.**

4         MS. KIMBALL:  Mr. Hambrick, if you could

5    pull up USX003 and go to Page 17.

6    **Q.    (By Ms. Kimball)  And under Exploration**

7    **and Development, the last full paragraph that**

8    **begins, "In 1954," the second line of that paragraph**

9    **says, "In the years from 1957 to 1960 this effort**

10   **was financed by expenditures of the company**

11   **aggregating 1.19 million and to the extent of**

12   **$200,000 by the Defense Minerals Exploration**

13   **Administration"?**

14   A.    So, that 1.19 is in addition to the

15   $200,000.

16   **Q.    Yes, that is how I read it.**

17   A.    It is reasonable to say of 19.19, 200,000

18   was applied to the contract was work applied to the

19   contract and the balance was for Molycorp's account?

20   **Q.    Molycorp's own -- the balance was for**

21   **Molycorp's --**

22   A.    Own exploration.

23   **Q.    -- exploration under its own private**

24   **capital?**

25   A.    All I can say there it must have been very

Page 192

1   frustrating for Molycorp that that expenditure

2   didn't result in anything positive.

3       Q.   So it is your testimony that the

4   1.2 million that they spent on their own had no net

5   benefit?

6       A.   No, I think we established that 200,000 of

7   that was on the contract.

8       Q.   Right.

9       A.   And 900-and-something wasn't.  And I am

10  not aware that they -- that they were successful and

11  found anything of substance.

12      Q.   So you testified that DMEA certification

13  of the ore body allowed Chevron to borrow additional

14  funding, correct?

15      A.   Yes.

16      Q.   But DMEA certified Chevron's ore discovery

17  in 1961, correct?

18      A.   Yes.

19      Q.   And Chevron raised $8 million of private

20  capital with no DMEA certification just between 1954

21  and 1957, right?

22      A.   I think we already covered the 1957

23  whereby they appended their signed contract to that

24  fundraising so that was, you know, from a market

25  perspective that was deemed to be a positive.

1      Q.    The $4 million?

2      A.    Yeah.

3      Q.    In 1957?

4      A.    Yeah.

5      Q.    They raised 4 million before that without

6   the application?

7      A.    Yes.

8      Q.    We just covered that Chevron raised

9   $1.5 million from private banks in 1954 and

10  2.8 million from Kennecott in '55?

11     A.    Agreed, yes.

12     Q.    And Chevron had been mining for decades

13  before it ever received any DMEA certification,

14  correct?

15     A.    Three-and-a-half decades, I think.

16     Q.    The certification of discovery did not

17  require Chevron to do anything, correct?

18     A.    Other than what they have done in

19  accordance with the contract.

20     Q.    Well, the certification didn't require

21  them to do anything, did it?

22           THE COURT:  Counsel, you have already

23  asked him that question at least twice.

24           MS. KIMBALL:  I'm sorry, Your Honor.

25           THE COURT:  They didn't have to do

Page 194

1    anything if they didn't want to.

2              MS. KIMBALL:   Okay.   Thank you,

3    Your Honor.

4         A.    Other than submit a final report.

5         Q.    **(By Ms. Kimball)  And the certification of**

6    **discovery did not guarantee that it would be**

7    **feasible to mine any of the ore blocks, correct?**

8         A.    Correct.

9         Q.    **The certification did not give any**

10   **consideration to potential mining or milling costs?**

11        A.    No, premature.

12        Q.    **Or any ore grade cutoff?**

13        A.    Premature.

14        Q.    **Any waste or ratios?**

15        A.    Premature.

16        Q.    **Or any market prices?**

17        A.    The same comment.

18        Q.    **The certification also did not dictate**

19   **what method of mining might be used if Chevron**

20   **decided to continue exploring and develop a mine,**

21   **correct?**

22        A.    It didn't explicitly state it but it was

23   obvious for anyone who looked at the tonnage grade

24   and basically depth of where that mineralization had

25   been discovered, that the only way of mining that

Page 195

1    was by an open pit.

2        Q.    Now, did the exploration under the DMEA

3    loan was at the 7800 level, correct?

4        A.    Yes.

5        Q.    And the open pit was from the surface down

6    to about 8400, correct?

7        A.    Yes.

8        Q.    So the open pit never got down to the area

9    that was explored under DMEA, correct?

10       A.    Not quiet, but what needs to be

11   appreciated is that the up-holes from Drift Number 3

12   East and the downholes from Drift Number 4 West

13   intersected the mineralization which subsequent

14   drilling confirmed was continuous all the way

15   through to surface.  So it is the same orbity.

16       Q.    So after the DMEA loan or after the DMEA

17   exploration was completed and Chevron conducted

18   additional exploration on its own, it was able to

19   open an open pit mine, correct?

20       A.    It was, but it wouldn't have been able to

21   without the most fundamentally important of any new

22   Greenfield, well -- Brownfill Mining project which

23   is the discovery of mineralization from exploration

24   and that is what the DMEA program resulted in.

25       Q.    And that was --

 1      A.      The most important time in a mine's life.

 2      **Q.      And that was the discovery of ore bodies**

 3  **down at the 7800 level, correct?**

 4      A.      Which subsequently were approved to be

 5  continuous through to surface.

 6      **Q.      So the historical documents consistently**

 7  **describe the open pit mine as the result of**

 8  **exploration Chevron undertook after the DMEA loan,**

 9  **correct?**

10      A.      As I said the DMEA exploration resulted in

11  the discovery of what was a large volume of low

12  grade material.  That was just a start of the work

13  that was needed to be done to prove that up prior to

14  making a development decision.

15          MS. KIMBALL:  Mr. Hambrick, could you

16  please pull up CX118 which was previously admitted.

17  And I think if you go to Page 3 it gives the title

18  page of the document.

19      **Q.      (By Ms. Kimball)  Dr. Rigby, this is a**

20  **report of Questa Mine by the -- I think if you go to**

21  **Page 9 it also provides some additional information,**

22  **but this is a report of Questa Mine by Bear Creek**

23  **Mining Company which was a subsidiary of Kennecott,**

24  **correct?**

25      A.      I believe so, yes.

Page 197

1          MS. KIMBALL:  Mr. Hambrick, could you

2     please turn to Pages 67 and 68.

3          And if we could see the bottom of 67 where

4     it starts.

5          A.    57?

6          **Q.    (By Ms. Kimball)  This is PDF 67.  It**

7     **follows the Bates numbering at the very bottom of**

8     **the page.**

9          MS. KIMBALL:  So, Mr. Hambrick, if you

10    could pull up side by side the bottom paragraph of

11    Page 68 beginning with Subpart B.

12         **Q.    (By Ms. Kimball)  Okay.  Dr. Rigby, do you**

13    **see here it is describing the Sulphur Gulch**

14    **mineralized zone?**

15         A.    Yes.

16         **Q.    And the Sulphur Gulch mineralized zone is**

17    **where the open pit was ultimately placed, correct?**

18         A.    Yes.

19         **Q.    And then if you go to the top of Page 68.**

20         **Do you see here where it says, "Molybdenum**

21    **is visible at the surface in some places"?**

22         A.    Yes.

23         **Q.    Later on it says, "The eastern edge of the**

24    **ore has been penetrated by numerous and extensive**

25    **addits."**

1           **And then the last sentence of the**

2    **paragraph -- I'm sorry the next sentence says,**

3    **"These workings were driven in search of high grade**

4    **veins but little production is reported from them.**

5    **No drilling has been done here by Molycorp during**

6    **their low grade exploration program."**

7        A.    Yes, I wouldn't have expected that because

8    the drilling was confined to the agreed underground

9    in accordance with the DMEA contract.

10       Q.    **And the exploration that had been done in**

11   **the area of the open pit was all for high grade,**

12   **correct?**

13       A.    I am -- well, no production came from the

14   open -- well, there wasn't an open pit, so no

15   production from surface was forthcoming and no

16   drilling was done at the time until post-1961.

17       Q.    **So, I'm sorry, in this paragraph it says**

18   **that there were numerous and extensive addits that**

19   **had been driven in search of high grade veins,**

20   **correct?**

21       A.    Yeah, but I don't know when that was

22   actually done.

23       Q.    **Okay.  But it was not done under the DMEA**

24   **loan, correct?**

25       A.    No.

1    Q.    So the area of the open pit had been

2    explored but not under the DMEA loan, correct?

3    A.    I think it had been partially explored but

4    with some stage in the past.  But without the

5    benefit of the results of the DMEA exploration

6    program successfully delineating the three ore

7    blocks, so low grade ore blocks.

8    Q.    So there had been exploration for high

9    grade ore at the surface for mineralization was

10   visible on the surface?

11   A.    Yes.  I presume those were the addits that

12   were referenced.

13   Q.    And do you see in the last sentence of

14   this section it says, "This area is of particular

15   interest as a potential open pit deposit."

16   A.    Yes, yes absolutely right.

17   Q.    And that is ultimately what Chevron did,

18   correct, they put the open pit in Sulphur Gulch?

19   A.    Yes.

20   Q.    On the area of mineralization that was up

21   at the surface?

22   A.    That was first identified from the DMEA

23   contract underground.

24   Q.    So you previously testified that there was

25   no drilling done under DMEA in the area that became

1    the open pit, correct?

2        A.    Not in accordance with the contract that I

3    am aware of.

4        Q.    **That there was no drilling -- sorry, that**

5    **was a bad question with too many negatives.**

6              **It was your previous testimony that there**

7    **was no drilling in the area of the open pit under**

8    **the DMEA contract, correct?**

9        A.    Correct.

10       Q.    **Okay.  And you further testified that all**

11   **of the exploration in that area began in 1962,**

12   **correct?**

13       A.    Subsequent to the discovery of the three

14   ore blocks and the emphasis shifting to surface

15   drilling, yes.

16       Q.    **And the models that you discussed in your**

17   **direct testimony you further confirm that there was**

18   **no drilling under the DMEA contract that occurred in**

19   **the area that became the open pit, correct?**

20       A.    Certainly not that I am aware of.

21             MS. KIMBALL:  Let's look at USX380 which

22   was previously admitted.

23       Q.    **(By Ms. Kimball)  Dr. Rigby, this is an**

24   **image that you prepared for your expert report,**

25   **correct?**

 1      A.    One of many.

 2      **Q.    And this is a side view into the mountain,**

 3  **correct?**

 4      A.    Well, it is interesting because can I just

 5  give a clarification here?  This is a view looking

 6  northwest, which means it is basically a projection.

 7  It is an isometric view and it wasn't intended to

 8  show the geometrical relativity between the open

 9  pit, the underground, the drill holes and so on.

10  That wasn't its subjective because it says it was a

11  view through the open pit location, not the open pit

12  because the open pit didn't exist at that time.  But

13  you have to, whatever features you want to show, you

14  have to project them onto a particular plane.

15      **Q.    Sure.**

16      A.    Then you look at an oblique view and it

17  distorts the relative position.  So I think for the

18  purposes that you want to use this diagram for, it

19  is misleading.  What I was going to suggest if you,

20  if you would allow me is just to do two very simple

21  sketches on the white board, which I think will

22  clarify what I am trying to say.

23      **Q.    We will go through all of the images in**

24  **your report.  So in this image am I correctly**

25  **understanding that the DMEA exploration occurred in**

Page 202

1    what would have been southeast of the location that

2    became the open pit?

3        A.    South -- wait a minute.

4        Q.    Did I get my directions wrong?

5        A.    Southwest.

6        Q.    Okay.  Because we are looking northeast

7    you said?

8        A.    Northwest we are looking.  That is why I

9    wanted to show you the orbity, then you would know

10   straight away.

11       Q.    We will get to that.  So the DMEA drilling

12   is at a location that is south and west of the open

13   pit, correct?

14       A.    Yes, that is fair.

15       Q.    Okay.

16             THE COURT:  But there is no open pit

17   there, right?

18             MS. KIMBALL:  Sorry?

19             THE COURT:  There is no open pit.

20       Q    (By Ms. Kimball) There was no open pit at

21   the time, of the area that became the open pit?

22       A.    Yes.

23       Q.    Am I correctly understanding here that the

24   neon green lines are the diamond drill lines?

25       A.    They are.

1      Q.      **That were done under DMEA?**

2      A.      Correct.

3      Q.      **Am I correct in understanding that all of**

4  **the drilling under the DMEA was done at an elevation**

5  **hundreds of feet below what is depicted on here as**

6  **the open pit?**

7      A.      Well, that it just says the open pit

8  location.  There isn't an open pit there, that is

9  why I am saying this is misleading because you go to

10  bring the third dimension in to see just how big the

11  open pit was and the relationship between the open

12  pit and the low grade mineralization, which was

13  discovered under the DMEA contract.  The two are

14  very closely related.

15      Q.      **But the DMEA contract drilling occurred**

16  **several hundred feet below the lowest elevation of**

17  **the open pit, right?**

18      A.      There were vertically drilled up-holes in

19  continuity of mineralization.

20      Q.      **But the up-holes were maximum of 500 feet,**

21  **correct?**

22      A.      Yes.  Still intersected the

23  mineralization.

24      Q.      **Which was still lower than the bottom of**

25  **the open pit?**

Page 204

1      A.      The open pit ultimately, I can't show, can

2    I draw?  The thing you have to bear in mined is this

3    enormous amount of waste rock which basically limits

4    the distance down the orbity that an economic open

5    pit could extract.  And that is why the exploration

6    was deeper, I agree, but it was directly below what

7    ultimately became the open pit side walls.

8      **Q.      Okay.**

9            MR. TODD:  Your Honor, for the record

10   could we preserve this as a demonstrative?

11           THE COURT:  I'm sorry?

12           MR. TODD:  For the record, Your Honor,

13   could we preserve the marked up chart as a

14   demonstrative exhibit?

15           THE COURT:  How do we do that?

16           (Discussion off the record.)

17     A.    I still don't like this view.  There are

18   much better views that we could use.

19     **Q.      (By Ms. Kimball)  Let's look at CX420**

20   **which is another image from your expert report.  So**

21   **this is also an image from your expert report,**

22   **correct?**

23     A.    This is.

24     **Q.      This exhibit has also previously been**

25   **admitted.**

1      A.     It is.

2      **Q.     And there is no place in looking at this**

3  **image where the drillings intersect the area that**

4  **became the open pit either, correct?**

5      A.     I believe that is where I should have

6  added another note to this diagram.  Because the

7  green outline is the base of the open pit, okay?  It

8  is the bottom of the open pit.

9           THE COURT:  Which green outline?

10     A.     That one, that is the bottom of the open

11 pit.  The open pit is several hundred feet deep and

12 it has slopes ranging from 28 degrees in the

13 riolites, 38 degrees in the undersites and

14 45 degrees in the granite, which should make this

15 sort of open pit perimeter somewhere like that

16 (indicating).

17     **Q     (By Ms. Kimball) Several hundred to several**

18 **thousand feet above those lines, correct?**

19     A.     These are -- if you look at an overall

20 slope handle it may be 28, 38, 45, maybe 35 degrees.

21 You know, it is not steep, it is flat.  So over a

22 depth of an open pit, several hundred feet thick,

23 you could well be 2,000 feet further horizontally to

24 the south.

25     **Q.     Because you have removed a bunch of**

1    overburden, correct?

2        A.    Yes, but the pit slopes are sort of like

3    that (indicating).  They are not 45 degrees, they

4    are more like 33, 35.

5        Q.    Okay.

6              MS. KIMBALL:  Let's go to USX379.

7        Q.    (By Ms. Kimball)  Now, this is an image

8    from your expert report that then has grid lines

9    superimposed on top of it, correct?  This exhibit

10   has also been previously admitted?

11       A.    Yes.

12       Q.    This is an image from your expert report?

13       A.    It is indeed, yes.

14       Q.    Thank you.

15             And the arrows and dots show the drills

16   under DMEA that are closest to the open pit,

17   correct?

18       A.    Correct.

19       Q.    And they are still to the west of the open

20   pit, correct?

21       A.    But again the same point as the last

22   diagram.  This is the base of the open pit.  And so,

23   you know, I mean, to do what I did previously you

24   might be having something, you know, like that

25   (indicating).

1    **Q.    But none of those drill lines ever**

2    **intersected the open pit, correct?**

3        A.    They intersected the mineralization that

4    was exploited by the open pit, yes.

5        **Q.    They never intersected the area that was**

6    **actually excavated by the open pit, correct?**

7        A.    They, actually they did.  They didn't

8    intersect the material that was mined in the open

9    pit, but the ore that they intersected immediately

10   above was part of the stripping to access the ore in

11   the open pit.  So it is within the open pit

12   perimeter.

13       **Q.    It is within the open pit perimeter, but**

14   **several hundred feet below it?**

15       A.    Correct.

16       **Q.    Okay.  Several hundred to several**

17   **thousand?**

18       A.    I would say several hundred rather than

19   several thousand.

20       **Q.    But the perimeter is going from the**

21   **overburden that is --**

22       A.    It depends whether you are talking down

23   dip, vertical or what.  Let's not complicate things.

24            MS. KIMBALL:  Your Honor, this would

25   actually be a decent time to stop.

Page 208

1            THE COURT:  Okay.  We will be in recess

2   until 9:00 tomorrow morning.

3            (Proceedings concluded at 3:57 p.m.)

Page 209

1                    REPORTER'S CERTIFICATE

2

3        I certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.  I further certify that the

6    transcript fees and format comply with those

7    prescribed by the Court and the Judicial Conference

8    of the United States.

9

10   Date:  March 14, 2022

11

12            _____

13            PAUL BACA, RPR, CCR
              Certified Court Reporter #112
14            License Expires:  12-31-2022

15

16

17

18

19

20

21

22

23

24

25

PAUL BACA OFFICIAL COURT REPORTER