Page 446

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


CHEVRON MINING,

      Plaintiff

vs.                  No. 1:13-CV-00328 PJK/JFR

UNITED STATES OF AMERICA,
UNITED STATES DEPARTMENT OF THE INTERIOR,
UNITED STATES DEPARTMENT OF AGRICULTURE,

      Defendants.



TRANSCRIPT OF PROCEEDINGS

March 16, 2022

Volume 3
Pages 446 -


BEFORE:  HONORABLE JUDGE PAUL KELLY
        UNITED STATES 10TH CIRCUIT JUDGE




Proceedings reported by stenotype.

Transcript produced by computer-aided

transcription.

Page 447

```
 1    A P P E A R A N C E S:

 2    FOR THE PLAINTIFF:

 3            MODRALL SPERLING
              500 Fourth Street NW, Suite 1000
 4            Albuquerque, New Mexico  87103
              505-848-1800
 5            BY:  MEGAN MUIRHEAD
              mmuirhead@modrall.com
 6
                        - and -
 7
              SIDLEY AUSTIN, LLP
 8            1501 K Street N.W.
              Washington, D.C.  20005
 9            202-736-8000
              BY:  GORDON TODD
10            gtodd@sidley.com
                   MARK HOPSON
11            mhopson@sidley.com
                   BENJAMIN MUNDEL
12            bmundel@sidley.com
                   ELLEN CRISHAM PELLEGRINI
13            epellegrini@sidley.com

14    FOR THE DEFENDANT:

15            U.S. DEPARTMENT OF JUSTICE
              ENVIRONMENT and NATURAL RESOURCES DIVISION
16            ENVIRONMENTAL DEFENSE SECTION
              P.O. Box 7611
17            Washington, D.C.  20044-7611
              202-616-6519
18            BY:  BRYAN JAMES HARRISON
              Bryan.Harrison@usdoj.gov
19                 TSUKI HOSHIJIMA
              Tsuki.Hoshijima@usdoj.gov
20                 MICHAEL AUGUSTINI
              Michael.Augustini@usdoj.gov
21                 KIMERE KIMBALL
              Kimere.kimball@usdoj.gov
22

23

24

25
```

Page 448

1                    I N D E X

2    WITNESS:                                    PAGE:

3    MARY SITTON

4         Cross-Exam by Ms. Crisham Pellegrini    452
          Redirect Examination by Mr. Augustini   461
5
     FREDERIC QUIVIK
6
          Cross-Examination by Mr. Todd           475
7         Redirect Examination by Mr. Harrison    590

8    JAY BRIGHAM

9         Cross-Examination by Mr. Hopson         627
          Redirect Examination by Mr. Hoshijima   636
10

11

12   Certificate of Reporter                     651

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 449

1          THE COURT:  You may proceed.

2          MR. TODD:  Good morning, Your Honor.

3          A few housekeeping matters.  First,

4   Your Honor, I mentioned yesterday there were some

5   discovery that Chevron wanted to offer and we had to

6   confer with the Government.  We have done that, and

7   have agreed that all of the discovery documents that

8   we tendered in Docket Number 223 may be admitted.

9          THE COURT:  Very good.

10          MR. TODD:  Secondly, Your Honor, I

11   realized at the end of the day that there was two

12   exhibits I used with Dr. Rigby that I failed to move

13   into evidence.  That was CX109, CX110 and CX47.

14   Those are the maps that I overlaid.

15          THE COURT:  All right.  Any objections?

16          MS. KIMBALL:  No objections.

17          MR. TODD:  They're admitted, 109, 110, and

18   47, all CX.

19          (Exhibits admitted, CX109, CX110, CX47.)

20          MR. TODD:  Thirdly, Your Honor, we have

21   reviewed the case as it has gone on so far and based

22   on the evidence to this point, we see no need to

23   call Mr. Cryderman, who is the witness we were going

24   to call tomorrow --

25          THE COURT:  Okay.

1        MR. TODD:  -- the molybdenum fellow, so

2   with that, Chevron needs only hold the evidence open

3   for Dr. Haddad, and we hope to get a date when we

4   can get him to Santa Fe and we will confer and come

5   to you.

6        THE COURT:  All right.  Very good.

7        MR. TODD:  And the final point, the case

8   management order provides for 40 days from the close

9   of trial to submit post-trial briefs and findings

10  and conclusions.  Depending on when Dr. Haddad gets

11  cross-examined, we may need to play with that date,

12  but we can take that up later.

13       THE COURT:  Okay.  Thank you.

14       MR. TODD:  With that, we leave it to the

15  Government.

16       THE COURT:  Thank you.

17       Counsel, you may call your first witness.

18       MR. AUGUSTINI:  Good morning, Your Honor.

19       The United States calls Mary Sitton.

20       (Whereupon, the witness was sworn.)

21       THE DEPUTY CLERK:  Please be seated and

22  state and spell your name for the record.

23       THE WITNESS:  My name is Mary Sitton.  The

24  last name is spelled S-I-T-T-O-N.

25       MR. AUGUSTINI:  Good morning, Ms. Sitton.

Page 451

1            Did you prepare a written direct testimony

2    for the Court in this matter?

3            THE WITNESS:  I did.

4            MR. AUGUSTINI:  Do you have a correction

5    to make before we offer it?

6            THE WITNESS:  I do.  It is on Page 15,

7    Paragraph 36.

8            We referenced one of the piles in that

9    paragraph as Sugar Shack and it should be Sulphur

10   Gulch South.

11           MR. AUGUSTINI:  Okay.  Any other

12   corrections?

13           THE WITNESS:  No.

14           MR. AUGUSTINI:  And with that, is your

15   testimony true and correct, to the best of your

16   knowledge?

17           THE WITNESS:  Yes.

18           MR. AUGUSTINI:  The United States offers

19   Ms. Sitton's direct testimony, Your Honor.

20           THE COURT:  Very good.  It will be

21   admitted.

22           (Ms. Mary Sitton's direct testimony was

23   prefiled and admitted.)

24           MS. CRISHAM PELLEGRINI:  Good morning,

25   Your Honor.

Page 452

                        CROSS-EXAMINATION

 1

 2    BY MS. CRISHAM PELLEGRINI:

 3       Q.    Ms. Sitton, I only have two topics from

 4    your testimony to discuss with you this morning.

 5            We're going to start by talking about your

 6    experience.  Your experience and expertise is in

 7    aerial photographic research acquisition and

 8    analysis; is that correct?

 9       A.    Yes.

10       Q.    And you have never testified in court as

11    any other sort of expert?

12       A.    No.

13       Q.    You are not an expert in mining?

14       A.    No.

15       Q.    You are not an expert in environmental

16    engineering?

17       A.    No.

18       Q.    You are not a certified geologist?

19       A.    I have a background in geology.  I have a

20    Bachelor's degree in geology, but I am not a

21    certified geologist, no.

22       Q.    You are not an expert in soil science?

23       A.    I am familiar with soil science but I am

24    not an expert.

25       Q.    And you're not an expert in land patents?

Page 453

```
1        A.    No.

2        Q.    And you are not an expert in mining

3   claims?

4        A.    No.

5        Q.    So in your testimony, Ms. Sitton, when you

6   testified and talk about the record of decision from

7   the EPA, you are not testifying regarding the

8   scientific or the technical basis for the EPA

9   recommendations and conclusions, correct?

10       A.    Well, I use those documents in

11  corroboration with my analysis of the aerial

12  photographs, so I am documenting what is in the

13  reports and I am using that in correspondence with

14  my analysis of the aerial photographs.

15       Q.    But you are not just -- sorry, just to

16  clarify, you're not testifying regarding the

17  technical basis for the EPA's conclusions?

18       A.    I don't doubt their technical basis, but

19  you know, I think it is an accurate document.

20       Q.    Then the next topic I want to discuss with

21  you deals with the tailings area.

22       A.    Uh-huh.

23       Q.    In your testimony, you discuss the western

24  tailings impoundment.

25       A.    I discussed both, but yes.
```

Page 454

1          Q.      And you understand that Molycorp purchased

2     the land for the western tailings impoundment from

3     the Federal Government?

4          A.      I do.

5          Q.      And prior to that sale, Molycorp informed

6     the Government that they plan to use the land for

7     tailings, correct?

8          A.      Yes.

9          Q.      And prior to the sale, the Government

10    determined that that land that they were selling to

11    Molycorp would -- the highest and best use of that

12    land would be for tailings?

13         A.      I think that is what the document said.

14         Q.      Next to or near the tailings impoundments,

15    Molycorp held unpatented mill site claims, correct?

16         A.      Yes.

17         Q.      Those unpatented claims were known as

18    pending claims?

19         A.      Right.

20         Q.      Okay.  And you analyzed aerial photographs

21    of the tailings area, which included these

22    unpatented claims, from four separate years?

23         A.      Yes.

24         Q.      The first picture was from September 1965?

25         A.      Correct.

1    Q.    The next in time was October of '74?

2    A.    Correct.

3    Q.    And then the next in time was September of

4  '81?

5    A.    Correct.

6    Q.    And then the final picture or photograph

7  was from June 1990?

8    A.    Yes.

9    Q.    Now, in your review of the October '74,

10  photograph, you did not identify any tailings

11  located on those unpatented mill site claims,

12  correct?

13    A.    That is correct.

14    Q.    However, when you looked at the photograph

15  from 1981, you did note some tailings on those

16  unpatented claims, correct?

17    A.    There was a small amount of tailings in

18  Pinon 11, it was less than an acre.

19    Q.    And so, based on your review of the

20  photographs, you're not able to tell when exactly

21  Molycorp started putting tailings on those

22  unpatented mill site claims, correct?

23    A.    Well, there was only one and that was

24  Pinon 11, so it had to have occurred -- there is a

25  gap in the aerial photographs, from '74 to '81, so

Page 456

1    it was there in '81.  It was less than an acre and

2    it had to be sometime prior to that date of 1981.

3        Q.    So in order to help us find out when those

4    tailings were first placed there, I want to show you

5    Chevron Exhibit 325, which is already in evidence.

6            This document is Molycorp's 1977

7    application to patent the Pinon claims.

8            And Molycorp will show they divided the

9    Pinon claims into two groups.

10           Are you aware of that?

11       A.    Yes.

12       Q.    So they have two separate -- in this

13   document, have two separate patent applications.

14           So if we turn to Page 3 of 10, of the

15   first patent application, would you agree with me,

16   Ms. Sitton, that the document states that in 1977,

17   as of 1977, the mill sites being named in this

18   application were presently being used to receive

19   tailings?

20       A.    That is what the document says, but that

21   is not what the aerial photographs show.  I think it

22   is a general thing about the whole entire area.

23           I didn't see tailings in all of the mill

24   site claims.

25       Q.    Okay.  Just to clarify, you didn't look at

Page 457

1   a photograph from 1977, correct?

2       A.   No, but I had one from '81 and between '74

3   and '81, I wasn't seeing any tailings in any of the

4   Pinon claims except for that small part in Pinon 11.

5       Q.   Okay.  And actually, if we go back to the

6   front of this page, I just want to see if it covers

7   Pinon 11.

8            I think the first one does not.

9       A.   Does not.

10      Q.   Okay.  So according to the application for

11  these Pinon claims, Molycorp, in 1977, was presently

12  using these mill sites for tailings, according to

13  the document?

14      A.   That is what the document said, but that

15  is not what I saw in the aerial photographs.

16      Q.   And then, if we turn to Page 6 of the

17  application -- and this is the second application?

18      A.   Uh-huh.

19      Q.   And this also -- this one includes

20  Pinon 11?

21      A.   Correct.

22      Q.   Okay.  If we turn to Page 8 of 10.

23           And in this application, would you agree

24  with me that it states that these mill site claims

25  were also being used to receive tailings?

1      A.      Again, that is what the document says.  I

2  think they are talking about the entire area, you

3  know, those -- the tailings were going into the two

4  ponds and the mill site claims were to support that

5  activity.

6          I didn't see tailings going into any of

7  the ponds except for Pinon 11, and a small amount.

8      Q.      **And just to clarify, this application,**

9  **though, is not for the tailings impoundments,**

10 **correct, it is for just the mill sites?**

11     A.      That is what it says, yeah.

12     Q.      **Okay.  And now, if we look at what the**

13 **United States was saying about these mill site**

14 **claims, at the same time, I am going to show you**

15 **Chevron 331, which has also already been admitted**

16 **into evidence.**

17     A.      Uh-huh.

18     Q.      **And this is a 1979 Government Mineral**

19 **Report for those same Pinon mill site claims?**

20     A.      Uh-huh.

21     Q.      **Okay.  It has nothing to do with either**

22 **the western or eastern tailings impoundment?**

23     A.      Uh-huh.

24     Q.      **And was the document put together by the**

25 **Government?**

1           Is that correct?

2     A.    Yes.

3     Q.    Now, if we turn to Page 2 of the document,

4  would you agree with me that according to the

5  United States' Mineral Report of these Pinon claims,

6  it states that the Pinon mill site claims are being

7  used for waste disposal?

8     A.    What paragraph is that?

9     Q.    I could pull it out.

10          Paragraph 4, underneath "Background and

11  Land Status."

12          The paragraph that starts with, "Molycorp,

13  a subsidiary company of Union Oil," halfway through

14  that paragraph.

15          Starting, "The mill site claims are

16  presently being used for waste disposal from these

17  operations."

18     A.    That is what the document says, but that

19  is not what I was seeing on the aerial photographs.

20  And, you know, back then I don't know if waste

21  disposal was considered like CERCLA waste either,

22  so --

23     Q.    Okay.  So you would agree with me, though,

24  Ms. Sitton, that we now have -- there are two

25  documents saying that tailings were being placed on

Page 460

1    the Pinon claim prior to 1981?

2        A.    This document doesn't say tailings.   It

3    says waste disposal.   It could be they are putting

4    roads in, they could be putting ditches in, it could

5    be anything.

6        Q.    Anything that would be waste.   A road is

7    not waste.

8        A.    Right.   But that is what the document says

9    but that is not what I saw in the aerial

10   photographs.

11       Q.    Sorry, I understand that.   I just want to

12   clarify that we have seen, there's at least

13   documents that states that waste is being placed on

14   these unpatented Pinon claims prior to 1981.

15       A.    Correct.   And it doesn't say which ones,

16   it doesn't say how -- I'm sorry.   It doesn't say how

17   much, doesn't say which ones and, you know -- and I

18   looked at the aerial photographs.   And when I looked

19   at them, I only saw tailings in Pinon 11.

20              MS. CRISHAM PELLEGRINI:   No further

21   questions, Your Honor.

22              THE COURT:   Thank you.

23              You may redirect.

24

25

Page 461

1                    REDIRECT EXAMINATION

2      BY MR. AUGUSTINI:

3      **Q.     Good morning, Ms. Sitton.**

4      A.     Good morning.

5             MR. AUGUSTINI:  Mr. Hambrick, could you

6      please pull up USX414.

7      **Q     (By Mr. Augustini) Do you recognize this**

8      **signature, Ms. Sitton?**

9      A.     I do.

10     **Q.     Did you prepare it?**

11     A.     I did.

12     **Q.     What does it reflect?**

13     A.     That is an aerial photograph, dated

14     October 3, 1974, covering the tailing site in the

15     western portion of the mine site.

16     **Q.     Did you locate the site boundary depicting**

17     **the tailings area with a redline?**

18     A.     I did.

19     **Q.     And where did you get that site boundary?**

20     A.     That is URS boundary.  It came off of one

21     of their maps.

22     **Q.     URS is Chevron's environmental contractor?**

23     A.     Yes.

24     **Q.     So you use the same boundary that Chevron**

25     **uses to depict its property ownership?**

Page 462

1        A.    Yes.

2        Q.    **Generally, can you indicate with a touch**

3   **screen, what area has been discussed regarding the**

4   **Pinon claims, where are the Pinon claims relative on**

5   **this photo?**

6        A.    They are on the west side of the western

7   tailings pond.

8              There is actually a map overlay that goes

9   on here.  This is general because the map is not up.

10  There is some over here and there is some up here

11  (indicating).

12       Q.    **Okay.  So if I add to your annotations --**

13  **well, it is not a line, but generally the Pinon**

14  **claims are over there (indicating)?**

15       A.    Yes.

16       Q.    **And where are these tailings that**

17  **Chevron's counsel has been talking about, based on**

18  **the documents in the Pinon claims, as of '74?**

19       A.    In '74, they are shown as the light-toned

20  material below Dam 1 in the eastern pond.  I mean

21  above Pond 1 and then above Dam 4 in the western

22  impoundment.

23       Q.    **Those are the --**

24             THE COURT:  So the white is --

25             THE WITNESS:  Yeah, those are the tailings

1    ponds.  And there is some, like, kind of a greenish

2    liquid in the southern part of the western pond.

3              THE COURT:  What is the white stuff there

4    in the --

5              THE WITNESS:  That is the tailings that

6    have settled out in the pond.

7              THE COURT:  Where?

8              THE WITNESS:  The tailings, you know, they

9    take the tailings from the mill site and they slough

10   it over into the ponds.  And when it gets in there,

11   it settles out as a light-toned settlement.

12             THE COURT:  And how does the white -- I am

13   talking about the white with the second purple arrow

14   there.

15             THE WITNESS:  Okay.  In the eastern pond

16   or the western pond?

17             THE COURT:  I don't know which pond it is.

18   I can't tell east from west here.

19             MR. AUGUSTINI:  Let's clear this,

20   Your Honor.

21             THE WITNESS:  Okay.  You know, I can show

22   where the pipeline enters the -- there is a pipeline

23   that enters the eastern impoundment from the mill

24   site to the west.  And I would have to blow this up,

25   but it comes into the east side right there

Page 464

1    (indicating), and then it flows out into this pond.

2    And then if this pond gets full --

3                  THE COURT:  So that white is a pond?

4                  THE WITNESS:  Right.  It is a tailings

5    pond.

6                  THE COURT:  Okay.  I thought you said it

7    was a tailings.

8                  THE WITNESS:  It is a tailings pond, so it

9    receives sediment-laden liquid from the mine.

10                 THE COURT:  Okay.  That clears it up if

11   that is a pond there.

12       **Q    (By Mr. Augustini) Just to be super clear,**

13   **Ms. Sitton, is the white material essentially the**

14   **solids that settled down into the bottom of the**

15   **tailings impoundment?**

16       A.   Yes.

17                 MR. AUGUSTINI:  And where there is liquid,

18   Your Honor, in the western impoundment --

19       **Q.   (By Mr. Augustini)  Are the tailings**

20   **visible because what you see is liquid, correct?**

21       A.   Correct.

22                 THE COURT:  But the tailings are the white

23   above that, is part of a pond, right?

24                 THE WITNESS:  Correct.

25                 THE COURT:  And that is showing the

1    tailings in it.

2              THE WITNESS:  Right.

3              THE COURT:  Okay.  Thank you.

4      **Q    (By Mr. Augustini) Right.**

5              **And as of '74, it just so happens that the**

6      **eastern impoundment is mostly dry; is that your**

7      **interpretation of this photo?**

8      A.    Yeah, there may be some wet sediment in

9      there because there is some light and some medium

10     tone, so some of that may be wet.

11     **Q.    For example, the medium tone material is**

12     **darker gray?**

13     A.    Correct.

14     **Q.    And is it your testimony that maybe there**

15     **is some liquid in that area but not the full**

16     **impoundment, correct?**

17     A.    Correct.

18              MR. AUGUSTINI:  Just to be clear,

19     Your Honor, we have talked about Section 35 and

20     Section 36.  I think I can see the section line.

21     A.    Right.

22     **Q.    (By Mr. Augustini)  And there is a 36.**

23     **That is where I have marked the X.**

24              **Is that the eastern impoundment?**

25     A.    Yes.

Page 466

1    Q.    And then, obviously, the other side is the

2  western impoundment that is at issue in the case,

3  correct?

4    A.    Correct.

5          MR. AUGUSTINI:  Over here, if we can zoom

6  in to the west, Mr. Hambrick, please.

7          THE COURT:  Over where?

8          MR. AUGUSTINI:  There we are.

9    A.    That is Section 35, showing the western

10 tailings pond.

11   Q    (By Mr. Augustini) We have the red boundary

12 line for Chevron's property further to the west,

13 correct?

14   A.    Yes.

15         THE COURT:  Would you move your mic over a

16 little bit.

17   Q    (By Mr. Augustini) What have you annotated

18 along in this area?

19   A.    There is a ditch and a berm.

20   Q.    And those are to the west of the western

21 tailings impoundment, correct?

22   A.    Correct.

23   Q.    And then beyond that ditch, in the berm,

24 over here (indicating)?

25   A.    That is forest and trees, trees.

Page 467

1      Q.     Are those the Pinon claims?

2      A.     Yes.

3      Q.     And where is the white tailings material

4   within those claims that Chevron is talking about?

5      A.     There are no tailings over there.  That is

6   all vegetated.

7      Q.     Now, you did mention, both in your report

8   and your direct testimony, that as of 1981,

9   September 1981, the next photo that you reviewed,

10  there is a tiny portion of tailings that just sneaks

11  into the easternmost part of Pinon 11, correct?

12     A.     Correct.

13     Q.     And that is the only one out of all the

14  Pinon claims where you saw any tailings at all,

15  correct?

16     A.     Correct.

17            MR. AUGUSTINI:  Mr. Hambrick, US417,

18  please.

19     Q     (By Mr. Augustini) Ms. Sitton, do you

20  recognize this figure?

21     A.     I do.

22     Q.     What is it, please?

23     A.     This is a September 20, 1981 aerial

24  photograph with my annotations on the photograph and

25  it has got the section numbers, it has got the

Page 468

1    tailings pipe leading into the eastern impoundment.

2              THE COURT:  And where is the pipe that you

3    talked about?

4              THE WITNESS:  Right there (indicating).

5              THE COURT:  Okay.  Thank you.

6              THE WITNESS:  Right there (indicating).

7         Q    (By Mr. Augustini) And again, just for

8    general reference, what we are talking about here is

9    the eastern impoundment.  That is not part of the

10   case, right?

11        A.    Correct.

12        Q.    And over here, again, we have the western

13   impoundment, right?

14        A.    Correct.

15        Q.    And just generally --

16             THE COURT:  Try to stay put.  Just move

17   that microphone over there.  There you go.

18             MR. AUGUSTINI:  Thank you, Your Honor.

19        Q    (By Mr. Augustini) Do you see liquid in

20   either of the impoundments as of September 1981?

21        A.    There is some liquid in both of those.  In

22   Section 36, it would be at the end of the pipe that

23   leads into it over here.  And then in the western

24   one, there is some liquid up here (indicating).

25        Q.    But they are basically dry as of this

Page 469

1    time, correct?

2         A.    The majority of them are dry, yes.

3         Q.    So what, then, is this liquid that is

4    pooled up over here (indicating)?

5         A.    That is a diversion channel to keep water

6    from entering the ponds.

7               THE COURT:  The what?  I'm sorry.

8               THE WITNESS:  It is like a diversion

9    channel and a decant channel.  So as water comes off

10   the mountain, they want to capture it there so that

11   it doesn't run into the ponds and then run out the

12   other side, fill up the ponds and overtop the dams.

13        Q     (By Mr. Augustini) Ms. Sitton, were you

14   here when Mr. Dewey testified regarding the purpose

15   of those perimeter channels?

16        A.    I was.

17        Q.    And is that consistent -- is your view

18   consistent with how he described the use of those

19   drainage ditches?

20        A.    It is.

21        Q.    And what is this redline that is hatched

22   down along there?

23        A.    That is a berm.  And again, that berm is

24   constructed to keep water.  The mountains to the

25   west are very steep and there's some drainages that

1    come down towards the ponds.  So that dike is

2    keeping that water from entering those ponds.

3         Q.    So I guess, in a general sense, you could

4    say that a perimeter berm that blocks runoff from

5    the mountains is related to the use of the

6    impoundments.

7              Is that what you were getting at earlier

8    in your testimony this morning?

9         A.    Yes.

10        Q.    Just as an example, I know you used 3D

11   viewing software to better appreciate the topography

12   of the area, correct?

13        A.    I do.

14        Q.    But you are familiar with the drainages

15   and can you confirm, essentially, that one of the

16   main drainages from the mountains comes through like

17   that?

18        A.    It does.

19        Q.    Is there another drainage that you can see

20   and just briefly point out for the Court's reference

21   to the north?

22        A.    To the north?  There is one coming down

23   through here.  There is a couple over here.

24   (Indicating).

25        Q.    And the whole idea is, you don't want your

Page 471

1    impoundments to be swamped with natural runoff from

2    the mountains, correct?

3        A.    Correct.

4        Q.    And if you had to pinpoint the less than

5    1 acre that relates to Pinon 11, can you do that

6    this morning?

7        A.    I can.

8              And to explain to the Court how I can do

9    that, we put these Pinon claim maps into our

10   geographic information systems database and that way

11   we can overlay that map over the top of these

12   photographs.

13             So that was helpful because then I could

14   look at the map over the top of the photograph and I

15   could see where all the Pinon claims were and I

16   could -- I, you know, look at it in stereo and

17   identify what was in -- within those claims.

18             And in Pinon 11, the very southeast corner

19   of Pinon 11, I don't even know if I could get a

20   little dot in there -- it is right there.

21             It scoots into right there.  It is less

22   than an acre.  (Indicating).

23       Q.    And that dot is probably bigger than the

24   actual amount of tailing that you can see within the

25   claim, correct?

1      A.    Yes.

2      Q.    And, again, do you recall Chevron was

3  applying for ownership of the Pinon claims at the

4  time, correct?

5      A.    Correct.

6      Q.    Do you remember the date of the patent

7  issuance with respect to Pinon 11?

8      A.    I think it was just prior to this, in

9  April '81.

10     Q.    Okay.  So as of this moment, Chevron owns

11 even that less than 1-acre part that is covered by a

12 small amount of tailings, correct?

13     A.    Yes.

14     Q.    How long did Chevron continue operating

15 these impoundments after 1981?

16     A.    I think until they stopped mining in 2014.

17           MR. AUGUSTINI:  Mr. Hambrick, please

18 display CX331, Page 4.

19     Q   (By Mr. Augustini) Ms. Sitton, was this the

20 patent survey that Chevron's counsel discussed with

21 you earlier this morning?

22     A.    Yes.

23     Q.    And she pointed to some particular

24 language that generally described the use of the

25 Pinon claims, correct?

Page 473

1       A.     Yes.

2       **Q.     And you mentioned that --**

3              MR. AUGUSTINI:  Well, let's look at the

4       bottom of the page, blow that up under "Claim

5       Development," please.

6       **Q     (By Mr. Augustini) When you look at what**

7       **the use actually was as of this time in the late**

8       **1970s, what does CX331 indicate, Ms. Sitton?**

9       A.     That they -- the initial development began

10      in 1976.  They constructed a retention dike, an

11      access road, fence, surface runoff, a decant

12      channel, around the periphery of the enlarged

13      tailings disposal area.

14      **Q.     So would all of those things relate,**

15      **generally, to the use, specifically the disposal of**

16      **tailings that is occurring to the east impoundments?**

17      A.     Yes.

18      **Q.     Now, Ms. Sitton, do you know, based on**

19      **EPA's record of decision, approximately how much**

20      **area will need to be covered with clean soil and**

21      **revegetated with respect to the two tailings**

22      **impoundments?**

23             MS. CRISHAM PELLEGRINI:  Objection,

24      Your Honor.  This goes to the environmental issues,

25      which goes to the environmental issue, which have

1    already been stipulated and it is also beyond the

2    scope of the cross.

3              THE COURT:  Sustained.

4        **Q    (By Mr. Augustini) Ms. Sitton, do you know**

5    **approximately the size of the two impoundments,**

6    **based on your review of the aerial photographs?**

7        A.    Over 700 acres, both of them.

8              THE COURT:  700 acres of the tailing

9    ponds?

10             THE WITNESS:  Both of them, yeah.  Uh-huh.

11             MR. AUGUSTINI:  No further questions,

12   Your Honor.

13             THE COURT:  Thank you very much.

14             You may step down.

15             (Whereupon, the witness was excused.)

16             THE COURT:  You may call your next

17   witness.

18             MR. HARRISON:  Your Honor, the Government

19   calls Dr. Fredric Quivik.

20             (Whereupon, the witness was sworn.)

21             THE DEPUTY CLERK:  Please be seated, and

22   state and spell your name for the record.

23             THE WITNESS:  My name is Fredric Lincoln

24   Quivik.  Last name spelled, Q-U-I-V as in vegetable,

25   I-K.

Page 475

```
 1              MR. HARRISON:  Good morning, Dr. Quivik.

 2              THE WITNESS:  Good morning.

 3              MR. HARRISON:  Did you submit written

 4    testimony in this case?

 5              THE WITNESS:  I did.

 6              MR. HARRISON:  Is that still your

 7    testimony today?

 8              THE WITNESS:  Yes.

 9              MR. HARRISON:  Do you have any changes to

10    that testimony?

11              THE WITNESS:  No, good.

12              MR. HARRISON:  Your Honor, I would like to

13    offer Dr. Quivik's testimony.

14              THE COURT:  Very good.  Accepted.

15              (Dr. Frederic Quivik's direct testimony

16    was prefiled and admitted.)

17                   CROSS-EXAMINATION

18    BY MR. TODD:

19       Q.   Good morning, Dr. Quivik.  Nice to see you

20    again.

21       A.   Good to see you.

22              MR. TODD:  Your Honor, before I start, I

23    would like to make one note.

24              We are very mindful of your exhortations

25    to move things along.
```

 1              THE COURT:  You don't have to go very

 2      fast.

 3              MR. TODD:  In that spirit, we are mindful

 4      to move things along.

 5              This witness has submitted 99 pages of

 6      narrative testimony, without any breaks, even from

 7      questions, so this may take a little while.  But I

 8      do want you to know I was until midnight turning a

 9      100-page outline into a 49-page outline, so I am

10      trying.

11              THE COURT:  All right.

12              MR. TODD:  Thank you.

13      Q    (By Mr. Todd) Dr. Quivik, the Government

14      has tendered you as an expert in industrial history,

15      correct?

16      A    Correct.

17      Q    And you have testified in other cases as

18      an industrial historian, correct?

19      A    Yes.

20      Q    And you have never been qualified by a

21      Court to testify as an expert in anything other than

22      industrial history?

23      A    Correct.

24      Q    And all of the testimony that you are

25      offering in this case is as an industrial historian?

Page 477

1    A.    Yes, an expert industrial historian.

2    Q.    An expert industrial historian, thank you,

3  sir.

4          Now, this case involves Federal land use,

5  mining laws and policy.  And you understand that.

6          You are not a lawyer, sir, correct?

7    A.    Correct.

8    Q.    And you don't hold yourself out as an

9  expert in Federal land management?

10   A.    Correct.

11   Q.    You have no prior expertise with mining

12 claims or anything like that, for example?

13   A.    Correct.

14   Q.    And you are not an expert in geology?

15   A.    Correct.

16   Q.    Or in mining or metallurgic or

17 construction engineering?

18   A.    Correct.

19   Q.    You are not here offering opinions as an

20 environmental scientist?

21   A.    Correct.

22   Q.    Nor as an expert in mineral processing?

23   A.    Correct.

24   Q.    Now, this case also, as we know from

25 testimony over the last two days, has to do with

Page 478

1    mine finances, correct?

2        A.    Correct.

3        Q.    And as to that, you're not an economist?

4        A.    That is right.

5        Q.    And you are not an expert in mine finance?

6        A.    That is right.

7        Q.    And you have not analyzed the

8    profitability of the Questa Mine?

9        A.    Correct.

10       Q.    You have made no analysis of Molycorp's

11   ability to borrow funds or access capital markets at

12   any particular point in time?

13       A.    I have read the history of those things

14   but I have not performed an expert analysis of them.

15       Q.    And you have, likewise, made no analysis

16   of the capital resources available to Molycorp at

17   any particular point in time, including from other

18   mines or facilities that Molycorp may have owned?

19       A.    Again, I've read the history of those but

20   I've not conducted an analysis as a finance expert.

21       Q.    And you have undertaken no study of

22   molybdenum markets, molybdenum prices or molybdenum

23   sales at any particular point in time?

24       A.    Correct.

25       Q.    And specifically, you haven't analyzed

1    Molycorp's molybdenum sales?

2         A.    Correct.

3         Q.    And you performed no expert analysis?

4         A.    Correct.

5         Q.    Okay.  At the end of this case, we are all

6    going to forget how to pronounce molybdenum.

7              And lastly, Doctor, you have made no study

8    of the economic effects or benefits of the Questa

9    Mine and you're offering no such opinions here

10   today, correct?

11        A.    Correct.

12        Q.    Now, let's start off --

13        A.    I might add, if I may --

14        Q.    Sure.

15        A.    -- especially at the front end of that

16   list of professions in which I am not an expert, I

17   am an expert in the history of those kinds of

18   activities.

19             The legal environment that mining

20   companies operated in, mining engineering,

21   metallurgic engineering, but I don't hold myself out

22   as an attorney, for instance.

23        Q.    And you made that clear in your direct

24   testimony, and I appreciate that.

25             Now, in your direct testimony, you discuss

Page 480

1      Federal land use law, and we've heard about some of

2      that with Mr. Fredley.

3             In your direct testimony, you opine that

4      you see no evidence that the Federal Government

5      assisted or contributed to the development of the

6      Questa Mine; is that generally correct?

7      A.    As a direct participant, yes.

8      Q.    Now, in your testimony, you do discuss the

9      Federal mining laws and, in particular, the Mining

10     Act of 1872, correct?

11     A.    Yes.

12     Q.    And that law allowed persons to enter

13     Federal land, stake claims, explore valuable

14     minerals, extract those minerals, sell them for a

15     profit, and if the statutory conditions are met,

16     convert that land to their own private ownership,

17     right?

18     A.    Correct.

19     Q.    Now, the U.S. laws are not compelled to

20     open mineral lands for Federal exploration in this

21     manner.

22             It chose to do that, right?

23     A.    That was a decision by Congress.

24     Q.    And since the mining law of 1872, Congress

25     has, from time to time, withdrawn some public lands

Page 481

1    from the kind of mineral entry I just described,

2    right?

3        A.    Correct.

4        Q.    It created National Parks, Yellowstone,

5    Yosemite, right?

6        A.    Yes.

7        Q.    And it has closed and preserved wilderness

8    areas?

9        A.    Yes.

10       Q.    It included some right around the Questa

11   Mine, right?

12       A.    Yes.

13       Q.    And the Wilderness Act of 1964, as we have

14   discussed previously, gave holders of unpatented

15   mining claims a grace period of, I want to say it

16   was 20 years to make a discovery or forfeit their

17   claim, right?

18       A.    Yes.  Recognizing that had the Government

19   tried to nullify those claims immediately, that

20   would qualify as a taking.

21       Q.    So instead, it nullified them 20 years

22   later?

23       A.    Gave the mining companies or the holders

24   of those claims, a good faith time period to see

25   whether they actually were mineralized or not.

1       Q.    Now, despite being able to withdraw land

2   or make them wilderness areas and such, Congress

3   did, as we know from this case, open many Federal

4   lands, including the land at Questa, for exploration

5   and development for resources, such as molybdenum,

6   correct?

7       A.    Yes, metals generally.

8       Q.    And in your view, Doctor, the

9   United States allowed individuals and companies an

10  exclusive and practically unfettered right to

11  explore, develop and operate mines on Federal land.

12            That is your view, right?

13      A.    Yes.  As long as they obeyed State, Local

14  and Federal laws, yes.

15      Q.    Now, a mine claimant can extract and sell

16  minerals from an unpatented mining claim, which is

17  land still owned by the Federal Government, without

18  paying royalties to the Government, right?

19      A.    Correct.

20      Q.    And the United States erected this

21  structure purposefully to incentivize and encourage

22  the exploration and prompt development of mineral

23  resources on Federal land, right?

24      A.    Recognizing that the Government did not

25  want to be in the mining business itself and owning

Page 483

1    the resources, which was the practice in most other

2    countries.

3         **Q.    So that is a yes, right?**

4         A.    That is a yes, yes.  Decided to put this

5    whole industry in private hands.

6         **Q.    And so through the procedures and**

7    **protections, that we've discussed, established under**

8    **the mining laws, the Government facilitated mining**

9    **activity.**

10        A.    In that it created a legal structure in

11   which private mining activity could take place, yes.

12        **Q.    Which, in turn, facilitated that mining**

13   **activity.**

14        A.    Yes, as I said.

15        **Q.    And it did so in order to make resources**

16   **on Federal land available to the public for economic**

17   **development, correct?**

18        A.    Yes, the economic development of the

19   nation.

20        **Q.    And, in fact, it's been the policy, and**

21   **you just said this, in other words, it's been the**

22   **policy of the U.S. to encourage the development of**

23   **Federal mineral lands to put those lands and**

24   **minerals to use.**

25        A.    I think a more accurate way of saying it

Page 484

1   would be that it was the policy of the Government to

2   put the mining industry in private hands.  And

3   recognizing that the Government did not want to do

4   all of the survey work to figure out where the

5   mineral lands were, it would leave that task to

6   private parties, as well, and make the public domain

7   and, in time, National Forests available to private

8   parties to discover minerals, and if they found

9   minerals, to put those mineral lands in private

10  hands.

11      Q.    But you would agree it has been the policy

12  of the U.S. to encourage the development of Federal

13  mineral lands?

14      A.    To encourage a private mining industry.

15      Q.    And you would further agree, I think, that

16  historically it was the policy of the Government to

17  interfere as little as possible in the conduct of

18  miners, as they explored, developed and exploited

19  these mineral lands, right?

20      A.    Correct.

21      Q.    Now, these laws that we have discussed, as

22  a general matter, protected Molycorp and the Questa

23  site as it developed, right?

24      A.    Yes.

25      Q.    You are not aware of any substantial

Page 485

1    mining work at the Questa site before the claim --

2    before the claims were located under the mining

3    laws?

4        A.    I am not.

5        Q.    And, in fact, you have never heard of

6    anyone developing a molybdenum mine without the

7    protections of the Federal mining laws?

8        A.    I have not, in the United States.

9        Q.    Now, you would agree, Doctor, I believe

10   that mining companies, such as Molycorp, are more

11   likely to invest in developing a site, such as

12   Questa, with the protections afforded by the Federal

13   mining laws, right?

14           More likely with them than without them.

15       A.    Yes, I understand from talking with people

16   in the mining industry that they generally like to

17   invest in mining enterprises in the United States

18   because the legal infrastructure here makes that

19   much less risky than in some other countries.

20           So I think the United States has worked at

21   trying to create that legal infrastructure, yes.

22       Q.    All right.  I think you are right.

23           And, in fact, would it be fair to say that

24   the mining laws were pivotal to Molycorp's

25   operations?

Page 486

1    A.    Well, Molycorp operated within the

2  United States, and the United States created that

3  legal structure.  And so it would be like saying the

4  traffic laws of my city are pivotal for my being

5  able to drive around the streets of the city.

6    **Q.    Doctor, there can be a law on the books**

7  **that applies to a company but it is not really**

8  **pivotal it to that company's operation in an**

9  **existential way.  I want to push you on that a**

10  **little bit.**

11    **Would you agree that the mining laws were**

12  **pivotal in an existential way to the development of**

13  **the Questa Mine?**

14    A.    In the sense that the whole legal

15  infrastructure of our country is pivotal to what we

16  all do, day in and day out, if we are a law-abiding

17  citizen.

18    **Q.    That is a bit of a duck, Dr. Quivik.**

19    A.    I am trying to get at, understand what you

20  mean by pivotal.

21    **Q.    Let's put it a different way.**

22    A.    I don't think it is in any way

23  extraordinary or distinctive.

24    **Q.    Okay.**

25    MR. TODD:  Could we pull up Paragraph 84

Page 487

1    of Dr. Quivik's direct testimony, please.

2         Q    (By Mr. Todd) Your sworn testimony in this

3    case, Doctor, is that Molycorp's unpatented mining

4    claims and mill sites, which of course were located

5    under the mining laws, right, were pivotal to its

6    operation, and Molycorp paid close attention to

7    locating and maintaining these claims.

8              You agree with that statement, right?

9         A.   Yes.

10        Q.   Okay.  Now, the mining laws of 1872 is the

11   only Federal statute that incentivizes mining,

12   right?

13        A.   There have been a variety of statutes that

14   have, in one way or another, addressed the mining

15   industry, yes.

16        Q.   You are familiar with the Defense

17   Production Act of 1950?

18        A.   Yes.

19        Q.   And Congress has, as we have heard

20   yesterday, enacted that at the outbreak of the

21   Korean War, shortly after World War II, to remediate

22   supply uncertainties that the nation suffered during

23   World War II, fair?

24        A.   Fair.

25        Q.   The Defense Production Act was intended to

Page 488

1    increase the supply and diversify the supply base

2    for various critical and strategic minerals, right?

3        A.    Yes.

4        Q.    So two things there, both increase the

5    amount of stuff and also diversify the supply base,

6    which are slightly different, right?

7        A.    Yes.  And in the program we are talking

8    about, indirectly, through fostering exploration.

9        Q.    Right.  And the Defense Production Act

10   created the Defense Minerals Exploration Agency,

11   DMEA, which in turn made loans to partially fund

12   mining activities, right?

13       A.    Yes.

14       Q.    Okay.

15       A.    No, to partially fund exploration

16   activities.

17       Q.    Exploration activities.  Thank you,

18   Doctor.

19             And now, DMEA loans -- obviously, we have

20   heard a lot of talk in the last two days about it,

21   DMEA loans.

22             You would agree, Doctor, they are not like

23   an ordinary bank loan, are they?

24       A.    No.

25       Q.    In fact, they are significantly more

1   favorable to the borrower than the ordinary bank

2   loan, right?

3        A.    Yes.

4        Q.    They were interest free?

5        A.    Yes.

6        Q.    They did not necessarily have to be

7   repaid?

8        A.    Correct.

9        Q.    And even if a discovery was made, the

10   borrower did not -- if the borrower did not develop

11   the discovery within ten years, the loan didn't have

12   to be repaid, right?

13        A.    Correct.

14        Q.    In fact, a borrower had to repay the

15   principal only if a discovery was made and developed

16   within ten years and the borrower recovered and sold

17   some ore, in which case royalties would be paid from

18   the proceeds, right?

19        A.    Yes, from the property that was explored.

20        Q.    From the discovery.

21        A.    No, from the property that was explored.

22        Q.    Okay.  And the DMEA or Congress, when it

23   set up this program, and the DMEA, in turn, did not

24   insist on repayment at the point of discovery was

25   made, in order to avoid discouraging some potential

1    **borrowers, right?**

2         A.    Yes.    I think mining companies would have

3    been reluctant to enter in an agreement that

4    requires them to start mining immediately because

5    there are lots of factors that would determine

6    whether they would want to actually embark on a

7    mining project.

8         **Q.    Right.  They might make a discovery but**

9    **not have the capital on hand to develop it**

10   **immediately.**

11        A.    Or they might, but the market conditions

12   might not be what they would like to see.  They

13   might not have the technology in hand to do that.  A

14   number of factors.

15        **Q.    Right.**

16             **Because, as we have discussed and, as I**

17   **know you know, whether something constitutes ore in**

18   **a technical sense depends on whether it is**

19   **commercially valuable.  And so it can change with**

20   **market fluctuation, right?**

21        A.    Can be produced at a profit.

22        **Q.    Okay.  And so DMEA structured its loans in**

23   **a way to make them more attractive to potential**

24   **borrowers?**

25        A.    In the mining industry, I think that is

1    fair to say.

2        Q.    Yeah.

3              And given all this, this made a DMEA loan

4    a much less risky proposition for the borrower than

5    a bank loan would have been?

6        A.    Yes.

7        Q.    The risk of the loan, the possibility that

8    it did not result in a discovery, that fell entirely

9    on the United States, right?

10       A.    Yes.

11       Q.    And the Government offered these favorable

12   loans to incentivize mining companies to explore for

13   additional critical or strategic mineral resources,

14   right?

15       A.    Yes.

16       Q.    Now, as we have discussed, Molycorp

17   applied for and received a DMEA loan, which did, in

18   fact, result in the development -- in the discovery

19   and development of a mineral resource, right?

20       A.    Yes.

21       Q.    So in this instance, at least, the DMEA

22   achieved its purpose?

23       A.    I should say indirectly resulted in the

24   development of a mineral resource, but yes, there

25   was a chain of events that followed.

1    Q.    Okay.  Let's change and focus in a little

2    more on mining claims, under the mining laws that we

3    discussed a few minutes ago.

4           The Government argues, and I am going to

5    paraphrase here, tell me if I'm misunderstanding the

6    case, but the Government asserts, basically, that

7    once Molycorp located unpatented mining claims,

8    which could include mill site claims, the Government

9    was essentially powerless to exercise any authority

10   over those lands to inhibit or control or direct the

11   creation or placement of mining waste; is that a

12   fair assessment?

13   A.    That -- I don't want to speak for the

14   Government, but I think that characterizes my view,

15   and that is my view based on reading of the

16   understanding of mining companies in the period,

17   Federal officials in the period, Mr. Lindley, whom

18   we heard about in previous testimony, Mr. Fredley's

19   testimony, so, yes.

20   Q.    Since you're in the box, I will gladly

21   take your view and work with that.  Okay, sir?

22   A.    Okay.

23   Q.    Now, yesterday, with Mr. Fredley, we did

24   hear the term paramount proprietor used to describe

25   the Government's relationship with Federal lands.

1           **You are familiar with that term?**

2      A.    Yes.

3      Q.    **And you don't disagree with -- putting**

4  **aside any question of what specific powers the**

5  **Government has, you don't disagree that at the end**

6  **of the day the United States continues to own land**

7  **on which there have been located unpatented mining**

8  **claims?**

9      A.    Well, since we are talking about details

10  here, I think it would be more accurate to say that

11  the Government holds the title, but the mining or --

12  the mining claimholder owns virtually all of the

13  other rights, and those are property rights, and the

14  claimholder owns all of those rights.

15     Q.    **Okay.**

16     A.    The only thing left in the Government's

17  hands is the title.

18     Q.    **So your testimony is that with respect to**

19  **land, on which there are unpatented mining claims,**

20  **the Federal Government continues to hold the title**

21  **to that land?**

22     A.    Yes.

23     Q.    **Okay.  Now, an unpatented mining claim**

24  **does not give fee simple-type ownership to a**

25  **claimholder, does it?**

Page 494

1        A.     Correct.  The Government holds the title.

2    The claimholder owns virtually everything else.

3        **Q.     And an unpatented claimholder's rights are**

4    **contingent on the performance of certain tasks,**

5    **right?**

6        A.     If the claimholder wants to obtain a

7    patent and eventually obtain title to that land,

8    there is a series of steps that the law requires the

9    claimholder to go to, to eventually get title, yes.

10       **Q.     A claimholder has to pay an annual fee?**

11       A.     No, the claimholder has to pay -- perform

12   what is called assessment work, spend $100 a year on

13   exploration and development of the claim.

14       **Q.     You don't understand that there has ever**

15   **been a requirement that a claimholder pay an annual**

16   **fee?**

17       A.     I don't recall that in the law, no.

18       **Q.     Okay.  But as you have mentioned, a**

19   **claimholder does have to spend a certain amount of**

20   **money annually actively working and developing the**

21   **claim?**

22       A.     Yes, and be able to document that.

23       **Q.     Okay.  And if they don't actively work the**

24   **claim, the unpatented mining claim can be**

25   **invalidated, correct?**

1    A.    Correct.

2    Q.    **And in that instance, whatever rights the**

3  **claimholder holds, would revert back to the U.S.,**

4  **right?**

5    A.    Yes.

6    Q.    **And you understand, Doctor, that one of**

7  **the key aspects of the bundle of property rights**

8  **that every first-year law student learns about, is**

9  **the right to exclude others?**

10           THE COURT:  Right to what?  I'm sorry.

11           MR. TODD:  The right to exclude others.

12    A.    Yes.

13    Q    **(By Mr. Todd) A holder of an unpatented**

14  **mining claim does not have a general right to**

15  **exclude others from the land, do they?**

16    A.    Are we talking about mining claims in the

17  public domain or mining claims in National Forest?

18    Q.    **Well, if you think the answer is**

19  **different, I will take the answer for both.**

20    A.    In the National Forests, there is a limit

21  to which a claimholder has rights to that parcel of

22  land.  It has rights only for the purposes of

23  exploring, developing and mining minerals.

24           And so if this is a National Forest and

25  there are trees growing on the mining claim, the

Page 496

1   claimholder can cut trees, if the claimholder is

2   going to use those trees in furthering its mining

3   operation, but it could not cut trees for commercial

4   purposes, for instance.

5       Q.    And in this case we are in a National

6   Forest, right?

7       A.    Yes.

8       Q.    So let's stick with that answer.

9             And so, no general right to exclude and no

10  unlimited use of surface forests, right?

11      A.    Can you repeat the question?

12      Q.    Let me break them out.

13            The question I had asked you originally

14  was whether the holder of an unpatented mining claim

15  has a general right to exclude others from that

16  claim.

17            And if I understand your answer correctly,

18  you said in a National Forest an unpatented mining

19  claimholder's rights to exclude is limited.

20            I think that is what you said.

21      A.    I am trying to think through that because

22  there are a lot of different ways of excluding.  For

23  instance, the holder of the claim can exclude other

24  people who might want to come on to the claim and

25  explore or develop a mine.  And --

1      Q.    Because the holder -- sorry to

2  interrupt -- the holder of the claim has an excusive

3  use of that land for mining purposes?

4      A.    Yes.

5      Q.    Okay.

6      A.    And if the exploration and development had

7  reached the point at which the mining -- the miner

8  had a lot of improvements on the site, I can

9  imagine -- I haven't seen these details spelled out

10  anywhere, but I can imagine, for practical purposes,

11  that the miner could put a fence around that

12  property and exclude others, even if they weren't

13  intent on trying to be a claim jumper.

14      Q.    We discussed this at your deposition that

15  building a fence around a big open pit would be a

16  good safety idea, right?

17      A.    Yes.

18      Q.    And that is why I asked the question, as I

19  did, that there isn't a general right to exclude.

20  There may be some specific bases to exclude, such as

21  for mining purposes, but not a general right to

22  exclude.

23            Like no one can come up on this mining

24  claim at all.

25      A.    Well, it would be pretty much up to the

1    claimholder to decide that, I think.

2         Q.    Okay.  And the other aspect of your

3    answer, when I confused you with my long, rambling

4    question, that you mentioned timber.

5              And to draw that out, an unpatented mining

6    claimholder can't harvest the surface timber and

7    sell it commercially but they can use timber on the

8    claim to support their mining, right, such as

9    timbering a mineshaft?

10        A.    Yes.

11        Q.    But the United States can enter land where

12   there is an unpatented mining claim, harvest the

13   timber and sell it commercially, right?

14        A.    In a National Forest, yes.  That is what

15   the Forest Service was established to do, is to

16   manage those resources, the surface resources.

17        Q.    And the holder of an unpatented mining

18   claim can't operate a business other than a mine.

19   For example, cannot operate a livestock grazing

20   business or a saloon that is unrelated to the mining

21   activity, right?

22        A.    Correct.

23        Q.    But someone who owned that land in fee

24   simple could do these things as long as they are

25   consistent with State zoning law, right?

Page 499

1      A.    Yes.

2      Q.    And you would agree, Doctor, I think, that

3  even mining activity on unpatented mining claims is

4  subject to reasonable regulation by the Federal

5  Government?

6      A.    If the Federal Government passes laws or

7  establishes regulations that regulate industry, then

8  I think a mining operation would qualify as the kind

9  of industry that is being regulated by the

10 Government.

11     Q.    Okay.  And that is fair, laws generally

12 apply to mining operations.

13           But you are familiar with the Organic Act

14 of 1897, are you not?

15     A.    Yes.

16     Q.    And that is the Act which created and

17 established what ultimately became the U.S. Forest

18 Service?

19     A.    Yes.

20     Q.    And the Organic Act provides that the

21 rights of persons to locate mining claims on forest

22 lands should not be unreasonably burdened, right?

23     A.    Correct.

24     Q.    And so the converse of that, as you agreed

25 with me at your deposition, is that mining claim

Page 500

1    **activities on Federal lands -- sorry -- mining**

2    **activities on Federal lands may be reasonably**

3    **burdened?**

4         A.    That would be the implication.

5         **Q.    And the Forest Service has, in fact,**

6    **issued regulations regulating and restricting mining**

7    **activities on Federal forest lands, right?**

8         A.    Over time, yes.

9              MR. TODD:  So let's look at U.S.

10   Exhibit 276, please.  Could we pull that up, Patty?

11        **Q    (By Mr. Todd) Do you see the document on**

12   **the screen in front of you, sir?**

13        A.    Yes.

14        **Q.    Have you had a chance to review this**

15   **letter?  Do you recognize this document?**

16        A.    I see the date and that it is addressed to

17   Molycorp, but I don't know who it is from and I have

18   not seen enough yet to know what this one is about.

19             MR. TODD:  Patty, let's go to the end of

20   the next page.

21        **Q    (By Mr. Todd) Doctor, do you see the**

22   **letterhead at the top, it is from the Forest Service**

23   **and the Department of Agriculture?**

24        A.    Yes, the local ranger station.

25        **Q.    Which is right down the road from the**

Page 501

1    mine.

2         A.    Correct.

3         Q.    It is dated January 12, 1973?

4         A.    Right.

5         Q.    Which was right in the middle or towards

6    the end of the four years it took to consummate the

7    land exchange?

8         A.    Correct.

9              MR. TODD:  And if we flip to the next

10   page, Patty, or the very end of the letter.

11        Q    (By Mr. Todd) We will see it is from John

12   S. Hart, District Forest Ranger.

13             Do you see that?

14        A.    Yes.

15        Q.    And Mr. Dewey spoke about knowing Mr. Hart

16   and the good relationship the mine had with him.

17             Do you recall that testimony?

18        A.    Yes.

19             MR. TODD:  Let's go back to the first

20   page.

21        Q    (By Mr. Todd) And, Doctor, I am perfectly

22   happy that, as you said, you have not reviewed this.

23   I am perfectly happy to let you read it, if you

24   would like.

25             If you just direct Patty, over here, she

Page 502

1    can scroll it for you.

2        A.    Okay.  You can scroll down a little bit

3    more.

4              You can continue.

5              Okay.  Can we continue that sentence to

6    the next page, please?  Okay.

7              Okay.  All right.  Thank you.

8        Q.    Thank you, Doctor.

9              I don't usually have people read entire

10   documents on the stand but as you said, you have not

11   seen that before.

12       A.    I have seen this before.

13       Q.    Oh, okay.  I thought you said you hadn't.

14       A.    I just couldn't see by the title and

15   wanted to be reminded of what the whole letter was

16   about.

17       Q.    Fair.

18             Dr. Quivik, in this letter, you would

19   agree, that the Forest Service told Molycorp that

20   from then forward it would have to get a special use

21   permit from the Service anytime it wanted to cut an

22   access road or to drill on an unpatented mining

23   claim?

24       A.    Yes.

25       Q.    Okay.  And it references Federal

Page 503

1   regulations that were adopted to institute that

2   requirement?

3       A.    Yes.

4       Q.    Do you happen to know what legal authority

5   the Forest Service cited for those regulations?

6            It is not in the letter.  I was wondering

7   if you knew.

8       A.    Okay.  I don't.  I -- this is in the early

9   '70s, right when a lot of environmental regulations

10  were beginning to be developed by various Federal

11  agencies, and so it is not at all surprising to see

12  that the Forest Service is going to take greater

13  interest in administering its surface resources.

14           And building access roads would be part of

15  that administrative mandate for the Forest Service,

16  under the Organic Act, of course, 1897, yeah.

17      Q.    Would it surprise you if that was the

18  authority the Forest Service cited?

19      A.    No.

20      Q.    And this letter sets out the process for

21  applying for a special use permit and whether or not

22  one would be approved?

23      A.    Yes.

24      Q.    And so under this regulation, the Forest

25  Service officials would be reviewing Molycorp's

Page 504

1    proposed activities anytime it wanted to cut an

2    access road or drill on one of its own unpatented

3    mining claims?

4        A.    Yes.

5        Q.    And special use permits, as you know, can

6    sometimes take months, if not years, to issue,

7    right?

8        A.    Yes.

9              MR. TODD:  Your Honor, I move to admit

10   USX276.

11             THE COURT:  Any objections?

12             MR. HARRISON:  No objections.

13             (Exhibit admitted, USX276.)

14       Q    (By Mr. Todd) The following year, the

15   Forest Service issued regulations, much more

16   expansive regulations, that required mines operating

17   in Federal forests to submit a plan of operations

18   for Forest Service approval, right?

19       A.    Yes.

20       Q.    And a plan of operations had to detail the

21   entire operation, including the steps it would take

22   for environmental protection, which would include

23   waste deposition, right?

24       A.    I don't recall waste deposition being

25   named in that statute.  I do know that it was for

1    purposes of allowing the Forest Service to assess

2    how the mining activity would impact the resources

3    that the Forest Service was administering, the

4    surface resources.

5              And it was very clear that the purpose was

6    not to tell the mining companies how to conduct

7    their mining activities.

8         Q.    But part of a mining claim -- and we can

9    pull up the regulation if we need to -- but it does

10   specifically require the mine to submit an

11   environmental plan, the steps they will take for

12   environmental protection?

13        A.    I believe that is the language, yes.

14              Focused on the surface environment that

15   the Forest Service was administering.

16        Q.    And in order to operate at all, a mine

17   needed to have a Forest Service approved plan or a

18   Forest Service approved dispensation from the

19   requirement to have a plan, right?

20        A.    Correct.

21        Q.    And as you know Federal agencies must

22   identify when they promulgated regulations, must

23   identify the statutory authority that empowers them

24   to issue those regulations, right?

25        A.    Yes.

Page 506

1        Q.    And you know, Doctor, that for those 1974

2    regulations, the one statute the Forest Service

3    invoked was the Organic Act of 1897, right?

4        A.    Yes.

5        Q.    Now, let's shift gears and shift

6    locations.  Let's go underground.

7              There is a disagreement in this case,

8    Dr. Quivik, about who was using what to explore for

9    what way -- that was a mouthful.

10             But you understand there have been

11   competing views as to when Molycorp was using

12   diamond drilling and when it was exploring for

13   low-grade ore, right?

14       A.    I wouldn't have thought there was a

15   disagreement but if you point it out to me, we can

16   dig into it.

17       Q.    You sat in the courtroom, you haven't

18   heard witnesses and lawyers sparring over when

19   diamond drilling was used and when low-grade ore was

20   searched for?

21       A.    Yeah, I know what you are referring to.

22       Q.    Okay.  Now, let me start with some things

23   I think we will all agree on, and that is with the

24   original underground mine, just a few questions

25   around that.

1           There is no dispute, is there, that

2     Molycorp used drifting and crosscutting, tunneling

3     methods in the original underground mine to mine ore

4     and to explore for ore?

5           A.    That is correct.

6           Q.    And we know that the original underground

7     mine did not use diamond drilling to explore for

8     ore?

9           A.    Correct.

10          Q.    In fact, we know from an article that he

11    wrote in the 1930s, that Mr. J.B. Carman, the

12    manager of the mine, felt that diamond drilling was

13    an untrustworthy means of searching for high-grade

14    ore?

15          A.    Correct.

16          Q.    Then we come to the 1954 to 1956 period,

17    and this is the dispute that I referenced a few

18    minutes ago, the Government contends that Molycorp

19    was searching for low-grade ore, using diamond

20    drilling during that period, and they pointed to

21    some documents and Chevron's witnesses have taken

22    the position that Molycorp was not searching for

23    low-grade ore and was not using diamond drilling in

24    those years.  And we have pointed to some documents.

25          And you have seen all of them?

Page 508

1      A.    Yes.

2      Q.    You are the historian, and I am hoping

3   that you can clear this up for us.

4           Dr. Quivik, you agree, do you not, with

5   Chevron's position that from 1954 to 1956 Molycorp

6   was searching for more veins of high-grade ore and

7   not for a large low-grade ore body, correct?

8      A.    Correct.

9      Q.    And you also agree that, during those

10  years, Molycorp was still using the same mining

11  techniques it had used in the original underground

12  mine drifts and crosscutting?

13     A.    Yes.

14     Q.    Dr. Rigby testified yesterday about how a

15  mining company searches for a low-grade ore body

16  drifting and crosscutting horizontally, drilling

17  vertically and defining in three dimensions a large

18  block, right?

19     A.    That it can analyze based on samples taken

20  from throughout that three-dimensional block, yes.

21     Q.    Precisely.  You take the core samples from

22  the drills, you take the channel samples or the knot

23  samples from the tunnels, you assay them and then

24  you can track the increasing or decreasing

25  concentration of the mineral interest as it moves

Page 509

1    throughout that block, right?

2        A.    Yes.

3        Q.    Okay.  And that then allows a mining

4    company to, while it may not be perfect, but to

5    understand, based on an estimate of the size of that

6    block, they can estimate the size of the ore in that

7    block?

8        A.    Yes.  The volume of the ore, yeah.

9        Q.    The volume of the ore.

10            And if the grade is sufficient, they can

11   determine, by grade, I mean how high the percentage

12   is of the mineral of interest.

13            And based on the market price, at the

14   time, as we discussed earlier, they can determine

15   whether there is commercially-viable ore right in

16   the formal technical sense of ore?

17       A.    Well, in the original exploration, they

18   wouldn't determine that definitively.  They would

19   have a vague understanding of that block, and it

20   might suggest that it merits more intensive

21   exploration but they wouldn't have determined

22   immediately that the whole block qualified as ore

23   because there is too much space between the various

24   drill holes.

25       Q.    That is a question of time and effort,

1    right?

2            The process I just described might take

3    place over a few months or over a space of years,

4    and at a point in time, with enough crosscutting,

5    drifting, tunneling or drilling, sampling and

6    assaying, you can get to the point that you can get

7    to the point of having reserves, right?

8        A.    Yes.

9        Q.    And by proving reserves, a mining company

10    will improve its access to investment capital or

11    bank lending?

12        A.    Correct.

13        Q.    Now, in your testimony, Doctor, you cited

14    the 1964 SEC filing that the Government has showed a

15    number of times, that is USX003?

16        A.    Yes.

17        Q.    Right.

18            Now that document wasn't in either of your

19    reports, right?

20        A.    I don't recall that it was, correct.

21        Q.    And you didn't mention that at your

22    deposition?

23        A.    Again, that is my recollection.  I hope

24    you're not setting me up for perjuring myself.

25        Q.    Absolutely not.

Page 511

1      A.     Okay.

2      Q.     I will represent to you that you discussed

3  it for the first time in your report.

4      A.     Thank you.

5      Q.     The Government has cited that document for

6  its contention, contrary to your testimony, that

7  there was drilling and exploration at Questa in '54.

8             You have heard that, right?

9             MR. HARRISON:  Objection, Your Honor.

10 That misstates prior testimony.

11            THE COURT:  The record will speak for

12 itself.

13     Q     (By Mr. Todd) The Government has also

14 shown -- I will move on from that document.

15            The Government has also shown an article,

16 which is CX186, which is written by Mr. Robert

17 Carpenter in 1968.

18            Do you recall that?

19     A.     Yes.

20     Q.     Okay.  Would you agree with me that in

21 1956 Mr. Carpenter shared the view of Mr. Carman,

22 who I mentioned earlier, that the appropriate method

23 of exploration at Questa was drifting and

24 crosscutting, looking for high-grade ore as opposed

25 to looking for low-grade ore?

Page 512

1    A.    He was certainly on board with the idea of

2  looking for high-grade ore.  He also mentioned that

3  there were indications of this low-grade material,

4  so I don't recall that he actually stated it in an

5  either/or kind of proposition but he was on board

6  with the idea of looking for high-grade material.

7    **Q.    Now, Molycorp applied for a DMEA loan in**

8  **December of 1956, correct?**

9    A.    Correct.

10   **Q.    And in your 99 pages of narrative**

11 **uninterrupted written testimony, by my count you**

12 **devoted about five paragraphs to the period from**

13 **1957 to 1960.**

14   A.    If that is your count, I will go with it.

15   **Q.    It flew by.**

16        MR. HARRISON:  Objection, Your Honor.  I'd

17 move to strike.

18        THE COURT:  State your objection.

19        MR. AUGUSTINI:  Your Honor, the commentary

20 is not necessary.

21        THE COURT:  Overruled.

22   **Q    (By Mr. Todd) It is your view, is it not,**

23 **Doctor, that the United States Government, the DMEA**

24 **here, exercised no control whatsoever over the**

25 **DMEA-funded exploration process; is that right?**

Page 513

```
 1      A.     In my understanding of the word,
 2   "control," yes.
 3      Q.     Okay.  I would like to talk through the
 4   DMEA loan process generally, and we will do that
 5   pretty quickly, and then we will talk about the
 6   Molycorp loan specifically, okay?
 7      A.     Okay.
 8      Q.     The DMEA loan process began with the
 9   submission of an application by the company seeking
10   to borrow money, right?
11      A.     Right.
12      Q.     In which they would describe the proposed
13   project?
14      A.     Yes.
15      Q.     These applications were then reviewed by
16   DMEA officials, which included mining engineers and
17   geologists, right?
18      A.     Correct.
19      Q.     Now, to clarify for His Honor, who may not
20   be as familiar with the DMEA as you are, yesterday
21   there was mention of various other Government
22   agencies.
23             Am I correct in understanding that the
24   DMEA had mining engineers and geologists who were
25   succumbered from, or double-hatted, from the Bureau
```

Page 514

1    of Mines and the U.S. Geological Survey?

2        A.    That is right.

3        Q.    Okay.

4              MR. TODD:  So that is why we were mixing

5    other agencies, Your Honor.

6        Q    (By Mr. Todd) So these applications,

7    Dr. Quivik, they were assessed on paper and

8    sometimes on the ground by a field team?

9        A.    Yes.

10       Q.    And a field team, if one was involved,

11   would assess the applicant's capabilities, the

12   terrain, the geology, and generally, the conditions

13   on the ground, right?

14       A.    Yes.

15       Q.    And if the Government was interested, the

16   parties would then negotiate a contract?

17       A.    Correct.

18       Q.    And the Government, in those contracts,

19   would specify the work at some level of detail in

20   order to ensure that the company used reasonable and

21   appropriate methods to conduct the exploration?

22       A.    The work was specified in the contract and

23   the work was also proposed by the applicant, so

24   there was this negotiation but the work was proposed

25   by the applicants and documented in the contract.

1      Q.     And we saw that negotiation in this case,

2      right?

3      A.     Yes.

4      Q.     And what the parties, both would have to

5      agree it's the contract, right?

6      A.     Correct.

7      Q.     And the details would be written down, in

8      some level of detail, and then that is what the

9      Government was going to fund?

10     A.     And that is what Molycorp was going to do.

11     Q.     Precisely.

12            And we heard yesterday from Dr. Rigby and

13     I think from some other witnesses, that under the

14     DMEA program, Government engineers and geologists

15     would also supply substantial technical assistance

16     and advice, free of charge, to the operators.

17            You're familiar with that, right?

18     A.     Yes.

19     Q.     So a company borrowing money from the

20     DMEA, as we discussed earlier, could get a loan on

21     really good terms and free technical advice?

22     A.     Yes.

23     Q.     And DMEA contracts provided that at the

24     end of a project, if a discovery was made, the

25     Government could certify that discovery, right?

1      A.    Yes.  And it's important to remember that

2  the certification was for the Government's use only.

3  It was a public document, so a mining company could

4  use it for its purposes but the reason the

5  certification step is in there is for the

6  Government's purposes.

7      **Q.    That is interesting.**

8            **And we discussed earlier the obligation to**

9  **repay a loan and that was triggered by a**

10  **certification?**

11      A.    Could you repeat the question, please?

12      **Q.    I nailed it.  Let me try it again.**

13            **Certification of a discovery, under the**

14  **contract, would trigger a borrower's obligation to**

15  **repay a loan through royalty payments, if there was**

16  **a development of a discovery?**

17      A.    Yes, it was the first step in the

18  triggering a two-step triggering process.

19      **Q.    And as we discussed earlier, royalties**

20  **would then be paid from the land?**

21      A.    Yes.  From revenue generated by producing

22  from the land, yeah.

23      **Q.    Thank you.  You are much more specific**

24  **than I am.  I appreciate that.**

25            MR. TODD:  Your Honor, we are a few

Page 517

1    minutes before 10:30.  If you want to take a break

2    now, I have a natural stopping point.

3              THE COURT:  We can take a break now.  It

4    will be our morning break.  That will be about 15

5    minutes, so that will be about 24 minutes before 11.

6              MR. TODD:  Thank you, Your Honor.

7              (A recess was taken.)

8              THE COURT:  You may be seated.

9              You may proceed.

10             MR. TODD:  Thank you, Your Honor.

11        **Q.    (By Mr. Todd)  Dr. Quivik, Molycorp**

12   **applied for a DMEA loan in 1967.**

13             MR. TODD:  Let's pull the application,

14   which is CX46.

15        **Q    (By Mr. Todd) This document has been**

16   **displayed in court previously, but we haven't really**

17   **worked through it in a systematic way.**

18             **So for the Court's benefit, I would like**

19   **to do that with you.**

20             **You see here, is this the first page of**

21   **Molycorp's application?**

22        A.    Yes.

23             MR. TODD:  If we go to the next page,

24   Patty.

25        **Q    (By Mr. Todd) You see it was signed by**

Page 518

1    Mr. J.B. Carman, who you have mentioned this

2    morning?

3         A.    Yes.

4         Q.    In the application --

5              MR. TODD:  If we go to Page 6 of 15 in the

6    PDF.

7         Q   (By Mr. Todd) And let me direct you,

8    Doctor, to the third paragraph down.

9              And the last sentence there reads,

10   "Exhaustion of the ore bodies below the tunnel

11   stopped production."

12             Do you see that?

13        A.    Yes.

14        Q.    So Mr. Carman acknowledges, in the

15   application, that at this point production of ore

16   from the mine has ceased?

17        A.    Correct.

18        Q.    And he actually notes that not once but

19   twice.

20             MR. TODD:  Patty, can we call out the last

21   paragraph on that page?

22        Q   (By Mr. Todd) He says, "As stated, no

23   production is forthcoming from any part of the mine

24   and no ore reserves are considered available."

25             Do you see that?

1      A.    Yes.

2      Q.    So as of the time of this application, no

3  ore in the mine?

4      A.    Correct.

5      Q.    And to complete this paragraph, and this

6  was flagged yesterday, he also represented to the

7  Government that -- this is the last sentence here --

8  "No other exploration work is, for the present,

9  planned other than covered by this application."

10          Correct?

11     A.    Correct.

12     Q.    And this application refers to the

13  application being made to the DMEA for a loan,

14  right?

15     A.    Yes.

16     Q.    Dr. Rigby described yesterday, in his

17  testimony, that Molycorp, in its application,

18  proposed a program of drifting and crosscutting to

19  search for more high-grade veins.

20          You agree with that, right?

21     A.    Yes.

22     Q.    Molycorp didn't propose any diamond

23  drilling or any other kind of exploratory drilling

24  in its program?

25     A.    Correct.

Page 520

1      Q.     And no form of systematic sampling?

2      A.     Correct.

3      Q.     I am going to paraphrase and skip a little

4   bit here to move us along, but you would agree, I

5   believe, and I think you acknowledged this in your

6   testimony, that the Government did not simply accept

7   Molycorp's proposal as written, right?

8      A.     Correct.

9      Q.     In fact --

10             MR. TODD:   Could we pull up CX48, please.

11  And let's go to Page 6 of 10.

12     Q    (By Mr. Todd) CX48, Doctor, is a

13  compilation of DMEA materials back and forth inside

14  the agency assessing the application.  And I know

15  you have seen this before.

16             MR. TODD:   Patty, let's call out the

17  second paragraph, first sentence.

18     Q    (By Mr. Todd) This is a memo from the field

19  team, Dr. Quivik, who wrote, "In reviewing the

20  application prior to the examination, it was

21  apparent that the company's exploration program of

22  approximately $450,000 was not based on known

23  geological data, and, therefore, was not warranted

24  in its entirety."

25             That was the DMEA field team's assessment

1    of Molycorp's proposal, right?

2         A.    Right.

3         Q.    And having objected to Molycorp's

4    proposal, the field team then went on to note that,

5    "There was data suggesting that there may be a large

6    and significant low-grade molybdenum body at

7    Questa."

8               Right?

9         A.    Correct.

10        Q.    And they suggested looking for that

11   instead?

12        A.    Correct.

13        Q.    And pursuant to that, it was the

14   Government that then suggested adding diamond

15   drilling and sampling to the exploration program,

16   right?

17        A.    That is right.

18        Q.    Now, the DMEA recognized at the time,

19   Dr. Quivik, did it not, that it was asking Molycorp

20   to undertake something that was entirely new and

21   different from what it had been doing before?

22        A.    Yes.  Not entirely new in the mining

23   industry but at that site, yes.

24        Q.    That's an entirely fair point.

25               MR. TODD:  Let's look at Chairman George's

Page 522

1   supplemental memo, dated December 27, 1957, and that

2   is CX, the same packet, Page 4.

3           Let's call out the last paragraph, please.

4       Q    (By Mr. Todd) And, again, this is a DMEA

5   official writing, and he notes, with the apologies

6   for reading a long paragraph, but follow along with

7   me, "It is suggested that the field examiners'

8   alternate program should be discussed with the

9   applicant during the examination.

10          "Judging from available information, the

11  milling facilities and probably the main addit would

12  not be able to handle large tonnages of ore,

13  therefore, the applicant may not want to participate

14  in an exploration program to search -- or project,

15  sorry, to search for large bodies of ore of lower

16  grade than have previously been mined because it

17  would require a considerable capital outlay to

18  expand the mine and surface plant to make the 0.5 to

19  0.75 percent MLS2 material commercially

20  exploitable."

21          That is consistent with what you disagreed

22  with, right?  They were suggesting something

23  different at Molycorp, at Questa?

24      A.   Did I disagree with something?

25      Q.   Yeah, you agreed with me --

Page 523

1       A.      Oh, okay.  I thought I heard you say

2   disagree.

3               Yeah, this is a nice summary of this stage

4   in the negotiation process.

5       **Q.      And a shift like this would also result in**

6   **a significantly larger amount of waste rock than the**

7   **operation that had been at the Questa site**

8   **previously, right?**

9       A.      Well, if they were to have developed an

10  underground block cave mining, it would not have

11  been significantly more waste rock, but it would

12  have been a larger operation, to be sure, than they

13  had been undertaking.

14      **Q.      You are distinguishing block cave from**

15  **open pit.  But let me talk to you on block cave.**

16              **A block cave mine, developing a large**

17  **low-grade ore body would certainly produce much more**

18  **in the way of mine tailings than the prior**

19  **underground pick and shovel operation at Questa,**

20  **right?**

21      A.      That is correct.

22      **Q.      And an open pit mine would result in a**

23  **significantly larger amount of both waste rock**

24  **overburden and tailings?**

25      A.      Yes.

Page 524

1      Q.    And that would have been known and obvious

2   at the time to these DMEA officials, right?

3      A.    Everyone in the mining industry.

4      Q.    Now, we have heard testimony yesterday

5   that Molycorp was resistant to the Government's

6   proposal in 1957 that Molycorp search for low-grade

7   ore.

8            You don't disagree with that

9   characterization, do you?

10     A.    No.

11     Q.    You have looked through the field team's

12  engineering and geological report, which recounts

13  the negotiations, right?

14     A.    Yes.

15     Q.    And as described in that report, Molycorp

16  and Mr. Carman, in particular, weren't fully in love

17  with the Government's proposal when it was first

18  made?

19     A.    That is right.

20     Q.    And the field team described, at least one

21  of the meetings, one of the negotiation meetings as

22  being a fiasco, right?

23     A.    Yes.

24     Q.    Ultimately, however, the Government and

25  Molycorp agreed to an exploration program that

Page 525

1   combined some of Molycorp's desire to tunnel

2   underground from its original proposal and the

3   Government's desire to search in a particular area

4   for low-grade ore using diamond drilling and

5   sampling, right?

6        A.    Yes, a sort of compromised work plan that

7   both parties would agree to.

8        Q.    Precisely.  A compromised plan, and as any

9   new contract, neither side was completely happy,

10  meaning the negotiators did a good job, fair?

11       A.    Sounds good.

12       Q.    It was the field team that recommended

13  diamond drilling, right?

14       A.    Yes.

15       Q.    And the field team specified how the core

16  samples from those drills should be handled?

17       A.    Yes.

18       Q.    And they also recommended including

19  channel sampling, cutting a continuous strip along

20  the tunnel wall 3 inches wide and 1-inch deep,

21  right?

22       A.    Yes.

23       Q.    So the contract reflecting this

24  compromised program was executed in 1957?

25       A.    Yes.

Page 526

1        Q.    May of '57.

2              And the contract included this joint

3      program that included drilling and sampling?

4        A.    Yes.

5        Q.    And the contract required Molycorp to

6      perform all of the work expertly, in a workmen-like

7      manner and in accordance with good mining standards,

8      right?

9        A.    Yes.

10       Q.    And the Government was entitled to inspect

11     the workings, right?

12       A.    Correct.

13       Q.    And they could inspect the workings to

14     make sure that the work was being performed in an

15     appropriate manner, right?

16       A.    Yes, particularly the work for which

17     Molycorp would seek the Government's 50 percent

18     share.

19       Q.    Precisely.

20       A.    Yeah.

21       Q.    Precisely.

22             And Molycorp had to keep books and records

23     that the Government could review?

24       A.    Yes.

25       Q.    And Molycorp was required to make monthly

Page 527

1    reports detailing the work it had performed under

2    the contract and including all of the sampling data,

3    right?

4         A.    Yes, if it wanted to be paid.

5         Q.    Exactly.

6               And these requirements allowed the U.S. to

7    confirm that Molycorp was implementing the program

8    according to its terms, right?

9         A.    Correct.

10        Q.    So they knew whether to pay?

11        A.    Correct.

12        Q.    The work under the program, to be funded

13   under the program, is set forth in detail in an

14   Exhibit A to the contract, right?

15              You are familiar with that?

16        A.    Yes.

17        Q.    And that Exhibit A identified the

18   drifting, the crosscutting, the drilling, and the

19   sampling we have discussed?

20        A.    Yes.

21        Q.    It specified precisely how diamond drill

22   holes were to be drilled?

23        A.    Yes.

24        Q.    It specified the size of timbering in the

25   drifts and crosscuts?

1       A.     Yes.

2       Q.     It specified that drill core samples

3    should be separated into 10-foot sections?

4       A.     Yes.

5       Q.     It specified the size of the drill

6    stations to be constructed underground?

7       A.     Yes.

8       Q.     Now a drill station is a cutout from a

9    tunnel wall that leaves enough space to get the

10   drill in and extract the 10-foot core, right?

11      A.     Right.  Without interfering with traffic

12   along the drift.

13      Q.     Precisely.

14             And the contract also specified how

15   channel samples would be taken and how those samples

16   would be handled, assayed and preserved, correct?

17      A.     Yes.

18      Q.     And these things were all subject to

19   Government approval?

20      A.     To make sure that Molycorp was doing what

21   it said it would do in the contract, yes.

22      Q.     Okay.  Do you recall -- we can pull it up

23   if we need to -- but the contract provides, "the

24   location, direction, inclination, extent and method

25   of sampling the work under the contract are subject

Page 529

1     to Government approval"?

2          A.     Yes.

3          Q.     And as you have noted a few times, under

4     the contract the Government agreed to pay 50 percent

5     of the work specified in the contract?

6          A.     Yes.

7          Q.     The Government had no obligation to pay

8     for work not specified in the contract?

9          A.     Correct.

10         Q.     Right.

11                And if the work deviated from the

12    contract, the Government could refuse to pay?

13         A.     Correct.

14         Q.     If the work was performed in a manner

15    unsatisfactory to the Government, the Government

16    could refuse to pay?

17         A.     Yes.

18         Q.     And if the Government --

19         A.     Under the terms of the contract.

20         Q.     Precisely, thank you.

21                And if the Government, in its sole

22    discretion, concluded that the program had failed to

23    achieve anticipated results and a discovery was not

24    likely, the Government could terminate the contract,

25    right?

Page 530

1      A.    During the contract, yes.

2      Q.    So the DMEA program wrapped up in June of

3   1960.

4            Does that sound right?

5      A.    Yes.

6      Q.    And at the conclusion of the program, and

7   we have already seen these documents in court, both

8   Molycorp and the DMEA submitted final reports

9   documenting the discovery that had been made as part

10   of the program?

11      A.    Yes.

12      Q.    And the DMEA's final report, wouldn't you

13   agree, recognized that, "it did recognize that

14   considerable exploration will still have to be done

15   before completed evaluation of the molybdenum

16   reserves and potential for this property can be

17   made."

18            Right?

19      A.    Yes.

20      Q.    And that was your point earlier, in an

21   early stage of a project, you may not yet know

22   enough to say we have got ore?

23      A.    Right.

24      Q.    Okay.  Nonetheless, the DMEA's final

25   report, the technical experts did recommend that,

1    "Because of the significant tonnage of potential

2    molybdenum ore found as a result of the exploration

3    carried out under the contract, it is recommended

4    that the property be certified as a discovery"?

5        A.    Yes.

6        Q.    That is what they reported.   Okay.

7              And as we have discussed in court, in

8    January of 1961, the Federal Government did, in

9    fact, certify a discovery?

10       A.    Yes.

11       Q.    Okay.

12             MR. TODD:   Could we bring up CX113,

13   please.

14             I am not sure we have actually shown the

15   certification yet, Your Honor, but here it is.

16       Q    (By Mr. Todd) Dr. Quivik, this is the

17   Federal Government's certification of the discovery

18   at Questa.

19       A.    Yes.

20       Q.    Okay.  And you noted earlier that the

21   Government wants this certification for its own

22   internal purposes but you would also agree that

23   simple common sense suggests that with a

24   certification like this in hand, a mining company is

25   more likely to be able to borrow money than without

1    such a thing, right?

2        A.    This would be a nice document to have when

3    approaching a bank or other finance.

4        Q.    With the certification in hand, Molycorp

5    did, in fact, borrow money for further exploration

6    and delineation of the ore body at Questa, right?

7        A.    Yes.

8        Q.    In fact, and I think you noted this in

9    your testimony, this ability to borrow was critical

10   because Molycorp heavily financed the program,

11   putting in very little of its own capital, right?

12       A.    That is right.

13       Q.    And Molycorp used the funds it borrowed to

14   delineate the ore body, right?

15       A.    Yes.

16       Q.    And you are not aware, Doctor, of any

17   document that indicates definitively that Molycorp

18   would have spent millions of dollars to delineate

19   the ore body if it had not already had the body of

20   knowledge developed during the DMEA program?

21       A.    I can't say that they would have, but I

22   should add that I take issue with the idea that they

23   would not have, and three of Chevron's witnesses

24   have made the point that they would not have but for

25   the DMEA program.

1          And we have some testimony yesterday that

2    suggested the best place to drill for oil is in an

3    oilfield and mining companies knew that that was the

4    case.  If Molycorp didn't want to, other mining

5    companies could very well have been interested in

6    doing that.

7          And we have Dr. Rigby's testimony that

8    options available to Molycorp could have been

9    entering a joint venture or I believe he made one

10   other option that was possible, but for instance,

11   Molycorp could have sold the property to another

12   mining company.

13         So I think it is impossible to say

14   definitively that that discovery would not have been

15   made absent the DMEA loan.  As an historian, I can't

16   say that it likely would have but I think the

17   chances are pretty good, given mining history in the

18   United States.

19   **Q.   As an industrial historian, you can't**

20   **testify definitively either way?**

21   A.   I can say that testimony saying that they

22   definitely would not have, cannot be supported by

23   the evidence.

24   **Q.   You can't say definitely would not have or**

25   **definitely would have?**

Page 534

1    A.    I am not saying definitely would have, I

2  am saying definitely would not have.

3    **Q.    As an industrial historian, you can't say**

4  **definitively either way?**

5    A.    Right.  But I am suggesting that there is

6  a very good likelihood that it would have been

7  discovered.

8    **Q.    You are speculating it might have been.**

9    A.    Right, I am speculating.

10   **Q.    Through its exploration, Molycorp then**

11  **moved from having indicated ore, which is the term**

12  **the DMEA used, to ultimately having reserves at**

13  **Questa?**

14   A.    Yes.

15   **Q.    And it then spent tens of millions of**

16  **dollars more to build the mill, the infrastructure**

17  **and developed the open pit for production, right?**

18   A.    Yes, based on a sequence of events that

19  discovered material that was not at all exploratory

20  with the DMEA.

21   **Q.    Right.**

22        **We're following the causal chain across**

23  **time?**

24   A.    Yes.

25   **Q.    Okay.  And you agree that -- you would**

1    agree that Molycorp would not have spent this

2    additional money without having confirmed reserves?

3         A.    Correct.

4              And it wouldn't have if it had decided to

5    ignore the discovery of low-grade ore bodies and

6    insisted on looking for high-grade material as well.

7    That was always an option for Molycorp.

8         Q.    Looking for more high-grade?

9         A.    Yeah, uh-huh.  If they were so intent on

10   that.  They could have ignored this discovery and,

11   you know, continued looking for high-grade.

12        Q.    Fair point.

13              But they didn't, and here we are.

14        A.    Yeah, correct.

15        Q.    Let me shift gears to the tailings

16   pipeline and the impoundment, and I have just a few

17   questions on this for you.

18              In your questioning, you talk about the

19   tailing pipeline, the special use permits and the

20   impoundments.

21              Obviously, the open pit began production,

22   Molycorp immediately, to dispose of the waste rock

23   and the tailings, right?

24        A.    Yes.

25        Q.    And Molycorp used an approximate 9.5 mile

Page 536

1   long pipeline to move tailings down to the

2   impoundments that we saw earlier in Ms. Sitton's

3   testimony?

4       A.    Right.

5       Q.    And the Forest Service, as you know,

6   issued Molycorp a special use permit to operate that

7   pipeline.

8       A.    To occupy that ground to operate it, yes,

9   sir.

10      Q.    Because about half the distance, about

11  half of that 9.5 miles was Forest Service land,

12  right?

13      A.    Right.

14            And the rest went across various other

15  kinds of land, including private land.

16      Q.    Precisely.

17            I think somewhere in the record there is a

18  picture of the pipeline going right past the ranger

19  station?

20      A.    Yeah.

21      Q.    There is pipeline and there is the ranger

22  station?

23      A.    Yeah.

24      Q.    So the ranger knew about the pipeline?

25      A.    Yeah.

1    Q.    Okay.  And the Forest Service has

2  acknowledged that, in its sworn testimony that has

3  been admitted in evidence in this case, that issuing

4  these special use permits was a discretionary act of

5  the Government.  Forest Service personnel were not

6  required to grant them.

7          You don't agree with that testimony, do

8  you?

9    A.    No.

10   Q.    Okay.  And you would agree that without

11 this special use permit, Molycorp would not have

12 been able to run the pipeline across Federal land?

13   A.    Correct.

14   Q.    And without the pipeline, Molycorp would

15 not have been able to operate the mill?

16   A.    It needed a place to put tailings, so it

17 would have needed to convey tailings in some

18 direction or another with the pipeline, yes.

19   Q.    Without the mill the mine wouldn't

20 operate?

21   A.    Correct.

22   Q.    Molycorp purchased the land for the

23 western impoundments in --

24   A.    May I finish?  Just a closing remark.

25   Q.    I thought you were done.

Page 538

1      A.     The one thing that is missing is any

2  suggestion if it were a discretionary act on the

3  part of the Forest Service, on what basis the Forest

4  Service would have denied that special use permit.

5  And I have seen no suggestion of why the Forest

6  Service should have done so.

7      **Q.     Well, the testimony from the Forest**

8  **Service is that this is a discretionary act that**

9  **could be granted or revoked in the discretion of the**

10  **Forest Service.**

11          **You wouldn't disagree with the Forest**

12  **Service sworn testimony, do you?**

13      A.     No.  All I am saying is that I'd like to

14  see a reason why, if it is discretionary, they

15  should have other than arbitrarily denying it.

16      **Q.     The --**

17          THE COURT:  And they would never do

18  anything arbitrarily.

19          MR. TODD:  I would like to think so.

20          Mr. Fredley testified yesterday, Your

21  Honor, that Federal agencies always act in the

22  public interest.

23          THE COURT:  Not always.

24          MR. TODD:  I may not suggest that as a

25  finding of fact.

1      Q     (By Mr. Todd) Molycorp, Dr. Quivik,

2  purchased the land for the western impoundment from

3  the United States in 1966?

4      A.    Correct.

5      Q.    And in deciding to sell the land to

6  Molycorp for use of a tailings pond, the

7  United States took into account the positive

8  economic benefits that the Questa Mine would have on

9  Northern New Mexico, right?

10     A.    That was one of the factors, you know,

11 checking off all of the factors they had to look at

12 to see whether such a sale was allowable under the

13 law for selling public land.

14     Q.    You have reviewed the appraisal report

15 that ultimately concludes, as we have heard this

16 morning, that the sale of the land to Molycorp for

17 use as a tailings pond was the highest and best use

18 of the land.

19            You have reviewed that document?

20     A.    Yes.  But I think people oftentimes think

21 industrial uses are higher uses than grazing, for

22 instance.

23     Q.    Okay.  And in that document -- I can pull

24 it up if we need to, but I am trying to move us

25 along -- the Government did note that expansion of

Page 540

1    the diamond mine would be a major economic benefit

2    to the area and noted that the land is great,

3    indeed, for a tailings pond, right?

4        A.    Correct.

5        Q.    And the appraisal noted that this area of

6    New Mexico has been generally economically depressed

7    for many years, right?

8        A.    Yes.

9        Q.    And it noted that Federal and state

10   officials are making a concerted effort to find

11   means of stimulating the economy, right?

12       A.    Yes.

13       Q.    The appraiser noted the number of

14   employees who may be hired, salaries that may be

15   paid and, you know, the general economic stimulus,

16   right?

17       A.    Yes.

18       Q.    As we noted, concluded that the sale was

19   the highest and best use of the land?

20       A.    Yes.

21       Q.    Okay.  Let's shift gears now to the land

22   exchange.

23       A.    Before we do, one other thing that I think

24   is worth noting is that in looking at the procedure

25   the BLM went through in selling that land, I see

Page 541

1  nothing to indicate that the BLM did anything

2  extraordinary because in addition to all the other

3  things, it would benefit the economy of Northern

4  New Mexico.

5         So that was not, as far as I can see, the

6  driving factor had that -- had this been a

7  prosperous area, there is every reason to believe

8  that the BLM would have made the sale anyhow.  It

9  met all the criteria.

10    **Q.    Okay.  But be that as it may, everything**

11  **that I just went through is in that appraisal**

12  **report, right?**

13       A.    That is correct.

14            MR. TODD:  And for the record, that is

15  Chevron Exhibit 158, Your Honor, which is already in

16  evidence.

17    **Q    (By Mr. Todd) Now let's talk about land**

18  **exchange, which, as Mr. Dewey testified, is why we**

19  **are here today.**

20         **In your testimony, Dr. Quivik, you state**

21  **that Molycorp owned all the land in which Molycorp**

22  **operated its first underground mine, its open pit**

23  **mine and its second mine, the block cave mine.**

24         **Is that your understanding?**

25       A.    Yes.

Page 542

1      Q.    And you also testify that you have seen no

2  evidence that the United States imposed requirements

3  on where Molycorp is supposed to waste?

4      A.    Correct.

5      Q.    Now, you do understand that most of the

6  land on which the Questa Mine was developed was

7  originally owned by the United States?

8      A.    Yes.

9      Q.    And you do understand that, at different

10  times, Molycorp undertook exploration activities on

11  land that was still owned by the United States?

12     A.    Land over which Molycorp had mining

13  claims, so it was acting legally.

14     Q.    Okay.  Right.

15          But that is still land that is owned by

16  the U.S.  It has --

17     A.    U.S. has title but Molycorp owned the

18  claims to those, owned all of the other property

19  rights.

20     Q.    We can leave it to the Tenth Circuit,

21  Doctor, to determine whether having title over land

22  makes you an owner of that land --

23     A.    Right.

24     Q.    -- and I think they have already resolved

25  that issue, but you can maintain that distinction.

Page 543

```
 1        A.     Right.

 2        Q.     You also understand that from time to time

 3   Molycorp engaged in mining activities, including

 4   drilling and tunneling on lands that were at the

 5   time still owned by the Federal Government or as you

 6   would like to say, to which the Federal Government

 7   still owned title?

 8        A.     Yes.

 9        Q.     And operated tailings pipelines across

10   Federal land?

11        A.     Yes, Forest Service land.

12        Q.     And disposed of waste rock on lands owned

13   by the Federal Government?

14        A.     Yes.

15        Q.     Now, on Monday His Honor asked --

16        A.     The Government owned title, yeah.  They

17   owned it, almost sounds like you are trying to

18   suggest that Molycorp was somehow breaking the

19   law --

20        Q.     No.

21        A.     -- putting rock on --

22        Q.     Not at all.

23               The question here is the implication of

24   the ownership.

25        A.     Uh-huh.
```

Page 544

1      Q.     On Monday His Honor asked Mr. Dewey, when

2  he was testifying, about the placement of waste rock

3  on lands still owned by the United States.

4      A.     Yes.

5      Q.     And you would agree, would you not, that

6  the fact is that most of the waste rock at Questa

7  was placed on land when it was still owned by the

8  Federal Government, right?

9      A.     I have seen those analysis and I have not

10  conducted my own analysis.

11      Q.     Okay.

12      A.     So I am taking those analysis as accurate.

13  I will agree with them.

14      Q.     Okay.

15             MR. TODD:  Let's pull up Paragraph 52,

16  please, of Dr. Quivik's testimony.

17      Q      (By Mr. Todd) This is your sworn testimony

18  in this case, again, which I think answers His

19  Honor's questions.

20             "Most of the waste rock that Molycorp

21  generated and disposed of at the Questa site had

22  already been placed on the selected lands

23  (previously encumbered by Molycorp unpatented mining

24  claims), by the time the land exchange was completed

25  in 1974.  Molycorp's general manager at the time

Page 545

1  testified that in 1974 the waste-rock piles had

2  grown to approximately 80 percent of the size they

3  would eventually reach."

4         Did I read that correctly?

5  A.   Yes.

6  Q.   And that is your sworn testimony in this

7  case?

8  A.   Yes.

9  Q.   And you would agree, would you not, sir,

10  that, with respect to the land from the Federal

11  Government, that ultimately hosted the mine, that

12  all came through patenting, sales and land

13  exchanges?

14  A.   Yes.

15  Q.   So let's talk -- let's focus in now on the

16  big land exchange.  There was more than one, but the

17  big one consummated in 1974.

18         You are familiar with that?

19  A.   Yes.

20  Q.   Okay.  And Molycorp -- well, as we heard

21  in prior testimony, the discussions around that

22  started in January of '69, right?

23  A.   Yes.

24  Q.   Okay.  But Molycorp submitted a formal

25  application for the --

Page 546

1      A.      Excuse me, discussions around just

2  narrowed on the land exchange, the possibility of

3  land exchange.

4      **Q.      The possibility that excluded the**

5  **possibility of land exchange?**

6      A.      Right.  The discussions for looking for

7  ways to acquire rights to dump waste rock, as I

8  recall, started in '68 with the inquiry about a

9  special use permit.

10     **Q.      That is good of you to recall that**

11 **testimony.**

12             **And then Mr. -- I forget if it was Mr. --**

13 **Dr. Rigby or Dr. Fredley noted that there may have**

14 **been some discussions earlier in time about land**

15 **exchange.**

16             **But in any event, we have seen there was**

17 **the January '69 meeting between Molycorp and the**

18 **Forest Service --**

19     A.      Yes.

20     **Q.      -- where we have some documentation of a**

21 **suggestion of a land exchange?**

22     A.      Yes.

23     **Q.      So thereabouts.**

24             **Molycorp submitted a formal application**

25 **for that exchange in November of '69?**

Page 547

```
 1        A.    Right, correct.

 2        Q.    And prior witnesses have described the

 3   circumstances leading up to the land exchange and so

 4   just as a general matter, could let us set up,

 5   Molycorp had discovered a bit of weakness in the

 6   west wall, required the removal of a lot more

 7   overburden, increased stricken ratio, a lot more

 8   waste rock to dispose of, hence, the need for a lot

 9   more land?

10        A.    Right, yes.

11        Q.    And in your testimony, you note that

12   Molycorp alone -- and this is your testimony,

13   Molycorp alone made the decision to keep operating,

14   right?

15        A.    Yes.

16        Q.    Okay.  And you testified the Government

17   had nothing to do with that decision?

18        A.    Correct.

19        Q.    Okay.  Now, Molycorp was aware -- I'm

20   sorry.  The Government was aware of Molycorp's need

21   for additional land to dispose of this additional

22   waste rock, right?

23        A.    Yes.

24        Q.    And in all of those years, in those years,

25   you are not aware of any evidence that the
```

Page 548

1    Government recommended or told Molycorp you need to

2    cease operating, right?

3        A.    Correct.

4        Q.    Okay.  Instead, the United States

5    ultimately provided more land to Molycorp to place

6    that waste rock, right, through the land exchange?

7        A.    Offered one avenue for Molycorp to obtain

8    title, knowing that Molycorp could obtain title by

9    staking mill site claims.

10            So knowing that under the Mining Law

11   Molycorp could get that land and recognizing that

12   the mill site option was the one by which they would

13   be able to do it.

14            So they offered the land exchange option

15   as one that would be beneficial to both parties.

16       Q.    Right.

17            So to clarify, and this is in your direct

18   testimony, in the Government's view, Molycorp had a

19   right under the Mining Laws to stake mill site

20   claims and use those for waste-rock disposal, right?

21       A.    Yes.

22       Q.    And instead, the Government proposed the

23   land exchange?

24       A.    Yes.

25            MR. TODD:  Let's pull up, please, CX212.

Page 549

1    No, that is not it.  Let's try 211.  210.

2              If I just kept going, I would have got

3    there.

4        Q    (By Mr. Todd) You have seen this document

5    before, right, Dr. Quivik?

6        A.   Yes.

7        Q.   This is an attendee list from this January

8    meeting and some notes by Jack Watson, Molycorp's

9    lawyer?

10       A.   Yes.

11       Q.   And the list notes the attendees attending

12   for Molycorp were Messers. Greslin, Lansing, Watson,

13   Torgerson and Crimes, right?

14       A.   Yes.

15       Q.   And for the Forest Service, Mr. Taylor,

16   Mr. Ashby, Mr. Taylor and Mr. Parde?

17       A.   Correct.

18       Q.   Now, the Forest Service is the lowest

19   level of district; is that right?

20       A.   Yes.

21       Q.   The Federal District Ranger, Mr. Hart, he

22   is the local guy for Molycorp?

23       A.   Yes.

24       Q.   And then above that, above the district,

25   is a forest, right?

Page 550

```
 1       A.    A National Forest, yes.

 2       Q.    Here it is, the Carson National Forest?

 3       A.    Yeah.

 4       Q.    And then above the forests, the number of

 5  forest aggregated into a region right?

 6       A.    Correct.

 7             And here we are talking about Region 3,

 8  which is headquartered in Albuquerque, right?

 9       A.    Yes.

10       Q.    So this meeting wasn't taking place at the

11  local district or the forest, it was down here in

12  Albuquerque at the regional level?

13       A.    Correct.

14       Q.    And Mr. Taylor, according to the Forest

15  Service, I don't know if you actually know this, was

16  responsible for the -- he was the branch chief

17  responsible for land management across Region 3?

18       A.    Yes.

19       Q.    Okay.  And Mr. Parde was the chief mineral

20  examiner for Region 3, is that right?

21       A.    I forget his title.  That may be true.  I

22  remember Harvey -- Harv Ashby as a mineral examiner,

23  but I don't recall Parde's title.  That may be

24  correct.

25       Q.    And do you know whether Mr. Cutler was an
```

Page 551

1    **Assistant Regional Forester?**

2         A.    I don't recall his title either.

3               MR. TODD:   I think those titles are shown

4    on CX211.

5               Can we just pull that up.

6               We can move on.   That is not

7    consequential.

8         **Q**    **(By Mr. Todd) This meeting happening in**

9    **Albuquerque, is it a significantly, relatively**

10   **senior level within the Forest Service, right?**

11        A.    It looks like it, yeah.

12        **Q.**    **And a meeting like this -- well, as we**

13   **discussed at your deposition, Molycorp would have**

14   **met with the region because they were facing a**

15   **serious challenge, right?**

16        A.    Yes.

17        **Q.**    **Disposing of a larger volume of waste**

18   **rock, whether or not they had a right to, would have**

19   **a significant impact on Forest Service land and**

20   **Molycorp was being mindful of the Forest Service's**

21   **reaction, would you agree?**

22        A.    Yes, they had been working cooperatively

23   for decades.

24        **Q.**    **And there is a lot in the record that**

25   **documents that good relationship; is that right?**

Page 552

1        A.    Yes.

2        Q.    And it is nice to see that.

3              And so Molycorp came to Albuquerque, the

4     regional headquarters, to discuss possible ways of

5     finding land to dispose of this larger volume of

6     waste rock?

7        A.    Yes.

8        Q.    Now, a meeting at the region, and I don't

9     know your experience, I worked for the Federal

10    Government for a little while, and maybe I am just

11    channeling my experience, the meeting with senior

12    Government officials don't just spring forth, they

13    take some planning, right?

14       A.    Yes.

15       Q.    Particularly when you have got, you know,

16    several people here, four, five people on both

17    sides, all relatively senior, right?

18       A.    Yes.

19       Q.    And advanced planning would probably

20    include subjects to be discussed and who would

21    attend, right?

22       A.    Yes.

23       Q.    Now, according to the Forest Service's

24    sworn testimony in this case, Mr. Taylor had no

25    responsibility for the Questa operation himself.

1          Do you know if that is true?

2     A.    I don't know that.

3     Q.    Do you have any basis to disagree with the

4 Forest Service's testimony?

5     A.    No.

6     Q.    The testimony suggests that he was

7 responsible for land exchanges.

8          Do you know -- do have any reason to doubt

9 that?

10    A.    No.

11    Q.    Okay.  And a former Forest Service

12 employee, who was deposed in this case, Mr. Roy

13 Grande, testified that Mr. Cutler handled all large

14 land exchanges.

15          Have you reviewed his deposition?

16    A.    I have.  I don't remember that he

17 specified Cutler but I will take your word for it.

18    Q.    You don't have any reason here and now to

19 disagree with that, do you?

20    A.    No.

21    Q.    So the Government --

22          MR. TODD:  Could we pull back up the 210?

23 Thanks.

24    Q   (By Mr. Todd) So looking at the bottom of

25 the list, they showed up with a team of folks who

Page 554

1    were ready to talk land exchanges.

2         A.    Yes.

3         Q.    Now, we know from Mr. Watson's notes at

4    the meeting, that Mr. Taylor, for the Forest

5    Service, suggested that the U.S. and Molycorp engage

6    in land exchange?

7         A.    Yes.

8         Q.    And Mr. Watson's notes record that

9    Molycorp agreed to prepare a description of the

10   lands that Molycorp wanted to receive and they would

11   provide that description to the Forest Service,

12   right?

13        A.    Yes.

14        Q.    And the Forest Service would then appraise

15   the land and make suggestions for the exchange?

16        A.    Yes.

17             MR. TODD:  Let's pull up 212, now, please.

18        Q    (By Mr. Todd) In February -- we saw this

19   document yesterday.

20             In February of -- February 20th of 1969,

21   Mr. Watson wrote to Mr. Taylor, following up on the

22   January 28th meeting -- and you have seen this

23   letter before, right?

24        A.    Yes.

25        Q.    And Mr. Watson identified land that

Page 555

1     Molycorp might want in an exchange?

2         A.    Yes.

3         Q.    And as per the meeting notes, he was

4     providing a description so the Government could

5     appraise the land, right?

6         A.    Yes.

7         Q.    And that is a requirement for an exchange,

8     right, appraisals and value for value?

9         A.    Yes.

10        Q.    And Mr. Watson also asked the Government

11    to confirm that it would identify parcels of private

12    land for Molycorp to buy land to trade to the

13    Government for the lands Molycorp wants, right?

14        A.    Yes.

15        Q.    Now, ultimately, as it turned out,

16    Molycorp suggested lands that it had an option on?

17        A.    Offered lands, yes.

18        Q.    Offered lands.  I always get offered and

19    selected confused, so I try really hard not to use

20    them.

21              And part of the process, the exchange

22    process, the Forest Service did a survey, the

23    offered and the selected lands?

24        A.    Yes.

25        Q.    I can use them both together.

1     A.    Excuse me?

2     Q.    I can use both terms together.

3           And the surveys confirmed that the land

4  that were going to be given to Molycorp were

5  non-mineral, right?

6     A.    Yes.

7     Q.    And the regional forester here, this would

8  be Region 3 here in Albuquerque, found that the land

9  exchange was in the public interest?

10    A.    Yes.

11    Q.    Okay.  Now, you would agree, would you

12  not, Dr. Quivik, that the United States benefited

13  from the land exchange?

14    A.    If it was in the public interest, then,

15  yes.

16    Q.    In exchange for the lands given to

17  Molycorp, the United States received two parcels of

18  land, right?

19    A.    Yes.

20    Q.    And those two parcels encroached on Forest

21  Service land, right?

22    A.    I have heard the term "in holding."  They

23  were surrounded by Forest Service land, and so they

24  were within the boundaries of the National Forest

25  but they were private land.

1    Q.    And when -- and this is a matter of,

2  again, first year property law for a law student,

3  but when a landowner holds land that is surrounded

4  by Forest Service land, the Forest Service has to

5  support that private land, right?

6    A.    Yes.

7    Q.    By allowing access and utilities and such,

8  right?

9    A.    That is my understanding.

10   Q.    So the Forest Service likes to close up

11 those gaps?

12   A.    Yes.

13   Q.    So that was a benefit here?

14   A.    Right.  And that was the purpose of the

15 1922 Land Exchange Act to do that sort of thing.

16   Q.    Great.

17         And the Government typically has an idea

18 whether it is a map in the office or whatever, but

19 they know where these parcels are and would like to

20 get them?

21   A.    Presumably.

22   Q.    The Forest Service also benefited from

23 transferring the selected lands to Molycorp, right?

24   A.    Well, it -- those were lands that the

25 Forest Service couldn't really manage because they

Page 558

1   had been covered with mining activity and so, in

2   exchange, the Forest Service got land that it could

3   administer as national forestry.

4       Q.    And when you say they have been covered by

5   mining activity, they had been covered in some form

6   by waste rock, right?

7       A.    Yeah, by mining activity.

8       Q.    The Government also benefited, I think you

9   would agree, by alleviating itself of any need to

10  administer those acres?

11      A.    Yes.

12      Q.    And the Government officials avoided the

13  workload of having to process a bunch of individual

14  mill site claims?

15      A.    Correct.  As did -- as Molycorp.

16      Q.    Okay.  Now the Forest Service has

17  testified in this matter and submitted sworn

18  deposition testimony that it executed the land

19  exchange to transfer away lands that no longer

20  served Forest Service purposes.

21           Do you dispute that testimony?

22      A.    No.

23      Q.    Now, the purpose of the land exchange was

24  to provide land to Molycorp for use for waste-rock

25  disposal?

1      A.    To provide an alternative means for

2  Molycorp acquiring title to that land.

3      **Q.    Okay.  So that is a, yes, I think?**

4      A.    It is a yes, but they didn't just walk up

5  and say, Hey, we will give you some land so you can

6  dump stuff on it.  They were already using it.  They

7  had the rights to use it.  Could have gotten it as

8  mill site claims.  So the Forest Service was

9  offering an alternative means of getting title to

10  that.

11     **Q.    Let me phrase it this way, then.**

12            **The Forest Service knew what Molycorp's**

13  **plan was for the land, right?**

14     A.    Yes.

15     **Q.    That they would dispose of waste rock on**

16  **it?**

17     A.    Yes.

18     **Q.    And specifically, we're talking, the land**

19  **exchange was a big area but we are specifically**

20  **talking the slopes on the north side of the Red**

21  **River Valley where the three large rock piles stand**

22  **today, correct?**

23     A.    Yes.

24     **Q.    As part of the land exchange, the Federal**

25  **Government, the Forest Service in particular,**

Page 560

1    undertook an environmental assessment weighing the

2    pros and cons of the proposed exchange and

3    ultimately recommended it, right?

4        A.    Correct.

5              MR. TODD:  Let's take a look at CX281.

6    And again, we have seen this document before.

7        Q    (By Mr. Todd) Dr. Quivik, you have reviewed

8    this document, right?

9        A.    Yes.

10       Q.    It's discussing a lot of things, right?

11       A.    Yes.

12       Q.    One of the things it discusses at some

13   length are the economic benefits that the Questa

14   Mine provided to Northern New Mexico, right?

15       A.    Yes.

16       Q.    The report discusses how economically

17   beneficial Molycorp had been up to that point for

18   the Town of Questa, right?

19       A.    Yes.

20       Q.    And for Northeast New Mexico, generally?

21       A.    Yes.

22       Q.    It noted that Molycorp was the largest

23   employer in Northern New Mexico?

24       A.    Yes.

25       Q.    It discusses the positive economic impacts

Page 561

1    on Taos County, more generally?

2         A.    Yes.

3         Q.    It notes for the Town of Questa benefits

4    such as a new school, incorporation of the town, a

5    police department, a fire department, modernized

6    homes, those kind of things, right?

7         A.    Yes.

8         Q.    It also notes that the mine is supplying a

9    needed mineral resource for the nation?

10        A.    I don't recall those words, but I will

11   take your word for it.  I wouldn't be surprised.

12        Q.    Okay.  I can pull it up for you.  It is in

13   the record.

14        A.    Okay.

15        Q.    Now, we saw back in that January '69

16   meeting that the Forest Service has to appraise the

17   selected lands before providing them to Molycorp,

18   right?

19             MR. TODD:  Could we pull up, please,

20   CX259.

21        Q    (By Mr. Todd) Dr. Quivik, you recognize

22   this document as the appraisal of the exchange

23   lands?

24        A.    Yes.

25             MR. TODD:  Could we go to Page 3, please.

Page 562

1              If you would just call out the numbered

2    list at the top there.

3              This is a list to, quote, "Summary and

4    Facts and Conclusions."

5              Do you see that?

6    A.    Yes.

7    **Q.    Dr. Quivik, who does this document state**

8    **is the owner of the selected lands?**

9    A.    Number one, the United States.

10   **Q.    And what did the appraiser conclude was**

11   **the highest and best use of this land?**

12   A.    Open pit mine dump.

13   **Q.    And the appraiser recommended that this**

14   **land be provided to Molycorp for that purpose,**

15   **right?**

16   A.    Yes.

17   **Q.    Okay.  Thank you.**

18   **          Okay.  Last topic.**

19   **          In your testimony, Dr. Quivik, you tell**

20   **the Court that after the discovery of the geological**

21   **weakness in the west wall of the open pit, you see**

22   **no evidence that the United States approved**

23   **Molycorp's revised mining plan in 1969 and that**

24   **Molycorp alone decided to keep mining with an**

25   **increase in stripping ratio.**

Page 563

1          Do you recall that testimony?

2     A.    Yes.

3     Q.    Now, through the land exchange, as we have

4  discussed, the U.S. provided land to Molycorp for

5  the placement of waste rock, right?

6     A.    Yes.

7     Q.    And you agree that without a place to

8  place the waste rock, the mine would have had to

9  shut down, right?

10     A.    Yes.

11     Q.    Now, the land exchange, as I think you

12  have already intimated, was not Molycorp's preferred

13  approach in January of '69, right?

14     A.    Well, they were exploring mill site

15  claims.

16     Q.    Right.

17     A.    The Forest Service informed them that mill

18  site claims would be an option -- excuse me, a land

19  exchange would be an option to mill site claims.

20     Q.    That meeting in January of '69, Molycorp

21  proposed to locate mill sites crossing the road on

22  the river and to use them to construct a waste drop

23  dump across the valley, right?

24     A.    Yes, that is a separate issue, and the two

25  should not be conflated.

Page 564

1      Q.      **The land exchange and the mill site plan?**

2      A.      No, the land exchange and where to place

3      the rock.

4      Q.      **I am not sure I follow you, but I am going**

5      **to keep going.**

6              **Okay.  But you don't --**

7      A.      Excuse me, how to acquire land to place

8      waste-rock dumps and where to place the rock

9      should -- those two should not be conflated.

10     Q.      **That is fair, because you could get land**

11     **and not put rock on it.**

12     A.      Right.

13             And there were a variety of places that

14     were potential for placing the rock, and one of

15     them, an idea that Molycorp floated, was to fill the

16     Red River Canyon with waste rock.  And a separate

17     issue was how was Molycorp going to gain title to

18     the land where it placed the waste rock.

19             So we have got lots of correspondence

20     about those possibilities but we have almost no

21     concrete record of what might have been entailed in

22     the idea, the concept of dumping waste rock in the

23     canyon.

24             And we don't really know how Molycorp

25     proposed to acquire land across -- across the river

Page 565

1    from its mining operation.

2         Q.    Okay.  Well, I suspect we are going to

3    unpack all of that as we go through here.

4              Let's start with mill site claims.

5              A mill site claim is a type of claim that

6    could be located under the Mining Law of 1872,

7    right?

8         A.    Yes.

9         Q.    And it doesn't host mining itself, but

10   rather, it hosts activities that support mining on a

11   mining claim?

12        A.    Correct.

13        Q.    And those support activities could include

14   milling, roads, other support services, right?

15        A.    Yes.

16        Q.    And as you admitted forthrightly earlier,

17   it could include waste-rock storage, correct?

18        A.    Yes.  Or dumping.

19        Q.    Or dumping.

20              And a mill site claim can be patented in

21   the same manner as an unpatented mining claim can,

22   right?

23        A.    A similar procedure, a different set of

24   boxes that would have to be checked before a patent

25   can issue.

1    Q.    That is a very fair answer.

2          What I meant was, an unpatented mill site

3    claim can be patented and converted to prior -- to

4    private ownership?

5    A.    Yes.

6    Q.    Right.

7          Just as an unpatented mining claim can be

8    patented and converted to private ownership?

9    A.    Yes.

10   Q.    Now, the January 1969 meeting, in your

11   testimony you characterized this as, "Nothing more

12   than a preliminary conversation about an idea

13   Molycorp then chose not to pursue."

14         And you also call it, "a verbal exchange

15   of preliminary ideas."

16         That is your testimony?

17   A.    That is all we have a record of, is the

18   verbal exchange, yes.

19   Q.    Okay.  That is what there is a record of?

20   A.    Yes.

21   Q.    Okay.  Now, you don't actually know,

22   sitting here today, how detailed Molycorp's

23   presentation actually was, right?

24   A.    No.

25   Q.    You don't know whether Molycorp used any

Page 567

1    documents in making its presentation?

2         A.    No.

3         Q.    You don't know what documents were

4    prepared or in what level of detail, right?

5         A.    That's correct.

6         Q.    Okay.  You don't know how long the parties

7    discussed the idea, right?

8         A.    Right.

9         Q.    You don't know how long the meeting

10   lasted?

11        A.    Correct.

12        Q.    And you don't know how vigorous the debate

13   was?

14        A.    Correct.

15        Q.    That is what we don't know --

16        A.    We don't even know if there was a debate.

17        Q.    Well, I think the meeting notes suggested

18   that there was some debate, but let's move on.

19              Let's review what we do know.

20              We do know that Molycorp, at least, made a

21   proposal to the Forest Service that it would locate

22   mill site claims, that came down the Red River

23   Valley and extended across the road in the bottom of

24   the valley, right?

25        A.    Across the road and across the river to

Page 568

 1   the south side of the river.

 2        Q.    To the other side?

 3        A.    Yes.

 4        Q.    Okay.  And we know that Molycorp proposed

 5   to use those lands for waste-rock disposal?

 6        A.    Yes.

 7        Q.    And we know that Molycorp proposed to

 8   protect the road and the river using culverts or

 9   tunnels, right?

10        A.    We know that from other documents, not

11   from those handwritten notes.

12        Q.    We know that from the Forest Service's

13   written account of the meeting prepared later,

14   right?

15        A.    Yes.

16        Q.    And we know that Molycorp proposed to

17   construct across these culverts using -- using waste

18   rock, a bridge that would provide access to the

19   other side of the valley, right?

20        A.    Yes.

21        Q.    And we know that the area under potential

22   consideration ran roughly from the location of the

23   mill site down to Columbine Canyon, right?

24        A.    Yes.

25        Q.    And as Dr. Rigby testified yesterday,

1   maybe it is the whole space, maybe it is less, just

2   depending on what the ultimate plan was?

3       A.   Yes.

4       Q.   We know that Mr. Torgerson was Molycorp's

5   chief engineer, right?

6       A.   Yes.

7       Q.   And we know that Mr. Torgerson would have

8   been responsible for overseeing the locating of the

9   mill site claims and the design and engineering of

10  the rock pile, right?

11      A.   Yes.  You know, engineers like him, at

12  different times, I am not sure who would have been

13  in charge, but he was up there, yes.

14      Q.   I can pull up your deposition testimony,

15  if you would like.  It is what we agreed at your

16  deposition.

17      A.   Yes.

18      Q.   Okay.  And we know from Mr. Dewey's

19  testimony that Mr. Torgerson prepared some drawings

20  or schematics, they unfortunately haven't survived

21  to this day, right?

22      A.   I heard that testimony.

23      Q.   Okay.  But, we did see yesterday, in fact,

24  the Government used a map of the potential mill site

25  claims, right?

Page 570

1     A.    Yes.  They had -- but those were mill site

2  claims only on the north side of the river.  So they

3  didn't address the idea of filling the Red River

4  Canyon with waste rock.  They were only for

5  acquiring the land where the current -- basically

6  where the current waste dumps sit.

7     Q.    We can pull it up, if you would like.

8           Those claims do extend across the road to

9  the bottom of the valley, right?

10    A.    To the bottom but not across.

11    Q.    We will get there.  We will get to it in a

12  minute, I assure you.

13          You're not in a position to contradict

14  Mr. Dewey's recollections, are you?

15    A.    I wasn't there.

16          MR. TODD:  And well, let's pull up that

17  map, please, now.  It is CX216.

18          And let's go to the map, which I think is

19  the third page.

20          And, Patty, can you blow up maybe that

21  area right there?

22    Q    (By Mr. Todd) Dr. Quivik, do you see the

23  southern extent of the mill site claims?

24    A.    I do.

25    Q.    Do you see the R38?

1      A.    Yes.

2      **Q.    The mill site claims extend slightly past**

3  **the R38, right?**

4      A.    Yes.

5      **Q.    The river is right next to the road,**

6  **right?**

7      A.    Yes.

8      **Q.    I think they are not both shown clearly**

9  **here.**

10          MR. TODD:  We can put that down, thanks.

11     A.    Wait.  May I talk about it some?

12     **Q    (By Mr. Todd) Sure.**

13     A.    This is a sketch map, a sketch drawing to

14  suggest a concept, an idea, and the amount of land

15  that is south of the highway is very small and could

16  accommodate a very small amount of waste rock had

17  they planned to dump it right there.

18          And so that drawing could as easily

19  reflect what it does so that the southeastern

20  border, I will call it, is -- doesn't cover up the

21  road so that everyone can see the road.

22     **Q.    Your speculation, looking at this, is that**

23  **they drew the mill site claims past the road just so**

24  **we can see the road?**

25     A.    Yes, so we can see where the road is and

1    not to obfuscate the road.

2        Q.    **This area of the land to the south of the**

3    **road and the river that I have drawn, Forest Service**

4    **land, right?**

5        A.    Yes.

6        Q.    **Not withdrawn from the mineral entry,**

7    **right?**

8        A.    No.  In fact, there were mining claims

9    staked there.

10       Q.    **And Molycorp could have located mill site**

11   **claims, too, right?**

12       A.    Could have, yes.

13       Q.    **Now, we know back to the meeting we do**

14   **know that at the meeting Mr. Taylor said he would**

15   **not agree to locating a mill site claim that crossed**

16   **the road and the river, right?**

17       A.    He said he would oppose the idea.

18       Q.    **Okay.**

19             MR. TODD:  Can we bring back up 210?

20       Q    **(By Mr. Todd) Handwritten notes, and I'm**

21   **going to read the second sentence here.**

22             **His handwriting is better than mine.**

23             **"Mr. Taylor advised that they would" --**

24       A.    Excuse me.  This would not agree it is

25   another one that says would oppose, so --

1      Q.     Well -- and specifically what he is not

2   agreeing is that -- to the proposed mill site claims

3   extending across the road, right?

4      A.     Right.

5      Q.     The proposal was to have them go across

6   the road, according to these notes, right?

7      A.     Yes.

8      Q.     And instead, as the notes reflect,

9   Mr. Taylor suggested the land exchange?

10     A.     Yes.

11     Q.     Now, in your testimony, you assert that

12   after -- you testified, that after this meeting

13   Molycorp chose to move on with the land exchange and

14   not to pursue the valley fill plan, right?

15     A.     Yes.

16          MR. TODD:  Let's pull back up CX212,

17   please, which is Mr. Watson's letter to the Forest

18   Service following up on the meeting.

19          And in this letter -- let's highlight

20   Paragraph 2, please.  I'm sorry, Page 2,

21   Paragraph 2.

22     Q    (By Mr. Todd) Mr. Watson said, following

23   the meeting after the Forest Service has declared

24   its opposition to this plan, he write, "Should it be

25   determined that all or a portion of the claims are

Page 574

1    nonmineral, then it is, of course, our contention

2    that mill sites could be located upon it and that

3    the use of the area for dumps is a legitimate mill

4    site use."

5              Do you see that?

6    A.    Yes.

7    Q.    So as of this letter, at least, Mr. Watson

8    was still holding out hope for the valley fill plan,

9    right?

10   A.    No, he was suggesting that if the land

11   exchange that -- this letter is basically saying, we

12   will start negotiating a land exchange but it is our

13   position that if the land exchange doesn't go

14   through, we still believe that we can acquire title

15   to the land using mill site claims.

16             There is no mention here of filling the

17   Red River Canyon with waste rock.

18   Q.    Well, what the first sentence says,

19   Dr. Quivik, "Should it be determined that all or a

20   portion of the claims are nonmineral."

21             Do you see that?

22   A.    Yes.

23   Q.    Doing an examination of the land was a

24   requirement for the land exchange, right?  And to

25   exchange, the lands had to be nonmineral, right?

1      A.     That is my understanding.

2      Q.     **So the precondition here, that would be**

3   **something that would allow the land to go through,**

4   **right?**

5      A.     It would have confirmed the condition of

6   the land exchange, but the lands were nonmineral.

7      Q.     **He then states, "Molycorp's position that**

8   **they could use mill sites to establish these dumps,"**

9   **and you have already agreed several times that**

10  **Molycorp did have that right, under the law, right?**

11     A.     Yes.

12     Q.     **This letter, you would agree with me,**

13  **suggests that at this time the Forest Service was**

14  **articulating a different view.  That, in fact, they**

15  **could not use mill sites, quote/unquote, for waste**

16  **rock, right?**

17     A.     I have seen that correspondence, that some

18  people in the Forest Service were questioning

19  whether waste dumps was the proper use of mill

20  sites.

21     Q.     **Okay.  Let's go --**

22            MR. TODD:  Can you get rid of that,

23  please.

24            Let's blow up the next paragraph, please.

25     Q    **(By Mr. Todd) This is the next paragraph of**

Page 576

1      the same letter.

2              And Mr. Watson writes, "As you know from

3      our conference" -- and I think that is a reference

4      to the January meeting, would you agree?

5      A.    I agree.

6      Q.    "As you know from our conference, Molycorp

7      originally contemplated locating mill sites in most

8      of this area.  Perhaps Mr. Parde hasn't been able to

9      verify that mill sites can be acquired for dumping

10     of waste materials."

11             Do you see that?

12     A.    Yes.

13     Q.    Does that suggest that Mr. Parde was

14     raising a question whether Molycorp could dispose of

15     waste rock on mill sites?

16     A.    Yes.

17     Q.    And Mr. Watson wants to know whether

18     Mr. Parde has come up with anything to support that

19     legal interpretation, right?

20     A.    Right.

21             MR. TODD:  Let's pull up CX216, which is

22     Assistant Regional Forester John Kone.

23     Q     (By Mr. Todd) He responds -- you are

24     familiar with this letter, right?

25     A.    Yes.

1      Q.     April 18, 1969.

2             MR. TODD:  Let's call up the last

3      paragraph, place.  The bottom two lines.

4      Q     (By Mr. Todd) And so the Assistant Regional

5      Forester responds to Mr. Watson's inquiry and

6      writes, "With regard to the propriety of mill site

7      locations, our attorney has not yet been able to

8      determine whether mill site claims can properly --

9             MR. TODD:  The next page, please.

10     Q     (By Mr. Todd) -- been used for mine waste,

11     dumps."

12            Do you see that?

13     A.     Yes.

14     Q.     He also raises a question, which was

15     discussed yesterday, about the shape of the mill

16     site claims?

17     A.     Yes.

18     Q.     Okay.  And you saw that fan on the side of

19     the hill?

20     A.     Yes.

21     Q.     Mr. Fredley testified yesterday that

22     Federal law -- the Federal law that establishes mill

23     site claims dictates an acreage but not a shape.

24            You don't have any reason to disagree with

25     that, do you?

Page 578

1        A.    No.

2        Q.    In the last paragraph of this letter --

3              MR. TODD:  Let's highlight that, please,

4     and call it out, I should say.

5        Q    (By Mr. Todd) Assistant Regional

6     Forester Koen writes, "We recognize that sufficient

7     land adjacent to the mine for waste dumps must be

8     made available to Molycorp really by some means."

9              Do you see that?

10       A.    Yes.

11       Q.    Okay.  So to the Forest Service views,

12    this as something they have to do?

13       A.    Yes.

14       Q.    It continues, "However, since there is an

15    area of about 2400 acres of National Forest land

16    involved, we believe it necessary to initiate a

17    friendly validity contest to determine if mill site

18    claims or mining claims can be located solely for

19    the purpose of mine waste disposal if Molycorp

20    intends to hold the land under the Mining Laws."

21             Did I read that correctly?

22       A.    Yes.

23       Q.    The reference to hold the land under the

24    Mining Laws, that means by mill sites, right?

25       A.    Yes.  He names mining claims and mill

Page 579

1    sites but it's the mill site idea.

2        Q.    And the question that would be put to

3    issue in this, "friendly validity contest," is to

4    determine if mill site claims can be located solely

5    for the purpose of mine waste disposal.

6             Do you see that?

7        A.    Yes.

8        Q.    And you would agree that what the

9    Assistant Regional Forester is saying here is that

10   if Molycorp wants to proceed with its mill site

11   approach instead of the land exchange, then the

12   Forest Service would initiate a validity contest to

13   test whether that was appropriate?

14       A.    Yes.

15       Q.    Now, Mr. Watson wrote back to Mr. Koen a

16   few days later.

17            MR. TODD:  Let's pull up CX217.

18            Actually, we can take that down.

19       Q.    (By Mr. Todd)  Now, as you agreed with me

20   the first thing this morning, you are not familiar

21   with how validity contests are conducted, right?

22       A.    Not in great detail.  I have a broad

23   understanding but not in great detail.

24       Q.    And Mr. Fredley has testified that a

25   validity contest could last from five to up to even

Page 580

1    ten years.

2              Do you recall that?

3         A.   Yes.

4         Q.   **You are not offering any opinion**

5    **contradicting Mr. Fredley's testimony regarding**

6    **validity contests, are you?**

7         A.   No.  The only thing to point out is that

8    they had been operating with each other in good

9    faith and he uses the word friendly validity claim.

10   And so it could have been that he was suggesting,

11   let's just test this one question and not contest

12   it, but test it.

13        Q.   **That's what he could have been suggesting?**

14        A.   Could have been, yeah.  We don't know but

15   that is why he does say, "a friendly one."

16        Q.   **He does use the word friendly?**

17        A.   Yes.

18        Q.   **But just to confirm, you're not in a**

19   **position to contradict Mr. Fredley's testimony**

20   **regarding the validity contest, are you?**

21        A.   In general if two parties are contesting

22   each other, I am not in a position to contradict his

23   testimony.

24        Q.   **Thank you.**

25             **Now in your testimony you state that**

Page 581

1    Molycorp decided to apply to obtain title to the

2    land through a land exchange with the Forest Service

3    because that was cheaper and easier?

4         A.    Yes.

5         Q.    And in assessing the costs, Molycorp would

6    have included financial costs such as surveyors and

7    lawyers, right?

8         A.    Yes.

9         Q.    The cost of locating the claims?

10        A.    Yes.

11        Q.    And costs would also have included loss of

12   time or disruptions to operations, right?

13        A.    Well, I am not sure about disruptions of

14   operations because the operations were not disrupted

15   while they were waiting for the land exchange to go

16   through.  They knew they could continue operating as

17   they were and one way or another this acquisition of

18   title would happen whether it is through mill site

19   claims or the land exchange.

20        Q.    My question goes specifically to Molycorp

21   weighing whether or not to risk a validity contest.

22        A.    But you are assuming that it would be

23   contested not friendly, right?

24        Q.    Well, either way.

25        A.    Yeah.

1      Q.    Either way.  If Mr. Fredley is correct as

2    Molycorp would have known, a validity contest could

3    last a long time?

4      A.    Yeah.  A land exchange could last a long

5    time, right.

6      Q.    It ended up lasting four years, right?

7      A.    Yeah.

8      Q.    November of '69 to January of '74?

9      A.    Right, four years.  And Molycorp's

10   operations were not interrupted during that period.

11     Q.    They weren't because Molycorp didn't risk

12   the validity contest, right?

13     A.    No, no, I mean their mining operations

14   weren't interrupted even though it took four years.

15     Q.    I appreciate that.

16           In the land exchange process they were not

17   interrupted?

18     A.    Right.  A friendly validity contest might

19   have been completed in a shorter period of time.

20     Q.    And an unfriendly validity contest might

21   have taken up to ten years?

22     A.    No one is talking to an unfriendly

23   validity contest.

24     Q.    Have you ever heard someone use the term

25   friendly when they actually meant hostile?

 1      A.     We are talking about people who work

 2  together and want to cooperate, the Forest Service

 3  and Molycorp, so this seems collegial to me.

 4      **Q.     That is your opinion?**

 5      A.     Yes.

 6      **Q.     Okay.  Do you recall your deposition?**

 7      A.     Excuse me?

 8      **Q.     Do you recall your deposition?**

 9      A.     Oh, yes.

10             MR. TODD:  Let's pull up Page 603, Line 3

11  through 11.

12      **Q.     (By Mr. Todd)  Sir, were you asked the**

13  **following question and did you give the following**

14  **answers, I will start on Line 4.**

15             **"Would the cost of a validity contest to**

16  **Molycorp merely be financial or might Molycorp also**

17  **measure it in terms of time?"**

18             ANSWER:  "Absolutely, those would be

19  costs."

20             QUESTION:  "What would the time -- how

21  will the time be a cost?  What would be the

22  relevance of time?"

23             ANSWER:  "That could delay the mining

24  operation," and you represented to me how long they

25  would last.

Page 584

1                    That was your sworn testimony, right?

2       A.    Yes.  We were talking about whether this

3    would actually be a friendly validity contest.

4               I remember that you commented in the

5    deposition that that could be a sarcastic remark,

6    but we didn't have an opportunity to delve into it

7    in this kind of depth at my deposition.

8       **Q.    You're not disputing Mr. Fredley's**

9    **testimony that a validity contest could last five to**

10   **ten years?**

11              MR. HARRISON:  Objection, asked and

12   answered.

13              MR. TODD:  It hasn't been answered very

14   clearly, Your Honor.  I'm not asking about this

15   case, I just want a straight answer as a general

16   matter whether a validity contest could last five to

17   ten years.

18      **Q.    (By Mr. Todd)  Mr. Fredley so testified,**

19   **you are not contradicting him, right?**

20      A.    I am not contradicting him.

21      **Q.    Thank you.**

22              **Now, as you have noted several times in**

23   **your testimony and here this morning, Molycorp did,**

24   **in fact, have a right under the Mining Laws to**

25   **locate mill site claims and place waste rock on**

Page 585

1    them, right?

2        A.    Yes.

3        Q.    **And that is different than what Mr. Koen**

4    **told Mr. Watson and what the Forest Service told**

5    **Molycorp in early 1969, right?**

6        A.    Yes.  I can't explain why he would have

7    said that because I have seen earlier comments by

8    Forest Service people expressing that understanding

9    and as the land exchange was getting underway, again

10   Forest Service people were expressing their

11   understanding that Molycorp could get this land

12   through mill site claims.  So I can't explain why he

13   would have made that statement in 1969.

14       Q.    **Thank you, sir.**

15             MR. TODD:  Let's pull up CX281, which is

16   the environmental assessment.

17       Q.    **(By Mr. Todd)  In the 1972 environmental**

18   **assessment, the Forest Service discussed**

19   **alternatives to the exchange, right?**

20       A.    Yes.

21             MR. TODD:  And let's go to Page 7 of the

22   PDF.

23             There we go.  Thank you, Patty.

24       Q.    **(By Mr. Todd)  One alternative listed on**

25   **the second, which is the second paragraph here,**

Page 586

1    would have been to prohibit the dumping of waste on

2    Forest Service land entirely.

3              Do you see that?

4    A.    Yes.

5    Q.    And the U.S. rejected that for the reason

6    you have already identified, which is Molycorp could

7    have used mill site claims to grab the land and

8    place waste rock, right?

9    A.    Yes.

10   Q.    The Government wrote, "The mining company

11   has every right to use mill sites for those disposal

12   areas," right?

13   A.    Yes.

14   Q.    And that is consistent with your

15   understanding?

16   A.    Yes.

17   Q.    The environmental assessment here also

18   describes Molycorp's valley fill proposal in some

19   detail, and you referenced this earlier.

20             MR. TODD:   So let's highlight the first

21   paragraph, please.

22   Q.    (By Mr. Todd)  And so this is Forest

23   Service's description of what Molycorp had proposed

24   in January of 1969.  And it reads:  "One of the

25   company's proposals is to dump the waste into the

Page 587

1    Red River Canyon from a point just below the mine to

2    the mouth of Columbine Canyon.  This plan would

3    require a tunnel for rerouting State Route 38 and a

4    diversion of the Red River.  This is the least

5    expensive means of disposing of the overburden, but

6    the impact on the environment and ecology of the Red

7    River Canyon would be tremendous.  The proposal has

8    been vigorously opposed by the Forest Service and

9    ecologists groups.  Because of this opposition, the

10   Company has made other proposals."

11            Do you see that?

12   A.    Yes.

13   Q.    Now this assessment acknowledges that the

14   Forest Service had vigorously opposed the proposal

15   when it was made, right?

16   A.    Yes.

17   Q.    And that was back in '69.

18            The Forest Service also asserts here that

19   the plan was opposed by ecology groups.

20            Do you see that?

21   A.    Yes.

22   Q.    Now the Forest Service in its sworn

23   testimony has been unable to identify ecology,

24   ecologists or environmental groups that this

25   referred to.  You are not aware of who this refers

Page 588

1  to either, right?

2      A.    No.

3      Q.    Lastly the Forest Service asserts that the

4  impact on the environment and ecology would be

5  tremendous.

6            Do you see that?

7      A.    Yes.

8      Q.    Now, you know, you agree, that the Forest

9  Service -- let me back up.

10           The Forest Service has acknowledged in its

11 sworn testimony that it never undertook any

12 environmental analysis of Molycorp's proposal.

13           Do you have any reason to dispute that

14 testimony?

15     A.    No, especially because they had nothing on

16 which to base an analysis.

17     Q.    And you're not aware of any such analysis?

18     A.    Right, correct.

19     Q.    And nor have you seen any Forest Service

20 or other Federal agency document that analyzed the

21 relative ease or relative cost or ease of

22 remediation of either the valley fill concept or

23 placing waste rock on just the north slope of the

24 Red River Valley, right?

25     A.    No, Molycorp to our knowledge did not

 1   provide any of those kinds of detailed plans.  Did

 2   not submit a proposal and so the Forest Service

 3   could not have done that kind of analysis.

 4        **Q.    Okay.  And that takes care of the valley**

 5   **fill plan, no analysis of that.  By question had two**

 6   **components.  You also have seen no study by the**

 7   **Forest Service of the cost of remediability of**

 8   **placing rock on just the north slopes of the Red**

 9   **River Valley instead of across the valley, right, no**

10   **comparative analysis?**

11        A.    No, that wasn't an issue in this.

12        **Q.    And as the environmental assessment here**

13   **documents in the last sentence, we have noted the**

14   **vigorous opposition by the Forest Service here and**

15   **these unidentified ecology groups, right?**

16        A.    Yes.

17        **Q.    And as the Forest Service writes here in**

18   **the last sentence, "Because of this option, the**

19   **Company has made the other proposals," right?**

20              MR. TODD:  Your Honor, no further

21   questions.

22              THE COURT:  Thank you.  Can you redirect

23   in six minutes?

24              MR. HARRISON:  No, Your Honor.

25              THE COURT:  I think we will take our noon

Page 590

1    recess until 1:30.  We'll be in recess.

2            (A recess was taken.)

3            THE COURT:  Good afternoon.  You may be

4    seated.  You may redirect if you must.

5            MR. HARRISON:  Thank you, Your Honor.

6            THE COURT:  You are still under oath.

7            THE WITNESS:  Yes, Your Honor.

8                   REDIRECT EXAMINATION

9    BY MR. HARRISON:

10       **Q.   Dr. Quivik, do you remember the questions**

11   **about your experience and qualifications as an**

12   **industrial historian?**

13       A.   Yes.

14       **Q.   And you acknowledge you're testifying here**

15   **as an industrial mining historian?**

16       A.   Yes.

17       **Q.   Can you explain the importance and role of**

18   **an industrial historian in a case like this?**

19       A.   A case like this took place across, or the

20   facts that are being litigated in this case, a case

21   like this took place across many decades.

22            And it is important to have an historian

23   look at the evidence, look at the historical facts

24   and be able to put together a meaningful explanation

25   of how those facts unfolded, how, the basis on which

Page 591

1    based on documentary evidence, various participants

2    in that history did what they did and especially in

3    cases like cases involving mining companies, to have

4    an historian who is knowledgeable about mining

5    engineering, about metallurgical engineering, about

6    the other facets of the environments that mining

7    companies operate in to be able to help explain that

8    history as it unfolded.

9            One other thing that is important is that

10   we all, as human beings, have a tendency to project

11   what we know on to people in the past, and it is

12   important for an historian to look at what those

13   actors were doing, knowing what they knew then and

14   not to project what we know now onto those past

15   actions.

16       **Q.   Dr. Quivik, could you explain the**

17   **historical importance throughout the 20th Century of**

18   **the Lindley treatise that was talked about during**

19   **your cross-examination as it relates to the Federal**

20   **Government and also to mining companies?**

21       A.   Yes.  The Lindley treatise was a treatise

22   describing the legalities of the Mining Law for

23   people who are acting in the United States in the

24   mining industry, both with regard to miners, mining

25   companies on the one hand and people including

1  Government officials on another hand who might want

2  to know what are mining companies allowed to do

3  under the Mining Act.

4       **Q.    And in your experience as an historian, is**

5  **it your opinion that the Lindley treatise was relied**

6  **on by mining companies and the United States?**

7            MR. TODD:  Objection, leading.

8            THE COURT:  Overruled.

9       A.    Yes.  One of the examples I cite is a

10  Mining Engineers Handbook by a person named Robert

11  Peel, and it is one of the prominent texts in the

12  field with sections on lots of different facets of

13  mining, including engineering but also water rights

14  and finance and management.

15            And there is one section on the law and he

16  cites extensively from Lindley describing Lindley as

17  the main treatise so that miners can understand what

18  the level infrastructure is within which they are

19  operating with regard to mining claims and other

20  matters.

21       **Q.    Historically speaking how did the Mining**

22  **Laws permit private parties to have the exclusive**

23  **right to possess and mine Federal lands?**

24       A.    Well, normally one would think if someone

25  owns a piece of land one would have to get

Page 593

1    permission from the owner of that land to go onto

2    the land and start exploring for minerals.

3              And the Mining Act gave miners the right

4    of entry on the land so they didn't have to notify

5    the Government if they were entering the public

6    domain to explore for minerals.  And it gave miners

7    the right to occupancy.  So once they staked a

8    claim, located a claim, filed it in a local office,

9    clerk and recorders office in the county, they could

10   occupy it, meaning start digging, start building

11   improvements, all of those kinds of things and they

12   could do those things without having to notify the

13   Federal Government that they were doing those

14   things.

15             The only time necessarily that the

16   Government would learn that they had entered public

17   land had occupied public land is if the miner

18   discovered a mineral and wanted to move that

19   unpatented minor claim to a patent.

20   **Q.    And so was patenting required to mine or**

21   **use the claims for mining purposes?**

22   A.    No.  A miner could enter the land, occupy

23   the land and then if the miner found exploitable

24   minerals, could start mining, generating revenue,

25   all of which the miner could do without notifying

Page 594

1    the Government and without owing the Government

2    anything.

3        **Q.    As a practical matter, you heard and were**

4    **asked questions about Mr. Lindley's term, the**

5    **paramount proprietor, or the paramount owner.  That**

6    **term is certainly used in Mr. Lindley's treatise,**

7    **but as a practical matter could you discuss how**

8    **Chevron or how a mining company would act on a**

9    **property with respect to the possession of that**

10   **property vis-a-vis the United States?**

11              MR. TODD:  Objection, Your Honor.  I guess

12   ambiguous and overbroad.  The witness is being asked

13   to describe how Chevron or every other mining

14   company would act on some unidentified property.

15              THE COURT:  Sustained.

16       **Q    (By Mr. Harrison) In your experience as a**

17   **mining historian and in your review of the documents**

18   **in this case, could you describe for the Court the**

19   **efforts that Chevron, briefly describe the effort**

20   **that Chevron did at the Questa site to suggest it**

21   **had exclusive possession of the property?**

22              THE COURT:  I don't understand the

23   question.

24       **Q    (By Mr. Harrison) I will rephrase.**

25              **What did Chevron do once it had staked**

Page 595

1    mining and mill site claims on at the Questa site to

2    suggest that it had authority over that land?

3              MR. TODD:  Objection, ambiguous.

4              THE COURT:  I'm sorry?

5              MR. TODD:  I just objected again,

6    Your Honor.  I think the question is still ambiguous

7    and overbroad.

8              THE COURT:  Yes.

9        Q    (By Mr. Harrison) I will move on, then.

10             Dr. Quivik, as a mining historian are you

11   familiar with how mining companies respond to

12   possible changes in the Mining Laws and regulations?

13       A.   I have seen those responses unfold

14   historically, yes.

15       Q.   You were asked about the Northern

16   New Mexico economic policy.

17             Do you recall being asked about that?

18       A.   Yes.

19       Q.   In your review of the historical documents

20   in this case, is there anything to suggest to you

21   that the Government would have acted any differently

22   had that policy not been in place?

23       A.   No.

24       Q.   You were also asked about the exploration

25   of the Questa Mine in the 1950s.  In your review of

1    **the historical documents in this case, was it**

2    **apparent to Chevron in the 1950s that there was the**

3    **potential of low-grade ore at the Questa site?**

4         A.    They were aware that there was molybdenum

5    all over the place and they were also aware from

6    reports like Schilling's report and their own

7    geologists' report, Carpenter's report that there

8    was low-grade material in the area.

9         **Q.    And so because you know the potential of**

10   **an ore body and in this case a low-grade ore body,**

11   **are the methods for extracting that ore obvious and**

12   **well-known?**

13        A.    Yes.

14        **Q.    And in this case what were those methods?**

15        A.    Well, as we have heard throughout the

16   trial, in the first phase of mining at the Questa

17   Mine, Molycorp was using selective underground

18   mining, driving drifts and crosscuts and opening

19   slopes and extracting ore and that was extracting

20   high-grade ore that it could do at a profit.

21             With the low-grade material there would

22   have been two options available to Molycorp that

23   would have, it would have known about in the mining

24   industry, one is block cave mining and we have heard

25   that described and the other is open pit mining and

Page 597

1   we have heard that described.

2       Q.    Was diamond drilling prevalent in the

3   mining industry in the 1950s?

4       A.    Yes.

5       Q.    In your review of the documents in this

6   case, what is your opinion about the availability of

7   funds that Chevron had in the 1950s prior to the

8   DMEA loan?

9       A.    Well, I have seen the documents that show

10  that Molycorp raised funds through sales of stock

11  and through bank loans.

12      Q.    You were also asked questions about DMEA

13  generally, and do you recall those questions?

14      A.    Yes.

15      Q.    What is your understanding of DMEA's

16  programs support for molybdenum exploration as

17  compared to the DMEA program support for other

18  minerals exploration?

19      A.    There were three categories of metals for

20  which the DMEA would make loans for exploration.

21  Two of those metals, uranium and cobalt, were of

22  such a status that the DMEA would make a loan of

23  90 percent of the exploration costs to the mining

24  company.

25             There were a couple of other metals

1    tungsten and manganese for which DMEA would make a

2    loan of 75 percent of the cost and then, as we have

3    heard throughout this testimony, DMEA would make

4    loans of 50 percent for molybdenum and that is in

5    the same category as lead, zinc, copper and other

6    metals.

7         Q.    Are you aware of any other mines at the

8    time that used DMEA funding?

9         A.    Yes.

10        Q.    Are you aware of any mines at the time

11   that did not use DMEA funding?

12        A.    Yes.

13        Q.    And did any of those mines include

14   uranium?

15        A.    Yes.

16        Q.    Could you briefly explain that for the

17   Court?

18        A.    Yes.  I testified, Your Honor, in U.S. v.

19   Newmont, which is the midnight Superfund midnight

20   mine, Superfund case in the state of Washington.

21   And that was a uranium mine, and it was discovered

22   and explored during the 1950s, during this DMEA

23   period and the developers chose to explore and

24   develop that mine without DMEA assistance.

25        Q.    You were also asked about the control that

1    the DMEA had over Chevron during the DMEA contract.

2            Do you recall being asked about that?

3    A.    Yes.

4    Q.    In terms of control, what is your opinion

5    as to DMEA's control over Chevron?

6    A.    Well, the agency was able to use its

7    influence during the negotiation period to negotiate

8    a contract with Molycorp that addressed some of the

9    exploration objectives that DMEA thought would be

10   more reasonable than what Molycorp wanted to do and

11   also to convince Molycorp to use exploration methods

12   that the DMEA thought would be more effective at

13   this particular site.

14           And during that whole negotiation process,

15   Molycorp was free to walk away from the

16   negotiations, refuse to compromise and not get a

17   loan, but Molycorp decided to compromise and enter

18   that contract.

19   Q.    And after entering into the DMEA contract

20   did Chevron do exploration work on its own?

21   A.    Yes.

22   Q.    And any work that was deemed to be not

23   covered by DMEA, could Chevron do that exploration

24   work on its own as well?

25   A.    Yes, and it did.  It conducted, it drove

1   about as much in terms of drifts and crosscuts on

2   its own account with its own funds as it did under

3   the DMEA program.  And it did not need permission

4   from the Government or from the agency, to do that

5   additional exploration work on its own.

6        Q.    When did the Government determine that

7   molybdenum was no longer a defense necessity?

8        A.    About two months after the contract was

9   signed.

10       Q.    On cross-examination you were shown

11  Chevron's DMEA application and also was called out

12  to the statement that, "no known reserves and no

13  other exploration work was planned."

14             Do you recall seeing that?

15       A.    Yes.

16       Q.    In your review of the historical documents

17  in this case, do you believe that that is entirely

18  correct?

19       A.    Well, the reserves were that the

20  high-grade reserves were exhausted and that may have

21  been true that at that particular moment Molycorp

22  had no other exploration program in mind.

23       Q.    But was Molycorp also aware of the

24  presence of low-grade ore at the time of its DMEA

25  application?

Page 601

1     A.     I am sure it was.

2     Q.     **What did the DMEA final report --**

3     A.     I guess I should say it was aware of the

4     low-grade material.  No one knew yet whether it

5     would qualify as ore.

6     Q.     **In the final report that DMEA issued, do**

7     **you recall what DMEA concluded regarding the ore**

8     **reserve that was located?**

9     A.     In general, yes.

10    Q.     **And what is that?**

11    A.     That it documented the three blocks of

12    probable ore and also documented a much larger

13    volume of low-grade material that was in the general

14    area of the Questa Mine about which little was known

15    as of yet.

16    Q.     **And what happened next?**

17    A.     Molycorp raised some more financing and

18    began an exploration, some more exploration from

19    that same level, the 7800-foot level.

20           In the beginning most of its exploration

21    was towards the Southwest and in what was called the

22    Southwest zone, and then in a year or two it began

23    to devote some attention to exploration in the

24    Northeast zone as well.

25           And would you like me to elaborate or just

Page 602

1   in general?

2              THE COURT:  Just answer the question.

3              THE WITNESS:  Yeah, I am just wondering

4   how much detail I should get into.

5        Q    (By Mr. Harrison) That is good for now,

6   thank you.

7        A.   Okay.

8        Q.   You mentioned the 7800 level.  Was the

9   DMEA-funded drilling at a different elevation and in

10  a different block of ground as the open pit mine

11  that was ultimately developed?

12             MR. TODD:  Objection, Your Honor, that

13  exceeds the scope of cross.  Dr. Quivik has a

14  lengthy dissertation in his direct testimony on the

15  relative location between the DME discover and the

16  open pit.  As you recall we discussed it with

17  Dr. Rigby yesterday.  I asked no questions at all

18  about that testimony, so this is beyond the scope of

19  cross.

20             THE COURT:  Sustained.

21       Q    (By Mr. Harrison) In your opinion as a

22  mining historian, could Chevron have entered into a

23  joint venture or other arrangement in an effort to

24  develop a low-grade ore body?

25             THE COURT:  Counsel, how can an historian

1  say what Chevron might have done under a different

2  set of circumstances?

3       MR. HARRISON:  Understood.

4       **Q.    (By Mr. Harrison)  Dr. Quivik, are you**

5  **aware of joint ventures that occurred between mining**

6  **companies in the mid-20th Century?**

7       A.   Yes.  Including between Molycorp and

8  Kennecott.

9       **Q.    Could you just briefly describe that,**

10  **please?**

11       A.   At the time that the -- in the mid-'50s

12  and at the time that the DMEA exploration program

13  was underway, Molycorp had a joint venture going

14  with Kennecott for a mine in Québec.

15           And in other mining districts I have

16  researched in the course of doing work on Superfund

17  litigation, I have encountered a number of those

18  kinds of instances when, or in which the owner of a

19  set of mining claims entered into a joint venture

20  with another usually larger mining company to have

21  the larger mining company finance or help finance

22  the exploration and oftentimes actually do the work,

23  at least lend expertise and that sort of thing.

24       **Q.    As part of your testimony in this case did**

25  **you develop an opinion as to the location of the ore**

1    bodies that were identified through DMEA?

2         A.    Yes.

3         Q.    Did you come across any -- in developing

4    that, did you come across any documents to support

5    that position?

6         A.    Yes.

7         Q.    What were some of those documents?

8         A.    Well, Molycorp's final report, 1960.  And

9    then there were other documents that referenced that

10   report, the OME's final report.  Well, the

11   certification is based on those reports.  I don't

12   recall that the certification necessarily specifies

13   three blocks of material.

14            And then they were subsequently

15   referenced, for instance, when Molycorp filed the

16   patents and mining claims, and there was reference

17   to those blocks beneath some of the mining claims

18   Molycorp patented.

19        Q.    In your review of the documents in this

20   case, when was the extent of the ore body final and

21   fully understood?

22        A.    Well, the most recent information I have

23   seen is a 2009 USGS document.  A document that

24   Dr. Rigby uses twice in his direct testimony for

25   illustrating the Questa area.

1          MR. HARRISON:  Can we show CX363, please.

2   If we could turn --

3      **Q.   (By Mr. Harrison)  Is this the document**

4   **you are referring to?**

5      A.   Yes.

6          MR. HARRISON:  If we could turn to Page 5?

7          MR. TODD:  Your Honor, I will interpose an

8   objection again on exceeding the scope of cross, if

9   I am correct as to where Mr. Harrison is going with

10  this.

11         THE COURT:  I will overrule it at this

12  time.

13         MR. HARRISON:  If we could zoom in on the

14  area, there.

15     **Q.   (By Mr. Harrison)  Could you please**

16  **explain what this map shows with respect to the ore**

17  **bodies at the Questa site?**

18     A.   Yes, this shows the -- Your Honor, you can

19  see a kind of brown horseshoe-shaped body there.

20  That is what is called the central ore body and in

21  case you are interested, the Northern part of that

22  was oftentimes called the Northeast zone and the

23  southern part oftentimes called -- excuse me, the

24  Northeast zone and then the Southwest zone.

25         And it wasn't until relatively or recently

Page 606

1    from the literature that people understood that that

2    was one horseshoe-shaped ore body.

3          And then off to the northeast we can see

4    underneath the outline of the open pit another ore

5    body that is identified as the Sulphur Gulch ore

6    body.  And just to the -- there is a little line

7    separating those two.  I don't know if you can see

8    that, Your Honor.  There is a little lobe of the

9    yellow material that is kind of right in the middle

10   of the horseshoe.  And then just to the -- extending

11   downward and on this drawing and towards the right,

12   there is a line there.  That is an outline, and it

13   is demonstrating that the Sulphur Gulch ore body is

14   a distinct ore body from the central ore body.

15         And then on this page in the text

16   describing this illustration there is some

17   additional information which Dr. Rigby did not share

18   with the Court, and that points out that the open

19   pit is mining the Sulphur Gulch ore body and then

20   the central ore body is one of the other ore bodies

21   in the area.  It is at much greater depth, and that

22   would be an ore body that might have potential for

23   block cave mining.  But it is a distinct ore body

24   from the ore body that was being mined by the open

25   pit.

Page 607

1          MR. TODD:  Your Honor, I renew my

2   objection and move to strike that entire answer.

3   That was entirely beyond the scope of cross.  That

4   was intended to --

5          THE COURT:  I will deny your motion to

6   strike, but I would suggest that you start a whole

7   new dialogue about stuff that was never discussed

8   before.

9          MR. HARRISON:  Understood, Your Honor.

10          Your Honor, if I may on that point,

11   Dr. Rigby testified yesterday as to two new

12   demonstrative exhibits on the easel.  And in the

13   normal course of a trial, Dr. Quivik would have been

14   provided the opportunity to testify as to those

15   during his direct examination.

16          THE COURT:  Well, he could have here, too.

17          MR. HARRISON:  We were not aware of the

18   drawings that were made on the easel yesterday at

19   trial, and so we were wondering, or with the Court's

20   indulgence, I would like to ask a few questions of

21   those two demonstrative exhibits that Dr. Rigby drew

22   yesterday in court that Dr. Quivik can testify to is

23   the first time he has seen images like that?

24          THE COURT:  And as a, what, industrial

25   historian it is relevant?

Page 608

 1              MR. HARRISON:  Dr. Quivik's rebuttal

 2     report does address certain areas of Dr. Rigby's

 3     report pertaining to the location and cites of

 4     drilling that was done in the open pit area.

 5              THE COURT:  What significance is it?

 6              MR. HARRISON:  The significance is that it

 7     goes to show the demonstrative goes to show that the

 8     marks on there are not approximate and not accurate

 9     as to where the actual drilling occurred and --

10              THE COURT:  So what?  I mean, I don't

11     think that that is an issue here.  Nobody is saying

12     that they drilled in the wrong place or that the

13     lines are anything other than approximations.  This

14     is a whole new area you are getting into.

15              MR. HARRISON:  Understood, Your Honor.  I

16     think the point is that the drilling did not

17     directly lead to the area of the open pit.

18              THE COURT:  What significance is it?

19              MR. HARRISON:  I will move on, Your Honor.

20     Thank you.

21              THE COURT:  All right.  Thank you.

22     **Q    (By Mr. Harrison) So, Dr. Quivik, after the**

23     **DMEA program ended in 1960, Chevron ultimately**

24     **decided to develop an open pit mine?**

25     A.    Yes.

Page 609

1       Q.      Could you explain, based on your review of

2   the historical documents in this case, the efforts

3   that went into Chevron's development of the open pit

4   mine, briefly, please?

5       A.      Well, after about three more years of

6   exploration in an area much larger than had been

7   explored under the DMEA program, Molycorp began

8   exploring in an area that is now the open pit and

9   the indications that that held promise as an open

10  pit was the fact that there was a lot of molybdenum

11  in the soils on the surface there.

12              And that led Molycorp to identify that

13  area as a target distinct from the northwest, the

14  Northeast zone and the Southwest zone.  And that

15  exploration ultimately led Molycorp to raise the

16  money to actually develop an open pit mine there and

17  that mine began operating in late '65 and full-scale

18  operation in '66.

19      Q.      You were asked a lot of questions today

20  about mining claims and mill sites and unpatented

21  claims versus patenting of those claims, so I would

22  like to ask you some questions about those now, as

23  it relates to the open pit mine.

24              What is the significance of Chevron's

25  staking mining and mill site claims for the land

Page 610

1     **around the open pit?**

2              THE COURT:   I'm sorry, I don't understand

3     that question.

4     **Q     (By Mr. Harrison) Did Chevron stake mining**

5     **and mill site claims around the open pit?**

6     A.    Yes.

7     **Q.    Why did it do that?**

8     A.    Well, the mining claims that it staked

9     around what became the open pit it had already

10    staked.

11             There was a core group of mining claims

12    and then as Molycorp came to recognize that it

13    appeared that there is more and more area of

14    mineralized, potentially mineralized with

15    molybdenum, it staked mining claims on a pretty

16    large area that I think was something like 12 miles

17    long and several miles wide.

18             And the Questa Mine is roughly at the

19    middle of that area, and so the significance of

20    staking those claims is that Molycorp had a pretty

21    good idea that there was a lot more molybdenum in

22    the area and it wanted to make sure that it had the

23    rights to explore, develop and possibly mine those

24    potential mineral deposits and not a competitor.

25             We know from the history that at one point

Page 611

1   Climax was in the area trying to stake mining claims

2   as well.

3           The significance of Molycorp staking mill

4   site claims is that Molycorp could only gain title

5   to a mining claim if they could demonstrate that

6   they had discovered a mineral, and then they could

7   apply for patent.  If they needed other lands to

8   support their mining activities for milling, for

9   disposing of waste, for building support facilities,

10  any of the kinds of things that would have to occur

11  to support a mining activity, the Mining Law of 1872

12  gave them a right to stake mill site claims.

13          And they could locate them, again, without

14  notifying the Government that they were doing so,

15  without asking permission to do so and they could

16  start using them immediately.  And in order to apply

17  for patent to those mill site claims, they had to

18  have occupied the mill site claim, meaning they had

19  to have some kind of improvement on the mill site

20  claim.

21          So they were using that as a method to

22  acquire land they needed if they didn't think that

23  they could acquire it through the mining claim

24  route.

25      Q.    **And so one of the uses of the mill site**

Page 612

1    then is for waste disposal?

2        A.    Yes.

3        Q.    Did you review any documents pertaining to

4    waste-rock disposal and the capacity of that at the

5    Questa site?

6        A.    I am not sure what you mean by capacity.

7        Q.    Did you review any corporate documents

8    that analyzed the location of waste-rock piles and

9    plans for waste-rock dumping?

10       A.    Yes, both feasibility studies and other

11   planning documents.

12             MR. HARRISON:  Could we show CX282.

13       Q.    (By Mr. Harrison)  This is the 1972

14   feasibility study.  Is this one of the documents

15   that you reviewed?

16       A.    Yes.

17             MR. HARRISON:  If you could turn to

18   Pages 18 and 19.

19       Q.    (By Mr. Harrison)  Dr. Quivik, what is

20   your opinion as to the -- at the bottom of Page 18,

21   the dumps available and future dumps sections?

22             MR. TODD:  Objection, exceeds the scope of

23   cross.  Again, I asked no questions about the actual

24   mechanics of the valley fill plan.

25             THE COURT:  That's correct.

Page 613

1        Q     (By Mr. Harrison) Dr. Quivik, do you see on

2    Page 19 -- strike that.

3             You were also asked about the tailings

4    pipeline areas and the special use permit.

5             Do you recall that testimony?

6        A.    Yes.

7        Q.    And you were asked whether it was a

8    discretionary act of the Forest Service to grant the

9    special use permit?

10       A.    Yes.

11       Q.    Did you hear Mr. Fredley's testimony

12   yesterday that the process that the Forest Service

13   went through was proper?

14       A.    Yes.

15       Q.    You were also asked about the BLM land

16   exchange and the appraisal report, which was CX259.

17            Do you recall being asked about that

18   today?

19       A.    BLM land exchange?

20       Q.    Excuse me, the public sale auction.

21       A.    Yes, okay.  Could you repeat the question,

22   please.

23       Q.    Yes.

24            You were also asked about the appraisal

25   report from the BLM public land sale auction?

Page 614

1      A.    Yes.

2      Q.    And do you recall in there you were shown

3   that it was the, quote, highest and best usage of

4   that area for the tailings impoundment area?

5      A.    Yes.

6      Q.    What is the purpose of an appraisal report

7   as part of this land, the public sale land auction?

8      A.    Well, I think that there are a couple of

9   functions.  One is to try to get a sense of what the

10  value might be.  And another is to assess or

11  appraise its possible uses and to allow that

12  information to inform the Government of whether or

13  not this would be a sale that would be proper and in

14  the public interest as well as, of course, the

15  person who wants to purchase it.

16     Q.    So the public uses that were identified in

17  the appraisal report, those aren't the required

18  usage, uses of the property, is it?

19     A.    No.

20     Q.    What could a mining company like Chevron

21  do on Federal lands once it located a mining or mill

22  site claim?

23     A.    Anything as long as they are not violating

24  the law.  And if it is in the Forest Service, then,

25  of course, they can't do commercial logging and

Page 615

1    stuff like that.

2        **Q.    And what could the Federal Government do**

3    **once a mining company or individual had located**

4    **claims on Federal lands?**

5        A.    Well, in many instances the Federal

6    Government wouldn't even know about it until years

7    later if a patent was applied for.

8              And if the Federal Government did know

9    about it, I suppose the Government could look to see

10   if there were any laws being violated.  But other

11   than that, pretty much nothing.

12       **Q.    You were asked on direct a lot of**

13   **questions about the January 1969 meeting and were**

14   **asked to make a lot of assumptions about what was**

15   **discussed or not discussed or what was presented and**

16   **what was not presented.**

17             THE COURT:  You said on direct

18   examination?

19       **Q    (By Mr. Harrison) Excuse me, your**

20   **cross-examination.**

21             **Do you recall being asked those questions?**

22       A.    Yes.

23       **Q.    In your review of the documents in this**

24   **case to form your opinion -- strike that.**

25             **What documents did you rely on to form**

1    **your opinion about the January 1969 meeting?**

2    A.    The handwritten notes that I saw during my

3    cross-examination and the reference to that meeting

4    in, I believe it is the 1972 planning or feasibility

5    study, where that conference appears to be

6    referenced.  And I think those are the -- well, and

7    then in February in Mr. Watson's letter to the

8    Forest Service suggesting that Molycorp would like

9    to move towards a land exchange.  There is a

10   reference to the conference, but it says little

11   about it other than the idea of a land exchange was

12   suggested.

13       **Q.    As an historian would you have expected**

14   **other documents from the January 1969 meeting to**

15   **have been preserved or at least part of the records**

16   **of either Chevron or the Forest Service?**

17            MR. TODD:  Objection, calls for

18   speculation.

19            THE COURT:  Sustained.

20       **Q    (By Mr. Harrison) So you just mentioned the**

21   **February 20, 1969 letter.**

22            MR. HARRISON:  If we could bring that up,

23   please, CX212.

24       **Q.    (By Mr. Harrison)  Is this the letter**

25   **where Chevron requests the land exchange?**

Page 617

1    A.    Yes.  It is not the formal application,

2    that came later in the year, but this is the letter

3    in which Molycorp says that it is going to apply for

4    a land exchange.

5        Q.    In your review of the documents in this

6    case, did you come across any correspondence or

7    other documents to suggest that Chevron was not

8    intent on pursuing the land exchange after this

9    point?

10       A.    No.

11       Q.    And so I just want to be clear when I ask

12   you a few questions about this and the subsequent

13   letters, but are there two issues going on at this

14   time with respect to the Forest Service and

15   Molycorp?

16       A.    Well, I guess there is, there remains the

17   question because Mr. Watson brings it up here of

18   whether Molycorp could get the land by following the

19   mill site route, and so that is a question.

20            And then will the land exchange work, so

21   those are the two issues that are still being

22   explored here by Molycorp, which of those routes

23   would be preferable.

24       Q.    But these communications don't pertain to

25   the Red River plan that you have heard about?

Page 618

1              MR. TODD:  Objection, leading.

2              THE COURT:  Sustained.

3         Q    (By Mr. Harrison) Do these plans refer to

4    the Red River plan, or excuse me, does this letter

5    refer to the Red River plan or anything related to

6    property that is on the south side of the river and

7    highway?

8         A.   No.

9         Q.   And, in fact, you were asked in your

10   cross-examination about the top of Page 2 of this

11   document, the first two paragraphs, or maybe the

12   first three.

13             MR. HARRISON:  If we could turn to Page 2.

14        Q.   (By Mr. Harrison)  The first sentence

15   references Parcels 1 and 2.  What is your

16   understanding as to where those parcels are located

17   on the site?

18        A.   They are all on the north side of the

19   river.  Parcel 1 is basically a little bit southeast

20   of the open pit mine and then there is a strip of

21   mill site claims overlaying what is called the Moly

22   tunnel, and that is the axis into the underground

23   workings from basically along the river.  And

24   Molycorp had acquired that land through mill site

25   claims.

1          And then the rest of it is, the major

2     portion of the acreage is, I will say southwest,

3     west and a little bit northwest of the open pit

4     mine.

5          Q.     And if you will look at the last paragraph

6     on the call-out it says, "As you know, from our

7     conference Molycorp originally contemplated located

8     mill sites in most of this area."

9               What is your understanding as to what

10    "this area" means?

11         A.     The area being proposed, Parcels 1 and 2

12    for the land exchange.

13         Q.     Not the area south of the river?

14         A.     Correct.

15         Q.     Around this time did Molycorp also propose

16    an idea about fan-shaped mill sites?

17         A.     Yes.

18              MR. HARRISON:   If I could show CX216 at 3.

19         Q.     (By Mr. Harrison)  You were asked on your

20    cross-examination about the extent to which these

21    mill site proposed mill sites went south.

22              Do you recall being asked those questions?

23         A.     Went south of the river?

24         Q.     Correct.

25         A.     Yes.

1      Q.    And in reviewing this document where do

2   the proposed mill sites end?

3      A.    Well, again, it is my contention that this

4   is more of a sketch map than a precise survey map,

5   and so the edges are just south of the highway.

6      Q.    Are you aware of Chevron ever staked these

7   fan-shaped claims?

8      A.    I have seen no documentation that these

9   were ever staked or located.  I think this was a

10   sketch to illustrate to the Forest Service an idea

11   and explore the possibilities of pursuing this idea.

12      Q.    And you heard the testimony earlier this

13   week about the fan-shaped plan, it was an end around

14   of the mill site requirements?

15      A.    I can't remember if that exact wording was

16   used, but anyhow, it was a way to be able to stake

17   and patent a lot of mill sites instead of having to

18   do them in sequence as waste rock made its way down

19   the hills onto additional mill site claims.

20      Q.    So it made it easier for Chevron, it would

21   have made it easer to Chevron to be able to patent

22   those mill site claims?

23      A.    Had Chevron pursued this route, yes.

24            MR. HARRISON:  If we could go to CX216.

25      Q.    (By Mr. Harrison)  You were also asked

Page 621

1    about this question on your cross-examination, but I

2    want to ask about a different issue in here, the

3    third paragraph starts with, "With regard to"?

4        A.    Yes.

5        Q.    What is your understanding of this

6    paragraph and the statements about the need to

7    relinquish or adjudicate the unpatented mining

8    claims?

9        A.    It is my understanding that the Forest

10   Service could not have engaged in the land exchange

11   if there were already claims to the land to be

12   exchanged.

13           And to be very precise, that meant even

14   claims owned by the party that would receive these

15   lands in a land exchange.  So the Forest Service

16   would want to make sure that those claims, those

17   mining claims were relinquished before the exchange

18   could be completed.

19       Q.    And the Forest Service also mentions there

20   was an alternative to the relinquishment of those

21   claims and that would be a validity contest?

22       A.    Yes.

23       Q.    And, again, this goes to the tracts

24   adjacent to the open pit mine?

25       A.    Yes.

Page 622

1      Q.     That ultimately ended up being the subject
2   of the land exchange?
3      A.     Yes, plus some additional lands.
4      Q.     In your review of the documents, were
5   there, in fact, conflicting or pending claims on
6   some of the land exchange land?
7      A.     Yes.
8      Q.     And in your review of the documents, do
9   you recall seeing a suggestion from Chevron that the
10  Forest Service initiate a validity contest to
11  resolve those claims?
12     A.     Yes.  They were claims owned by a couple
13  of other parties and Chevron suggested initially
14  that perhaps the Forest Service could initiate a
15  validity claim, a validity contest against those
16  claimholders.  And if it demonstrated that they were
17  not mineralized and therefore invalid claims, then
18  they could be included in the land exchange.
19         As I recall, Molycorp decided, for
20  expediency, they would just drop that issue for the
21  time being and that is why when you look at a map of
22  what Parcel 2 looks like, there is kind of a
23  rectangular area to the southwest that was omitted.
24         Once Molycorp resolved those conflicting
25  claims, it then applied for a land exchange and

Page 623

1    received patent to those claims as well.

2         Q.    **So also in this letter --**

3              MR. HARRISON:  If we could go to the top

4    of Page 2.

5         Q.    **(By Mr. Harrison)  -- discusses not only**

6    **the land exchange process that we just talked about**

7    **with the relinquishment or the validity contest, but**

8    **it also discusses the shape of the mill site claims**

9    **that we were just discussing.**

10             **Do you see that?**

11        A.    Yes.

12        Q.    **And what does the Forest Service say about**

13   **the shape of the claims as it pertains to the**

14   **possible patenting of them?**

15        A.    "We doubt that the Mining Law contemplated

16   individual site claims of 2,000 to 3,000 feet in

17   length and we would prefer 5-acre mill sites that

18   were rectangles to conform with legal subdivisions

19   on surveyed land."

20        Q.    **And it also notes concern about the**

21   **fan-shaped nature of the mill sites?**

22        A.    Yes, the shape of the mill site claims as

23   proposed.

24        Q.    **In your experience -- strike that.**

25             **In your review of the documents in this**

1    **case, did you see any other proposed mill sites or**

2    **mining claims, or actual mill sites or mining claims**

3    **where Chevron put forward something other than a**

4    **rectangular shape or something similar to that?**

5         A.    The one -- they are 90-degree angles.

6    There was a set of mill site claims along the river

7    and the Forest Service already had a use for, I

8    believe it was a campground, and so there was

9    already a use for kind of the southeast end of some

10   of those claims.  And I forget now who suggested the

11   solution, but if you will look at the property

12   boundary of those claims combined, it is kind of a

13   sawtooth pattern along there, so it is all 90-degree

14   angles but they're not rectangles, probably

15   speaking.

16        Q.    **But nothing like the fan-shapes or the**

17   **long skinny mill sites that are here?**

18        A.    Correct.

19        Q.    **You were asked in your cross-examination**

20   **if the Forest Service rejected Molycorp's mill site**

21   **applications for the area that was -- that we have**

22   **seen before on CX216 at Page 3, the fan-shaped mill**

23   **sites.**

24             **Do you recall being asked that question?**

25        A.    If the Forest Service rejected them?

Page 625

1     **Q.    Yes.**

2           MR. TODD:  Objection, Your Honor.

3     A.   I don't recall that precise question, no.

4     **Q   (By Mr. Harrison) To your knowledge, did**

5  **Chevron ever apply for patents on those mill sites?**

6     A.   No.

7     **Q.   Did Chevron continue dumping on the area**

8  **adjacent to the open pit while the land exchange was**

9  **pending?**

10    A.   Yes.

11          MR. HARRISON:  With the Court's

12  indulgence.

13          THE COURT:  Thank you.  You may step down.

14          (Whereupon, the witness was excused.)

15          THE COURT:  You may call your next

16  witness.

17          MR. HOSHIJIMA:  The United States calls

18  Dr. Jay Brigham.

19          THE COURT:  Brigham?

20          MR. HOSHIJIMA:  Brigham, yes.

21          (Whereupon, the witness was sworn.)

22          THE COURT REPORTER:  Please state and

23  spell your full name for the record.

24          THE WITNESS:  My name is Jay Brigham.  My

25  last name is spelled, B-R-I-G-H-A-M.

Page 626

1          THE COURT:  You may proceed.

2          MR. HOSHIJIMA:  Dr. Brigham, did you

3    submit written direct testimony for this case?

4          THE WITNESS:  Yes, I did.

5          MR. HOSHIJIMA:  Have you identified a

6    small correction to a citation in that written

7    direct?

8          THE WITNESS:  Yes, I have.

9          MR. HOSHIJIMA:  In Paragraph 36 should the

10   citation to USX082.001 actually be a citation to

11   another page in the same document, which is

12   USX082.0012?

13         THE WITNESS:  That is correct.

14         MR. HOSHIJIMA:  Does that correction

15   change the substance of your testimony?

16         THE WITNESS:  No, it does not.

17         MR. HOSHIJIMA:  With that correction is

18   your written testimony true and correct to the best

19   of your knowledge?

20         THE WITNESS:  Yes.

21         MR. HOSHIJIMA:  The United States offers

22   Dr. Brigham's direct testimony.

23         THE COURT:  Thank you.

24         (Dr. Jay Brigham's direct testimony was

25   prefiled and admitted.)

Page 627

1                         CROSS-EXAMINATION

2        BY MR. HOPSON:

3        Q.    Good afternoon, Dr. Brigham.

4        A.    Good afternoon, Counsel.

5        Q.    I don't think we have ever met, I am Mark

6    Hopson.   I am one of the lawyers representing

7    Chevron in this case.

8        A.    Nice to meet you, sir.

9        Q.    I have seen you in the courtroom.   I think

10   we have exchanged nods a couple of times?

11       A.    I believe you are correct.

12       Q.    Dr. Brigham, you offer up an opinion and I

13   am actually reading from your direct testimony at

14   Paragraph 46, that the U.S. historical policies with

15   respect to molybdenum had virtually no direct impact

16   on Molycorp's mining operations at Questa, right?

17       A.    That's correct.   I take your word that you

18   read it correctly.

19       Q.    Okay.   Just two qualifiers there.   Your

20   report really did focus on direct impacts not

21   indirect impacts, correct?

22       A.    My report was looking at what I would say

23   is high-level Government policies really beginning

24   right before the Second World War into the

25   mid-1970s.

Page 628

1      Q.    And in reaching that opinion I think we
2  can agree you did not consider every Federal agency
3  policy or Federal agency action that might have had
4  an impact on the Questa Mine, correct?
5      A.    Yes, sir.
6      Q.    What you did look at is programs like the
7  Defense Plant Corporation, that was one of them,
8  right?
9      A.    Yes, sir.
10     Q.    You looked at the Emergency Plant
11 Facilities Contract program, right?
12     A.    Yes.
13     Q.    And without going through all of them, you
14 also looked at a Certificate of Necessity program
15 that provided for accelerated tax depreciation,
16 correct?
17     A.    That's correct.
18     Q.    And you agree that Molycorp would not
19 necessarily have had to apply for or receive one of
20 these specific benefits to be encouraged to increase
21 production?
22     A.    I believe that's correct.
23     Q.    Now, your focus, as you said, was on these
24 World War II era and Korean War era programs, right?
25     A.    Those were two of my focuses.

Page 629

1     Q.    Right.  You didn't consider, for example,

2  whether the Mining Law of 1872 had any impact on how

3  Molycorp developed the Questa Mine?

4     A.    I did not examine the 1872 Mining Law.

5     Q.    Okay.  And you didn't consider to what

6  extent the Forest Service's Northern New Mexico

7  policy caused the Forest Service to encourage or

8  take actions to facilitate the mining at Questa,

9  right?

10     A.    I did not look at that.

11     Q.    You didn't focus on whether special use

12  permits were granted to Molycorp by the Forest

13  Service to enable or facilitate the development of

14  the mine?

15     A.    I did not.

16     Q.    You didn't consider the extent to which

17  the land exchange, which we have talked a lot about,

18  facilitated or encouraged the development of the

19  Questa Mine?

20     A.    I did not.

21     Q.    You didn't look at the extent to which the

22  land exchange actually affected the current location

23  of mine waste at the Questa site?

24     A.    No, I did not.

25     Q.    And you also didn't consider any actions

Page 630

1    of the Bureau of Land Management and how that might

2    have impacted the Questa Mine?

3        A.    No, I did not.

4        Q.    That includes, of course, looking at sales

5    of land by the BLM, rights of way granted to

6    Molycorp by the BLM, and easements granted to BLM.

7    That is all excluded from the basis of your opinion,

8    right?

9        A.    That's correct.

10       Q.    One of the things that you looked at, in

11   addition to what we have already talked about, is

12   the operation of the U.S. Government's stockpile of

13   molybdenum and you looked both at the so-called

14   Metals Reserve Company and the later national

15   stockpile, correct?

16       A.    Yes, sir.

17       Q.    And you do agree that molybdenum was

18   considered a strategic and critical mineral that was

19   on the United States' stockpile list until 1970?

20       A.    Yes.

21       Q.    And molybdenum actually physically

22   remained in the U.S. Government's stockpile until

23   1975?

24       A.    The sales to remove or to get rid of the

25   molybdenum, if you will, from the stockpile had been

Page 631

1    made but the deliveries had not yet been, the

2    deliveries had not yet been done.

3        Q.    Just like any other stockpile, they just

4    gradually sold it off, right?

5        A.    Yes, gradually.

6        Q.    You do know that only two companies

7    produced molybdenum primarily, and those were Climax

8    and the Questa Mine, correct?

9        A.    Yes.

10       Q.    And we can agree, I think, that you don't

11   have to sell to or buy from the stockpile to

12   recognize that if the Government is making a market

13   it can affect the price, right?

14            (Brief pause in proceedings.)

15       Q.    (By Mr. Hopson)  We both understand that

16   the Government's purchases could increase demand and

17   have an affect on price, right?

18       A.    It could, yes, sir.

19       Q.    And releasing materials, selling materials

20   from the stockpile could cause prices to go down?

21       A.    That is certainly the case, although, as I

22   testified to in my deposition referencing the

23   Government's 30(b)(6) witness, the Government was

24   very cognizant of that and took steps to avoid it.

25   And I also think that comes through in the

Page 632

 1   documentation.

 2       Q.    Right.  They didn't want to dump a lot of

 3   materials from any stockpile on the market at once

 4   and drive down the price, right?

 5       A.    Yes.  They are very cognizant of not

 6   wanting to negatively impact any one industry.

 7       Q.    Now, we have to go back a little ways, but

 8   you do write that the United States did purchase

 9   some molybdenum from Molycorp during World War II,

10   right?

11       A.    Yes, sir.

12       Q.    And you used a document that lists war

13   supply contracts, but only those contracts above

14   $50,000?

15       A.    That's correct.  That is the caveat with

16   that document.

17       Q.    Right.  But you found that Molycorp had

18   ten contracts totaling $2,371,000 to sell molybdenum

19   to the stockpile, correct?

20             I could pull the document up.  This is not

21   a memory test, if you want me to pull the document

22   up.

23       A.    I know the document quite well and your

24   characterization of it is correct, however, I

25   believe those sales were actually to the Treasury

1    Department which I would believe meant that they

2    were going into the land lease program.

3         Q.    Fair enough.

4               **And from all we can tell, that molybdenum**

5    **did come from the Questa Mine, right?**

6         A.    I am not 100 percent sure of that.  It

7    certainly could have.  It is my understanding that

8    Molycorp also had the roasting facilities that was

9    actually from the roasting facilities according to

10   that document.  And perhaps the molybdenum came from

11   either Questa or from another party that Molycorp

12   purchased it from.

13        Q.    **Are you referencing Urad, the roasting**

14   **facility there?**

15        A.    I know Urad was, had some production

16   during the war, they had some labor issues as well.

17   I am not sure if they could have also been

18   purchasing from a third party.

19        Q.    Fair enough.

20              **You're familiar with the DMEA program,**

21   **isn't that correct?**

22        A.    That is correct.

23        Q.    **In fact, you have researched the DMEA**

24   **program for other expert testimony or expert reports**

25   **that you provided over time, right?**

Page 634

1          A.     Yes, I have.

2          Q.     **And you know the DMEA was established to**

3   **encourage production of strategic minerals?**

4          A.     Yes.

5          Q.     **And one of those minerals was molybdenum,**

6   **right?**

7          A.     Yes, it was one of a number.

8          Q.     **And while you didn't focus on it, you did**

9   **note in your testimony that the U.S. entered into a**

10  **DMEA loan with Molycorp in May 1957, right?**

11         A.     Yes, sir.

12         Q.     **And you know, because of your other**

13  **background, that the U.S. Geological Survey or the**

14  **Bureau of Mines would often go on-site and provide**

15  **some technical advice or assistance in the context**

16  **of negotiating these DMEA contracts, right?**

17                MR. HOSHIJIMA:  Objection.  It goes beyond

18  the scope of the direct exam in which we did not

19  have Dr. Brigham look at the DMEA program in the

20  context of this site.

21                MR. HOPSON:  It is impeachment,

22  Your Honor.  His broad opinion is narrowed by not

23  looking at the DMEA program.

24                THE COURT:  Overruled.

25         Q     **(By Mr. Hopson) So what I was asking you is**

1    you know that Federal employees with expertise in

2    mining might go on-site, boots on the ground, to

3    offer advice and assistance to companies who are in

4    the process of seeking DMEA funding, correct?

5        A.    Yes, USGS and/or BOM employees.

6        Q.    And there could be some back and forth

7    between the applicant and the DMEA as these

8    contracts were negotiated, right, sir?

9        A.    That's correct.

10       Q.    You do know and have testified that at the

11   time of the DMEA contract, the underground mine had

12   pretty much played out and they were looking to stay

13   in business in Questa, right?

14       A.    Yes.

15       Q.    And you also know that Molycorp was hoping

16   that a DMEA contract and exploration would allow

17   that to happen?

18       A.    Well, I am certainly aware they made the

19   application and the application was approved.   I

20   think it was a good business decision to seek out

21   the funding.

22       Q.    Do you have any reason to believe it is

23   not accurate to say that the DMEA assistance enabled

24   Molycorp to explore new ore sources?

25       A.    Well, by definition under the DMEA program

Page 636

1    it had to be for exploration of new sources as

2    opposed to existing operations.

3         **Q.    Right.  So the fact is the DMEA program**

4    **did enable Molycorp to explore for new ore sources,**

5    **right?**

6         A.    Yes.

7              MR. HOPSON:  I have no further questions,

8    Your Honor.

9              THE COURT:  Thank you.

10             You may redirect.

11                  REDIRECT EXAMINATION

12   BY MR. HOSHIJIMA:

13        **Q.    Dr. Brigham, you were asked at the**

14   **beginning of that cross-examination about various**

15   **World War II era programs that the Government had to**

16   **incentivize the production of certain materials,**

17   **correct?**

18        A.    Yes.

19        **Q.    You were asked about the Defense Plant**

20   **Corporation program?**

21        A.    Yes, I was.

22        **Q.    And a facilities contract program whose**

23   **name you will be able to tell me?**

24        A.    The Emergency Facilities contract.

25        **Q.    You were also asked just now about the tax**

Page 637

1    depreciation program, correct?

2        A.    Yes.

3        Q.    **Were any of those programs specific to**

4    **molybdenum?**

5        A.    No.  In fact, they were economy-wide and

6    quite broad in what especially Defense Plant

7    Corporation, what could be funded.

8        Q.    **And you were asked and testified about how**

9    **those were World War II and Korean War era programs,**

10   **correct?**

11       A.    Well, to be accurate there was a World

12   War II set of policies and then they were reenacted

13   in September of 1950 with the Production Act.

14       Q.    **You were asked whether there was World**

15   **War II and Korean War period policies would have had**

16   **an indirect impact on Molycorp's operations at the**

17   **Questa Mine, right?**

18            MR. HOPSON:  That misstates the prior

19   testimony, Your Honor, objection.

20            THE COURT:  Restate your question.

21       Q    **(By Mr. Hoshijima) These World War II and**

22   **Korean War policies, did they have a direct impact**

23   **on the Questa Mine?**

24       A.    I don't think a direct impact, no.

25       Q.    **Why not?**

1    A.    Well, Molycorp did not -- chose not to

2    participate in these programs, so that would to me

3    mean they didn't have a direct impact.

4    **Q.    Mr. Hopson asked you whether they could**

5    **nonetheless encourage or have encouraged Molycorp's**

6    **production of molybdenum, correct?**

7    A.    If they had chosen to participate I think

8    that could have happened.

9    **Q.    Supposing such encouragement could have**

10    **happened, what was happening in the timeline of the**

11    **Questa site at the time of these programs?**

12    A.    Are we talking -- are you asking for both

13    World War II period and the Korean period?

14    **Q.    Let's go one at a time.**

15    A.    Well, that during World War II they,

16    obviously, the underground, the first underground

17    mine was still being operated and that actually was

18    the case during Korea, though I believe there were

19    some signs that the mineralized ore had started to

20    tail out.

21    **Q.    All of these programs that Mr. Hopson**

22    **asked you about were before the open pit mine,**

23    **correct?**

24    A.    Yes, sir.

25    **Q.    How would you characterize generally the**

1   **United States' policy about defense-related**

2   **materials during World War II and the Korean War?**

3       A.    Well, especially during World War II,

4   which was much larger in scale and scope in many

5   ways than Korea, but it also is applicable to the

6   Korean War period.  The concern was how to manage

7   scarcity.  There was an overwhelming demand for

8   metals, minerals, fuels, almost an endless list of

9   commodities and items, and the Government needed

10  to -- the Government had to institute programs to

11  encourage further development, further use and also

12  to make sure that those engaged in production for

13  either of the wars were receiving the materials over

14  those who were engaged in production that was not

15  essential to the war, or the wars in this case.

16      Q.    **Was there any change in that national**

17  **defense policy by the time Molycorp had started the**

18  **open pit mine at Questa?**

19      A.    Well, I believe, you know, you originally

20  asked me about wartime policies, which I described.

21  I do believe there was a change in the

22  United States' defense posture in the mid-1950s

23  after the Korean War.

24      Q.    **How would you describe that change?**

25      A.    The change was a result of the election of

Page 640

1    President Eisenhower, who pledged in the war in

2    Korea, which he did.   President Eisenhower also had

3    a very great concern about balancing the budget and

4    reducing defense spending.

5            To that end he came up with what was

6    deemed the New Look defense policy, which was much

7    more relying on the Air Force and the nuclear

8    deterrent, at that time, bombs but within a few

9    years missiles, as well as covert operations.

10           And again it was largely motivated by a

11   concern with spending and Federal spending.   I think

12   that impacts a lot of what we actually talked about

13   with the move away, you know, the decline in the

14   stockpile, the expense associated with it, excuse

15   me, and those types of things.

16      **Q.    To be clear are we talking about --**

17           MR. HOPSON:   Your Honor, I am going to

18   object.   This is very interesting but far beyond the

19   scope of my cross.

20           THE COURT:   That's correct.

21      **Q    (By Mr. Hoshijima) How would you describe**

22   **the impact that a change in policy in the 1950s had**

23   **on the United States' defense interest in**

24   **molybdenum?**

25           MR. HOPSON:   Beyond the scope, Your Honor.

1                THE COURT:  Sustained.

2        Q    (By Mr. Hoshijima) You were asked on your

3    cross-examination about various other laws like the

4    Mining Law or the Northern New Mexico policy.

5            Do you recall that?

6        A.   Yes.

7        Q.   And other Forest Service and land

8    management agencies policies, like special use

9    permits?

10       A.   I recall those questions.

11       Q.   Do you have expertise generally with the

12   United States' historic defense policy during this

13   time period?  And by that, I mean the '50s and the

14   '60s?

15       A.   Yes.

16       Q.   Were those programs considered important

17   parts of a national defense policy?

18       A.   Those aren't programs that I would

19   normally think of when I would be thinking of a

20   national defense policy.

21       Q.   You were also asked about the national

22   defense stockpile and molybdenum's inclusion in that

23   stockpile, correct?

24       A.   Yes.

25       Q.   You were asked about how there was

Page 642

1      molybdenum in that stockpile until the 1970s.

2                 Do you recall that?

3      A.     I recall those questions.

4      Q.     When does the amount of molybdenum in the

5      stockpile peak?

6      A.     It was in 1956.

7      Q.     Are you aware of the United States

8      purchasing any molybdenum for the stockpile at any

9      point after that time?

10     A.     No, I am not.

11     Q.     In fact was there a time after that when

12     the Government was diverting deliveries to the

13     stockpile?

14     A.     Well, it was in 1956 when they diverted,

15     first made a diversion from the stockpile.  And I

16     believe I might have misspoke a moment ago, it is

17     '56, '57 were the high points.

18     Q.     So why is it, then, that there is

19     molybdenum in the stockpile until the 1970s if the

20     Government's really not acquiring any more after the

21     mid-1950s?

22     A.     Well, there is a couple of reasons.  By

23     the late '50s Congress was starting to look at this

24     and there was concern about it, as I have mentioned.

25     The expense of maintaining the stockpile, not just

Page 643

1    molybdenum, but the entire stockpile, there is quite

2    a few things in it.  It took Congress several years

3    until 1962 to pass the first law to authorize sales

4    out of it.

5              And there were subsequent laws, obviously,

6    but as I testified, there was a concern that you

7    don't want to flood the market of molybdenum or any

8    other market.

9        **Q.    You were asked at last about purchases**

10   **that the Government made of molybdenum from Molycorp**

11   **during World War II.**

12             **Do you recall that testimony?**

13       A.    Yes.

14       **Q.    You were asked if you could say whether**

15   **any of the molybdenum came from the Questa site.**

16             **Do you recall that?**

17       A.    Yes.

18       **Q.    What are the other possible sources that**

19   **Molycorp could have had for the molybdenum that it**

20   **sold to the United States in World War II?**

21       A.    Well, as I believe I have testified, the

22   Urad mine in Colorado did have some production and

23   then it is possible that the roasting facilities at

24   Molycorp in Washington, New York, Pennsylvania,

25   perhaps purchased it on the market.

1    Q.    Are you aware of any evidence that would

2   suggest one way or the other if it is more likely

3   that the molybdenum that Molycorp sold under those

4   contracts came from Questa or from one of those

5   other sources?

6    A.    I have seen nothing to indicate from where

7   that material came from.

8    Q.    Because we don't have that historical

9   documentation anymore?

10    A.    That is correct.  Those contracts have

11   long since been destroyed.

12    Q.    Do you know if Molycorp ever sold

13   molybdenum to the United States at any point after

14   World War II?

15    A.    Not with certainty.

16    Q.    Are you aware of any evidence that the

17   Government purchased molybdenum from Molycorp after

18   World War II?

19    A.    Again, we don't have that, we don't have

20   that documentation.  I can't testify one way or the

21   other.

22    Q.    If Molycorp was not selling molybdenum to

23   the United States, who would it have been selling to

24   after World War II?

25    A.    Other private enterprise, steel companies,

1   other companies that would use molybdenum for one

2   thing or another.

3       **Q.    Were private steel companies, then, the**

4   **major consumers of molybdenum?**

5       A.    I know from the documentation that the

6   majority of molybdenum went into steel, steel

7   products into steel, yes.

8       **Q.    Do you know if most of those steel**

9   **products would have eventually been bought up or**

10  **used by the United States Government?**

11      A.    Well, I am sure some of those steel

12  products were used for by the Government for defense

13  or other purposes.  I would also suspect some went

14  to, into the private market.

15      **Q.    Well, what were some of the possible uses**

16  **of that molybdenum containing steel in the private**

17  **market?**

18      A.    Well, people use steel for many things.

19  You could use it for bridge building, you could use

20  it for any number of things.  You could use it in

21  the, you know, the '50s and the '60s were the age of

22  the big cars, they still had a lot of steel in them.

23  They wouldn't surprise me.

24      **Q.    And when you say cars, are you talking**

25  **about passenger cars that private citizens would**

Page 646

1    use?

2         A.    Yes, Detroit, for lack of a better phrase.

3         Q.    **You were asked by Mr. Hopson about the**

4    **DMEA program.**

5               **Do you recall that?**

6         A.    Yes.

7         Q.    **Now, to be clear, you weren't asked to**

8    **review Molycorp's documentation or the documentation**

9    **relating to Molycorp's DMEA contract, correct?**

10        A.    Yes, I was, I was told that Dr. Quivik

11   would review that.  I was asked not to.

12        Q.    **Nonetheless do you have general knowledge**

13   **of the DMEA program?**

14        A.    Yes, I do.

15        Q.    **And that is what Mr. Hopson asked you**

16   **about, correct?**

17        A.    Yes, it is.

18        Q.    **Where does that knowledge come from?**

19        A.    I testified in my deposition, that was in

20   December of 2019, that I had worked on the Federal

21   resources case up in Northern Idaho.

22               Since my deposition I was asked to work on

23   the Gold King case involving the Domingo Mining

24   District in Colorado, and I looked at a number of --

25   well, actually they were DMEA and also OME

1   contracts.

2      **Q.    Based on that other experience which**

3   **Mr. Hopson asked you about, do you have knowledge**

4   **about the end of the DMEA program?**

5      A.    Yes, I do.

6      **Q.    When and how did the DMEA program come to**

7   **an end?**

8      A.    It officially came to an end in the spring

9   of 1958.

10          At that time it was decided that the

11   defense element of it was no longer needed.  So the

12   DMEA went out of business, so to speak, and the OME

13   replaced it.

14          The OME was -- and the documentation, it

15   is in the record, was that although you don't need

16   this encouragement for national defense, it is good

17   public policy, anyway, for sound economic growth.

18          One of the differences between the DMEA

19   and the OME is that under OME there was an interest

20   component added, so it is not quite as favorable as

21   it was under the DMEA.

22      **Q.    You said it was in 1958 that the DMEA**

23   **program came to an end?**

24      A.    That is when it officially came to an end.

25      **Q.    That was less than a year after the DMEA**

Page 648

1    contract in this case was signed?

2        A.    Yes.  In fact, I believe it was in May of

3    '58, so it was almost maybe exactly a year.

4        Q.    So the DMEA contract that was signed here

5    shortly before the end of the DMEA program, did the

6    United States honor it?

7        A.    Yes.

8             MR. HOSHIJIMA:  Let's quickly pull up

9    CX089, which has been previously admitted.

10       Q.    (By Mr. Hoshijima)  This is a 1958

11   Government report.

12             Are you familiar with this document?

13       A.    Yes, I have seen this.

14             MR. HOSHIJIMA:  Can you turn to PDF

15   Page 20 of the report.  Under the heading Enactment

16   of a New Program, can we magnify that first

17   paragraph.

18       Q.    (By Mr. Hoshijima)  Do you see where it

19   says that in 1957 ODM advised that there was no

20   longer a defense necessity for the DMEA program?

21       A.    Yes, I see that.

22       Q.    Is that consistent with your understanding

23   of the history of that program?

24       A.    Yes, it is.

25       Q.    And ODM, do you recall what that was?

1      A.    I believe it is Office of Defense

2   Management.

3      **Q.    The sentence after that it says that all**

4   **minerals and metals expansion goals had been filled**

5   **and stockpiles of most such commodities were now**

6   **sufficient.**

7           **Is the history of the United States'**

8   **stockpile of molybdenum consistent with that**

9   **statement?**

10     A.    Yes, it is.

11          MR. HOSHIJIMA:  I have no further

12   questions.

13          THE COURT:  Thank you.

14          You may step down, sir.

15          THE WITNESS:  Thank you, Your Honor.

16          (Whereupon, the witness was excused.)

17          THE COURT:  You may call your next

18   witness.

19          MR. AUGUSTINI:  No more witnesses,

20   Your Honor.

21          THE COURT:  Thank you.  We are out of

22   witnesses.  Do we have any idea when the next

23   witness will be available?

24          MS. CRISHAM PELLEGRINI:  Your Honor, we

25   just spoke with Dr. Haddad and his mother

Page 650

1   unfortunately took another turn for the worse and is

2   in the hospital, so he is still unclear as to when

3   he will be available, but he is hoping to find that

4   out shortly.  He will let us know and then we can

5   confer with the Government.

6            THE COURT:  Very good we will go into

7   recess and wait on how his mom does and we will try

8   to set up a date, as I say, probably the week after

9   next at the earliest, depending on what happens to

10  me in Denver.

11           So thank you-all for your presentations,

12  they were very helpful, and we'll be in recess

13  subject to call.

14           (Proceedings concluded at 2:57 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Page 651

1                    REPORTER'S CERTIFICATE

2

3         I certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.   I further certify that the

6    transcript fees and format comply with those

7    prescribed by the Court and the Judicial Conference

8    of the United States.

9

10   Date:  March 16, 2022

11

12         _____

13         PAUL BACA, RPR, CCR
           Certified Court Reporter #112
14         License Expires:  12-31-2022

15

16

17

18

19

20

21

22

23

24

25