Page 209

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


CHEVRON MINING,

           Plaintiff

vs.                          No. 1:13-CV-00328 PJK/JFR

UNITED STATES OF AMERICA,
UNITED STATES DEPARTMENT OF THE INTERIOR,
UNITED STATES DEPARTMENT OF AGRICULTURE,

           Defendants.



TRANSCRIPT OF PROCEEDINGS

March 15, 2022

Volume 2
Pages 209 - 444


BEFORE:  HONORABLE JUDGE PAUL KELLY
         UNITED STATES 10TH CIRCUIT JUDGE




    Proceedings reported by stenotype.

    Transcript produced by computer-aided

transcription.

Page 210

```
 1   A P P E A R A N C E S:

 2   FOR THE PLAINTIFF:

 3           MODRALL SPERLING
             500 Fourth Street NW, Suite 1000
 4           Albuquerque, New Mexico  87103
             505-848-1800
 5           BY:  MEGAN MUIRHEAD
             mmuirhead@modrall.com
 6
                       - and -
 7
             SIDLEY AUSTIN, LLP
 8           1501 K Street N.W.
             Washington, D.C.  20005
 9           202-736-8000
             BY:  GORDON TODD
10           gtodd@sidley.com
                 MARK HOPSON
11           mhopson@sidley.com
                 BENJAMIN MUNDEL
12           bmundel@sidley.com
                 ELLEN CRISHAM PELLEGRINI
13           epellegrini@sidley.com

14   FOR THE DEFENDANT:

15           U.S. DEPARTMENT OF JUSTICE
             ENVIRONMENT and NATURAL RESOURCES DIVISION
16           ENVIRONMENTAL DEFENSE SECTION
             P.O. Box 7611
17           Washington, D.C.  20044-7611
             202-616-6519
18           BY:  BRYAN JAMES HARRISON
             Bryan.Harrison@usdoj.gov
19               TSUKI HOSHIJIMA
             Tsuki.Hoshijima@usdoj.gov
20               MICHAEL AUGUSTINI
             Michael.Augustini@usdoj.gov
21               KIMERE KIMBALL
             Kimere.kimball@usdoj.gov
22

23

24

25
```

Page 211

1                          I N D E X

2    WITNESS:                                        PAGE:

3    DR. NEAL RIGBY

4         Cross-Exam (Cont'd) by Ms. Kimball         213
          Redirect Examination by Mr. Hopson         225
5
     DAVID FREDLEY
6
          Cross-Examination by Mr. Harrison          263
7         Redirect Examination by Mr. Hopson         345

8    TIMOTHY CONSIDINE

9         Cross-Examination by Mr. Hoshijima         358
          Redirect Examination by Mr. Hopson         423
10

11   Certificate of Reporter                         444

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 212

1           THE COURT:  Good morning, you may be

2    seated.

3           Where is our witness?

4           MR. TODD:  Dr. Rigby is back there, Your

5    Honor.  I think we have one thing to take care of.

6           THE COURT:  He is hiding back there?

7           MR. TODD:  He will be called in a minute,

8    Your Honor.  We have one other item to deal with

9    first, if that is okay.

10          MS. KIMBALL:  Your Honor, we have not yet

11   moved to admit the deposition designations.  We just

12   want to jointly move to admit the deposition

13   designations into the record.

14          THE COURT:  All right.

15          MR. TODD:  Chevron recalls Dr. Rigby.

16          THE COURT:  Okay.  You are still under

17   oath.

18          (Whereupon, the witness was previously

19   sworn.)

20          THE COURT:  You may proceed.

21          MS. KIMBALL:  Thank you, Your Honor.  All

22   right.  Can you hear me all right?

23          THE COURT:  I'm sorry?

24          MS. KIMBALL:  Can you hear me all right?

25          THE COURT:  Go ahead.

1                    CROSS-EXAMINATION (Continued)

2        BY MS. KIMBALL:

3        Q.    Dr. Rigby, Chevron conducted a substantial

4    amount of exploration after the end of the DMEA

5    contract and before developing the open pit,

6    correct?

7        A.    Certainly did.

8        Q.    And no Federal employee told Chevron how

9    to conduct its privately-financed exploration,

10   correct?

11       A.    Not that I am aware of.

12       Q.    Chevron did not consult with DMEA or any

13   other Federal agency when developing the open pit,

14   correct?

15       A.    I am not in a position to really say.  I

16   don't know what they did.

17       Q.    All right.  Let's turn to your opinions

18   regarding the Red River plan.

19             You testified that Chevron had an idea to

20   dump its waste rock on top of the state highway and

21   river in the Red River Canyon, correct?

22       A.    I did.

23       Q.    And the highway we are talking about is

24   State Highway 38, correct?

25       A.    It is.

1     Q.     And the river is the Red River, correct?

2     A.     Yes.

3            MS. KIMBALL:  Let's pull up U.S. Demo 03.

4     Q.     (By Ms. Kimball)  Do you recognize this

5     image as the image of the mine as it is today?

6     A.     I believe so, yes.

7     Q.     And can you just identify on this drawing

8     where the Red River fill plan would be.

9            So it would run the entire length from

10    Columbine Canyon down to the mill facility, correct?

11    A.     What was the question?

12    Q.     Your plan would run from Columbine Canyon

13    down to the mill facility?

14    A.     Not necessarily.  That is the route, the

15    relevant place.  You see the front piles on the

16    right-hand side there, but my own belief, the

17    designs, the concepts that we came up with, it was

18    never defined how long that tunnel, culvert would

19    need to be, there is so much flexibility in the

20    design.

21           You know, maybe I think I said in my

22    report a half a mile.  It could have been a quarter

23    of a mile, it could have been -- you know, the

24    minimum would have been 150 feet if you just needed

25    a bridge to cross the 38 and the Red River.  So we

Page 215

1  give examples of what it would look like and some

2  alternative lengths, but that was never finalized

3  because the concept was basically killed.

4      **Q.    And so you have never actually seen any**

5  **engineering plans for what they were planning to do,**

6  **correct?**

7      A.    I heard yesterday that some did exist but,

8  unfortunately, I haven't seen any other than the

9  ones that we prepared.

10     **Q.    You have never seen anything that Molycorp**

11 **prepared?**

12     A.    No.

13     **Q.    And you have never seen any evidence that**

14 **they presented any plans to the Forest Service?**

15     A.    Not that I am aware of.

16     **Q.    And how tall would the valley fill have**

17 **needed to have been?**

18     A.    Again, if you read my report, I do discuss

19 the flexibility that one had.  And in terms of, I

20 mean, we have a volume that we need to dispose of,

21 maybe 350 million tons or thereabouts, but you have

22 got so many different dimensions.  You have got both

23 sides of the valley, and therefore -- and the

24 dimensions that you could use with that volume and

25 that tonnage really would depend upon -- because I

Page 216

1  believe in progressive restoration, you would

2  basically build the waste-rock dumps with a view to

3  a final landfall and a final restored surface.

4         And therefore not having been finalized,

5  my point is you could have placed the waste-rock to

6  replicate the topography in the region so that

7  post-reclamation and restoration with trees, scrub,

8  et cetera, et cetera, you really wouldn't know that

9  that was actually waste-rock dump.

10     **Q.   And all of this is your, you're theorizing**

11  **about what could have happened, not anything that**

12  **Molycorp had actually planned.  You have never seen**

13  **any plans that they --**

14         THE COURT:  He has already answered that

15  question.

16     **Q   (By Ms. Kimball) Okay.  But you have never**

17  **seen anything from Molycorp that shows that they**

18  **were planning to do --**

19         THE COURT:  He already answered that

20  question, too.  We are going to have to move this

21  along, so try not to repeat yourself.

22         MS. KIMBALL:  Okay.  I'm sorry.

23     **Q   (By Ms. Kimball) Chevron did not own the**

24  **land with the state highway on it, correct?**

25     A.   I don't believe so.

1    Q.    The Forest Service owned that land and

2    New Mexico had an easement for that highway?

3    A.    I believe so.

4    Q.    And Chevron would have needed permission

5    from both the Forest Service and New Mexico in order

6    to tunnelize the highway?

7         MR. TODD:  Objection, Your Honor, calls

8    for a legal conclusion.  I don't know that

9    Dr. Rigby, is here as a -- well, he is not here as

10   an expert in land use law or state law.

11        THE COURT:  He can say that.

12   A.    Could you repeat the question then,

13   please.

14   Q    (By Ms. Kimball) Would Chevron have needed

15   permission from the Forest Service and the State of

16   New Mexico to tunnelize the highway?

17   A.    I don't know, but I would assume possibly,

18   yes.

19   Q.    And Chevron did not own the river?

20   A.    No.

21   Q.    The State of New Mexico owned the river?

22   A.    I believe.

23   Q.    And so they also would have needed

24   permission from the State of New Mexico to tunnelize

25   the river?

1      A.     I would assume so.

2      Q.     **And as we sit here today you have never**

3   **seen any evidence that they ever broached this issue**

4   **with the State of New Mexico?**

5      A.     I think, as I indicated earlier, the

6   project never advanced that far, unfortunately.

7      Q.     **But if they did not have permission to go**

8   **over the river, they never could have done this plan**

9   **either, correct?**

10     A.     I would have hoped so, yes.

11     Q.     **And the State of New Mexico had already**

12  **been concerned about the impact the mine was having**

13  **on the river, correct?**

14     A.     I am not sure.

15            MS. KIMBALL:  Mr. Hambrick, could you pull

16  up CX209, which has previously been admitted?

17            THE COURT:  What was that again?

18            MS. KIMBALL:  CX209.

19            THE COURT:  Okay.

20     Q.     **(By Ms. Kimball)  Dr. Rigby, this --**

21            MR. TODD:  Your Honor, objection.

22            THE COURT:  State your objection.

23            MR. TODD:  I am going to sit back down, if

24  that's okay, so you can hear me, Your Honor.

25            THE COURT:  I can hardly understand you.

Page 219

1              MR. TODD:  I apologize for sitting.  Your

2    Honor, I gave Ms. Kimball some leeway yesterday in

3    raising environmental issues.  We do have a

4    stipulation dealing with environmental issues.  This

5    is about the third or fourth time that she has asked

6    about this with this witness.

7              I object to this line of testimony.  The

8    impact to the river has nothing to do with the

9    allocation issues, perspective issues before the

10   Court today.  That is for the third phase.

11             THE COURT:  Sustained.

12             MS. KIMBALL:  Your Honor, if I may.  I am

13   bringing this up only to point out the --

14             THE COURT:  No.  We have a stipulation.  I

15   have got it right here, if you need a copy of it.

16       **Q    (By Ms. Kimball) Dr. Rigby, you have never**

17   **seen any evidence that Molycorp had discussed the**

18   **impact that the Red River plan would have on the --**

19   **that the dump fill itself would have on the river?**

20             THE COURT:  Counsel, we have been down

21   that road.  Now I want you to move on.

22       **Q    (By Ms. Kimball) Dr. Rigby, you opined**

23   **filling the river with waste-rock could have been an**

24   **economically superior option, correct?**

25        A.    Yes.

1      Q.    And you estimate that the Red River dump

2   idea would have cost approximately $2.4 million,

3   correct?

4      A.    An indicative cost, yes.

5      Q.    And the land exchange cost Chevron

6   approximately $85,000, correct?

7      A.    I believe so.

8      Q.    And your estimate for 2.4 million only

9   estimates the cost of the steel for the tunnel,

10   correct?

11      A.    It was a cost of culverts based on a

12   quotation from an engineering company for a similar

13   structure which would have been used for another

14   internal waste dump on the erection site on the pit,

15   which is where they erected the shovels and that

16   would require access, maintenance of access for haul

17   trucks.

18            I thought that was a good indicator

19   because that dump would probably have been much

20   higher than what you envisioned in the Red River

21   Valley waste disposal concept.

22      Q.    It was only for the steel and the

23   construction materials for the culverts themselves?

24      A.    It was basically everything for the

25   culvert.

1    Q.    Did it include the labor for the culvert?

2    A.    I believe it was an all-in cost.

3    Q.    And the haulage tunnel that you were

4    basing this on, that wasn't going to be over a

5    public highway, correct?

6    A.    It was an internal access road used by

7    these enormous haul trucks.

8    Q.    And a dry haulage culvert doesn't have to

9    accommodate vehicles traveling highways, correct?

10    A.    Oh, yes, there are certain restrictions on

11    mines in terms of speed limits.

12    Q.    Right.  So there aren't the same -- they

13    are not traveling the same speed as you travel on

14    the highway, correct, as cars travel on the highway?

15    A.    Well, I think and it is like my earlier

16    response because the concept was flatly refused by

17    the Forest Service, vigorously opposed, I think the

18    term was, that this detail was never really gotten

19    into.  And I suspect if it had gone forward, there

20    would have been some additional speed restrictions

21    within the culvert of R38.

22    Q.    You think the state highway tunnel would

23    have been reduced in speed?

24    A.    I would say that would have been one

25    consideration.

1    **Q.    Okay.  But you haven't seen anything from**

2    **Molycorp evidencing --**

3            THE COURT:  Counsel, he has already

4    testified he has seen nothing.

5    **Q    (By Ms. Kimball) You also opined that the**

6    **Red River plan was technically feasible.  Dr. Rigby,**

7    **the tailings pipeline runs along the same route that**

8    **you had planned for the Red River fill plan,**

9    **correct?**

10   A.    It does indeed.

11           MS. KIMBALL:  And, Mr. Hambrick, could you

12   pull up USX373, which has previously been admitted.

13   **Q.    (By Ms. Kimball)  This shows the route of**

14   **the tailings pipeline, correct?**

15   A.    Yes, I believe so.

16   **Q.    It is running the full length of the mine?**

17           MS. KIMBALL:  I think there is an issue

18   with what documents are being pulled up.  The Clerk

19   needs to switch the screen to show from the defense

20   exhibits.

21           Thank you.

22   **Q    (By Ms. Kimball) All right.  This shows the**

23   **tailings pipeline that runs along the mine, correct?**

24   A.    Well, it runs along the southern boundary

25   of the mine, yes.

1      **Q.     It runs along the river and the highway**

2  **the entire length, right?**

3      A.     The logical place to locate it.

4           MS. KIMBALL:  And if we could turn to

5  CX432.

6      **Q.     (By Ms. Kimball)  This shows your three**

7  **markups of the potential valley fill idea, correct?**

8      A.     Those are three markups, just examples of

9  what it could look like, certainly not a

10  recommendation.

11           THE COURT:  Let me interrupt you for a

12  minute.  What has this got to do with anything that

13  we are dealing with today?  Anything?

14           MS. KIMBALL:  Well, Chevron has --

15           THE COURT:  Well, they said that it never

16  got beyond the discussion and it was quenched right

17  away.  So why do we even have to get into the

18  details?  How is it relevant?  If you can show me

19  relevance, you can go do it.

20           MS. KIMBALL:  Well, Chevron has asserted

21  that the United States is liable for the rock piles

22  because they could have -- there was this

23  possibility --

24           THE COURT:  That is hardly an issue.

25           MS. KIMBALL:  Okay.

1          THE COURT:  We are here to allocate based

2    upon the fact that the Government is deemed to be a

3    potentially responsible party by the Tenth Circuit.

4    And we have covered this and covered it and covered

5    it.  You could cover the river with it, and so I

6    would like to move on or we are going to be here for

7    months.

8          MS. KIMBALL:  Thank you, Your Honor.

9      **Q     (By Ms. Kimball) Dr. Rigby, regardless of**

10   **whether Chevron may have preferred an option other**

11   **than the waste-rock piles that it has already**

12   **created, they did, in fact, seek and obtain**

13   **ownership over their own waste-rock piles, correct?**

14     A.     By way of the land exchange, yes.

15     **Q.     And they have had exclusive ownership of**

16   **those waste-rock piles for the past 50 years,**

17   **correct?**

18     A.     '74 to now, almost.

19     **Q.     So about 50 years?**

20     A.     Yes.

21          MS. KIMBALL:  No further questions,

22   Your Honor.

23          THE COURT:  You may redirect.

24

25

1                    REDIRECT EXAMINATION

2      BY MR. TODD:

3      Q.    **Good morning, Dr. Rigby.**

4      A.    Good morning.

5      Q.    **Dr. Rigby, let me start where Ms. Kimball**

6      **started yesterday.  You were asked some questions**

7      **about acid rock drainage and showed some pictures of**

8      **some yellow water and there was discussion of acid**

9      **rock drainage from there and the rock piles.**

10           **Do you recall those questions?**

11     A.    I do.

12     Q.    **What happens to all of the water that**

13     **comes off the rock piles or in either of those**

14     **pools?**

15     A.    It is basically collected, treated and

16     discharged.

17     Q.    **Now, is the mine the only place in the**

18     **valley where acid rock drainage occurs?**

19     A.    No, no.

20     Q.    **Where else does it occur?**

21     A.    Multiple hydrothermal alteration scars,

22     which as I mentioned yesterday, during rainfall

23     events, snow melt, et cetera, et cetera, creates

24     erosion flows, which basically flow down the steep

25     sides of the valley across the R38 and into the Red

1    River.  So regular occurrence and has been forever.

2         Q.    **Have these been known to impact the road**

3    **and the river?**

4         A.    Absolutely.

5         Q.    **How so?**

6         A.    The deadly flows need to be cleared, so

7    the R38 is closed while the authorities clear the

8    debris, and it basically, because of the acid

9    generating nature of the material, it clearly

10   reduces the pH in the Red River and turns the Red

11   River red, plus turbidity.

12        Q.    **Now in the 1960s and 1970s when the**

13   **waste-rock piles were being created, are you aware**

14   **of the Government ever objecting to the waste-rock**

15   **piles as being a source of potential acid rock**

16   **drainage?**

17        A.    No.

18        Q.    **What is your understanding of what the**

19   **Forest Service issue was of the waste-rock piles?**

20        A.    I believe they viewed the waste-rock piles

21   favorably or positively because they reduced -- they

22   basically sealed existing hydrothermal scars in that

23   location and inhibited ARD from that material.

24             MR. TODD:  Could we turn, Patty, please to

25   Chevron Exhibit 281, Page 5.

1             Let's go to the next page, please.

2             And highlight the third paragraph down

3      under Section 3, starting, "There are several."

4       Q.    (By Mr. Todd)  Dr. Rigby, this is the

5      Forest Service's environmental assessment and

6      justification of a land exchange, so justifying

7      giving land to Molycorp for waste rock disposal?

8       A.    Yes.

9       Q.    How did the Forest Service deal or view

10     the waste-rock piles here?

11      A.    As I said, positively, but it reduced this

12     impact.

13      Q.    Let's move on.  You were asked lots of

14     questions about Molycorp's exploration program at

15     Questa in 1954 to 1956, so prior to the DMEA loan.

16             Do you recall that?

17      A.    I do.

18      Q.    Now the Government has asserted that

19     Molycorp in those years was using diamond drilling

20     to search for a low grade ore body.  I take it the

21     answers on cross yesterday that you disagree with

22     both of propositions?

23      A.    Correct.

24      Q.    Let's start with drilling.  The Government

25     on cross with both witnesses yesterday extolled

1    **Mr. John Schilling as an expert regarding the Questa**

2    **Mine in the 1950s.**

3            **Do you recall that?**

4    A.    I do.

5    **Q.    Do you agree with that assessment of**

6    **Mr. Schilling's expertise?**

7    A.    A very, very capable exploration

8    geologist, yes.

9    **Q.    And very familiar with the mine?**

10   A.    Indeed.

11          MR. TODD:  Let's pull up CX043, the 1956

12   Schilling report, please.  Let's please turn to

13   Page 8 to 9 of the report, which is starting at

14   Page 22 of 104.

15   **Q.    (By Mr. Todd)  Dr. Rigby, how does**

16   **Mr. Schilling -- what exploration methods does**

17   **Mr. Schilling report as of 1956 that Molycorp was**

18   **using or not using at the Questa Mine?**

19   A.    Basically underground exploration is

20   carried on by drifting and raising among the veins,

21   crosscutting where appropriate and, as he says,

22   diamond drilling is not used.

23   **Q.    If diamond drilling had been used at**

24   **Questa?**

25   A.    He would have known.

Page 229

1     Q.     He would have known?

2     A.     Indeed.

3            MR. TODD:  Let's pull up CX054.

4     Q.     (By Mr. Todd)  And this, Dr. Rigby, to

5     move us along, is the DMEA field team's Final Joint

6     Geological and Mine Drilling report.

7     A.     Yes.

8     Q.     What was the purpose of this document?

9     A.     It was basically a first opinion on, or an

10    assessment of what Molycorp was proposing in support

11    of their application for a DMEA funding.

12    Q.     And it is dated April 2, 1957.

13           Do you see that?

14    A.     Yes.

15    Q.     This is another contemporaneous account of

16    what was at the mine?

17    A.     Indeed.

18    Q.     Would the field team have inspected the

19    mine in person?

20    A.     Yes.

21    Q.     As well as reviewing documentation?

22    A.     Correct.

23    Q.     How comprehensive of a review in your

24    understanding would the field team had taken?

25    A.     I think, as I alluded to yesterday, really

1    to me it was the expertise experience and capability

2    of the geologists and engineers within the DMEA, the

3    USGS and the Bureau of Mines that had tremendous, I

4    think, impact on this program because they took

5    their jobs very, very seriously and they did, to me,

6    a very detailed assessment of, A, what was being

7    proposed in the context of the geological

8    environment and the geological understanding which

9    existed at the time for the Questa Mine.

10           MR. TODD:  Let's turn to Page 6, which is

11   16 of 54.

12      Q.    (By Mr. Todd)  Dr. Rigby, what exploration

13   methods did the DMEA field team in 1957 report were

14   used or not used at the Questa Mine?

15      A.    Well, basically drifts and crosscuts.  As

16   you can see, no diamond drilling has been done.  And

17   basically assay records have not been kept or are

18   not available.  And this is fundamental information

19   that you must have at a mine or certainly for

20   geological evaluation.

21      Q.    You stressed the importance of sampling

22   and assaying yesterday in response to a question

23   from Ms. Kimball.  What sorts of sampling was

24   Molycorp using pre-DMEA?

25      A.    Because it was looking for high grade

1    veins, high grade veins are clearly visible once you

2    intersect them, and therefore they didn't really

3    need, you know, comprehensive sampling.  But, and I

4    think what I was aware of was that apparently they

5    occasionally take grab samples from all cuts as they

6    are coming out of the mine.

7              Well, the problem of that is where exactly

8    did that sample come from?  That sample is very good

9    for that sample in terms of the limited content, but

10   you don't know in three-dimensional space where it

11   actually came from, so it is not particularly

12   helpful.

13     **Q.    You mentioned in your testimony some other**

14   **types of samples, knot samples and channel samples?**

15     A.    Knot samples, channel samples and indeed

16   in diamond drilling you actually get a core, you

17   composite sections of that core, assay that core, so

18   you get a specific location and grade of that

19   sample, which is critical especially when you are

20   looking for low grade deposits.

21     **Q.    Now the Government yesterday showed**

22   **USX003, which was an SEC filing from 1964, which**

23   **stated that there was diamond drilling and searching**

24   **for low grade ore as of 1954.**

25              **Based on the materials you have just seen**

1    that is not correct.  If Molycorp was not using

2    exploratory drilling or representative sampling

3    prior to 1956, is it possible at all in your

4    experience and your expertise that that they were

5    searching for a low grade ore body?

6         A.    I don't believe so, no.

7         Q.    What sort of ore was Molycorp exploring

8    for prior to the DMEA program?

9         A.    What they always explored for, which was

10   high grade vein system that would support their

11   operations as they had done since 1921.

12         MR. TODD:  Let's pull up Mr. Schilling's

13   report again, CX43.

14         Q.    (By Mr. Todd)  The Government asserts that

15   Molycorp's DMEA application was driven in part by

16   Mr. Schilling's discussion of low grade ore at

17   Questa.

18              Do you agree with that?

19         A.    Well, if it was I would have thought that

20   they would have appended Mr. Schilling's geological

21   assessment to their application, but they didn't.

22         Q.    And during Mr. Dewey's testimony we heard

23   that Mr. Schilling did identify low grade

24   mineralization at Questa but concluded that what was

25   known at that point wasn't commercially viable.

1           **Do you recall that?**

2      A.    That's right, they were not large enough.

3            MR. TODD:  Let's turn to Page 92, please,

4      of this report.

5      **Q.    (By Mr. Todd)  Looking at the top of the**

6      **paragraph here, the highlighted text, what did**

7      **Mr. Schilling say had to happen first before one**

8      **could know whether there was commercially viable low**

9      **grade ore at Questa?**

10     A.    It would need a detail study of grade and

11     tonnage to establish economic value like any mine.

12     **Q.    And what would such a study entail?**

13     A.    A large amount of drilling, bulk sampling,

14     as a precursor to scoping study, a pre-feasibility

15     study and a final feasibility study.  A lot of hard

16     work to basically underwrite an investment and

17     development decision once you have demonstrated

18     economic value.  Serious business it is.

19     **Q.    Are you aware of any evidence suggesting**

20     **that any of that work had been done prior to the**

21     **DMEA's involvement?**

22     A.    Not at all.

23     **Q.    Who first suggested such a program?**

24     A.    The DMEA.

25     **Q.    Did Molycorp rely on Dr. Schilling's**

1   findings at all when it submitted its DMEA proposal?

2       A.   I wasn't there, so I can't say, but there

3   is certainly nothing in the record to suggest that.

4       Q.   Whose reports did Molycorp rely on and

5   attach to its application?

6       A.   Two reports from Carpenter dated '54 and

7   '56.

8       Q.   Now Mr. Carpenter's '56 report, at least,

9   does mention low grade mineralization at Questa.

10  Did he anywhere recommend a program to go delineate

11  it and explore for it?

12      A.   Certainly not in that report.

13      Q.   What did he recommend?

14      A.   Continuing more of the same, looking for

15  the contact where they believe they may find high

16  grade vein systems.

17      Q.   When you say the contact, can you

18  describe?

19      A.   It just says basically the contact between

20  the volcanics and the country rock.  You climb up

21  the volcanics where you end up with sheers and

22  fractures and so on, which hopefully hold some

23  mineralization.

24      Q.   The Government also noted that

25  Mr. Carpenter in '56 noted diamond drilling.  Did he

1   recommend that diamond core drilling be used to

2   search for low grade ore?

3        A.    I don't believe so.   That reference, which

4   I checked, I believe it is a quicker way of reaching

5   the contact and that was the purpose of that diamond

6   drilling reference.

7        Q.    Okay.  So to sum up, in December of 1956

8   when Molycorp applied for a loan, as the Government

9   demonstrated yesterday, Molycorp knew of low grade

10  mineralization at Questa, knew about diamond

11  drilling and knew that a study of grade and tonnage

12  using drilling and sampling could show if the ore's

13  commercial.  Knowing all of that, what did Molycorp

14  propose to do to the DMEA?

15       A.    More crosscutting and drifting which could

16  only be directed at exploring for more high grade

17  vein systems.

18       Q.    Any drilling?

19       A.    No.

20       Q.    Any sampling?

21       A.    No.

22       Q.    During the negotiations over the contract,

23  as you testified a minute ago, it was the DMEA that

24  suggested using drilling and sampling and engaging

25  in the studies to look for low grade ore; is that

1    **right?**

2       A.    Yes.

3       Q.    **How would you characterize Molycorp's**

4    **reaction to the Government's proposal that it do**

5    **these things?**

6       A.    If I can use my own words, I think they

7    were very negative.  I mean, look, you are applying

8    to the DMEA for a loan to support exploration.  You

9    don't want to get acrimonious, but they clearly

10   resisted the suggestion for diamond drilling,

11   systematic sampling and so on, and so forth.

12            That was one of the internal memos or

13   letters from the DMEA stated, you know, a lot of

14   what they were proposing was just not supportable.

15   It wasn't supported by geological knowledge or even

16   geological hypothesis.  And as one of the references

17   was, it is more like prospecting that exploring and

18   certainly the DMEA wasn't set up to fund

19   prospecting.

20      Q.    **Let me change gears now.  You were asked a**

21   **lot of questions about the importance of the DMEA or**

22   **whether the DMEA was important to the development of**

23   **the Questa mine.**

24            **Do you recall those?**

25      A.    I do.

1      Q.     **In your expert opinion, Dr. Rigby, could**

2   **Molycorp have discovered and delineated and**

3   **exploited the low grade ore body without the DMEA's**

4   **technical and financial involvement?**

5      A.     I think I said in my report, highly

6   unlikely.

7      Q.     **Let's talk about the execution of the**

8   **program.  We have already talked about the contract**

9   **negotiation.**

10             **How valuable, in your opinion, was the**

11   **DMEA's technical assistance during the execution of**

12   **the program?**

13      A.     Very valuable.  I mean, you know, they

14   would -- again in my report I think I used the term

15   hands-on.  They were very much hands-on.  This is an

16   important exploration program which had to be

17   executed as designed or as developed, but it needed

18   close oversight because the thing about an

19   exploration program is you don't do it with blinkers

20   on.

21             In other words, you embark on an

22   exploration program and you are learning from every

23   day.  You are learning from every drill hole and you

24   think, oh, we don't know that.  That now changes our

25   thinking.  So we modify maybe the next drill hole to

Page 238

1   maximize the benefit.

2          These are expensive drill holes, so you

3   are eking out every little bit of geological

4   knowledge to increase your understanding, and

5   modifying the program as you go.  That is why it was

6   important for the oversight of highly experienced

7   people.

8       **Q.     Did the DMEA provide any assistance or**

9   **guidance with respect to assaying?**

10      A.     Yes, they did.  I mean, that was agreed in

11  the report and specification for assaying composite

12  samples of core channel sampling along the drifts

13  and crosscuts.  And the, I think two examples of

14  requests.  I think one which was denied and the

15  other one which was approved.

16         One was a request to dispense with channel

17  sampling and just have an occasional wall sample.

18  The interpretation of the justification of the

19  request was, it was bogus and therefore it was

20  denied.

21         The other one that was approved was, you

22  know, because of the broken nature of a lot of the

23  ground, diamond drilling is difficult.  And the

24  problem in diamond drilling in poor ground is that

25  core recovery is low.  You know, and they had some

Page 239

1    very, very low examples of core recovery.

2         The problem with low core recovery is did

3    we lose mineralization or did we lose waste.  We

4    don't know.  So the company requested that in

5    background, they be allowed to take sludge samples

6    which is basically the sludge that comes back out of

7    the hole from the drilling.  It is not as good but

8    it is certainly better than nothing.  That was

9    approved.

10        **Q.    How about discovering errors in assaying?**

11        A.    Apparently that did happen.  I don't think

12   we ever got to the bottom of why, but partway

13   through the program, I think it was probably late

14   '58, maybe '59, it was discovered that for whatever

15   reason assay results have been overstated by a

16   factor of two and basically we had to be cut in half

17   50 percent of the reported value.  That was a bit of

18   a blow.

19        **Q.    Who discovered that error?**

20        A.    I am not sure who actually discovered it.

21   I am not sure if it was DMEA.  The fact is, it

22   doesn't matter, it happened.

23        **Q.    The Government noted that Molycorp dug**

24   **more feet of tunnel on its own account than were dug**

25   **using DMEA funding.**

Page 240

1          **Do you recall that?**

2     A.    I do.

3     **Q.    Have you reviewed a Molycorp tunnel on its**

4 **own?**

5     A.    I have.

6     **Q.    And where and what is your assessment of**

7 **that?**

8     A.    I think there are two dimensions to what

9 they did themselves.  One really resulted in

10 nothing, which was probably, I am guessing

11 4,000 feet or I think they did, in total, in

12 addition to what was done in the contract about

13 5,900 feet.

14          A lot of that was, I believe, to the

15 south, so the southwest and to the west looking for

16 high grade veins on their own, and I believe they

17 were unsuccessful.

18          But also some of that was, number one,

19 crosscut north, which was ultimately, let's say, and

20 certainly drifts off that crosscut part of the DMEA

21 program.  I think that was -- that was good, let's

22 say good development to access an area which would

23 subsequently be proven to be from an exploration

24 perspective highly successful.

25     **Q.    The discovery at the end that you**

Page 241

1     mentioned there, was that Molycorp work or jointly

2     funded work?

3         A.     Jointly funded work.

4                MR. TODD:  Let's pull up CX107, which is

5     Molycorp's final report on the DMEA program.  We saw

6     this yesterday.  And let's turn to Page 4, which is

7     6 of 9 in the exhibit.

8         Q.     (By Mr. Todd)  At the bottom of the page

9     here, Dr. Rigby, it provides a summary of all of the

10    drifting, crosscutting and drilling that was done

11    during the program.

12               Do you see that?

13        A.     I do.

14        Q.     Did Molycorp do any drilling on its own

15    account?

16        A.     I don't believe so.

17        Q.     So if we include exploration by drilling,

18    who covered more square feet, Molycorp on its own or

19    the DMEA funded work?

20        A.     Yeah, the DMEA funded work, clearly.

21        Q.     There was 21,417 feet of drilling?

22        A.     Yes.

23        Q.     Thank you.

24               Let's move on to finances.  Ms. Kimball

25    asked a lot of questions about bank borrowing and

Page 242

1    capital raising yesterday.

2           Do you recall those questions?

3    A.    I do.

4    Q.    In your expert opinion, sir, would

5    Molycorp have been able to raise funds to explore

6    and develop the low grade ore body at Questa without

7    the DMEA's finance or involvement?

8    A.    I don't believe so because providers of

9    finance have to have a reason, have to have -- when

10   you are applying for finance associated with mining,

11   you have to have a good argument.  There has to be

12   an expectation of success, there has to be evidence.

13   The investors and banks and so on are no fools.

14   They have their own people with expertise in the

15   sector, and, you know, they will do thorough

16   assessment in their due diligence before providing

17   funding.

18          So you have to get your ducks in a row

19   before you approach financiers.

20   Q.    Ms. Kimball noted that in '54 and '55,

21   Molycorp was able to raise about $3 million.

22          Do you recall that?

23   A.    I believe so.

24   Q.    Would Molycorp's financial position in

25   1955 be relevant to whether it could explore for ore

Page 243

1   in 1957 at Questa?

2      A.    I think I mentioned that yesterday as

3   well, using, I think it was the prospectus for the

4   raising in '57 or there was a summary of basically

5   balance sheets for the previous five or six years.

6   The numbers range, basically what was available in

7   income plus or less special factors ranged from

8   about 500,000 to a million.

9            But that is not just Questa, that is

10  Molycorp Corporation with all of their other assets

11  as well.  So there wasn't a lot left to support

12  excavation at Questa and certainly not for searching

13  for large low grade orbity.

14     Q.    And despite having raised the fund that

15  the Government pointed to, by the time of the DMEA

16  application in December of '56, did Molycorp have an

17  exploration planned at Questa?

18     A.    It states in the application that no

19  further exploration plans were available.  They had

20  no plans for further exploration.

21     Q.    What impact did the signing of the DMEA

22  contract have on Molycorp's ability to raise funding

23  specifically for exploration of Questa in '57?

24     A.    As I said earlier, from an investor

25  perspective, you know, any good news can often be

1  leveraged and that's exactly what Molycorp did.  In

2  1957, soon after their contract was signed, Molycorp

3  basically went to the market and raised funds and

4  attached the signed contract to that application.

5      Q.    And what impacts did the Government's

6  certification of a discovery at Questa in 1961 have

7  on Molycorp's ability to raise funds to explore and

8  delineate the ore body at Questa?

9      A.    Exactly the same, because now you have an

10  even stronger story to tell to the market, not just

11  that you have an exploration in place with the DMEA,

12  but now in '60 the certification, that that resulted

13  in a discovery of a large low grade ore body, which

14  would be in the whole objective of the exploration

15  program in the first place.  And Molycorp quite

16  rightly got into that for the market in further

17  raising.

18      Q.    Last question on finances.  The Government

19  has pointed out repeatedly, and correctly, that

20  Molycorp spent a lot more on its own account over

21  the years, so '57 to '64, a lot more than the DMEA

22  contributed to the exploration program.  You agree

23  with that, right?

24      A.    You mean post-'60?

25      Q.    I am including the money that Molycorp

Page 245

1    **spent on its own '57 to '60.**

2        A.    Yeah.

3        **Q.    And then from '60 to '64 many millions**

4    **more, right?**

5        A.    Yes.

6        **Q.    Okay.  Given that, and that's correct, but**

7    **given that, Dr. Rigby, what is your view of the role**

8    **of the DMEA's contribution to that initial**

9    **exploration program?  How do you characterize those**

10   **funds?**

11       A.    I would definitely characterize it as seed

12   capital or seed funding, which achieved its

13   objective.  It identified the ore body and that is

14   the discovery holes which are so critical to any,

15   you know, any new deposit, any new project.  That

16   really is the most important time in the life, but

17   that's when the real work starts.

18            And as I have mentioned earlier, you have

19   got a huge amount of work to do to raise the

20   knowledge base and the certainty to have pretty

21   definitive cash flow projections to support a

22   development decision and investment commitment.

23       **Q.    Shifting gears again, Dr. Rigby, you were**

24   **asked a lot of questions yesterday about the**

25   **relationship between the DMEA exploration area**

1    underground and the open pit mine on the surface.

2              Do you recall that?

3        A.   I do.

4        Q.   And the suggestion was that these were

5    different, separate, unconnected.

6              Do you recall that?

7        A.   I do.

8              MR. TODD:  I will take a little time with

9    this, Your Honor.  I think it is important to walk

10   through this carefully and geologically.  I will do

11   this as quickly as I can.

12             THE COURT:  Slow down just a little.

13             MR. TODD:  Yes, Your Honor.

14       Q    (By Mr. Todd) Dr. Rigby, let me start with

15   this.  The three different mining operations at

16   Questa, two underground mines, one open pit, did

17   they develop different ore bodies?

18       A.   Well, I don't believe so.  It's basically

19   one contiguous continuous, but contiguous is a

20   geological term, large horseshoe-shaped ore body.

21       Q.   There are lots of references in the

22   documents to the northeast zone and the southwest

23   zone.  What does that mean?  What are those?

24       A.   Those are two zones within that large

25   horseshoe-shaped mineral, area of mineralization

1  which had elevated molybdenum grades, hence the

2  northeast and the southwest.

3      Q.    Did DMEA's funded exploration occur in

4  both?

5      A.    To a degree, yes.

6      Q.    And what exploration occurred in the

7  northeast zone?

8      A.    They, I think the emphasis shifted and

9  certainly towards the latter part of the contract,

10  the emphasis certainly focused on the northeast zone

11  as a result of, you know, of intersecting

12  mineralization.

13      Q.    We saw a minute ago yesterday that

14  Molycorp's final report to the DMEA.

15          MR. TODD:   Could we pull up CX107, again

16  and let's go to Page 9 of 9 and let's highlight the

17  three blocks, please.

18      Q.    (By Mr. Todd)   Just to orient us,

19  Dr. Rigby, this was mentioned yesterday.   What did

20  Molycorp report discovering through the DMEA funded

21  exploration?

22      A.    From the results of the exploration

23  analysis of the assays, the drill logs and so on,

24  they delineated three ore blocks, three distinct ore

25  blocks; Block 1, Block 2 and Block 3.

Page 248

1            Block 3 was certainly in the northeast

2    zone.

3        Q.    **And have you seen these plotted on maps?**

4        A.    I have.

5            MR. TODD:  Could we pull up CX211, please.

6        Q.    **(By Mr. Todd)  This is a mineral**

7    **examiner's report from 1969 prepared by a gentleman**

8    **named Harb Ashby; is that right?**

9        A.    It is.

10            MR. TODD:  Could we turn to Page 20 of 23,

11    please.

12        Q.    **(By Mr. Todd)  To move us along,**

13    **Dr. Rigby, do these maps plot where the three ore**

14    **blocks were?**

15        A.    Yes, you can see them sort of dotted three

16    blocks.

17        Q.    **And so that's the pixillation?**

18        A.    The pixilation, that is the word I was

19    looking for.

20        Q.    **And what, we see reference to Summit 4,**

21    **Lonesome Limited, Summit 5?**

22        A.    Those are the claims.

23        Q.    **Mining claims?**

24        A.    Mining claims, yes.

25        Q.    **On the surface?**

1      A.    Patented claims on the surface.

2      **Q.    And do you generally agree with the**

3  **location of these ore blocks?**

4      A.    I do.  I believe that is Block 3, isn't

5  it?

6      **Q.    That's correct, sir.**

7      A.    Yes.

8      **Q.    Did the DMEA similarly prepare a final**

9  **report?**

10     A.    Yes.

11           MR. TODD:  Let's pull up CX108.

12     **Q.    (By Mr. Todd)  And is this the DMEA's**

13  **final report?**

14     A.    It is.

15           MR. TODD:  Could we go to Page 15 of 17,

16  please.  And let's highlight the final paragraph or

17  blow it up, please.

18     **Q.    (By Mr. Todd)  What did the DMEA report**

19  **about the jointly-funded exploration discover?**

20     A.    Well, you want me to read that?

21     **Q.    You can paraphrase it.**

22     A.    It is a large block.  They concurred or

23  concluded that there was inferred reserves.  Let's

24  not go into detail on that terminology, but they

25  believed about 2.5 billion tons of molybdenum

Page 250

1    bearing rock containing better than .2 percent

2    molybdenite or molybdenum disulfide.  Within that

3    huge mass, there were two blocks of commercial grade

4    .5 percent and within those they estimated

5    10 million tons each or thereabouts.

6            And again, Number 1 Crosscut North, which

7    is particularly relevant to Block 3.

8        Q.    **And what does commercial grade mean?**

9        A.    Well, commercial grade indicates that you

10   can mine it for a profit.  It indicates, you know,

11   all of the evaluation work is to follow, but people

12   have a feel for what cutoff grade, which is the

13   breakeven grade above which you make money, below

14   which you lose money.

15           And hence they believed because of that

16   grade and I think ultimately the cutoff grade for

17   the open pit was about .15 percent, so if you are

18   mining .5 percent you are making a profit.

19       Q.    **Dr. Rigby, is it possible to relate these**

20   **blocks and zones that we have seen in these reports**

21   **to mining claims and the location of the open pit on**

22   **the surface?**

23       A.    Yes.  By overlaying various plans.

24       Q.    **I thought you would say that.  I am going**

25   **to give you the materials to do that.**

Page 251

1      A.      Thank you.

2              MR. TODD:  Could we pull up CX109, please.

3   Could we highlight the legends at the top and the

4   bottom so Dr. Rigby can see them.

5      A.      That is better.

6      **Q.      (By Mr. Todd)  Could you tell the Court**

7   **what this map from 1960 depicts?**

8      A.      Okay.  It is a plan of the second tunnel

9   shelf level showing the exploration under the DMEA

10  contract.  And I think the most important -- can you

11  just raise the top a little bit or pull the whole

12  thing down?  Well, the most important --

13     **Q.      Let me ask you this, Dr. Rigby.  In the**

14  **top left do you see who prepared this map?**

15     A.      USGS.

16             MR. TODD:  We can get rid of the top call

17  out.

18     A.      The most important thing there from a --

19  in terms of the exploration success is, number one,

20  Crosscut North, right in the middle of that figure,

21  and you can see it is going north.  I don't want to

22  put my finger on it and draw on it because I will

23  ruin the diagram.

24     **Q.      (By Mr. Todd)  I can clear it if you would**

25  **like.**

Page 252

1      A.    Okay.   Number 1 Crosscut North.   What

2    happened with that and that was -- that was

3    developed by Molycorp on its own, I understand.   And

4    probably the latter or the last 2 to 300 feet of

5    that Number 1 Crosscut North, that is less than

6    that, it is probably about there (indicating),

7    started to intercept pretty good grade, I think .5

8    on average.

9          There were assays of .7 percent moly, that

10   was, you know, very encouraging.   And then within

11   the DMEA contract and they agreed that -- the DMEA

12   agreed that they would support as part of the

13   program Number 4 Drift West, which is to the left

14   shown in red and from a Number 3 Drift East, which

15   is also shown in red.   That is 4 Drift West, 3 Drift

16   East.

17     **Q.    And what is the implication of the tunnels**

18   **there in red on this map?**

19     A.    They were basically jointly funded, DMEA

20   and Molycorp.   And from Number 3 Drift East, drill

21   holes, diamond drills holes upwards were drilled and

22   from Number 4 Drift West, diamond drill holes

23   downwards were drilled and both intersected good

24   grade mineralization.

25          MR. TODD:  Let me call up CX110, please.

Page 253

1    Q.    (By Mr. Todd)  CX110, Dr. Rigby, is the

2  same as CX19 except there are some handwritten

3  notations.

4           Do you see those?

5    A.    I do.

6    Q.    What is your understanding of what those

7  depict?

8    A.    I think those are handwritten notations

9  from Dr. Quivik, I believe, indicating the edges of

10  blocks.

11    Q.    It says OME1 and OME2, and we will confirm

12  this later, but they represent the locations of the

13  two commercial ore blocks, okay?

14    A.    Yeah.

15    Q.    Is that your understanding?

16    A.    Yes.

17    Q.    And do you generally agree with the

18  location of those?

19    A.    Without doing a detail analysis, they look

20  reasonable.

21    Q.    One last document to show you for the

22  overlay.

23           MR. TODD:  Could we pull up CX47, Page 13,

24  I think, it is.

25    Q.    (By Mr. Todd)  And, Dr. Rigby, this is a

1    **1958 map, and what does this combine?**

2        A.    This is basically Molycorp's patented

3    claims at the time on surface.

4        **Q.    What do you see overlaid on it in the**

5    **middle?**

6        A.    Is that the -- I don't see it yet.  Are we

7    overlaying the second?

8        **Q.    It is difficult to see, but if you look in**

9    **the middle of this you will see the 1958 second**

10   **level tunnel --**

11       A.    And can we see the ore blocks?

12       **Q.    In a minute.**

13       A.    Okay.

14       **Q.    I know that you have looked at this not on**

15   **the screen.  Is it your understanding that the**

16   **tunnel system in the middle of the picture is the**

17   **1958 second level --**

18       A.    Yeah, because you basically superimpose

19   overlaying.  So we have got the surface claim

20   locations, you have got the underground development

21   on the second tunnel, the second level tunnel shelf.

22            MR. TODD:  Could we overlay CX47, CX110

23   and CX211.  Can we zoom in on the area with the

24   pixillation and OME2.

25       **Q.    (By Mr. Todd)  And, Dr. Rigby, what does**

Page 255

1   **this show you about the Molycorp reported ore blocks**

2   **and the DMEA reported ore zones?**

3       A.     Well, I think we see three things.  One

4   basically that successful exploration with the up

5   and downholes in the northeast zone from the

6   development and drilling.

7             Then the delineation and certification of

8   the ore blocks patented, the surface claims

9   specifically Summit 4, Summit 5 and Lonesome are all

10  pretty much coincident.  It is the same, in the area

11  and the beauty -- and then they discovered this from

12  an analysis that Harb Ashby and mineral examination

13  report where he, when he looks at -- when he visited

14  the mine or the site and walked the surface,

15  identified where the claims were and then gave a

16  written description of activities that were

17  occurring at the time, and that was in 1969.

18            He refers to ore mining taking place on

19  the -- in the eastern part of Lonesome.

20            Stripping of overburden taking place for

21  the rest of Lonesome and stripping of overburden

22  taking place on Summit 4 and 5.

23            So that is telling me that this area that

24  you just circled was within the open pit.

25      Q.     **Now, Ms. Kimball, yesterday, made the**

Page 256

1    point that the DMEA workings, the discovery that we

2    just saw, was lower than the open pit?

3        A.    Yes, which is why you used up-drill holes

4    drilled vertically upward.

5        Q.    And your response several times was but it

6    is the same ore body?

7        A.    The same ore body, absolutely.

8        Q.    Yesterday you were very, very eager to

9    draw something on the white board over there?

10       A.    I was.

11       Q.    And you weren't allowed to, yesterday?

12       A.    No.

13       Q.    Okay.

14             MR. TODD:  Your Honor, after testimony

15   yesterday, I didn't discuss Mr. Rigby's testimony

16   with him, but to save time today I didn't want him

17   drawing in court to move us along, so I invited him

18   to come early this morning and to draw whatever he

19   wanted.  He has drawn something on that board, I

20   haven't seen it, I haven't discussed it with him,

21   but I would like to let him describe what he wanted

22   to say yesterday if that is okay?

23             THE COURT:  Any objection?

24             MS. KIMBALL:  No.

25             THE COURT:  No objection, you may.

Page 257

1          MR. TODD:  May I approach, Your Honor?

2     A.     So this is basically a plan view of the

3     northeast zone.  This is -- we have already seen

4     these and the two previous diagrams.  So this is the

5     Number 1 Crosscut North, that is Number 3 Drift

6     East, and this is the Number 4 Drift West.

7          And these are the locations, approximate

8     locations of the diamond drill holes.  These were

9     drilled up and these were drilled down (indicating).

10    And I think the -- only one more?

11         The second diagram is a section looking

12    north.  If you imagine the Number 1 Crosscut is

13    going in this direction due north and the last 2 to

14    300 feet intersected reasonably high grade

15    mineralization?

16         This is Number 3 Drift East, from which

17    drill holes were drilled upwards intersecting the

18    mineralization.  This is, if you can imagine, this

19    is Number 4 Drift West, but it is sort of drilled

20    here, right?  Downholes intersected the

21    mineralization.  So this was the mineralization in

22    the northeast zone.

23         The geologists believe -- this is the

24    existing topography, Sulphur Gulch, and this is the

25    mountain.  They believed originally the

Page 258

1   mineralization went all the way but it was eroded

2   over geological time.

3          And to me this demonstrates more than

4   plans and so on, how awry the mineralization was

5   first discovered then delineated with exploration

6   program funded partly by the DMEA.

7          I think that puts it in simple terms and

8   the open pit ultimately, I mean it is not perfect in

9   terms of scaling and what have you, but the open pit

10  was around here (indicating).

11         MR. TODD:  Your Honor, could we mark these

12  as Chevron Demonstrative 4 and 5?

13         THE COURT:  Yes, please.  Go ahead and

14  mark them on the paper.

15         (Exhibit marked, Chevron Demonstrative 4

16  and 5.)

17    **Q.    (By Mr. Todd)  Dr. Rigby, final question.**

18  **Once this discovery was made underground as part of**

19  **the DMEA program, what did Molycorp then do to get**

20  **to the open pit?**

21    A.    Oh, well, that was in 1960 when the

22  discovery was certified and almost immediately they,

23  they started work.

24         '61 they raised additional funds and those

25  additional funds really was for further exploration

Page 259

1    and definition drilling, infill drilling, and a huge

2    amount of work which culminated in the finalization

3    and publication of the feasibility study in 1964.

4           And that work, it was, it started with

5    exploration to get high resolution of the grade

6    distribution and better understanding of the edges

7    and the variability of the mineralization, but then

8    it shifted to some serious open pit design work and

9    then a huge amount of metallurgical test work.

10   Because, you know, they only had a 50-ton per day

11   mill.  We ended up with eight, in '65, an 8,000-ton

12   per day operation.

13          And so they had to make sure that they had

14   done sufficient test work metallurgical test work on

15   both samples and pilot plant test work to ensure

16   that they had the right process flow sheet which

17   would optimize the recovery of the molybdenite

18   concentrate.

19      Q.    **And in your expert opinion would any of**

20   **that have been done without the original DMEA**

21   **discovery?**

22      A.    In my expert opinion, absolutely not.

23      Q.    **Last topic, Dr. Rigby, the Red River**

24   **Valley fill concept.  I am not going to ask you any**

25   **questions about the design or hypotheticals.  His**

Page 260

1    Honor has moved us on from that.  Let me just ask

2    you this:  The Government has suggested that

3    Molycorp was not really serious about the valley

4    fill concept, that it was just something that was

5    just tossed out casually at one meeting and wasn't

6    really a thing.

7            In your expert opinion, was this a serious

8    proposal addressing a serious need for Molycorp?

9        A.    Undoubtedly, yes, it was a critical need,

10   not just serious, it was critical at that time.

11       Q.    And what are your bases for believing

12   that?

13       A.    Well, information that I have read but

14   also conversations that I have had with Dave

15   Shoemaker, Gene Dewey and John Landreth.  And the

16   document in 1972 which looks forward of the next,

17   four, five, six years in terms of mine planning and

18   clearly can be seen on one of the pages in that

19   document, there is still talk about the bridge waste

20   dump, and the south side waste-rock piles, which is

21   on the south side of the river.

22            MR. TODD:  Could we pull up CX, I am going

23   to guess, 282.  Could we go to Page 18.

24       Q.    (By Mr. Todd)  Are these the dumps you are

25   referring to?

1      A.     Absolutely.

2             MR. TODD:  If we could highlight the

3      possible future dumps.

4      **Q.    (By Mr. Todd)  What is your understanding**

5      **of Sector 1, Sector 2 and Sector 3?**

6      A.     Basically these are all north.  A, are

7      basically north dumps, and B are pretty much south

8      dumps.  And we can see three, well, four references

9      Sector 1 south, south side Red River, 2, south,

10     same.  Sector 3, the same, and then a bridge filled

11     axis across Red River requires tunnel through.  That

12     is how you get access to the south side for waste

13     disposal.

14     **Q.    Is it understanding, Doctor, and have you**

15     **formed an opinion that this is the same valley fill**

16     **concept Molycorp proposed to the Forest Service in**

17     **1969?**

18     A.     It can only be the same.

19            MR. TODD:  No further questions,

20     Your Honor.

21            THE COURT:  You may step down.

22            (Whereupon, the witness was excused.)

23            THE COURT:  You may call your next

24     witness.

25            We have a mechanical issue and so we are

1   going to take about a five-minute break and see if

2   we can get it resolved.

3               (A recess was taken.)

4               THE COURT:  We can proceed.

5               MR. HOPSON:  Chevron calls Dave Fredley.

6               THE COURT:  Thank you.

7               (Whereupon, the witness was sworn.)

8               THE COURT:  You may proceed.

9               THE COURT REPORTER:  Would you please

10  state and spell your last name for the record?

11              THE WITNESS:  My name is David C. Fredley,

12  F-R-E-D-L-E-Y.

13              MR. HOPSON:  Mr. Fredley, did you submit

14  written direct testimony in this case?

15              THE WITNESS:  Yes, sir.

16              MR. HOPSON:  Did you prepare that

17  testimony?

18              THE WITNESS:  Yes, sir.

19              MR. HOPSON:  Is that testimony true and

20  correct today, to the best of your knowledge?

21              THE WITNESS:  Yes, sir.

22              MR. HOPSON:  We tender his testimony,

23  Your Honor.

24              THE COURT:  Thank you.  It will be

25  admitted.

1            (Mr. David Fredley's direct testimony was

2    prefiled and admitted.)

3            THE COURT:  Counsel, you may proceed.

4            And tell me your name again.

5            MR. HARRISON:  Good morning, Your Honor.

6            Bryan Harrison.

7            THE COURT:  Okay.  Thank you,

8    Mr. Harrison.

9                    CROSS-EXAMINATION

10    BY MR. HARRISON:

11        **Q.     Good morning, Mr. Fredley.**

12        A.     Good morning, Mr. Harrison.

13        **Q.     You worked for the Bureau of Land**

14    **Management and then the Forest Service as part of**

15    **your professional career; is that correct?**

16        A.     Yes.

17        **Q.     Forest Service is part of the Department**

18    **of Agriculture?**

19        A.     That is correct.

20        **Q.     And BLM is part of the Department of**

21    **Interior?**

22        A.     Yes.

23        **Q.     You would agree that both of these**

24    **agencies work to serve the public interest, correct?**

25        A.     Would you repeat that?

Page 264

1      Q.     Both of these agencies work to serve the

2  public interest?

3      A.     Absolutely.

4      Q.     And based on your experience with both,

5  you would agree that Federal agencies must comply

6  with laws and regulations?

7      A.     Yes, and they write regulations.

8      Q.     And they aren't to provide special

9  treatment to any one individual or company?

10     A.     I wouldn't think so.

11     Q.     And oftentimes, agency decisions must

12  balance a broad range of competing interests?

13     A.     For sure.

14     Q.     Chevron is a for-profit company, correct?

15     A.     I assume they are.

16     Q.     And Chevron's corporate predecessor,

17  Molycorp, is a for-profit company, as well?

18     A.     I would assume so.

19     Q.     And their primary purpose is to make as

20  much money as possible for shareholders, correct?

21     A.     I think that is one of the goals of

22  companies.

23     Q.     The Forest Service does not share that

24  same mission or goal, correct?

25     A.     To make money for a company?

Page 265

1      Q.      Correct.

2      A.      No.

3      Q.      Neither does BLM?

4      A.      That is correct.

5      Q.      You never worked for either BLM or the

6   Forest Service in New Mexico?

7      A.      No, I did not.

8      Q.      And when you worked for both, none of your

9   responsibilities involved the Questa Mine?

10     A.      That is correct.

11     Q.      And none of your responsibilities would

12  either involve the Defense Minerals Exploration

13  Administration or DMEA?

14     A.      That is true.

15     Q.      In your testimony, you were not providing

16  legal interpretations of the mining laws, correct?

17     A.      I am providing an expert on what I believe

18  the mining law states.

19     Q.      But you are not a lawyer, correct?

20     A.      I am not a lawyer, for sure.

21     Q.      And you've never published a treatise on

22  mining laws?

23     A.      No, I have not.

24     Q.      Throughout your testimony, you repeat a

25  phrase that, "United States was the paramount

1    proprietor of the Questa site."

2           Do you recall that?

3    A.    I do.

4    Q.    And you took this term from a 1914

5    treatise by Curtis Lindley?

6    A.    That's correct.

7    Q.    You would consider his treatise as a

8    leading authority on mining or mining law?

9    A.    Absolutely.

10   Q.    And Mr. Lindley was a preeminent mining

11   attorney?

12   A.    That is correct.

13   Q.    And considered authoritative on these

14   issues?

15   A.    Yes.

16   Q.    Would you give his legal interpretations

17   of the mining laws more weight than that of a

18   layperson?

19   A.    Obviously.

20           MR. HARRISON:  If I could show CX

21   Exhibit 10.

22   Q    (By Mr. Harrison) These are excerpts from

23   Mr. Lindley's treatise that you testified about on

24   direct, correct?

25   A.    Yes.

Page 267

1          MR. HARRISON:  If we could turn to

2  Page 25.

3      Q    (By Mr. Harrison) In talking about mining

4  claims, in the middle of Page 25, Mr. Lindley said

5  that, "A patent adds but little to a locator's

6  security."

7          Do you see that?

8      A.   Yes.

9      Q.   And so as long as a claim is located or

10  staked, patenting doesn't mean much to Mr. Lindley.

11          Would you agree with that?

12      A.   No.

13      Q.   Are mining claims property rights?

14      A.   They are possessory rights.

15          MR. HARRISON:  If we could turn to the

16  next page.

17      Q    (By Mr. Harrison) At the top of Page 26,

18  the first sentence, Mr. Lindley writes, "The owner

19  of such a location is entitled to the exclusive

20  possession and enjoyment against everyone, including

21  the United States itself."

22          Did I read that correctly?

23      A.   You read that correctly.

24      Q.   In your direct, you testified that the

25  locator's rights are subordinate to the

Page 268

1    United States; is that correct?

2        A.    Yes, I did.

3        Q.    Is that still your testimony?

4        A.    Absolutely.

5        Q.    So you disagree with Mr. Lindley that a

6    locator has exclusive possession, even against the

7    United States?

8        A.    Absolutely.

9        Q.    But even if the United States is the

10    nominal paramount owner or paramount proprietor, as

11    you say.

12            From a practical perspective, the

13    United States did not act as the paramount

14    proprietor at the Questa Mine site; is that correct?

15        A.    No, that is not correct.

16            A paramount proprietor is a paramount

17    proprietor.  They acted as the Government's

18    representative at the site.

19        Q.    They didn't control any of the mine's

20    mineral activities, did they?

21        A.    Of course, they did.

22        Q.    They didn't dictate where and how the

23    mining should occur?

24        A.    They dictated how and where waste dumps

25    should be disposed of.

1      Q.     **We will get to that in a little bit.**

2             **The Government did not control timber**

3      **activities on the land, did they?**

4      A.     When you say, "on the land," what are you

5      referring to?

6      Q.     **On the Questa site.**

7      A.     The Questa site has both patented private

8      land and unpatented Federal land, so you'll have to

9      be more specific for me to answer that.

10     Q.     **So on the unpatented claims for both**

11     **mining claims and mill sites, the United States did**

12     **not -- was not in use of that property when**

13     **Chevron -- after Chevron had located or staked**

14     **claims on those, correct?**

15     A.     I don't think that's correct.  They had

16     whatever use they wanted to that property.

17     Q.     **The United States, in fact, did not use**

18     **that property while Chevron had mill site and mining**

19     **claims; is that correct?**

20     A.     I don't have any information that they did

21     not use that.

22     Q.     **Well, in your deposition, you testified**

23     **that the Federal Government could use these lands,**

24     **the service of these lands, for recreations.**

25             **Do you recall testifying to that?**

1      A.     I do.

2      **Q.     What recreations could have been used in**

3  **the area around the open pit mine when Chevron held**

4  **unpatented mill site and mining claims there?**

5      A.     It would have been difficult, but if a

6  hunter wanted to go in there, he probably could

7  have.  If a hiker wanted to go in there, he probably

8  could have.  If a photographer wanted to go in

9  there, he probably could have.

10     **Q.     Chevron had a security gate at the front**

11  **of the facility, correct?**

12     A.     Oh, absolutely.

13     **Q.     They had fences, correct?**

14     A.     There were fences.

15            Could you describe where you might be

16  talking about with that?

17     **Q.     Throughout the property there were fences**

18  **that restricted the ability of the general public to**

19  **access the property.**

20     A.     There were some fences and some gates.

21            But if my understanding is correct, and I

22  have been on the site a couple of times, those

23  fences and gates were on Molycorp private property.

24     **Q.     So if one of Chevron's competitors, say**

25  **Climax, decided it wanted to access the property on**

1  the unpatented mining or mill site claims, would

2  they have been able to go on to that property, given

3  that your testimony is they are public lands?

4       A.   Sure.

5       Q.   As paramount proprietor, Mr. Lindley also

6  explained that there are, quote, "equitable

7  circumstances that bind the United States from

8  interfering with Chevron's mining or possession."

9            Do you recall him writing about that?

10      A.   I don't recall that specific statement.

11      Q.   So if we could look below, on Page 26

12  here, the second sentence, quote, "There are

13  equitable circumstances binding upon the conscious

14  of the governmental proprietor that must never be

15  disregarded."

16           Do you see that?

17      A.   I do.

18      Q.   If the United States were to divest or

19  withdraw Chevron's mining rights, according to

20  Mr. Lindley, that would violate -- that would be

21  improper?

22      A.   Would you repeat that again, please?

23      Q.   Sure, I will rephrase.

24           The next sentence will be helpful, as

25  well.

1            **"Rights have become vested that cannot be**
2    **divested without the violation of all the principles**
3    **of justice and reason."**
4            **So my question is, if the United States**
5    **were to attempt to divest or withdraw Chevron's**
6    **mining rights, that would be violative of, quote,**
7    **"all the principles of justice and reason,"**
8    **according to Mr. Lindley?**
9        A.    I guess I would have to research that a
10   little bit further than sitting right here on the
11   stand and -- but the Government has -- has withdrawn
12   from entry of lands that have mining claims all the
13   time.
14           The Government has stopped patenting on
15   the mining claims.  So it does it constantly.
16       **Q.    And, but practically speaking, the**
17   **United States never withdrew or divested Chevron's**
18   **mining rights here by withdrawing either of their**
19   **mining claims?**
20       A.    Not that I am aware of.
21       **Q.    And they never restricted any of Chevron's**
22   **mining claims, correct?**
23       A.    They never restricted?
24       **Q.    Yeah.  Well, they never -- strike that.**
25           MR. HARRISON:  Let's look at another

Page 273

1   authority on the role of the Federal Government with

2   respect to mining claims.

3           If we could show CX006, please.

4   **Q.    (By Mr. Harrison)  You testified in your**

5   **direct about this 1908 letter to the editor written**

6   **by Gifford Pinchot; is that correct?**

7   A.    Yes, sir.

8   **Q    (By Mr. Harrison) And Mr. Pinchot was the**

9   **first director of the Forest Service?**

10  A.    He was the first chief, yes.

11          And he wasn't called a chief at that time,

12  he was just called The Forester.

13  **Q.    Generally speaking, an individual doesn't**

14  **or didn't need permission to stake or locate claims**

15  **in the National Forest; is that correct?**

16  A.    They needed the lands to be open by the

17  1872 mining log, and so the Federal Government gave

18  them that authority, yes.

19  **Q.    But other than that, there is no**

20  **permission that a locator needs to seek or obtain**

21  **before they can stake a mining claim?**

22  A.    Well, that is the permission.  The Federal

23  Government gave them that permission.

24  **Q.    And the Forest Service can't interfere**

25  **with someone's staking of claims; is that also**

1   **correct?**

2      A.    They can.  They can.  You know, anytime

3   Dick and Harry can go out there and put four stakes

4   in the ground.

5            MR. HARRISON:  Let's turn to Page 3, the

6   second full paragraph that starts with, "The fact

7   that."

8      **Q    (By Mr. Harrison) In this paragraph,**

9   **Mr. Pinchot says that the Federal Government will**

10  **stay out of the way of mining activities in the**

11  **National Forest; is that correct?**

12     A.    Well, I think you were paraphrasing in

13  there, but I don't think that is exactly what he

14  says.

15     **Q.    Mr. Pinchot says here that, at the bottom,**

16  **"No rules and regulations of the Forest Service have**

17  **ever interfered with the right to prospect, locate**

18  **and develop mineral claims."**

19     A.    That is right.  At that time there were no

20  rules that did that.

21            MR. HARRISON:  If we could go to the top

22  of Page 4.

23     **Q    (By Mr. Harrison) The first paragraph says,**

24  **"Even if the Forest Service desired to prevent**

25  **prospecting in the National Forest and emphatically**

1    does not, it could not do so under the law."

2              Do you see that?

3    A.    Yes, I do.

4    Q.    Do you agree with that assessment?

5    A.    I do, at that time.

6    Q.    You testified at your deposition --

7    A.    And I -- and that's because the law at

8    that time allowed prospecting and exploration under

9    the 1872 mining on National Forest, unless they were

10   withdrawn for other purposes.

11   Q.    You testified at your deposition that,

12   "The Forest Service did not violate the law or do

13   anything improper," in your opinion, "with the

14   management of the Federal lands regarding Chevron's

15   mining and mill site claims."

16             Do you recall testifying to that?

17   A.    I do.

18   Q.    Is that still your testimony?

19   A.    It is.

20   Q.    And since the early 20th Century, Chevron

21   has treated the entire Questa Mine property as its

22   own, both the property it owned and the property it

23   held on patented mining and mill site claims on; is

24   that correct?

25   A.    No, I don't think that's correct.

Page 276

1          Q.    Is it true that Chevron included

2    unpatented mining and mill site claims and

3    descriptions of its land holdings?

4          A.    Yes.

5          Q.    And is it true that Chevron also

6    represented in patent applications that it held

7    possession and control of the located or staked

8    lands?

9          A.    That's correct.  That is what a mining

10   claim is.  It is a possessory right against other

11   junior claimants coming in and jumping the claim.

12              MR. HARRISON:  If we could show USX32.

13         Q    (By Mr. Harrison) This is an August 1976

14   land status map that was produced by Chevron.

15              Have you seen this map before?

16         A.    You know, I have.

17         Q.    And is it an accurate map representing

18   Chevron's landownership?

19         A.    That, I don't know if it is all accurate

20   on landownership.

21         Q.    Do you have any reason to dispute that

22   this was produced by Chevron or that it is a

23   document in this case?

24         A.    I have no reason, one way or the other.

25              MR. HARRISON:  Your Honor, I would move to

Page 277

 1   admit USX32.

 2            MR. HOPSON:  No objections, Your Honor.

 3            THE COURT:  Without objection, admitted.

 4            (Exhibit admitted, USX32.)

 5       Q.   (By Mr. Harrison) On this map it shows --

 6   this is after the land exchange is completed,

 7   correct?

 8       A.   That is correct.  It shows 1976.  The land

 9   exchange was completed in 1974.

10       Q.   And it shows that Chevron has owned or

11   staked virtually all of the land from Questa to Red

12   River; is that correct?

13       A.   I assume that is what this -- this map is

14   showing, but I don't know it as a fact.

15       Q.   And Chevron denotes the boundary of that

16   area as, quote, "boundary of Molycorp land."

17            Do you see that?

18       A.   I do see that notation.

19       Q.   And also, it does show two separate ore

20   bodies here, the northeast zone and the southwest

21   zone?

22       A.   It shows some high-grade areas of an ore

23   body, yes.

24       Q.   Would you agree that Chevron was able to

25   freely acquire and use the land at and around the

Page 278

1   **Questa site?**

2       A.    No, I wouldn't exactly agree with that.

3   It wasn't exactly easy to acquire the lands in the

4   exchange.

5           MR. HARRISON:  Let's look at CX282.

6           We have seen this exhibit several times

7   already, but it is the February 1972 Feasibility

8   Study.

9           If we could turn to Pages 38 and 39.

10      **Q     (By Mr. Harrison) This section of,**

11  **"Landownership, Claims, Leases and Patents."**

12          **Would you agree with the first sentence**

13  **here that "Chevron's land acquisition efforts have**

14  **been relatively unhampered"?**

15      A.    Well, if that is what it says, they --

16  they'll probably have that understanding.

17      **Q.    And this is while the land exchange is**

18  **going on; is that correct?**

19      A.    Over the past 50 years, yes.

20      **Q.    And in here, it notes that, "That is not**

21  **to say that certain problems have not arisen in the**

22  **purchasing of homesteads and other privately-owned**

23  **land."**

24          **Do you see that?**

25      A.    Yes.

1       Q.      And then it concludes, this paragraph,

2   "Forest lands are open to mineral location and

3   virtually all of the Red River trench has been

4   staked with low mining claims under the mining law

5   of 1872."

6           Do you see that?

7       A.    I do.

8       Q.     So here it seems that the only issue

9   Chevron has with acquiring land is with private

10  landowners and homesteads, not with the Federal

11  Government; is that correct?

12      A.    Apparently, that is true.

13      Q.     So around the same time the Chevron Group

14  was concerned with changes to the mining laws and

15  regulations, would you agree with that?

16      A.    I think the entire mining industry was

17  concerned about changes in the mining law.

18      Q.     And fair to say, Chevron felt pressure to

19  act fast in order to own and obtain additional lands

20  at and around the Questa Mine site?

21      A.    I think it was one of the considerations,

22  that they agreed to the exchange.

23           MR. HARRISON:  If we could look at the

24  middle of Page 38, the paragraph that starts, "It is

25  expected" -- sorry, the next paragraph.

1    Q    (By Mr. Harrison) Chevron writes in the

2   memo notes, "The only thing certain is that the

3   mining law of 1872 will be repealed.  The only

4   question is what will take its place.  No matter

5   what legislation is passed, it will not be as

6   favorable to the mining industry as the present

7   law."

8            Do you see that?

9    A.    I do.

10   Q.    So fair to say, Chevron felt a need to

11  acquire as much property as quickly as possible

12  before changes to the mining laws would occur?

13   A.    I think that is fair to say, and it was a

14  very pressured statement because that is exactly

15  what happened in 1995 when Congress said there would

16  be no more patenting mining claims.

17   Q.    And this section ends -- if we could look

18  at Page 39, the last paragraph -- by saying that, "A

19  concerted effort should be initiated in patenting

20  mill site claims adjacent to the Questa main ore

21  body and mill patent ore body areas."

22            So Chevron here is noting that it needs to

23  make a concerted effort at that time to acquire this

24  property?

25   A.    Absolutely.

Page 281

1      Q.    If we could just go back up to --

2      A.    I assume that is because they would --

3  they would have more control over their own private

4  land than if it were Federal land.

5      Q.    And to that point, Mr. Fredley, if we

6  could go back to the paragraph that starts with,

7  "Current proposals."

8            Here Chevron expresses concern that, "The

9  changes in the mining law would allow the Secretary

10  of Interior to dictate the method of prospecting,

11  when mining should start and stop, how the deposit

12  is said to be mined, et cetera.

13            "The investment risk still falls on

14  industry but it will have little control over

15  anything else."

16            Do you see that?

17      A.    I do.

18      Q.    And that is consistent with the concern

19  that you just testified about?

20      A.    Absolutely.

21      Q.    You testified, in your direct, that "The

22  United States' ownership rights are similar to a

23  private landowner's fee simple ownership rights."

24            Is that correct?

25      A.    Yes.

Page 282

1      Q.    And you also testified that, "The

2  United States holds the same power over Federal land

3  as an individual would over private land."

4      A.    More power.

5      Q.    The general public cannot enter someone's

6  private property, locate claims and explore for

7  minerals, correct?

8      A.    For sure.

9      Q.    But that was the case with the

10  United States land until at least 1976?

11      A.    That's private individuals.

12      Q.    Strike that.

13            Someone from the general public could

14  enter land of the United States, locate claims and

15  explore for minerals without providing any notice to

16  the United States, correct?

17      A.    If the lands were open to mineral entry,

18  that is correct.

19      Q.    A private fee simple landowner has the

20  right to exclude people from their property,

21  correct?

22      A.    That's correct, as does the Federal

23  landowner.

24      Q.    But the United States can't pick and

25  choose who stakes mining claims on its property, can

1   **they?**

2       A.     That is, that's correct, as long as the

3   person is a citizen of the United States or a

4   corporation, they can stake a mining claim on lands

5   that are available under the 1872 mining law.

6       **Q.     And someone just can't start exploring or**

7   **developing a mine on private property without the**

8   **approval of the owner, correct?**

9       A.     Correct.  And that is the same with the

10  Federal owner.

11      **Q.     After 1976?**

12      A.     No, since the 1872 mining law, and the

13  Federal owner is the one that passed the 1872 mining

14  law that allowed that person or corporation to come

15  onto the land.

16      **Q.     You would agree that the United States**

17  **supports many individuals, companies and industries,**

18  **correct?**

19      A.     Yes.

20      **Q.     And, in fact, that is the primary purpose**

21  **of the Government itself?**

22      A.     I think the primary purpose of the

23  Government is to support the citizens of the country

24  and defend our shores, deliver our mail.

25      **Q.     So on some level, then, nothing is**

Page 284

1    possible without the support or encouragement or

2    involvement of the United States?

3        A.    I guess that is somewhat a fair statement.

4        Q.    So let's go through some of your direct

5    testimony on areas that you claim the United States

6    supported, encouraged or facilitated Chevron's

7    mining developments.

8              Chevron's open pit mining operations

9    required a tailings implement area, correct?

10       A.    Yes, it did.

11       Q.    And without that, it would not have

12   existed?  The mine could not have existed?

13       A.    That's correct.

14       Q.    So in 1964, Chevron purchased 440 acres

15   from the State of New Mexico for the first tailings

16   implement area?

17       A.    That's correct.

18       Q.    And the State of New Mexico knew that

19   Chevron was going to use the land for a tailings

20   area?

21       A.    That is correct.

22       Q.    And Chevron started construction on the

23   tailings pond the next year, 1965?

24       A.    I believe that's correct.

25       Q.    Did the State of New Mexico support or

Page 285

1    encourage Chevron's Questa Mine development by

2    selling them the property for the eastern tailings

3    implement area?

4        A.    Apparently.

5        Q.    Chevron also needed to obtain property

6    right-of-ways from dozens of private landowners for

7    the tailings implement area; is that correct?

8        A.    I believe that is right.

9        Q.    And did each of these landowners support

10   and facilitate Chevron's mining operations?

11       A.    I have no idea.

12       Q.    Well, they provided right-of-ways for

13   Chevron to be able to use the tailings implement

14   area.

15            Would that be sufficient, under your

16   opinion, to constitute support and encouragement?

17       A.    A private individual -- private

18   individuals did a right-of-way for tailings

19   implements, is that what you are saying?

20            MR. HARRISON:  If we could show USX476.

21            This is an admitted exhibit that was part

22   of Mr. David Shoemaker's deposition and was an

23   attachment to Chevron's January 2001 response letter

24   to the EPA.

25            If we could turn to Page 8.

1      **Q     (By Mr. Harrison) This is a list of**

2   **tailings dam previous owners.**

3            **You have no reason to dispute the contents**

4   **of this list?**

5            THE COURT:  Counsel, let me inquire.

6            Are you attempting to do something in

7   contrary to the stipulated order concerning

8   evidentiary items that the tailings don't have

9   anything to do with this case?

10           MR. HARRISON:  No, Your Honor, I am

11  simply --

12           THE COURT:  What are you trying to do?

13           MR. HARRISON:  I am showing Mr. Fredley

14  that -- I'm trying to elicit testimony that there

15  were other individuals and entities who were

16  involved in the development of the Questa Mine site.

17           THE COURT:  And your point is?

18           MR. HARRISON:  That his testimony is that

19  it was the United States' involvement that

20  encouraged and facilitated, but the point is there

21  are others as well who did that.

22           THE COURT:  I think it is a given, but go

23  ahead.

24      **Q     (By Mr. Harrison) So for the second**

25  **tailings pond, Chevron purchased land from a BLM**

Page 287

1  public land sale option in 1966; is that correct?

2      A.   That is correct.

3      Q.   Chevron needed this land?

4      A.   They did.

5      Q.   And Chevron initiated the BLM process to

6  request the public sale land auction?

7      A.   Yes.

8      Q.   Chevron was the highest bidder?

9      A.   Yes.

10     Q.   And it was reasonable for BLM to accept

11  the highest bid of Chevron, correct?

12     A.   Yes.

13     Q.   Were any tailings disposal disposed of --

14  strike that.

15          You are not aware of any tailings

16  disposals on the area that was the subject of the

17  public land sale prior to Chevron purchasing it at

18  the public land sale auction; is that correct?

19     A.   That is correct.

20     Q.   And prior to the land sale auction,

21  Chevron had actually located mill sites on this

22  area, correct?

23     A.   That is correct.

24     Q.   And so Chevron could have obtained

25  ownership by applying for patents on these lands had

Page 288

1    there been a current mining use, correct?

2        A.    As long as they were presently being used

3    and occupied for mining or milling purposes, they

4    could have done that.

5        Q.    **Chevron preferred the land sale or the**

6    **public land sale option instead because they thought**

7    **it would be better public relations; is that**

8    **correct?**

9        A.    That is correct.

10       Q.    **And it was Chevron's decision where to**

11   **locate its tailings implement areas?**

12       A.    That is correct.  There wasn't too many

13   areas available and that is why they choose this

14   spot.

15       Q.    **Chevron also located and patented, in your**

16   **words, quote, "Some mill site claims near the**

17   **western tailings area."**

18           **Is that correct?**

19       A.    That is correct.

20       Q.    **These are called the Pinon Claims?**

21       A.    They are.

22           MR. HARRISON:  If we could show USX432.

23           And so the Pinon Claims are the lightly

24   shaded areas around the periphery of the implement

25   area, correct?

Page 289

1     A.     They are the stipulated areas to the north

2  and southwest part, yes.

3     Q.     **And a diversion ditch goes through these**

4  **mill sites, correct?**

5     A.     Apparently, yes.

6     Q.     **And that is for diverting natural runoff,**

7  **as you heard Mr. Dewey testify to yesterday?**

8     A.     That is correct.

9     Q.     **And the diversion ditch was not used for**

10 **tailings waste disposal; is that correct?**

11    A.     It was used to support the tailings

12 disposal.

13    Q.     **By preventing the natural runoff from**

14 **going into the tailings area?**

15    A.     That's correct.

16    Q.     **I want to ask just two general questions**

17 **about the tailings pipeline, with respect to**

18 **ownership.**

19           **It was Chevron's decision to develop the**

20 **tailings pipeline; is that correct?**

21    A.     Absolutely.

22    Q.     **And Chevron needed to obtain permission**

23 **for the tailings pipeline from several entities in**

24 **addition to the Forest Service; is that correct?**

25    A.     Molycorp did, yes, for sure.

Page 290

1       Q.      And any one of those could have withheld

2    their consent or approval for the routing of the

3    pipeline, correct?

4       A.      They could have as private landowners,

5    just as the Forest Service could and the Federal

6    Government could.

7       Q.      You testified that special use permits are

8    completely discretionary, correct?

9       A.      Yes, I did.

10      Q.      But the Forest Service acted properly and

11   followed its regulations when it issued the special

12   use permit, correct?

13      A.      I have no reason to think they violated

14   any regulation or law by issuing the special use

15   permit.

16      Q.      And there is no reason for the Forest

17   Service to terminate or cancel the special use

18   permit, correct?

19      A.      They didn't do it.

20      Q.      And there would have been no reason why

21   they could have?

22      A.      I don't know of any reason.

23      Q.      Another permit that you testified about

24   was the decant water discharge permit issued by BLM.

25              Do you recall that as your testimony?

1      A.    I do.

2            MR. HARRISON:  If we could show USX432,

3    again.

4      Q    (By Mr. Harrison) So the tailings disposal

5    areas are the two dark areas in the middle of the

6    map, correct?

7      A.    That is right.

8      Q.    And there are two sections of tailings,

9    Section 35 and Section 36?

10     A.    In general, that is a correct description.

11     Q.    And the decant water discharge permit was

12   only for Section 35 of the tailings area; is that

13   correct?

14     A.    As far as I know, that is correct.

15     Q.    Chevron did not receive a permit for

16   Section 36 because the water flowed over Chevron's

17   own property and private right-a-ways?

18     A.    You know, I am just not sure on that.

19     Q.    Okay.

20     A.    This diagram does not show the

21   right-of-way, by the way, for the decant water.

22     Q.    But --

23     A.    It shows present decant but it doesn't

24   show right-of-way.

25     Q.    I will ask a general question and not

Page 292

1    pertaining to the map itself.

2            For the decant water discharge permit in

3    Section 35 over the BLM land, BLM required a

4    stipulation in 1970 that the water must meet

5    Federal, State and Local water quality standards,

6    correct?

7        A.    That is my understanding.

8        Q.    And this was before the Clean Water Act

9    was enacted, so that did not require Chevron at that

10   time to obtain a national pollutant discharge

11   elimination permit; is that correct?

12       A.    I don't know.

13       Q.    And we already talked about, but you heard

14   Mr. Dewey testify about how the decant process

15   would, in theory, send clean water into the Red

16   River; is that correct?

17       A.    I think that is correct, yes.

18       Q.    And so there is no reason, in your

19   opinion, for BLM to not allow Chevron to send clean

20   water over Federal lands into the Red River,

21   correct?

22       A.    Correct.

23       Q.    We will get to the land exchange in a

24   little bit, but I just want to ask two questions

25   there now.

1         **A land exchange would give Chevron fee**

2     **ownership of that land?**

3         A.    That is correct.  It is also my

4     understanding that there could have been conditions

5     placed on it, but in general, it is fee ownership.

6         **Q.    And you also agree, as you testified at**

7     **your deposition, that there was no reason for the**

8     **Government to disapprove or refuse the land**

9     **exchange; is that correct?**

10        A.    No, they were the ones that suggested it.

11    Why would they refuse it?

12        **Q.    Let's switch gears and talk about the**

13    **pre-DMEA exploration and a few issues there.  I know**

14    **it's been discussed at length but there are a few**

15    **questions I want to ask you about your direct**

16    **testimony.**

17            **So once Chevron exhausted the high-grade**

18    **ore in the first underground mine, you say that**

19    **Chevron had no planned exploration and no reserves**

20    **until the DMEA application; is that correct?**

21        A.    That is what Molycorp said, yes.

22        **Q.    And you heard the testimony of Mr. Dewey**

23    **yesterday that Chevron knew of the existence of**

24    **low-grade ore before applying for the DMEA loan,**

25    **correct?**

Page 294

1      A.    Yes.

2      Q.    You also heard Mr. Dewey testify that

3  Chevron was very familiar with John Schilling and

4  his 1956 report that noted a large low-grade

5  molybdenum ore deposit, correct?

6      A.    Yes.

7      Q.    You also heard that Mr. Dewey said that

8  the Chevron team's reluctance to undertake low-grade

9  ore exploration because it, quote, had no use for

10 it, end quote?

11     A.    Yes.

12     Q.    Do you take issue with any of that of

13 Mr. Dewey's testimony?

14     A.    I don't.

15     Q.    You also heard Dr. Rigby testify that

16 Chevron was well aware of diamond drilling methods

17 at the time of the DMEA application; is that

18 correct?

19          MR. HOPSON:  Objection, Your Honor.

20 Misstates prior testimony.

21          THE COURT:  Sustained.

22     Q    (By Mr. Harrison) Are you aware of whether

23 diamond drilling methods were prevalent at the time

24 of the DMEA application in the late 1950s in the

25 mining industry?

Page 295

1       A.      Of course.

2               Could you give me a second so I could get

3       a drink of water?

4       **Q.      You also heard testimony about Dr.**

5       **Carpenter and his involvement with Chevron at the**

6       **site prior to the DMEA loan application; is that**

7       **correct?**

8       A.      Yes.

9               MR. HARRISON:  If I could show CX186.

10      **Q     (By Mr. Harrison) This is a 1968 article**

11      **from Robert Carpenter, titled "Geology and Ore**

12      **Deposits of the Questa Molybdenum Mine Area."**

13              **Have you seen this before?**

14      A.      You know, I have seen that.

15              MR. HARRISON:  Your Honor, I would like to

16      move for admission of CX186.

17              MR. HOPSON:  No objection, Your Honor.

18              THE COURT:  Without objections, it will be

19      admitted.

20              (Exhibit admitted, CX186.)

21      **Q     (By Mr. Harrison) If we could turn to**

22      **page three, paragraph which begins, "Because of."**

23              **So you heard the testimony that Dr.**

24      **Carpenter was intimately involved with the Questa**

25      **Mine, correct?**

1      A.    Yes, I did.

2      Q.    Okay.  In this paragraph, Dr. Carpenter

3  writes, quote, "Underground headings were advanced

4  into target areas and diamond" -- or, excuse me, let

5  me begin with the first sentence of the paragraph.

6           "Because of increasing difficulties of

7  maintaining the small tonnage high-grade production,

8  an intensive exploration program was initiated in

9  1953."

10          Do you see that?

11     A.    I do.

12     Q.    And then two sentences later, it says,

13  "Underground headings were advanced into targeted

14  areas and diamond drilling was initiated."

15          Do you see that?

16     A.    I do.

17     Q.    And then the next sentence says, "By 1957

18  it was apparent that the Questa Mine held promise of

19  large reserves of low-grade molybdenum ore."

20          Do you see that?

21     A.    I do.

22     Q.    You also heard testimony from Mr. Dewey

23  and Dr. Rigby that prior to the May DMEA contract,

24  Chevron was able to obtain millions of dollars in

25  financing, correct?

1    A.    Yes.

2          MR. HOPSON:  Objection.  Again, that

3    question misstates the prior testimony.

4          THE COURT:  Can you restate your question?

5    **Q    (By Mr. Harrison) Are you aware that in**

6    **June, 1955, Chevron sold Kennecott $2.8 million**

7    **worth of stock?**

8    A.    I guess I am aware of it.  I've heard

9    testimony of that but I am not a mine finance expert

10   or stock expert.

11   **Q.    Are you aware that in June, 1954, Chevron**

12   **obtained $1.5 million in loans?**

13   A.    Apparently.

14   **Q.    And are you aware that Chevron had a**

15   **$4.2 million stock offering in 1957?**

16         MR. HOPSON:  Objection, cumulative.

17         THE COURT:  I will overrule that.

18   A.    Apparently.

19   **Q    (By Mr. Harrison) So in your opinion -- in**

20   **your opinion in this case, you have testified that**

21   **Chevron had given up on exploration until DMEA; is**

22   **that correct?**

23   A.    Yes.

24         MR. HARRISON:  If we could show USX520.

25   **Q    (By Mr. Harrison) This is Chevron's --**

Page 298

1    Molycorp's 1956 annual report, which predates the

2    DMEA contract, correct?

3        A.    Yes, it predates by a few months.

4              MR. HARRISON:  If we could go to

5    page four, under "General."

6        Q    (By Mr. Harrison) The first paragraph says,

7    "Your company continues its policy of searching for

8    new sources of minerals."

9              Do you see that?

10             THE COURT:  The first paragraph?

11       A.    Yes, I do.

12       Q    (By Mr. Harrison) The first sentence of the

13   next paragraph says, "Concentrated exploration is

14   currently being done at Questa New Mexico."

15       A.    Yes.

16       Q.    And then about --

17             THE COURT:  Why don't you ask him to read

18   it himself and then you can ask him questions.

19       Q    (By Mr. Harrison) Sure.  I just have one

20   more question on this, but if you could read that

21   paragraph and let me know when?

22       A.    Read the entire?

23       Q.    Just the paragraph "Concentrated

24   exploration."

25             THE COURT:  Just to yourself.

Page 299

1      A.    Okay.  I have read it.

2      **Q    (By Mr. Harrison) In the middle of the**

3   **paragraph, it says that "Surrounding land had been**

4   **staked on behalf of your corporation in order to"**

5   **and then it cuts off "extensions of indicated**

6   **mineralized area."**

7         **Do you see that?**

8      A.    I do.

9      **Q.    So if, in your opinion, Chevron had given**

10  **up on exploration efforts, why would they be staking**

11  **claims prior to the DMEA contract?**

12     A.    Well, there are lots of areas outside the

13  current underground mine.  So I assume that they

14  were looking at other areas.

15         Also, I think what this might be talking

16  about is, this was right in the middle of or towards

17  the end of their negotiations with the DMEA people

18  about initiating a contract.

19         And so when they say "core drilling will

20  shortly begin," I suspect that that is the core

21  drilling that is defined by the contract that is

22  just a couple of months from the future.

23     **Q.    You have heard testimony about DMEA, that**

24  **it is a voluntary program, correct?**

25     A.    Yes, it is.

Page 300

1       Q.      And DMEA requires that the plan must show

2   a geological probability of making a significant

3   discovery?

4       A.      Yes.

5       Q.      And you heard Dr. Rigby testify earlier

6   today that the purpose of DMEA is not for

7   prospecting?

8       A.      That is correct.

9       Q.      You testified that DMEA approval of

10   Chevron's application was entirely discretionary,

11   correct?

12      A.      That's correct.

13      Q.      But, again it was Chevron who decided to

14   submit the application?

15      A.      Yes, they did.

16      Q.      And they entered into the contract in May,

17   1957?

18      A.      That is correct.

19      Q.      Chevron was not required to agree to the

20   terms of the contract?

21      A.      Molycorp was not required to agree to the

22   terms of the contract, if they wanted the contract.

23      Q.      And DMEA repayment obligations are created

24   only if Chevron were to develop a producing mine,

25   correct?

1      A.      And a discovery had been determined.

2      **Q.      Repayment obligations are not contingent**

3  **on just a recovery?**

4      A.      Would you state that again?

5      **Q.      Sure.**

6              **The repayment obligations under DMEA**

7  **require both a certificate of discovery and**

8  **development by the participant, correct?**

9      A.      As a result of that discovery, that is

10  correct.

11     **Q.      You testified, in your direct, that**

12  **repayment was required, quote, "if a discovery was**

13  **made from the exploration work, the federal**

14  **government was entitled to interest-free royalties**

15  **in return for the initial loans."**

16             **Do you recall that?**

17     A.      I do.

18     **Q.      Is that still your testimony?**

19     A.      Yes.

20     **Q.      But in addition to that, the repayment**

21  **obligations are -- require a producing mine,**

22  **correct?**

23     A.      Well, that is kind of the only way that

24  you produce minerals and make money is from a

25  producing mine and that is what happened.

Page 302

1      Q.     Chevron or DMEA contract ended in June,

2    1960, correct?

3      A.     Yes.

4      Q.     And Chevron's final report noted that

5    there were high -- there was a several high-grade

6    ore bodies in the area or low-grade low bodies in

7    the area, generally speaking?

8      A.     I think that is correct.  That is what

9    Molycorp stated in their final report.

10     Q.     And Molycorp also did additional

11   exploration on its own during that same time period,

12   correct?

13     A.     That is correct.

14     Q.     DMEA also issued its own final report in

15   1960, correct?

16     A.     Yes, they did.

17     Q.     And it is also noted the presence of a

18   large low-grade ore body, correct?

19     A.     Absolutely.  A tremendous deposit of

20   low-grade ore.

21     Q.     And DMEA's final report also said that it

22   would take considerable time and capacity for

23   explore this low-grade ore body, correct?

24     A.     For sure.

25     Q.     Is it fair to say that Chevron did

1    **substantially more exploration after the DMEA**

2    **contract than prior to it, with respect to**

3    **developing the --**

4              MR. HOPSON:  Objection, cumulative.

5              THE COURT:  Overruled.

6    A.    Would you repeat that, please?

7    **Q    (By Mr. Harrison) Sure.**

8          **Did Chevron do more exploration for the --**

9    **to develop the open pit mine after the DMEA contract**

10   **ended?**

11   A.    They did a lot more drilling and

12   delineation of the ore deposit.  There is no

13   question about that.

14            But I think Dr. Rigby addressed that

15   pretty clearly this morning, and I have absolutely

16   no reason to doubt anything he said about that.

17   **Q.    Chevron didn't formally decide to develop**

18   **an open pit until 1964, correct?**

19   A.    I don't know when they formally decided to

20   do it or not.

21   **Q.    In October, 1964, Chevron estimated the**

22   **post of developing the open pit mine and facilities,**

23   **would be $27.5 million.**

24            **Are you aware of that?**

25   A.    I guess so.

Page 304

1     Q.     And Chevron borrowed 20 million?

2            THE COURT:  If you know.

3     Q     (By Mr. Harrison) If you know.

4     A.     I assume they did but I don't know for

5     sure.

6     Q.     And just two years later, in 1966, are you

7     aware that Chevron estimated that the total cost for

8     development, exploration and construction were

9     upwards of $44 million?

10    A.     That sounds right.

11    Q.     And that was at the time when the mine was

12    just beginning its operations?

13    A.     Correct.

14    Q.     So part of its decision to develop and

15    mine using the open pit method, Chevron designed its

16    open pit mining facilities, correct?

17    A.     Absolutely.

18    Q.     And it built or modified facilities to

19    transition from the underground mine to the open pit

20    mine, correct?

21    A.     A major redesign of all of their

22    facilities.

23    Q.     It built a new expanded mill with course

24    or storage bins?

25    A.     Yes.

Page 305

1      Q.     And that was on land Chevron owned,
2   correct?
3      A.     I think so, yes.
4      Q.     It built primary, secondary and tertiary
5   crushers on land that Chevron owned?
6      A.     They built everything they needed to
7   develop the mine.
8      Q.     On land that Chevron owned?
9      A.     Some of it, and some of it was on federal
10  land.
11     Q.     Subject to a mill site claim?
12     A.     That is correct.
13     Q.     The land that ultimately became the open
14  pit mine was owned by Chevron at that time, correct,
15  at the start of development?
16     A.     Well, I think there are different time
17  frames of ownership.  But I don't believe all of the
18  land that was developed into the open pit was owned
19  by Chevron as patented mining claims.
20     Q.     So Chevron's open pit operations began in
21  late 1965 and continued in earnest in early 1966?
22     A.     That is true.
23     Q.     And you heard Mr. Dewey testify yesterday
24  about Chevron's mining claims for the open pit?
25     A.     Yes.

Page 306

1      Q.      And in those mining plans, Chevron

2   discussed ways to dispose of waste rock?

3      A.      Absolutely.

4      Q.      And Chevron chose where to dispose of that

5   waste rock?

6      A.      Yes.

7              Depending on what period of time we are

8   talking about here.

9      Q.      Sure.

10             At the beginning of the open pit.

11     A.      That is correct.

12     Q.      And initially, Chevron did not choose

13   these waste-dump areas based on any input from the

14   United States?

15     A.      I think that is true, yes.

16     Q.      You heard Mr. Dewey testify about the west

17   wall and what Chevron's engineers called Quivering

18   Ridge; is that correct?

19     A.      I believe that is -- yeah, I didn't use

20   the term Quivering Ridge, but yes.

21     Q.      So shortly after beginning open pit

22   operations in 1967, there was a major fault in the

23   west wall of the open pit?

24     A.      I think there was testimony that it was

25   not a fault but there was a weakness.

Page 307

1    Q.    But the weakness was on Chevron-owned
2    land, correct?
3    A.    I would have to look at the maps and the
4    patented or unpatented mining claims again, but I
5    won't disagree with it.
6    Q.    And you heard Mr. Dewey testify about
7    Chevron deciding to continuing mining and revising
8    its mining plan in response to what has been called
9    a fault?
10   A.    Yes.
11   Q.    The United States did not participate or
12   make a decision for Chevron to continue its open pit
13   mining under the new mining plan; is that correct?
14   A.    That is correct.
15   Q.    And the revised mining plan increased the
16   waste ratio from about two-to-one to roughly
17   ten-to-one; is that correct?
18   A.    That's correct.
19   Q.    So Chevron then needed to figure out a
20   place to put all of this new waste rock, correct?
21   A.    That is correct.
22   Q.    So in 1968, at about the time of the
23   discovery of the west wall issues, Chevron applied
24   for patents on several mining claims around the open
25   pit area.

1            **Are you aware of those?**

2      A.    Absolutely.

3      **Q.    And the patents for those issued in two**

4  **years later, in 1970?**

5      A.    That is right.

6      **Q.    But either with acquiring those**

7  **additional -- that additional land, Chevron felt it**

8  **was necessary to own additional or possess**

9  **additional land in order to dispose of its waste**

10  **rock, correct?**

11      A.    The mining claim is patented because there

12  is mineral there.  And in general, mining companies

13  don't like to put waste upon their mineral land.

14  They don't like to move waste twice.

15      **Q.    So Chevron felt it needed additional land**

16  **in addition to that area so it wouldn't have to move**

17  **the waste rock twice, correct?**

18      A.    Exactly.

19      **Q.    And another reason, perhaps, that Chevron**

20  **needed or wanted different land was it was concerned**

21  **with changes to the mining laws, at that time?**

22      A.    I don't think that had any bearing on the

23  need for additional land.

24            The mining operation is what determines

25  whether they needed additional land.

1        Q.    **A factor -- would you agree that a factor**

2   **going into the consideration to own the land was the**

3   **possible changes in the mining laws?**

4        A.    Yes, there -- that's the -- no doubt.

5        Q.    **So another idea that Chevron had was to**

6   **apply for special use permits to dump the waste rock**

7   **on these lands; is that correct?**

8        A.    I believe there is something in the record

9   that said that Molycorp was pursuing a long-term

10  special use permit.

11             There was a lot of previous records that

12  showed that it was really -- the Forest Service

13  considered long-term special use permits.  A lot of

14  back and forth between the four supervisors' office

15  and the regional office, well, should we issue

16  special use permit or not issue special use permits.

17  There are -- there are a half of -- so I suspect

18  that is what that report was talking about, that it

19  was a Forest Service idea and so they were pursuing

20  that, at one time.

21       Q.    **Do you recall Mr. Dewey's testimony**

22  **yesterday about Chevron was reluctant to use a**

23  **special use permit or apply for a special use**

24  **permit?**

25       A.    Yes.

1      Q.     **And some of the reasons that were**

2   **expressed were because the special use permit could**

3   **be withdrawn by the Forest Service, correct?**

4      A.     That is right, they are discretionary.

5      Q.     **And it could also require restoration of**

6   **the land?**

7      A.     Yeah, I would assume that they could put

8   any kind of stipulation you want in a special use

9   permit.

10              MR. HARRISON:  If we could show CX204 and

11   pages one and two.

12      A.     But, that was -- that was -- a special use

13   permit was not the preferred method for the land,

14   you know, prior to the land exchange.

15      Q     **(By Mr. Harrison) The preferred method for**

16   **Chevron or for the Forest Service?**

17      A.     For the Forest Service.

18      Q.     **But isn't it true that it also wasn't the**

19   **preferred method for Chevron?**

20              **If we look at the top of page two here, do**

21   **you see the sentence that says, "We are reluctant to**

22   **reserve special use permits if they can be avoided"?**

23      A.     Yes, absolutely.

24      Q.     **And the reasons explained there were the**

25   **same reasons that Mr. Dewey testified about**

1    **yesterday, correct?**

2       A.      That is correct.  And it was also the

3    position of the Forest Service not to issue special

4    use permits for waste disposal.

5       **Q.      And Chevron never applied for a special**

6    **use permit?**

7       A.      They did not.

8       **Q.      So another way for Chevron to acquire the**

9    **land was for -- for the -- needed for the waste rock**

10   **was to stake and patent mining and mill site claims**

11   **in the area adjacent to the open pit; is that**

12   **correct?**

13      A.      That is correct.

14      **Q.      And Chevron had staked mining and mill**

15   **site claims in almost all of that area, prior to the**

16   **1968 time period?**

17      A.      Absolutely.

18      **Q.      Encompassing something like 2,000 acres or**

19   **more of land?**

20      A.      Well, just adjacent to the mining up area,

21   that's correct.

22      **Q.      Are you aware that in 1971 Chevron**

23   **estimated that it was only using about 400 acres of**

24   **that area for dumping waste rock?**

25      A.      Yes, I am.  The Washington office of the

1   Forest Service asked the regional office in

2   Albuquerque to -- to determine the amounts of land

3   that were being used by mining in the area.  That

4   was -- that request was made to Molycorp and

5   Molycorp responded that it was around 400 acres that

6   were currently being used for waste disposal on

7   Forest Service land.

8       **Q.    And as part of that process, are you aware**

9   **of internal communications at Chevron that said that**

10  **they still require all of the lands involved in the**

11  **land exchange, not just the acres involved in**

12  **current dumping?**

13      A.    That's correct.

14      **Q.    And just so we are clear, we are talking**

15  **about the area around and adjacent to the open pit,**

16  **not anything on the other side of the highway and**

17  **river, correct?**

18      A.    That is correct.  By that time it was --

19  it was clear that they weren't going to be using the

20  other side.

21          MR. HARRISON:  So let's go back to CX204.

22          This is a July 26, 1968 letter.

23          If you can show the first paragraph,

24  please.

25      **Q    (By Mr. Harrison) I will give you a second**

Page 313

1    to read this and then I will ask you a question.

2        A.    Okay.

3        Q.    So this is a letter from John Watson, who

4    is one of Chevron's counsels, to vice president at

5    Chevron, Mr. Kentro.

6             Mr. Watson notes at the outset here that

7    there are -- the mining claims have, quote,

8    "doubtful discoveries."

9             Do you see that?

10       A.    I do.

11       Q.    And so you can't patent mining claims

12   without mineralization, correct?

13       A.    Absolutely right.

14       Q.    And so, in order for Chevron to acquire

15   this land through the Mining Act patenting process,

16   they would need to withdraw the mining claims and

17   stake those as mill sites, correct?

18       A.    You wouldn't necessarily -- you wouldn't

19   necessarily have to withdraw the mining claims.  You

20   could -- so you could still have mill sites on

21   mining claims.  It is no big deal.

22       Q.    And for the mill sites to be patented,

23   Chevron would need current use at the time of the

24   patent application for each of those claims?

25       A.    That's correct.

Page 314

1      Q.     And Mr. Watson acknowledges that in this

2  letter as well, in the second paragraph?

3      A.     That is right.

4      Q.     And at the time of this 19 --

5      A.     A mill site has to be presently used and

6  occupied for those purposes, and that is what he was

7  stating there.

8      Q.     And later in this letter, the third

9  paragraph on the second page, Mr. Watson expresses

10  concern about the lack of present use and occupation

11  for these proposed mill sites.

12             Do you see that?

13      A.     Yes.

14      Q.     To patent a mill site, the mining law

15  requires that the mill sites not exceed 5 acres; is

16  that correct?

17      A.     Yes.

18      Q.     Like you said, it also requires a current

19  use, not a future use or a planned use?

20      A.     That is correct.

21      Q.     So is it fair to say that these legal

22  requirements for the mill sites presented a

23  challenge for Chevron if it wanted to apply for

24  patents on these claims?

25      A.     Well, if they weren't being presently used

1    and occupied, it would be a challenge.

2         Q.    And to get around that challenge, you

3    heard Mr. Dewey testify yesterday that Chevron,

4    quote, "devised a plan that worked around," end

5    quote, the mill cited law.

6              Do you recall that testimony?

7         A.    I do.

8         Q.    And that was the fan-shaped mill sites

9    that were -- would run from the area near the open

10   pit down to the highway, correct?

11        A.    I do, yes.

12             MR. HARRISON:   If we could show CX216 at

13   page three.

14        Q    (By Mr. Harrison) These are the fan-shaped

15   mill sites referenced by Mr. Dewey and in the

16   July, 1968 letter?

17        A.    Yes.

18        Q.    And this is the area adjacent to the open

19   pit up to the highway?

20        A.    Or down to the highway.

21        Q.    Or down to the highway, yes.

22        A.    Sure.

23        Q.    And so if this was found permissible, that

24   would have allowed Chevron an easier time claiming

25   use on the mill sites so that they could patent

1   them; is that correct?

2      A.    You know, it was a pretty innovative idea

3   to think about, is that if you just put some waste

4   on the top part of the mill site and it extends all

5   the way down past the road, then you are occupying

6   the entire mill site.  It was kind of a funny way to

7   do it.

8      Q.    But that is not consistent with the

9   requirements of the mining law, is it?

10     A.    You know, I think that is a question

11  because the mining law just talks about, you know,

12  5 acres in size.

13          What the Forest Service and the BLM prefer

14  is that they be in, you know, 5-acre chunks,

15  according to the rectangular survey system that is

16  preferred.

17          But I don't think there is anything in the

18  mining law that says that has to be that way.

19     Q.    Are you aware of any other set of mining

20  or mill site claims that Chevron located at the

21  Questa site that were fan-shaped or non-rectangular

22  in shape?

23     A.    No.  No, I am not.

24     Q.    And they located almost, if not over,

25  1,000 mill site and mining claims?

Page 317

1      A.    Well, I think a small number of mill

2  sites, the tremendous amount of those load claims

3  compared to mill sites.

4      **Q.    So Chevron was looking for an easier way**

5  **to simplify the patenting process by coming up with**

6  **the fan-shaped narrow mill site claims, correct?**

7      A.    They were thinking of an innovative way to

8  do it.

9            THE COURT:  Did they put waste all over

10 those lines?

11           THE WITNESS:  Pardon me, Your Honor?

12           THE COURT:  Did they put waste all over

13 those mill site lines?

14           THE WITNESS:  Eventually.  These were

15 never -- these were never staked as mill sites.

16 This was a sketch that was developed by Molycorp.

17           THE COURT:  Was this before any patents

18 were issued?

19           THE WITNESS:  Absolutely.

20     **Q    (By Mr. Harrison) So this letter was**

21 **July, 1968.**

22           **Let's fast forward a few months to**

23 **January, 1969.**

24           **We have heard a lot about this**

25 **January, 1969 meeting between Chevron and the Forest**

1    Service.

2         And you heard that testimony in court,

3    correct?

4    A.    Yes.

5    Q.    And the major topic of the meeting seemed

6    to be this idea of a Red River Canyon tunnel fill

7    idea, correct?

8    A.    That is right.

9    Q.    Do you agree that this would have been a

10   major project?

11   A.    Absolutely.

12   Q.    Would it have required extensive design

13   and planning?

14   A.    Absolutely.

15   Q.    Permitting from various governmental

16   entities?

17   A.    I don't know all the extent of the

18   permitting that would be required from the state.  I

19   just don't know.

20   Q.    But permits, in your experience, with a

21   project like this, permits would be required?

22   A.    Well, if they are required, they are, but

23   I have no knowledge of what permits might be

24   required in that case.

25   Q.    And would it have involved -- would a

Page 319

1    **project like this have necessarily involved seeking**

2    **public input and feedback, as well?**

3         A.    It could have, sure.  Yeah.

4         **Q.    And if -- strike that.**

5              **So at the January, 1969 meeting, the**

6    **Forest Service suggested a land exchange, correct?**

7         A.    No.  It was the Forest Service that

8    suggested the land exchange.

9         **Q.    I think I said that but if I didn't, then**

10   **I misspoke.**

11        A.    Okay.

12        **Q.    And Chevron agreed to prepare a map of the**

13   **selected and offered lands following that meeting?**

14        A.    That is correct.

15        **Q.    And Chevron never presented a formal**

16   **application to the Forest Service?  Well, anything**

17   **relating to the Red River -- Red River plan?**

18             THE COURT:  Well, are we going to go into

19   that proposed Red River overpass?

20             MR. HARRISON:  No, Your Honor.  I have a

21   few more questions on that before I get to a --

22             THE COURT:  Why do you have any questions

23   on that?

24        **Q    (By Mr. Harrison) In your direct testimony,**

25   **you took issue with the fact that the Forest Service**

Page 320

1    **never undertook an analysis of the Red River Canyon**

2    **idea; is that correct?**

3        A.    That's correct.

4        **Q.    But, there was no way for them to do that**

5    **without a formal submission?**

6             THE COURT:  Counsel, why are you going

7    there?  I want you to move on.  We have exhausted

8    that topic.

9        **Q    (By Mr. Harrison) Let's go back to the**

10   **communications following the January, 1969 meeting.**

11            **So three weeks after that, Chevron's**

12   **lawyer wrote to the Forest Service to make**

13   **application for the land exchange.**

14            **Are you aware of that?**

15       A.    I am aware of correspondence, yes.

16       **Q.    And from that point forward, Chevron was**

17   **fully intent on proceeding with the land exchange,**

18   **correct?**

19       A.    It was pretty urgent to proceed with it.

20   They needed that -- that land for the waste

21   disposal.

22            MR. HARRISON:  If we could show CX212.

23            So this is the February, 1969 letter we

24   were just discussing.

25            If we could turn to the top of page two.

1   And this letter, again, is from Mr. Watson,

2   Chevron's counsel.

3      Q    (By Mr. Harrison) And it says that "Parcels

4   one and two are practically covered with load-mining

5   claims."

6           Do you see that?

7      A.   Yes, sir.

8      Q.   And parcels one and two, just so we are

9   all clear, are for the -- the areas that ultimately

10   ended up becoming the land subject to the land

11   exchange, correct?

12     A.   Yes.

13     Q.   And then a few sentences down, it says,

14   "In this same general area are two other claims, the

15   Sugarloaf and Magnifico, which belongs to other

16   persons."

17          Do you see that?

18          MR. HARRISON:  If we could just zoom back

19   out, please.  If we could go to the last paragraph.

20     Q    (By Mr. Harrison) Mr. Watson writes that

21   those who attended the meeting are, quote,

22   "Sincerely appreciative of your suggestions, and

23   thank you for your consideration of this matter."

24          Do you see that?

25     A.   Yes.

Page 322

1      Q.      There is nothing here to suggest that the

2   meeting wasn't amiable or that -- not friendly?

3      A.      I think it was professional.

4      Q.      And so the Forest Service responded to

5   Chevron's letter in April of 1969.

6              Are you aware of that?

7      A.      I am sure they did.

8              MR. HARRISON:  If we could show CX216,

9   please.

10     Q     (By Mr. Harrison) Looking at the third

11   paragraph on the first page, the first sentence

12   says, explains that "Unpatented mining claims would

13   either have to be relinquished or adjudicated."

14             Do you see that?

15     A.      Yes.

16     Q.      And by adjudicated, that means through a

17   validity contest?

18     A.      That's correct.

19     Q.      And that makes sense that in order for the

20   United States to be able to convey the land, it

21   needed clear title on that land?

22     A.      That is correct.

23     Q.      So if Chevron did not want to relinquish

24   the claims, they could have proceeded with the

25   validity contest to clear those claims, the mining

Page 323

1    claims, from the land?

2        A.    If they didn't want to relinquish the

3    claims, they could go through a validity contest

4    is --

5        Q.    Yes.

6        A.    -- that what you are asking?

7        Q.    Yes.

8        A.    They would want to contest their own

9    claims, is that what you're asking?

10        Q.    I'm just asking what the letter says in

11    that respect with regard to the first sentence here.

12        A.    The first sentence says, you've got two

13    options, you can relinquish them or we can challenge

14    them in a validity contest.

15        Q.    In order for the land exchange to

16    continue?

17        A.    Correct.

18        Q.    So that was a choice that Chevron could

19    have made.  They could have, instead of

20    relinquishing them, could have offered to go through

21    the validity contest?

22        A.    They would ask for a validity contest with

23    their own claims?  I guess they could have, sure.

24        Q.    And the relinquishment is held in escrow,

25    correct?

1     A.    Evidently.

2     Q.    **And if you would look about halfway down**

3  **this paragraph, it says, "The relinquishments are**

4  **not recorded or made a public record until the land**

5  **exchange has reached the point of patent in the**

6  **respective land."**

7             **Do you see that?**

8     A.    I do.

9     Q.    **And just again, so we are clear, we are**

10 **talking about this land exchange is for the area**

11 **adjacent to the open pit mine, nothing across the**

12 **river or on the other side of the river?**

13    A.    That's correct.

14    Q.    **And in this letter, the Forest Service**

15 **also expressed some concerns of Chevron's proposing**

16 **of the fan-shaped mill sites; is that correct?**

17    A.    I would have to look further down the

18 letter.

19             MR. HARRISON:  If we could go to the top

20 of the last -- the last paragraph of page one, top

21 of page two.

22    A.    Yes, it is in there.

23    Q     **(By Mr. Harrison) And I think you testified**

24 **earlier that whether or not the permissibility or**

25 **whether or not it was permissible to use fan-shaped**

1    mill site was a question?

2        A.    Correct.

3        Q.    And the Forest Service also notes here

4    that, quote, "The shape of the mill sites, as

5    proposed by Molycorp, is also a matter of concern."

6              Do you see that?

7        A.    I do.

8        Q.    And this is in addition to the concerns

9    that Chevron's lawyers had already raised for

10   itself, to Chevron's employees about the active and

11   current use of mill sites, in order to have those

12   patented, correct?

13       A.    Correct.

14       Q.    Your testimony is that this letter from

15   the Forest Service threatened Chevron by suggesting

16   a friendly validity contest.

17             Is that still your testimony?

18       A.    Yes.

19       Q.    But isn't it more the case that the Forest

20   Service is just ensuring that it is acting in

21   compliance with its -- with the laws and

22   regulations?

23       A.    Well, of course, the Forest Service and

24   federal government acts in compliance with its laws

25   and regulations.  There is no doubt about that.

1      Q.    If there was a question, like you said,

2   about the propriety of using the mill site claims in

3   the fan-shaped manner that Chevron is proposing,

4   that would be something that would need to be

5   necessarily resolved, correct?

6      A.    That, and the fact that there are fan

7   shapes of mill sites would have to be resolved.

8      Q.    You testified that a validity contest

9   would take many years to resolve; is that correct?

10     A.    Yes, I testified to that, and so did the

11  Forest Service 30(b)(6) witness.

12     Q.    And so CX216 is dated April 18, 1965.

13           If we go forward just a week -- a little

14  more than a week later, Chevron also suggested that

15  the Forest Service initiate a validity contest

16  related to issues of the land exchange?

17     A.    Correct.

18           MR. HARRISON:  It is -- we can -- can we

19  show CX218?

20     Q    (By Mr. Harrison) So this is an April 30th

21  letter from Chevron's counsel to the Forest Service.

22           Do you see that?

23           THE COURT:  Yeah, 1969?

24           MR. HARRISON:  1969.

25     A.    I see the first page of it.

Page 327

1          MR. HARRISON:  So if we can turn to the --

2    the second page, the first full, the paragraph

3    beginning with Mr. Koen.

4        Q    (By Mr. Harrison) This refers to the

5    April 18th letter that we were just looking at?

6        A.   Yes.

7        Q.   And it says here -- I will give you a

8    minute to read it.

9        A.   Okay, got it.

10       Q.   So this letter, just barely a week later,

11   Chevron is suggesting to the Forest Service that it

12   initiated a validity contest related to the land

13   exchange, correct?

14       A.   On -- I guess on mining claims that it did

15   not own.

16       Q.   And Chevron also inquired in this

17   letter -- if we turn to the next page, first full

18   paragraph -- "To avoid the situation, Chevron also

19   inquired as to whether the Forest Service would

20   initiate a quiet title action related to those

21   mining claims that were not Chevron's."

22            Is that correct?

23       A.   That were not Molycorp's, yes.

24       Q.   And Chevron wanted or needed these mining

25   claims and title quieted so that the land exchange

1    could be -- the land subject to the land exchange

2    could be conveyed with clear title, correct?

3        A.    That's correct.

4        Q.    And this letter also closes with "Permit

5    us to thank Mr. Parte and Mr. Ashby for your

6    kindness and cooperation in this matter."

7              Do you see that?

8        A.    I do.

9        Q.    "And the tone is professional and

10   friendly"?

11       A.    Absolutely.

12       Q.    And so throughout the rest of 1969 and the

13   following year, Chevron expressed continued interest

14   in finalizing the land exchange, correct?

15       A.    They had to have it.

16             MR. HARRISON:  If we could go to USX34.

17       Q    (By Mr. Harrison) This is Chevron's formal

18   land exchange application.

19             Do you see that?

20       A.    Yes.

21             MR. HARRISON:  And the transmittal letter

22   is actually on pages five and six, so if we could

23   show those.

24       Q    (By Mr. Harrison) And it is dated

25   November 5th, 1969?

Page 329

1     A.     Yes.

2            MR. HARRISON:  If we go to page six, first

3     full paragraph.

4     **Q     (By Mr. Harrison) It notes here that**

5     **"Chevron will relinquish the unpatented mining**

6     **claims when the land exchange is consummated."**

7            **Do you see that?**

8     A.     I do.

9     **Q.     And it is the future tense here, "when the**

10    **exchange is consummated and will relinquish."**

11    A.     That's correct.

12    **Q.     And it again closes at the end with "Thank**

13    **you again for your and your staff's assistance and**

14    **cooperation in this matter."**

15           **Do you see that?**

16    A.     Yes, I do.

17           MR. HARRISON:  I would move for the

18    admission of USX34.

19           THE COURT:  Any objection?

20           MR. HARRISON:  No objections, Your Honor.

21           THE COURT:  Without objections.

22           (Exhibit admitted, USX34.)

23           MR. HARRISON:  If we could show CX235.

24    **Q     (By Mr. Harrison) This is an April 30th,**

25    **1970 letter to Molycorp's general manager, Colin**

Page 330

1    Campbell, from the Forest Service; isn't that

2    correct?

3        A.    Yes.

4        Q.    Have you seen this document before?

5        A.    I have.

6             MR. HARRISON:  Your Honor, I would move

7    for admission of CX235.

8             THE COURT:  Any objections?

9             MR. HOPSON:  No objections.

10            THE COURT:  Without objections, it is

11   admitted.

12            (Exhibit admitted, CX235.)

13       Q    (By Mr. Harrison) And if we look at this,

14   the first sentence says that "It would be necessary

15   for Molycorp to relinquish the mining claims prior

16   to the issuance of a patent."

17            Do you see that?

18       A.    Yes.

19       Q.    And then the second sentence of the second

20   paragraph says that "The Forest Service will keep

21   the relinquishment in escrow until we know that the

22   patent will issue."

23            Do you see that?

24       A.    That is correct.  That's what it says.

25       Q.    And again, here it is future tense, will

1    relinquish.  And it does not suggest anything that

2    the claim had actually been relinquished, correct?

3         A.    Well, I don't think they had been

4    relinquished, at this time.

5         Q.    Nothing to suggest here that the claims

6    would be relinquished until the exchange was

7    consummated, correct?

8         A.    That is what this letter says.

9         Q.    Do you have any reason to dispute that

10   that was the process by which the relinquishment

11   happened as part of this land exchange?

12        A.    The Molycorp did relinquish the claims.

13   Was signed by the general manager, I guess, that

14   Molycorp notarized and given to the Forest Service.

15             Whether or not that relinquishment, I

16   guess you can -- you can argue whether a

17   relinquishment that was signed and notarized was a

18   relinquishment or not.

19        Q.    So the other side of the land exchange

20   deal, Chevron provided offered lands to the

21   United States, correct?

22        A.    That is correct.

23        Q.    Are you aware that in 1972 Chevron

24   provided a warranty deed for the offered lands?

25        A.    Yes.

Page 332

1      Q.      And the land exchange was finalized in

2  1974?

3      A.      That is correct.

4      Q.      Is it your testimony then that the

5  United States owned the warranty deed for the --

6  owned the land, the offered lands, in 1972 prior to

7  the consummation of the land exchange, simply

8  because Chevron provided the warranty deed?

9      A.      I don't know.  I have not really

10  researched that, to be honest about it.

11      Q.      Chevron didn't do anything between the

12  time of the relinquishment in May, 1970 to the

13  finalizing of the land exchange in January of 1974

14  to suggest that they didn't feel like they had the

15  right of access to that property, correct?

16      A.      That's correct.

17      Q.      Chevron continued to dump waste rock on

18  the land exchange while the land exchange was

19  pending, correct?

20      A.      For sure.

21      Q.      Would you say it was business as usual?

22      A.      I don't think any mining operation is

23  really business as usual.

24              MR. HARRISON:  If I could show CX306.

25              So this is part of the land exchange file.

Page 333

1    If we could go to page 168, the May 20th, 1970

2    letter.

3        Q    (By Mr. Harrison) Have you seen this letter

4    before?

5        A.    I have.

6            MR. HARRISON:  Your Honor, I would like to

7    move for admission of CX306.

8            MR. HOPSON:  No objection.

9            THE COURT:  Thank you.

10           Without objection, it will be admitted.

11           (Exhibit admitted, CX306.)

12       Q    (By Mr. Harrison) And this is a letter from

13   Chevron's counsel to the Department of Agriculture,

14   the Forest Service?

15       A.    Yes.

16       Q.    If we look at the second paragraph here,

17   it says, "We understand that you will hold the

18   enclosed relinquishment until you are assured by the

19   BLM that patent will issue in a few days to the

20   selected lands involved in the land exchange."

21           Do you see that?

22       A.    Absolutely.

23       Q.    Again, it is future tense here, will hold

24   until you are assured, correct?

25       A.    Correct.

1      Q.     And we discussed this earlier, there was a

2  reference to two outstanding mineral claims that

3  Chevron did not possess as part of the land

4  exchange.  I believe those were the Sugarloaf and

5  the Magnifico.

6             Do you recall those?

7      A.    Yes.

8      Q.     Were those ultimately removed from

9  Chevron's land exchange proposal and later patented

10 in the 1980s?

11     A.    That's correct.

12     Q.     So around the same time or -- excuse me.

13            In 1971, as part of the land exchange, the

14 Forest Service prepared an environmental analysis.

15            Are you aware of that?

16     A.    Yes.

17            MR. HARRISON:  If you could show CX281.

18     Q    (By Mr. Harrison) And this is the 1972

19 Environmental Analysis.

20            Have you seen this document before?

21     A.    I have.

22     Q.     And this was prepared as a result of the

23 requirements under the National Environmental Policy

24 Act of 1970, correct?

25     A.    Yes.

Page 335

1      Q.      Also, called NIPA?

2      A.      Yes.

3      Q.      **If we could turn to page 17, in the middle**

4   **paragraph that starts, "With Jack Watson from**

5   **Molybdenum Corp., explained that the company**

6   **prepared to exchange the land rather than acquire**

7   **them through mill site applications."**

8           **Do you see that?**

9      A.      Well, this was not in the EA unit, right?

10     Q.      **Correct.  This is part of a transmittal**

11  **letter transmitting the EA, I believe.**

12     A.      This has -- this is not a transmittal

13  letter.

14     Q.      **Excuse me, a memorandum to file.**

15     A.      Okay.  Granted.

16     Q.      **Thank you.**

17           MR. HARRISON:  If we could go -- now let's

18  look at the Environmental Analysis.  If we could go

19  to page six, please, under "Adverse Environmental

20  Effects Which Cannot Be Avoided."

21           Do you see the sentence in the first

22  paragraph that says, "The mining activities will

23  still continue on the patented mining claims or on

24  mill sites and are not dependent upon approval or

25  disapproval of this land exchange proposal"?

1      A.    I do.

2      **Q.    Do you agree with that assessment?**

3      A.    Not exactly.

4          And the reason I don't agree with it is

5  because it was the Forest Service that disapproved

6  of the use of mill sites.  That is the whole purpose

7  of this exchange and subsequent EA.

8      **Q.    So just to finish, the land exchange**

9  **timeline, the Forest Service approved the**

10  **environmental analysis in February 1972, correct?**

11     A.    That is correct.

12     **Q.    And then throughout the rest of 1972, the**

13  **Forest Service approved the land exchange and**

14  **instructed Chevron on next steps?**

15     A.    Well, the land exchange was consummated in

16  1974, yeah.

17     **Q.    So --**

18     A.    So I don't understand your question.

19     **Q.    I will strike that.**

20         **So after this -- so the land exchange was**

21  **finalized in January of 1974, correct?**

22     A.    That's correct.

23     **Q.    A month after the land exchange, Chevron**

24  **attempted or Chevron sought to protect their mining**

25  **operations by locating more mining claims in the**

Page 337

1      area; is that correct?

2          A.      Absolutely.

3          Q.      And the reason -- the reason for that is

4      so that their claims, the land that they owned and

5      possible claims were contiguous?

6          A.      That is true.

7          Q.      And that would be done so Chevron would

8      not have to deal with issues of --

9          A.      Claim jumpers.

10         Q.      Which we have talked about already.

11         A.      Right.  And this is the area just

12     contiguous to the exchange boundary.

13         Q.      Right.

14                 The little block?

15         A.      That's right.

16         Q.      Exactly.

17                 So the land exchange, Chevron received the

18     same land that it would have received if it had gone

19     through the patenting process; is that correct?

20         A.      If they were allowed to have gone through

21     patenting, I guess.

22         Q.      And even if Chevron had decided to apply

23     for patenting and was allowed to do so, Chevron

24     would have still continued dumping waste rock on

25     these areas; is that correct?

1     A.    No, not exactly.  I think that is what

2  Dr. Rigby was talking about.  If -- if Molycorp was

3  allowed to have their mill sites in the way they

4  wanted to, it would have been a totally different

5  configuration of the waste dumps.

6     **Q.    But what we have talked about today with**

7  **these letters and the mill sites is for mill sites**

8  **on areas adjacent to the open pit and on the north**

9  **side of the river and highway.**

10          **We haven't talked about anything going**

11  **across the river and highway or on the other side,**

12  **correct?**

13     A.    We haven't but the Forest Service and

14  Molycorp did.

15     **Q.    All right.  Let's switch gears.  I have**

16  **just a few more things, and talk about Chevron's**

17  **second underground blockade mine.**

18          **That began in the mid-1970s, that**

19  **development?**

20     A.    I think that is correct.

21     **Q.    And that was on land that Chevron owned**

22  **outright?**

23     A.    I am not 100 percent sure on that.

24          There were patents issued after that, I

25  think -- well, maybe -- I would have to look at the

Page 339

1     maps but you may be correct.

2          Q.     The United States was not involved in

3     Chevron's decision to explore for developer operate

4     the new underground blockade mine, correct?

5          A.     No, that was a Molycorp decision.

6          Q.     You testified that the federal government

7     wanted the Questa Mine developed in order to help

8     spread economic development in Northern New Mexico;

9     is that correct?

10         A.     Yes.

11         Q.     Is there anything wrong with that policy?

12         A.     No.

13         Q.     The federal government helped private

14    entities and individuals all the time, correct?

15         A.     Correct.

16         Q.     And when it does, it is supposed to be in

17    the public interest?

18         A.     Yes.

19         Q.     And advance the interest of the

20    United States?

21         A.     Yes.

22         Q.     So it is not your testimony that the

23    federal government's interest in promoting economic

24    development was improper, is it?

25         A.     No, just the opposite.

1       Q.    And Chevron was a beneficiary of that

2   policy, agreed?

3       A.    Agreed.

4       Q.    So if -- just to wrap up, so if the United

5   States had restricted or withdrawn any of Chevron's

6   mining claims or rights on the federal lands at

7   issue here, would that have been improper?

8       A.    Would you repeat that, please?

9       Q.    Sure.   Let me rephrase.

10              If Chevron had restricted Chevron's mining

11  rights, would that have constituted a taking?

12      A.    You mean if the federal government had

13  restricted Chevron --

14      Q.    Yes.

15      A.    -- or Molycorp's?

16              MR. HOPSON:  Objection.  Calls for a legal

17  conclusion.

18              THE COURT:  Sustained.

19      Q    (By Mr. Harrison) You testified in your

20  direct that you felt that it may constitute a

21  taking; is that correct?

22      A.    I would have to look at the exact words

23  from that.

24              MR. HARRISON:  Could we show Fredley

25  Direct 101, please.

Page 341

1      Q      (By Mr. Harrison) **The answer at the bottom**

2   **of the page, it says, "Question:  But these laws**

3   **don't let that kind of incident, patented claims or**

4   **mining claims, with a mineral fine, do they?**

5              **"Answer:  No, generally not."**

6              **Do you see that at the bottom?**

7      A.   Yes.

8      Q.   **And you say, "It doesn't want to effect a**

9   **taking, which could be very costly for the**

10  **United States."**

11             MR. HOPSON:  Objections, Your Honor.  This

12  is referencing the Wilderness Act and a

13  congressional policy here.  This has nothing to do

14  with the analogous situation of taking away

15  Chevron's mining claims.

16             THE COURT:  And where are you going with

17  this?

18             MR. HARRISON:  I will move on, Your Honor.

19     Q    (By Mr. Harrison) **Chevron exploited the**

20  **federal lands for its commercial gain, correct?**

21             THE COURT:  What do you mean by

22  "exploited"?

23             MR. HOPSON:  Used it to benefit it

24  commercially as part of its business.

25     A.   Yes.

1      **Q      (By Mr. Harrison) Chevron sought out the**
2  **United States' assistance so it could further**
3  **develop its mining operations; is that correct?**
4      A.    That is correct.  And the federal
5  government provided that assistance.
6      **Q.    And you have testified today and**
7  **previously that you take no issue with the**
8  **Government's actions in respect to many of those**
9  **actions; is that correct?**
10     A.    That's correct.
11     **Q.    Chevron approached the United States in**
12 **every one of those instances, correct?**
13     A.    That is correct.
14     **Q.    Chevron freely availed itself with every**
15 **opportunity provided to it under the mining laws and**
16 **regulations of the United States, correct?**
17     A.    Molycorp did.
18     **Q.    Just so we are clear when we are**
19 **discussing Chevron today, it also means Molycorp and**
20 **the predecessors?**
21     A.    Fair enough.
22     **Q.    Chevron entered federal lands without**
23 **paying anything, correct?**
24     A.    Depending on the time frame, that is
25 correct.

1      **Q.    Chevron extracted minerals without paying**

2  **any royalties to the United States, correct?**

3      A.    Correct, except for the DMEA royalties.

4      **Q.    And we discussed those, that it was a**

5  **repayment -- interest-free repayment of the loan**

6  **amount, correct?**

7      A.    As a result of discovery, that is correct.

8      **Q.    And we talked today about how Chevron**

9  **treated the lands, as if they were their own with**

10  **fences, security gates, security guards and whatnot,**

11  **correct?**

12     A.    We discussed that, and I believe that the

13  fences and the security gates that you may be

14  talking about, were on private land since 1924.

15     **Q.    We looked at documents today where Chevron**

16  **called the land its own and part of its land**

17  **holdings, correct?**

18     A.    That is, you know, somebody says, I own a

19  mining claim, okay?  Fair enough.

20     **Q.    Chevron decided which claims -- strike**

21  **that.**

22           **Chevron was the one who decided which of**

23  **its mining and mill site claims to apply for patents**

24  **on, correct?**

25     A.    Yes.

1      Q.    And the United States, in all of these

2  interactions, was simply responding to Chevron's

3  request, correct?

4      A.    For patent?

5      Q.    Yes.

6      A.    Yes.

7      Q.    And in respect to the special use permit

8  for the tailings pipeline, the United States would

9  simply respond to Chevron's request for a permit,

10  correct?

11            THE COURT:  You are not going repeat

12  everything you already asked, are you?

13            MR. HARRISON:  No, Your Honor.  Just a few

14  more questions.

15            THE COURT:  It is almost 12:00.  I hope

16  you are done by then.

17            MR. HARRISON:  We will be done by lunch?

18      A.    Yes.

19      Q    (By Mr. Harrison) So in many respects, it

20  was inevitable for the United States to interact

21  with Chevron given that Chevron was mining on

22  federal lands; is that correct?

23      A.    For sure.

24      Q.    And there is no legal reason why the

25  United States could have shut down Chevron's mining

Page 345

1     operations; is that correct?

2          A.     There is no reason they would have.

3               MR. HARRISON:  With the Court's

4     indulgence, just one minute.

5               THE COURT:  Thank you.

6               MR. HARRISON:  No further questions.

7               THE COURT:  We will pick up redirect after

8     lunch.

9               We'll be in recess until 1:30.

10              (A recess was taken.)

11              THE COURT:  Good afternoon.  You may be

12    seated, and you may begin.

13              MR. HOPSON:  Thank you, Your Honor.

14                    REDIRECT EXAMINATION

15    BY MR. HOPSON:

16         Q.     Good afternoon.  Remember to speak into

17    the microphone, Mr. Fredley, okay?

18         A.     Yes, sir.

19         Q.     So do you recall Mr. Harrison asking you

20    quite a few questions about the mining laws?

21         A.     Yes.

22         Q.     I want to jump to the bottom line here and

23    get your opinion as a historian and an expert in

24    mining on Federal lands and just ask you generally

25    was it U.S. policy, at least prior to 1975, to

1  **support and encourage mining on public lands?**

2      A.    Absolutely.  The title of the 1872 mining

3  law is an act to promote the development of mineral

4  resources of the United States, and that policy

5  continued all the way through to the 1970s.

6      **Q.    Focusing on the Questa site specifically,**

7  **did the Forest Service and other agencies in the**

8  **United States Government specifically support,**

9  **encourage and enable the open pit mine at Questa?**

10     A.    Absolutely.

11     **Q.    Can you tell the Court briefly your**

12 **understanding from the historical record of the**

13 **reasons why they supported the open pit mine?**

14     A.    Several reasons.  Number one, it was

15 providing strategic minerals to the United States.

16 It was providing employment to the local

17 communities, it was a valuable resource.

18     **Q.    Let me ask you this, and we will move on.**

19 **Without the U.S. Government's support, cooperation**

20 **and encouragement, could open pit mining at Questa**

21 **have occurred?**

22     A.    No.

23     **Q.    Do you recall the additional questions**

24 **about whether the United States retains an interest**

25 **in or the ability to control lands that have**

1      unpatented mining claims?

2          A.    Yes.

3          Q.    Did the U.S. Forest Service send Molycorp

4      a bill for the value of certain timber that was

5      destroyed when waste rock was placed on unpatented

6      mining claims?

7          A.    I have seen that record.

8          Q.    Does that suggest to you that the

9      United States continued to have an interest and

10     ability to control land that has unpatented mining

11     claims?

12         A.    Absolutely.  It was Federal land under

13     Federal control.

14         Q.    There was a question, as I recall, whether

15     the Forest Service objected to the fan-shaped claims

16     and that was the basis for rejecting the valley fill

17     plan.

18              Do you remember that question or

19     questions?

20         A.    Yes, I do.

21         Q.    Do you recall that Mr. Dewey testified

22     that Molycorp actually staked fan-shaped mill side

23     claims in the Capulin Canyon?

24         A.    Yes.

25         Q.    Did the Forest Service object to those

Page 348

1  fan-shaped claims?

2      A.    No.   The only claims of any shape that the

3  Forest Service objected to were the ones involving

4  the cross river area.

5      Q.    **And was there reason for objecting to**

6  **those, the shape of the mill site claims?**

7      A.    At the cross river area because they

8  didn't want Molycorp have mill sites across there

9  and develop their first proposal for a cross river,

10  crossroad waste dump.

11      Q.    **I want you to focus for a minute on the**

12  **land that Molycorp obtained in the land exchange.**

13  **And I just want to ask you this question:   Prior to**

14  **January '74 when the land exchange was consummated,**

15  **who owned that land?**

16      A.    Federal Government.

17      Q.    **Did the fact that mining claims were**

18  **relinquished or in escrow change that in any way?**

19      A.    Absolutely not.

20          MR. HOPSON:   I would like to turn,

21  Ms. Hutchman, to U.S. Exhibit 520.

22      Q.    **(By Mr. Hopson)   Which I will tell you,**

23  **Mr. Fredley, is the 1956 report to stockholders with**

24  **Molycorp.**

25          MR. HOPSON:   And if we could go to Page 4

Page 349

1    of that, I believe it is the last page.  And if you

2    could please blow out the fourth paragraph from the

3    bottom.

4         Q.    (By Mr. Hopson)  Which you were shown by

5    Mr. Harrison during your cross-examination.

6              Do you recall reading that?

7         A.    Yes.

8         Q.    Mr. Harrison pointed out that this was

9    prior to the execution of the DMEA contract,

10   correct?

11        A.    That is correct.

12        Q.    But when, in fact, did Molycorp apply for

13   the DMEA loan?

14        A.    Several months prior to this document.

15        Q.    This document is dated December 31st, I'm

16   sorry, that is the year it is reporting.  It is

17   dated March 14, 1957.  It is reporting on the year

18   1956.

19             Do you recall when the DMEA contract was

20   actually executed?

21        A.    May 1957.

22        Q.    So was the DMEA contract well underway by

23   the time this report was written?

24        A.    Pretty much.

25             MR. HOPSON:  Let's please call up,

1   Ms. Hutchman, Chevron's Exhibit 216.

2       Q.     (By Mr. Hopson)  And this you will recall,

3   Mr. Fredley, is a correspondence from the Department

4   of Agriculture Forest Service to Mr. Watson, the

5   Molycorp attorney, correct?

6       A.     Yes.

7       Q.     And this document, if you recall, contains

8   the drawings of the fan-shaped claims?

9       A.     Yes.

10      Q.     I want to call out something else in here.

11             MR. HOPSON:  Could we go to the second

12  page, Page 2 of 8 and call out the final, second to

13  the final paragraph.

14      Q.     (By Mr. Hopson)  Let's just take a second

15  to look at that, Mr. Fredley.

16             The first sentence says, "We recognize

17  that sufficient land adjacent to the mine for waste

18  dumps must be made available to Molycorp by some

19  means."

20             Based on your entire review of the record

21  is that the Forest Service position that they must

22  make land available for waste?

23      A.     Yes.

24      Q.     Prior to the time of the valley fill

25  proposal did the U.S. Forest Service ever object to

Page 351

1    placing rock or waste on unpatented claims?

2        A.    No.

3        Q.    Let me ask you, do you recall that there

4    is a regulation governing mill sites?

5        A.    Yes.

6        Q.    And it requires the mill sites to be

7    5 acres, right?

8        A.    That is correct.

9        Q.    But it doesn't say anything about the

10   shape?

11       A.    That is right.  I think that is Department

12   of Interior regulations.

13             MR. HOPSON:  Let's call out 281,

14   Chevron 281.

15       Q.    (By Mr. Hopson)  Mr. Fredley, you see here

16   that this is the environmental analysis done by the

17   Government in connection with the land exchange,

18   correct?

19       A.    Yes.

20       Q.    I just want to call out one thing the

21   Government says in this document, and it is at

22   Page 6 of the original document, which is at Page 7

23   of the PDF.

24             MR. HOPSON:  One page prior, sorry,

25   Ms. Hutchman.  If you could call out the

Page 352

1   alternatives to the proposed action.

2        Q.    (By Mr. Hopson)  Just take a quick look at

3   that, Mr. Fredley, so we know what you are talking

4   about here.

5            Have you had a chance to skim that?

6        A.    Yes.

7        Q.    I want to ask you about one sentence in

8   the middle paragraph that begins, the second

9   alternative this sentence begins, "Under the mining

10  laws."

11           "Under the mining laws," the Government

12  says, "the mining company has every right to use

13  mill sites for waste disposal areas."

14           Is that statement that I just read

15  consistent with your understanding of the constant

16  Forest Service policy other than with respect to the

17  valley fill plan?

18       A.    Absolutely.

19           MR. HOPSON:  Let's look at Chevron

20  Exhibit 282.

21       Q.    (By Mr. Hopson)  This, Mr. Fredley, is the

22  interim report of feasibility for the Questa site,

23  correct?

24       A.    Yes.

25       Q.    Are you familiar with this document?

Page 353

1    A.    Yes.

2          MR. HOPSON:  Let's turn to Page 33 of 60.

3    Q.    (By Mr. Hopson)  You know that this is a

4    report, Mr. Fredley, that is made in February of

5    1972, right?

6    A.    Yes.

7    Q.    I want to call out what the language at

8    the top of the page that says, "Present disposal

9    areas."

10         And I want to ask you about the first

11   sentence, Mr. Fredley.  It says, "Most of the

12   present waste is disposed on land that is the

13   property of the Federal Government.  This is done

14   with the cognizance and approval of the

15   administrating agency, the U.S. Forest Service."

16         If you will look back at your study of the

17   record for many years, is that single statement

18   consistent with your opinions and conclusions?

19   A.    Absolutely.

20   Q.    You were shown Chevron 186, which is an

21   article written by Robert Carpenter later in time,

22   1968.

23         Do you recall that?

24   A.    Yes.

25   Q.    We don't need to call that up, but

Page 354

1    Mr. Harrison read a paragraph in which Mr. Carpenter

2    talked about exploration for low grade ore occurring

3    as early as 1953.

4              Do you recall him reading you that?

5    A.    I do.

6    Q.    Do you also recall that Dr. Rigby

7    testified and others confirmed that there was no

8    drilling at Questa prior to the DMEA contract.

9              Do you recall hearing that testimony?

10   A.    I do.

11   Q.    What does the historical record show?

12   A.    The historical record shows without a

13   doubt that there was no diamond drilling done at the

14   Questa Mine prior to the DMEA.

15   Q.    The article is in 1968, he is referring

16   back to 1953.  Did something important happen at the

17   Questa Mine site between 1953 and 1968?

18   A.    Well, development of a large low grade ore

19   deposit.

20   Q.    Do you think that might have influenced

21   Mr. Carpenter's recollection of his own advice or

22   perhaps his recounting of his own advice?

23   A.    It very well could have.

24   Q.    Mr. Carpenter never recommended looking

25   for a low grade ore.

Page 355

1      A.     He did not.

2             MR. HOPSON:  Ms. Hutchman, let's call up

3      Chevron Exhibit 218, please.

4      Q.     (By Mr. Hopson)  Take a look at that and

5      just make sure you recall what this is about.  It is

6      a letter from Mr. Jack Watson to the United States

7      Department of Agriculture Forest Service, and it is

8      dated April 30, 1969.

9             Do you recall being asked about this?

10     A.     Yes.

11     Q.     Let me show you what you were asked about

12     on Page 2 of 3.  Mr. Harrison called out language in

13     the first full paragraph asking if the Forest

14     Service would contest certain claims.

15            Do you see that language?

16     A.     Yes, I do.

17     Q.     And he said, in essence, hey, this is,

18     Molycorp's asking for validity contest, right?

19     A.     Yes.

20     Q.     What land, what challenge to the title is

21     at issue here?

22     A.     Two unpatented mining claims not owned by

23     Molycorp.

24     Q.     These are two claims on which individuals

25     named Emma Lou Reach and David Williams are fighting

1  **with Molycorp over the patenting, correct?**

2      A.   Correct.

3           MR. HOPSON:  If you will flip the page to

4  Page 3, could you call out the paragraph that

5  begins, "To avoid this situation."

6      **Q.   (By Mr. Hopson)  What is Mr. Watson asking**

7  **the Forest Service to do, as you understand it?**

8      A.   To bring some action to quiet the title so

9  that the exchange would move forward.

10     **Q.   He is asking the Forest Service to do his**

11 **work as an attorney because he is a good lawyer?**

12     A.   That is right.

13     **Q.   Is this in any way related to the Forest**

14 **Service threatening a validity contest to shut down**

15 **the valley fill plan?**

16     A.   No.

17     **Q.   Okay.  Did the Forest Service threaten a**

18 **validity contest for the purpose of shutting down**

19 **the valley fill plan?**

20     A.   Yes.

21     **Q.   Did the Forest Service force the land**

22 **exchange?**

23     A.   Absolutely, and the record is clear on

24 that.

25     **Q.   And that resolved in a long angle of**

1   **repose waste piles above the Red River and the**

2   **highway?**

3      A.    Absolutely.  There is no question that the

4   Forest Service made that the only option for

5   Molycorp.

6      **Q.    All right.**

7              MR. HOPSON:  Thank you.  Mr. Fredley.

8   Your Honor, I have nothing else.

9              THE COURT:  Thank you.  This witness may

10  step down.

11             (Whereupon, the witness was excused.)

12             THE COURT:  And you may call your next

13  witness.

14             MR. HOPSON:  I shouldn't have walked away.

15             Your Honor, Chevron calls Dr. Tim

16  Considine.

17             (Whereupon, the witness was sworn.)

18             THE DEPUTY CLERK:  Please have a seat.

19  State and definitely spell your last name, please.

20             THE WITNESS:  My name is Timothy

21  Considine, C-O-N-S-I-D-I-N-E.

22             MR. HOPSON:  Mr. Considine, did you

23  prepare written direct testimony in this case?

24             THE WITNESS:  I did.

25             MR. HOPSON:  Is that written direct

Page 358

1    testimony accurate to the best of your knowledge?

2              THE WITNESS:  Yes, sir, it is.

3              MR. HOPSON:  Do you wish to make any

4    changes, amendments or modifications to it?

5              THE WITNESS:  No, I do not.

6              MR. HOPSON:  Thank you.  Your Honor, we

7    tender Dr. Considine.

8              THE COURT:  Very good, you may

9    cross-examine.

10             (Dr. Timothy Considine's direct testimony

11   was prefiled and admitted.)

12             THE COURT:  You may proceed.

13                  CROSS-EXAMINATION

14      BY MR. HOSHIJIMA:

15      **Q.    Dr. Considine, was Molycorp a for-profit**

16   **company?**

17      A.    Yes.

18      **Q.    Was Molycorp engaged in commercial**

19   **activity under the direction of its executives and**

20   **Board of Directors?**

21      A.    I would presume so.

22      **Q.    Was all of that commercial activity**

23   **conducted for the purpose of making a profit for its**

24   **stockholders?**

25      A.    Yes, I believe so.

1      Q.      If the Questa Mine were not profitable,

2    Molycorp could have stopped mining it at any time,

3    correct?

4      A.      That is an option they could exercise,

5    yes.

6      Q.      The Government never forced Molycorp to

7    stay in business if it was unprofitable, did it?

8      A.      Not to my knowledge.

9      Q.      Let's turn to your direct testimony.  You

10   began your testimony by describing the Government's

11   approach to molybdenum during World War II, correct?

12     A.      Yes, sir.

13     Q.      Was World War II during Molycorp's first

14   underground mining phase?

15     A.      Yes.

16     Q.      That was the first of three phases of

17   mining at the Questa site?

18     A.      Yes.

19     Q.      Was that the old underground mine that

20   Molycorp operated until about 1956?

21     A.      Yes, it was.

22     Q.      During World War II were there a number of

23   Government programs to simulate the production of

24   various resources, including molybdenum?

25     A.      Yes.

Page 360

1     Q.     Did Molycorp participate in any of those

2     programs?

3     A.     As I described in my report, no.

4     Q.     Did Molycorp receive Government aide

5     through the defense planned corporation program?

6     A.     No, they did not.

7     Q.     Did Molycorp receive Government aide

8     through the emergency planned facilities program?

9     A.     No, they did not.  And in my report I

10    described the reasons why they did not.  They were a

11    fairly small operation and they were well on in

12    their production period.  They had been producing

13    more than 20 years, at that point, and I judged that

14    there were little incentives for them to adopt those

15    offers.

16    Q.     Did Molycorp receive Government aide

17    through the necessity certificates program?

18    A.     No.

19    Q.     Do you agree, then, with Dr. Brigham's

20    expert opinion that Molycorp received no Federal

21    assistance through any World War II programs that

22    were potentially available at that time?

23    A.     Yes.

24    Q.     Let's pull up your direct testimony and

25    turn your attention to the testimony at the bottom

1   of Page 6 to the top of Page 7.

2           Did you testify that the postwar decline

3   in molybdenum production contributed to the

4   United States passage of the Defense Production Act

5   of 1950?

6       A.   I think that was one factor in it.  There

7   were many considerations in the passage of that

8   legislation.  There was an expectation that world

9   economic growth would accelerate into the future and

10  there was overarching concern that resource

11  availability could be an issue that would constrain

12  the potential of the economy to grow.

13      Q.   The Defense Production Act of 1950 was not

14  specifically about molybdenum, was it?

15      A.   As far as I understand it, it covered many

16  nonfuel and nonfuel minerals, including molybdenum.

17      Q.   The Defense Production Act, then, was a

18  wide-ranging statute that had to be with expanding

19  the supply of various materials not just molybdenum,

20  right?

21      A.   Yeah, I would agree with that, yes.

22      Q.   So when you say that the decline in

23  molybdenum production contributed to the passage of

24  the Defense Production Act, you are not making that

25  statement as an expert in mid-20th Century American

Page 362

1    history, are you?

2        A.    Well, can you refer, give me a moment

3    just --

4            MR. HOPSON:  Your Honor, could I remind

5    the witness that he has a binder with all of his

6    testimony sitting right there if he is looking for

7    something else.

8            THE WITNESS:  Thank you.

9        A.    Yeah, I did mention, "The post-war decline

10   in molybdenum production contributed to the

11   United States Government's passage of the Defense

12   Production Act of 1950."

13       Q.    (By Mr. Hoshijima)  Did you review the

14   legislative history of the Defense Production Act in

15   making that statement?

16       A.    Not in great detail.

17       Q.    So are you opining that molybdenum

18   specifically was the reason that Congress decided to

19   pass the Defense Production Act?

20       A.    That was not my intent in that statement.

21   I think it was a contributing factor.

22       Q.    You don't have an opinion on the degree of

23   contribution, though?

24       A.    No.

25       Q.    Let's keep moving forward in time.

1              **Did molybdenum participate in any**

2    **Government incentive programs during the Korean War?**

3         A.    Not that I am aware of.

4         Q.    **The Korean War was also during the first**

5    **underground mining phase, correct?**

6         A.    May I make a correction on that?

7         Q.    **Please.**

8         A.    When you asked did molybdenum contribute

9    or participate in any Government programs during the

10   Korean War, I answered with respect to Molycorp.

11            I am not -- I believe other producers in

12   the -- other molybdenum producers may have

13   participated in those programs.

14        Q.    **My question was specifically about**

15   **Molycorp.**

16        A.    Okay.

17        Q.    **To clarify the record, Molycorp did not**

18   **participate in any Government incentive programs**

19   **during the Korean War, correct?**

20        A.    Yes, that is correct.

21        Q.    **And, again, that was during the first**

22   **underground phase?**

23        A.    Yes.

24        Q.    **Even without Government aide from these**

25   **World War II or Korean War programs, Molycorp**

Page 364

1    **profited from the first underground mine, correct?**

2        A.    Yes.

3        Q.    **By the mid-1950s the first underground**

4    **mine was beginning to run out of ore, correct?**

5        A.    Yes, that is correct.

6        Q.    **You offer an opinion that Molycorp would**

7    **not have undertaken any more exploration at the**

8    **Questa site after that time without assistance from**

9    **the DMEA, correct?**

10       A.    Yes.  The way I viewed it was from a

11   project finance standpoint where if Molycorp wished

12   to find new reserves, they would have to explain

13   their current production trajectory, which was

14   approaching depletion, and it would be really

15   difficult for them to make the case that what they

16   were doing could be extended.

17            It was a small operation and as the

18   previous witnesses have described, they were

19   primarily focused on one form of mining that did not

20   include open pit mining but instead focused on

21   underground mining following fairly high

22   concentrated or veins.

23            MR. HOSHIJIMA:  Let's pull up that

24   testimony on Page 11 of your direct exam.

25       Q.    **(By Mr. Hoshijima)  We are looking at a**

1    **couple of questions and answers in the middle of**

2    **that page.**

3              **This is a similar opinion to what**

4    **Dr. Rigby and Mr. Fredley testified about earlier,**

5    **right?**

6         A.   Yes, it is similar.

7         Q.   **Are you relying on their opinions or are**

8    **you putting forth this opinion independently?**

9         A.   I am putting it forth independently based

10   on my experience teaching mineral economics for more

11   than 20 years at Penn State and working with mining

12   engineers where I learned that the expenditures for

13   the discovery of ore bodies is very high risk.

14             And then once that is established there is

15   success, there are very significant capital

16   expenditures that follow to identify, delineate and

17   define the ore body and demonstrate to banks, in

18   particular, that the development risk is lower and

19   production could be at some point contemplated.

20        Q.   **Dr. Considine, my question was just**

21   **whether you had an independent opinion.  That is a**

22   **yes or no?**

23        A.   That is a yes.

24             THE COURT:  He answered the question.

25             MR. HOSHIJIMA:  He answered a lot more

1    than the question, Your Honor.

2         Q.    (By Mr. Hoshijima)  Were you in the

3    courtroom yesterday listening to Dr. Rigby's

4    testimony on this issue?

5         A.    Yes.

6         Q.    Were you listening to Mr. Fredley's

7    testimony on this issue?

8         A.    Yes, yes.

9         Q.    In that case we will try to move through

10   this fairly quickly.

11             Do you believe that Molycorp started a

12   private exploration program in 1954, which was

13   three years before the DMEA contract?

14        A.    When you use the term private, what was a

15   private?

16        Q.    A private exploration program?

17        A.    Private exploration program.  That seems a

18   bit new to me.  I know there was exploration --

19   mining companies do exploration all the time.

20             What I did in my research behind the

21   expert report was I looked at the annual reports and

22   one of the difficulties with looking at the annual

23   reports and making inferences is that they cover the

24   entire company, not just molybdenum production, but

25   the other minerals that Molycorp produced.

Page 367

1        Q.      Let me make sure I understand the answer.

2    Are you saying that Molycorp did start a private

3    exploration program at the Questa site in 1954?

4        A.      When you say private exploration effort,

5    it sounds like some sort of company, and I just -- I

6    am unaware of that.

7              MR. HOSHIJIMA:  Can we pull up USX003,

8    please, and turn to page -- well, let me show the

9    cover first.

10       Q.      (By Mr. Hoshijima)  Do you recognize this

11   as Molycorp's statement to the SEC?

12       A.      Right, from 1964.

13       Q.      And you see that at the very top of that

14   document?

15       A.      Yes, thank you.

16              MR. HOSHIJIMA:  Let's turn to Page 17.

17   Can we magnify the second to the last paragraph

18   starting with, "In 1954."

19       Q.      (By Mr. Hoshijima)  Dr. Considine, can you

20   review this paragraph?

21       A.      Yes, I remember reading this, awhile ago.

22       Q.      Do you agree, then, that in 1954, which

23   was three years before the DMEA contract, Molycorp

24   started a privately-funded exploration program at

25   the Questa site?

1      A.     That is what the words say, yes.

2             MR. HOSHIJIMA:  We can take that down.

3      Q.     **(By Mr. Hoshijima)  Do you agree with the**

4  **prior testimony that Molycorp obtained millions of**

5  **dollars in financing through bank loans and stock**

6  **offerings in 1954 and '55?**

7      A.     I heard that in the previous testimony,

8  and I believe it to be true.

9      Q.     **Any reason to believe that is not true?**

10     A.     No.  I would add, though, that I believe

11 those statements are based on the overall capital

12 raising by the entire company.  So it is not clear,

13 and that is one of the difficulties I had in my

14 research.  In using the annual reports, they report

15 consolidated income assets and activity.  They have

16 records broken down by commodity, but oftentimes the

17 numbers are not as aggregated.

18     Q.     **Molycorp during this time period had**

19 **operations outside of Questa, New Mexico, correct?**

20     A.     That is correct.

21     Q.     **What are some of those other operations?**

22     A.     As I recall, in the late '50s there was a

23 mine, rare earths mine, a Columbian mine, and there

24 were other properties that were in various stages of

25 development, such as the Québec property previously

1    discussed in prior testimony.

2        Q.    **Is it fair to say, then, that in this time**

3    **period, and that is the 1950s, Molycorp is a company**

4    **of international scope?**

5        A.    Yeah, yes.

6        Q.    **We talked about the bank loans and the**

7    **stock offerings in the mid-1950s.  Did that give**

8    **Molycorp millions of dollars of cash in hand as of**

9    **1955?**

10       A.    You know, I really can't say what their

11   capital needs and there -- you know, when companies

12   deal with capital, it is quite complicated and I

13   didn't really have any insights into their sources

14   and uses of capital other than just reading the

15   annual reports.

16            MR. HOSHIJIMA:  Can we pull up USX519,

17   which has been previously admitted.

18       Q.    **(By Mr. Hoshijima)  Do you recognize this**

19   **to be Molycorp's report to stockholders for the year**

20   **ending 1955?**

21       A.    Yes.

22            MR. HOSHIJIMA:  Let's go to Page 6,

23   please.  If we can expand the top half of the page

24   under Current Assets.

25       Q.    **(By Mr. Hoshijima)  This is for the year**

1   **1955.  Molycorp has $3.15 million in cash on hand,**

2   **correct?**

3        A.    Yeah, yes.

4        Q.    **In your direct testimony you discuss 2019**

5   **dollars versus dollars of the day, let's say dollars**

6   **in 1956.**

7             **Do you recall that?**

8        A.    Yes.

9        Q.    **This $3.15 million that Molycorp had on**

10  **hand in 1955, that is worth a lot more than**

11  **$3 million is worth today, correct?**

12       A.    In today's dollars it would be larger than

13  the numbers reported on the page here, yes.

14       Q.    **Many times larger?**

15       A.    Yes.  But may I add a clarification here,

16  firms use cash for a variety of uses.  They have

17  cash needs other than exploration, operations, and

18  so on, payroll, benefits.  There are many uses of

19  cash.

20       Q.    **It would have been Molycorp's choice how**

21  **to spend that cash?**

22       A.    Of course.

23       Q.    **It had a variety of options, including**

24  **exploration, right?**

25       A.    Yes, yes.

1      **Q.     The Government had no say in how Molycorp**

2   **spent this cash, right?**

3      A.    Not that I am aware of.

4            MR. HOSHIJIMA:  We can take down this

5   document.

6      **Q.    (By Mr. Hoshijima)  Dr. Considine, do you**

7   **agree with Mr. Fredley's testimony that to obtain**

8   **DMEA funding an applicant had to show the geologic**

9   **probability of making a significant discovery?**

10     A.    Well, I am not really qualified as an

11  economist to opine on that.  What I can tell you is

12  that I read the supporting documentation and I

13  notice that is the description of the DMEA program.

14           And what struck me was they had a table at

15  the end of loans that -- the number of loans

16  approved and denied.  And they mention in the

17  narrative that one of the criteria was the presence

18  or the possibility of reserves being at the

19  location.

20           And that reminded me of an old adage in

21  the oil industry that the best place to drill for

22  oil is in an oilfield.  In other words, and this, I

23  think this applies to minerals as well.  So if you

24  already have a site that is in production, it is

25  likely that there could be additional reserves

1   nearby.  So, yes, I agree with Mr. Fredley's

2   assessment.

3        **Q.    To follow-up on that statement about the**

4   **oilfields.**

5        A.    Yes.

6        **Q.    At the Questa site Molycorp had been**

7   **mining molybdenum for decades, right?**

8        A.    Yes.  When we are talking 1955, it would

9   have been about 35 years, yeah.

10        **Q.    Given that, to obtain the DMEA funding**

11   **Molycorp, had to demonstrate a significant**

12   **probability of finding a discovery.  Couldn't**

13   **Molycorp have gone to a private lender with that**

14   **same geological information and requested a loan?**

15        A.    Well, it is possible, but as I mentioned

16   in my report that this mine, this particular mine, a

17   fairly small mine by world standards, was nearing

18   the end of its useful life.  It was depleting.  So

19   it probably would have been a tough sell, if you

20   will, on that basis.

21        **Q.    You can't rule out the possibility that if**

22   **the DMEA contract had not been awarded Molycorp**

23   **could have gotten a private lender to give it a loan**

24   **based on that same geological information?**

25        A.    Well, anything is possible, but the fact

1  of the matter is DMEA loaned Molycorp money and they

2  both entered an exploration effort.  That is a fact.

3      Q.   **Do you recall how much money Molycorp was**

4  **able to obtain from the DMEA in a loan?**

5      A.   It was about half a million dollars in

6  dollars of the day --

7      Q.   **Was --**

8      A.   -- total, and then they shared their cost,

9  50/50.

10     Q.   **The amount Molycorp got from the**

11 **Government was no more than $250,000, correct?**

12     A.   Yeah, it could have been slightly over

13 that.

14     Q.   **$255,000?**

15     A.   Yeah, that's correct.

16     Q.   **Do you recall the testimony from, I**

17 **believe yesterday, that Molycorp did not actually**

18 **even use that whole amount, it only used about**

19 **$200,000?**

20     A.   Yes, I recall that.

21     Q.   **Do you agree with the prior testimony that**

22 **during the period of DMEA funding, which was about**

23 **1957 to 1960, Molycorp spent over 1 million of its**

24 **own money for exploration efforts?**

25     A.   That sounds about right, yes, I agree with

Page 374

 1    that.

 2        **Q.    Do you agree with the prior testimony that**

 3    **during the 1957 to 1960 time period Molycorp**

 4    **conducted thousands of feet of drifting and**

 5    **crosscutting on its own without the DMEA funding?**

 6        A.    I heard that and I can't dispute that.

 7    Again, I am an economist, not a mining engineer.  I

 8    was struck by Dr. Rigby's testimony that it was the

 9    geologic knowledge and expertise that the USGS

10    shared with Molycorp that was quite valuable.

11    Sometimes there are things that people do that

12    aren't monetized, and this may be one example.

13        **Q.    Let's go up to Page 12 of your testimony.**

14            **In the second to the last answer on that**

15    **page you say, and I am referring to the second half**

16    **of that answer.  "Molycorp would not have been able**

17    **to borrow the money needed for this exploration**

18    **before the Federal Government's DMEA loan."**

19        A.    Yes, that is clear.

20            MR. HOSHIJIMA:  And let's get rid of that

21    magnification.  And go to the next page.

22        **Q.    (By Mr. Hoshijima)  In the second to the**

23    **last answer on that page you say, "Molycorp could**

24    **have never secured the necessary financing to**

25    **delineate and develop the low grade ore body without**

Page 375

1    the Government's certification."

2            Is that your testimony?

3        A.    Yes.

4        Q.    The word "never" in there is very

5    definitive, right?

6        A.    Yes.

7        Q.    You didn't qualify that statement in your

8    direct testimony, did you?

9        A.    Apparently not.

10       Q.    But you didn't site any historical

11   document in which a bank or lender says that it

12   would not have provided a loan but for the DMEA

13   certification, correct?

14       A.    It is hard to find a counterfactual, I

15   didn't look for it.  I was just, again to reiterate,

16   I was -- I viewed Molycorp at that point in time

17   when the DMEA contract was struck in 1957 as a small

18   company or a small operation that was sort of on its

19   last legs and they needed outside help, primarily in

20   terms of a paradigm shift on how they would look for

21   extending their reserve base.

22       Q.    At the beginning of that answer you said

23   finding a counterfactual is difficult and you didn't

24   look for one, right?

25       A.    That is correct.

1      **Q.      And yet without having looked for a**
2   **counterfactual and recognizing that is not possible,**
3   **you said that Molycorp could have never secured the**
4   **necessary financing without the certification?**
5      A.      That is clear as a bell, right here on the
6   screen.  Again, I would like to remind you, the
7   focus of my report was on quantifying the benefits
8   from the Questa site.
9      **Q.      The focus of your opinion in this case was**
10  **not about the DMEA?**
11     A.      Oh, I did mention DMEA but, you know, the
12  core effort in the report was to determine the
13  profitability of the mine, the state and local
14  economic impacts, and the impacts on the overall
15  molybdenum market.
16     **Q.      So it is not a core opinion that Molycorp**
17  **could have never secured the necessary financing**
18  **without the certification?**
19     A.      I would look upon it as my opinion as an
20  economist based on the data and information I
21  reviewed.
22     **Q.      Turning to Page 13 of your testimony at**
23  **the top of that page you say that, "Molycorp**
24  **borrowed and spent about $50 million after the**
25  **certification to prepare the open pit mine for**

1    operation."

2              Do you see that?

3       A.    Yes, I do.  At the very top of the page?

4       Q.    Yes.

5       A.    Yes.

6       Q.    That is part of your answer?

7       A.    Yes.

8       Q.    None of that money came from the

9    United States, right?

10      A.    As far as I know, that's correct, none of

11   it did come from the United States.

12      Q.    Now the figure in your report is

13   50 million, but wasn't it more like $110 million

14   that Molycorp spent to develop the open pit mine?

15      A.    Oh, the data that I used for cap X for the

16   mine was based on a ten-year summary of mine

17   performance dated 1975.

18            And in the very first column where cap X

19   prior to 1960, prior to the mine startup.  And it

20   was actually 43.06 million, so I don't know where

21   the 110 million is coming from.

22      Q.    I think you used the term cap X, which I

23   am not familiar with.  Can you explain that?

24      A.    Capital expenditures.  Upfront capital

25   expenditures for the construction of the mine and

Page 378

1    supporting facilities.

2           MR. HOSHIJIMA:  Let's pull up USX481,

3    please.  This is a document that has been previously

4    admitted.

5       Q.    (By Mr. Hoshijima)  Do you recognize this

6    as a 1957 Molycorp document entitled Questa Mine and

7    Mill Fact Sheet?

8       A.    Correct.  It is November 1975.  I see to

9    date a total of 110 million has been invested.

10      Q.    And you are referring to the top paragraph

11   of this fact sheet?

12      A.    Yes.

13      Q.    The 110 million that has been invested,

14   this is talking about the open pit mine at Questa,

15   right?

16      A.    Wait a minute.  You know, actually when I

17   read that paragraph it is kind of ambiguous whether,

18   you know, they are including, you know, capital

19   expenditures prior to the construction of the open

20   pit mine.

21           So, and the other caveat with this number

22   is when I did my profit evaluation and investment

23   evaluation, the 43.06 that I just quoted you a few

24   moments ago, that was for the open pit prior to '66.

25           Subsequent to that the -- there were

1    numbers or expenditures for capital in subsequent

2    years and that is not included in the 43.06 that I

3    quoted you as the upfront expenditures.

4           So, you know, you have to be careful on

5    the numbers and what they include and it is not

6    clear to me, you know, they mention in the first

7    sentence high-grade underground mining operation.

8    Are they including, you know, to date, well, what

9    does that mean, going back to 1920 or 1966?  It is

10   not clear to me.

11          And that is sort of the test I used when I

12   did my analysis.  I was looking for numbers that

13   were historically accurate and represented actual

14   expenditures over a certain period of time.

15       **Q.    Assuming that this 110 million-dollar**

16   **figure includes investments dating back to the**

17   **beginning of the first underground mine operation,**

18   **would all of that money have been Molycorp's private**

19   **finance?**

20       A.    Well, that is a big assumption, one, but I

21   will grant you if you assume that, what do you mean

22   by private?  I mean, it would be included in their

23   assets and, you know, depreciated over time, and so

24   on.  I have no idea if this is a, you know, pre or

25   post-depreciated capital, I don't know what it is.

Page 380

1          These are the type of numbers I shied away

2    from in my analysis.  Usually I focused my analysis

3    based on accounting and financial records from the

4    mine operation.

5       Q.    **None of this $110 million invested in this**

6    **site would have come from the U.S. Government,**

7    **right?**

8       A.    Oh, well, there was the DMEA, well that

9    was repaid and that was it, yeah, it was likely.

10      Q.    **For $200,000?**

11      A.    Yeah, to the $250,000.

12      Q.    **Other than the DMEA, none of this $110**

13   **million in investment at the Questa site comes from**

14   **the U.S. Government, right?**

15      A.    Right.  But I, you know, I really would

16   like to impress upon the Court here that, you know,

17   it is the -- there are a lot of good ideas that

18   aren't monetized, you know, and this idea of

19   searching for a low-grade ore body, convincing a

20   mine that was in operation for more than three

21   decades that they should have a paradigm shift and

22   look elsewhere, have a different view of the mine,

23   was a very important contribution by the USGS and

24   the Bureau of Mines.  And that is what those

25   agencies do, they help industry.

Page 381

1      Q.    $200,000 that the DMEA contributed, that

2   number is less than a quarter of 1 percent of 110

3   million, right?

4      A.    Yeah, it is a small number, you know, if

5   you are comparing it to a large number, but, again,

6   I have to reiterate not all great ideas are

7   monetized.  In fact, many of the best ideas of all

8   time are not monetized.

9              MR. HOSHIJIMA:  I move to strike that

10  answer as nonresponsive.

11             THE COURT:  Overruled.  You give it to the

12  witness to answer, and he answered.

13             MR. HOSHIJIMA:  You can take this down.

14     Q.    (By Mr. Hoshijima)  Would Molycorp have

15  developed the open pit mine if it did not think it

16  would be profitable?

17     A.    No.

18             MR. HOPSON:  Objection, calls for

19  speculation.

20             THE COURT:  Sustained.

21     Q.    (By Mr. Hoshijima)  Did Molycorp know that

22  there was a risk that the open pit mine would not be

23  profitable?

24             MR. HOPSON:  The same objection.

25             THE COURT:  Overruled.

Page 382

1      A.     Please repeat the question.

2      **Q.     (By Mr. Hoshijima)   Did Molycorp know**

3  **there was a risk that the open pit mine would not be**

4  **profitable?**

5      A.     Oh, I have no factual basis to answer that

6  question, I really don't know.

7      **Q.     You have no idea if Molycorp knew about**

8  **the risk of a lack of profit at the open pit mine?**

9      A.     Well, let me say this:  I took a look at

10 the mine feasibility analysis that was discussed and

11 brought up in previous presentations and it is a

12 very long document, lots of numbers.  And one thing

13 that was not done, as far as I can tell from a quick

14 scan of the documents, is a risk analysis.

15          And a risk analysis is a fairly

16 complicated mathematical technique where you

17 recognize the uncertainties of certain parameters

18 that guide your investment valuation such as price

19 or cost or strippage, for instance, that was not

20 done.  But I am sure that the people who prepare

21 those numbers, especially the people who did the

22 computations had a feel for the sensitivity of the

23 bottom line estimate to certain key consumptions.

24          MR. HOSHIJIMA:  Let's pull up USX003.

25 Let's turn to Page 5, please.

1      Q.    (By Mr. Hoshijima)  Did Molycorp estimate

2   in this SEC filing that the cost of preparing the

3   open pit mine and preparing it for production is

4   approximately 27 and a half million?

5      A.    Yes, that is stated in the paragraph, and

6   I recall reading about this and noted that this

7   document was prepared, I believe, in 1964 several

8   years prior to the actual opening of the mine, the

9   open pit mine.

10      Q.    To come up with 27 and a half million to

11   develop the open pit mine, Molycorp borrowed a lot

12   of money, right?

13      A.    I presume so, but I didn't really look at

14   the debt equity sources of financing.  But previous

15   testimony indicated, identified a couple of banks

16   and I would imagine most of this capital was

17   obtained from bank loans.

18          MR. HOSHIJIMA:  Let's magnify the last

19   paragraph on this page, please.

20      Q.    (By Mr. Hoshijima)  Do you see where it

21   says, "As a result of the bank loans and the sale of

22   the debentures offered hereby, the company will

23   incur an aggregate indebtedness of nearly 32 and a

24   half million dollars."

25      A.    Yes, I see that.

Page 384

1      **Q.      That was considerably in excess of the**

2   **company's total assets and net worth, correct?**

3      A.      That is what the words read, yes.

4      **Q.      Is incurring that amount of debt a risky**

5   **thing for a company to do?**

6      A.      Well, I am an economist, not a financier,

7   but companies incur debt all the time.  Some have

8   very high levels of debt relative to their assets.

9   It varies by the industry.

10          MR. HOSHIJIMA:  Turning to the next page

11   of this document.  Let's magnify the last paragraph

12   before the heading, Subscription Offer.

13      **Q.      (By Mr. Hoshijima)  Did Molycorp**

14   **recognize, "The risks inherent in all mining**

15   **venture, many of which risks arise by reason of**

16   **conditions which may be beyond the control of the**

17   **company"?**

18          THE COURT:  What is your question?

19      **Q      (By Mr. Hoshijima) I am asking if Molycorp**

20   **recognized the risk in 1964 of open pit mining?**

21      A.      There is really no basis in my analysis.

22   It really wasn't a focus of my analysis, and it

23   would only be speculative on my part to say whether

24   Molycorp can, as you asked, considered the risks.  I

25   am sure they were aware of them but, you know, I

Page 385

1  can't get inside the heads of the people who were

2  making these decisions back then.

3      Q.    In this Molycorp document, Molycorp tells

4  investors to consider these risks, right?

5      A.    Yeah, that is what this paragraph is

6  intending to communicate, the inherent risks and

7  these are all accurate that are associated with any

8  mineral investment property.

9      Q.    One of the risks listed in this paragraph

10  is a change in economic and general conditions?

11     A.    Where are you, on the third line?  Yes,

12  okay.  Yes.

13     Q.    Another risk to Molycorp was, "the

14  development of additional sources of molybdenum and

15  competing metals and products"?

16     A.    That's correct.

17     Q.    Another risk that Molycorp was aware of

18  was that, "there may be changes in the price and

19  market conditions for molybdenum products"?

20     A.    That is what the paragraph reads, yes.

21     Q.    And another risk that Molycorp was aware

22  of was that, "construction delays and other factors

23  might affect the capital cost of the project and the

24  cost of mining and production"?

25     A.    That is correct.

1     Q.     Despite knowing those risks, Molycorp

2  decided to go forward with the open pit mine, right?

3     A.     They made that decision, yes.

4     Q.     They made that decision voluntarily?

5     A.     Yes.

6     Q.     Did that risk pay off?

7     A.     Well, according to my analysis, both the

8  open pit mine and the underground mine lost money.

9     Q.     Did the fact that the business risk did

10  not pay off mean that Molycorp should not be

11  responsible for environmental consequences?

12     A.     No, I believe Molycorp and Chevron are

13  agreeing to shoulder their share of the cost,

14  whatever is decided.

15     Q.     You opine that Molycorp's open pit mine

16  and second underground mine were unprofitable,

17  correct?

18     A.     Yeah, that is what my analysis shows.

19     Q.     To reach that conclusion you used a before

20  tax cash analysis, correct?

21     A.     Yes.  Well, I actually compared that to a

22  GAAP analysis, Generally Approved Account Procedure

23  Analysis, and both methods show that the mine lost

24  money for the open pit.

25              I just did it before tax cash analysis for

Page 387

1   the second underground mine.

2        Q.    **The approach you discuss in your direct**

3   **testimony is just the before-tax approach, correct?**

4        A.    Well, I recommend that approach but I do

5   present by way of comparison the conventional

6   approach where you capitalize stripping costs, and

7   other costs.

8        Q.    **Does that analysis take into account any**

9   **impacts of taxes on the economics of the open pit**

10  **mine?**

11       A.    No.  I used the convention in mineral

12  economics that projects are evaluated on a

13  before-tax basis.

14       Q.    **A company can sometimes use losses to**

15  **offset tax liabilities, correct?**

16       A.    That is correct, however, like I said, the

17  convention in mineral economics is to look at,

18  essentially, the cash flow.  How much money is

19  coming in the door to support the operation and how

20  much money is going out the door to run the

21  operation.  And that is kind of the gold standard in

22  financial analysis.

23            In fact, a lot financial analysts today

24  look at tech companies the same way.  Tech company

25  may look good on an after-tax basis, but when you

Page 388

1    look at it on a tax -- on a before-tax cash flow

2    basis, it may not look so good.  So really kind of

3    gives you a true picture of the cash generating

4    capability of the enterprise.

5         Q.    **Let me be clear.  The approach you used**

6    **did not take into account the tax effects?**

7         A.    That is correct.

8         Q.    **Did Molycorp have other --**

9         A.    I have a caveat on that, only to the

10   extent my subsequent analysis, I did in the economic

11   impacts track the taxes that Molycorp paid for

12   concentrate Social Security taxes, and state and

13   local taxes.

14        Q.    **Did Molycorp, and we are talking about the**

15   **open pit mine period, have other assets other than**

16   **at Questa that might have resulted in taxable income**

17   **even when it was taking a loss at Questa?**

18        A.    Yeah, that is possible, but, again, the

19   question that I focused on in my study was what was

20   the financial viability of the Questa Mine because

21   the focus here is who is going to pay for the cost

22   of environmental remediation.

23             So Questa, the operators of Questa and its

24   financial viability at the mine was the core issue.

25             MR. HOSHIJIMA:  Let's turn to CX123,

Page 389

1    please.  Let's turn to the next page after this.

2        Q.    (By Mr. Hoshijima)  Do you see this is

3    Molycorp's 1963 annual report?

4        A.    That is indicated on the top left, yes.

5              MR. HOSHIJIMA:  I move to admit CX123.

6              MR. HOPSON:  No objection, Your Honor.

7              THE COURT:  With that objection, 123 is

8    admitted.

9              (Exhibit admitted, CX123.)

10       Q.    (By Mr. Hoshijima)  This annual report is

11   from 1963 which is why Molycorp is developing the

12   open pit mine, correct?

13       A.    Yes.

14             MR. HOSHIJIMA:  Let's magnify the third

15   paragraph under Financial.  The paragraph above

16   that, please.

17       Q    (By Mr. Hoshijima) This report by Molycorp

18   says that in 1963, which was just before it started

19   the open pit mine, the company's financial condition

20   was the strongest in its history, correct?

21       A.    That is what it says, yeah.

22             MR. HOSHIJIMA:  Let's take down that call

23   out and pull up the last paragraph under Financial.

24       Q.    (By Mr. Hoshijima)  Do you see where it

25   says that Molycorp took the exploration and

Page 390

1    **development expenditures at the Questa site and**

2    **deducted it for income tax purposes and eliminated**

3    **the entire 1963 income tax liability for the parent**

4    **company?**

5        A.    Yes, that is what it says.

6        **Q.    Well, Molycorp benefited financially as a**

7    **company as a whole from this particular expense,**

8    **right?**

9        A.    That is what the passage says, yes, that's

10   correct.

11       **Q.    In fact, not only did Molycorp use its**

12   **exploration expenditures at the open pit mine to**

13   **write off its entire 1963 income tax liability, but**

14   **it also got refunds for income taxes for prior**

15   **years, correct?**

16       A.    Yeah.  That is explained by our tax laws.

17       **Q.    Your analysis, though, was that before tax**

18   **analysis, which did not take into account this sort**

19   **of thing, correct?**

20       A.    That's correct because, again, I was

21   focused on the economic viability of the Questa Mine

22   and I did not have the detailed data that would be

23   required to do a complete disaggregation and

24   allocation of any sort of tax benefits recognizing

25   that this was a multi-product operation.  It was a

Page 391

1   very complicated accounting exercise, essentially.

2   There was no breakouts of, you know, cash flow from

3   rare earths and the other enterprises that Molycorp

4   had.  And, again, the convention in mineral

5   economics is to look at projects on a before-tax

6   basis because taxes can get very complicated, they

7   vary by jurisdiction, you know, country by country,

8   state by state, depletion allowances and so on.  So

9   it is hard to get an apples to apples comparison of

10  projects.

11      Q.    **Taking you back to the beginning of that**

12  **answer, you did not do the detailed analysis that**

13  **would have been necessary to say whether the**

14  **Molycorp company as a whole benefited financially**

15  **monetarily from the Questa Mine, right?**

16      A.    Yes.  And the reason I didn't is I didn't

17  have the data.

18      Q.    **To clarify, when you said yes, did you not**

19  **do that detailed analysis, correct?**

20      A.    I did not do the detailed analysis.

21            THE COURT:  He said that, Counsel, four or

22  five times.

23      Q.    **(By Mr. Hoshijima)  You opined that the**

24  **Questa open pit mine was not profitable for two main**

25  **reasons, correct?**

Page 392

1      A.     Yes.

2      **Q.     The first of those was that it encountered**

3   **higher than expected stripping costs, correct?**

4      A.     Correct.

5      **Q.     Was the second that they had fluctuations**

6   **in places?**

7      A.     I believe I said in my report that when

8   prices eventually went up in the mid-'70s production

9   at Questa's open pit mine was declining.  So they

10  were sort of at the -- sort of an unfortunate

11  sequence of events where their production in the

12  open pit was declining and they weren't able to

13  capture additional revenues.  Prices soared in the

14  late '70s to offset their prior losses.

15     **Q.     Let's put that aside and start with your**

16  **first reason, which has to do with stripping costs?**

17     A.     Yes.

18     **Q.     Before developing the open pit mine,**

19  **Molycorp estimated what it felt its costs would be,**

20  **right?**

21     A.     Yes.  I did previously mention the

22  feasibility report and in that report, estimated

23  costs were projected.

24     **Q.     But much more than Molycorp expected had**

25  **to do with the move to open pit mine?**

1      A.     That is correct.

2      Q.     **That is because it encountered an**

3 **instability in the west wall of the open pit mine?**

4      A.     Again, I am not a mining engineer.  I was

5 just looking at the numbers and I saw the stripping

6 costs jump up and I was just looking at the cost

7 numbers.  I didn't look at the causation.

8      Q.     **You don't know what caused the increased**

9 **stripping costs in the mid-1960s?**

10      A.     I said through the previous testimony, I

11 think it is pretty clear that there was some sort

12 of, you know, slide, whatever you want to call it,

13 technical term.  It just said we moved more earth

14 which meant more diesel fuel costs and equipment

15 time and labor to move all the material.  And that

16 showed up in my cost numbers.

17      Q.     **When the stripping costs increased above**

18 **what was initially anticipated, Molycorp decided to**

19 **continue open pit mining anyway, right?**

20      A.     The record shows that production continued

21 from 1966 through 1981.

22      Q.     **Even though Molycorp knew that decision**

23 **would result in far more waste rock having to be**

24 **disposed?**

25      A.     Yeah, I just looked at the numbers.

1   Again, you know, I just took it as a given.  I

2   didn't really make any connection with their

3   operational decisions and whether or not they should

4   have pursued it.

5       Q.    The instability that Molycorp encountered

6   that resulted in these increased stripping costs, is

7   that the kind of risk that Molycorp knew about

8   before it started open pit mining?

9       A.    Oh, I can't speak for the engineers and

10  the project managers.  It certainly was a

11  discontinuous event there.  I can't recall the exact

12  year, I think it was '69 or '70 where stripping

13  costs jumped up very abruptly and that looks to me

14  like a surprise, excuse me.

15      Q.    Isn't that kind of unexpected geological

16  finding the exact kind of risk that Molycorp

17  described in that SEC document we saw earlier?

18      A.    Yeah, it would be consistent with that,

19  but those, I mean, things happen.

20      Q.    You testified also that operating profits

21  started falling significantly starting 1977,

22  correct?

23      A.    Yeah, I believe that is the -- your

24  question was operating profit or costs?

25      Q.    Operating profits.

 1    A.    Operating profits, yeah, it looked like

 2  they really started going down in 1977, you are

 3  right.

 4    **Q.    Was that the same year that there was a**

 5  **massive rock slide in the open pit mine that shut**

 6  **off half of the pit's capacity?**

 7    A.    You know, I really didn't track that.  I

 8  mean, I heard about the slide, but I was really kind

 9  of focused on the numbers and just took them.  I

10  didn't think it was important to pull in my

11  analysis, I don't know.

12        MR. HOSHIJIMA:  Could we pull up Dewey

13  direct exam, PDF Pages 17 to 18.  The Dewey direct

14  exam.  Let's go down another page, bottom of Page 18

15  to 19, please.  Let's expand the answer starting

16  with, "Yes, when the company signed."  I'm sorry,

17  that's not the right one.  Let's take it off.  Let's

18  take down this document.

19    **Q.    (By Mr. Hoshijima)  You also analyzed the**

20  **profitability of the second underground mine, right?**

21    A.    Yes, sir.

22    **Q.    Is Molycorp's decision to shift the mining**

23  **back underground?**

24    A.    Pardon?

25    **Q.    Was it Molycorp's decision to shift the**

Page 396

1    mining back underground?

2         A.    Yes.

3         Q.    **Did Molycorp incur a capital cost of**

4    **developing the second underground mine of**

5    **$250 million?**

6         A.    Yes.

7         Q.    **None of that came from the United States,**

8    **right?**

9         A.    Correct.

10        Q.    **By then, though, the molybdenum prices had**

11   **dropped, right?**

12        A.    What year?

13        Q.    **1983 when the second underground mine**

14   **started production.**

15        A.    Yes, yes 1983, yeah.

16        Q.    **You opine later in your direct testimony**

17   **that the Government sales from the stockpile could**

18   **have affected the market prices of molybdenum?**

19        A.    Yes.  I did a market simulation of during

20   the period, I think, it was 19- -- in the '60s

21   through the mid-'70s the stockpile for molybdenum

22   was eliminated by 1975.  And, yes, I presented

23   evidence that showed that the sales from the

24   stockpile reduced market prices.

25        Q.    **The last sale was 1975, so that would have**

1    **nothing to do with the unprofitability of the second**

2    **underground mine, right?**

3        A.    That's correct.

4        Q.    **You didn't analyze the current financial**

5    **status of Chevron, did you?**

6        A.    You mean in 2020?

7            MR. HOPSON:  Objection, relevance of

8    Chevron's current financial situation.

9            THE COURT:  Sustained.

10       Q    **(By Mr. Hoshijima) Does Molycorp now own**

11   **the property at the Questa Mine?**

12       A.    My understanding, I visited it a few years

13   ago, Chevron owns the property and there is

14   facilities operating there.

15       Q.    **Chevron owns the property, not Molycorp?**

16       A.    Yeah.

17       Q.    **Chevron would benefit from any future**

18   **increases in the value of the property once it is**

19   **cleaned up, correct?**

20       A.    Yeah, I presume so if they are the owner.

21   As the previous witnesses have described, there is

22   kind after complex mosaic of landownership because

23   you are in a forest land and BLM land, so I am not

24   sure what the footprint is.

25            MR. HOSHIJIMA:  Let's pull up CX487,

Page 398

1   please.

2       Q.    (By Mr. Hoshijima)  Is this a figure from

3   your direct testimony that shows your estimate of

4   labor income from the open pit mine?

5       A.    Yes, yes.

6       Q.    In the first column the wages and salaries

7   were paid to Molycorp employees, right?

8       A.    Correct.

9       Q.    Employees like Mr. Dewey?

10      A.    I am not sure if Mr. Dewey is still

11  working with Molycorp.

12      Q.    These wages and salaries weren't paid to

13  the United States, were they?

14      A.    No, they are paid to individuals who paid

15  taxes to the United States.

16      Q.    The second column, benefits.

17      A.    Yes.

18      Q.    Is that referring to benefits to Molycorp

19  employees like pensions, vacation and health

20  insurance?

21      A.    Yes.

22      Q.    Those numbers in that second column, they

23  are not paid to the United States, are they?

24      A.    Well, every employee that's supported by

25  health care is one less employee that has to be

1    supported by the Government.

2        **Q.    Looking at the indirect column, indirect**

3    **income in the fourth column.**

4        A.    Yes.

5        **Q.    Do those values represent Molycorp's**

6    **purchases of goods and services from other local**

7    **businesses?**

8        A.    Yeah, they are so-called supply chain or

9    indirect impacts.

10       **Q.    The numbers in that column aren't figures**

11   **paid to the United States, correct?**

12       A.    Not directly, but there are indirect

13   impacts on the finances of all levels of Government,

14   because any business activity generates tax revenue.

15       **Q.    Specifically the numbers in the fourth**

16   **column of your figure represent dollar amounts paid**

17   **to other businesses in the area, right?**

18       A.    It is labor income, yes, from supporting

19   industries, that is correct.

20           MR. HOSHIJIMA:   Let's turn to CX488, which

21   is a figure cited in your direct exam.

22       **Q.    (By Mr. Hoshijima)   This is a table of**

23   **state and local taxes resulting from the open pit**

24   **mine, correct?**

25       A.    Yes.

1      Q.      These numbers are paid to the State of

2  New Mexico and the county?

3      A.      Yeah, and any other special districts like

4  fire, schools, you know, every municipality has a

5  different arrangement of those.

6      Q.      None of these numbers in this figure

7  represent numbers paid to the Federal Government,

8  right?

9      A.      Yeah, the table is entitled State and

10  Local Taxes.  That is correct.

11      Q.      Let's turn to Federal taxes.  The

12  United States did not tax Molycorp any differently

13  from any other business, did it?

14      A.      I don't believe so.  I didn't see any

15  special provisions I just see --

16          MR. HOSHIJIMA:  Let's turn to CX489.

17      Q.      (By Mr. Hoshijima)  Is this your estimate

18  of Federal taxes resulting from the open pit mine?

19      A.      Yes, it is.

20      Q.      The first column is labeled FICA.

21          Do you see that?

22      A.      Yes.

23      Q.      Are those FICA taxes that fund Social

24  Security and Medicare?

25      A.      Yeah, those are the employer and employee

1  contributions to social insurance.

2       Q.    **These numbers aren't numbers that go into**

3  **the Government's general treasury, right?**

4       A.    Well, Social Security is a major

5  entitlement program that is part of the Federal

6  budget so, yes, they are.

7       Q.    **The second column unemployment?**

8       A.    Yeah.

9       Q.    **Those represent the amounts paid for**

10 **funding Federal unemployment benefits?**

11      A.    Yes.

12      Q.    **The benefits would go, then, to all**

13 **recipients of unemployment benefits?**

14      A.    Yes.

15      Q.    **The other Federal taxes that Molycorp**

16 **paid, do they go to various Government benefits and**

17 **services like highways and national defense?**

18      A.    Would you rephrase that question or state

19 it again, please.

20      Q.    **The other Federal taxes that Molycorp**

21 **paid, do they go to funding Government benefits like**

22 **national defense and highways?**

23      A.    Yeah, that is what all of our tax, that is

24 what we do when we pay taxes, we are paying for

25 public goods that the Government provides, like

Page 402

1   national defense.

2      Q.    **Molycorp benefited from all of that,**

3   **correct?**

4      A.    Yeah, as we all do.

5      Q.    **Let's turn to the part of your testimony**

6   **where you talk about economic benefits created for**

7   **consumers.**

8      A.    Okay.

9      Q.    **Your opinion is that the Questa Mine**

10  **created savings for purchasers of molybdenum,**

11  **correct?**

12     A.    Yes.

13     Q.    **You also say, though, that the Government**

14  **was not a purchaser of molybdenum, correct?**

15     A.    The main -- not a direct purchaser, but

16  the main users of molybdenum are ferro and stainless

17  steel producers.  And they produce products that are

18  bought by General Motors, Caterpillar tractor,

19  General Dynamics that make submarines and aircraft

20  carriers.  And, again, that is part of the supply

21  chain and so I think this distinction about, you

22  know, who buys directly is splitting hairs.

23          The Government in providing national

24  defense for everyone, as you have mentioned, has to

25  buy big capital goods that are made out of steel,

1   and a lot of those goods, particularly in defense,

2   have molybdenum in them because they have certain

3   physical properties that are unique to defense

4   equipment.

5       Q.    The direct purchasers of molybdenum are

6   generally private steel companies, correct?

7       A.    It is my understanding, yes.

8       Q.    Who then sell the steel to many companies,

9   like you said, Caterpillar, other --

10      A.    Thousands of different companies, yes.

11      Q.    Because molybdenum containing steel has a

12  lot of applications in the private industry,

13  correct?

14      A.    Private and defense industries.

15      Q.    In fact, molybdenum containing steel is

16  used in mining equipment, correct?

17      A.    I guess so, I don't know the details.  We

18  have another expert coming up that probably could

19  speak to that.

20      Q.    Going further down in your direct

21  testimony you say that the Questa open pit mine had

22  a significant impact on molybdenum market prices,

23  correct?

24      A.    The operation of the open pit mine?

25      Q.    Yes.

Page 404

1      A.    Yes.

2      **Q.    And you do that based on an economic model**

3   **that you applied in this case?**

4      A.    Right.  Simple supply and demand.

5      **Q.    In explaining that model in your direct**

6   **testimony, you explained that in a competitive**

7   **market with many producers, any one producer would**

8   **not have a significant impact on market prices,**

9   **correct?**

10     A.    Right, because there would be thousands,

11   maybe millions of individual firms.

12     **Q.    It is when there is a dominant producer**

13   **that can charge a monopoly price that your analysis**

14   **results in finding impacts to market prices?**

15     A.    Well, my analysis applies to both, really

16   empirically, but the -- you raise a good point about

17   the unique features of the molybdenum market.

18          Historically it has been dominated, was

19   dominated by one firm, Climax.  And, in fact, in

20   1960 Climax produced 85 percent of the molybdenum in

21   the United States.  And there was a concern in the

22   Department of Justice about the competitive

23   consequences of that because there are other

24   examples and other industries where a dominant firm,

25   like Standard Oil 100 years prior, exerted their

Page 405

1    market power and was found to be in violation of

2    antitrust laws.

3              MR. HOSHIJIMA:  Let's pull up CX105.

4    **Q.    (By Mr. Hoshijima)  Is this the 1960**

5    **report that you were referring to?**

6    A.    Yes.

7              MR. HOSHIJIMA:  Let's go to Page 5.

8    **Q.    (By Mr. Hoshijima)  Do you see in the**

9    **second paragraph where it says that, "As of 1960**

10   **much of the total supplier of molybdenum comes as a**

11   **byproduct of copper and tungsten"?**

12   A.    Well, I see molybdenum's direct production

13   is associated with byproducts and much of the total

14   supply comes as a byproduct of copper and tungsten.

15   **Q.    Do you understand that to mean that**

16   **molybdenum is produced as a byproduct by copper**

17   **companies that are mining copper?**

18   A.    Yes, and that is the structure of the

19   market.  There is a dominant firm, Climax, with a

20   market share that varies, as I have mentioned, from

21   a high of 85 to 35, 40 percent.

22              And then there is Questa that is coming in

23   and out of the market over the decades.

24              And then there is the byproduct producers

25   of molybdenum who are primarily in the business of

1   producing copper and tungsten and they respond to

2   incentives in that market, not the molybdenum

3   market.

4          MR. HOSHIJIMA:  Let's take out, let's

5   remove this magnification.  Let's look at the bottom

6   of the page where it describes Climax, the one

7   dominant primary producer of molybdenum.  That is

8   what you have been discussing, correct?

9          A.    That's correct.

10         **Q.    The report then goes on to say, though,**

11   **that, "Climax's position appears somewhat mitigated**

12   **by the emergence of important byproduct production**

13   **of molybdenum by copper companies."**

14              **Is that correct?**

15         A.    That is correct and it is important and I

16   would underline somewhat mitigated, that is, to us

17   and I read that, that there are limitations to that

18   mitigation.

19              MR. HOSHIJIMA:  Let's go two more pages

20   forward in this report.

21         **Q.    (By Mr. Hoshijima)  Do you see in the**

22   **second paragraph where it says that, "From a third**

23   **to a half of molybdenum has been produced as a**

24   **byproduct of copper and tungsten production"?**

25         A.    Yes.

1      Q.      And that the copper producers, at times

2   when there is less demand for molybdenum, can skip

3   that byproduct production of molybdenum.

4           Do you see that?

5      A.    Yes.

6      Q.      That means on the flip side, do you see

7   where it says, "There is great flexibility in the

8   molybdenum market"?

9      A.    Yes, I see that.

10      Q.      So in times of less demand the copper

11   companies might not make as much byproduct

12   molybdenum but conversely when demand increases

13   copper companies can fill that void?

14      A.    That is what the implication is, I agree

15   with that.  But I might add if, I don't know where

16   you are going with this, but if you read on in the

17   document at the very end of the document, I think

18   this is written by the Attorney General of the

19   United States.  He says that there is some concern

20   about the competition in the market with such a

21   dominant producer, so byproduct producers, they kind

22   of come and go in the market, primarily dependent on

23   market conditions in their market, not necessarily

24   molybdenum.

25           So it is not a guarantee that in times of

1   lean demand copper producers may omit processing of

2   byproduct molybdenum.  It really kind of depends on

3   what is happening in copper and tungsten because

4   that is their main line of business.

5            MR. HOSHIJIMA:  Let's turn to Page 8 of

6   this report.  PDF Page 11.

7        Q.    (By Mr. Hoshijima)  This part of the

8   report further discusses those copper companies that

9   produce molybdenum as a byproduct, correct?

10       A.    Yes.

11       Q.    It says that an important source that is

12   more recently developed as of this 1960 report is

13   molybdenum bearing copper ores?

14       A.    Correct.

15       Q.    Further down in that paragraph do you see

16   how it says that the amount of byproduct production

17   of molybdenum from copper companies may fluctuate as

18   a factor of, and one of the factors it lists is the

19   demand for molybdenum justifying the costs of its

20   separate extraction?

21       A.    I see that.

22       Q.    So it is saying that when demand for

23   molybdenum goes up, that might make it more

24   worthwhile for some of these copper companies to

25   produce molybdenum as a byproduct?

 1      A.    If the level of prices in the copper

 2   market justifies the level of copper production.

 3            THE COURT:  Counsel, would this be a good

 4   time to take our afternoon break?

 5            MR. HOSHIJIMA:  Yes, Your Honor.

 6            THE COURT:  Thank you.  We will be in

 7   recess for 15 minutes.

 8            (A recess was taken.)

 9            THE COURT:  You may be seated.

10      Q    (By Mr. Hoshijima) Dr. Considine, before

11   the break you recall we were talking about this 1960

12   Government report, correct?

13      A.    Yes, sir.

14      Q.    We were talking about the recent

15   development of molybdenum bearing copper ores?

16      A.    You mean the byproduct?

17      Q.    Yes.

18      A.    Yes.

19      Q.    Do you see near the bottom of this page

20   where it discusses how Kennecott Copper Company is

21   the largest byproduct producer?

22      A.    Yes.

23      Q.    You have heard that company name come up a

24   number of times in this trial, but Kennecott

25   operates one of the largest open pit mining ventures

Page 410

1    in the world, correct?

2        A.    Yes, I see this.

3        Q.    That is a source for byproduct molybdenum

4    production?

5        A.    Yes.

6              MR. HOSHIJIMA:  Let's turn to PDF Page 14.

7        Q.    (By Mr. Hoshijima)  Looking at the second

8    paragraph, do you see how, as of 1960 -- and again

9    this is before the start of the open pit mine --

10   this report says that commercially recoverable

11   reserves are estimated as sufficient for 50-year

12   supply?

13       A.    That is what the passage reads, yes.

14             MR. HOSHIJIMA:  Let's turn to PDF Page 21.

15       Q.    (By Mr. Hoshijima)  Do you see that in

16   1950 there were four companies involved in byproduct

17   production of molybdenum?

18       A.    Yes, that is what the first sentence

19   indicates.

20       Q.    Midway through that paragraph it describes

21   how by the end of that decade there were nine

22   companies doing that, correct?

23       A.    Correct.

24             MR. HOSHIJIMA:  Turning to PDF Page 33.

25       Q.    (By Mr. Hoshijima)  First paragraph under

1    Competitive Effect, do you see how it says that,

2    "Molybdenum byproduct occurrence and copper ores

3    provides a considerable degree of reserve capacity

4    for expended production"?

5        A.    Yes, that is what it indicates.

6        Q.    That is referring, again, to the idea that

7    copper companies could increase their byproduct

8    production of molybdenum if there is demand, right?

9        A.    It could, but as I cautioned before the

10   break, there is actually two factors involved in the

11   supply from byproduct producers of molybdenum.  It

12   would be the price of the main product and the price

13   of molybdenum.

14       Q.    This 1960 report, after discussing the

15   byproduct production of molybdenum, says that, "a

16   real shortage of molybdenum is unlikely," correct?

17       A.    That is what it reads.  That is correct.

18             MR. HOSHIJIMA:  We can take this document

19   down.

20       Q.    (By Mr. Hoshijima)  When molybdenum is

21   added to steel, molybdenum is about 1 percent of the

22   ultimate product, right?

23       A.    I am not a metallurgist, so I can't opine

24   on that.

25       Q.    So you don't know how much of molybdenum

1    **ends up in the final steel product?**

2        A.    I have done studies on tracking

3    ferroalloys into alloy and stainless steel

4    production on tonnage basis, but I don't know, you

5    know, the percent contents off the top of my head.

6        **Q.    The analysis you did for your direct**

7    **testimony was about the impact of the Questa Mine on**

8    **the market prices of molybdenum, right?**

9        A.    That is right, molybdenum concentrate.

10       **Q.    You did not analyze how much the Questa**

11   **Mine production would have affected the price of**

12   **steel?**

13       A.    No, I didn't look at that.

14       **Q.    The purchasers of molybdenum, again, were**

15   **private steel companies, right?**

16       A.    For the most part.  There are many

17   different uses, chemicals and other nondurable

18   products use molybdenum powders, and so on.  I

19   didn't really do a detailed end use analysis in my

20   report, I just looked at the market for molybdenum

21   concentrate and the impacts that the stockpile sales

22   and Questa production had on the price.

23       **Q.    That price reduction would have gone to**

24   **the benefit of the private steel companies, right?**

25       A.    As I have mentioned before, that is

Page 413

1    correct, that would lower the cost of producing

2    goods, primarily capital goods that contain

3    molybdenum bearing steel.

4         **Q.    If it were the case that molybdenum makes**

5    **up about 1 percent of steel, does that mean that the**

6    **price impacts would not really be felt by the**

7    **consumers of steel?**

8         A.    Well, I compute the consumer cost savings

9    from lower molybdenum prices from -- that results

10   from the Questa production and those numbers are

11   reported in the report.  And they amount to hundreds

12   of millions, billions of dollars over the entire

13   mining period, so they are worthy to take note.

14   Granted they are a small fraction of the overall

15   economy and overall steel use, but every little bit

16   helps.

17        **Q.    In your direct testimony you describe the**

18   **Federal Government's stockpile of molybdenum,**

19   **correct?**

20        A.    Yes.

21             MR. HOSHIJIMA:  Let's turn to Page 42 of

22   your testimony.

23        **Q.    (By Mr. Hoshijima)  You say that, "Because**

24   **Questa represented a new and significant source of**

25   **molybdenum, Questa reduced the United States**

1    **Government's need for the strategic stockpile"?**

2        A.    Yes, I noted that the United States sold

3    27.6 million pounds of molybdenum from the strategic

4    stockpile just prior to the startup of the Questa

5    open pit mine.

6        **Q.    When you referred to the new and**

7    **significant sources of molybdenum, you are talking**

8    **about the open pit mine starting in 1965, right?**

9        A.    Yes.

10        **Q.    Your opinion is that that open pit mine is**

11    **what allowed the Government to start selling**

12    **molybdenum from the stockpile?**

13        A.    I pointed that out and, you know, there

14    are a lot of -- any economic decision made by the

15    Government or market entails many factors, and this

16    could have been one of them because it was

17    significant because Questa was a primary producer.

18            All of the other, there was Climax as a

19    primary producer, now the United States had another

20    second significant primary producer producing

21    roughly 10 percent of the market of total

22    production, and then the byproduct producers,

23    further diversifying and adding to the flexibility

24    in the market, which I think is a good thing.

25            MR. HOSHIJIMA:  Let's turn to USX053 on

1    Page 134.  This exhibit has been previously

2    admitted.

3        Q.    (By Mr. Hoshijima)  Do you see that it

4    represents the national stockpile goals plotted

5    against their inventories?

6        A.    Yes, the inventory levels are the Xs and

7    the goals are the plus signs.

8        Q.    This is for molybdenum disulfide?

9        A.    Yes.

10       Q.    Do you see that it is about 1958 that the

11   inventories, which again are shown with the plus

12   marks, are -- sorry, strike that.

13             Do you see that it is about 1958 when the

14   inventories, which are represented by the X mark,

15   meets the goal for the stockpiling of molybdenum?

16       A.    Yeah, they may be a few years earlier it

17   intersects at that point.

18       Q.    Certainly years before Molycorp opened the

19   open pit mine, correct?

20       A.    Yeah, I think it is important to keep in

21   mind what else was happening at the period.  And if

22   you look at Climax production in particular during

23   the 1950s, it increased dramatically.

24       Q.    So Climax's production, not the Questa

25   open pit mine, is what allowed the Government to

1  **meet its stockpile goals?**

2      A.    I didn't say that.  I think it is a

3  contributing factor.  There are a lot of other

4  factors in the management of the stockpile.  It is

5  not just the supply, but the anticipated demand and

6  the probability.  The whole point of owning a

7  stockpile, and this is what the Defense Department

8  and other Government agencies do, is they, they war

9  game it, you know.  They think, okay, what happens

10  if we fight, for instance, World War III, which was

11  a real concern at this time, how much material would

12  we need.  So the demand in both the supply side

13  considerations are, I think, likely taken into

14  account.

15      **Q.    Even if a lot of factors are taken into**

16  **account, how could it be that the Questa open pit**

17  **mine production is one of those factors if 1958 is**

18  **before the DMEA even certifies a discovery?**

19      A.    Well, I think it is just the simple idea

20  that Government concerned about the availability of

21  materials keeps in mind that there -- they are

22  trying to develop a diverse portfolio of assets and

23  Questa would fit into that strategy.

24          MR. HOSHIJIMA:  Let's look at USX081,

25  which has been previously admitted.

1      Q.      (By Mr. Hoshijima)   Do you see this as a

2  January to June 1956 stockpile report to Congress?

3      A.      Yes, yes.

4              MR. HOSHIJIMA:   Let's turn to Page 24.

5      Q.      (By Mr. Hoshijima)   There is a section on

6  molybdenum on the top left of the page.

7              Do you see that?

8      A.      Yes.

9      Q.      Again, this is in a 1956 report.   Do you

10  see how, because of an improved defense position for

11  molybdenum, the Government actually instead of

12  receiving deliveries to the stockpile deferred them

13  to private industry?

14      A.      I see those words, yes.

15      Q.      1956, which is nearly ten years before

16  open pit production, the Government no longer needs

17  these deliveries to the stockpile, correct?

18      A.      Well, the future is important to consider,

19  but the past is as well.   And the thing to keep in

20  mind here is the United States just finished

21  fighting the Korean War and there were major

22  problems in the steel industry.   And maybe some of

23  those problems have -- were resolved at this time.

24              So I would ask, and I am not sure here,

25  what the improved defense position for molybdenum

 1   actually is.  It is not really explained here.

 2       Q.    **Whatever it is, though, it doesn't have**

 3   **anything to do with what Molycorp is doing in**

 4   **Questa, right?**

 5       A.    Well, when was this, in '56, this

 6   document?

 7       Q.    **Yes.**

 8       A.    Well, like I said, you know, this is part

 9   of what stockpiling programs do is they try to look

10   around the world for sources of supply in

11   anticipation of future demand.  And for this

12   particular material, that defense scenario would

13   play prominently.

14       Q.    **This document near the end of this**

15   **paragraph notes, "The capacity of domestic producers**

16   **in Colorado and Arizona," when it talks about the**

17   **stockpile being met, right?**

18       A.    Well, it is just saying that capacity of

19   domestic producers in Colorado and Arizona is being

20   increased, presumably.  Well, that is the byproduct

21   producers part of this diversified portfolio.

22       Q.    **No mention in this paragraph of production**

23   **in Questa, New Mexico, that would allow the**

24   **Government to defer deliveries to the stockpile,**

25   **right?**

1    A.    Right.  This is 1956 and what the DMEA

2  loan really started, I guess, they started work in

3  '57, so this is before then, yeah.

4    **Q.    This is before the DMEA contract is even**

5  **signed, correct?**

6    A.    Yeah.

7          MR. HOSHIJIMA:  Let's pull up USX539.

8  This has been previously admitted.

9    **Q.    (By Mr. Hoshijima)  Do you see that it is**

10  **the January to June 1957 stockpile report?**

11    A.    I do.

12          MR. HOSHIJIMA:  Let's turn to Page 10.

13          THE COURT:  Counsel, can I inquire as to

14  where you are going with this year by year hour per

15  hour?  It seems irrelevant to what we are here for.

16          MR. HOSHIJIMA:  This is one more document

17  about the state of molybdenum in the United States

18  when Molycorp is seeking the DMEA loan.

19          THE COURT:  Well, so what?

20          MR. HOSHIJIMA:  Chevron is arguing that

21  the Government had a significant defense interest in

22  molybdenum at that point in time.

23          THE COURT:  Well, there was a comment

24  there.  I think it has been covered over and over

25  again.

```
 1                    MR. HOSHIJIMA:  I will move on.

 2        Q    (By Mr. Hoshijima) The Government

 3   eventually sold off excess molybdenum from the

 4   national stockpile, right?

 5        A.   Yes.

 6        Q.   We saw that it was in 1958 when its

 7   inventory was met?

 8        A.   Well, that is where the goals intersected

 9   with the inventory levels.

10        Q.   When the goals were met?

11        A.   Yeah.

12        Q.   But it is actually not until 1975 that the

13   last bit of molybdenum is sold off from the

14   stockpile, right?

15        A.   That is what the historical record

16   indicates, yes.

17        Q.   That is because the Government took its

18   time to make those sales so it didn't flood the

19   market, correct?

20        A.   Yeah, that is always a concern with the

21   drawdown of a stockpile.

22        Q.   The Government --

23        A.   Unless it is intended, for instance, for

24   example in the case of oil.

25        Q.   To avoid disrupting the market, then, the
```

1    **Government, even after the stockpile inventory goal**

2    **had been met, took its time releasing molybdenum**

3    **from the stockpile, right?**

4         A.    Well, that wasn't really a focus of my

5    analysis.  I just took the numbers as they were to

6    make a judgment call of whether that was the best

7    route, I don't know, I can't really make that

8    judgment.

9         Q.    **Final topic, then, you discuss sales of**

10   **molybdenum from the stockpile in your direct**

11   **testimony, correct?**

12        A.    Yes.

13        Q.    **Are you aware that Molycorp was a**

14   **purchaser of molybdenum from the national stockpile?**

15        A.    I believe so.  It is not clear to me, but

16   I will grant you that.

17             MR. HOSHIJIMA:  Let's pull up USX098.

18   This has been previously admitted.

19        Q.    **(By Mr. Hoshijima)  Do you see this is a**

20   **1964 GSA news release?**

21        A.    I do.

22        Q.    **Do you see that Molycorp has bid for sale**

23   **of molybdenum from the stockpile?**

24        A.    That is what it indicates, yes.

25        Q.    **Molycorp was awarded a bid, right?**

Page 422

1      A.     Yeah, awards went to three bidders and

2  there they are.

3      Q.     **Molycorp then benefited from sales of**

4  **molybdenum from the stockpile, right?**

5      A.     Behind every side of the sale there are

6  two winners, the seller and the buyer.  Yeah, they

7  were probably buying this molybdenum to hoist in

8  there processing facilities.

9             MR. HOSHIJIMA:  USX103, please.  This has

10  been previously admitted.

11      Q.     **(By Mr. Hoshijima)  Do you see it is a**

12  **1969 GSA news release?**

13      A.     Yes.

14      Q.     **Do you see that again in 1969 Molycorp is**

15  **purchasing molybdenum from the national stockpile?**

16      A.     Yes.  And I interpret this as just the

17  likely fact that they had excess capacity to process

18  molybdenum and they saw it in their best interest to

19  pursue this opportunity.

20      Q.     **And the Government didn't need it at that**

21  **time, right?**

22      A.     Well, that is implied.  They are selling

23  it, so if you sell something you want to get rid of

24  it, yes.

25             MR. HOSHIJIMA:  I have no further

Page 423

1   questions.

2              THE COURT:  Thank you.  You may redirect.

3              MR. HOPSON:  Yes, Your Honor.

4              Good afternoon, Your Honor.

5              THE COURT:  Good afternoon.

6                    REDIRECT EXAMINATION

7   BY MR. HOPSON:

8        **Q.    You are currently an economist at the**

9   **School of Energy Resources at the University of**

10  **Wyoming, right?**

11       A.    Yes.

12       **Q.    And prior to that time you spent some time**

13  **at Penn State focusing on mineral economics, right?**

14       A.    That's correct.

15       **Q.    So are you familiar with issues around**

16  **valuing, evaluating and seeking mine financing?**

17       A.    Somewhat.  I don't have direct experience

18  in that, but, yeah, I have rubbed elbows with a lot

19  of people who have written programs that support

20  that activity.

21       **Q.    I believe you said that when you did your**

22  **analysis you used before-tax cash flow for a reason.**

23            **What was the reason?**

24       A.    The reason is that it is considered the

25  gold standard of mineral project evaluation and it

Page 424

1    strips away all the complexities and distortions of

2    the tax code.  So you really want to make your

3    investment decision based on the cash generating

4    capability of the project.

5              MR. HOPSON:  We saw, and I am going to ask

6    Ms. Hutchman to put up Chevron Exhibit 123, which is

7    the 1963 annual report.

8         Q.   (By Mr. Hopson)  Do you remember looking

9    at that?

10        A.   Yeah.

11        Q.   Let me see if I can do it without the

12   document, make it quicker.

13        A.   Okay.

14        Q.   You were shown some information that

15   suggested that the benefits of the tax deduction

16   were substantial in one year, that is, the tax

17   deduction for capital appreciation to Questa, yes?

18        A.   Yes.

19        Q.   Have you seen that for any other year

20   during the operation of the mine?

21        A.   I did not.

22        Q.   You are familiar as an economist with the

23   timeline of what happened at the Questa Mine,

24   correct?

25        A.   Yes.

1      Q.      And in December of 1956 at the time that

2    Molycorp was applying for assistance from the

3    United States Government, what was the state of

4    their reserves?

5      A.      They were essentially tapped out of

6    molybdenum at the Questa site.

7      Q.      Were they in production?

8      A.      No.  I believe they shut down somewhere,

9    sometime in 1956 or '57.

10     Q.      Did they have any planned exploration?

11     A.      No.  In fact, one document indicated

12   explicitly that they had no plans to conduct further

13   exploration.

14     Q.      In your experience with mine financing and

15   mineral economics, is it likely a private lender,

16   like a bank, would have loaned money for exploration

17   at the Questa site given the mineral economics on

18   the ground?

19     A.      I think it would be unlikely because

20   there -- it was basically a tapped out operation.

21   It was a small play that was played.  And unless

22   there was something else that attracted attention,

23   then it would probably be passed upon.

24     Q.      There were questions you were asked about

25   whether it was risky to take out bank loans.

1          **Do you remember those risk questions?**

2      A.    I do.

3      Q.    **Was it risky to lend to Molycorp once they**

4  **had in hand a DMEA certification of mineral**

5  **discovery?**

6      A.    That really impressed me because I looked

7  at that document and there was a big number.  I

8  think it was 2 billion pounds of possible reserves.

9  And based on my experience in risk evaluation, one

10  of the key elements of risk is whether a resource is

11  there or not.  And just the fact that someone with

12  credibility like the USGS or the DMEA loan people

13  saying, yes, there is a resource here and it is

14  significant would immediately lower that risk

15  premium that people subjectively put on any

16  investment.

17      Q.    **Particularly investments in minerals**

18  **exploration?**

19      A.    Yes.

20          MR. HOPSON:  Let's look, Ms. Hutchman, at

21  US Exhibit 519.

22      Q.    **(By Mr. Hopson)  And looking at the first**

23  **page here you will see this is a report to**

24  **stockholders of Molycorp for the year ended**

25  **December 31, 1955, correct?**

Page 427

1    A.    Correct.

2    Q.    And if you flip over a couple of pages you

3    see that this is actually issued on March 1, 1956,

4    correct?

5    A.    Correct.

6    Q.    Now, you were asked questions about this

7    document and particularly asked questions about the

8    balance sheet.

9          Do you recall that?

10   A.    Yes.

11         MR. HOPSON:  Let's go to Page 6.

12   Q.    (By Mr. Hopson)  This was a page you were

13   asked questions about.

14         Do you recall that?

15   A.    I do.

16   Q.    Now to start with this is a consolidated

17   balance sheet, correct?

18   A.    Correct.

19   Q.    So it includes not only the Questa Mine

20   but all of the rest of Molycorp's businesses,

21   correct?

22   A.    That's correct.

23   Q.    You were pointed to the line in the

24   balance sheet that said that Molycorp had at that

25   moment in time $3.150 million in cash, correct?

Page 428

1      A.    Correct.

2      **Q.    Does that mean to you, Dr. Considine, that**

3  **Molycorp has $3.1 million to invest in exploration**

4  **at the Questa Mine?**

5      A.    No, it doesn't.

6          MR. HOPSON:  Let's flip to the next page.

7      **Q.    (By Mr. Hopson)  Can you tell me,**

8  **Dr. Considine, what their current liabilities were**

9  **at the time they had $3.1 million in cash?**

10     A.    About 3.7 million.

11     **Q.    So Molycorp wasn't exactly cash rich at**

12  **that moment in time?**

13     A.    No.  In fact, in my report I compare rates

14  of return before and after the '56, '57 period and

15  it was a clear break in the trend.  And, you know,

16  it is almost two-thirds lower after the depletion of

17  the Questa mine.

18     **Q.    I'm sorry, I probably just doesn't catch**

19  **that.  What was two-thirds lower?**

20     A.    The return on assets.

21     **Q.    Okay.**

22          MR. HOPSON:  Ms. Hutchman, let's look at

23  US Exhibit 3.

24     **Q.    (By Mr. Hopson)  Again, I am not going to**

25  **go through everything you were shown in this, but do**

1  **you recall looking at this SEC register statement**

2  **and being asked if the company had obtained**

3  **financing in 1954 and 1955?**

4      A.    Yes, I recall.

5      Q.    **And was that consolidated corporate**

6  **financing or was it specific to Questa?**

7      A.    I believe it was consolidated.

8      Q.    **And, again, back to your familiarity with**

9  **mine financing, is raising money for a consolidated**

10 **corporation a different process than raising money**

11 **specifically to explore for a mineral at a specific**

12 **cite?**

13     A.    Yes.  There is a lot more exacting

14 information that is required for a specific site.

15     Q.    **What kind of exacting information, sir?**

16     A.    Oh, such as the location, the mineral, the

17 amount of mineral that could be recovered, estimated

18 costs, transportation infrastructure to the site,

19 et cetera.

20     Q.    **Just one question I want to ask you about**

21 **US Exhibit 481.**

22         **You were asked the question about the**

23 **statement that says to date a total of $110 million**

24 **has been invested.**

25         **Let me ask you, do you know what time**

1    period that refers to?

2        A.    I do not.

3        Q.    Is there anything else in this document

4    that indicates that?

5        A.    I read it, I couldn't figure it out.

6              MR. HOPSON:  We can put that document

7    aside.

8        Q    (By Mr. Hopson) I want to talk a little bit

9    about the Attorney General's report to Congress

10   dated May 27, 1960, which is in evidence as

11   Chevron 105.

12             Are you familiar with that document,

13   Dr. Considine?

14       A.    Yes, I am.

15       Q.    To begin with, this is a report to

16   Congress by the Attorney General of the

17   United States that solely focused on the molybdenum

18   market and molybdenum industry, correct?

19       A.    Correct.

20       Q.    Does that suggest to you that the United

21   States Government believes that molybdenum is

22   important in 1960?

23       A.    Yes.  It is the Attorney General of the

24   United States picking out one material among many.

25   It is significant.

Page 431

1      Q.    Let's look -- I am having a hard time

2  reading the number at the bottom of the page, but I

3  believe it is Page 13 to 43, it is actually Page 10

4  in the original report.

5            You were asked quite a few questions about

6  whether there was molybdenum supply as a byproduct

7  of copper production.

8            Do you recall those?

9      A.    Yes, I do.

10     Q.    Can you look at Table Number 1 and tell us

11 generally the trend for byproduct production from

12 1950 through 1959?

13     A.    From byproduct ore?

14     Q.    Yes, by product ore.

15     A.    Just eyeballing I don't see a trend, it is

16 up and down, rather zigzag pattern.

17     Q.    Do you know whether there was a strike at

18 the Climax mine in 1958?

19     A.    Yes, I did see an oblique mention of that.

20     Q.    If you exclude 1958 do you see a trend?

21     A.    Yes.  Climax was increasing production

22 significantly.

23            MR. HOPSON:  I would like to ask us to

24 turn to Page 31 in the original report, which I

25 believe is Page 34 of the document itself.

Page 432

1          Q.     (By Mr. Hopson)   Now, you have read the

2    report before, correct?

3          A.     Yes.

4                 MR. HOPSON:   In the middle paragraph, if

5    we could call that out.

6          Q.     (By Mr. Hopson)   The Attorney General

7    reports that in 1950, direct production came from

8    only two firms, one clearly dominant.   Who are the

9    two firms?

10         A.     Climax and Questa.

11         Q.     And which is the dominant one?

12         A.     Climax.

13         Q.     You referenced, I don't know exactly how

14   you put it, but potential antitrust concerns,

15   competition concerns by having a dominant firm.

16                Do you recall that testimony?

17         A.     I do.

18         Q.     Look at the last sentence of that

19   paragraph, which reads, "But the existence of a

20   single primary producer of an important metal

21   necessarily occasions some uneasiness and doubts are

22   increased by concern for competition in associated

23   nonferrous metal production."

24                Does that statement by the Attorney

25   General relate to your expressed concern about a

1    **dominant role for Climax in the molybdenum market?**

2       A.    Yes, it does, very much so.  And this is

3    why I have mentioned in my testimony that one of the

4    motivations or considerations in the stockpile and

5    also the DMEA loan is this competitive balance in

6    the molybdenum market.  And the need for the

7    Government and particular the steel firms who are

8    producing these vital materials for defense to have

9    a diversified source of supply and some sway over

10   the price, some negotiating power over the price as

11   opposed to being at the whims of a single producer.

12      **Q.    And when we look at this market overall is**

13   **the byproduct supply a reliable or stable one as you**

14   **look at the market?**

15      A.    No.  I see that there are many other

16   factors that, besides the price of molybdenum, that

17   affects the source of byproduct molybdenum supply in

18   particular the price of copper and tungsten, that

19   may not necessarily move with molybdenum prices.

20      **Q.    Okay.  If we could turn back to Page 30 of**

21   **the report, which again appears to be Page 33 of the**

22   **exhibit.  I just want to show you and you can look**

23   **at it in your binder if you want to, that the last**

24   **few pages of this report the Attorney General is**

25   **addressing competitive effects; is that correct?**

1      A.    That's correct.

2      Q.    **He is noting both negative and potentially**

3  **positive competitive effects, correct?**

4      A.    Yes, yes.

5            MR. HOPSON:  Could we turn to Page 32,

6  which is Page 35 of the exhibit, and could you

7  highlight the first complete sentence on that page.

8      Q.    **(By Mr. Hopson)  Would you read that for**

9  **me, Dr. Considine?**

10     A.    "And when the Molybdenum Corporation of

11  America's mine exhausted its main ore resources,

12  defense production assistance was granted to enable

13  it to explore new ore sources."

14     Q.    **So the Attorney General believed that the**

15  **DMEA program enabled Molycorp to find new ore**

16  **sources?**

17     A.    Yes.

18     Q.    **And the Attorney General reported that as**

19  **a favorable development in the competitive market?**

20     A.    Yes.

21     Q.    **I am not going to pull out a lot of these**

22  **documents, but you were asked a number of questions**

23  **that to me sounded like they were suggesting that**

24  **molybdenum was not really that important.**

25           **Do you remember those questions?**

Page 435

1      A.     Yes, yes.

2      **Q.     Was molybdenum on the stockpile list all**

3   **the way through 1970?**

4      A.     Yes, it was stockpiled and then there was

5   positive levels of the stockpile until 1975.

6      **Q.     Positive levels meaning molybdenum**

7   **remained in the stockpile?**

8      A.     Yeah.   There was a stockpile of molybdenum

9   until 1975.

10     **Q.     And was Molycorp listed as a strategic**

11  **mineral critical for national defense throughout**

12  **that time period?**

13     A.     Yes, my understanding.

14            MR. HOPSON:   If we could just call up the

15  front page of US Exhibit 81.

16     **Q.     (By Mr. Hopson)   Do you recall looking at**

17  **this document with a bunch of questions suggesting**

18  **that there were plenty, there is plenty of**

19  **molybdenum around?**

20     A.     Yes.

21     **Q.     And what is the date of this stockpile**

22  **report?**

23     A.     January to June '56, 1956.

24     **Q.     We know something, though, about the**

25  **U.S.'s view about molybdenum because the U.S. went**

1  forward with the DMEA contract at Questa Mine after

2  this report, right?

3      A.    Correct.

4            MR. HOPSON:  Let's look at Chevron

5  Exhibit 48, please.

6      Q.    (By Mr. Hopson)  This is, if you don't

7  recall, it is a collection of internal

8  correspondence and memoranda between and among

9  various Government officials.

10           Do you recall looking at this?

11     A.    Not in detail, I just scanned it.

12     Q.    Well, let me just call your attention to

13  Page 10 of 10 of the exhibit.

14     A.    Okay.

15     Q.    This is after the stockpile report, right?

16     A.    Right, December 12, 1956.

17     Q.    This is a memorandum from a fellow who is

18  a commodity specialist in the Branch of Ferrous

19  Metals and Ferroalloys to the Chief of the Rare and

20  Miscellaneous Metal Division in the DMEA, right?

21     A.    Correct.

22           MR. HOPSON:  And if you highlight the last

23  full paragraph, the full sentence.

24     Q.    (By Mr. Hopson)  It suggests what the

25  United States really thinks about the importance of

Page 437

 1    molybdenum at this point.

 2            He states, "The strategic importance of

 3    molybdenum and the limited noncommercial deposits

 4    makes it highly desirable, in my opinion, to

 5    endeavor to increase known reserves whenever

 6    feasible."

 7            Did I read that correctly?

 8    A.    You sure did.

 9    Q.    And was this desire to increase the supply

10    of molybdenum, and particularly to support a second

11    primary producer the reason the United States

12    entered into the DMEA contract?

13    A.    It is probably an overarching

14    consideration in that decision, very important.

15            MR. HOPSON:  I have no further questions,

16    Your Honor.

17            THE COURT:  This witness can be excused.

18            (Whereupon, the witness was excused.)

19            THE COURT:  Do we have one short witness,

20    maybe a 10-minute witness?

21            MR. TODD:  I believe we do, Your Honor,

22    but may I deal with a couple of housekeeping matters

23    first just to explain where we are in the cadence of

24    the trial.

25            First, a couple of non-witness evidentiary

Page 438

1   issues.  We have referred a few times to the two

2   stipulations that were previously entered with the

3   Court's record on the Court's docket.  Those are

4   Dockets 160 and 158.

5          As those are evidentiary stipulations, we

6   would like to move them into evidence as part of the

7   hearing record.

8          THE COURT:  Okay.  Any objections?

9          MS. KIMBALL:  No objection.

10          THE COURT:  Without objections they will

11   be so admitted.

12          (Exhibits admitted, Court's Docket 160 and

13   158.)

14          MR. TODD:  Thank you, Your Honor.

15          Secondly, there was another stipulation

16   agreement between the parties that was not docketed

17   and that -- but it is memorialized in an e-mail and

18   that relates to the question of response costs.  An

19   element of an allocation action as the party

20   bringing it has to prove that they have incurred at

21   least some response costs, i.e., clean-up costs.

22          And the Government has kindly agreed that

23   we can stipulate that Chevron has incurred some

24   costs without having to bring a witness in to

25   testify to all of that money.

Page 439

1          So with the Government's agreement, I

2    would like to just make that clear on the record.

3          MS. KIMBALL:  No objection.

4          THE COURT:  Very good.  So stipulated.

5          MR. TODD:  Thank you, Your Honor.

6          Thirdly, in Docket Number 223, which is

7    when Chevron tendered its affirmative case to the

8    Court, we identified a number of discovery responses

9    that we wanted to offer.

10          As the Court knows a party's responses in

11    discovery are party admissions and admissible

12    without a witness.  I was going to offer those, but

13    I understand from Ms. Kimball that the Government

14    wants to stand on some of the objections within

15    those responses.  So rather than offer them now, I

16    would like to hold the record open so we can

17    hopefully resolve those and minimize what the Court

18    will have to look at.

19          THE COURT:  Very good.

20          MR. TODD:  Thank you, Your Honor.

21          With respect to witnesses, Your Honor,

22    Chevron has two more witnesses but neither of whom

23    we can call right now.

24          You may recall from the January status

25    conference that Bob Cryderman, who is an expert in

Page 440

1   molybdenum couldn't be here in the early part of the

2   week because he was at an academic conference.  We

3   hope he is coming tomorrow and we had agreed

4   previously he would testify Thursday.  We will get

5   him on in the Government's -- as part of the

6   Government's case, our case, but in the middle of

7   their case once he is here.

8            And secondly, I mentioned Dr. Haddad whose

9   mother had the stroke.  We just need to agree on a

10   date and a format for doing his cross-examination.

11   We can discuss that now, I am happy to discuss that

12   whenever Your Honor would like.

13            THE COURT:  Yeah, without knowing his

14   particular status and I sort of know my status, like

15   I am gone next week.  We will have to just wait and

16   see how it shakes out and we will make every effort

17   to accommodate both parties.  I know you would like

18   to stay back east where it is more civilized than

19   out here.

20            MR. TODD:  I would dispute that,

21   Your Honor.  Dr. Haddad has great flexibility, he

22   simply doesn't want to leave Los Angeles while his

23   mother is in this condition.  If we could do it

24   remotely he could probably do it any day, I

25   shouldn't say any, that's overreaching.  Most days

Page 441

```
 1   when the Court could do it.

 2           So perhaps if Your Honor identifies dates,

 3   maybe put aside a half day.  I am not sure it would

 4   even take that long.  If you give us dates, then we

 5   could work around those.

 6           THE COURT:  So you assume that we will

 7   Zoom him?

 8           MR. TODD:  If you are willing to do Zoom

 9   and I know the Government would prefer to do it in

10   person.

11           THE COURT:  Yeah, I am willing.  We can do

12   it from Santa Fe, too.

13           MR. AUGUSTINI:  May I be heard briefly,

14   Your Honor, if you are done, Counsel?

15           MR. TODD:  Please.

16           MR. AUGUSTINI:  Yes, Your Honor.  Our

17   strong preference is to conduct live

18   cross-examination.  I am happy to come back to

19   New Mexico, to Santa Fe if it is convenient for you.

20   We will accommodate Dr. Haddad's schedule, obviously

21   we understand their personal circumstances.

22           So in terms of agreeing on a date, we will

23   work with Chevron on that, but we do prefer live

24   cross-examination.  We just think it is just better

25   overall.
```

Page 442

1          THE COURT:  It probably is.

2          MR. AUGUSTINI:  Thank you, Your Honor.

3          MR. TODD:  I am sure we are all happy to

4    do it in Santa Fe.  Your Honor, honestly, if we were

5    thinking, we would have done this whole trial in

6    Santa Fe.  I apologize on behalf of both parties for

7    not suggesting that.

8          THE COURT:  That is all right.

9          MR. TODD:  The last issue, Your Honor, a

10   moment of personal privilege, we are now going to

11   hand the case over to the Government to call their

12   first witness, Ms. Sitton, who I believe we can get

13   up and down very quickly today.

14          But before I do that any efficient

15   courtroom presentation doesn't rely on the folks at

16   the podium, it is the folks in the back doing the

17   work.  I just wanted to introduce on the record

18   Alexia Jansen, Matt Simpson and Deesha Shah, a

19   couple of associates and a paralegal with my firm

20   who have put in some tireless nights here.

21          THE COURT:  Welcome.

22          MR. TODD:  Thank you, Your Honor.

23          THE COURT:  Now it is 4:00.  Do you really

24   need to put this witness on today?

25          MR. AUGUSTINI:  No, actually I am afraid

Page 443

1    that we would interrupt your trip back to Santa Fe

2    if we tried to, and I don't know how much cross

3    Chevron has but, I may have some redirect.  So we

4    are happy to start first thing in the morning,

5    whatever time the Court prefers.

6              THE COURT:  I would prefer to do that if

7    it is not a big inconvenience.

8              MR. AUGUSTINI:  Whatever time Your Honor

9    would like.  We are happy to start earlier.

10             THE COURT:  We can start at 9:00.

11   Tomorrow I have got a sentencing at 4:00 in another

12   courtroom and on another case.  Not one of you

13   people, so we will be in recess, then, until 9:00

14   tomorrow morning.

15             Thank you.

16             (Proceedings concluded at 3:58 p.m.)

17

18

19

20

21

22

23

24

25

Page 444

1                    REPORTER'S CERTIFICATE

2

3       I certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.  I further certify that the

6    transcript fees and format comply with those

7    prescribed by the Court and the Judicial Conference

8    of the United States.

9

10   Date:  March 15, 2022

11

12              _____

13              PAUL BACA, RPR, CCR
                Certified Court Reporter #112
14              License Expires:  12-31-2022

15

16

17

18

19

20

21

22

23

24

25

PAUL BACA OFFICIAL COURT REPORTER