```
0445
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF NEW MEXICO
 3
 4    CHEVRON MINING,
 5             Plaintiff
 6    vs.                        No. 1:13-CV-00328 PJK/JFR
 7    UNITED STATES OF AMERICA,
      UNITED STATES DEPARTMANT OF THE INTERIOR,
 8    UNITED STATES DEPARTMENT OF AGRICULTURE,
 9             Defendants.
10
11
12                  TRANSCRIPT OF PROCEEDINGS
13                     March 16, 2022
14                        Volume 3
                       Pages 445 - 650
15
16    BEFORE:  HONORABLE JUDGE PAUL KELLY
                UNITED STATES 10TH CIRCUIT JUDGE
17
18
19
20        Proceedings reported by stenotype.
21        Transcript produced by computer-aided
22    transcription.
23
24
25
0446
 1    A P P E A R A N C E S:
 2    FOR THE PLAINTIFF:
 3            MODRALL SPERLING
              500 Fourth Street NW, Suite 1000
 4            Albuquerque, New Mexico  87103
              505-848-1800
 5            BY:  MEGAN MUIRHEAD
              mmuirhead@modrall.com
 6
                         - and -
 7
              SIDLEY AUSTIN, LLP
 8            1501 K Street N.W.
              Washington, D.C.  20005
 9            202-736-8000
              BY:  GORDON TODD
10            gtodd@sidley.com
                 MARK HOPSON
11            mhopson@sidley.com
                 BENJAMIN MUNDEL
12            bmundel@sidley.com
                 ELLEN CRISHAM PELLEGRINI
```

1

```
13              epellegrini@sidley.com
14  FOR THE DEFENDANT:
15              U.S. DEPARTMENT OF JUSTICE
                ENVIRONMENT and NATURAL RESOURCES DIVISION
16              ENVIRONMENTAL DEFENSE SECTION
                P.O. Box 7611
17              Washington, D.C.  20044-7611
                202-616-6519
18              BY:  BRYAN JAMES HARRISON
                Bryan.Harrison@usdoj.gov
19                   TSUKI HOSHIJIMA
                Tsuki.Hoshijima@usdoj.gov
20                   MICHAEL AUGUSTINI
                Michael.Augustini@usdoj.gov
21                   KIMERE KIMBALL
                Kimere.kimball@usdoj.gov
22
23
24
25
0447
```

```
 1                   I N D E X
 2  WITNESS:                                    PAGE:
 3  MARY SITTON
 4       Cross-Exam by Ms. Crisham Pellegrini    451
         Redirect Examination by Mr. Augustini   460
 5
    FREDERIC QUIVIK
 6
         Cross-Examination by Mr. Todd           474
 7       Redirect Examination by Mr. Harrison    589
 8  JAY BRIGHAM
 9       Cross-Examination by Mr. Hopson         626
         Redirect Examination by Mr. Hoshijima   635
10
11
12  Certificate of Reporter                      650
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
0448
 1              THE COURT:  You may proceed.
```

2

```
 2              MR. TODD:  Good morning, Your Honor.
 3              A few housekeeping matters.  First,
 4   Your Honor, I mentioned yesterday there were some
 5   discovery that Chevron wanted to offer and we had to
 6   confer with the Government.  We have done that, and
 7   have agreed that all of the discovery documents that
 8   we tendered in Docket Number 223 may be admitted.
 9              THE COURT:  Very good.
10              MR. TODD:  Secondly, Your Honor, I
11   realized at the end of the day that there was two
12   exhibits I used with Dr. Rigby that I failed to move
13   into evidence.  That was CX109, CX110 and CX47.
14   Those are the maps that I overlaid.
15              THE COURT:  All right.  Any objections?
16              MS. KIMBALL:  No objections.
17              MR. TODD:  They're admitted, 109, 110, and
18   47, all CX.
19              (Exhibits admitted, CX109, CX110, CX47.)
20              MR. TODD:  Thirdly, Your Honor, we have
21   reviewed the case as it has gone on so far and based
22   on the evidence to this point, we see no need to
23   call Mr. Cryderman, who is the witness we were going
24   to call tomorrow --
25              THE COURT:  Okay.
0449
 1              MR. TODD:  -- the molybdenum fellow, so
 2   with that, Chevron needs only hold the evidence open
 3   for Dr. Haddad, and we hope to get a date when we
 4   can get him to Santa Fe and we will confer and come
 5   to you.
 6              THE COURT:  All right.  Very good.
 7              MR. TODD:  And the final point, the case
 8   management order provides for 40 days from the close
 9   of trial to submit post-trial briefs and findings
10   and conclusions.  Depending on when Dr. Haddad gets
11   cross-examined, we may need to play with that date,
12   but we can take that up later.
13              THE COURT:  Okay.  Thank you.
14              MR. TODD:  With that, we leave it to the
15   Government.
16              THE COURT:  Thank you.
17              Counsel, you may call your first witness.
18              MR. AUGUSTINI:  Good morning, Your Honor.
19              The United States calls Mary Sitton.
20              (Whereupon, the witness was sworn.)
21              THE DEPUTY CLERK:  Please be seated and
22   state and spell your name for the record.
23              THE WITNESS:  My name is Mary Sitton.  The
24   last name is spelled S-I-T-T-O-N.
25              MR. AUGUSTINI:  Good morning, Ms. Sitton.
0450
 1              Did you prepare a written direct testimony
```

3

```
 2    for the Court in this matter?
 3              THE WITNESS:  I did.
 4              MR. AUGUSTINI:  Do you have a correction
 5    to make before we offer it?
 6              THE WITNESS:  I do.  It is on Page 15,
 7    Paragraph 36.
 8              We referenced one of the piles in that
 9    paragraph as Sugar Shack and it should be Sulphur
10    Gulch South.
11              MR. AUGUSTINI:  Okay.  Any other
12    corrections?
13              THE WITNESS:  No.
14              MR. AUGUSTINI:  And with that, is your
15    testimony true and correct, to the best of your
16    knowledge?
17              THE WITNESS:  Yes.
18              MR. AUGUSTINI:  The United States offers
19    Ms. Sitton's direct testimony, Your Honor.
20              THE COURT:  Very good.  It will be
21    admitted.
22              (Ms. Mary Sitton's direct testimony was
23    prefiled and admitted.)
24              MS. CRISHAM PELLEGRINI:  Good morning,
25    Your Honor.
0451
 1                    CROSS-EXAMINATION
 2    BY MS. CRISHAM PELLEGRINI:
 3    Q.    Ms. Sitton, I only have two topics from
 4    your testimony to discuss with you this morning.
 5              We're going to start by talking about your
 6    experience.  Your experience and expertise is in
 7    aerial photographic research acquisition and
 8    analysis; is that correct?
 9    A.    Yes.
10    Q.    And you have never testified in court as
11    any other sort of expert?
12    A.    No.
13    Q.    You are not an expert in mining?
14    A.    No.
15    Q.    You are not an expert in environmental
16    engineering?
17    A.    No.
18    Q.    You are not a certified geologist?
19    A.    I have a background in geology.  I have a
20    Bachelor's degree in geology, but I am not a
21    certified geologist, no.
22    Q.    You are not an expert in soil science?
23    A.    I am familiar with soil science but I am
24    not an expert.
25    Q.    And you're not an expert in land patents?
0452
 1    A.    No.
```

4

```
 2      Q.    And you are not an expert in mining
 3 claims?
 4      A.    No.
 5      Q.    So in your testimony, Ms. Sitton, when you
 6 testified and talk about the record of decision from
 7 the EPA, you are not testifying regarding the
 8 scientific or the technical basis for the EPA
 9 recommendations and conclusions, correct?
10      A.    Well, I use those documents in
11 corroboration with my analysis of the aerial
12 photographs, so I am documenting what is in the
13 reports and I am using that in correspondence with
14 my analysis of the aerial photographs.
15      Q.    But you are not just -- sorry, just to
16 clarify, you're not testifying regarding the
17 technical basis for the EPA's conclusions?
18      A.    I don't doubt their technical basis, but
19 you know, I think it is an accurate document.
20      Q.    Then the next topic I want to discuss with
21 you deals with the tailings area.
22      A.    Uh-huh.
23      Q.    In your testimony, you discuss the western
24 tailings impoundment.
25      A.    I discussed both, but yes.
0453
 1      Q.    And you understand that Molycorp purchased
 2 the land for the western tailings impoundment from
 3 the Federal Government?
 4      A.    I do.
 5      Q.    And prior to that sale, Molycorp informed
 6 the Government that they plan to use the land for
 7 tailings, correct?
 8      A.    Yes.
 9      Q.    And prior to the sale, the Government
10 determined that that land that they were selling to
11 Molycorp would -- the highest and best use of that
12 land would be for tailings?
13      A.    I think that is what the document said.
14      Q.    Next to or near the tailings impoundments,
15 Molycorp held unpatented mill site claims, correct?
16      A.    Yes.
17      Q.    Those unpatented claims were known as
18 pending claims?
19      A.    Right.
20      Q.    Okay.  And you analyzed aerial photographs
21 of the tailings area, which included these
22 unpatented claims, from four separate years?
23      A.    Yes.
24      Q.    The first picture was from September 1965?
25      A.    Correct.
0454
 1      Q.    The next in time was October of '74?
```

5

```
 2       A.     Correct.
 3       Q.     And then the next in time was September of
 4  '81?
 5       A.     Correct.
 6       Q.     And then the final picture or photograph
 7  was from June 1990?
 8       A.     Yes.
 9       Q.     Now, in your review of the October '74,
10  photograph, you did not identify any tailings
11  located on those unpatented mill site claims,
12  correct?
13       A.     That is correct.
14       Q.     However, when you looked at the photograph
15  from 1981, you did note some tailings on those
16  unpatented claims, correct?
17       A.     There was a small amount of tailings in
18  Pinon 11, it was less than an acre.
19       Q.     And so, based on your review of the
20  photographs, you're not able to tell when exactly
21  Molycorp started putting tailings on those
22  unpatented mill site claims, correct?
23       A.     Well, there was only one and that was
24  Pinon 11, so it had to have occurred -- there is a
25  gap in the aerial photographs, from '74 to '81, so
0455
 1  it was there in '81.  It was less than an acre and
 2  it had to be sometime prior to that date of 1981.
 3       Q.     So in order to help us find out when those
 4  tailings were first placed there, I want to show you
 5  Chevron Exhibit 325, which is already in evidence.
 6            This document is Molycorp's 1977
 7  application to patent the Pinon claims.
 8            And Molycorp will show they divided the
 9  Pinon claims into two groups.
10            Are you aware of that?
11       A.     Yes.
12       Q.     So they have two separate -- in this
13  document, have two separate patent applications.
14            So if we turn to Page 3 of 10, of the
15  first patent application, would you agree with me,
16  Ms. Sitton, that the document states that in 1977,
17  as of 1977, the mill sites being named in this
18  application were presently being used to receive
19  tailings?
20       A.     That is what the document says, but that
21  is not what the aerial photographs show.  I think it
22  is a general thing about the whole entire area.
23            I didn't see tailings in all of the mill
24  site claims.
25       Q.     Okay.  Just to clarify, you didn't look at
0456
 1  a photograph from 1977, correct?
```

2      A.    No, but I had one from '81 and between '74
3  and '81, I wasn't seeing any tailings in any of the
4  Pinon claims except for that small part in Pinon 11.
5      Q.    Okay.  And actually, if we go back to the
6  front of this page, I just want to see if it covers
7  Pinon 11.
8            I think the first one does not.
9      A.    Does not.
10      Q.    Okay.  So according to the application for
11  these Pinon claims, Molycorp, in 1977, was presently
12  using these mill sites for tailings, according to
13  the document?
14      A.    That is what the document said, but that
15  is not what I saw in the aerial photographs.
16      Q.    And then, if we turn to Page 6 of the
17  application -- and this is the second application?
18      A.    Uh-huh.
19      Q.    And this also -- this one includes
20  Pinon 11?
21      A.    Correct.
22      Q.    Okay.  If we turn to Page 8 of 10.
23            And in this application, would you agree
24  with me that it states that these mill site claims
25  were also being used to receive tailings?
0457
1      A.    Again, that is what the document says.  I
2  think they are talking about the entire area, you
3  know, those -- the tailings were going into the two
4  ponds and the mill site claims were to support that
5  activity.
6            I didn't see tailings going into any of
7  the ponds except for Pinon 11, and a small amount.
8      Q.    And just to clarify, this application,
9  though, is not for the tailings impoundments,
10  correct, it is for just the mill sites?
11      A.    That is what it says, yeah.
12      Q.    Okay.  And now, if we look at what the
13  United States was saying about these mill site
14  claims, at the same time, I am going to show you
15  Chevron 331, which has also already been admitted
16  into evidence.
17      A.    Uh-huh.
18      Q.    And this is a 1979 Government Mineral
19  Report for those same Pinon mill site claims?
20      A.    Uh-huh.
21      Q.    Okay.  It has nothing to do with either
22  the western or eastern tailings impoundment?
23      A.    Uh-huh.
24      Q.    And was the document put together by the
25  Government?
0458
1            Is that correct?

7

```
 2       A.    Yes.
 3       Q.    Now, if we turn to Page 2 of the document,
 4  would you agree with me that according to the
 5  United States' Mineral Report of these Pinon claims,
 6  it states that the Pinon mill site claims are being
 7  used for waste disposal?
 8       A.    What paragraph is that?
 9       Q.    I could pull it out.
10             Paragraph 4, underneath "Background and
11  Land Status."
12             The paragraph that starts with, "Molycorp,
13  a subsidiary company of Union Oil," halfway through
14  that paragraph.
15             Starting, "The mill site claims are
16  presently being used for waste disposal from these
17  operations."
18       A.    That is what the document says, but that
19  is not what I was seeing on the aerial photographs.
20  And, you know, back then I don't know if waste
21  disposal was considered like CERCLA waste either,
22  so --
23       Q.    Okay.  So you would agree with me, though,
24  Ms. Sitton, that we now have -- there are two
25  documents saying that tailings were being placed on
0459
 1  the Pinon claim prior to 1981?
 2       A.    This document doesn't say tailings.  It
 3  says waste disposal.  It could be they are putting
 4  roads in, they could be putting ditches in, it could
 5  be anything.
 6       Q.    Anything that would be waste.  A road is
 7  not waste.
 8       A.    Right.  But that is what the document says
 9  but that is not what I saw in the aerial
10  photographs.
11       Q.    Sorry, I understand that.  I just want to
12  clarify that we have seen, there's at least
13  documents that states that waste is being placed on
14  these unpatented Pinon claims prior to 1981.
15       A.    Correct.  And it doesn't say which ones,
16  it doesn't say how -- I'm sorry.  It doesn't say how
17  much, doesn't say which ones and, you know -- and I
18  looked at the aerial photographs.  And when I looked
19  at them, I only saw tailings in Pinon 11.
20             MS. CRISHAM PELLEGRINI:  No further
21  questions, Your Honor.
22             THE COURT:  Thank you.
23             You may redirect.
24
25
0460
 1                    REDIRECT EXAMINATION
```

```
 2        BY MR. AUGUSTINI:
 3        Q.    Good morning, Ms. Sitton.
 4        A.    Good morning.
 5              MR. AUGUSTINI:  Mr. Hambrick, could you
 6   please pull up USX414.
 7        Q    (By Mr. Augustini) Do you recognize this
 8   signature, Ms. Sitton?
 9        A.    I do.
10        Q.    Did you prepare it?
11        A.    I did.
12        Q.    What does it reflect?
13        A.    That is an aerial photograph, dated
14   October 3, 1974, covering the tailing site in the
15   western portion of the mine site.
16        Q.    Did you locate the site boundary depicting
17   the tailings area with a redline?
18        A.    I did.
19        Q.    And where did you get that site boundary?
20        A.    That is URS boundary.  It came off of one
21   of their maps.
22        Q.    URS is Chevron's environmental contractor?
23        A.    Yes.
24        Q.    So you use the same boundary that Chevron
25   uses to depict its property ownership?
0461
 1        A.    Yes.
 2        Q.    Generally, can you indicate with a touch
 3   screen, what area has been discussed regarding the
 4   Pinon claims, where are the Pinon claims relative on
 5   this photo?
 6        A.    They are on the west side of the western
 7   tailings pond.
 8              There is actually a map overlay that goes
 9   on here.  This is general because the map is not up.
10   There is some over here and there is some up here
11   (indicating).
12        Q.    Okay.  So if I add to your annotations --
13   well, it is not a line, but generally the Pinon
14   claims are over there (indicating)?
15        A.    Yes.
16        Q.    And where are these tailings that
17   Chevron's counsel has been talking about, based on
18   the documents in the Pinon claims, as of '74?
19        A.    In '74, they are shown as the light-toned
20   material below Dam 1 in the eastern pond.  I mean
21   above Pond 1 and then above Dam 4 in the western
22   impoundment.
23        Q.    Those are the --
24              THE COURT:  So the white is --
25              THE WITNESS:  Yeah, those are the tailings
0462
 1   ponds.  And there is some, like, kind of a greenish
```

```
 2   liquid in the southern part of the western pond.
 3              THE COURT:  What is the white stuff there
 4   in the --
 5              THE WITNESS:  That is the tailings that
 6   have settled out in the pond.
 7              THE COURT:  Where?
 8              THE WITNESS:  The tailings, you know, they
 9   take the tailings from the mill site and they slough
10   it over into the ponds.  And when it gets in there,
11   it settles out as a light-toned settlement.
12              THE COURT:  And how does the white -- I am
13   talking about the white with the second purple arrow
14   there.
15              THE WITNESS:  Okay.  In the eastern pond
16   or the western pond?
17              THE COURT:  I don't know which pond it is.
18   I can't tell east from west here.
19              MR. AUGUSTINI:  Let's clear this,
20   Your Honor.
21              THE WITNESS:  Okay.  You know, I can show
22   where the pipeline enters the -- there is a pipeline
23   that enters the eastern impoundment from the mill
24   site to the west.  And I would have to blow this up,
25   but it comes into the east side right there
0463
 1   (indicating), and then it flows out into this pond.
 2   And then if this pond gets full --
 3              THE COURT:  So that white is a pond?
 4              THE WITNESS:  Right.  It is a tailings
 5   pond.
 6              THE COURT:  Okay.  I thought you said it
 7   was a tailings.
 8              THE WITNESS:  It is a tailings pond, so it
 9   receives sediment-laden liquid from the mine.
10              THE COURT:  Okay.  That clears it up if
11   that is a pond there.
12       Q    (By Mr. Augustini) Just to be super clear,
13   Ms. Sitton, is the white material essentially the
14   solids that settled down into the bottom of the
15   tailings impoundment?
16       A.    Yes.
17              MR. AUGUSTINI:  And where there is liquid,
18   Your Honor, in the western impoundment --
19       Q.    (By Mr. Augustini)  Are the tailings
20   visible because what you see is liquid, correct?
21       A.    Correct.
22              THE COURT:  But the tailings are the white
23   above that, is part of a pond, right?
24              THE WITNESS:  Correct.
25              THE COURT:  And that is showing the
0464
 1   tailings in it.
```

10

```
 2              THE WITNESS:  Right.
 3              THE COURT:  Okay.  Thank you.
 4      Q    (By Mr. Augustini) Right.
 5              And as of '74, it just so happens that the
 6  eastern impoundment is mostly dry; is that your
 7  interpretation of this photo?
 8      A.    Yeah, there may be some wet sediment in
 9  there because there is some light and some medium
10  tone, so some of that may be wet.
11      Q.    For example, the medium tone material is
12  darker gray?
13      A.    Correct.
14      Q.    And is it your testimony that maybe there
15  is some liquid in that area but not the full
16  impoundment, correct?
17      A.    Correct.
18              MR. AUGUSTINI:  Just to be clear,
19  Your Honor, we have talked about Section 35 and
20  Section 36.  I think I can see the section line.
21      A.    Right.
22      Q.    (By Mr. Augustini)  And there is a 36.
23  That is where I have marked the X.
24              Is that the eastern impoundment?
25      A.    Yes.
0465
 1      Q.    And then, obviously, the other side is the
 2  western impoundment that is at issue in the case,
 3  correct?
 4      A.    Correct.
 5              MR. AUGUSTINI:  Over here, if we can zoom
 6  in to the west, Mr. Hambrick, please.
 7              THE COURT:  Over where?
 8              MR. AUGUSTINI:  There we are.
 9      A.    That is Section 35, showing the western
10  tailings pond.
11      Q    (By Mr. Augustini) We have the red boundary
12  line for Chevron's property further to the west,
13  correct?
14      A.    Yes.
15              THE COURT:  Would you move your mic over a
16  little bit.
17      Q    (By Mr. Augustini) What have you annotated
18  along in this area?
19      A.    There is a ditch and a berm.
20      Q.    And those are to the west of the western
21  tailings impoundment, correct?
22      A.    Correct.
23      Q.    And then beyond that ditch, in the berm,
24  over here (indicating)?
25      A.    That is forest and trees, trees.
0466
 1      Q.    Are those the Pinon claims?
```

11

2        A.    Yes.
3        Q.    And where is the white tailings material
4    within those claims that Chevron is talking about?
5        A.    There are no tailings over there.  That is
6    all vegetated.
7        Q.    Now, you did mention, both in your report
8    and your direct testimony, that as of 1981,
9    September 1981, the next photo that you reviewed,
10   there is a tiny portion of tailings that just sneaks
11   into the easternmost part of Pinon 11, correct?
12       A.    Correct.
13       Q.    And that is the only one out of all the
14   Pinon claims where you saw any tailings at all,
15   correct?
16       A.    Correct.
17             MR. AUGUSTINI:  Mr. Hambrick, US417,
18   please.
19       Q    (By Mr. Augustini) Ms. Sitton, do you
20   recognize this figure?
21       A.    I do.
22       Q.    What is it, please?
23       A.    This is a September 20, 1981 aerial
24   photograph with my annotations on the photograph and
25   it has got the section numbers, it has got the
0467
1    tailings pipe leading into the eastern impoundment.
2             THE COURT:  And where is the pipe that you
3    talked about?
4             THE WITNESS:  Right there (indicating).
5             THE COURT:  Okay.  Thank you.
6             THE WITNESS:  Right there (indicating).
7        Q    (By Mr. Augustini) And again, just for
8    general reference, what we are talking about here is
9    the eastern impoundment.  That is not part of the
10   case, right?
11       A.    Correct.
12       Q.    And over here, again, we have the western
13   impoundment, right?
14       A.    Correct.
15       Q.    And just generally --
16             THE COURT:  Try to stay put.  Just move
17   that microphone over there.  There you go.
18             MR. AUGUSTINI:  Thank you, Your Honor.
19       Q    (By Mr. Augustini) Do you see liquid in
20   either of the impoundments as of September 1981?
21       A.    There is some liquid in both of those.  In
22   Section 36, it would be at the end of the pipe that
23   leads into it over here.  And then in the western
24   one, there is some liquid up here (indicating).
25       Q.    But they are basically dry as of this
0468
1    time, correct?

12

```
 2        A.    The majority of them are dry, yes.
 3        Q.    So what, then, is this liquid that is
 4   pooled up over here (indicating)?
 5        A.    That is a diversion channel to keep water
 6   from entering the ponds.
 7              THE COURT:  The what?  I'm sorry.
 8              THE WITNESS:  It is like a diversion
 9   channel and a decant channel.  So as water comes off
10   the mountain, they want to capture it there so that
11   it doesn't run into the ponds and then run out the
12   other side, fill up the ponds and overtop the dams.
13        Q     (By Mr. Augustini) Ms. Sitton, were you
14   here when Mr. Dewey testified regarding the purpose
15   of those perimeter channels?
16        A.    I was.
17        Q.    And is that consistent -- is your view
18   consistent with how he described the use of those
19   drainage ditches?
20        A.    It is.
21        Q.    And what is this redline that is hatched
22   down along there?
23        A.    That is a berm.  And again, that berm is
24   constructed to keep water.  The mountains to the
25   west are very steep and there's some drainages that
0469
 1   come down towards the ponds.  So that dike is
 2   keeping that water from entering those ponds.
 3        Q.    So I guess, in a general sense, you could
 4   say that a perimeter berm that blocks runoff from
 5   the mountains is related to the use of the
 6   impoundments.
 7              Is that what you were getting at earlier
 8   in your testimony this morning?
 9        A.    Yes.
10        Q.    Just as an example, I know you used 3D
11   viewing software to better appreciate the topography
12   of the area, correct?
13        A.    I do.
14        Q.    But you are familiar with the drainages
15   and can you confirm, essentially, that one of the
16   main drainages from the mountains comes through like
17   that?
18        A.    It does.
19        Q.    Is there another drainage that you can see
20   and just briefly point out for the Court's reference
21   to the north?
22        A.    To the north?  There is one coming down
23   through here.  There is a couple over here.
24   (Indicating).
25        Q.    And the whole idea is, you don't want your
0470
 1   impoundments to be swamped with natural runoff from
```

```
 2    the mountains, correct?
 3        A.    Correct.
 4        Q.    And if you had to pinpoint the less than
 5    1 acre that relates to Pinon 11, can you do that
 6    this morning?
 7        A.    I can.
 8              And to explain to the Court how I can do
 9    that, we put these Pinon claim maps into our
10    geographic information systems database and that way
11    we can overlay that map over the top of these
12    photographs.
13              So that was helpful because then I could
14    look at the map over the top of the photograph and I
15    could see where all the Pinon claims were and I
16    could -- I, you know, look at it in stereo and
17    identify what was in -- within those claims.
18              And in Pinon 11, the very southeast corner
19    of Pinon 11, I don't even know if I could get a
20    little dot in there -- it is right there.
21              It scoots into right there.  It is less
22    than an acre.  (Indicating).
23        Q.    And that dot is probably bigger than the
24    actual amount of tailing that you can see within the
25    claim, correct?
0471
 1        A.    Yes.
 2        Q.    And, again, do you recall Chevron was
 3    applying for ownership of the Pinon claims at the
 4    time, correct?
 5        A.    Correct.
 6        Q.    Do you remember the date of the patent
 7    issuance with respect to Pinon 11?
 8        A.    I think it was just prior to this, in
 9    April '81.
10        Q.    Okay.  So as of this moment, Chevron owns
11    even that less than 1-acre part that is covered by a
12    small amount of tailings, correct?
13        A.    Yes.
14        Q.    How long did Chevron continue operating
15    these impoundments after 1981?
16        A.    I think until they stopped mining in 2014.
17              MR. AUGUSTINI:  Mr. Hambrick, please
18    display CX331, Page 4.
19        Q     (By Mr. Augustini) Ms. Sitton, was this the
20    patent survey that Chevron's counsel discussed with
21    you earlier this morning?
22        A.    Yes.
23        Q.    And she pointed to some particular
24    language that generally described the use of the
25    Pinon claims, correct?
0472
 1        A.    Yes.
```

14

```
 2      Q.     And you mentioned that --
 3             MR. AUGUSTINI:  Well, let's look at the
 4      bottom of the page, blow that up under "Claim
 5      Development," please.
 6      Q     (By Mr. Augustini) When you look at what
 7      the use actually was as of this time in the late
 8      1970s, what does CX331 indicate, Ms. Sitton?
 9      A.     That they -- the initial development began
10      in 1976.  They constructed a retention dike, an
11      access road, fence, surface runoff, a decant
12      channel, around the periphery of the enlarged
13      tailings disposal area.
14      Q.     So would all of those things relate,
15      generally, to the use, specifically the disposal of
16      tailings that is occurring to the east impoundments?
17      A.     Yes.
18      Q.     Now, Ms. Sitton, do you know, based on
19      EPA's record of decision, approximately how much
20      area will need to be covered with clean soil and
21      revegetated with respect to the two tailings
22      impoundments?
23             MS. CRISHAM PELLEGRINI:  Objection,
24      Your Honor.  This goes to the environmental issues,
25      which goes to the environmental issue, which have
0473
 1      already been stipulated and it is also beyond the
 2      scope of the cross.
 3             THE COURT:  Sustained.
 4      Q     (By Mr. Augustini) Ms. Sitton, do you know
 5      approximately the size of the two impoundments,
 6      based on your review of the aerial photographs?
 7      A.     Over 700 acres, both of them.
 8             THE COURT:  700 acres of the tailing
 9      ponds?
10             THE WITNESS:  Both of them, yeah.  Uh-huh.
11             MR. AUGUSTINI:  No further questions,
12      Your Honor.
13             THE COURT:  Thank you very much.
14             You may step down.
15             (Whereupon, the witness was excused.)
16             THE COURT:  You may call your next
17      witness.
18             MR. HARRISON:  Your Honor, the Government
19      calls Dr. Fredric Quivik.
20             (Whereupon, the witness was sworn.)
21             THE DEPUTY CLERK:  Please be seated, and
22      state and spell your name for the record.
23             THE WITNESS:  My name is Fredric Lincoln
24      Quivik.  Last name spelled, Q-U-I-V as in vegetable,
25      I-K.
0474
 1             MR. HARRISON:  Good morning, Dr. Quivik.
```

15

```
 2              THE WITNESS:  Good morning.
 3              MR. HARRISON:  Did you submit written
 4   testimony in this case?
 5              THE WITNESS:  I did.
 6              MR. HARRISON:  Is that still your
 7   testimony today?
 8              THE WITNESS:  Yes.
 9              MR. HARRISON:  Do you have any changes to
10   that testimony?
11              THE WITNESS:  No, good.
12              MR. HARRISON:  Your Honor, I would like to
13   offer Dr. Quivik's testimony.
14              THE COURT:  Very good.  Accepted.
15              (Dr. Frederic Quivik's direct testimony
16   was prefiled and admitted.)
17                      CROSS-EXAMINATION
18      BY MR. TODD:
19      Q.   Good morning, Dr. Quivik.  Nice to see you
20   again.
21      A.   Good to see you.
22              MR. TODD:  Your Honor, before I start, I
23   would like to make one note.
24              We are very mindful of your exhortations
25   to move things along.
0475
 1              THE COURT:  You don't have to go very
 2   fast.
 3              MR. TODD:  In that spirit, we are mindful
 4   to move things along.
 5              This witness has submitted 99 pages of
 6   narrative testimony, without any breaks, even from
 7   questions, so this may take a little while.  But I
 8   do want you to know I was until midnight turning a
 9   100-page outline into a 49-page outline, so I am
10   trying.
11              THE COURT:  All right.
12              MR. TODD:  Thank you.
13      Q    (By Mr. Todd) Dr. Quivik, the Government
14   has tendered you as an expert in industrial history,
15   correct?
16      A.   Correct.
17      Q.   And you have testified in other cases as
18   an industrial historian, correct?
19      A.   Yes.
20      Q.   And you have never been qualified by a
21   Court to testify as an expert in anything other than
22   industrial history?
23      A.   Correct.
24      Q.   And all of the testimony that you are
25   offering in this case is as an industrial historian?
0476
 1      A.   Yes, an expert industrial historian.
```

```
 2      Q.    An expert industrial historian, thank you,
 3   sir.
 4            Now, this case involves Federal land use,
 5   mining laws and policy.  And you understand that.
 6            You are not a lawyer, sir, correct?
 7      A.    Correct.
 8      Q.    And you don't hold yourself out as an
 9   expert in Federal land management?
10      A.    Correct.
11      Q.    You have no prior expertise with mining
12   claims or anything like that, for example?
13      A.    Correct.
14      Q.    And you are not an expert in geology?
15      A.    Correct.
16      Q.    Or in mining or metallurgic or
17   construction engineering?
18      A.    Correct.
19      Q.    You are not here offering opinions as an
20   environmental scientist?
21      A.    Correct.
22      Q.    Nor as an expert in mineral processing?
23      A.    Correct.
24      Q.    Now, this case also, as we know from
25   testimony over the last two days, has to do with
0477
 1   mine finances, correct?
 2      A.    Correct.
 3      Q.    And as to that, you're not an economist?
 4      A.    That is right.
 5      Q.    And you are not an expert in mine finance?
 6      A.    That is right.
 7      Q.    And you have not analyzed the
 8   profitability of the Questa Mine?
 9      A.    Correct.
10      Q.    You have made no analysis of Molycorp's
11   ability to borrow funds or access capital markets at
12   any particular point in time?
13      A.    I have read the history of those things
14   but I have not performed an expert analysis of them.
15      Q.    And you have, likewise, made no analysis
16   of the capital resources available to Molycorp at
17   any particular point in time, including from other
18   mines or facilities that Molycorp may have owned?
19      A.    Again, I've read the history of those but
20   I've not conducted an analysis as a finance expert.
21      Q.    And you have undertaken no study of
22   molybdenum markets, molybdenum prices or molybdenum
23   sales at any particular point in time?
24      A.    Correct.
25      Q.    And specifically, you haven't analyzed
0478
 1   Molycorp's molybdenum sales?
```

```
 2       A.     Correct.
 3       Q.     And you performed no expert analysis?
 4       A.     Correct.
 5       Q.     Okay.  At the end of this case, we are all
 6  going to forget how to pronounce molybdenum.
 7              And lastly, Doctor, you have made no study
 8  of the economic effects or benefits of the Questa
 9  Mine and you're offering no such opinions here
10  today, correct?
11       A.     Correct.
12       Q.     Now, let's start off --
13       A.     I might add, if I may --
14       Q.     Sure.
15       A.     -- especially at the front end of that
16  list of professions in which I am not an expert, I
17  am an expert in the history of those kinds of
18  activities.
19              The legal environment that mining
20  companies operated in, mining engineering,
21  metallurgic engineering, but I don't hold myself out
22  as an attorney, for instance.
23       Q.     And you made that clear in your direct
24  testimony, and I appreciate that.
25              Now, in your direct testimony, you discuss
0479
 1  Federal land use law, and we've heard about some of
 2  that with Mr. Fredley.
 3              In your direct testimony, you opine that
 4  you see no evidence that the Federal Government
 5  assisted or contributed to the development of the
 6  Questa Mine; is that generally correct?
 7       A.     As a direct participant, yes.
 8       Q.     Now, in your testimony, you do discuss the
 9  Federal mining laws and, in particular, the Mining
10  Act of 1872, correct?
11       A.     Yes.
12       Q.     And that law allowed persons to enter
13  Federal land, stake claims, explore valuable
14  minerals, extract those minerals, sell them for a
15  profit, and if the statutory conditions are met,
16  convert that land to their own private ownership,
17  right?
18       A.     Correct.
19       Q.     Now, the U.S. laws are not compelled to
20  open mineral lands for Federal exploration in this
21  manner.
22              It chose to do that, right?
23       A.     That was a decision by Congress.
24       Q.     And since the mining law of 1872, Congress
25  has, from time to time, withdrawn some public lands
0480
 1  from the kind of mineral entry I just described,
```

```
 2   right?
 3        A.    Correct.
 4        Q.    It created National Parks, Yellowstone,
 5   Yosemite, right?
 6        A.    Yes.
 7        Q.    And it has closed and preserved wilderness
 8   areas?
 9        A.    Yes.
10        Q.    It included some right around the Questa
11   Mine, right?
12        A.    Yes.
13        Q.    And the Wilderness Act of 1964, as we have
14   discussed previously, gave holders of unpatented
15   mining claims a grace period of, I want to say it
16   was 20 years to make a discovery or forfeit their
17   claim, right?
18        A.    Yes.  Recognizing that had the Government
19   tried to nullify those claims immediately, that
20   would qualify as a taking.
21        Q.    So instead, it nullified them 20 years
22   later?
23        A.    Gave the mining companies or the holders
24   of those claims, a good faith time period to see
25   whether they actually were mineralized or not.
0481
 1        Q.    Now, despite being able to withdraw land
 2   or make them wilderness areas and such, Congress
 3   did, as we know from this case, open many Federal
 4   lands, including the land at Questa, for exploration
 5   and development for resources, such as molybdenum,
 6   correct?
 7        A.    Yes, metals generally.
 8        Q.    And in your view, Doctor, the
 9   United States allowed individuals and companies an
10   exclusive and practically unfettered right to
11   explore, develop and operate mines on Federal land.
12              That is your view, right?
13        A.    Yes.  As long as they obeyed State, Local
14   and Federal laws, yes.
15        Q.    Now, a mine claimant can extract and sell
16   minerals from an unpatented mining claim, which is
17   land still owned by the Federal Government, without
18   paying royalties to the Government, right?
19        A.    Correct.
20        Q.    And the United States erected this
21   structure purposefully to incentivize and encourage
22   the exploration and prompt development of mineral
23   resources on Federal land, right?
24        A.    Recognizing that the Government did not
25   want to be in the mining business itself and owning
0482
 1   the resources, which was the practice in most other
```

```
 2   countries.
 3        Q.    So that is a yes, right?
 4        A.    That is a yes, yes.  Decided to put this
 5   whole industry in private hands.
 6        Q.    And so through the procedures and
 7   protections, that we've discussed, established under
 8   the mining laws, the Government facilitated mining
 9   activity.
10        A.    In that it created a legal structure in
11   which private mining activity could take place, yes.
12        Q.    Which, in turn, facilitated that mining
13   activity.
14        A.    Yes, as I said.
15        Q.    And it did so in order to make resources
16   on Federal land available to the public for economic
17   development, correct?
18        A.    Yes, the economic development of the
19   nation.
20        Q.    And, in fact, it's been the policy, and
21   you just said this, in other words, it's been the
22   policy of the U.S. to encourage the development of
23   Federal mineral lands to put those lands and
24   minerals to use.
25        A.    I think a more accurate way of saying it
0483
 1   would be that it was the policy of the Government to
 2   put the mining industry in private hands.  And
 3   recognizing that the Government did not want to do
 4   all of the survey work to figure out where the
 5   mineral lands were, it would leave that task to
 6   private parties, as well, and make the public domain
 7   and, in time, National Forests available to private
 8   parties to discover minerals, and if they found
 9   minerals, to put those mineral lands in private
10   hands.
11        Q.    But you would agree it has been the policy
12   of the U.S. to encourage the development of Federal
13   mineral lands?
14        A.    To encourage a private mining industry.
15        Q.    And you would further agree, I think, that
16   historically it was the policy of the Government to
17   interfere as little as possible in the conduct of
18   miners, as they explored, developed and exploited
19   these mineral lands, right?
20        A.    Correct.
21        Q.    Now, these laws that we have discussed, as
22   a general matter, protected Molycorp and the Questa
23   site as it developed, right?
24        A.    Yes.
25        Q.    You are not aware of any substantial
0484
 1   mining work at the Questa site before the claim --
```

20

2  before the claims were located under the mining
3  laws?
4       A.    I am not.
5       Q.    And, in fact, you have never heard of
6  anyone developing a molybdenum mine without the
7  protections of the Federal mining laws?
8       A.    I have not, in the United States.
9       Q.    Now, you would agree, Doctor, I believe
10  that mining companies, such as Molycorp, are more
11  likely to invest in developing a site, such as
12  Questa, with the protections afforded by the Federal
13  mining laws, right?
14          More likely with them than without them.
15       A.    Yes, I understand from talking with people
16  in the mining industry that they generally like to
17  invest in mining enterprises in the United States
18  because the legal infrastructure here makes that
19  much less risky than in some other countries.
20          So I think the United States has worked at
21  trying to create that legal infrastructure, yes.
22       Q.    All right.  I think you are right.
23          And, in fact, would it be fair to say that
24  the mining laws were pivotal to Molycorp's
25  operations?
0485
1       A.    Well, Molycorp operated within the
2  United States, and the United States created that
3  legal structure.  And so it would be like saying the
4  traffic laws of my city are pivotal for my being
5  able to drive around the streets of the city.
6       Q.    Doctor, there can be a law on the books
7  that applies to a company but it is not really
8  pivotal it to that company's operation in an
9  existential way.  I want to push you on that a
10  little bit.
11          Would you agree that the mining laws were
12  pivotal in an existential way to the development of
13  the Questa Mine?
14       A.    In the sense that the whole legal
15  infrastructure of our country is pivotal to what we
16  all do, day in and day out, if we are a law-abiding
17  citizen.
18       Q.    That is a bit of a duck, Dr. Quivik.
19       A.    I am trying to get at, understand what you
20  mean by pivotal.
21       Q.    Let's put it a different way.
22       A.    I don't think it is in any way
23  extraordinary or distinctive.
24       Q.    Okay.
25          MR. TODD:  Could we pull up Paragraph 84
0486
1  of Dr. Quivik's direct testimony, please.

2      Q    (By Mr. Todd) Your sworn testimony in this
3  case, Doctor, is that Molycorp's unpatented mining
4  claims and mill sites, which of course were located
5  under the mining laws, right, were pivotal to its
6  operation, and Molycorp paid close attention to
7  locating and maintaining these claims.
8           You agree with that statement, right?
9      A.    Yes.
10     Q.    Okay.  Now, the mining laws of 1872 is the
11 only Federal statute that incentivizes mining,
12 right?
13     A.    There have been a variety of statutes that
14 have, in one way or another, addressed the mining
15 industry, yes.
16     Q.    You are familiar with the Defense
17 Production Act of 1950?
18     A.    Yes.
19     Q.    And Congress has, as we have heard
20 yesterday, enacted that at the outbreak of the
21 Korean War, shortly after World War II, to remediate
22 supply uncertainties that the nation suffered during
23 World War II, fair?
24     A.    Fair.
25     Q.    The Defense Production Act was intended to
0487
1  increase the supply and diversify the supply base
2  for various critical and strategic minerals, right?
3      A.    Yes.
4      Q.    So two things there, both increase the
5  amount of stuff and also diversify the supply base,
6  which are slightly different, right?
7      A.    Yes.  And in the program we are talking
8  about, indirectly, through fostering exploration.
9      Q.    Right.  And the Defense Production Act
10 created the Defense Minerals Exploration Agency,
11 DMEA, which in turn made loans to partially fund
12 mining activities, right?
13     A.    Yes.
14     Q.    Okay.
15     A.    No, to partially fund exploration
16 activities.
17     Q.    Exploration activities.  Thank you,
18 Doctor.
19          And now, DMEA loans -- obviously, we have
20 heard a lot of talk in the last two days about it,
21 DMEA loans.
22          You would agree, Doctor, they are not like
23 an ordinary bank loan, are they?
24     A.    No.
25     Q.    In fact, they are significantly more
0488
1  favorable to the borrower than the ordinary bank

```
 2   loan, right?
 3       A.   Yes.
 4       Q.   They were interest free?
 5       A.   Yes.
 6       Q.   They did not necessarily have to be
 7   repaid?
 8       A.   Correct.
 9       Q.   And even if a discovery was made, the
10   borrower did not -- if the borrower did not develop
11   the discovery within ten years, the loan didn't have
12   to be repaid, right?
13       A.   Correct.
14       Q.   In fact, a borrower had to repay the
15   principal only if a discovery was made and developed
16   within ten years and the borrower recovered and sold
17   some ore, in which case royalties would be paid from
18   the proceeds, right?
19       A.   Yes, from the property that was explored.
20       Q.   From the discovery.
21       A.   No, from the property that was explored.
22       Q.   Okay.  And the DMEA or Congress, when it
23   set up this program, and the DMEA, in turn, did not
24   insist on repayment at the point of discovery was
25   made, in order to avoid discouraging some potential
0489
 1   borrowers, right?
 2       A.   Yes.  I think mining companies would have
 3   been reluctant to enter in an agreement that
 4   requires them to start mining immediately because
 5   there are lots of factors that would determine
 6   whether they would want to actually embark on a
 7   mining project.
 8       Q.   Right.  They might make a discovery but
 9   not have the capital on hand to develop it
10   immediately.
11       A.   Or they might, but the market conditions
12   might not be what they would like to see.  They
13   might not have the technology in hand to do that.  A
14   number of factors.
15       Q.   Right.
16            Because, as we have discussed and, as I
17   know you know, whether something constitutes ore in
18   a technical sense depends on whether it is
19   commercially valuable.  And so it can change with
20   market fluctuation, right?
21       A.   Can be produced at a profit.
22       Q.   Okay.  And so DMEA structured its loans in
23   a way to make them more attractive to potential
24   borrowers?
25       A.   In the mining industry, I think that is
0490
 1   fair to say.
```

23

```
 2      Q.    Yeah.
 3            And given all this, this made a DMEA loan
 4   a much less risky proposition for the borrower than
 5   a bank loan would have been?
 6      A.    Yes.
 7      Q.    The risk of the loan, the possibility that
 8   it did not result in a discovery, that fell entirely
 9   on the United States, right?
10      A.    Yes.
11      Q.    And the Government offered these favorable
12   loans to incentivize mining companies to explore for
13   additional critical or strategic mineral resources,
14   right?
15      A.    Yes.
16      Q.    Now, as we have discussed, Molycorp
17   applied for and received a DMEA loan, which did, in
18   fact, result in the development -- in the discovery
19   and development of a mineral resource, right?
20      A.    Yes.
21      Q.    So in this instance, at least, the DMEA
22   achieved its purpose?
23      A.    I should say indirectly resulted in the
24   development of a mineral resource, but yes, there
25   was a chain of events that followed.
0491
 1      Q.    Okay.  Let's change and focus in a little
 2   more on mining claims, under the mining laws that we
 3   discussed a few minutes ago.
 4            The Government argues, and I am going to
 5   paraphrase here, tell me if I'm misunderstanding the
 6   case, but the Government asserts, basically, that
 7   once Molycorp located unpatented mining claims,
 8   which could include mill site claims, the Government
 9   was essentially powerless to exercise any authority
10   over those lands to inhibit or control or direct the
11   creation or placement of mining waste; is that a
12   fair assessment?
13      A.    That -- I don't want to speak for the
14   Government, but I think that characterizes my view,
15   and that is my view based on reading of the
16   understanding of mining companies in the period,
17   Federal officials in the period, Mr. Lindley, whom
18   we heard about in previous testimony, Mr. Fredley's
19   testimony, so, yes.
20      Q.    Since you're in the box, I will gladly
21   take your view and work with that.  Okay, sir?
22      A.    Okay.
23      Q.    Now, yesterday, with Mr. Fredley, we did
24   hear the term paramount proprietor used to describe
25   the Government's relationship with Federal lands.
0492
 1            You are familiar with that term?
```

24

```
 2        A.    Yes.
 3        Q.    And you don't disagree with -- putting
 4   aside any question of what specific powers the
 5   Government has, you don't disagree that at the end
 6   of the day the United States continues to own land
 7   on which there have been located unpatented mining
 8   claims?
 9        A.    Well, since we are talking about details
10   here, I think it would be more accurate to say that
11   the Government holds the title, but the mining or --
12   the mining claimholder owns virtually all of the
13   other rights, and those are property rights, and the
14   claimholder owns all of those rights.
15        Q.    Okay.
16        A.    The only thing left in the Government's
17   hands is the title.
18        Q.    So your testimony is that with respect to
19   land, on which there are unpatented mining claims,
20   the Federal Government continues to hold the title
21   to that land?
22        A.    Yes.
23        Q.    Okay.  Now, an unpatented mining claim
24   does not give fee simple-type ownership to a
25   claimholder, does it?
0493
 1        A.    Correct.  The Government holds the title.
 2   The claimholder owns virtually everything else.
 3        Q.    And an unpatented claimholder's rights are
 4   contingent on the performance of certain tasks,
 5   right?
 6        A.    If the claimholder wants to obtain a
 7   patent and eventually obtain title to that land,
 8   there is a series of steps that the law requires the
 9   claimholder to go to, to eventually get title, yes.
10        Q.    A claimholder has to pay an annual fee?
11        A.    No, the claimholder has to pay -- perform
12   what is called assessment work, spend $100 a year on
13   exploration and development of the claim.
14        Q.    You don't understand that there has ever
15   been a requirement that a claimholder pay an annual
16   fee?
17        A.    I don't recall that in the law, no.
18        Q.    Okay.  But as you have mentioned, a
19   claimholder does have to spend a certain amount of
20   money annually actively working and developing the
21   claim?
22        A.    Yes, and be able to document that.
23        Q.    Okay.  And if they don't actively work the
24   claim, the unpatented mining claim can be
25   invalidated, correct?
0494
 1        A.    Correct.
```

2      Q.    And in that instance, whatever rights the
3   claimholder holds, would revert back to the U.S.,
4   right?
5      A.    Yes.
6      Q.    And you understand, Doctor, that one of
7   the key aspects of the bundle of property rights
8   that every first-year law student learns about, is
9   the right to exclude others?
10            THE COURT:  Right to what?  I'm sorry.
11            MR. TODD:  The right to exclude others.
12      A.    Yes.
13      Q    (By Mr. Todd) A holder of an unpatented
14   mining claim does not have a general right to
15   exclude others from the land, do they?
16      A.    Are we talking about mining claims in the
17   public domain or mining claims in National Forest?
18      Q.    Well, if you think the answer is
19   different, I will take the answer for both.
20      A.    In the National Forests, there is a limit
21   to which a claimholder has rights to that parcel of
22   land.  It has rights only for the purposes of
23   exploring, developing and mining minerals.
24            And so if this is a National Forest and
25   there are trees growing on the mining claim, the
0495
1   claimholder can cut trees, if the claimholder is
2   going to use those trees in furthering its mining
3   operation, but it could not cut trees for commercial
4   purposes, for instance.
5      Q.    And in this case we are in a National
6   Forest, right?
7      A.    Yes.
8      Q.    So let's stick with that answer.
9            And so, no general right to exclude and no
10   unlimited use of surface forests, right?
11      A.    Can you repeat the question?
12      Q.    Let me break them out.
13            The question I had asked you originally
14   was whether the holder of an unpatented mining claim
15   has a general right to exclude others from that
16   claim.
17            And if I understand your answer correctly,
18   you said in a National Forest an unpatented mining
19   claimholder's rights to exclude is limited.
20            I think that is what you said.
21      A.    I am trying to think through that because
22   there are a lot of different ways of excluding.  For
23   instance, the holder of the claim can exclude other
24   people who might want to come on to the claim and
25   explore or develop a mine.  And --
0496
1      Q.    Because the holder -- sorry to

26

```
 2    interrupt -- the holder of the claim has an excusive
 3    use of that land for mining purposes?
 4         A.    Yes.
 5         Q.    Okay.
 6         A.    And if the exploration and development had
 7    reached the point at which the mining -- the miner
 8    had a lot of improvements on the site, I can
 9    imagine -- I haven't seen these details spelled out
10    anywhere, but I can imagine, for practical purposes,
11    that the miner could put a fence around that
12    property and exclude others, even if they weren't
13    intent on trying to be a claim jumper.
14         Q.    We discussed this at your deposition that
15    building a fence around a big open pit would be a
16    good safety idea, right?
17         A.    Yes.
18         Q.    And that is why I asked the question, as I
19    did, that there isn't a general right to exclude.
20    There may be some specific bases to exclude, such as
21    for mining purposes, but not a general right to
22    exclude.
23         Like no one can come up on this mining
24    claim at all.
25         A.    Well, it would be pretty much up to the
0497
 1    claimholder to decide that, I think.
 2         Q.    Okay.  And the other aspect of your
 3    answer, when I confused you with my long, rambling
 4    question, that you mentioned timber.
 5         And to draw that out, an unpatented mining
 6    claimholder can't harvest the surface timber and
 7    sell it commercially but they can use timber on the
 8    claim to support their mining, right, such as
 9    timbering a mineshaft?
10         A.    Yes.
11         Q.    But the United States can enter land where
12    there is an unpatented mining claim, harvest the
13    timber and sell it commercially, right?
14         A.    In a National Forest, yes.  That is what
15    the Forest Service was established to do, is to
16    manage those resources, the surface resources.
17         Q.    And the holder of an unpatented mining
18    claim can't operate a business other than a mine.
19    For example, cannot operate a livestock grazing
20    business or a saloon that is unrelated to the mining
21    activity, right?
22         A.    Correct.
23         Q.    But someone who owned that land in fee
24    simple could do these things as long as they are
25    consistent with State zoning law, right?
0498
 1         A.    Yes.
```

27

2       Q.     And you would agree, Doctor, I think, that
3   even mining activity on unpatented mining claims is
4   subject to reasonable regulation by the Federal
5   Government?
6       A.     If the Federal Government passes laws or
7   establishes regulations that regulate industry, then
8   I think a mining operation would qualify as the kind
9   of industry that is being regulated by the
10  Government.
11      Q.     Okay.  And that is fair, laws generally
12  apply to mining operations.
13             But you are familiar with the Organic Act
14  of 1897, are you not?
15      A.     Yes.
16      Q.     And that is the Act which created and
17  established what ultimately became the U.S. Forest
18  Service?
19      A.     Yes.
20      Q.     And the Organic Act provides that the
21  rights of persons to locate mining claims on forest
22  lands should not be unreasonably burdened, right?
23      A.     Correct.
24      Q.     And so the converse of that, as you agreed
25  with me at your deposition, is that mining claim
0499
1   activities on Federal lands -- sorry -- mining
2   activities on Federal lands may be reasonably
3   burdened?
4       A.     That would be the implication.
5       Q.     And the Forest Service has, in fact,
6   issued regulations regulating and restricting mining
7   activities on Federal forest lands, right?
8       A.     Over time, yes.
9              MR. TODD:  So let's look at U.S.
10  Exhibit 276, please.  Could we pull that up, Patty?
11      Q    (By Mr. Todd) Do you see the document on
12  the screen in front of you, sir?
13      A.     Yes.
14      Q.     Have you had a chance to review this
15  letter?  Do you recognize this document?
16      A.     I see the date and that it is addressed to
17  Molycorp, but I don't know who it is from and I have
18  not seen enough yet to know what this one is about.
19             MR. TODD:  Patty, let's go to the end of
20  the next page.
21      Q    (By Mr. Todd) Doctor, do you see the
22  letterhead at the top, it is from the Forest Service
23  and the Department of Agriculture?
24      A.     Yes, the local ranger station.
25      Q.     Which is right down the road from the
0500
1   mine.

28

```
 2      A.    Correct.
 3      Q.    It is dated January 12, 1973?
 4      A.    Right.
 5      Q.    Which was right in the middle or towards
 6 the end of the four years it took to consummate the
 7 land exchange?
 8      A.    Correct.
 9            MR. TODD:  And if we flip to the next
10 page, Patty, or the very end of the letter.
11      Q    (By Mr. Todd) We will see it is from John
12 S. Hart, District Forest Ranger.
13            Do you see that?
14      A.    Yes.
15      Q.    And Mr. Dewey spoke about knowing Mr. Hart
16 and the good relationship the mine had with him.
17            Do you recall that testimony?
18      A.    Yes.
19            MR. TODD:  Let's go back to the first
20 page.
21      Q    (By Mr. Todd) And, Doctor, I am perfectly
22 happy that, as you said, you have not reviewed this.
23 I am perfectly happy to let you read it, if you
24 would like.
25            If you just direct Patty, over here, she
0501
 1 can scroll it for you.
 2      A.    Okay.  You can scroll down a little bit
 3 more.
 4            You can continue.
 5            Okay.  Can we continue that sentence to
 6 the next page, please?  Okay.
 7            Okay.  All right.  Thank you.
 8      Q.    Thank you, Doctor.
 9            I don't usually have people read entire
10 documents on the stand but as you said, you have not
11 seen that before.
12      A.    I have seen this before.
13      Q.    Oh, okay.  I thought you said you hadn't.
14      A.    I just couldn't see by the title and
15 wanted to be reminded of what the whole letter was
16 about.
17      Q.    Fair.
18            Dr. Quivik, in this letter, you would
19 agree, that the Forest Service told Molycorp that
20 from then forward it would have to get a special use
21 permit from the Service anytime it wanted to cut an
22 access road or to drill on an unpatented mining
23 claim?
24      A.    Yes.
25      Q.    Okay.  And it references Federal
0502
 1 regulations that were adopted to institute that
```

```
 2    requirement?
 3         A.    Yes.
 4         Q.    Do you happen to know what legal authority
 5    the Forest Service cited for those regulations?
 6               It is not in the letter.  I was wondering
 7    if you knew.
 8         A.    Okay.  I don't.  I -- this is in the early
 9    '70s, right when a lot of environmental regulations
10    were beginning to be developed by various Federal
11    agencies, and so it is not at all surprising to see
12    that the Forest Service is going to take greater
13    interest in administering its surface resources.
14               And building access roads would be part of
15    that administrative mandate for the Forest Service,
16    under the Organic Act, of course, 1897, yeah.
17         Q.    Would it surprise you if that was the
18    authority the Forest Service cited?
19         A.    No.
20         Q.    And this letter sets out the process for
21    applying for a special use permit and whether or not
22    one would be approved?
23         A.    Yes.
24         Q.    And so under this regulation, the Forest
25    Service officials would be reviewing Molycorp's
0503
 1    proposed activities anytime it wanted to cut an
 2    access road or drill on one of its own unpatented
 3    mining claims?
 4         A.    Yes.
 5         Q.    And special use permits, as you know, can
 6    sometimes take months, if not years, to issue,
 7    right?
 8         A.    Yes.
 9               MR. TODD:  Your Honor, I move to admit
10    USX276.
11               THE COURT:  Any objections?
12               MR. HARRISON:  No objections.
13               (Exhibit admitted, USX276.)
14         Q.    (By Mr. Todd) The following year, the
15    Forest Service issued regulations, much more
16    expansive regulations, that required mines operating
17    in Federal forests to submit a plan of operations
18    for Forest Service approval, right?
19         A.    Yes.
20         Q.    And a plan of operations had to detail the
21    entire operation, including the steps it would take
22    for environmental protection, which would include
23    waste deposition, right?
24         A.    I don't recall waste deposition being
25    named in that statute.  I do know that it was for
0504
 1    purposes of allowing the Forest Service to assess
```

```
 2    how the mining activity would impact the resources
 3    that the Forest Service was administering, the
 4    surface resources.
 5              And it was very clear that the purpose was
 6    not to tell the mining companies how to conduct
 7    their mining activities.
 8    Q.     But part of a mining claim -- and we can
 9    pull up the regulation if we need to -- but it does
10    specifically require the mine to submit an
11    environmental plan, the steps they will take for
12    environmental protection?
13    A.     I believe that is the language, yes.
14              Focused on the surface environment that
15    the Forest Service was administering.
16    Q.     And in order to operate at all, a mine
17    needed to have a Forest Service approved plan or a
18    Forest Service approved dispensation from the
19    requirement to have a plan, right?
20    A.     Correct.
21    Q.     And as you know Federal agencies must
22    identify when they promulgated regulations, must
23    identify the statutory authority that empowers them
24    to issue those regulations, right?
25    A.     Yes.
0505
 1    Q.     And you know, Doctor, that for those 1974
 2    regulations, the one statute the Forest Service
 3    invoked was the Organic Act of 1897, right?
 4    A.     Yes.
 5    Q.     Now, let's shift gears and shift
 6    locations.  Let's go underground.
 7              There is a disagreement in this case,
 8    Dr. Quivik, about who was using what to explore for
 9    what way -- that was a mouthful.
10              But you understand there have been
11    competing views as to when Molycorp was using
12    diamond drilling and when it was exploring for
13    low-grade ore, right?
14    A.     I wouldn't have thought there was a
15    disagreement but if you point it out to me, we can
16    dig into it.
17    Q.     You sat in the courtroom, you haven't
18    heard witnesses and lawyers sparring over when
19    diamond drilling was used and when low-grade ore was
20    searched for?
21    A.     Yeah, I know what you are referring to.
22    Q.     Okay.  Now, let me start with some things
23    I think we will all agree on, and that is with the
24    original underground mine, just a few questions
25    around that.
0506
 1              There is no dispute, is there, that
```

31

```
 2    Molycorp used drifting and crosscutting, tunneling
 3    methods in the original underground mine to mine ore
 4    and to explore for ore?
 5         A.    That is correct.
 6         Q.    And we know that the original underground
 7    mine did not use diamond drilling to explore for
 8    ore?
 9         A.    Correct.
10         Q.    In fact, we know from an article that he
11    wrote in the 1930s, that Mr. J.B. Carman, the
12    manager of the mine, felt that diamond drilling was
13    an untrustworthy means of searching for high-grade
14    ore?
15         A.    Correct.
16         Q.    Then we come to the 1954 to 1956 period,
17    and this is the dispute that I referenced a few
18    minutes ago, the Government contends that Molycorp
19    was searching for low-grade ore, using diamond
20    drilling during that period, and they pointed to
21    some documents and Chevron's witnesses have taken
22    the position that Molycorp was not searching for
23    low-grade ore and was not using diamond drilling in
24    those years.  And we have pointed to some documents.
25              And you have seen all of them?
0507
 1         A.    Yes.
 2         Q.    You are the historian, and I am hoping
 3    that you can clear this up for us.
 4              Dr. Quivik, you agree, do you not, with
 5    Chevron's position that from 1954 to 1956 Molycorp
 6    was searching for more veins of high-grade ore and
 7    not for a large low-grade ore body, correct?
 8         A.    Correct.
 9         Q.    And you also agree that, during those
10    years, Molycorp was still using the same mining
11    techniques it had used in the original underground
12    mine drifts and crosscutting?
13         A.    Yes.
14         Q.    Dr. Rigby testified yesterday about how a
15    mining company searches for a low-grade ore body
16    drifting and crosscutting, drilling horizontally,
17    vertically and defining in three dimensions a large
18    block, right?
19         A.    That it can analyze based on samples taken
20    from throughout that three-dimensional block, yes.
21         Q.    Precisely.  You take the core samples from
22    the drills, you take the channel samples or the knot
23    samples from the tunnels, you assay them and then
24    you can track the increasing or decreasing
25    concentration of the mineral interest as it moves
0508
 1    throughout that block, right?
```

```
 2       A.    Yes.
 3       Q.    Okay.  And that then allows a mining
 4  company to, while it may not be perfect, but to
 5  understand, based on an estimate of the size of that
 6  block, they can estimate the size of the ore in that
 7  block?
 8       A.    Yes.  The volume of the ore, yeah.
 9       Q.    The volume of the ore.
10             And if the grade is sufficient, they can
11  determine, by grade, I mean how high the percentage
12  is of the mineral of interest.
13             And based on the market price, at the
14  time, as we discussed earlier, they can determine
15  whether there is commercially-viable ore right in
16  the formal technical sense of ore?
17       A.    Well, in the original exploration, they
18  wouldn't determine that definitively.  They would
19  have a vague understanding of that block, and it
20  might suggest that it merits more intensive
21  exploration but they wouldn't have determined
22  immediately that the whole block qualified as ore
23  because there is too much space between the various
24  drill holes.
25       Q.    That is a question of time and effort,
0509
 1  right?
 2             The process I just described might take
 3  place over a few months or over a space of years,
 4  and at a point in time, with enough crosscutting,
 5  drifting, tunneling or drilling, sampling and
 6  assaying, you can get to the point that you can get
 7  to the point of having reserves, right?
 8       A.    Yes.
 9       Q.    And by proving reserves, a mining company
10  will improve its access to investment capital or
11  bank lending?
12       A.    Correct.
13       Q.    Now, in your testimony, Doctor, you cited
14  the 1964 SEC filing that the Government has showed a
15  number of times, that is USX003?
16       A.    Yes.
17       Q.    Right.
18             Now that document wasn't in either of your
19  reports, right?
20       A.    I don't recall that it was, correct.
21       Q.    And you didn't mention that at your
22  deposition?
23       A.    Again, that is my recollection.  I hope
24  you're not setting me up for perjuring myself.
25       Q.    Absolutely not.
0510
 1       A.    Okay.
```

```
 2      Q.    I will represent to you that you discussed
 3   it for the first time in your report.
 4      A.    Thank you.
 5      Q.    The Government has cited that document for
 6   its contention, contrary to your testimony, that
 7   there was drilling and exploration at Questa in '54.
 8            You have heard that, right?
 9            MR. HARRISON:  Objection, Your Honor.
10   That misstates prior testimony.
11            THE COURT:  The record will speak for
12   itself.
13      Q    (By Mr. Todd) The Government has also
14   shown -- I will move on from that document.
15            The Government has also shown an article,
16   which is CX186, which is written by Mr. Robert
17   Carpenter in 1968.
18            Do you recall that?
19      A.    Yes.
20      Q.    Okay.  Would you agree with me that in
21   1956 Mr. Carpenter shared the view of Mr. Carman,
22   who I mentioned earlier, that the appropriate method
23   of exploration at Questa was drifting and
24   crosscutting, looking for high-grade ore as opposed
25   to looking for low-grade ore?
0511
 1      A.    He was certainly on board with the idea of
 2   looking for high-grade ore.  He also mentioned that
 3   there were indications of this low-grade material,
 4   so I don't recall that he actually stated it in an
 5   either/or kind of proposition but he was on board
 6   with the idea of looking for high-grade material.
 7      Q.    Now, Molycorp applied for a DMEA loan in
 8   December of 1956, correct?
 9      A.    Correct.
10      Q.    And in your 99 pages of narrative
11   uninterrupted written testimony, by my count you
12   devoted about five paragraphs to the period from
13   1957 to 1960.
14      A.    If that is your count, I will go with it.
15      Q.    It flew by.
16            MR. HARRISON:  Objection, Your Honor.  I'd
17   move to strike.
18            THE COURT:  State your objection.
19            MR. AUGUSTINI:  Your Honor, the commentary
20   is not necessary.
21            THE COURT:  Overruled.
22      Q    (By Mr. Todd) It is your view, is it not,
23   Doctor, that the United States Government, the DMEA
24   here, exercised no control whatsoever over the
25   DMEA-funded exploration process; is that right?
0512
 1      A.    In my understanding of the word,
```

34

2   "control," yes.
3       Q.    Okay.  I would like to talk through the
4   DMEA loan process generally, and we will do that
5   pretty quickly, and then we will talk about the
6   Molycorp loan specifically, okay?
7       A.    Okay.
8       Q.    The DMEA loan process began with the
9   submission of an application by the company seeking
10  to borrow money, right?
11      A.    Right.
12      Q.    In which they would describe the proposed
13  project?
14      A.    Yes.
15      Q.    These applications were then reviewed by
16  DMEA officials, which included mining engineers and
17  geologists, right?
18      A.    Correct.
19      Q.    Now, to clarify for His Honor, who may not
20  be as familiar with the DMEA as you are, yesterday
21  there was mention of various other Government
22  agencies.
23            Am I correct in understanding that the
24  DMEA had mining engineers and geologists who were
25  succumbered from, or double-hatted, from the Bureau
0513
1   of Mines and the U.S. Geological Survey?
2       A.    That is right.
3       Q.    Okay.
4             MR. TODD:  So that is why we were mixing
5   other agencies, Your Honor.
6       Q     (By Mr. Todd) So these applications,
7   Dr. Quivik, they were assessed on paper and
8   sometimes on the ground by a field team?
9       A.    Yes.
10      Q.    And a field team, if one was involved,
11  would assess the applicant's capabilities, the
12  terrain, the geology, and generally, the conditions
13  on the ground, right?
14      A.    Yes.
15      Q.    And if the Government was interested, the
16  parties would then negotiate a contract?
17      A.    Correct.
18      Q.    And the Government, in those contracts,
19  would specify the work at some level of detail in
20  order to ensure that the company used reasonable and
21  appropriate methods to conduct the exploration?
22      A.    The work was specified in the contract and
23  the work was also proposed by the applicant, so
24  there was this negotiation but the work was proposed
25  by the applicants and documented in the contract.
0514
1       Q.    And we saw that negotiation in this case,

35

```
 2   right?
 3       A.    Yes.
 4       Q.    And what the parties, both would have to
 5   agree it's the contract, right?
 6       A.    Correct.
 7       Q.    And the details would be written down, in
 8   some level of detail, and then that is what the
 9   Government was going to fund?
10       A.    And that is what Molycorp was going to do.
11       Q.    Precisely.
12             And we heard yesterday from Dr. Rigby and
13   I think from some other witnesses, that under the
14   DMEA program, Government engineers and geologists
15   would also supply substantial technical assistance
16   and advice, free of charge, to the operators.
17             You're familiar with that, right?
18       A.    Yes.
19       Q.    So a company borrowing money from the
20   DMEA, as we discussed earlier, could get a loan on
21   really good terms and free technical advice?
22       A.    Yes.
23       Q.    And DMEA contracts provided that at the
24   end of a project, if a discovery was made, the
25   Government could certify that discovery, right?
0515
 1       A.    Yes.  And it's important to remember that
 2   the certification was for the Government's use only.
 3   It was a public document, so a mining company could
 4   use it for its purposes but the reason the
 5   certification step is in there is for the
 6   Government's purposes.
 7       Q.    That is interesting.
 8             And we discussed earlier the obligation to
 9   repay a loan and that was triggered by a
10   certification?
11       A.    Could you repeat the question, please?
12       Q.    I nailed it.  Let me try it again.
13             Certification of a discovery, under the
14   contract, would trigger a borrower's obligation to
15   repay a loan through royalty payments, if there was
16   a development of a discovery?
17       A.    Yes, it was the first step in the
18   triggering a two-step triggering process.
19       Q.    And as we discussed earlier, royalties
20   would then be paid from the land?
21       A.    Yes.  From revenue generated by producing
22   from the land, yeah.
23       Q.    Thank you.  You are much more specific
24   than I am.  I appreciate that.
25             MR. TODD:  Your Honor, we are a few
0516
 1   minutes before 10:30.  If you want to take a break
```

```
 2    now, I have a natural stopping point.
 3              THE COURT:  We can take a break now.  It
 4    will be our morning break.  That will be about 15
 5    minutes, so that will be about 24 minutes before 11.
 6              MR. TODD:  Thank you, Your Honor.
 7              (A recess was taken.)
 8              THE COURT:  You may be seated.
 9              You may proceed.
10              MR. TODD:  Thank you, Your Honor.
11       Q.   (By Mr. Todd)  Dr. Quivik, Molycorp
12    applied for a DMEA loan in 1967.
13              MR. TODD:  Let's pull the application,
14    which is CX46.
15       Q    (By Mr. Todd) This document has been
16    displayed in court previously, but we haven't really
17    worked through it in a systematic way.
18              So for the Court's benefit, I would like
19    to do that with you.
20              You see here, is this the first page of
21    Molycorp's application?
22       A.   Yes.
23              MR. TODD:  If we go to the next page,
24    Patty.
25       Q    (By Mr. Todd) You see it was signed by
0517
 1    Mr. J.B. Carman, who you have mentioned this
 2    morning?
 3       A.   Yes.
 4       Q.   In the application --
 5              MR. TODD:  If we go to Page 6 of 15 in the
 6    PDF.
 7       Q    (By Mr. Todd) And let me direct you,
 8    Doctor, to the third paragraph down.
 9              And the last sentence there reads,
10    "Exhaustion of the ore bodies below the tunnel
11    stopped production."
12              Do you see that?
13       A.   Yes.
14       Q.   So Mr. Carman acknowledges, in the
15    application, that at this point production of ore
16    from the mine has ceased?
17       A.   Correct.
18       Q.   And he actually notes that not once but
19    twice.
20              MR. TODD:  Patty, can we call out the last
21    paragraph on that page?
22       Q    (By Mr. Todd) He says, "As stated, no
23    production is forthcoming from any part of the mine
24    and no ore reserves are considered available."
25              Do you see that?
0518
 1       A.   Yes.
```

37

```
 2      Q.    So as of the time of this application, no
 3  ore in the mine?
 4      A.    Correct.
 5      Q.    And to complete this paragraph, and this
 6  was flagged yesterday, he also represented to the
 7  Government that -- this is the last sentence here --
 8  "No other exploration work is, for the present,
 9  planned other than covered by this application."
10            Correct?
11      A.    Correct.
12      Q.    And this application refers to the
13  application being made to the DMEA for a loan,
14  right?
15      A.    Yes.
16      Q.    Dr. Rigby described yesterday, in his
17  testimony, that Molycorp, in its application,
18  proposed a program of drifting and crosscutting to
19  search for more high-grade veins.
20            You agree with that, right?
21      A.    Yes.
22      Q.    Molycorp didn't propose any diamond
23  drilling or any other kind of exploratory drilling
24  in its program?
25      A.    Correct.
0519
 1      Q.    And no form of systematic sampling?
 2      A.    Correct.
 3      Q.    I am going to paraphrase and skip a little
 4  bit here to move us along, but you would agree, I
 5  believe, and I think you acknowledged this in your
 6  testimony, that the Government did not simply accept
 7  Molycorp's proposal as written, right?
 8      A.    Correct.
 9      Q.    In fact --
10            MR. TODD:  Could we pull up CX48, please.
11  And let's go to Page 6 of 10.
12      Q    (By Mr. Todd) CX48, Doctor, is a
13  compilation of DMEA materials back and forth inside
14  the agency assessing the application.  And I know
15  you have seen this before.
16            MR. TODD:  Patty, let's call out the
17  second paragraph, first sentence.
18      Q    (By Mr. Todd) This is a memo from the field
19  team, Dr. Quivik, who wrote, "In reviewing the
20  application prior to the examination, it was
21  apparent that the company's exploration program of
22  approximately $450,000 was not based on known
23  geological data, and, therefore, was not warranted
24  in its entirety."
25            That was the DMEA field team's assessment
0520
 1  of Molycorp's proposal, right?
```

```
2        A.    Right.
3        Q.    And having objected to Molycorp's
4   proposal, the field team then went on to note that,
5   "There was data suggesting that there may be a large
6   and significant low-grade molybdenum body at
7   Questa."
8              Right?
9        A.    Correct.
10       Q.    And they suggested looking for that
11  instead?
12       A.    Correct.
13       Q.    And pursuant to that, it was the
14  Government that then suggested adding diamond
15  drilling and sampling to the exploration program,
16  right?
17       A.    That is right.
18       Q.    Now, the DMEA recognized at the time,
19  Dr. Quivik, did it not, that it was asking Molycorp
20  to undertake something that was entirely new and
21  different from what it had been doing before?
22       A.    Yes.  Not entirely new in the mining
23  industry but at that site, yes.
24       Q.    That's an entirely fair point.
25             MR. TODD:  Let's look at Chairman George's
0521
1   supplemental memo, dated December 27, 1957, and that
2   is CX, the same packet, Page 4.
3              Let's call out the last paragraph, please.
4        Q    (By Mr. Todd) And, again, this is a DMEA
5   official writing, and he notes, with the apologies
6   for reading a long paragraph, but follow along with
7   me, "It is suggested that the field examiners'
8   alternate program should be discussed with the
9   applicant during the examination.
10             "Judging from available information, the
11  milling facilities and probably the main addit would
12  not be able to handle large tonnages of ore,
13  therefore, the applicant may not want to participate
14  in an exploration program to search -- or project,
15  sorry, to search for large bodies of ore of lower
16  grade than have previously been mined because it
17  would require a considerable capital outlay to
18  expand the mine and surface plant to make the 0.5 to
19  0.75 percent MLS2 material commercially
20  exploitable."
21             That is consistent with what you disagree
22  with, right?  They were suggesting something
23  different at Molycorp, at Questa?
24       A.    Did I disagree with something?
25       Q.    Yeah, you agreed with me --
0522
1        A.    Oh, okay.  I thought I heard you say
```

```
 2   disagree.
 3           Yeah, this is a nice summary of this stage
 4   in the negotiation process.
 5       Q.    And a shift like this would also result in
 6   a significantly larger amount of waste rock than the
 7   operation that had been at the Questa site
 8   previously, right?
 9       A.    Well, if they were to have developed an
10   underground block cave mining, it would not have
11   been significantly more waste rock, but it would
12   have been a larger operation, to be sure, than they
13   had been undertaking.
14       Q.    You are distinguishing block cave from
15   open pit.  But let me talk to you on block cave.
16           A block cave mine, developing a large
17   low-grade ore body would certainly produce much more
18   in the way of mine tailings than the prior
19   underground pick and shovel operation at Questa,
20   right?
21       A.    That is correct.
22       Q.    And an open pit mine would result in a
23   significantly larger amount of both waste rock
24   overburden and tailings?
25       A.    Yes.
0523
 1       Q.    And that would have been known and obvious
 2   at the time to these DMEA officials, right?
 3       A.    Everyone in the mining industry.
 4       Q.    Now, we have heard testimony yesterday
 5   that Molycorp was resistant to the Government's
 6   proposal in 1957 that Molycorp search for low-grade
 7   ore.
 8           You don't disagree with that
 9   characterization, do you?
10       A.    No.
11       Q.    You have looked through the field team's
12   engineering and geological report, which recounts
13   the negotiations, right?
14       A.    Yes.
15       Q.    And as described in that report, Molycorp
16   and Mr. Carman, in particular, weren't fully in love
17   with the Government's proposal when it was first
18   made?
19       A.    That is right.
20       Q.    And the field team described, at least one
21   of the meetings, one of the negotiation meetings as
22   being a fiasco, right?
23       A.    Yes.
24       Q.    Ultimately, however, the Government and
25   Molycorp agreed to an exploration program that
0524
 1   combined some of Molycorp's desire to tunnel
```

40

```
 2    underground from its original proposal and the
 3    Government's desire to search in a particular area
 4    for low-grade ore using diamond drilling and
 5    sampling, right?
 6        A.    Yes, a sort of compromised work plan that
 7    both parties would agree to.
 8        Q.    Precisely.  A compromised plan, and as any
 9    new contract, neither side was completely happy,
10    meaning the negotiators did a good job, fair?
11        A.    Sounds good.
12        Q.    It was the field team that recommended
13    diamond drilling, right?
14        A.    Yes.
15        Q.    And the field team specified how the core
16    samples from those drills should be handled?
17        A.    Yes.
18        Q.    And they also recommended including
19    channel sampling, cutting a continuous strip along
20    the tunnel wall 3 inches wide and 1-inch deep,
21    right?
22        A.    Yes.
23        Q.    So the contract reflecting this
24    compromised program was executed in 1957?
25        A.    Yes.
0525
 1        Q.    May of '57.
 2              And the contract included this joint
 3    program that included drilling and sampling?
 4        A.    Yes.
 5        Q.    And the contract required Molycorp to
 6    perform all of the work expertly, in a workmen-like
 7    manner and in accordance with good mining standards,
 8    right?
 9        A.    Yes.
10        Q.    And the Government was entitled to inspect
11    the workings, right?
12        A.    Correct.
13        Q.    And they could inspect the workings to
14    make sure that the work was being performed in an
15    appropriate manner, right?
16        A.    Yes, particularly the work for which
17    Molycorp would seek the Government's 50 percent
18    share.
19        Q.    Precisely.
20        A.    Yeah.
21        Q.    Precisely.
22              And Molycorp had to keep books and records
23    that the Government could review?
24        A.    Yes.
25        Q.    And Molycorp was required to make monthly
0526
 1    reports detailing the work it had performed under
```

41

```
 2   the contract and including all of the sampling data,
 3   right?
 4        A.    Yes, if it wanted to be paid.
 5        Q.    Exactly.
 6              And these requirements allowed the U.S. to
 7   confirm that Molycorp was implementing the program
 8   according to its terms, right?
 9        A.    Correct.
10        Q.    So they knew whether to pay?
11        A.    Correct.
12        Q.    The work under the program, to be funded
13   under the program, is set forth in detail in an
14   Exhibit A to the contract, right?
15              You are familiar with that?
16        A.    Yes.
17        Q.    And that Exhibit A identified the
18   drifting, the crosscutting, the drilling, and the
19   sampling we have discussed?
20        A.    Yes.
21        Q.    It specified precisely how diamond drill
22   holes were to be drilled?
23        A.    Yes.
24        Q.    It specified the size of timbering in the
25   drifts and crosscuts?
0527
 1        A.    Yes.
 2        Q.    It specified that drill core samples
 3   should be separated into 10-foot sections?
 4        A.    Yes.
 5        Q.    It specified the size of the drill
 6   stations to be constructed underground?
 7        A.    Yes.
 8        Q.    Now a drill station is a cutout from a
 9   tunnel wall that leaves enough space to get the
10   drill in and extract the 10-foot core, right?
11        A.    Right.  Without interfering with traffic
12   along the drift.
13        Q.    Precisely.
14              And the contract also specified how
15   channel samples would be taken and how those samples
16   would be handled, assayed and preserved, correct?
17        A.    Yes.
18        Q.    And these things were all subject to
19   Government approval?
20        A.    To make sure that Molycorp was doing what
21   it said it would do in the contract, yes.
22        Q.    Okay.  Do you recall -- we can pull it up
23   if we need to -- but the contract provides, "the
24   location, direction, inclination, extent and method
25   of sampling the work under the contract are subject
0528
 1   to Government approval"?
```

42

```
 2      A.     Yes.
 3      Q.     And as you have noted a few times, under
 4 the contract the Government agreed to pay 50 percent
 5 of the work specified in the contract?
 6      A.     Yes.
 7      Q.     The Government had no obligation to pay
 8 for work not specified in the contract?
 9      A.     Correct.
10      Q.     Right.
11             And if the work deviated from the
12 contract, the Government could refuse to pay?
13      A.     Correct.
14      Q.     If the work was performed in a manner
15 unsatisfactory to the Government, the Government
16 could refuse to pay?
17      A.     Yes.
18      Q.     And if the Government --
19      A.     Under the terms of the contract.
20      Q.     Precisely, thank you.
21             And if the Government, in its sole
22 discretion, concluded that the program had failed to
23 achieve anticipated results and a discovery was not
24 likely, the Government could terminate the contract,
25 right?
0529
 1      A.     During the contract, yes.
 2      Q.     So the DMEA program wrapped up in June of
 3 1960.
 4             Does that sound right?
 5      A.     Yes.
 6      Q.     And at the conclusion of the program, and
 7 we have already seen these documents in court, both
 8 Molycorp and the DMEA submitted final reports
 9 documenting the discovery that had been made as part
10 of the program?
11      A.     Yes.
12      Q.     And the DMEA's final report, wouldn't you
13 agree, recognized that, "it did recognize that
14 considerable exploration will still have to be done
15 before completed evaluation of the molybdenum
16 reserves and potential for this property can be
17 made."
18             Right?
19      A.     Yes.
20      Q.     And that was your point earlier, in an
21 early stage of a project, you may not yet know
22 enough to say we have got ore?
23      A.     Right.
24      Q.     Okay.  Nonetheless, the DMEA's final
25 report, the technical experts did recommend that,
0530
 1 "Because of the significant tonnage of potential
```

2   molybdenum ore found as a result of the exploration
3   carried out under the contract, it is recommended
4   that the property be certified as a discovery"?
5       A.    Yes.
6       Q.    That is what they reported.  Okay.
7             And as we have discussed in court, in
8   January of 1961, the Federal Government did, in
9   fact, certify a discovery?
10      A.    Yes.
11      Q.    Okay.
12            MR. TODD:  Could we bring up CX113,
13  please.
14            I am not sure we have actually shown the
15  certification yet, Your Honor, but here it is.
16      Q    (By Mr. Todd) Dr. Quivik, this is the
17  Federal Government's certification of the discovery
18  at Questa.
19      A.    Yes.
20      Q.    Okay.  And you noted earlier that the
21  Government wants this certification for its own
22  internal purposes but you would also agree that
23  simple common sense suggests that with a
24  certification like this in hand, a mining company is
25  more likely to be able to borrow money than without
0531
1   such a thing, right?
2       A.    This would be a nice document to have when
3   approaching a bank or other finance.
4       Q.    With the certification in hand, Molycorp
5   did, in fact, borrow money for further exploration
6   and delineation of the ore body at Questa, right?
7       A.    Yes.
8       Q.    In fact, and I think you noted this in
9   your testimony, this ability to borrow was critical
10  because Molycorp heavily financed the program,
11  putting in very little of its own capital, right?
12      A.    That is right.
13      Q.    And Molycorp used the funds it borrowed to
14  delineate the ore body, right?
15      A.    Yes.
16      Q.    And you are not aware, Doctor, of any
17  document that indicates definitively that Molycorp
18  would have spent millions of dollars to delineate
19  the ore body if it had not already had the body of
20  knowledge developed during the DMEA program?
21      A.    I can't say that they would have, but I
22  should add that I take issue with the idea that they
23  would not have, and three of Chevron's witnesses
24  have made the point that they would not have but for
25  the DMEA program.
0532
1             And we have some testimony yesterday that

44

2  suggested the best place to drill for oil is in an
3  oilfield and mining companies knew that that was the
4  case.  If Molycorp didn't want to, other mining
5  companies could very well have been interested in
6  doing that.
7          And we have Dr. Rigby's testimony that
8  options available to Molycorp could have been
9  entering a joint venture or I believe he made one
10 other option that was possible, but for instance,
11 Molycorp could have sold the property to another
12 mining company.
13         So I think it is impossible to say
14 definitively that that discovery would not have been
15 made absent the DMEA loan.  As an historian, I can't
16 say that it likely would have but I think the
17 chances are pretty good, given mining history in the
18 United States.
19    Q.    As an industrial historian, you can't
20 testify definitively either way?
21    A.    I can say that testimony saying that they
22 definitely would not have, cannot be supported by
23 the evidence.
24    Q.    You can't say definitely would not have or
25 definitely would have?
0533
1     A.    I am not saying definitely would have, I
2  am saying definitely would not have.
3     Q.    As an industrial historian, you can't say
4  definitively either way?
5     A.    Right.  But I am suggesting that there is
6  a very good likelihood that it would have been
7  discovered.
8     Q.    You are speculating it might have been.
9     A.    Right, I am speculating.
10    Q.    Through its exploration, Molycorp then
11 moved from having indicated ore, which is the term
12 the DMEA used, to ultimately having reserves at
13 Questa?
14    A.    Yes.
15    Q.    And it then spent tens of millions of
16 dollars more to build the mill, the infrastructure
17 and developed the open pit for production, right?
18    A.    Yes, based on a sequence of events that
19 discovered material that was not at all exploratory
20 with the DMEA.
21    Q.    Right.
22          We're following the causal chain across
23 time?
24    A.    Yes.
25    Q.    Okay.  And you agree that -- you would
0534
1  agree that Molycorp would not have spent this

45

2    additional money without having confirmed reserves?
3        A.    Correct.
4              And it wouldn't have if it had decided to
5    ignore the discovery of low-grade ore bodies and
6    insisted on looking for high-grade material as well.
7    That was always an option for Molycorp.
8        Q.    Looking for more high-grade?
9        A.    Yeah, uh-huh.  If they were so intent on
10   that.  They could have ignored this discovery and,
11   you know, continued looking for high-grade.
12       Q.    Fair point.
13             But they didn't, and here we are.
14       A.    Yeah, correct.
15       Q.    Let me shift gears to the tailings
16   pipeline and the impoundment, and I have just a few
17   questions on this for you.
18             In your questioning, you talk about the
19   tailing pipeline, the special use permits and the
20   impoundments.
21             Obviously, the open pit began production,
22   Molycorp immediately, to dispose of the waste rock
23   and the tailings, right?
24       A.    Yes.
25       Q.    And Molycorp used an approximate 9.5 mile
0535
1    long pipeline to move tailings down to the
2    impoundments that we saw earlier in Ms. Sitton's
3    testimony?
4        A.    Right.
5        Q.    And the Forest Service, as you know,
6    issued Molycorp a special use permit to operate that
7    pipeline.
8        A.    To occupy that ground to operate it, yes,
9    sir.
10       Q.    Because about half the distance, about
11   half of that 9.5 miles was Forest Service land,
12   right?
13       A.    Right.
14             And the rest went across various other
15   kinds of land, including private land.
16       Q.    Precisely.
17             I think somewhere in the record there is a
18   picture of the pipeline going right past the ranger
19   station?
20       A.    Yeah.
21       Q.    There is pipeline and there is the ranger
22   station?
23       A.    Yeah.
24       Q.    So the ranger knew about the pipeline?
25       A.    Yeah.
0536
1        Q.    Okay.  And the Forest Service has

2   acknowledged that, in its sworn testimony that has
3   been admitted in evidence in this case, that issuing
4   these special use permits was a discretionary act of
5   the Government.  Forest Service personnel were not
6   required to grant them.
7         You don't agree with that testimony, do
8   you?
9         A.   No.
10        Q.   Okay.  And you would agree that without
11  this special use permit, Molycorp would not have
12  been able to run the pipeline across Federal land?
13        A.   Correct.
14        Q.   And without the pipeline, Molycorp would
15  not have been able to operate the mill?
16        A.   It needed a place to put tailings, so it
17  would have needed to convey tailings in some
18  direction or another with the pipeline, yes.
19        Q.   Without the mill the mine wouldn't
20  operate?
21        A.   Correct.
22        Q.   Molycorp purchased the land for the
23  western impoundments in --
24        A.   May I finish?  Just a closing remark.
25        Q.   I thought you were done.
0537
1         A.   The one thing that is missing is any
2   suggestion if it were a discretionary act on the
3   part of the Forest Service, on what basis the Forest
4   Service would have denied that special use permit.
5   And I have seen no suggestion of why the Forest
6   Service should have done so.
7         Q.   Well, the testimony from the Forest
8   Service is that this is a discretionary act that
9   could be granted or revoked in the discretion of the
10  Forest Service.
11        You wouldn't disagree with the Forest
12  Service sworn testimony, do you?
13        A.   No.  All I am saying is that I'd like to
14  see a reason why, if it is discretionary, they
15  should have other than arbitrarily denying it.
16        Q.   The --
17             THE COURT:  And they would never do
18  anything arbitrarily.
19             MR. TODD:  I would like to think so.
20             Mr. Fredley testified yesterday, Your
21  Honor, that Federal agencies always act in the
22  public interest.
23             THE COURT:  Not always.
24             MR. TODD:  I may not suggest that as a
25  finding of fact.
0538
1         Q    (By Mr. Todd) Molycorp, Dr. Quivik,

47

2      purchased the land for the western impoundment from
3      the United States in 1966?
4          A.    Correct.
5          Q.    And in deciding to sell the land to
6      Molycorp for use of a tailings pond, the
7      United States took into account the positive
8      economic benefits that the Questa Mine would have on
9      Northern New Mexico, right?
10         A.    That was one of the factors, you know,
11     checking off all of the factors they had to look at
12     to see whether such a sale was allowable under the
13     law for selling public land.
14         Q.    You have reviewed the appraisal report
15     that ultimately concludes, as we have heard this
16     morning, that the sale of the land to Molycorp for
17     use as a tailings pond was the highest and best use
18     of the land.
19               You have reviewed that document?
20         A.    Yes.  But I think people oftentimes think
21     industrial uses are higher uses than grazing, for
22     instance.
23         Q.    Okay.  And in that document -- I can pull
24     it up if we need to, but I am trying to move us
25     along -- the Government did note that expansion of
0539
1      the diamond mine would be a major economic benefit
2      to the area and noted that the land is great,
3      indeed, for a tailings pond, right?
4          A.    Correct.
5          Q.    And the appraisal noted that this area of
6      New Mexico has been generally economically depressed
7      for many years, right?
8          A.    Yes.
9          Q.    And it noted that Federal and state
10     officials are making a concerted effort to find
11     means of stimulating the economy, right?
12         A.    Yes.
13         Q.    The appraiser noted the number of
14     employees who may be hired, salaries that may be
15     paid and, you know, the general economic stimulus,
16     right?
17         A.    Yes.
18         Q.    As we noted, concluded that the sale was
19     the highest and best use of the land?
20         A.    Yes.
21         Q.    Okay.  Let's shift gears now to the land
22     exchange.
23         A.    Before we do, one other thing that I think
24     is worth noting is that in looking at the procedure
25     the BLM went through in selling that land, I see
0540
1      nothing to indicate that the BLM did anything

48

2    extraordinary because in addition to all the other
3    things, it would benefit the economy of Northern
4    New Mexico.
5            So that was not, as far as I can see, the
6    driving factor had that -- had this been a
7    prosperous area, there is every reason to believe
8    that the BLM would have made the sale anyhow.  It
9    met all the criteria.
10   Q.    Okay.  But be that as it may, everything
11   that I just went through is in that appraisal
12   report, right?
13   A.    That is correct.
14          MR. TODD:  And for the record, that is
15   Chevron Exhibit 158, Your Honor, which is already in
16   evidence.
17   Q.    (By Mr. Todd) Now let's talk about land
18   exchange, which, as Mr. Dewey testified, is why we
19   are here today.
20          In your testimony, Dr. Quivik, you state
21   that Molycorp owned all the land in which Molycorp
22   operated its first underground mine, its open pit
23   mine and its second mine, the block cave mine.
24          Is that your understanding?
25   A.    Yes.
0541
1    Q.    And you also testify that you have seen no
2    evidence that the United States imposed requirements
3    on where Molycorp is supposed to waste?
4    A.    Correct.
5    Q.    Now, you do understand that most of the
6    land on which the Questa Mine was developed was
7    originally owned by the United States?
8    A.    Yes.
9    Q.    And you do understand that, at different
10   times, Molycorp undertook exploration activities on
11   land that was still owned by the United States?
12   A.    Land over which Molycorp had mining
13   claims, so it was acting legally.
14   Q.    Okay.  Right.
15          But that is still land that is owned by
16   the U.S.  It has --
17   A.    U.S. has title but Molycorp owned the
18   claims to those, owned all of the other property
19   rights.
20   Q.    We can leave it to the Tenth Circuit,
21   Doctor, to determine whether having title over land
22   makes you an owner of that land --
23   A.    Right.
24   Q.    -- and I think they have already resolved
25   that issue, but you can maintain that distinction.
0542
1    A.    Right.

49

```
 2      Q.    You also understand that from time to time
 3   Molycorp engaged in mining activities, including
 4   drilling and tunneling on lands that were at the
 5   time still owned by the Federal Government or as you
 6   would like to say, to which the Federal Government
 7   still owned title?
 8      A.    Yes.
 9      Q.    And operated tailings pipelines across
10   Federal land?
11      A.    Yes, Forest Service land.
12      Q.    And disposed of waste rock on lands owned
13   by the Federal Government?
14      A.    Yes.
15      Q.    Now, on Monday His Honor asked --
16      A.    The Government owned title, yeah.  They
17   owned it, almost sounds like you are trying to
18   suggest that Molycorp was somehow breaking the
19   law --
20      Q.    No.
21      A.    -- putting rock on --
22      Q.    Not at all.
23            The question here is the implication of
24   the ownership.
25      A.    Uh-huh.
0543
 1      Q.    On Monday His Honor asked Mr. Dewey, when
 2   he was testifying, about the placement of waste rock
 3   on lands still owned by the United States.
 4      A.    Yes.
 5      Q.    And you would agree, would you not, that
 6   the fact is that most of the waste rock at Questa
 7   was placed on land when it was still owned by the
 8   Federal Government, right?
 9      A.    I have seen those analysis and I have not
10   conducted my own analysis.
11      Q.    Okay.
12      A.    So I am taking those analysis as accurate.
13   I will agree with them.
14      Q.    Okay.
15            MR. TODD:  Let's pull up Paragraph 52,
16   please, of Dr. Quivik's testimony.
17      Q    (By Mr. Todd) This is your sworn testimony
18   in this case, again, which I think answers His
19   Honor's questions.
20            "Most of the waste rock that Molycorp
21   generated and disposed of at the Questa site had
22   already been placed on the selected lands
23   (previously encumbered by Molycorp unpatented mining
24   claims), by the time the land exchange was completed
25   in 1974.  Molycorp's general manager at the time
0544
 1   testified that in 1974 the waste-rock piles had
```

```
 2    grown to approximately 80 percent of the size they
 3    would eventually reach."
 4              Did I read that correctly?
 5         A.   Yes.
 6         Q.   And that is your sworn testimony in this
 7    case?
 8         A.   Yes.
 9         Q.   And you would agree, would you not, sir,
10    that, with respect to the land from the Federal
11    Government, that ultimately hosted the mine, that
12    all came through patenting, sales and land
13    exchanges?
14         A.   Yes.
15         Q.   So let's talk -- let's focus in now on the
16    big land exchange.  There was more than one, but the
17    big one consummated in 1974.
18              You are familiar with that?
19         A.   Yes.
20         Q.   Okay.  And Molycorp -- well, as we heard
21    in prior testimony, the discussions around that
22    started in January of '69, right?
23         A.   Yes.
24         Q.   Okay.  But Molycorp submitted a formal
25    application for the --
0545
 1         A.   Excuse me, discussions around just
 2    narrowed on the land exchange, the possibility of
 3    land exchange.
 4         Q.   The possibility that excluded the
 5    possibility of land exchange?
 6         A.   Right.  The discussions for looking for
 7    ways to acquire rights to dump waste rock, as I
 8    recall, started in '68 with the inquiry about a
 9    special use permit.
10         Q.   That is good of you to recall that
11    testimony.
12              And then Mr. -- I forget if it was Mr. --
13    Dr. Rigby or Dr. Fredley noted that there may have
14    been some discussions earlier in time about land
15    exchange.
16              But in any event, we have seen there was
17    the January '69 meeting between Molycorp and the
18    Forest Service --
19         A.   Yes.
20         Q.   -- where we have some documentation of a
21    suggestion of a land exchange?
22         A.   Yes.
23         Q.   So thereabouts.
24              Molycorp submitted a formal application
25    for that exchange in November of '69?
0546
 1         A.   Right, correct.
```

2      Q.    And prior witnesses have described the
3  circumstances leading up to the land exchange and so
4  just as a general matter, could let us set up,
5  Molycorp had discovered a bit of weakness in the
6  west wall, required the removal of a lot more
7  overburden, increased stricken ratio, a lot more
8  waste rock to dispose of, hence, the need for a lot
9  more land?
10     A.    Right, yes.
11     Q.    And in your testimony, you note that
12  Molycorp alone -- and this is your testimony,
13  Molycorp alone made the decision to keep operating,
14  right?
15     A.    Yes.
16     Q.    Okay.  And you testified the Government
17  had nothing to do with that decision?
18     A.    Correct.
19     Q.    Okay.  Now, Molycorp was aware -- I'm
20  sorry.  The Government was aware of Molycorp's need
21  for additional land to dispose of this additional
22  waste rock, right?
23     A.    Yes.
24     Q.    And in all of those years, in those years,
25  you are not aware of any evidence that the
0547
1  Government recommended or told Molycorp you need to
2  cease operating, right?
3      A.    Correct.
4      Q.    Okay.  Instead, the United States
5  ultimately provided more land to Molycorp to place
6  that waste rock, right, through the land exchange?
7      A.    Offered one avenue for Molycorp to obtain
8  title, knowing that Molycorp could obtain title by
9  staking mill site claims.
10           So knowing that under the Mining Law
11  Molycorp could get that land and recognizing that
12  the mill site option was the one by which they would
13  be able to do it.
14           So they offered the land exchange option
15  as one that would be beneficial to both parties.
16     Q.    Right.
17           So to clarify, and this is in your direct
18  testimony, in the Government's view, Molycorp had a
19  right under the Mining Laws to stake mill site
20  claims and use those for waste-rock disposal, right?
21     A.    Yes.
22     Q.    And instead, the Government proposed the
23  land exchange?
24     A.    Yes.
25           MR. TODD:  Let's pull up, please, CX212.
0548
1  No, that is not it.  Let's try 211.  210.

```
 2              If I just kept going, I would have got
 3    there.
 4       Q    (By Mr. Todd) You have seen this document
 5    before, right, Dr. Quivik?
 6       A.   Yes.
 7       Q.   This is an attendee list from this January
 8    meeting and some notes by Jack Watson, Molycorp's
 9    lawyer?
10       A.   Yes.
11       Q.   And the list notes the attendees attending
12    for Molycorp were Messers. Greslin, Lansing, Watson,
13    Torgerson and Crimes, right?
14       A.   Yes.
15       Q.   And for the Forest Service, Mr. Taylor,
16    Mr. Ashby, Mr. Taylor and Mr. Parde?
17       A.   Correct.
18       Q.   Now, the Forest Service is the lowest
19    level of district; is that right?
20       A.   Yes.
21       Q.   The Federal District Ranger, Mr. Hart, he
22    is the local guy for Molycorp?
23       A.   Yes.
24       Q.   And then above that, above the district,
25    is a forest, right?
0549
 1       A.   A National Forest, yes.
 2       Q.   Here it is, the Carson National Forest?
 3       A.   Yeah.
 4       Q.   And then above the forests, the number of
 5    forest aggregated into a region right?
 6       A.   Correct.
 7            And here we are talking about Region 3,
 8    which is headquartered in Albuquerque, right?
 9       A.   Yes.
10       Q.   So this meeting wasn't taking place at the
11    local district or forest, it was down here in
12    Albuquerque at the regional level?
13       A.   Correct.
14       Q.   And Mr. Taylor, according to the Forest
15    Service, I don't know if you actually know this, was
16    responsible for the -- he was the branch chief
17    responsible for land management across Region 3?
18       A.   Yes.
19       Q.   Okay.  And Mr. Parde was the chief mineral
20    examiner for Region 3, is that right?
21       A.   I forget his title.  That may be true.  I
22    remember Harvey -- Harv Ashby as a mineral examiner,
23    but I don't recall Parde's title.  That may be
24    correct.
25       Q.   And do you know whether Mr. Cutler was an
0550
 1    Assistant Regional Forester?
```

```
 2        A.    I don't recall his title either.
 3              MR. TODD:  I think those titles are shown
 4   on CX211.
 5              Can we just pull that up.
 6              We can move on.  That is not
 7   consequential.
 8        Q    (By Mr. Todd) This meeting happening in
 9   Albuquerque, is it a significantly, relatively
10   senior level within the Forest Service, right?
11        A.    It looks like it, yeah.
12        Q.    And a meeting like this -- well, as we
13   discussed at your deposition, Molycorp would have
14   met with the region because they were facing a
15   serious challenge, right?
16        A.    Yes.
17        Q.    Disposing of a larger volume of waste
18   rock, whether or not they had a right to, would have
19   a significant impact on Forest Service land and
20   Molycorp was being mindful of the Forest Service's
21   reaction, would you agree?
22        A.    Yes, they had been working cooperatively
23   for decades.
24        Q.    And there is a lot in the record that
25   documents that good relationship; is that right?
0551
 1        A.    Yes.
 2        Q.    And it is nice to see that.
 3              And so Molycorp came to Albuquerque, the
 4   regional headquarters, to discuss possible ways of
 5   finding land to dispose of this larger volume of
 6   waste rock?
 7        A.    Yes.
 8        Q.    Now, a meeting at the region, and I don't
 9   know your experience, I worked for the Federal
10   Government for a little while, and maybe I am just
11   channeling my experience, the meeting with senior
12   Government officials don't just spring forth, they
13   take some planning, right?
14        A.    Yes.
15        Q.    Particularly when you have got, you know,
16   several people here, four, five people on both
17   sides, all relatively senior, right?
18        A.    Yes.
19        Q.    And advanced planning would probably
20   include subjects to be discussed and who would
21   attend, right?
22        A.    Yes.
23        Q.    Now, according to the Forest Service's
24   sworn testimony in this case, Mr. Taylor had no
25   responsibility for the Questa operation himself.
0552
 1              Do you know if that is true?
```

54

2        A.    I don't know that.
3        Q.    Do you have any basis to disagree with the
4    Forest Service's testimony?
5        A.    No.
6        Q.    The testimony suggests that he was
7    responsible for land exchanges.
8             Do you know -- do have any reason to doubt
9    that?
10       A.    No.
11       Q.    Okay.  And a former Forest Service
12   employee, who was deposed in this case, Mr. Roy
13   Grande, testified that Mr. Cutler handled all large
14   land exchanges.
15            Have you reviewed his deposition?
16       A.    I have.  I don't remember that he
17   specified Cutler but I will take your word for it.
18       Q.    You don't have any reason here and now to
19   disagree with that, do you?
20       A.    No.
21       Q.    So the Government --
22            MR. TODD:  Could we pull back up the 210?
23   Thanks.
24       Q    (By Mr. Todd) So looking at the bottom of
25   the list, they showed up with a team of folks who
0553
1    were ready to talk land exchanges.
2        A.    Yes.
3        Q.    Now, we know from Mr. Watson's notes at
4    the meeting, that Mr. Taylor, for the Forest
5    Service, suggested that the U.S. and Molycorp engage
6    in land exchange?
7        A.    Yes.
8        Q.    And Mr. Watson's notes record that
9    Molycorp agreed to prepare a description of the
10   lands that Molycorp wanted to receive and they would
11   provide that description to the Forest Service,
12   right?
13       A.    Yes.
14       Q.    And the Forest Service would then appraise
15   the land and make suggestions for the exchange?
16       A.    Yes.
17            MR. TODD:  Let's pull up 212, now, please.
18       Q    (By Mr. Todd) In February -- we saw this
19   document yesterday.
20            In February of -- February 20th of 1969,
21   Mr. Watson wrote to Mr. Taylor, following up on the
22   January 28th meeting -- and you have seen this
23   letter before, right?
24       A.    Yes.
25       Q.    And Mr. Watson identified land that
0554
1    Molycorp might want in an exchange?

55

```
 2       A.     Yes.
 3       Q.     And as per the meeting notes, he was
 4  providing a description so the Government could
 5  appraise the land, right?
 6       A.     Yes.
 7       Q.     And that is a requirement for an exchange,
 8  right, appraisals and value for value?
 9       A.     Yes.
10       Q.     And Mr. Watson also asked the Government
11  to confirm that it would identify parcels of private
12  land for Molycorp to buy land to trade to the
13  Government for the lands Molycorp wants, right?
14       A.     Yes.
15       Q.     Now, ultimately, as it turned out,
16  Molycorp suggested lands that it had an option on?
17       A.     Offered lands, yes.
18       Q.     Offered lands.  I always get offered and
19  selected confused, so I try really hard not to use
20  them.
21              And part of the process, the exchange
22  process, the Forest Service did a survey, the
23  offered and the selected lands?
24       A.     Yes.
25       Q.     I can use them both together.
0555
 1       A.     Excuse me?
 2       Q.     I can use both terms together.
 3              And the surveys confirmed that the land
 4  that were going to be given to Molycorp were
 5  non-mineral, right?
 6       A.     Yes.
 7       Q.     And the regional forester here, this would
 8  be Region 3 here in Albuquerque, found that the land
 9  exchange was in the public interest?
10       A.     Yes.
11       Q.     Okay.  Now, you would agree, would you
12  not, Dr. Quivik, that the United States benefited
13  from the land exchange?
14       A.     If it was in the public interest, then,
15  yes.
16       Q.     In exchange for the lands given to
17  Molycorp, the United States received two parcels of
18  land, right?
19       A.     Yes.
20       Q.     And those two parcels encroached on Forest
21  Service land, right?
22       A.     I have heard the term "in holding."  They
23  were surrounded by Forest Service land, and so they
24  were within the boundaries of the National Forest
25  but they were private land.
0556
 1       Q.     And when -- and this is a matter of,
```

56

```
 2  again, first year property law for a law student,
 3  but when a landowner holds land that is surrounded
 4  by Forest Service land, the Forest Service has to
 5  support that private land, right?
 6       A.    Yes.
 7       Q.    By allowing access and utilities and such,
 8  right?
 9       A.    That is my understanding.
10       Q.    So the Forest Service likes to close up
11  those gaps?
12       A.    Yes.
13       Q.    So that was a benefit here?
14       A.    Right.  And that was the purpose of the
15  1922 Land Exchange Act to do that sort of thing.
16       Q.    Great.
17             And the Government typically has an idea
18  whether it is a map in the office or whatever, but
19  they know where these parcels are and would like to
20  get them?
21       A.    Presumably.
22       Q.    The Forest Service also benefited from
23  transferring the selected lands to Molycorp, right?
24       A.    Well, it -- those were lands that the
25  Forest Service couldn't really manage because they
0557
 1  had been covered with mining activity and so, in
 2  exchange, the Forest Service got land that it could
 3  administer as national forestry.
 4       Q.    And when you say they have been covered by
 5  mining activity, they had been covered in some form
 6  by waste rock, right?
 7       A.    Yeah, by mining activity.
 8       Q.    The Government also benefited, I think you
 9  would agree, by alleviating itself of any need to
10  administer those acres?
11       A.    Yes.
12       Q.    And the Government officials avoided the
13  workload of having to process a bunch of individual
14  mill site claims?
15       A.    Correct.  As did -- as Molycorp.
16       Q.    Okay.  Now the Forest Service has
17  testified in this matter and submitted sworn
18  deposition testimony that it executed the land
19  exchange to transfer away lands that no longer
20  served Forest Service purposes.
21             Do you dispute that testimony?
22       A.    No.
23       Q.    Now, the purpose of the land exchange was
24  to provide land to Molycorp for use for waste-rock
25  disposal?
0558
 1       A.    To provide an alternative means for
```

```
 2   Molycorp acquiring title to that land.
 3        Q.    Okay.  So that is a, yes, I think?
 4        A.    It is a yes, but they didn't just walk up
 5   and say, Hey, we will give you some land so you can
 6   dump stuff on it.  They were already using it.  They
 7   had the rights to use it.  Could have gotten it as
 8   mill site claims.  So the Forest Service was
 9   offering an alternative means of getting title to
10   that.
11        Q.    Let me phrase it this way, then.
12              The Forest Service knew what Molycorp's
13   plan was for the land, right?
14        A.    Yes.
15        Q.    That they would dispose of waste rock on
16   it?
17        A.    Yes.
18        Q.    And specifically, we're talking, the land
19   exchange was a big area but we are specifically
20   talking the slopes on the north side of the Red
21   River Valley where the three large rock piles stand
22   today, correct?
23        A.    Yes.
24        Q.    As part of the land exchange, the Federal
25   Government, the Forest Service in particular,
0559
 1   undertook an environmental assessment weighing the
 2   pros and cons of the proposed exchange and
 3   ultimately recommended it, right?
 4        A.    Correct.
 5        MR. TODD:  Let's take a look at CX281.
 6   And again, we have seen this document before.
 7        Q    (By Mr. Todd) Dr. Quivik, you have reviewed
 8   this document, right?
 9        A.    Yes.
10        Q.    It's discussing a lot of things, right?
11        A.    Yes.
12        Q.    One of the things it discusses at some
13   length are the economic benefits that the Questa
14   Mine provided to Northern New Mexico, right?
15        A.    Yes.
16        Q.    The report discusses how economically
17   beneficial Molycorp had been up to that point for
18   the Town of Questa, right?
19        A.    Yes.
20        Q.    And for Northeast New Mexico, generally?
21        A.    Yes.
22        Q.    It noted that Molycorp was the largest
23   employer in Northern New Mexico?
24        A.    Yes.
25        Q.    It discusses the positive economic impacts
0560
 1   on Taos County, more generally?
```

58

```
 2        A.    Yes.
 3        Q.    It notes for the Town of Questa benefits
 4   such as a new school, incorporation of the town, a
 5   police department, a fire department, modernized
 6   homes, those kind of things, right?
 7        A.    Yes.
 8        Q.    It also notes that the mine is supplying a
 9   needed mineral resource for the nation?
10        A.    I don't recall those words, but I will
11   take your word for it.  I wouldn't be surprised.
12        Q.    Okay.  I can pull it up for you.  It is in
13   the record.
14        A.    Okay.
15        Q.    Now, we saw back in that January '69
16   meeting that the Forest Service has to appraise the
17   selected lands before providing them to Molycorp,
18   right?
19              MR. TODD:  Could we pull up, please,
20   CX259.
21        Q     (By Mr. Todd) Dr. Quivik, you recognize
22   this document as the appraisal of the exchange
23   lands?
24        A.    Yes.
25              MR. TODD:  Could we go to Page 3, please.
0561
 1              If you would just call out the numbered
 2   list at the top there.
 3              This is a list to, quote, "Summary and
 4   Facts and Conclusions."
 5              Do you see that?
 6        A.    Yes.
 7        Q.    Dr. Quivik, who does this document state
 8   is the owner of the selected lands?
 9        A.    Number one, the United States.
10        Q.    And what did the appraiser conclude was
11   the highest and best use of this land?
12        A.    Open pit mine dump.
13        Q.    And the appraiser recommended that this
14   land be provided to Molycorp for that purpose,
15   right?
16        A.    Yes.
17        Q.    Okay.  Thank you.
18              Okay.  Last topic.
19              In your testimony, Dr. Quivik, you tell
20   the Court that after the discovery of the geological
21   weakness in the west wall of the open pit, you see
22   no evidence that the United States approved
23   Molycorp's revised mining plan in 1969 and that
24   Molycorp alone decided to keep mining with an
25   increase in stripping ratio.
0562
 1              Do you recall that testimony?
```

```
 2       A.    Yes.
 3       Q.    Now, through the land exchange, as we have
 4  discussed, the U.S. provided land to Molycorp for
 5  the placement of waste rock, right?
 6       A.    Yes.
 7       Q.    And you agree that without a place to
 8  place the waste rock, the mine would have had to
 9  shut down, right?
10       A.    Yes.
11       Q.    Now, the land exchange, as I think you
12  have already intimated, was not Molycorp's preferred
13  approach in January of '69, right?
14       A.    Well, they were exploring mill site
15  claims.
16       Q.    Right.
17       A.    The Forest Service informed them that mill
18  site claims would be an option -- excuse me, a land
19  exchange would be an option to mill site claims.
20       Q.    That meeting in January of '69, Molycorp
21  proposed to locate mill sites crossing the road on
22  the river and to use them to construct a waste drop
23  dump across the valley, right?
24       A.    Yes, that is a separate issue, and the two
25  should not be conflated.
0563
 1       Q.    The land exchange and the mill site plan?
 2       A.    No, the land exchange and where to place
 3  the rock.
 4       Q.    I am not sure I follow you, but I am going
 5  to keep going.
 6             Okay.  But you don't --
 7       A.    Excuse me, how to acquire land to place
 8  waste-rock dumps and where to place the rock
 9  should -- those two should not be conflated.
10       Q.    That is fair, because you could get land
11  and not put rock on it.
12       A.    Right.
13             And there were a variety of places that
14  were potential for placing the rock, and one of
15  them, an idea that Molycorp floated, was to fill the
16  Red River Canyon with waste rock.  And a separate
17  issue was how was Molycorp going to gain title to
18  the land where it placed the waste rock.
19             So we have got lots of correspondence
20  about those possibilities but we have almost no
21  concrete record of what might have been entailed in
22  the idea, the concept of dumping waste rock in the
23  canyon.
24             And we don't really know how Molycorp
25  proposed to acquire land across -- across the river
0564
 1  from its mining operation.
```

60

```
 2      Q.    Okay.  Well, I suspect we are going to
 3 unpack all of that as we go through here.
 4           Let's start with mill site claims.
 5           A mill site claim is a type of claim that
 6 could be located under the Mining Law of 1872,
 7 right?
 8      A.    Yes.
 9      Q.    And it doesn't host mining itself, but
10 rather, it hosts activities that support mining on a
11 mining claim?
12      A.    Correct.
13      Q.    And those support activities could include
14 milling, roads, other support services, right?
15      A.    Yes.
16      Q.    And as you admitted forthrightly earlier,
17 it could include waste-rock storage, correct?
18      A.    Yes.  Or dumping.
19      Q.    Or dumping.
20           And a mill site claim can be patented in
21 the same manner as an unpatented mining claim can,
22 right?
23      A.    A similar procedure, a different set of
24 boxes that would have to be checked before a patent
25 can issue.
0565
 1      Q.    That is a very fair answer.
 2           What I meant was, an unpatented mill site
 3 claim can be patented and converted to prior -- to
 4 private ownership?
 5      A.    Yes.
 6      Q.    Right.
 7           Just as an unpatented mining claim can be
 8 patented and converted to private ownership?
 9      A.    Yes.
10      Q.    Now, the January 1969 meeting, in your
11 testimony you characterized this as, "Nothing more
12 than a preliminary conversation about an idea
13 Molycorp then chose not to pursue."
14           And you also call it, "a verbal exchange
15 of preliminary ideas."
16           That is your testimony?
17      A.    That is all we have a record of, is the
18 verbal exchange, yes.
19      Q.    Okay.  That is what there is a record of?
20      A.    Yes.
21      Q.    Okay.  Now, you don't actually know,
22 sitting here today, how detailed Molycorp's
23 presentation actually was, right?
24      A.    No.
25      Q.    You don't know whether Molycorp used any
0566
 1 documents in making its presentation?
```

```
 2        A.    No.
 3        Q.    You don't know what documents were
 4   prepared or in what level of detail, right?
 5        A.    That's correct.
 6        Q.    Okay.  You don't know how long the parties
 7   discussed the idea, right?
 8        A.    Right.
 9        Q.    You don't know how long the meeting
10   lasted?
11        A.    Correct.
12        Q.    And you don't know how vigorous the debate
13   was?
14        A.    Correct.
15        Q.    That is what we don't know --
16        A.    We don't even know if there was a debate.
17        Q.    Well, I think the meeting notes suggested
18   that there was some debate, but let's move on.
19              Let's review what we do know.
20              We do know that Molycorp, at least, made a
21   proposal to the Forest Service that it would locate
22   mill site claims, that came down the Red River
23   Valley and extended across the road in the bottom of
24   the valley, right?
25        A.    Across the road and across the river to
0567
 1   the south side of the river.
 2        Q.    To the other side?
 3        A.    Yes.
 4        Q.    Okay.  And we know that Molycorp proposed
 5   to use those lands for waste-rock disposal?
 6        A.    Yes.
 7        Q.    And we know that Molycorp proposed to
 8   protect the road and the river using culverts or
 9   tunnels, right?
10        A.    We know that from other documents, not
11   from those handwritten notes.
12        Q.    We know that from the Forest Service's
13   written account of the meeting prepared later,
14   right?
15        A.    Yes.
16        Q.    And we know that Molycorp proposed to
17   construct across these culverts using -- using waste
18   rock, a bridge that would provide access to the
19   other side of the valley, right?
20        A.    Yes.
21        Q.    And we know that the area under potential
22   consideration ran roughly from the location of the
23   mill site down to Columbine Canyon, right?
24        A.    Yes.
25        Q.    And as Dr. Rigby testified yesterday,
0568
 1   maybe it is the whole space, maybe it is less, just
```

 2    depending on what the ultimate plan was?
 3         A.    Yes.
 4         Q.    We know that Mr. Torgerson was Molycorp's
 5    chief engineer, right?
 6         A.    Yes.
 7         Q.    And we know that Mr. Torgerson would have
 8    been responsible for overseeing the locating of the
 9    mill site claims and the design and engineering of
10    the rock pile, right?
11         A.    Yes.  You know, engineers like him, at
12    different times, I am not sure who would have been
13    in charge, but he was up there, yes.
14         Q.    I can pull up your deposition testimony,
15    if you would like.  It is what we agreed at your
16    deposition.
17         A.    Yes.
18         Q.    Okay.  And we know from Mr. Dewey's
19    testimony that Mr. Torgerson prepared some drawings
20    or schematics, they unfortunately haven't survived
21    to this day, right?
22         A.    I heard that testimony.
23         Q.    Okay.  But, we did see yesterday, in fact,
24    the Government used a map of the potential mill site
25    claims, right?
0569
 1         A.    Yes.  They had -- but those were mill site
 2    claims only on the north side of the river.  So they
 3    didn't address the idea of filling the Red River
 4    Canyon with waste rock.  They were only for
 5    acquiring the land where the current -- basically
 6    where the current waste dumps sit.
 7         Q.    We can pull it up, if you would like.
 8               Those claims do extend across the road to
 9    the bottom of the valley, right?
10         A.    To the bottom but not across.
11         Q.    We will get there.  We will get to it in a
12    minute, I assure you.
13               You're not in a position to contradict
14    Mr. Dewey's recollections, are you?
15         A.    I wasn't there.
16         MR. TODD:  And well, let's pull up that
17    map, please, now.  It is CX216.
18               And let's go to the map, which I think is
19    the third page.
20               And, Patty, can you blow up maybe that
21    area right there?
22         Q.    (By Mr. Todd)  Dr. Quivik, do you see the
23    southern extent of the mill site claims?
24         A.    I do.
25         Q.    Do you see the R38?
0570
 1         A.    Yes.

63

```
 2      Q.    The mill site claims extend slightly past
 3  the R38, right?
 4      A.    Yes.
 5      Q.    The river is right next to the road,
 6  right?
 7      A.    Yes.
 8      Q.    I think they are not both shown clearly
 9  here.
10            MR. TODD:  We can put that down, thanks.
11      A.    Wait.  May I talk about it some?
12      Q  (By Mr. Todd)  Sure.
13      A.    This is a sketch map, a sketch drawing to
14  suggest a concept, an idea, and the amount of land
15  that is south of the highway is very small and could
16  accommodate a very small amount of waste rock had
17  they planned to dump it right there.
18            And so that drawing could as easily
19  reflect what it does so that the southeastern
20  border, I will call it, is -- doesn't cover up the
21  road so that everyone can see the road.
22      Q.    Your speculation, looking at this, is that
23  they drew the mill site claims past the road just so
24  we can see the road?
25      A.    Yes, so we can see where the road is and
0571
 1  not to obfuscate the road.
 2      Q.    This area of the land to the south of the
 3  road and the river that I have drawn, Forest Service
 4  land, right?
 5      A.    Yes.
 6      Q.    Not withdrawn from the mineral entry,
 7  right?
 8      A.    No.  In fact, there were mining claims
 9  staked there.
10      Q.    And Molycorp could have located mill site
11  claims, too, right?
12      A.    Could have, yes.
13      Q.    Now, we know back to the meeting we do
14  know that at the meeting Mr. Taylor said he would
15  not agree to locating a mill site claim that crossed
16  the road and the river, right?
17      A.    He said he would oppose the idea.
18      Q.    Okay.
19            MR. TODD:  Can we bring back up 210?
20      Q  (By Mr. Todd)  Handwritten notes, and I'm
21  going to read the second sentence here.
22            His handwriting is better than mine.
23            "Mr. Taylor advised that they would" --
24      A.    Excuse me.  This would not agree it is
25  another one that says would oppose, so --
0572
 1      Q.    Well -- and specifically what he is not
```

```
 2   agreeing is that -- to the proposed mill site claims
 3   extending across the road, right?
 4       A.    Right.
 5       Q.    The proposal was to have them go across
 6   the road, according to these notes, right?
 7       A.    Yes.
 8       Q.    And instead, as the notes reflect,
 9   Mr. Taylor suggested the land exchange?
10       A.    Yes.
11       Q.    Now, in your testimony, you assert that
12   after -- you testified, that after this meeting
13   Molycorp chose to move on with the land exchange and
14   not to pursue the valley fill plan, right?
15       A.    Yes.
16             MR. TODD:  Let's pull back up CX212,
17   please, which is Mr. Watson's letter to the Forest
18   Service following up on the meeting.
19             And in this letter -- let's highlight
20   Paragraph 2, please.  I'm sorry, Page 2,
21   Paragraph 2.
22       Q    (By Mr. Todd) Mr. Watson said, following
23   the meeting after the Forest Service has declared
24   its opposition to this plan, he write, "Should it be
25   determined that all or a portion of the claims are
0573
 1   nonmineral, then it is, of course, our contention
 2   that mill sites could be located upon it and that
 3   the use of the area for dumps is a legitimate mill
 4   site use."
 5             Do you see that?
 6       A.    Yes.
 7       Q.    So as of this letter, at least, Mr. Watson
 8   was still holding out hope for the valley fill plan,
 9   right?
10       A.    No, he was suggesting that if the land
11   exchange that -- this letter is basically saying, we
12   will start negotiating a land exchange but it is our
13   position that if the land exchange doesn't go
14   through, we still believe that we can acquire title
15   to the land using mill site claims.
16             There is no mention here of filling the
17   Red River Canyon with waste rock.
18       Q.    Well, what the first sentence says,
19   Dr. Quivik, "Should it be determined that all or a
20   portion of the claims are nonmineral."
21             Do you see that?
22       A.    Yes.
23       Q.    Doing an examination of the land was a
24   requirement for the land exchange, right?  And to
25   exchange, the lands had to be nonmineral, right?
0574
 1       A.    That is my understanding.
```

2        Q.     So the precondition here, that would be
3    something that would allow the land to go through,
4    right?
5        A.     It would have confirmed the condition of
6    the land exchange, but the lands were nonmineral.
7        Q.     He then states, "Molycorp's position that
8    they could use mill sites to establish these dumps,"
9    and you have already agreed several times that
10   Molycorp did have that right, under the law, right?
11       A.     Yes.
12       Q.     This letter, you would agree with me,
13   suggests that at this time the Forest Service was
14   articulating a different view.  That, in fact, they
15   could not use mill sites, quote/unquote, for waste
16   rock, right?
17       A.     I have seen that correspondence, that some
18   people in the Forest Service were questioning
19   whether waste dumps was the proper use of mill
20   sites.
21       Q.     Okay.  Let's go --
22              MR. TODD:  Can you get rid of that,
23   please.
24              Let's blow up the next paragraph, please.
25       Q    (By Mr. Todd) This is the next paragraph of
0575
1    the same letter.
2              And Mr. Watson writes, "As you know from
3    our conference" -- and I think that is a reference
4    to the January meeting, would you agree?
5        A.     I agree.
6        Q.     "As you know from our conference, Molycorp
7    originally contemplated locating mill sites in most
8    of this area.  Perhaps Mr. Parde hasn't been able to
9    verify that mill sites can be acquired for dumping
10   of waste materials."
11              Do you see that?
12       A.     Yes.
13       Q.     Does that suggest that Mr. Parde was
14   raising a question whether Molycorp could dispose of
15   waste rock on mill sites?
16       A.     Yes.
17       Q.     And Mr. Watson wants to know whether
18   Mr. Parde has come up with anything to support that
19   legal interpretation, right?
20       A.     Right.
21              MR. TODD:  Let's pull up CX216, which is
22   Assistant Regional Forester John Kone.
23       Q    (By Mr. Todd) He responds -- you are
24   familiar with this letter, right?
25       A.     Yes.
0576
1        Q.     April 18, 1969.

```
 2              MR. TODD:  Let's call up the last
 3   paragraph, place.  The bottom two lines.
 4        Q    (By Mr. Todd) And so the Assistant Regional
 5   Forester responds to Mr. Watson's inquiry and
 6   writes, "With regard to the propriety of mill site
 7   locations, our attorney has not yet been able to
 8   determine whether mill site claims can properly --
 9              MR. TODD:  The next page, please.
10        Q    (By Mr. Todd) -- been used for mine waste,
11   dumps."
12              Do you see that?
13        A.   Yes.
14        Q.   He also raises a question, which was
15   discussed yesterday, about the shape of the mill
16   site claims?
17        A.   Yes.
18        Q.   Okay.  And you saw that fan on the side of
19   the hill?
20        A.   Yes.
21        Q.   Mr. Fredley testified yesterday that
22   Federal law -- the Federal law that establishes mill
23   site claims dictates an acreage but not a shape.
24              You don't have any reason to disagree with
25   that, do you?
0577
 1        A.   No.
 2        Q.   In the last paragraph of this letter --
 3              MR. TODD:  Let's highlight that, please,
 4   and call it out, I should say.
 5        Q    (By Mr. Todd) Assistant Regional
 6   Forester Koen writes, "We recognize that sufficient
 7   land adjacent to the mine for waste dumps must be
 8   made available to Molycorp really by some means."
 9              Do you see that?
10        A.   Yes.
11        Q.   Okay.  So to the Forest Service views,
12   this as something they have to do?
13        A.   Yes.
14        Q.   It continues, "However, since there is an
15   area of about 2400 acres of National Forest land
16   involved, we believe it necessary to initiate a
17   friendly validity contest to determine if mill site
18   claims or mining claims can be located solely for
19   the purpose of mine waste disposal if Molycorp
20   intends to hold the land under the Mining Laws."
21              Did I read that correctly?
22        A.   Yes.
23        Q.   The reference to hold the land under the
24   Mining Laws, that means by mill sites, right?
25        A.   Yes.  He names mining claims and mill
0578
 1   sites but it's the mill site idea.
```

67

2      Q.    And the question that would be put to
3  issue in this, "friendly validity contest," is to
4  determine if mill site claims can be located solely
5  for the purpose of mine waste disposal.
6           Do you see that?
7      A.    Yes.
8      Q.    And you would agree that what the
9  Assistant Regional Forester is saying here is that
10 if Molycorp wants to proceed with its mill site
11 approach instead of the land exchange, then the
12 Forest Service would initiate a validity contest to
13 test whether that was appropriate?
14     A.    Yes.
15     Q.    Now, Mr. Watson wrote back to Mr. Koen a
16 few days later.
17           MR. TODD:  Let's pull up CX217.
18           Actually, we can take that down.
19     Q.    (By Mr. Todd)  Now, as you agreed with me
20 the first thing this morning, you are not familiar
21 with how validity contests are conducted, right?
22     A.    Not in great detail.  I have a broad
23 understanding but not in great detail.
24     Q.    And Mr. Fredley has testified that a
25 validity contest could last from five to up to even
0579
1  ten years.
2           Do you recall that?
3      A.    Yes.
4      Q.    You are not offering any opinion
5  contradicting Mr. Fredley's testimony regarding
6  validity contests, are you?
7      A.    No.  The only thing to point out is that
8  they had been operating with each other in good
9  faith and he uses the word friendly validity claim.
10 And so it could have been that he was suggesting,
11 let's just test this one question and not contest
12 it, but test it.
13     Q.    That's what he could have been suggesting?
14     A.    Could have been, yeah.  We don't know but
15 that is why he does say, "a friendly one."
16     Q.    He does use the word friendly?
17     A.    Yes.
18     Q.    But just to confirm, you're not in a
19 position to contradict Mr. Fredley's testimony
20 regarding the validity contest, are you?
21     A.    In general if two parties are contesting
22 each other, I am not in a position to contradict his
23 testimony.
24     Q.    Thank you.
25           Now in your testimony you state that
0580
1  Molycorp decided to apply to obtain title to the

```
 2   land through a land exchange with the Forest Service
 3   because that was cheaper and easier?
 4        A.    Yes.
 5        Q.    And in assessing the costs, Molycorp would
 6   have included financial costs such as surveyors and
 7   lawyers, right?
 8        A.    Yes.
 9        Q.    The cost of locating the claims?
10        A.    Yes.
11        Q.    And costs would also have included loss of
12   time or disruptions to operations, right?
13        A.    Well, I am not sure about disruptions of
14   operations because the operations were not disrupted
15   while they were waiting for the land exchange to go
16   through.  They knew they could continue operating as
17   they were and one way or another this acquisition of
18   title would happen whether it is through mill site
19   claims or the land exchange.
20        Q.    My question goes specifically to Molycorp
21   weighing whether or not to risk a validity contest.
22        A.    But you are assuming that it would be
23   contested not friendly, right?
24        Q.    Well, either way.
25        A.    Yeah.
0581
 1        Q.    Either way.  If Mr. Fredley is correct as
 2   Molycorp would have known, a validity contest could
 3   last a long time?
 4        A.    Yeah.  A land exchange could last a long
 5   time, right.
 6        Q.    It ended up lasting four years, right?
 7        A.    Yeah.
 8        Q.    November of '69 to January of '74?
 9        A.    Right, four years.  And Molycorp's
10   operations were not interrupted during that period.
11        Q.    They weren't because Molycorp didn't risk
12   the validity contest, right?
13        A.    No, no, I mean their mining operations
14   weren't interrupted even though it took four years.
15        Q.    I appreciate that.
16              In the land exchange process they were not
17   interrupted?
18        A.    Right.  A friendly validity contest might
19   have been completed in a shorter period of time.
20        Q.    And an unfriendly validity contest might
21   have taken up to ten years?
22        A.    No one is talking to an unfriendly
23   validity contest.
24        Q.    Have you ever heard someone use the term
25   friendly when they actually meant hostile?
0582
 1        A.    We are talking about people who work
```

69

```
 2   together and want to cooperate, the Forest Service
 3   and Molycorp, so this seems collegial to me.
 4        Q.    That is your opinion?
 5        A.    Yes.
 6        Q.    Okay.  Do you recall your deposition?
 7        A.    Excuse me?
 8        Q.    Do you recall your deposition?
 9        A.    Oh, yes.
10              MR. TODD:  Let's pull up Page 603, Line 3
11   through 11.
12        Q.    (By Mr. Todd)  Sir, were you asked the
13   following question and did you give the following
14   answers, I will start on Line 4.
15              "Would the cost of a validity contest to
16   Molycorp merely be financial or might Molycorp also
17   measure it in terms of time?"
18              ANSWER:  "Absolutely, those would be
19   costs."
20              QUESTION:  "What would the time -- how
21   will the time be a cost?  What would be the
22   relevance of time?"
23              ANSWER:  "That could delay the mining
24   operation," and you represented to me how long they
25   would last.
0583
 1              That was your sworn testimony, right?
 2        A.    Yes.  We were talking about whether this
 3   would actually be a friendly validity contest.
 4              I remember that you commented in the
 5   deposition that that could be a sarcastic remark,
 6   but we didn't have an opportunity to delve into it
 7   in this kind of depth at my deposition.
 8        Q.    You're not disputing Mr. Fredley's
 9   testimony that a validity contest could last five to
10   ten years?
11              MR. HARRISON:  Objection, asked and
12   answered.
13              MR. TODD:  It hasn't been answered very
14   clearly, Your Honor.  I'm not asking about this
15   case, I just want a straight answer as a general
16   matter whether a validity contest could last five to
17   ten years.
18        Q.    (By Mr. Todd)  Mr. Fredley so testified,
19   you are not contradicting him, right?
20        A.    I am not contradicting him.
21        Q.    Thank you.
22              Now, as you have noted several times in
23   your testimony and here this morning, Molycorp did,
24   in fact, have a right under the Mining Laws to
25   locate mill site claims and place waste rock on
0584
 1   them, right?
```

```
 2        A.     Yes.
 3        Q.     And that is different than what Mr. Koen
 4   told Mr. Watson and what the Forest Service told
 5   Molycorp in early 1969, right?
 6        A.     Yes.  I can't explain why he would have
 7   said that because I have seen earlier comments by
 8   Forest Service people expressing that understanding
 9   and as the land exchange was getting underway, again
10   Forest Service people were expressing their
11   understanding that Molycorp could get this land
12   through mill site claims.  So I can't explain why he
13   would have made that statement in 1969.
14        Q.     Thank you, sir.
15               MR. TODD:  Let's pull up CX281, which is
16   the environmental assessment.
17        Q.     (By Mr. Todd)  In the 1972 environmental
18   assessment, the Forest Service discussed
19   alternatives to the exchange, right?
20        A.     Yes.
21               MR. TODD:  And let's go to Page 7 of the
22   PDF.
23               There we go.  Thank you, Patty.
24        Q.     (By Mr. Todd)  One alternative listed on
25   the second, which is the second paragraph here,
0585
 1   would have been to prohibit the dumping of waste on
 2   Forest Service land entirely.
 3               Do you see that?
 4        A.     Yes.
 5        Q.     And the U.S. rejected that for the reason
 6   you have already identified, which is Molycorp could
 7   have used mill site claims to grab the land and
 8   place waste rock, right?
 9        A.     Yes.
10        Q.     The Government wrote, "The mining company
11   has every right to use mill sites for those disposal
12   areas," right?
13        A.     Yes.
14        Q.     And that is consistent with your
15   understanding?
16        A.     Yes.
17        Q.     The environmental assessment here also
18   describes Molycorp's valley fill proposal in some
19   detail, and you referenced this earlier.
20               MR. TODD:  So let's highlight the first
21   paragraph, please.
22        Q.     (By Mr. Todd)  And so this is Forest
23   Service's description of what Molycorp had proposed
24   in January of 1969.  And it reads:  "One of the
25   company's proposals is to dump the waste into the
0586
 1   Red River Canyon from a point just below the mine to
```

```
 2   the mouth of Columbine Canyon.  This plan would
 3   require a tunnel for rerouting State Route 38 and a
 4   diversion of the Red River.  This is the least
 5   expensive means of disposing of the overburden, but
 6   the impact on the environment and ecology of the Red
 7   River Canyon would be tremendous.  The proposal has
 8   been vigorously opposed by the Forest Service and
 9   ecologists groups.  Because of this opposition, the
10   Company has made other proposals."
11            Do you see that?
12       A.   Yes.
13       Q.   Now this assessment acknowledges that the
14   Forest Service had vigorously opposed the proposal
15   when it was made, right?
16       A.   Yes.
17       Q.   And that was back in '69.
18            The Forest Service also asserts here that
19   the plan was opposed by ecology groups.
20            Do you see that?
21       A.   Yes.
22       Q.   Now the Forest Service in its sworn
23   testimony has been unable to identify ecology,
24   ecologists or environmental groups that this
25   referred to.  You are not aware of who this refers
0587
 1   to either, right?
 2       A.   No.
 3       Q.   Lastly the Forest Service asserts that the
 4   impact on the environment and ecology would be
 5   tremendous.
 6            Do you see that?
 7       A.   Yes.
 8       Q.   Now, you know, you agree, that the Forest
 9   Service -- let me back up.
10            The Forest Service has acknowledged in its
11   sworn testimony that it never undertook any
12   environmental analysis of Molycorp's proposal.
13            Do you have any reason to dispute that
14   testimony?
15       A.   No, especially because they had nothing on
16   which to base an analysis.
17       Q.   And you're not aware of any such analysis?
18       A.   Right, correct.
19       Q.   And nor have you seen any Forest Service
20   or other Federal agency document that analyzed the
21   relative ease or relative cost or ease of
22   remediation of either the valley fill concept or
23   placing waste rock on just the north slope of the
24   Red River Valley, right?
25       A.   No, Molycorp to our knowledge did not
0588
 1   provide any of those kinds of detailed plans.  Did
```

72

```
 2   not submit a proposal and so the Forest Service
 3   could not have done that kind of analysis.
 4       Q.   Okay.  And that takes care of the valley
 5   fill plan, no analysis of that.  By question had two
 6   components.  You also have seen no study by the
 7   Forest Service of the cost of remediability of
 8   placing rock on just the north slopes of the Red
 9   River Valley instead of across the valley, right, no
10   comparative analysis?
11       A.   No, that wasn't an issue in this.
12       Q.   And as the environmental assessment here
13   documents in the last sentence, we have noted the
14   vigorous opposition by the Forest Service here and
15   these unidentified ecology groups, right?
16       A.   Yes.
17       Q.   And as the Forest Service writes here in
18   the last sentence, "Because of this option, the
19   Company has made the other proposals," right?
20           MR. TODD:  Your Honor, no further
21   questions.
22           THE COURT:  Thank you.  Can you redirect
23   in six minutes?
24           MR. HARRISON:  No, Your Honor.
25           THE COURT:  I think we will take our noon
0589
 1   recess until 1:30.  We'll be in recess.
 2           (A recess was taken.)
 3           THE COURT:  Good afternoon.  You may be
 4   seated.  You may redirect if you must.
 5           MR. HARRISON:  Thank you, Your Honor.
 6           THE COURT:  You are still under oath.
 7           THE WITNESS:  Yes, Your Honor.
 8               REDIRECT EXAMINATION
 9   BY MR. HARRISON:
10       Q.   Dr. Quivik, do you remember the questions
11   about your experience and qualifications as an
12   industrial historian?
13       A.   Yes.
14       Q.   And you acknowledge you're testifying here
15   as an industrial mining historian?
16       A.   Yes.
17       Q.   Can you explain the importance and role of
18   an industrial historian in a case like this?
19       A.   A case like this took place across, or the
20   facts that are being litigated in this case, a case
21   like this took place across many decades.
22           And it is important to have an historian
23   look at the evidence, look at the historical facts
24   and be able to put together a meaningful explanation
25   of how those facts unfolded, how, the basis on which
0590
 1   based on documentary evidence, various participants
```

2    in that history did what they did and especially in
3    cases like cases involving mining companies, to have
4    an historian who is knowledgeable about mining
5    engineering, about metallurgical engineering, about
6    the other facets of the environments that mining
7    companies operate in to be able to help explain that
8    history as it unfolded.
9            One other thing that is important is that
10   we all, as human beings, have a tendency to project
11   what we know on to people in the past, and it is
12   important for an historian to look at what those
13   actors were doing, knowing what they knew then and
14   not to project what we know now onto those past
15   actions.
16       Q.    Dr. Quivik, could you explain the
17   historical importance throughout the 20th Century of
18   the Lindley treatise that was talked about during
19   your cross-examination as it relates to the Federal
20   Government and also to mining companies?
21       A.    Yes.  The Lindley treatise was a treatise
22   describing the legalities of the Mining Law for
23   people who are acting in the United States in the
24   mining industry, both with regard to miners, mining
25   companies on the one hand and people including
0591
1    Government officials on another hand who might want
2    to know what are mining companies allowed to do
3    under the Mining Act.
4        Q.    And in your experience as an historian, is
5    it your opinion that the Lindley treatise was relied
6    on by mining companies and the United States?
7            MR. TODD:  Objection, leading.
8            THE COURT:  Overruled.
9        A.    Yes.  One of the examples I cite is a
10   Mining Engineers Handbook by a person named Robert
11   Peel, and it is one of the prominent texts in the
12   field with sections on lots of different facets of
13   mining, including engineering but also water rights
14   and finance and management.
15           And there is one section on the law and he
16   cites extensively from Lindley describing Lindley as
17   the main treatise so that miners can understand what
18   the level infrastructure is within which they are
19   operating with regard to mining claims and other
20   matters.
21       Q.    Historically speaking how did the Mining
22   Laws permit private parties to have the exclusive
23   right to possess and mine Federal lands?
24       A.    Well, normally one would think if someone
25   owns a piece of land one would have to get
0592
1    permission from the owner of that land to go onto

```
 2   the land and start exploring for minerals.
 3            And the Mining Act gave miners the right
 4   of entry on the land so they didn't have to notify
 5   the Government if they were entering the public
 6   domain to explore for minerals.  And it gave miners
 7   the right to occupancy.  So once they staked a
 8   claim, located a claim, filed it in a local office,
 9   clerk and recorders office in the county, they could
10   occupy it, meaning start digging, start building
11   improvements, all of those kinds of things and they
12   could do those things without having to notify the
13   Federal Government that they were doing those
14   things.
15            The only time necessarily that the
16   Government would learn that they had entered public
17   land had occupied public land is if the miner
18   discovered a mineral and wanted to move that
19   unpatented minor claim to a patent.
20       Q.    And so was patenting required to mine or
21   use the claims for mining purposes?
22       A.    No.  A miner could enter the land, occupy
23   the land and then if the miner found exploitable
24   minerals, could start mining, generating revenue,
25   all of which the miner could do without notifying
0593
 1   the Government and without owing the Government
 2   anything.
 3       Q.    As a practical matter, you heard and were
 4   asked questions about Mr. Lindley's term, the
 5   paramount proprietor, or the paramount owner.  That
 6   term is certainly used in Mr. Lindley's treatise,
 7   but as a practical matter could you discuss how
 8   Chevron or how a mining company would act on a
 9   property with respect to the possession of that
10   property vis-a-vis the United States?
11            MR. TODD:  Objection, Your Honor.  I guess
12   ambiguous and overbroad.  The witness is being asked
13   to describe how Chevron or every other mining
14   company would act on some unidentified property.
15            THE COURT:  Sustained.
16       Q    (By Mr. Harrison) In your experience as a
17   mining historian and in your review of the documents
18   in this case, could you describe for the Court the
19   efforts that Chevron, briefly describe the effort
20   that Chevron did at the Questa site to suggest it
21   had exclusive possession of the property?
22            THE COURT:  I don't understand the
23   question.
24       Q    (By Mr. Harrison) I will rephrase.
25            What did Chevron do once it had staked
0594
 1   mining and mill site claims on at the Questa site to
```

```
 2    suggest that it had authority over that land?
 3              MR. TODD:  Objection, ambiguous.
 4              THE COURT:  I'm sorry?
 5              MR. TODD:  I just objected again,
 6    Your Honor.  I think the question is still ambiguous
 7    and overbroad.
 8              THE COURT:  Yes.
 9        Q    (By Mr. Harrison) I will move on, then.
10              Dr. Quivik, as a mining historian are you
11    familiar with how mining companies respond to
12    possible changes in the Mining Laws and regulations?
13        A    I have seen those responses unfold
14    historically, yes.
15        Q    You were asked about the Northern
16    New Mexico economic policy.
17              Do you recall being asked about that?
18        A    Yes.
19        Q    In your review of the historical documents
20    in this case, is there anything to suggest to you
21    that the Government would have acted any differently
22    had that policy not been in place?
23        A    No.
24        Q    You were also asked about the exploration
25    of the Questa Mine in the 1950s.  In your review of
0595
 1    the historical documents in this case, was it
 2    apparent to Chevron in the 1950s that there was the
 3    potential of low-grade ore at the Questa site?
 4        A    They were aware that there was molybdenum
 5    all over the place and they were also aware from
 6    reports like Schilling's report and their own
 7    geologists' report, Carpenter's report that there
 8    was low-grade material in the area.
 9        Q    And so because you know the potential of
10    an ore body and in this case a low-grade ore body,
11    are the methods for extracting that ore obvious and
12    well-known?
13        A    Yes.
14        Q    And in this case what were those methods?
15        A    Well, as we have heard throughout the
16    trial, in the first phase of mining at the Questa
17    Mine, Molycorp was using selective underground
18    mining, driving drifts and crosscuts and opening
19    slopes and extracting ore and that was extracting
20    high-grade ore that it could do at a profit.
21              With the low-grade material there would
22    have been two options available to Molycorp that
23    would have, it would have known about in the mining
24    industry, one is block cave mining and we have heard
25    that described and the other is open pit mining and
0596
 1    we have heard that described.
```

```
 2       Q.    Was diamond drilling prevalent in the
 3  mining industry in the 1950s?
 4       A.    Yes.
 5       Q.    In your review of the documents in this
 6  case, what is your opinion about the availability of
 7  funds that Chevron had in the 1950s prior to the
 8  DMEA loan?
 9       A.    Well, I have seen the documents that show
10  that Molycorp raised funds through sales of stock
11  and through bank loans.
12       Q.    You were also asked questions about DMEA
13  generally, and do you recall those questions?
14       A.    Yes.
15       Q.    What is your understanding of DMEA's
16  programs support for molybdenum exploration as
17  compared to the DMEA program support for other
18  minerals exploration?
19       A.    There were three categories of metals for
20  which the DMEA would make loans for exploration.
21  Two of those metals, uranium and cobalt, were of
22  such a status that the DMEA would make a loan of
23  90 percent of the exploration costs to the mining
24  company.
25             There were a couple of other metals
0597
 1  tungsten and manganese for which DMEA would make a
 2  loan of 75 percent of the cost and then, as we have
 3  heard throughout this testimony, DMEA would make
 4  loans of 50 percent for molybdenum and that is in
 5  the same category as lead, zinc, copper and other
 6  metals.
 7       Q.    Are you aware of any other mines at the
 8  time that used DMEA funding?
 9       A.    Yes.
10       Q.    Are you aware of any mines at the time
11  that did not use DMEA funding?
12       A.    Yes.
13       Q.    And did any of those mines include
14  uranium?
15       A.    Yes.
16       Q.    Could you briefly explain that for the
17  Court?
18       A.    Yes.  I testified, Your Honor, in U.S. v.
19  Newmont, which is the midnight Superfund midnight
20  mine, Superfund case in the state of Washington.
21  And that was a uranium mine, and it was discovered
22  and explored during the 1950s, during this DMEA
23  period and the developers chose to explore and
24  develop that mine without DMEA assistance.
25       Q.    You were also asked about the control that
0598
 1  the DMEA had over Chevron during the DMEA contract.
```

77

```
 2              Do you recall being asked about that?
 3      A.    Yes.
 4      Q.    In terms of control, what is your opinion
 5 as to DMEA's control over Chevron?
 6      A.    Well, the agency was able to use its
 7 influence during the negotiation period to negotiate
 8 a contract with Molycorp that addressed some of the
 9 exploration objectives that DMEA thought would be
10 more reasonable than what Molycorp wanted to do and
11 also to convince Molycorp to use exploration methods
12 that the DMEA thought would be more effective at
13 this particular site.
14              And during that whole negotiation process,
15 Molycorp was free to walk away from the
16 negotiations, refuse to compromise and not get a
17 loan, but Molycorp decided to compromise and enter
18 that contract.
19      Q.    And after entering into the DMEA contract
20 did Chevron do exploration work on its own?
21      A.    Yes.
22      Q.    And any work that was deemed to be not
23 covered by DMEA, could Chevron do that exploration
24 work on its own as well?
25      A.    Yes, and it did.  It conducted, it drove
0599
 1 about as much in terms of drifts and crosscuts on
 2 its own account with its own funds as it did under
 3 the DMEA program.  And it did not need permission
 4 from the Government or from the agency, to do that
 5 additional exploration work on its own.
 6      Q.    When did the Government determine that
 7 molybdenum was no longer a defense necessity?
 8      A.    About two months after the contract was
 9 signed.
10      Q.    On cross-examination you were shown
11 Chevron's DMEA application and also was called out
12 to the statement that, "no known reserves and no
13 other exploration work was planned."
14              Do you recall seeing that?
15      A.    Yes.
16      Q.    In your review of the historical documents
17 in this case, do you believe that that is entirely
18 correct?
19      A.    Well, the reserves were that the
20 high-grade reserves were exhausted and that may have
21 been true that at that particular moment Molycorp
22 had no other exploration program in mind.
23      Q.    But was Molycorp also aware of the
24 presence of low-grade ore at the time of its DMEA
25 application?
0600
 1      A.    I am sure it was.
```

78

```
 2      Q.     What did the DMEA final report --
 3      A.     I guess I should say it was aware of the
 4   low-grade material.  No one knew yet whether it
 5   would qualify as ore.
 6      Q.     In the final report that DMEA issued, do
 7   you recall what DMEA concluded regarding the ore
 8   reserve that was located?
 9      A.     In general, yes.
10      Q.     And what is that?
11      A.     That it documented the three blocks of
12   probable ore and also documented a much larger
13   volume of low-grade material that was in the general
14   area of the Questa Mine about which little was known
15   as of yet.
16      Q.     And what happened next?
17      A.     Molycorp raised some more financing and
18   began an exploration, some more exploration from
19   that same level, the 7800-foot level.
20             In the beginning most of its exploration
21   was towards the Southwest and in what was called the
22   Southwest zone, and then in a year or two it began
23   to devote some attention to exploration in the
24   Northeast zone as well.
25             And would you like me to elaborate or just
0601
 1   in general?
 2             THE COURT:  Just answer the question.
 3             THE WITNESS:  Yeah, I am just wondering
 4   how much detail I should get into.
 5      Q   (By Mr. Harrison) That is good for now,
 6   thank you.
 7      A.     Okay.
 8      Q.     You mentioned the 7800 level.  Was the
 9   DMEA-funded drilling at a different elevation and in
10   a different block of ground as the open pit mine
11   that was ultimately developed?
12             MR. TODD:  Objection, Your Honor, that
13   exceeds the scope of cross.  Dr. Quivik has a
14   lengthy dissertation in his direct testimony on the
15   relative location between the DME discover and the
16   open pit.  As you recall we discussed it with
17   Dr. Rigby yesterday.  I asked no questions at all
18   about that testimony, so this is beyond the scope of
19   cross.
20             THE COURT:  Sustained.
21      Q   (By Mr. Harrison) In your opinion as a
22   mining historian, could Chevron have entered into a
23   joint venture or other arrangement in an effort to
24   develop a low-grade ore body?
25             THE COURT:  Counsel, how can an historian
0602
 1   say what Chevron might have done under a different
```

```
 2    set of circumstances?
 3              MR. HARRISON:  Understood.
 4         Q.    (By Mr. Harrison)  Dr. Quivik, are you
 5    aware of joint ventures that occurred between mining
 6    companies in the mid-20th Century?
 7         A.    Yes.  Including between Molycorp and
 8    Kennecott.
 9         Q.    Could you just briefly describe that,
10    please?
11         A.    At the time that the -- in the mid-'50s
12    and at the time that the DMEA exploration program
13    was underway, Molycorp had a joint venture going
14    with Kennecott for a mine in Québec.
15              And in other mining districts I have
16    researched in the course of doing work on Superfund
17    litigation, I have encountered a number of those
18    kinds of instances when, or in which the owner of a
19    set of mining claims entered into a joint venture
20    with another usually larger mining company to have
21    the larger mining company finance or help finance
22    the exploration and oftentimes actually do the work,
23    at least lend expertise and that sort of thing.
24         Q.    As part of your testimony in this case did
25    you develop an opinion as to the location of the ore
0603
 1    bodies that were identified through DMEA?
 2         A.    Yes.
 3         Q.    Did you come across any -- in developing
 4    that, did you come across any documents to support
 5    that position?
 6         A.    Yes.
 7         Q.    What were some of those documents?
 8         A.    Well, Molycorp's final report, 1960.  And
 9    then there were other documents that referenced that
10    report, the OME's final report.  Well, the
11    certification is based on those reports.  I don't
12    recall that the certification necessarily specifies
13    three blocks of material.
14              And then they were subsequently
15    referenced, for instance, when Molycorp filed the
16    patents and mining claims, and there was reference
17    to those blocks beneath some of the mining claims
18    Molycorp patented.
19         Q.    In your review of the documents in this
20    case, when was the extent of the ore body final and
21    fully understood?
22         A.    Well, the most recent information I have
23    seen is a 2009 USGS document.  A document that
24    Dr. Rigby uses twice in his direct testimony for
25    illustrating the Questa area.
0604
 1              MR. HARRISON:  Can we show CX363, please.
```

```
 2    If we could turn --
 3        Q.    (By Mr. Harrison)   Is this the document
 4    you are referring to?
 5        A.    Yes.
 6              MR. HARRISON:   If we could turn to Page 5?
 7              MR. TODD:   Your Honor, I will interpose an
 8    objection again on exceeding the scope of cross, if
 9    I am correct as to where Mr. Harrison is going with
10    this.
11              THE COURT:   I will overrule it at this
12    time.
13              MR. HARRISON:   If we could zoom in on the
14    area, there.
15        Q.    (By Mr. Harrison)   Could you please
16    explain what this map shows with respect to the ore
17    bodies at the Questa site?
18        A.    Yes, this shows the -- Your Honor, you can
19    see a kind of brown horseshoe-shaped body there.
20    That is what is called the central ore body and in
21    case you are interested, the Northern part of that
22    was oftentimes called the Northeast zone and the
23    southern part oftentimes called -- excuse me, the
24    Northeast zone and then the Southwest zone.
25              And it wasn't until relatively or recently
0605
 1    from the literature that people understood that that
 2    was one horseshoe-shaped ore body.
 3              And then off to the northeast we can see
 4    underneath the outline of the open pit another ore
 5    body that is identified as the Sulphur Gulch ore
 6    body.  And just to the -- there is a little line
 7    separating those two.  I don't know if you can see
 8    that, Your Honor.  There is a little lobe of the
 9    yellow material that is kind of right in the middle
10    of the horseshoe.  And then just to the -- extending
11    downward and on this drawing and towards the right,
12    there is a line there.  That is an outline, and it
13    is demonstrating that the Sulphur Gulch ore body is
14    a distinct ore body from the central ore body.
15              And then on this page in the text
16    describing this illustration there is some
17    additional information which Dr. Rigby did not share
18    with the Court, and that points out that the open
19    pit is mining the Sulphur Gulch ore body and then
20    the central ore body is one of the other ore bodies
21    in the area.  It is at much greater depth, and that
22    would be an ore body that might have potential for
23    block cave mining.  But it is a distinct ore body
24    from the ore body that was being mined by the open
25    pit.
0606
 1              MR. TODD:   Your Honor, I renew my
```

2  objection and move to strike that entire answer.
3  That was entirely beyond the scope of cross.  That
4  was intended to --
5          THE COURT:  I will deny your motion to
6  strike, but I would suggest that you start a whole
7  new dialogue about stuff that was never discussed
8  before.
9          MR. HARRISON:  Understood, Your Honor.
10         Your Honor, if I may on that point,
11 Dr. Rigby testified yesterday as to two new
12 demonstrative exhibits on the easel.  And in the
13 normal course of a trial, Dr. Quivik would have been
14 provided the opportunity to testify as to those
15 during his direct examination.
16         THE COURT:  Well, he could have here, too.
17         MR. HARRISON:  We were not aware of the
18 drawings that were made on the easel yesterday at
19 trial, and so we were wondering, or with the Court's
20 indulgence, I would like to ask a few questions of
21 those two demonstrative exhibits that Dr. Rigby drew
22 yesterday in court that Dr. Quivik can testify to is
23 the first time he has seen images like that?
24         THE COURT:  And as a, what, industrial
25 historian it is relevant?
0607
1          MR. HARRISON:  Dr. Quivik's rebuttal
2  report does address certain areas of Dr. Rigby's
3  report pertaining to the location and cites of
4  drilling that was done in the open pit area.
5          THE COURT:  What significance is it?
6          MR. HARRISON:  The significance is that it
7  goes to show the demonstrative goes to show that the
8  marks on there are not approximate and not accurate
9  as to where the actual drilling occurred and --
10         THE COURT:  So what?  I mean, I don't
11 think that that is an issue here.  Nobody is saying
12 that they drilled in the wrong place or that the
13 lines are anything other than approximations.  This
14 is a whole new area you are getting into.
15         MR. HARRISON:  Understood, Your Honor.  I
16 think the point is that the drilling did not
17 directly lead to the area of the open pit.
18         THE COURT:  What significance is it?
19         MR. HARRISON:  I will move on, Your Honor.
20 Thank you.
21         THE COURT:  All right.  Thank you.
22    Q    (By Mr. Harrison) So, Dr. Quivik, after the
23 DMEA program ended in 1960, Chevron ultimately
24 decided to develop an open pit mine?
25    A.   Yes.
0608
1     Q.   Could you explain, based on your review of

2   the historical documents in this case, the efforts
3   that went into Chevron's development of the open pit
4   mine, briefly, please?
5        A.    Well, after about three more years of
6   exploration in an area much larger than had been
7   explored under the DMEA program, Molycorp began
8   exploring in an area that is now the open pit and
9   the indications that that held promise as an open
10  pit was the fact that there was a lot of molybdenum
11  in the soils on the surface there.
12            And that led Molycorp to identify that
13  area as a target distinct from the northwest, the
14  Northeast zone and the Southwest zone.  And that
15  exploration ultimately led Molycorp to raise the
16  money to actually develop an open pit mine there and
17  that mine began operating in late '65 and full-scale
18  operation in '66.
19       Q.    You were asked a lot of questions today
20  about mining claims and mill sites and unpatented
21  claims versus patenting of those claims, so I would
22  like to ask you some questions about those now, as
23  it relates to the open pit mine.
24            What is the significance of Chevron's
25  staking mining and mill site claims for the land
0609
1   around the open pit?
2            THE COURT:  I'm sorry, I don't understand
3   that question.
4        Q    (By Mr. Harrison) Did Chevron stake mining
5   and mill site claims around the open pit?
6        A.    Yes.
7        Q.    Why did it do that?
8        A.    Well, the mining claims that it staked
9   around what became the open pit it had already
10  staked.
11            There was a core group of mining claims
12  and then as Molycorp came to recognize that it
13  appeared that there is more and more area of
14  mineralized, potentially mineralized with
15  molybdenum, it staked mining claims on a pretty
16  large area that I think was something like 12 miles
17  long and several miles wide.
18            And the Questa Mine is roughly at the
19  middle of that area, and so the significance of
20  staking those claims is that Molycorp had a pretty
21  good idea that there was a lot more molybdenum in
22  the area and it wanted to make sure that it had the
23  rights to explore, develop and possibly mine those
24  potential mineral deposits and not a competitor.
25            We know from the history that at one point
0610
1   Climax was in the area trying to stake mining claims

83

```
 2   as well.
 3          The significance of Molycorp staking mill
 4   site claims is that Molycorp could only gain title
 5   to a mining claim if they could demonstrate that
 6   they had discovered a mineral, and then they could
 7   apply for patent.  If they needed other lands to
 8   support their mining activities for milling, for
 9   disposing of waste, for building support facilities,
10   any of the kinds of things that would have to occur
11   to support a mining activity, the Mining Law of 1872
12   gave them a right to stake mill site claims.
13          And they could locate them, again, without
14   notifying the Government that they were doing so,
15   without asking permission to do so and they could
16   start using them immediately.  And in order to apply
17   for patent to those mill site claims, they had to
18   have occupied the mill site claim, meaning they had
19   to have some kind of improvement on the mill site
20   claim.
21          So they were using that as a method to
22   acquire land they needed if they didn't think that
23   they could acquire it through the mining claim
24   route.
25      Q.    And so one of the uses of the mill site
0611
 1   then is for waste disposal?
 2      A.    Yes.
 3      Q.    Did you review any documents pertaining to
 4   waste-rock disposal and the capacity of that at the
 5   Questa site?
 6      A.    I am not sure what you mean by capacity.
 7      Q.    Did you review any corporate documents
 8   that analyzed the location of waste-rock piles and
 9   plans for waste-rock dumping?
10      A.    Yes, both feasibility studies and other
11   planning documents.
12          MR. HARRISON:  Could we show CX282.
13      Q.    (By Mr. Harrison)  This is the 1972
14   feasibility study.  Is this one of the documents
15   that you reviewed?
16      A.    Yes.
17          MR. HARRISON:  If you could turn to
18   Pages 18 and 19.
19      Q.    (By Mr. Harrison)  Dr. Quivik, what is
20   your opinion as to the -- at the bottom of Page 18,
21   the dumps available and future dumps sections?
22          MR. TODD:  Objection, exceeds the scope of
23   cross.  Again, I asked no questions about the actual
24   mechanics of the valley fill plan.
25          THE COURT:  That's correct.
0612
 1      Q     (By Mr. Harrison) Dr. Quivik, do you see on
```

```
 2    Page 19 -- strike that.
 3             You were also asked about the tailings
 4    pipeline areas and the special use permit.
 5             Do you recall that testimony?
 6       A.    Yes.
 7       Q.    And you were asked whether it was a
 8    discretionary act of the Forest Service to grant the
 9    special use permit?
10       A.    Yes.
11       Q.    Did you hear Mr. Fredley's testimony
12    yesterday that the process that the Forest Service
13    went through was proper?
14       A.    Yes.
15       Q.    You were also asked about the BLM land
16    exchange and the appraisal report, which was CX259.
17             Do you recall being asked about that
18    today?
19       A.    BLM land exchange?
20       Q.    Excuse me, the public sale auction.
21       A.    Yes, okay.  Could you repeat the question,
22    please.
23       Q.    Yes.
24             You were also asked about the appraisal
25    report from the BLM public land sale auction?
0613
 1       A.    Yes.
 2       Q.    And do you recall in there you were shown
 3    that it was the, quote, highest and best usage of
 4    that area for the tailings impoundment area?
 5       A.    Yes.
 6       Q.    What is the purpose of an appraisal report
 7    as part of this land, the public sale land auction?
 8       A.    Well, I think that there are a couple of
 9    functions.  One is to try to get a sense of what the
10    value might be.  And another is to assess or
11    appraise its possible uses and to allow that
12    information to inform the Government of whether or
13    not this would be a sale that would be proper and in
14    the public interest as well as, of course, the
15    person who wants to purchase it.
16       Q.    So the public uses that were identified in
17    the appraisal report, those aren't the required
18    usage, uses of the property, is it?
19       A.    No.
20       Q.    What could a mining company like Chevron
21    do on Federal lands once it located a mining or mill
22    site claim?
23       A.    Anything as long as they are not violating
24    the law.  And if it is in the Forest Service, then,
25    of course, they can't do commercial logging and
0614
 1    stuff like that.
```

85

2       Q.     And what could the Federal Government do
3   once a mining company or individual had located
4   claims on Federal lands?
5       A.     Well, in many instances the Federal
6   Government wouldn't even know about it until years
7   later if a patent was applied for.
8              And if the Federal Government did know
9   about it, I suppose the Government could look to see
10  if there were any laws being violated.  But other
11  than that, pretty much nothing.
12      Q.     You were asked on direct a lot of
13  questions about the January 1969 meeting and were
14  asked to make a lot of assumptions about what was
15  discussed or not discussed or what was presented and
16  what was not presented.
17             THE COURT:  You said on direct
18  examination?
19      Q    (By Mr. Harrison) Excuse me, your
20  cross-examination.
21             Do you recall being asked those questions?
22      A.     Yes.
23      Q.     In your review of the documents in this
24  case to form your opinion -- strike that.
25             What documents did you rely on to form
0615
1   your opinion about the January 1969 meeting?
2       A.     The handwritten notes that I saw during my
3   cross-examination and the reference to that meeting
4   in, I believe it is the 1972 planning or feasibility
5   study, where that conference appears to be
6   referenced.  And I think those are the -- well, and
7   then in February in Mr. Watson's letter to the
8   Forest Service suggesting that Molycorp would like
9   to move towards a land exchange.  There is a
10  reference to the conference, but it says little
11  about it other than the idea of a land exchange was
12  suggested.
13      Q.     As an historian would you have expected
14  other documents from the January 1969 meeting to
15  have been preserved or at least part of the records
16  of either Chevron or the Forest Service?
17             MR. TODD:  Objection, calls for
18  speculation.
19             THE COURT:  Sustained.
20      Q    (By Mr. Harrison) So you just mentioned the
21  February 20, 1969 letter.
22             MR. HARRISON:  If we could bring that up,
23  please, CX212.
24      Q.     (By Mr. Harrison)  Is this the letter
25  where Chevron requests the land exchange?
0616
1       A.     Yes.  It is not the formal application,

```
 2    that came later in the year, but this is the letter
 3    in which Molycorp says that it is going to apply for
 4    a land exchange.
 5         Q.    In your review of the documents in this
 6    case, did you come across any correspondence or
 7    other documents to suggest that Chevron was not
 8    intent on pursuing the land exchange after this
 9    point?
10         A.    No.
11         Q.    And so I just want to be clear when I ask
12    you a few questions about this and the subsequent
13    letters, but are there two issues going on at this
14    time with respect to the Forest Service and
15    Molycorp?
16         A.    Well, I guess there is, there remains the
17    question because Mr. Watson brings it up here of
18    whether Molycorp could get the land by following the
19    mill site route, and so that is a question.
20               And then will the land exchange work, so
21    those are the two issues that are still being
22    explored here by Molycorp, which of those routes
23    would be preferable.
24         Q.    But these communications don't pertain to
25    the Red River plan that you have heard about?
0617
 1               MR. TODD:  Objection, leading.
 2               THE COURT:  Sustained.
 3         Q    (By Mr. Harrison) Do these plans refer to
 4    the Red River plan, or excuse me, does this letter
 5    refer to the Red River plan or anything related to
 6    property that is on the south side of the river and
 7    highway?
 8         A.    No.
 9         Q.    And, in fact, you were asked in your
10    cross-examination about the top of Page 2 of this
11    document, the first two paragraphs, or maybe the
12    first three.
13               MR. HARRISON:  If we could turn to Page 2.
14         Q.    (By Mr. Harrison)  The first sentence
15    references Parcels 1 and 2.  What is your
16    understanding as to where those parcels are located
17    on the site?
18         A.    They are all on the north side of the
19    river.  Parcel 1 is basically a little bit southeast
20    of the open pit mine and then there is a strip of
21    mill site claims overlaying what is called the Moly
22    tunnel, and that is the axis into the underground
23    workings from basically along the river.  And
24    Molycorp had acquired that land through mill site
25    claims.
0618
 1               And then the rest of it is, the major
```

2    portion of the acreage is, I will say southwest,
3    west and a little bit northwest of the open pit
4    mine.
5         Q.    And if you will look at the last paragraph
6    on the call-out it says, "As you know, from our
7    conference Molycorp originally contemplated located
8    mill sites in most of this area."
9              What is your understanding as to what
10   "this area" means?
11        A.    The area being proposed, Parcels 1 and 2
12   for the land exchange.
13        Q.    Not the area south of the river?
14        A.    Correct.
15        Q.    Around this time did Molycorp also propose
16   an idea about fan-shaped mill sites?
17        A.    Yes.
18              MR. HARRISON:  If I could show CX216 at 3.
19        Q.    (By Mr. Harrison)  You were asked on your
20   cross-examination about the extent to which these
21   mill site proposed mill sites went south.
22              Do you recall being asked those questions?
23        A.    Went south of the river?
24        Q.    Correct.
25        A.    Yes.
0619
1         Q.    And in reviewing this document where do
2    the proposed mill sites end?
3         A.    Well, again, it is my contention that this
4    is more of a sketch map than a precise survey map,
5    and so the edges are just south of the highway.
6         Q.    Are you aware of Chevron ever staked these
7    fan-shaped claims?
8         A.    I have seen no documentation that these
9    were ever staked or located.  I think this was a
10   sketch to illustrate to the Forest Service an idea
11   and explore the possibilities of pursuing this idea.
12        Q.    And you heard the testimony earlier this
13   week about the fan-shaped plan, it was an end around
14   of the mill site requirements?
15        A.    I can't remember if that exact wording was
16   used, but anyhow, it was a way to be able to stake
17   and patent a lot of mill sites instead of having to
18   do them in sequence as waste rock made its way down
19   the hills onto additional mill site claims.
20        Q.    So it made it easier for Chevron, it would
21   have made it easer to Chevron to be able to patent
22   those mill site claims?
23        A.    Had Chevron pursued this route, yes.
24              MR. HARRISON:  If we could go to CX216.
25        Q.    (By Mr. Harrison)  You were also asked
0620
1    about this question on your cross-examination, but I

```
 2   want to ask about a different issue in here, the
 3   third paragraph starts with, "With regard to"?
 4       A.    Yes.
 5       Q.    What is your understanding of this
 6   paragraph and the statements about the need to
 7   relinquish or adjudicate the unpatented mining
 8   claims?
 9       A.    It is my understanding that the Forest
10   Service could not have engaged in the land exchange
11   if there were already claims to the land to be
12   exchanged.
13            And to be very precise, that meant even
14   claims owned by the party that would receive these
15   lands in a land exchange.  So the Forest Service
16   would want to make sure that those claims, those
17   mining claims were relinquished before the exchange
18   could be completed.
19       Q.    And the Forest Service also mentions there
20   was an alternative to the relinquishment of those
21   claims and that would be a validity contest?
22       A.    Yes.
23       Q.    And, again, this goes to the tracts
24   adjacent to the open pit mine?
25       A.    Yes.
0621
 1       Q.    That ultimately ended up being the subject
 2   of the land exchange?
 3       A.    Yes, plus some additional lands.
 4       Q.    In your review of the documents, were
 5   there, in fact, conflicting or pending claims on
 6   some of the land exchange land?
 7       A.    Yes.
 8       Q.    And in your review of the documents, do
 9   you recall seeing a suggestion from Chevron that the
10   Forest Service initiate a validity contest to
11   resolve those claims?
12       A.    Yes.  They were claims owned by a couple
13   of other parties and Chevron suggested initially
14   that perhaps the Forest Service could initiate a
15   validity claim, a validity contest against those
16   claimholders.  And if it demonstrated that they were
17   not mineralized and therefore invalid claims, then
18   they could be included in the land exchange.
19            As I recall, Molycorp decided, for
20   expediency, they would just drop that issue for the
21   time being and that is why when you look at a map of
22   what Parcel 2 looks like, there is kind of a
23   rectangular area to the southwest that was omitted.
24            Once Molycorp resolved those conflicting
25   claims, it then applied for a land exchange and
0622
 1   received patent to those claims as well.
```

89

```
 2       Q.     So also in this letter --
 3              MR. HARRISON:  If we could go to the top
 4   of Page 2.
 5       Q.     (By Mr. Harrison)  -- discusses not only
 6   the land exchange process that we just talked about
 7   with the relinquishment or the validity contest, but
 8   it also discusses the shape of the mill site claims
 9   that we were just discussing.
10              Do you see that?
11       A.     Yes.
12       Q.     And what does the Forest Service say about
13   the shape of the claims as it pertains to the
14   possible patenting of them?
15       A.     "We doubt that the Mining Law contemplated
16   individual site claims of 2,000 to 3,000 feet in
17   length and we would prefer 5-acre mill sites that
18   were rectangles to conform with legal subdivisions
19   on surveyed land."
20       Q.     And it also notes concern about the
21   fan-shaped nature of the mill sites?
22       A.     Yes, the shape of the mill site claims as
23   proposed.
24       Q.     In your experience -- strike that.
25              In your review of the documents in this
0623
 1   case, did you see any other proposed mill sites or
 2   mining claims, or actual mill sites or mining claims
 3   where Chevron put forward something other than a
 4   rectangular shape or something similar to that?
 5       A.     The one -- they are 90-degree angles.
 6   There was a set of mill site claims along the river
 7   and the Forest Service already had a use for, I
 8   believe it was a campground, and so there was
 9   already a use for kind of the southeast end of some
10   of those claims.  And I forget now who suggested the
11   solution, but if you will look at the property
12   boundary of those claims combined, it is kind of a
13   sawtooth pattern along there, so it is all 90-degree
14   angles but they're not rectangles, probably
15   speaking.
16       Q.     But nothing like the fan-shapes or the
17   long skinny mill sites that are here?
18       A.     Correct.
19       Q.     You were asked in your cross-examination
20   if the Forest Service rejected Molycorp's mill site
21   applications for the area that was -- that we have
22   seen before on CX216 at Page 3, the fan-shaped mill
23   sites.
24              Do you recall being asked that question?
25       A.     If the Forest Service rejected them?
0624
 1       Q.     Yes.
```

```
 2              MR. TODD:  Objection, Your Honor.
 3      A.    I don't recall that precise question, no.
 4      Q     (By Mr. Harrison) To your knowledge, did
 5  Chevron ever apply for patents on those mill sites?
 6      A.    No.
 7      Q.    Did Chevron continue dumping on the area
 8  adjacent to the open pit while the land exchange was
 9  pending?
10      A.    Yes.
11              MR. HARRISON:  With the Court's
12  indulgence.
13              THE COURT:  Thank you.  You may step down.
14              (Whereupon, the witness was excused.)
15              THE COURT:  You may call your next
16  witness.
17              MR. HOSHIJIMA:  The United States calls
18  Dr. Jay Brigham.
19              THE COURT:  Brigham?
20              MR. HOSHIJIMA:  Brigham, yes.
21              (Whereupon, the witness was sworn.)
22              THE COURT REPORTER:  Please state and
23  spell your full name for the record.
24              THE WITNESS:  My name is Jay Brigham.  My
25  last name is spelled, B-R-I-G-H-A-M.
0625
 1              THE COURT:  You may proceed.
 2              MR. HOSHIJIMA:  Dr. Brigham, did you
 3  submit written direct testimony for this case?
 4              THE WITNESS:  Yes, I did.
 5              MR. HOSHIJIMA:  Have you identified a
 6  small correction to a citation in that written
 7  direct?
 8              THE WITNESS:  Yes, I have.
 9              MR. HOSHIJIMA:  In Paragraph 36 should the
10  citation to USX082.001 actually be a citation to
11  another page in the same document, which is
12  USX082.0012?
13              THE WITNESS:  That is correct.
14              MR. HOSHIJIMA:  Does that correction
15  change the substance of your testimony?
16              THE WITNESS:  No, it does not.
17              MR. HOSHIJIMA:  With that correction is
18  your written testimony true and correct to the best
19  of your knowledge?
20              THE WITNESS:  Yes.
21              MR. HOSHIJIMA:  The United States offers
22  Dr. Brigham's direct testimony.
23              THE COURT:  Thank you.
24              (Dr. Jay Brigham's direct testimony was
25  prefiled and admitted.)
0626
 1                      CROSS-EXAMINATION
```

```
 2      BY MR. HOPSON:
 3      Q.    Good afternoon, Dr. Brigham.
 4      A.    Good afternoon, Counsel.
 5      Q.    I don't think we have ever met, I am Mark
 6  Hopson.   I am one of the lawyers representing
 7  Chevron in this case.
 8      A.    Nice to meet you, sir.
 9      Q.    I have seen you in the courtroom.  I think
10  we have exchanged nods a couple of times?
11      A.    I believe you are correct.
12      Q.    Dr. Brigham, you offer up an opinion and I
13  am actually reading from your direct testimony at
14  Paragraph 46, that the U.S. historical policies with
15  respect to molybdenum had virtually no direct impact
16  on Molycorp's mining operations at Questa, right?
17      A.    That's correct.  I take your word that you
18  read it correctly.
19      Q.    Okay.  Just two qualifiers there.  Your
20  report really did focus on direct impacts not
21  indirect impacts, correct?
22      A.    My report was looking at what I would say
23  is high-level Government policies really beginning
24  right before the Second World War into the
25  mid-1970s.
0627
 1      Q.    And in reaching that opinion I think we
 2  can agree you did not consider every Federal agency
 3  policy or Federal agency action that might have had
 4  an impact on the Questa Mine, correct?
 5      A.    Yes, sir.
 6      Q.    What you did look at is programs like the
 7  Defense Plant Corporation, that was one of them,
 8  right?
 9      A.    Yes, sir.
10      Q.    You looked at the Emergency Plant
11  Facilities Contract program, right?
12      A.    Yes.
13      Q.    And without going through all of them, you
14  also looked at a Certificate of Necessity program
15  that provided for accelerated tax depreciation,
16  correct?
17      A.    That's correct.
18      Q.    And you agree that Molycorp would not
19  necessarily have had to apply for or receive one of
20  these specific benefits to be encouraged to increase
21  production?
22      A.    I believe that's correct.
23      Q.    Now, your focus, as you said, was on these
24  World War II era and Korean War era programs, right?
25      A.    Those were two of my focuses.
0628
 1      Q.    Right.  You didn't consider, for example,
```

```
 2    whether the Mining Law of 1872 had any impact on how
 3    Molycorp developed the Questa Mine?
 4         A.    I did not examine the 1872 Mining Law.
 5         Q.    Okay.  And you didn't consider to what
 6    extent the Forest Service's Northern New Mexico
 7    policy caused the Forest Service to encourage or
 8    take actions to facilitate the mining at Questa,
 9    right?
10         A.    I did not look at that.
11         Q.    You didn't focus on whether special use
12    permits were granted to Molycorp by the Forest
13    Service to enable or facilitate the development of
14    the mine?
15         A.    I did not.
16         Q.    You didn't consider the extent to which
17    the land exchange, which we have talked a lot about,
18    facilitated or encouraged the development of the
19    Questa Mine?
20         A.    I did not.
21         Q.    You didn't look at the extent to which the
22    land exchange actually affected the current location
23    of mine waste at the Questa site?
24         A.    No, I did not.
25         Q.    And you also didn't consider any actions
0629
 1    of the Bureau of Land Management and how that might
 2    have impacted the Questa Mine?
 3         A.    No, I did not.
 4         Q.    That includes, of course, looking at sales
 5    of land by the BLM, rights of way granted to
 6    Molycorp by the BLM, and easements granted to BLM.
 7    That is all excluded from the basis of your opinion,
 8    right?
 9         A.    That's correct.
10         Q.    One of the things that you looked at, in
11    addition to what we have already talked about, is
12    the operation of the U.S. Government's stockpile of
13    molybdenum and you looked both at the so-called
14    Metals Reserve Company and the later national
15    stockpile, correct?
16         A.    Yes, sir.
17         Q.    And you do agree that molybdenum was
18    considered a strategic and critical mineral that was
19    on the United States' stockpile list until 1970?
20         A.    Yes.
21         Q.    And molybdenum actually physically
22    remained in the U.S. Government's stockpile until
23    1975?
24         A.    The sales to remove or to get rid of the
25    molybdenum, if you will, from the stockpile had been
0630
 1    made but the deliveries had not yet been, the
```

93

2  deliveries had not yet been done.
3      Q.    Just like any other stockpile, they just
4  gradually sold it off, right?
5      A.    Yes, gradually.
6      Q.    You do know that only two companies
7  produced molybdenum primarily, and those were Climax
8  and the Questa Mine, correct?
9      A.    Yes.
10     Q.    And we can agree, I think, that you don't
11 have to sell to or buy from the stockpile to
12 recognize that if the Government is making a market
13 it can affect the price, right?
14         (Brief pause in proceedings.)
15     Q.    (By Mr. Hopson)  We both understand that
16 the Government's purchases could increase demand and
17 have an affect on price, right?
18     A.    It could, yes, sir.
19     Q.    And releasing materials, selling materials
20 from the stockpile could cause prices to go down?
21     A.    That is certainly the case, although, as I
22 testified to in my deposition referencing the
23 Government's 30(b)(6) witness, the Government was
24 very cognizant of that and took steps to avoid it.
25 And I also think that comes through in the
0631
1  documentation.
2      Q.    Right.  They didn't want to dump a lot of
3  materials from any stockpile on the market at once
4  and drive down the price, right?
5      A.    Yes.  They are very cognizant of not
6  wanting to negatively impact any one industry.
7      Q.    Now, we have to go back a little ways, but
8  you do write that the United States did purchase
9  some molybdenum from Molycorp during World War II,
10 right?
11     A.    Yes, sir.
12     Q.    And you used a document that lists war
13 supply contracts, but only those contracts above
14 $50,000?
15     A.    That's correct.  That is the caveat with
16 that document.
17     Q.    Right.  But you found that Molycorp had
18 ten contracts totaling $2,371,000 to sell molybdenum
19 to the stockpile, correct?
20         I could pull the document up.  This is not
21 a memory test, if you want me to pull the document
22 up.
23     A.    I know the document quite well and your
24 characterization of it is correct, however, I
25 believe those sales were actually to the Treasury
0632
1  Department which I would believe meant that they

94

```
 2   were going into the land lease program.
 3       Q.    Fair enough.
 4             And from all we can tell, that molybdenum
 5   did come from the Questa Mine, right?
 6       A.    I am not 100 percent sure of that.  It
 7   certainly could have.  It is my understanding that
 8   Molycorp also had the roasting facilities that was
 9   actually from the roasting facilities according to
10   that document.  And perhaps the molybdenum came from
11   either Questa or from another party that Molycorp
12   purchased it from.
13       Q.    Are you referencing Urad, the roasting
14   facility there?
15       A.    I know Urad was, had some production
16   during the war, they had some labor issues as well.
17   I am not sure if they could have also been
18   purchasing from a third party.
19       Q.    Fair enough.
20             You're familiar with the DMEA program,
21   isn't that correct?
22       A.    That is correct.
23       Q.    In fact, you have researched the DMEA
24   program for other expert testimony or expert reports
25   that you provided over time, right?
0633
 1       A.    Yes, I have.
 2       Q.    And you know the DMEA was established to
 3   encourage production of strategic minerals?
 4       A.    Yes.
 5       Q.    And one of those minerals was molybdenum,
 6   right?
 7       A.    Yes, it was one of a number.
 8       Q.    And while you didn't focus on it, you did
 9   note in your testimony that the U.S. entered into a
10   DMEA loan with Molycorp in May 1957, right?
11       A.    Yes, sir.
12       Q.    And you know, because of your other
13   background, that the U.S. Geological Survey or the
14   Bureau of Mines would often go on-site and provide
15   some technical advice or assistance in the context
16   of negotiating these DMEA contracts, right?
17             MR. HOSHIJIMA:  Objection.  It goes beyond
18   the scope of the direct exam in which we did not
19   have Dr. Brigham look at the DMEA program in the
20   context of this site.
21             MR. HOPSON:  It is impeachment,
22   Your Honor.  His broad opinion is narrowed by not
23   looking at the DMEA program.
24             THE COURT:  Overruled.
25       Q    (By Mr. Hopson) So what I was asking you is
0634
 1   you know that Federal employees with expertise in
```

2    mining might go on-site, boots on the ground, to
3    offer advice and assistance to companies who are in
4    the process of seeking DMEA funding, correct?
5        A.    Yes, USGS and/or BOM employees.
6        Q.    And there could be some back and forth
7    between the applicant and the DMEA as these
8    contracts were negotiated, right, sir?
9        A.    That's correct.
10       Q.    You do know and have testified that at the
11   time of the DMEA contract, the underground mine had
12   pretty much played out and they were looking to stay
13   in business in Questa, right?
14       A.    Yes.
15       Q.    And you also know that Molycorp was hoping
16   that a DMEA contract and exploration would allow
17   that to happen?
18       A.    Well, I am certainly aware they made the
19   application and the application was approved.  I
20   think it was a good business decision to seek out
21   the funding.
22       Q.    Do you have any reason to believe it is
23   not accurate to say that the DMEA assistance enabled
24   Molycorp to explore new ore sources?
25       A.    Well, by definition under the DMEA program
0635
1    it had to be for exploration of new sources as
2    opposed to existing operations.
3        Q.    Right.  So the fact is the DMEA program
4    did enable Molycorp to explore for new ore sources,
5    right?
6        A.    Yes.
7              MR. HOPSON:  I have no further questions,
8    Your Honor.
9              THE COURT:  Thank you.
10             You may redirect.
11                   REDIRECT EXAMINATION
12   BY MR. HOSHIJIMA:
13       Q.    Dr. Brigham, you were asked at the
14   beginning of that cross-examination about various
15   World War II era programs that the Government had to
16   incentivize the production of certain materials,
17   correct?
18       A.    Yes.
19       Q.    You were asked about the Defense Plant
20   Corporation program?
21       A.    Yes, I was.
22       Q.    And a facilities contract program whose
23   name you will be able to tell me?
24       A.    The Emergency Facilities contract.
25       Q.    You were also asked just now about the tax
0636
1    depreciation program, correct?

```
 2      A.    Yes.
 3      Q.    Were any of those programs specific to
 4  molybdenum?
 5      A.    No.  In fact, they were economy-wide and
 6  quite broad in what especially Defense Plant
 7  Corporation, what could be funded.
 8      Q.    And you were asked and testified about how
 9  those were World War II and Korean War era programs,
10  correct?
11      A.    Well, to be accurate there was a World
12  War II set of policies and then they were reenacted
13  in September of 1950 with the Production Act.
14      Q.    You were asked whether there was World
15  War II and Korean War period policies would have had
16  an indirect impact on Molycorp's operations at the
17  Questa Mine, right?
18            MR. HOPSON:  That misstates the prior
19  testimony, Your Honor, objection.
20            THE COURT:  Restate your question.
21      Q     (By Mr. Hoshijima) These World War II and
22  Korean War policies, did they have a direct impact
23  on the Questa Mine?
24      A.    I don't think a direct impact, no.
25      Q.    Why not?
0637
 1      A.    Well, Molycorp did not -- chose not to
 2  participate in these programs, so that would to me
 3  mean they didn't have a direct impact.
 4      Q.    Mr. Hopson asked you whether they could
 5  nonetheless encourage or have encouraged Molycorp's
 6  production of molybdenum, correct?
 7      A.    If they had chosen to participate I think
 8  that could have happened.
 9      Q.    Supposing such encouragement could have
10  happened, what was happening in the timeline of the
11  Questa site at the time of these programs?
12      A.    Are we talking -- are you asking for both
13  World War II period and the Korean period?
14      Q.    Let's go one at a time.
15      A.    Well, that during World War II they,
16  obviously, the underground, the first underground
17  mine was still being operated and that actually was
18  the case during Korea, though I believe there were
19  some signs that the mineralized ore had started to
20  tail out.
21      Q.    All of these programs that Mr. Hopson
22  asked you about were before the open pit mine,
23  correct?
24      A.    Yes, sir.
25      Q.    How would you characterize generally the
0638
 1  United States' policy about defense-related
```

2   materials during World War II and the Korean War?
3       A.    Well, especially during World War II,
4   which was much larger in scale and scope in many
5   ways than Korea, but it also is applicable to the
6   Korean War period.  The concern was how to manage
7   scarcity.  There was an overwhelming demand for
8   metals, minerals, fuels, almost an endless list of
9   commodities and items, and the Government needed
10  to -- the Government had to institute programs to
11  encourage further development, further use and also
12  to make sure that those engaged in production for
13  either of the wars were receiving the materials over
14  those who were engaged in production that was not
15  essential to the war, or the wars in this case.
16      Q.    Was there any change in that national
17  defense policy by the time Molycorp had started the
18  open pit mine at Questa?
19      A.    Well, I believe, you know, you originally
20  asked me about wartime policies, which I described.
21  I do believe there was a change in the
22  United States' defense posture in the mid-1950s
23  after the Korean War.
24      Q.    How would you describe that change?
25      A.    The change was a result of the election of
0639
1   President Eisenhower, who pledged in the war in
2   Korea, which he did.  President Eisenhower also had
3   a very great concern about balancing the budget and
4   reducing defense spending.
5             To that end he came up with what was
6   deemed the New Look defense policy, which was much
7   more relying on the Air Force and the nuclear
8   deterrent, at that time, bombs but within a few
9   years missiles, as well as covert operations.
10            And again it was largely motivated by a
11  concern with spending and Federal spending.  I think
12  that impacts a lot of what we actually talked about
13  with the move away, you know, the decline in the
14  stockpile, the expense associated with it, excuse
15  me, and those types of things.
16      Q.    To be clear are we talking about --
17            MR. HOPSON:  Your Honor, I am going to
18  object.  This is very interesting but far beyond the
19  scope of my cross.
20            THE COURT:  That's correct.
21      Q     (By Mr. Hoshijima) How would you describe
22  the impact that a change in policy in the 1950s had
23  on the United States' defense interest in
24  molybdenum?
25            MR. HOPSON:  Beyond the scope, Your Honor.
0640
1             THE COURT:  Sustained.

98

2        Q      (By Mr. Hoshijima) You were asked on your
3   cross-examination about various other laws like the
4   Mining Law or the Northern New Mexico policy.
5              Do you recall that?
6        A.     Yes.
7        Q.     And other Forest Service and land
8   management agencies policies, like special use
9   permits?
10       A.     I recall those questions.
11       Q.     Do you have expertise generally with the
12  United States' historic defense policy during this
13  time period?  And by that, I mean the '50s and the
14  '60s?
15       A.     Yes.
16       Q.     Were those programs considered important
17  parts of a national defense policy?
18       A.     Those aren't programs that I would
19  normally think of when I would be thinking of a
20  national defense policy.
21       Q.     You were also asked about the national
22  defense stockpile and molybdenum's inclusion in that
23  stockpile, correct?
24       A.     Yes.
25       Q.     You were asked about how there was
0641
1   molybdenum in that stockpile until the 1970s.
2              Do you recall that?
3        A.     I recall those questions.
4        Q.     When does the amount of molybdenum in the
5   stockpile peak?
6        A.     It was in 1956.
7        Q.     Are you aware of the United States
8   purchasing any molybdenum for the stockpile at any
9   point after that time?
10       A.     No, I am not.
11       Q.     In fact was there a time after that when
12  the Government was diverting deliveries to the
13  stockpile?
14       A.     Well, it was in 1956 when they diverted,
15  first made a diversion from the stockpile.  And I
16  believe I might have misspoke a moment ago, it is
17  '56, '57 were the high points.
18       Q.     So why is it, then, that there is
19  molybdenum in the stockpile until the 1970s if the
20  Government's really not acquiring any more after the
21  mid-1950s?
22       A.     Well, there is a couple of reasons.  By
23  the late '50s Congress was starting to look at this
24  and there was concern about it, as I have mentioned.
25  The expense of maintaining the stockpile, not just
0642
1   molybdenum, but the entire stockpile, there is quite

99

```
 2   a few things in it.  It took Congress several years
 3   until 1962 to pass the first law to authorize sales
 4   out of it.
 5          And there were subsequent laws, obviously,
 6   but as I testified, there was a concern that you
 7   don't want to flood the market of molybdenum or any
 8   other market.
 9      Q.   You were asked at last about purchases
10   that the Government made of molybdenum from Molycorp
11   during World War II.
12          Do you recall that testimony?
13      A.   Yes.
14      Q.   You were asked if you could say whether
15   any of the molybdenum came from the Questa site.
16          Do you recall that?
17      A.   Yes.
18      Q.   What are the other possible sources that
19   Molycorp could have had for the molybdenum that it
20   sold to the United States in World War II?
21      A.   Well, as I believe I have testified, the
22   Urad mine in Colorado did have some production and
23   then it is possible that the roasting facilities at
24   Molycorp in Washington, New York, Pennsylvania,
25   perhaps purchased it on the market.
0643
 1      Q.   Are you aware of any evidence that would
 2   suggest one way or the other if it is more likely
 3   that the molybdenum that Molycorp sold under those
 4   contracts came from Questa or from one of those
 5   other sources?
 6      A.   I have seen nothing to indicate from where
 7   that material came from.
 8      Q.   Because we don't have that historical
 9   documentation anymore?
10      A.   That is correct.  Those contracts have
11   long since been destroyed.
12      Q.   Do you know if Molycorp ever sold
13   molybdenum to the United States at any point after
14   World War II?
15      A.   Not with certainty.
16      Q.   Are you aware of any evidence that the
17   Government purchased molybdenum from Molycorp after
18   World War II?
19      A.   Again, we don't have that, we don't have
20   that documentation.  I can't testify one way or the
21   other.
22      Q.   If Molycorp was not selling molybdenum to
23   the United States, who would it have been selling to
24   after World War II?
25      A.   Other private enterprise, steel companies,
0644
 1   other companies that would use molybdenum for one
```

100

```
 2   thing or another.
 3        Q.    Were private steel companies, then, the
 4   major consumers of molybdenum?
 5        A.    I know from the documentation that the
 6   majority of molybdenum went into steel, steel
 7   products into steel, yes.
 8        Q.    Do you know if most of those steel
 9   products would have eventually been bought up or
10   used by the United States Government?
11        A.    Well, I am sure some of those steel
12   products were used for by the Government for defense
13   or other purposes.  I would also suspect some went
14   to, into the private market.
15        Q.    Well, what were some of the possible uses
16   of that molybdenum containing steel in the private
17   market?
18        A.    Well, people use steel for many things.
19   You could use it for bridge building, you could use
20   it for any number of things.  You could use it in
21   the, you know, the '50s and the '60s were the age of
22   the big cars, they still had a lot of steel in them.
23   They wouldn't surprise me.
24        Q.    And when you say cars, are you talking
25   about passenger cars that private citizens would
0645
 1   use?
 2        A.    Yes, Detroit, for lack of a better phrase.
 3        Q.    You were asked by Mr. Hopson about the
 4   DMEA program.
 5              Do you recall that?
 6        A.    Yes.
 7        Q.    Now, to be clear, you weren't asked to
 8   review Molycorp's documentation or the documentation
 9   relating to Molycorp's DMEA contract, correct?
10        A.    Yes, I was, I was told that Dr. Quivik
11   would review that.  I was asked not to.
12        Q.    Nonetheless do you have general knowledge
13   of the DMEA program?
14        A.    Yes, I do.
15        Q.    And that is what Mr. Hopson asked you
16   about, correct?
17        A.    Yes, it is.
18        Q.    Where does that knowledge come from?
19        A.    I testified in my deposition, that was in
20   December of 2019, that I had worked on the Federal
21   resources case up in Northern Idaho.
22              Since my deposition I was asked to work on
23   the Gold King case involving the Domingo Mining
24   District in Colorado, and I looked at a number of --
25   well, actually they were DMEA and also OME
0646
 1   contracts.
```

2      Q.    Based on that other experience which
3  Mr. Hopson asked you about, do you have knowledge
4  about the end of the DMEA program?
5      A.    Yes, I do.
6      Q.    When and how did the DMEA program come to
7  an end?
8      A.    It officially came to an end in the spring
9  of 1958.
10           At that time it was decided that the
11 defense element of it was no longer needed.  So the
12 DMEA went out of business, so to speak, and the OME
13 replaced it.
14           The OME was -- and the documentation, it
15 is in the record, was that although you don't need
16 this encouragement for national defense, it is good
17 public policy, anyway, for sound economic growth.
18           One of the differences between the DMEA
19 and the OME is that under OME there was an interest
20 component added, so it is not quite as favorable as
21 it was under the DMEA.
22     Q.    You said it was in 1958 that the DMEA
23 program came to an end?
24     A.    That is when it officially came to an end.
25     Q.    That was less than a year after the DMEA
0647
1  contract in this case was signed?
2      A.    Yes.  I believe it was in May of
3  '58, so it was almost maybe exactly a year.
4      Q.    So the DMEA contract that was signed here
5  shortly before the end of the DMEA program, did the
6  United States honor it?
7      A.    Yes.
8            MR. HOSHIJIMA:  Let's quickly pull up
9  CX089, which has been previously admitted.
10     Q.    (By Mr. Hoshijima)  This is a 1958
11 Government report.
12           Are you familiar with this document?
13     A.    Yes, I have seen this.
14           MR. HOSHIJIMA:  Can you turn to PDF
15 Page 20 of the report.  Under the heading Enactment
16 of a New Program, can we magnify that first
17 paragraph.
18     Q.    (By Mr. Hoshijima)  Do you see where it
19 says that in 1957 ODM advised that there was no
20 longer a defense necessity for the DMEA program?
21     A.    Yes, I see that.
22     Q.    Is that consistent with your understanding
23 of the history of that program?
24     A.    Yes, it is.
25     Q.    And ODM, do you recall what that was?
0648
1      A.    I believe it is Office of Defense

```
 2   Management.
 3       Q.   The sentence after that it says that all
 4   minerals and metals expansion goals had been filled
 5   and stockpiles of most such commodities were now
 6   sufficient.
 7            Is the history of the United States'
 8   stockpile of molybdenum consistent with that
 9   statement?
10       A.   Yes, it is.
11            MR. HOSHIJIMA:  I have no further
12   questions.
13            THE COURT:  Thank you.
14            You may step down, sir.
15            THE WITNESS:  Thank you, Your Honor.
16            (Whereupon, the witness was excused.)
17            THE COURT:  You may call your next
18   witness.
19            MR. AUGUSTINI:  No more witnesses,
20   Your Honor.
21            THE COURT:  Thank you.  We are out of
22   witnesses.  Do we have any idea when the next
23   witness will be available?
24            MS. CRISHAM PELLEGRINI:  Your Honor, we
25   just spoke with Dr. Haddad and his mother
0649
 1   unfortunately took another turn for the worse and is
 2   in the hospital, so he is still unclear as to when
 3   he will be available, but he is hoping to find that
 4   out shortly.  He will let us know and then we can
 5   confer with the Government.
 6            THE COURT:  Very good we will go into
 7   recess and wait on how his mom does and we will try
 8   to set up a date, as I say, probably the week after
 9   next at the earliest, depending on what happens to
10   me in Denver.
11            So thank you-all for your presentations,
12   they were very helpful, and we'll be in recess
13   subject to call.
14            (Proceedings concluded at 2:57 p.m.)
15
16
17
18
19
20
21
22
23
24
25
0650
 1                  REPORTER'S CERTIFICATE
```

```
2
3          I certify that the foregoing is a correct
4     transcript from the record of proceedings in the
5     above-entitled matter.  I further certify that the
6     transcript fees and format comply with those
7     prescribed by the Court and the Judicial Conference
8     of the United States.
9
10    Date:  March 16, 2022
11
12                    _____
13                    PAUL BACA, RPR, CCR
                      Certified Court Reporter #112
14                    License Expires:  12-31-2022
15
16
17
18
19
20
21
22
23
24
25
```